LIONEL Z. GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
ROBERT V. PRONGAY (#270796)
CASEY E. SADLER (#274241)
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com
        lglancy@glancylaw.com
        mmgoldberg@glancylaw.com
        rprongay@glancylaw.com
        csadler@glancylaw.com

JOSEPH P. GUGLIELMO
DONALD A. BROGGI
JOSEPH D. COHEN (#155601)
SCOTT+SCOTT LLP
The Chrysler Building
405 Lexington Avenue 40th Floor
New York, NY 10174
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
E-mail: jguglielmo@scott-scott.com
        dbrogi@scott-scott.com
        jcohen@scott-scott.com

*Attorneys for Plaintiff*
[Additional counsel on signature page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANIKA R. RIECKBORN, Individually and on Behalf of All Others Similarly Situated, | Case No.**:** |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| VELTI PLC, ALEX MOUKAS, WILSON W. CHEUNG, and JEFFREY G. ROSS, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Anika R. Rieckborn ("Plaintiff"), by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Velti plc ("Velti" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Velti; and (c) review of other publicly available information concerning Velti.

**NATURE OF THE ACTION AND OVERVIEW**

1.      This is a class action on behalf of purchasers of Velti's securities between January 27, 2011 and August 20, 2013, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Velti engages in the provision of mobile marketing and advertising technology and solutions for brands, advertising agencies, mobile operators, and media companies primarily in Europe, the Americas, Asia, and Africa.

3.      On August 20, 2013, the Company reported its 2013 fiscal second quarter financial results and disclosed that the Company had made the decision to write-down approximately $111 million to its trade receivables and accrued contract receivables relating to its enterprise business. Moreover, the Company announced a "major restructuring" of its business.

4.      On this news, shares of Velti declined $0.66 per share, more than 66%, to close on August 21, 2013, at $0.34 per share, on heavy trading volume.

5.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose

that: (1) the Company was having difficulties collecting certain receivables; (2) certain of the Company's receivables were uncollectible; (3) as a result, the Company's revenues and receivables were overstated during the Class Period; (4) that the Company lacked adequate internal and financial controls; and (5) as a result of the foregoing, the Company's statements and reported financial results were materially false and misleading at all relevant times.

6.     As a direct and proximate result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C.§§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Additionally, the Company maintains a corporate office within this Judicial District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

11.     Plaintiff Anika R. Rieckborn, as set forth in the accompanying certification, incorporated by reference herein, purchased Velti common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant Velti is a Jersey corporation with its principal executive offices located at First Floor, 28-32 Pembroke Street Upper, Dublin 2, Republic of Ireland.  Velti maintains its United States headquarters at 1 Market St., Steuart Tower, San Francisco, CA 94105.

13.     Defendant Alex Moukas ("Moukas") was, at all relevant times, Chief Executive Officer ("CEO") and a director of the Company.

14.     Defendant Wilson W. Cheung ("Cheung") was, at all relevant times, Chief Financial Officer ("CFO") of the Company until January 2013.

15.     Defendant Jeffrey G. Ross ("Ross") was, at all relevant times, CFO of the Company since January 2013.

16.     Defendants Moukas, Cheung and Ross are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Velti's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially

false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS
### Background

17. Velti engages in the provision of mobile marketing and advertising technology and solutions for brands, advertising agencies, mobile operators, and media companies primarily in Europe, the Americas, Asia, and Africa

## Materially False and Misleading

## Statements Issued During the Class Period

18. The Class Period starts on January 27, 2011. On this day, the Company's final Registration Statement for its Initial Public Offering ("IPO") was declared effective. The final Prospectus for the IPO, which was filed with the SEC on January 28, 2011, prior to the opening of the market, and was dated January 27, 2011, in relevant part, described the Company's revenue recognition policy as follows:

**Revenue Recognition**

We account for our SaaS revenue, license and software revenue and managed services revenue in accordance with Accounting Standards Codification (ASC) Topic 605 — Revenue Recognition and ASC Topic 985-605 — Certain Revenue Arrangements that Include Software Elements. We recognize revenue when all of the following conditions are satisfied: (i) there is persuasive evidence of an arrangement; (ii) the service has been rendered or delivery has occurred; (iii) the fee to be paid by the customer is fixed or determinable; and (iv) collectability of the fee is reasonably assured.

Software as a service revenue generated from our "usage-based" services, including subscription fees for use of individual software modules and our automated mobile marketing campaign creation templates, and fees charged for access to our technology platform, are recognized ratably over the period of the agreement as the fees are earned.

For our variable performance-based fees, we recognize revenue when the transaction

is completed, the specific quantitative goals are met or the milestone is achieved. For the majority of our contracts, we act as the principal and contract directly with suppliers for purchase of media and other third party production costs, and are responsible for payment of such costs as the primary obligor. We recognize the revenue generated on fees charged for such third party costs using the gross method. We recognize revenue at the gross amount billed when revenue is earned for services rendered and record the associated fees we pay as third party costs in the period such costs are incurred.

Revenue related to perpetual licensing arrangements is recognized upon the delivery of the license. Fees charged to customize our software solution are recognized using the completed contract or the percentage-of-completion method according to ASC 605-35, Revenue Recognition — Construction-Type and Production-Type Contracts, based on the ratio of costs incurred to the estimated total costs at completion.

Managed services revenue, when sold with software and support offerings, is accounted for separately when these services (i) have value to the customer on a standalone basis, (ii) are not essential to the functionality of the software and (iii) there is objective and reliable evidence of fair value of each deliverable. When accounted for separately, revenue is recognized as the services are rendered for time and material contracts, and ratably over the term of the contract when accepted by the customer for fixed price contracts. For revenue arrangements with multiple deliverables, such as an arrangement that includes license, support and professional services, we allocate the total amount the customer will pay to the separate units of accounting based on their relative fair values, as determined by the price of the undelivered items when sold separately.

The timing of revenue recognition in each case depends upon a variety of factors, including the specific terms of each arrangement and the nature of our deliverables and obligations, and the existence of evidence to support recognition of our revenue as of the reporting date. For contracts with extended payment terms for which we have not established a successful pattern of collection history, we recognize revenue when all of the criteria are met and when the fees under the contract are due and payable.

In the event that we have incurred costs associated with a specific revenue arrangement prior to the execution of the related contract, those costs are expensed as incurred.

Fees are recognized as revenue when all revenue recognition criteria have been met. Fees that have been invoiced are recorded in trade receivables and fees that have not been invoiced as of the reporting date but on which all revenue recognition criteria are met are accrued and reported as accrued contract receivables on the balance sheets and recognized as revenue in the period when the fees are earned.

We present revenue net of value-added tax, sales tax, excise tax and other similar assessments.

19.     On March 16, 2011, the Company issued a press release entitled, "VELTI ANNOUNCES FOURTH QUARTER AND FISCAL YEAR END 2010 RESULTS." Therein, the Company, in relevant part, stated:

> Velti plc (Nasdaq: VELT; AIM: VEL), the leading mobile marketing and advertising technology provider for brands, advertising agencies, mobile operators and media, announced its financial results for the fourth quarter and fiscal year ended December 31, 2010.
>
> **Financial Highlights**
>
> - Q4 2010 revenue of $57.5 million; fiscal 2010 revenue of $116.3 million
> - Q4 adjusted EBITDA of $22.5 million; fiscal 2010 adjusted EBITDA of $27.2 million
> - Q4 GAAP net income of $2.0 million and EPS of $0.05; fiscal 2010 GAAP net loss of $15.7 million and EPS of $0.41
> - Q4 adjusted net income of $13.5 million and adjusted EPS of $0.34; fiscal 2010 adjusted net income of $3.0 million and adjusted EPS of $0.07
>
> ***
>
> **Revenue and Business Growth**
>
> For the fourth quarter of 2010, Velti reported revenue of $57.5 million, compared with $20.6 million in the prior quarter ended September 30, 2010. On a GAAP basis, net income for the fourth fiscal quarter ended
>
> December 31, 2010 was $2.0 million or $0.05 per share, compared with a net loss of $6.0 or $0.16 per share, in the prior quarter ended September 30, 2010. On a non-GAAP basis, adjusted net income for the fourth fiscal quarter ended December 31, 2010 was $13.5 million. Adjusted EBITDA for the fourth quarter ended December 31, 2010 was $22.5 million, compared with $3.3 million reported in the third quarter ended September 30, 2010.
>
> Velti's total revenue has grown to $116.3 million for the year ended December 31, 2010, an increase of 29% from $90.0 million for the fiscal year ended December 31, 2009. On a GAAP basis, net loss for fiscal year ended December 31, 2010 was $15.7 million or $0.41 per share, compared with a net income of $6.5 million, or $0.17 per share, in the 2009 fiscal year.
>
> On a non-GAAP basis, adjusted net income for fiscal year ended December 31, 2010 was $3.0 million or $0.07 per share, compared with adjusted net income of $11.1 million, or $0.29 per share, in the fiscal year ended December 31, 2009.
>
> Velti's business strategy is to become the world's most widely adopted SaaS

platform for mobile marketing and advertising. Since 2009, the Company has focused intensive technology acquisition and development, deployment and sales efforts on making its platform, called Velti mGage, a standard for planning, delivering, analyzing and optimizing end-to-end mobile marketing campaigns around the world.

20. On April 12, 2011, Velti filed its Annual Report on Form 20-F with the SEC for the 2010 fiscal year. The Company's Form 20-F was signed by Defendants Moukas and Cheung, and reaffirmed the Company's statements previously announced on March 16, 2011. The Company's Form 20-F also contained Sarbanes-Oxley required certifications, signed by Defendants Moukas and Cheung, who certified:

1. I have reviewed this annual report on Form 20-F of Velti plc, for the fiscal year ended December 31, 2010;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Group and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally

accepted accounting principles;

    c)    Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)    Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.    The Company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the Audit Committee of the Board of Directors (or persons performing the equivalents functions):

    a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

    b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

21.    Additionally, the Company's Annual Report filed on Form 20-F with the SEC on April 12, 2011, described Velti's revenue recognition policy as follows:

**Revenue Recognition**

We derive our revenue from three sources:

1.    software as a service (SaaS) revenue, which consists of fees from customers who subscribe to our hosted mobile marketing and advertising platform, generally referred to as "usage-based" services, and fees from customers who utilize our software solutions to measure the progress of their transaction-based mobile marketing and advertising campaigns, generally referred to as "performance-based" services;

2.    license and software revenue, which consists of revenue from customers who license our mobile marketing and advertising platform and fees for customized software solutions delivered to and installed on the customers' server; and

3.     managed services revenue, which consists of fees charged to customers for professional services related to the implementation, execution, and monitoring of customized mobile marketing and advertising solutions.

We account for our revenue for these services and licenses in accordance with Accounting Standards Codification (ASC) Topic 605 — Revenue Recognition and ASC Topic 985-605 — Certain Revenue Arrangements that Include Software Elements. We recognize revenue when all of the following conditions are satisfied: (i) there is persuasive evidence of an arrangement; (ii) the service has been rendered or delivery has occurred; (iii) the fee to be paid by the customer is fixed or determinable; and (iv)collectability of the fee is reasonably assured.

SaaS revenue generated from our "usage-based" services, including subscription fees for use of individual software modules and our automated mobile marketing campaign creation templates, and fees charged for access to our technology platform, are recognized ratably over the period of the agreement as the fees are earned.

SaaS revenue generated from our "performance-based" services is generally based on specified metrics, typically relating to the number of transactions performed or number of text messages generated during the campaign multiplied by the cost per transaction or response in accordance with the terms of the related contracts. Some of our performance-based contracts include performance incentive provisions that link a portion of revenue that we may earn under the contract to the performance of the customer's campaign relative to quantitative or other milestones, such as the growth in the consumer base, reduced consumer churn, or the effectiveness of the end-user response. For our variable performance-based fees, we recognize revenue when the transaction is completed, the specific quantitative goals are met, or the milestone is achieved. For the majority of our contracts, we act as the principal and contract directly with suppliers for purchase of media and other third party production costs, and are responsible for payment of such costs as the primary obligor. We recognize the revenue generated on fees charged for such third party costs using the gross method. We recognize revenue at the gross amount billed when revenue is earned for services rendered and record the associated fees we pay as third party costs in the period such costs are incurred.

License and software revenue consists of fees charged for our mobile marketing and advertising technology provided on a perpetual license, and fees charged for services to customize and implement the specific software solution, including fees to customize the platform for use with the different media used by the customer in a campaign. Revenue related to perpetual licensing arrangements is recognized upon the delivery of the license. Fees charged to customize our software solution are recognized using the completed contract or percentage-of-completion method according to ASC 605-35, Revenue Recognition — Construction-Type and Production-Type Contracts, based on the ratio of costs incurred to the estimated total costs at completion.

Managed services revenue, when sold with software and support offerings, are

- 10 -

accounted for separately when these services (i) have value to the customer on a standalone basis, (ii) are not essential to the functionality of the software and (iii) there is objective and reliable evidence of fair value of each deliverable. When accounted for separately, revenues are recognized as the services are rendered for time and material contracts, and ratably over the term of the contract when accepted by the customer for fixed price contracts. For revenue arrangements with multiple deliverables, such as an arrangement that includes license, support and professional services, we allocate the total amount the customer will pay to the separate units of accounting based on their relative fair values, as determined by the price of the undelivered items when sold separately.

The timing of revenue recognition in each case depends upon a variety of factors, including the specific terms of each arrangement and the nature of our deliverables and obligations, and the existence of evidence to support recognition of our revenue as of the reporting date. For contracts with extended payment terms for which we have not established a successful pattern of collection history, we recognize revenue when all of the criteria are met and when the fees under the contract are due and payable.

In the event that we have incurred costs associated with a specific revenue arrangement prior to the execution of the related contract, those costs are expensed as incurred.

Fees that have been invoiced are recorded in trade receivables and in revenue when all revenue recognition criteria have been met. Fees that have not been invoiced as of the reporting date but all revenue recognition criteria are met are accrued and reported as accrued contract receivables on the balance sheets and recognized as revenue in the period when the fees are earned.

We present revenue net of value-added tax, sales tax, excise tax and other similar assessments.

Our revenue arrangements do not contain general rights of return.

22.    On May 12, 2011, the Company issued a press release entitled, "Velti Announces First Quarter 2011 Results." Therein, the Company, in relevant part, stated:

**Financial Highlights**

- Revenue of $29.6 million, an increase of 82% from Q1 2010 ($16.2 million);
- Adjusted EBITDA of $1.3 million; an increase of 180% from Q1 2010 ($457 thousand);
- GAAP net loss of $15.9 million and EPS of $(0.34);
- Adjusted net loss of $5.2 million and adjusted EPS of $(0.11)

***

**Revenue and Business Growth**

For first quarter ended March 31, 2011, Velti reported revenue of $29.6 million, compared with $16.2 million in the quarter ended March 31, 2010. On a GAAP basis, net loss for the quarter ended March 31, 2011 was $15.9 million or $(0.34) per share, compared with a net loss of $5.2 million or $(0.14) per share, for the quarter ended March 31, 2010. On a non-GAAP basis, adjusted net loss for the quarter ended March 31, 2011 was $5.2 million or $(0.11) per share compared with an adjusted net loss of $3.2 million or $(0.08) per share for the quarter ended March 31, 2010. Adjusted EBITDA for the quarter ended March 31, 2011 was $1.3 million, compared with $457 thousand for the quarter ended March 31, 2010.

Velti's business strategy is to become the world's most widely adopted SaaS platform for mobile marketing and advertising. Since 2009, the Company has focused its technology acquisition and development, deployment, and sales efforts on making its platform, Velti mGage, a standard for planning, delivering, analyzing and optimizing end-to-end mobile marketing campaigns around the world.

23.　　On August 10, 2011, the Company issued a press release entitled, "Velti Reports Second Quarter 2011 Financial Results." Therein, the Company, in relevant part, stated:

**Financial Highlights**

- Revenue of $34.4 million, an increase of 57% from Q2 2010;
- Adjusted EBITDA of $3.1 million; an increase of 205% from Q2 2010;
- GAAP net loss of $25.1 million and EPS of $(0.47); and
- Adjusted net loss of $2.0 million and adjusted EPS of $(0.04)

***

**Revenue and Business Growth**

For the second quarter ended June 30, 2011, Velti reported revenue of $34.4 million, compared with $21.9 million in the second quarter ended June 30, 2010. On a GAAP basis, net loss for the quarter ended June 30, 2011 was $25.1 million, or $(0.47) per share, compared with a net loss of $6.4 million, or $(0.17) per share, for the quarter ended June 30, 2010. On a non-GAAP basis, adjusted net loss for the quarter ended June 30, 2011 was $2.0 million, or $(0.04) per share compared with an adjusted net loss of $3.4 million, or $(0.09) per share for the quarter ended June 30, 2010. Adjusted EBITDA for the quarter ended June 30, 2011 was $3.1 million, compared with $1.0 million for quarter ended June 30, 2010.

Velti's goal is to continue to be the foremost mobile marketing technology company and offer the most widely adopted SaaS platform for mobile marketing and

advertising. Since 2009, the Company has focused its technology acquisition and development, deployment, and sales efforts on making its platform, Velti mGage, a standard for planning, delivering, analyzing and optimizing end-to-end mobile marketing campaigns around the world.

24.　On August 29, 2011, Velti filed an Interim Report on Form 6-K with the SEC for the 2011 fiscal second quarter.  The Company's Interim Report reaffirmed the Company's statements previously announced on August 10, 2011.  The Company's Interim Report also contained Sarbanes-Oxley required certifications, signed by Defendants Moukas and Cheung, substantially similar to the certifications contained in ¶20, *supra*.

25.　On November 15, 2011, the Company issued a press release entitled, "Velti Reports Third-Quarter 2011 Results."  Therein, the Company, in relevant part, stated:

**Q3 Financial Highlights**

- Revenue of $38.2 million, an increase of 85% from Q3 2010, driven by overall growth in smart phones, increased mobile marketing spend, and new blue chip clients
- Adjusted EBITDA of $5.6 million, compared with $3.3 million in Q3 2010, an increase of 73%;
- GAAP net income attributable to Velti of $0.6 million and EPS of $0.01 compared with a net loss of $6.0 million and EPS of $(0.16) for Q3 2010; and
- Adjusted net loss of $1.1 million and adjusted EPS of $(0.02) compared with an adjusted net loss of $3.9 million and adjusted EPS of $(0.10) for Q3 2010

26.　On December 2, 2011, Velti filed an Interim Report on Form 6-K with the SEC for the 2011 fiscal third quarter.  The Company's Interim Report was signed by Defendant Cheung and reaffirmed the Company's statements previously announced on November 15, 2011.  The Company's Interim Report also contained Sarbanes-Oxley required certifications, signed by Defendants Moukas and Cheung, substantially similar to the certifications contained in ¶20, *supra*.

27.　On March 12, 2012, the Company issued a press release entitled, "Velti Announces a Strong Fourth Quarter and Fiscal Year 2011 With 63% Year on Year Revenue and 95% Adjusted EBITDA Growth, Provides Guidance for a Robust 2012."  Therein, the Company, in relevant part,

stated:

- Announces fourth quarter revenue of $87.1 million and full year revenue of $189.2 million, a growth of 52% and 63%, respectively;
- Announces fourth quarter Adjusted EBITDA of $43.1 million and full year Adjusted EBITDA of $53.1 million, a growth of 92% and 95%, respectively.

DUBLIN, Ireland and SAN FRANCISCO, March 12, 2012 (GLOBE NEWSWIRE) -- Velti plc (Nasdaq:VELT), the leading global provider of mobile marketing and advertising technology and solutions, today announced its financial results for the fourth quarter and fiscal year ended December 31, 2011.

***

**Fiscal Year 2011 Financial Highlights**

- Revenue of $189.2 million, an increase of 63% from fiscal year 2010;
- Revenue less 3rd party costs of $135.3 million (resulting in a margin of 72% as a percentage of revenue), an increase of 70% from fiscal year 2010;
- Adjusted EBITDA of $53.1 million, compared with $27.2 million in fiscal year 2010, an increase of 95%;
- GAAP net loss attributable to Velti of $15.4 million and EPS of $(0.28) compared with a net loss of $15.7 million and EPS of $(0.41) for fiscal year 2010; and
- Adjusted net income of $29.0 million and adjusted diluted EPS of $0.50 compared with adjusted net income of $3.0 million and adjusted diluted EPS of $0.07 for 2010.

**Mobile Advertising and Marketing Revenues and Third Party Costs**

- Mobile advertising revenue of $29.8 million and mobile advertising 3rd party costs of $25.0 million; resultant mobile advertising revenue less 3rd party costs of $4.8 million (16% as a percentage of revenue);
- Mobile marketing revenue of $159.4 million, an increase of 45% from fiscal year 2010 and mobile marketing 3rd party costs of $28.9 million; resultant mobile marketing revenue less 3rd party costs of $130.5 million (82% as a percentage of revenue), an increase of 67% from fiscal year 2010

28.     On April 26, 2012, Velti filed its Annual Report on Form 20-F with the SEC for the 2011 fiscal year.  The Company's Form 20-F was signed by Defendants Moukas and Cheung, and reaffirmed the Company's statements previously announced on March 12, 2012.  The Company's Form 20-F also contained also contained Sarbanes-Oxley required certifications, signed by Defendants Moukas and Cheung, substantially similar to the certifications contained in ¶20, *supra*.

29.     Additionally, the Company's Annual Report filed on Form 20-F with the SEC on April 26, 2012, described the Company's revenue recognition practices as follows:

**Revenue Recognition**

We derive our revenue from three sources:

- software as a service (SaaS) revenue, which consists of fees from customers who subscribe to our hosted mobile marketing and advertising platform, generally referred to as "usage-based" services, and fees from customers who utilize our software solutions to measure the progress of their transaction-based mobile marketing and advertising campaigns, generally referred to as "performance-based" services;

- license and software revenue, which consists of revenue from customers who license our mobile marketing and advertising platform and fees for customized software solutions delivered to and installed on the customers' server either in perpetual or term licenses; and

- manaed services revenue, which consists of fees charged to customers for professional services related to the implementation, execution, and monitoring of customized mobile marketing and advertising solutions.

We account for revenue for these services and licenses in accordance with Accounting Standards Codification (ASC) Topic 605 - Revenue Recognition and ASC Topic 985-605 - Certain Revenue Arrangements that Include Software Elements. We recognize revenue when all of the following conditions are satisfied: (i) there is persuasive evidence of an arrangement; (ii) the service has been rendered or delivery has occurred; (iii) the fee to be paid by the customer is fixed or determinable; and (iv) collectability of the fee is reasonably assured.

SaaS revenue generated from our "usage-based" services, including subscription fees for use of individual software modules  and our automated mobile marketing campaign creation templates, and fees charged for access to our technology platform, are recognized ratably over the period of the agreement as the fees are earned.

SaaS revenue generated from our "performance-based" services is generally based on specified metrics, typically relating to the number of transactions performed during the campaign multiplied by the cost per action in accordance with the terms of the related contracts. Some of our performance-based contracts include performance incentive provisions that link a portion of revenue that we may earn under the contract to the performance of the customer's campaign relative to quantitative or other milestones, such as the growth in the consumer base, reduced consumer churn, or the effectiveness of the end-user response. We consider the performance-based fees to be contingent fees. We recognize this revenue monthly based on actual performance, which is when the fees are earned and the amount of

the fee can be reliably measured. Our performance-based arrangements are typically invoiced monthly, which can occur in a period subsequent to revenue being recognized.

License and software revenue consists of fees charged for our mobile marketing and advertising technology provided on a perpetual or term-based license. These types or arrangements do not typically include any ongoing support arrangements or rights to upgrades or enhancements and therefore revenue related to perpetual licensing arrangements is recognized upon the delivery of the license. Revenue from term based licenses are recognized over the related term. Fees charged to customize our software solution are recognized using the completed contract or percentage-of-completion method according to ASC 605-35, Revenue Recognition - Construction-Type and Production-Type Contracts, based on the ratio of costs incurred to the estimated total costs at completion.

Managed services revenue, when sold with software and support offerings, are accounted for separately when these services (i) have value to the customer on a standalone basis, (ii) are not essential to the functionality of the software and (iii) there is objective and reliable evidence of the selling price of each deliverable. When accounted for separately, revenue is recognized as the services are rendered for time and material contracts, and ratably over the term of the contract when accepted by the customer for fixed price contracts. For revenue arrangements with multiple deliverables, such as an arrangement that includes license, support and professional services, we allocate the total amount the customer will pay to the separate units of accounting based on their relative selling prices, as determined by the price of the undelivered items when sold separately.

The timing of revenue recognition in each case depends upon a variety of factors, including the specific terms of each arrangement and the nature of our deliverables and obligations, and the existence of evidence to support recognition of our revenue as of the reporting date. For contracts with extended payment terms for which we have not established a successful pattern of collection history, we recognize revenue when all other criteria are met and when the fees under the contract are due and payable. Fees that have been invoiced are recorded in trade receivables and in revenue when all revenue recognition criteria have been met. Fees that have not been invoiced as of the reporting date but for which all revenue recognition criteria are met are reported as accrued contract receivables on the balance sheets.

We present revenue net of value-added tax, sales tax, excise tax and other similar assessments. Our revenue arrangements do not contain general rights of return.

30.     The statements contained in ¶¶18-29, were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company was having difficulties collecting certain receivables; (2) that certain of the Company's receivables were

- 16 -

uncollectible; (3) that, as a result, the Company's revenues and receivables were overstated during the Class Period; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's statements and reported financial results were materially false and misleading at all relevant times.

31.     On May 15, 2012, the Company issued a press release entitled, "Velti Announces Solid First Quarter 2012 Financial Results: 75% Year on Year Revenue and 260% Adjusted EBITDA Growth, Increases 2012 Guidance."  Therein, the Company, in relevant part, stated:

- Announces first quarter revenue of $51.8 million, growth of 75%, compared to Q1 2011
- Announces first quarter adjusted EBITDA of $4.6 million, growth of 260%, compared to Q1 2011
- Increases annual revenue and adjusted EBITDA guidance and reiterates commitment to achieve break-even operating cash flow by Q3 2012 and positive free cash flow by Q4 2012

***

**Q1 2012 Financial Highlights**

- Revenue of $51.8 million, an increase of 75% from Q1 2011, with improving margins;
- Revenue less 3rd party costs of $34.9 million, an increase of 85% from Q1 2011, and resultant margin of 67% as percentage of revenue, in comparison to 64% in Q1 2011;
- Adjusted EBITDA of $4.6 million, compared with $1.3 million in Q1 2011, an increase of 260%;
- GAAP net loss attributable to Velti of $8.8 million and EPS of $(0.14) compared with a net loss of $15.9 million and EPS of $(0.34) for Q1 2011; and
- Adjusted net loss of $1.1 million and adjusted EPS of $(0.02) compared with an adjusted net loss of $5.2 million and adjusted EPS of $(0.11) for Q1 2011.

**Mobile Advertising and Marketing Revenues, Margins and Cash Flow**

- Mobile advertising revenue of $11.2 million and mobile advertising 3rd party costs of $8.8 million; resultant mobile advertising revenue less 3rd party costs of $2.5 million (22% as a percentage of revenue);
- Mobile marketing revenue of $40.6 million, an increase of 76% from Q1 2011 and mobile marketing 3rd party costs of $8.1 million; resultant mobile marketing revenue less 3rd party costs of $32.5 million (80% as a percentage

- 17 -

of revenue), an increase of 82% from Q1 2011;

- Velti's margins across both mobile marketing and advertising continue to increase year-on-year.

**Reach and Revenue Contribution**

- Velti's platform provides marketers the ability to reach 4.3 billion consumers in 67 countries and our customers have already connected with 1.4 billion consumers;
- The Americas, which we expect to be our largest region globally in 2012, contributed revenues of $13.3 million, compared to $8.2 million in Q1 2011;
- Europe, excluding the U.K., contributed $15.2 million, compared to $11.8 million in the same period last year, a solid increase defying a hard macroeconomic environment;
- The U.K. contributed $16.0 million, compared to $7.0 million in the same period last year;
- Asia and Africa revenue grew to $7.3 million, compared to $2.6 million in Q1 2011; and
- For Q1 2012, SaaS revenue contributed 90% of total revenue, in comparison to 79% for Q1 2011; license and managed services revenue fell to 3% and 7%, respectively, vs. 9% and 12% in Q1 2011.

32.    On May 15, 2012, the Company hosted a conference call with investors and analysts. Defendants Moukas and Cheung were present.  Therein, Defendant Cheung, in relevant part, stated:

Trade receivables, net of reserves, and accrued receivables were $85.5 million and $103.3 million respectively as of March 31, 2012, compared with $71 million and $98.2 million respectively as of December 31, 2011. Can we spend a bit of time discussing our receivables here? Recall, in Q4, due to many performance-based campaigns completed in the later part of December, we recognized a large portion of accrued revenues, resulting in a large accrued receivables balance at year-end.

Subsequently, in the first quarter, a lot of invoicing took place, moving a large amount of balance from accrued to trade receivables. As a result, for Q1 2012, our accrued receivables as a percentage of total AR, which is trade plus the accrued receivables, has decreased to 55% from 58% in Q4.

While we believe this percentage is still relatively high, bear in mind we had the strongest Q1 revenues ever in our history. And we managed to keep the accrued receivables balance roughly the same as Q4, while increasing our trade receivables balance by $14.5 million. We're actively managing the percentage of accrued receivables versus trade receivables, so as to drive free cash flows to the company as quickly as possible.

Now to the topic of trade DSOs. Excluding the impact of our acquisitions of Air2Web, MIG and CASEE, for the trailing 12 month period ended March 31 trade DSOs were 116 days, at approximately the same level as the 113 days in Q1 of 2011. Given the seasonality in our business, we expected a modest Q4 to Q1 increase and we consider this encouraging, given; A, the increase in year-over-year sales; and B, that after discussing with our investors we wound down significantly the factoring of receivables since last year to virtually nothing now; and C, our companywide mandate to move more quickly or to convert the accrued receivables into trade receivables so as to rapidly convert the receivables to cash.

In other words, trade DSOs may suffer modestly in the short-term, while we push accrued receivables to trade receivables to turn to cash more quickly. Our long-term trade DSO goal, however, is to reach the low 70 days in 18 to 24 months. So just to reconfirm, this will be driven by the lower DSOs in geographies such as the U.S. and the U.K.

33.     Additionally, in response to questions from analysts, Defendant Cheung, in relevant part, stated:

[*Analyst*]:      Great. And the other – just two other quick questions. In terms of contracts, one of the other slings that's thrown at you is that some of the contracts you have with large European carriers, for example, European companies, is they have ridiculously good payment terms, like 180 days or twice a year. Help me – based on some of our work in – we're hearing that you're actually renegotiating those contracts on better payment terms, is that correct?

And can you give us any update on how many companies you've been able to renegotiate effectively better payment terms and therefore increased price?

[*Defendant Cheung*]: We are doing a lot of things here in order to bring ourselves to operating free cash flow positive. So, obviously, one of the things that you've mentioned is that we are actually looking at a lot of the existing contracts, but more importantly is actually looking at some of the new contracts with the new customers.

We are pushing to make sure that the structure is such that the payment terms are better and we would be able to generate cash much faster. But there are some other leverages that we are pulling as well.

Number one, we are also pushing the accrued receivables more into trade receivables. We are also enhancing our collection efforts on the existing trade AR. And if you look at our aging right now, less than $10 million of those trade AR balances are actually invoiced more than 150 days. That's very critical.

And secondly, we are going to focus on revenue growth in geographies where we have much more favorable payment cycles, and I think that's what we're focusing on given the revenue shift mix that we have.

***

[*Analyst*]: And finally I just wanted to return to the issue of the accrued contract receivables. Sounds like you made some relative progress there. Just wondering what were sort of gating factors on getting those invoices out, and it sounds like you are making a push. Just any reference you could make, anything that you're doing specifically to try to address that going forward? Thank you.

[*Defendant Cheung*]: Definitely it requires a lot of discipline. Internally, we have dedicated people, basically looking at all the contracts and working with our sales force to ensure that nothing falls through the cracks.

We have been making a lot of phone calls as well to make sure that we push the collections, and this is an ongoing process. We now have the wherewithal to improve the – beef up the team, sales, administration and what have you, to make sure that we get the people and convert all that into cash on a much quicker cycle.

34.     As a result of the May 15, 2012 disclosures, shares of Velti declined $2.88 per share, more than 33%, to close on May 16, 2012, at $5.72 per share, on heavy trading volume.

35.     On June 1, 2012, Velti filed an Interim Report on Form 6-K with the SEC for the 2012 fiscal first quarter.  The Company's Interim Report was signed by Defendant Cheung and reaffirmed the Company's statements previously announced on May 15, 2012.  The Company's Interim Report also contained Sarbanes-Oxley required certifications, signed by Defendants Moukas and Cheung, substantially similar to the certifications contained in ¶20, *supra*.

36.     On August 14, 2012, the Company issued a press release entitled, "Velti Announces Record Q2 Financial Results and Free Cash Flow Generation; Revenue Growth of 71 Percent and Adjusted EBITDA of 100 Percent Year-Over-Yeaelti Announces Record Q2 Financial Results and Free Cash Flow Generation; Revenue Growth of 71 Percent and Adjusted EBITDA of 100 Percent Year-Over-Year."  Therein, the Company, in relevant part, stated:

- Announces second quarter revenue of $58.7 million, growth of 71 percent, compared with Q2 2011
- Announces second quarter adjusted EBITDA of $6.2 million, growth of 100 percent, compared with Q2 2011
- Generates $25.0 million in operating cash flow. Generated $7.0 million in free cash flow excluding acquisition and debt payments, $4.4 million

inclusive of acquisition and debt payments

- Increases annual revenue and adjusted EBITDA guidance, reiterates expectation for neutral operating cash flow in the third quarter and sustainable positive free cash flow by Q4 2012

*** 

**Revenue Contribution and Mobile Advertising and Marketing Revenues and Margins**

- The Americas contributed a record 29 percent of revenues or $16.7 million, compared with $7.4 million in Q2 2011. The U.S. will be our single largest market this year;
- Europe, excluding the U.K., contributed $18.8 million, compared with $15.6 million in Q2 2011;
- The U.K. contributed $13.6 million, compared with $4.7 million in the same period last year;

- Asia and Africa revenue grew to $9.5 million, compared with $6.7 million in Q2 2011;
- For Q2 2012, SaaS revenue contributed 83 percent of total revenue, compared with 80 percent for Q2 2011; license and software revenue contributed 5 percent of total revenue, compared with 12 percent for Q2 2011; and managed services revenue contributed 12 percent of total revenue, compared with 8 percent for Q2 2011;
- Mobile advertising revenue of $13.9 million (24 percent of total revenue), an increase of 137 percent from Q2 2011 and mobile advertising 3rd party costs of $10.4 million; resultant mobile advertising revenue less 3rd party costs of $3.5 million; and
- Mobile marketing revenue of $44.8 million (76 percent of total revenue), an increase of 57 percent from Q2 2011 and mobile marketing 3rd party costs of $10.6 million; resultant mobile marketing revenue less 3rd party costs of $34.2 million.

37.     On August 23, 2012, Velti filed an Interim Report on Form 6-K with the SEC for the 2012 fiscal second quarter.  The Company's Interim Report was signed by Defendant Cheung and reaffirmed the Company's statements previously announced on August 14, 2012.  The Company's Interim Report also contained Sarbanes-Oxley required certifications, signed by Defendants Moukas and Cheung, substantially similar to the certifications contained in ¶20, *supra*.

38.     The statements contained in ¶¶31-33, 35-37, were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company

- 21 -

was having difficulties collecting certain receivables; (2) that certain of the Company's receivables were uncollectible; (3) that, as a result, the Company's revenues and receivables were overstated during the Class Period; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's statements and reported financial results were materially false and misleading at all relevant times.

39.     On November 14, 2012, the Company issued a press release entitled, "Velti Announces Third Quarter 2012 Results." Therein, the Company, in relevant part, stated:

**Q3 2012 Financial Highlights**

- Record revenue of $62.4 million, an increase of 62 percent from Q3 2011; $66.6 million or 74 percent on a constant currency basis;
- Revenue less 3rd party costs of $39.7 million, an increase of 63 percent from Q3 2011;
- Adjusted EBITDA of $6.7 million, compared with $5.6 million in Q3 2011, an increase of 19 percent;
- Commencing in the third quarter Velti is significantly reducing its capitalization of internal software development to reflect the company's accelerated software development cycles and focus. This change resulted in higher research and development expenses in the third quarter, and accordingly, negatively impacted its adjusted EBITDA results. Going forward, Velti expects to continually reduce its internal capitalized software development investments. The effect of this change is $1.2 million in the third quarter;
- GAAP net loss attributable to Velti of $24.7 million and EPS of $(0.38) compared with a net income of $0.6 million and EPS of $0.01 for Q3 2011; included in the GAAP net loss is a $9.6 million non-cash expected loss on assets held for sale (primarily attributable to $7.8 million of discount associated with the deferred consideration from the company's divestiture), as well as a $5.3 million non-cash charge associated with the re-measurement of MIG's final deferred consideration; and
- Adjusted net loss of $1.8 million and adjusted EPS of $(0.03) compared with an adjusted net loss of $1.1 million and adjusted EPS of $(0.02) for Q3 2011.

\*\*\*

**Revenue Contribution and Mobile Advertising and Marketing Revenue and Margins**

- The Americas contributed 26 percent of revenue or $16.2 million, compared with $9.0 million in Q3 2011. The U.S. will be Velti's single largest market

- 22 -

this year;

- The U.K. contributed 27 percent of revenue or $17.1 million, compared with $5.3 million in the same period last year;

- For Q3 2012, SaaS revenue contributed 78 percent of total revenue, compared with 67 percent for Q3 2011; license and software revenue contributed 8 percent of total revenue, compared with 26 percent for Q3 2011; and managed services revenue contributed 14 percent of total revenue, compared with 7 percent for Q3 2011;

- Mobile advertising revenue was $14.0 million (22 percent of total revenue), an increase of 87 percent from Q3 2011 and mobile advertising 3rd party costs were $10.5 million; resultant mobile advertising revenue less 3rd party costs were $3.4 million; and

- Mobile marketing revenue was $48.4 million (78 percent of total revenue), an increase of 58 percent from Q3 2011 and mobile marketing 3rd party costs were $12.2 million; resultant mobile marketing revenue less 3rd party costs were $36.3 million.

40.     On this news, shares of Velti declined $2.27 per share, more than 34%, to close on November 15, 2012, at $4.37 per share, on heavy trading volume.

41.     On November 30, 2012, Velti filed an Interim Report on Form 6-K with the SEC for the 2012 fiscal third quarter. The Company's Interim Report was signed by Defendant Cheung and reaffirmed the Company's statements previously announced on November 14, 2012. The Company's Interim Report also contained Sarbanes-Oxley required certifications, signed by Defendants Moukas and Cheung, substantially similar to the certifications contained in ¶20, *supra*.

42.     On March 12, 2013, the Company issued a press release entitled, "Velti Announces Fourth Quarter and Fiscal Year 2012 Results." Therein, the Company, in relevant part, stated:

**Fiscal Year 2012 Financial Highlights**

- Revenue of $270.3 million, an increase of 43 percent from fiscal year 2011;
- Revenue less 3rd party costs of $178.9 million (resulting in a margin of 66 percent), an increase of 32 percent compared with revenue less 3rd party costs from fiscal year 2011;
- Adjusted EBITDA of $42.6 million, which includes a $7.4 million allowance for doubtful accounts; this is a decrease of 20 percent from fiscal year 2011;
- GAAP net loss attributable to Velti of $56.4 million and EPS of $(.88) compared with a net loss of $15.4 million and EPS of $(0.28) for fiscal year 2011, including $16.9 million related to the write-off of certain capitalized software and;

- Adjusted net income of $22.2 million and adjusted diluted EPS of $.34 compared with adjusted net income of $29.0 million and adjusted diluted EPS of $0.50 for 2011.

**Mobile Advertising and Marketing Revenues and Third Party Costs**

- Mobile advertising revenue of $54.3 million, an increase of 82 percent from fiscal year 2011 and mobile advertising 3rd party costs of $41.1 million; resultant mobile advertising revenue less 3rd party costs of $13.3 million (resulting in a margin of 24 percent);
- Mobile marketing revenue of $216.0 million, an increase of 36 percent from fiscal year 2011 and mobile marketing 3rd party costs of $50.3 million; resultant mobile marketing revenue less 3rd party costs of $165.7 million (resulting in a margin of 77 percent).

**Q4 2012 Financial Highlights**

- Revenue of $97.5 million, an increase of 12 percent from Q4 2011;
- Revenue less 3rd party costs of $66.6 million (resulting in a margin of 68 percent), a decrease of 2 percent compared with revenue less 3rd party costs from Q4 2011;
- Adjusted EBITDA of $25.1 million, compared with $43.1 million in Q4 2011, a decrease of 42 percent;
- GAAP net loss attributable to Velti of $5.2 million and diluted EPS of $(.08) compared with net income of $25.0 million and EPS of $0.40 for Q4 2011;
- Adjusted net income of $26.0 million and adjusted diluted EPS of $.39 compared with adjusted net income of $37.3 million and adjusted diluted EPS of $0.59 for Q4 2011;

43.     On April 11, 2013, Velti filed its Annual Report on Form 20-F with the SEC for the 2012 fiscal year.  The Company's Form 20-F was signed by Defendants Moukas and Cheung, and reaffirmed the Company's statements previously announced on March 12, 2013.  The Company's Form 20-F also contained also contained Sarbanes-Oxley required certifications, signed by Defendants Moukas and Cheung, substantially similar to the certifications contained in ¶20, *supra*.

44.     On May 13, 2013, the Company issued a press release entitled, "Velti Announces First Quarter 2013 Results."  Therein, the Company, in relevant part, stated:

**Q1 2013 Financial Highlights**

- Revenue of $41.0 million, a decrease of 21 percent from Q1 2012;
- Revenue less 3rd party costs in Q1 of $17.6 million;
- Adjusted EBITDA of ($18.3) million, or ($16.1) million excluding the bad debt provision compared with $4.6 million in Q1 2012;
- GAAP net loss attributable to Velti of $156.4 million and diluted EPS of ($2.38) during Q1 compared with a net loss of $8.8 million and EPS of ($0.14) for Q1 2012; Velti incurred a non-cash charge of $133.1 million related to the write-down of substantially all goodwill and other intangible assets, which was triggered by our decline in market value and was largely mechanical based on our stock price on March 31st. Notwithstanding the required accounting treatment, our view is that both the businesses acquired and the intangibles acquired or developed by the Company have substantial economic value in our ongoing business operations; and
- Adjusted net loss of $18.1 million and adjusted diluted EPS of ($0.27) compared with adjusted net loss of $1.1 million and adjusted diluted EPS of ($0.02) for Q1 2012.

**Mobile Advertising and Marketing Revenues and Third Party Costs**

- Mobile advertising revenue of $10.1 million, and mobile advertising 3rd party costs of $7.0 million; resultant mobile advertising revenue less 3rd party costs of $3.1 million, or a margin of 30 percent; and
- Mobile marketing revenue of $30.9 million, and mobile marketing 3rd party costs of $16.3 million; resultant mobile marketing revenue less 3rd party costs of $14.6 million, or a margin of 47 percent.

45. On June 10, 2012, Velti filed an Interim Report on Form 6-K with the SEC for the 2013 fiscal first quarter. The Company's Interim Report was signed by Defendant Ross and reaffirmed the Company's statements previously announced on May 13, 2013. The Company's Interim Report also contained Sarbanes-Oxley required certifications, signed by Defendants Moukas and Ross, substantially similar to the certifications contained in ¶20, *supra*

46. The statements contained in ¶¶39, 41-45, were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company was having difficulties collecting certain receivables; (2) that certain of the Company's receivables were uncollectible; (3) that, as a result, the Company's revenues and receivables were overstated during the Class Period; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's statements and reported financial results were

- 25 -

materially false and misleading at all relevant times.

**Disclosures at the End of the Class Period**

47.     On August 21, 2013, the Company issued a press release entitled, "Velti Announces Second Quarter 2013 Results." Therein, the Company, in relevant part, stated:

> Velti plc (Nasdaq: VELT), the leading global provider of mobile marketing and advertising technology and solutions, today announced financial results for the second quarter ended June 30, 2013.

> "While we understood there would be challenges to improving Velti's financial position and driving longterm growth, the second quarter proved to be more difficult than expected," said Alex Moukas, chief executive officer. "We continued however to take significant steps to focus the company on predictable business, customers and geographies. We also began a major restructuring effort to align our organization to our business strategy and current revenue level, removing approximately $40 million in annualized costs, in addition to our previously announced $40 million reduction of capital expenditures.

> "Over the past few months we have made significant progress extricating ourselves from businesses at the root of many of our difficulties, focusing instead on core opportunities for growth in mobile marketing in key geographies like Western Europe, North America, India and China. For example, in the fourth quarter of 2012 we began to reduce our commercial activities in Greece and Cyprus, and as of the end of Q2 2013 we are generating no meaningful revenue from customers in this region. Notwithstanding this reduction of business, customers with business activities in Greece and Cyprus continued to account for a significant portion of the Company's outstanding receivables. Due to a deterioration in collections from these customers, and indications that future payments were also at risk, we made the decision to writedown more than $100 million in outstanding receivables."

> "We remain focused on creating and executing highly effective campaigns for our customers. Our mobile marketing customers have responded with a retention rate of more than 95% and we continue to sign substantial contracts with new customers."

> "We move into the second half of the year as a more disciplined, focused organization that remains a leader in mobile marketing. We are committed to doing all we can to deliver value to customers and shareholders and our actions position Velti to become profitable and cash flow positive in 2014."

> **Engagement of Advisors**

> • The company engaged an investment bank to sell its supply-side U.S. advertising business, also known as Mobclix, as well as look at other strategic opportunities for the company.

- 26 -

- The company engaged Deloitte Financial Advisory Services to assist in evaluating the near-term and longer-term collectability of receivables on the books of its Greek and Cypriot subsidiaries. As a result of this evaluation, Velti is taking a charge in Q2 of approximately $111 million to its trade receivables and accrued contract receivables relating to its enterprise business, which primarily sold customized mobile marketing platforms to customers with operations principally within Greece and Cyprus. As part of Deloitte's engagement, Scott Avila from Deloitte is serving as the company's chief restructuring officer to provide restructuring advice and assistance.

**Q2 Business Highlights**

- Velti continues to experience demand for its services. During the second quarter it won and renewed programs with premier global brands such as Vodafone, Nokia, Coca-Cola, Toyota and China Unicom.
- The company launched Velti Pay, a mobile payment and messaging solution.
- Velti launched an enhanced version of its mGage Inspire platform that gives customers greater control over managing programs that support customer life-cycle management and long-term loyalty.
- Velti's new release of the mGage Communicate Pro platform is currently being rolled out simultaneously in the USA and the United Kingdom. The platform brings new functionality to allow brands to conduct interactive mobile marketing campaigns with a global reach.

**Q2 2013 Financial Highlights**

- Revenue of $31.2 million, a decrease of 47 percent from Q2 2012.
- Revenue less third-party costs in Q2 of $8.8 million.
- Adjusted EBITDA on a consolidated basis of $(20.9) million, excluding the one-time write off of certain receivables of $110.7 million, compared with $6.2 million in Q2 2012.
- Adjusted EBITDA, excluding Starcapital (our variable interest entity, or "VIE", that holds previously divested assets which we are required to consolidate despite a lack of equity ownership) of $(17.5) million, excluding bad debt expense of $98.7 million, compared with $6.2 million in Q2 2012.
- GAAP net loss attributable to Velti of $130.3 million and diluted EPS of $(1.56) during Q2 compared with a net loss of $17.7 million and EPS of $(0.28) for Q2 2012.

**Mobile Advertising and Marketing Revenues and Third-Party Costs**

- Mobile advertising revenue of $8.9 million, and mobile advertising third-party costs of $5.4 million; resultant mobile advertising revenue less third-party costs of $3.6 million, or a margin of 40 percent.
- Mobile marketing revenue of $22.3 million, and mobile marketing third-party costs of $17.0 million; resultant mobile marketing revenue less third-party costs of $5.3 million, or a margin of 23 percent.

- 27 -

**Cash, Operating and Free Cash Flow**

- Cash position of $19.4 million as of June 30, 2013.
- Q2 operating cash flow of $0.3 million, which excludes $7.6 million of acquisition-related payments associated with MIG.
- Q2 free cash flow of ($3.3) million, which excludes $7.6 million of acquisition-related payments associated with MIG.

48.     On this news, shares of Velti declined $0.66 per share, more than 66%, to close on August 21, 2013, at $0.34 per share, on heavy trading volume.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Velti's securities between January 27, 2011 and August 20, 2013, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

50.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Velti's securities were actively traded on the NASDAQ Stock Exchange (the "NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Velti shares were traded publicly during the Class Period on the NASDAQ. As of March 31, 2013, the Company had 65,622,141 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Velti or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

- 28 -

51.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Velti; and

(c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

55.     The market for Velti's securities was open, well-developed and efficient at all relevant times.   As a result of these materially false and/or misleading statements, and/or failures to disclose, Velti's securities traded at artificially inflated prices during the Class Period.   Plaintiff

and other members of the Class purchased or otherwise acquired Velti's securities relying upon the integrity of the market price of the Company's securities and market information relating to Velti, and have been damaged thereby.

56. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Velti's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Velti's business, operations, and prospects as alleged herein.

57. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Velti's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

58. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

59. During the Class Period, Plaintiff and the Class purchased Velti's securities at

artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors's losses.

## SCIENTER ALLEGATIONS

60. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Velti, their control over, and/or receipt and/or modification of Velti's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Velti, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

61. The market for Velti's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Velti's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Velti's securities and market information relating to Velti, and have been damaged thereby.

62. During the Class Period, the artificial inflation of Velti's stock was caused by the

material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Velti's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Velti and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

63. At all relevant times, the market for Velti's securities was an efficient market for the following reasons, among others:

(a) Velti stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Velti filed periodic public reports with the SEC and/or the NASDAQ;

(c) Velti regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Velti was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

64.     As a result of the foregoing, the market for Velti's securities promptly digested current information regarding Velti from all publicly available sources and reflected such information in Velti's stock price. Under these circumstances, all purchasers of Velti's securities during the Class Period suffered similar injury through their purchase of Velti's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

65.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Velti who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

66.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

- 33 -

67.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Velti's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

68.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Velti's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

69.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Velti's financial well-being and prospects, as specified herein.

70.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Velti's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Velti and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein,

and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

71.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

72.     The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Velti's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were

false or misleading.

73.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Velti's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Velti's securities during the Class Period at artificially high prices and were damaged thereby.

74.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Velti was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Velti securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

75.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

77.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78.     The Individual Defendants acted as controlling persons of Velti within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

79.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

80.     As set forth above, Velti and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's

securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: August 22, 2013                    GLANCY BINKOW & GOLDBERG LLP

By: *s/ Lionel Z. Glancy*
Lionel Z. Glancy
Michael Goldberg
Robert V. Prongay
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:     (310) 201-9150
Facsimile:     (310) 201-9160
Email: info@glancylaw.com
          lglancy@glancylaw.com
          mmgoldberg@glancylaw.com
          rprongay@glancylaw.com
          csadler@glancylaw.com

SCOTT+SCOTT LLP
Joseph P. Guglielmo
Donald A. Broggi
Joseph D. Cohen
The Chrysler Building
405 Lexington Avenue 40th Floor
New York, NY 10174
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com
dbroggi@scott-scott.com
jcohen@scott-scott.com

- and -

David R. Scott
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
drscott@scott-scott.com

LAW OFFICES OF HOWARD G. SMITH
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Attorneys for Plaintiff Anika R. Rieckborn*

**SWORN CERTIFICATION OF PLAINTIFF**

Velti plc, **SECURITIES LITIGATION**

I, Anika R. Rieckborn, certify that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase Velti plc, the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions Velti plc, during the class period set forth in the Complaint are as follows:

   See Attached Transactions

5. I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

   ___ Check here if you are a current employee or former employee of the defendant Company.

   I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: _08 - 22 - 13_        _Anika R. Ulla_
                            (Please Sign Your Name Above)

# Rieckborn Transactions in Velti plc

| Purchase Date | Shares | Price Bought |
| --- | --- | --- |
| 7/17/2012 | 500 | $5.83 |
| 7/17/2012 | 1,159 | $5.829 |
| 7/17/2012 | 341 | $5.81 |
| 7/25/2012 | 100 | $5.48 |
| 7/25/2012 | 300 | $5.48 |
| 7/25/2012 | 1,900 | $5.48 |
| 7/25/2012 | 100 | $5.475 |
| 7/25/2012 | 100 | $5.475 |
| 7/25/2012 | 500 | $5.47 |
| 4/16/2013 | 700 | $1.8594 |
| 4/16/2013 | 100 | $1.8594 |
| 4/16/2013 | 500 | $1.859 |
| 4/16/2013 | 3,500 | $1.859 |
| 4/16/2013 | 100 | $1.855 |
| 4/16/2013 | 100 | $1.855 |