1  Kathleen A. Herkenhoff (SBN 168562)
   **THE WEISER LAW FIRM, P.C.**
2  12707 High Bluff Drive, Suite 200
   San Diego, CA 92130
3  Telephone:  (858) 794-1441
   Facsimile:  (858) 794-1450
4  kah@weiserlawfirm.com

5  *Lead Counsel for Lead Plaintiff*
   *Bobby Yadegar/Ygar Capital LLC*

6  Joseph J. Tabacco, Jr. (SBN 75484)
   Christopher T. Heffelfinger (SBN 118058)
7  Nicole Lavallee (SBN 165755)
   **BERMAN DEVALERIO**
8  One California Street, Suite 900
   San Francisco, CA 94111
9  Telephone: (415) 433-3200
   Facsimile:  (415) 433-6382
10 jtabacco@bermandevalerio.com
   cheffelfinger@bermandevalerio.com
11 nlavallee@bermandevalerio.com

12 *Liaison Counsel and Attorneys for*
   *Plaintiff St. Paul Teachers' Retirement Fund Association*
13
   [*Additional Counsel on Signature Page*]
14
                    **UNITED STATES DISTRICT COURT**
15                 **NORTHERN DISTRICT OF CALIFORNIA**
                      **SAN FRANCISCO DIVISION**
16

17 In re VELTI PLC SECURITIES LITIGATION  )   Master File No. 3:13-cv-03889-WHO
                                          )
18                                        )   Consolidated with Case Nos.
                                          )   13-cv-03954-WHO
19                                        )   13-cv-04140-WHO
   _____  )   13-cv-04606-WHO
20                                        )
   This Document Relates To:              )   **CONSOLIDATED COMPLAINT FOR**
21                                        )   **VIOLATIONS OF THE SECURITIES**
   All Actions                            )   **ACT OF 1933 AND THE SECURITIES**
22                                        )   **EXCHANGE ACT OF 1934**
                                          )
23                                        )   <u>CLASS ACTION</u>
   _____  )
24

25

26

27

28
   _____
   [3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES
   ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

TABLE OF CONTENTS

I.       INTRODUCTION ...............................................................................................1

II.      JURISDICTION AND VENUE ........................................................................8

III.     INTRADISTRICT ASSIGNMENT...................................................................8

IV.      PARTIES ..........................................................................................................9

V.       BACKGROUND FACTS ...............................................................................13

VI.      DEFENDANTS' COURSE OF CONDUCT ..................................................14

         A.     Defendants' Accounting Shenanigans Manipulated the Company's
                Financial Results and, Thereby, Misled the Investing Public...............15

                1.     Applicable Standards ...............................................................15

                2.     Defendants Violated GAAP By Failing to Record an Adequate
                       Allowance for Doubtful Accounts ............................................17

                3.     The Greek and Cypriot Economic Crises Was Not to Blame....................19

                4.     Velti's Accrued Contract Receivables ......................................21

                5.     Days Sales Outstanding ............................................................23

                6.     Velti Violated Its Own Revenue Recognition Policy ...............25

                7.     Internal Controls .....................................................................25

                8.     Additional Allegations of Scienter............................................26

         B.     Baker Tilly Was Deliberately Reckless in Failing To Disclose The
                Inadequate Reserves, and to Question the Staggering Increase in
                Receivables and Their Ultimate Collectability ......................................29

VII.     THE SECURITIES ACT CLAIMS .................................................................31

         A.     The IPO.....................................................................................................31

         B.     The SPO....................................................................................................32

VIII.    FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS
         DURING THE CLASS PERIOD ....................................................................33

IX.      THE CLASS PERIOD ENDING DISCLOSURES........................................112

X.       LOSS CAUSATION........................................................................................114

XI.      SCIENTER .....................................................................................................115

XII.     UNDISCLOSED ADVERSE FACTS .............................................................115

XIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE WITH RESPECT TO
         EXCHANGE ACT CLAIMS ........................................................................116

XIV.   NO SAFE HARBOR ....................................................................................118

XV.    CLASS ACTION ALLEGATIONS ..............................................................118

XVI.   CLAIMS FOR RELIEF ................................................................................120

         COUNT I ......................................................................................................120

         COUNT II .....................................................................................................122

         COUNT III ....................................................................................................124

         COUNT IV ....................................................................................................125

         COUNT V ......................................................................................................128

PRAYER FOR RELIEF ..........................................................................................129

Lead Plaintiff Bobby Yadegar/Ygar Capital LLC and additional plaintiffs St. Paul Teachers' Retirement Fund Association, Newport News Employees' Retirement Fund and Oklahoma Firefighters Pension and Retirement System (collectively "Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation, a review and analysis of: (a) regulatory filings made by Velti plc ("Velti" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) research reports by financial analysts; (c) transcripts of investor conference calls; (d) press releases and media reports issued by and disseminated by Velti; (e) other publicly available information concerning Velti; and (f) documents and information obtained by Lead Counsel from former Velti employees through the course of Lead Counsel's investigation. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.     INTRODUCTION

1.     This is a securities class action on behalf of: (1) persons or entities who purchased or otherwise acquired the securities of Velti pursuant and/or traceable to the Company's registration statement and prospectus (the "IPO Registration Statement") issued in connection with the Company's January 28, 2011 initial public offering (the "IPO") and/or to the Company's registration statement and prospectus (the "SPO Registration Statement") issued in connection with the Company's June 14, 2011 secondary public offering (the "SPO"),[1] seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"); and (2) persons or entities who purchased or otherwise acquired Velti's securities between January 27, 2011 and

---

[1]     The IPO and SPO are referred to collectively as the "Offerings."

August 20, 2013, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act'') (hereinafter collectively the "Class").[2]

2.     In this Complaint, Plaintiffs assert two different sets of claims.  First, Plaintiffs assert strict liability, negligence, and non-fraud based claims (Counts I – III) under the Securities Act.   These claims are asserted against those defendants who are statutorily responsible for material misstatements of facts and omissions in the IPO Registration Statement and SPO Registration Statement.   Securities Act defendants include Velti, the individual members of Velti's Board of Directors (the "Board"), the underwriters of the Offerings, and Baker Tilly Virchow Krause, LLP ("Baker Tilly"), Velti's accounting firm which opined on the Company's financial statements contained in the IPO and SPO Registration Statements.  Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made at the time of the respective Offerings.

3.     Second, Plaintiffs assert scienter-based claims (Counts IV and V) under the Exchange Act against the Company, the Officer Defendants (as defined herein), and Baker Tilly. Those defendants are alleged to have knowingly or with deliberate recklessness made material misstatements and omissions about Velti's financial results, operations and internal controls throughout the Class Period.

4.     Velti describes itself as a provider of mobile marketing and advertising technology and solutions for brands, advertising agencies, mobile operators, and media companies primarily in Europe (especially Greece, where the Company was founded), the Americas, Asia, and Africa.  Velti claimed that its products and services allowed customers to create targeted, interactive, and measurable marketing and advertising campaigns directed to

---

[2]     Collectively, the IPO Registration Statement and the SPO Registration Statement are referred to herein as the "Registration Statements."

consumers via their mobile devices.  Velti sold its services to customers pursuant to written contracts that set forth the payment terms.  Velti did not get paid, however, until after the work done pursuant to a given contract was completed and the customer was invoiced.  Between the time of completion of work and the ultimate receipt of payment by the Company, the amount due to Velti represented an account receivable.  Velti's operating metric of days sales outstanding ("DSO") – the length of time it took the Company to actually collect cash for work completed on a contract – was a critical metric for both the Company and investors.

5.     The relationship between Velti's accounts receivable and revenue is particularly important in the context of this case, because Velti frequently took the position that its criteria for recognizing revenue on a particular contract was satisfied long (sometime, months or even years) before the receivable was actually paid.  Simply, Velti booked revenue from a given contract long before the underlying customer in fact paid its bill.  This meant Velti was often able to publicly portray extremely healthy revenue and earnings growth when it reported financial results, but in reality, the underlying revenue was based on what amounted to "a promise to pay" instead of cash in hand, and the tenuous relationship between promises and cash-in-hand meant that the Company's growth could evaporate at any moment.  Unbeknownst to the market, Velti was a mile wide but only an inch thick.

6.     Velti was originally founded in Athens in 2000, and up to and including the Class Period, maintained the most significant portion of its customer base in Greece.  Velti's contracts in Greece (and the Balkan region) typically had much longer payment terms than those in other geographic regions, particularly when compared to the U.S. and Western Europe.  Velti's endemic Greek ties would pose a challenge in April 2010 when Greek government debt was downgraded, setting off a chain reaction throughout the country (which eventually spread to the entire Balkan region).  Dramatically tightening credit led companies within Greece to substantially delay (already slow) payments to creditors and led multinational companies to reduce their exposure to the country's deteriorating economic situation.

7.      As the Greek economic crisis continued, Velti quickly began feeling the pinch. Already saddled with slow payments due to the Company's large Greek customer base, Velti's invoices remained unpaid.  While the Company continued to report robust revenue growth at the time of the IPO, the truth was that the historical gap between a customer's promise to pay and actual cash in hand was growing.  Unbeknownst to investors, Velti's reported growth was an illusion because the Company's ability to convert sales into cash was deteriorating.  The reduction of the cash inflows was beginning to take its toll on the Company, and the cash raised through its January 2011 IPO would not hold the Company for long.

8.      But it is more than that; instead of candidly informing the market (which would have dramatically reduced the proceeds reaped in the IPO and likely spelled an early doom for the SPO), Velti instead closed ranks and decided to wait-out the crisis.  In the interim, Velti represented to the market that its accounts receivable collections were actually **_improving_** and that it was successfully diversifying its customer base beyond Greece, leaving its problems behind.  None of this was true.

9.      Moreover, from the beginning of the Class Period until on or about May 15, 2012, the market was wholly unaware that Velti's reported DSO – the number of days Velti claimed it took to collect its receivables – was materially understated.  More specifically, prior to May 15, 2012, Velti reported its DSO number using only the time between when **_the customer was actually invoiced and payment was made in the calculation_**.[3]  Critically, Velti excluded the often significant period of time (which was constantly growing throughout the Class Period) between when Velti booked a sale as revenue and when the customer was actually invoiced from the calculation.[4]  By presenting DSO in this way, the Officer Defendants (defined herein) were able to portray a materially shorter DSO number, which in turn created the misleading impression that Velti was converting a sale into cash much faster than it actually was.

---

[3] Velti classified accounts receivable as "trade receivables" once a customer was actually invoiced for the amount due under the contract.

[4] Velti classified accounts receivable as "accrued contract receivables" between the time it recognized revenue from the contract and the time an invoice was sent to the customer.

1  Defendants' manipulation left investors unaware that the Company had very old receivables

2  sitting on its books for which it was not carrying an appropriate reserve for bad debts. This was

3  not only misleading, it was contrary to the requirements of Generally Accepted Accounting

4  Principles ("GAAP").

5        10.    Of course, Defendants' machinations could not be hidden forever, and ultimately

6  they were revealed. Several days before the Company's Q1 2012 earnings conference call on

7  May 15, 2012, a stock market research firm specializing in forensic accounting issues published

8  a report stating that the Company's reported DSO (the most important metric for measuring the

9  health of the Company's business) only included trade receivables and **_excluded_** accrued contract

10  receivables. Thus, the Company's true DSO was much longer than publicly stated. This

11  information was slowly digested by the market, and was reflected in the price of the Company's

12  securities, which materially declined in response over the next few days.

13        11.    On May 22, 2012, with the Company's stock price having taken a beating in the

14  face of otherwise-positive end-of-quarter disclosures, the Company was forced to confirm the

15  information and change the reported DSO. Under its new metric, "comprehensive DSO" – the

16  Company reported DSO calculated using both trade receivables **_and_** accrued contracts

17  receivables – was a far more accurate depiction of the true length of time it was taking for Velti

18  to collect payment from its customers. Once Velti transitioned to comprehensive DSO, however,

19  the Company's reported DSO figure jumped from an already-long 116 days to an incredible 272

20  days. The change more than doubled Velti's DSO.

21        12.    As time passed, Velti continued borrowing cash and was simultaneously divesting

22  assets to raise cash to keep its head above water. In August 2012, Velti entered into a $50

23  million multi-currency senior revolving credit facility with HSBC. The Company also entered

24  into "factoring arrangements"[5] in order to monetize its outstanding accounts receivables. On

25  November 14, 2012 the Company announced that due to its continued inability to timely collect

26  from certain of its customers in the Greek, Balkan, and select North African and Middle Eastern

27  ---

[5] Generally, "factoring" is the sale of receivables to a third party at a discount.

28

regions, it was divesting certain assets and customers in those regions. By the time this decision was made, DSO for these customers had climbed to an astonishing **450 days.** However, Defendants blunted the impact of this news by falsely and repeatedly stating that Velti had successfully transitioned its new business away from those regions to the U.S. and Western Europe.

13. Velti's desire to shift operations away from Greece was front and center in the Company's own public statements, as it stated in August 2012 that only 10% of its revenues came from Greece or the Balkans. Greek customers' reputation as "slow payers," combined with the region's critical economic condition, was the impetus for a more U.S.-focused business strategy where receivables were paid at regular, predictable, intervals. Velti routinely represented to investors that the Company was successfully migrating its business away from Greece and into the U.S. – yet such statements would be revealed as false when made by Velti's own later admissions.

14. Compounding the Company's problems, HSBC, the Company's primary lender, would soon begin to express serious reservations concerning its dealings with Velti. Indeed, by the end of March 2013, the Company had violated a covenant with HSBC which required it to maintain certain leverage ratios. This breach granted HSBC the right to accelerate the Company's obligations under its existing credit facility, rendering them immediately due and payable. In the Company's June 10, 2013 Current Report filed with the SEC on Form 6-K, the Company explained that as of March 31, 2013 "***substantially all our assets including our accounts receivable were pledged as a security against borrowings from HSBC.***" Not surprisingly, as a result, Velti was unable to find lenders willing to extend the Company any additional credit.

15. The Class Period ends on August 20, 2013 when the Company reported its Q2 2013 financial results and revealed the shocking news that it was writing off approximately $111 million of its trade receivables and accrued contract receivables. And, when it did so, the Company simultaneously made two additional stunning disclosures. First, the Company

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-6-

revealed that the receivables were "substantially old" and had been on Velti's books since ***before 2012;*** a *de facto* admission that the write-off was long overdue.  Second, Velti revealed that, at least as of the Q1 2012, ***two-thirds*** of Velti's revenues and receivables still came from Greece and the Balkans, thereby admitting the falsity of: (i) the Company's August 14, 2012 statement that only 10% of its receivables were from Greece and the Balkans, and (ii) its other repeated statements that Velti successfully transitioned away from those regions and that a majority of its revenues were derived from the U.S. and Western Europe.  In addition to these shocking disclosures, the Company announced a "major restructuring" of its business.

16.     On this news, shares of Velti's stock price declined by $0.66 per share, more than 66%, to close on August 21, 2013, at $0.34 per share, on heavy trading volume.

17.     In sum, throughout the Class Period, Defendants made material misstatements and omissions about the Company's business, operations, and prospects, misstating or failing to disclose that: (i) the Company was experiencing  difficulties collecting material  receivables; (ii) a significant portion of the Company's receivables were uncollectible; (iii) as a result, the Company's  revenues  and  receivables  were  overstated  during  the  Class  Period;  (iv) the Company's allowance for doubtful accounts was understated; (v) the Company lacked adequate internal and financial controls over its financial reporting; (vi) Velti's financial statements hid the true length of time it took the Company to collect recognized revenue and misled investors about the quality and collectability of its receivables; and (vii) as a result of the foregoing, the Company's statements and reported financial results were materially false and misleading at all relevant times.   In addition, Defendants made false and misleading statements about the geographic sources of Velti's business, that it successfully transitioned its business away from Greece and the Balkan States, and that the Company was deriving the majority of its revenue from U.S. and Western European customers on favorable payment terms.

18.     The foregoing could not have occurred but for the actions of Baker Tilly and the Underwriter Defendants (as defined herein) who executed the IPO and SPO.  Baker Tilly and the Underwriter  Defendants  failed  to  exercise  the  necessary  reasonable  care  to  ensure  the

1  Company's DSOs and financials conformed to GAAP, an act that infected both the IPO and SPO

2  and misled investors throughout the Class Period.

3  **II.     JURISDICTION AND VENUE**

4        19.     The claims asserted herein arise under Sections 11, 12 and 15 of the Securities

5  Act (15 U.S.C. §§77k, 77l(a) and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15

6  U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R.

7  §240.10b-5).

8        20.     This Court has jurisdiction over the subject matter of this action pursuant to 28

9  U.S.C. §1331 and Section 22 of the Securities Act (15 U.S.C. §77v) and Section 27 of the

10  Exchange Act (15 U.S.C. §78aa).

11        21.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and

12  Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the

13  alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts

14  charged herein, including the preparation and dissemination of materially false and/or misleading

15  information, occurred in substantial part in this Judicial District.  Additionally, the Company

16  maintained corporate, sales, marketing, product development, professional services, support and

17  administrative facilities in San Francisco, California.  The Company also has maintained, at

18  various relevant times, a registered agent at One Market Street, Suite 600, San Francisco,

19  California 94105.

20        22.     In connection with the acts, transactions, and conduct alleged herein, Defendants

21  directly and indirectly used the means and instrumentalities of interstate commerce, including the

22  United States mail, interstate telephone communications, and the facilities of a national securities

23  exchange.

24  **III.    INTRADISTRICT ASSIGNMENT**

25        23.     A substantial part of the events or omissions which give rise to the claims in this

26  action occurred in the City of San Francisco, in the County of San Francisco, and as such this

27  action is properly assigned to the San Francisco Division of this Court.

28

## IV.    PARTIES

24.    Court appointed Lead Plaintiff Bobby Yadegar controls Ygar Capital LLC ("YGAR"), is its sole owner, and has full authority to act for and on its behalf.   YGAR purchased or acquired Velti common stock[6] during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.   YGAR's certification was previously filed herein on October 21, 2013.  (ECF No. 44-2.)  YGAR has also been assigned the right to prosecute claims on behalf of certain additional parties, who also suffered damages, as set forth in its previously filed certifications.

25.    Additional Plaintiff St. Paul Teachers' Retirement Fund Association ("St. Paul") purchased Velti common stock pursuant to and traceable both to (a) the Company's January 28, 2011 IPO Registration Statement, and (b) the Company's June 14, 2011 SPO Registration Statement.  Further, St. Paul purchased or acquired Velti common stock during the Class Period. As a consequence of its purchases of Velti common stock, St. Paul has suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.  St Paul's certification was previously submitted to the Court in connection with the Motion of the Public Pension Funds to Relate and Consolidate Cases, for Appointment as Lead Plaintiff, and for Approval of Their Selection of Co-Lead Counsel. (ECF No. 29-2.)

26.    Additional Plaintiff Newport News Employees' Retirement Fund ("NNERF") purchased or acquired Velti common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.  NNERF's certification was previously submitted to the Court in connection with the Motion of the Public Pension Funds to Relate and Consolidate Cases, for Appointment as Lead Plaintiff, and for Approval of Their Selection of Co-Lead Counsel.  (ECF No. 29-4.)

---

[6]    The term "common stock" is used herein to refer to any and all Velti equity securities that traded on any securities exchange in the United States.

27.     Additional Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") purchased or acquired Velti common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. Oklahoma Firefighters' certification was previously submitted to the Court in connection with the Motion of the Public Pension Funds to Relate and Consolidate Cases, for Appointment as Lead Plaintiff, and for Approval of Their Selection of Co-Lead Counsel.  (ECF No. 29-3.)

28.     Defendant Velti is a Jersey corporation with its principal executive offices located at First Floor, 28-32 Pembroke Street Upper, Dublin 2, Republic of Ireland.  Velti maintains an office in the United States offices in San Francisco, and its registered agent is located at One Market Street, Suite 600 San Francisco, California 94105.

29.     Defendant Alex Moukas ("Moukas") was, at all relevant times, Chief Executive Officer ("CEO") and a director of the Company.  Defendant Moukas signed or authorized the signing of the IPO Registration Statement and the SPO Registration Statement.  According to the Registration Statements, Moukas sold 400,000 shares of Velti stock in the IPO and 700,000 shares in the SPO.

30.     Defendant Wilson W. Cheung ("Cheung") was Chief Financial Officer ("CFO") of the Company until January 2013.  Defendant Cheung signed or authorized the signing of the IPO Registration Statement and the SPO Registration Statement.

31.     Defendant Jeffrey G. Ross ("Ross") served as CFO of the Company as of January 2013.

32.     Defendant Winnie W. Tso ("'Tso") was, at all relevant times, Vice President, Global Controller of the Company.  Defendant Tso signed or authorized the signing of the IPO Registration Statement. According to Confidential Witness ("CW") 1, Tso was the primary contact between the Company and Baker Tilly during the preparation of the IPO Registration Statement.

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-10-

33.     Defendant Chris Kaskavelis ("Kaskavelis") was, at all relevant times, Chief Operating Officer ("COO") and a director of the Company.  Defendant Kaskavelis signed or authorized the signing of the IPO Registration Statement and the SPO Registration Statement. According to the Registration Statements, Kaskavelis sold 400,000 shares of Velti stock in the IPO and 700,000 shares in the SPO.

34.     Defendants Moukas, Cheung, Ross, Tso and Kasavelis are collectively referred to in this Complaint as the "Officer Defendants."

35.     The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Velti's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, or were being concealed from the public, and that the positive representations which were being made were then materially false and/or misleading.  The Officer Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Officer Defendants.

36.     Defendant David W. Mann ("Mann") was, at all relevant times, a director of the Company.  Defendant Mann signed or authorized the signing of the IPO Registration Statement and the SPO Registration Statement.  According to the SPO Registration Statement, Mann sold 18,000 shares of Velti stock in the SPO.

37.     Defendant David C. Hobley ("Hobley") was, at all relevant times, a director of the Company.  Defendant Hobley signed or authorized the signing of the IPO Registration Statement and the SPO Registration Statement.  According to the SPO Registration Statement, Hobley sold 13,000 shares of Velti stock in the SPO.

38.     Defendant Jerry Goldstein ("Goldstein") was, at all relevant times, a director of the Company.  Defendant Goldstein signed or authorized the signing of the IPO Registration Statement and the SPO Registration Statement.  According to the IPO Registration Statement, Goldstein sold 37,000 shares of Velti stock in the IPO.

39.     Defendant Nicholas P. Negroponte ("Negroponte") was, at all relevant times, a director of the Company.  Defendant Negroponte signed or authorized the signing of the IPO Registration Statement and the SPO Registration Statement.  According to the Registration Statements, Negroponte sold 68,000 shares of Velti stock in the IPO and 47,505 shares in the SPO.

40.     Defendants Mann, Hobley, Goldstein and Negroponte are collectively referred to herein as the "Director Defendants."

41.     The Officer Defendants and Director Defendants are collectively referred to in this Complaint as the "Individual Defendants."

42.     As officers and directors of a publicly held company whose common stock was registered with the SEC under the Securities Act, publicly traded and governed by the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate information about the Company's business, operations, financial statements, internal controls and to correct any previously issued statements that had become materially misstated or untrue, so that the market prices of the Company's publicly traded securities would be based on accurate information.  These Individual Defendants violated these requirements and obligations during the Class Period.

43.     Defendant Jefferies LLC (f/k/a Jefferies & Company, Inc.) ("Jefferies") served as an underwriter in connection with the IPO and the SPO.

44.     Defendant RBC Capital Markets, LLC ("RBC") served as an underwriter in connection with the IPO and the SPO.

45.     Defendant Needham & Company, LLC ("Needham") served as an underwriter in connection with the IPO and the SPO.

46.     Defendant Canaccord Genuity Inc. ("Canaccord") served as an underwriter in connection with the IPO and the SPO.

47.     Defendants Jefferies, RBC, Needham, and Canaccord are collectively referred to hereinafter as the "Underwriter Defendants."

48.     Defendant Baker Tilly served as the Company's accounting firm and certified the Company's consolidated financial statements included in both the IPO Registration Statement and SPO Registration Statement, and in the Company's Annual Reports filed with the SEC on Form 20-F on April 12, 2011, April 26, 2012 and April 11, 2013.  Baker Tilly is located at 225 South Sixth Street, Suite 2300, Minneapolis, Minnesota 55402.

## V.     BACKGROUND FACTS

49.     Velti describes itself as the "leading global provider" of mobile marketing and advertising technology and solutions that enables brands, advertising agencies, mobile operators, and media to implement highly targeted, interactive, and measurable campaigns by communicating with and engaging consumers via their mobile devices.  Velti sold its customers an "integrated, easy-to-use, end-to-end software platform," and generated revenue from its software-as-a-service ("SaaS") model, from licensing its software to customers and from providing managed services to customers.

50.     Velti's main product was a self-service platform called Velti mGage.  According to Velti, Velti mGage provided a one-stop-shop where its customers could plan marketing and advertising campaigns. They also could select advertising inventory, manage media buys, create mobile applications, design websites, build mobile CRM campaigns and track performance across their entire campaign in real-time.  In addition, Velti claimed that its proprietary databases and analytics platforms were able to process, analyze and optimize more than 1.3 billion new data facts daily.  Velti claimed that its mGage platform provided agencies and companies with a comprehensive set of tools including analytics and reporting, and business intelligence for consolidated media management, simplified mobile asset production, and highly engaging messaging campaigns.  Velti also offered customers who wanted professional assistance in

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-13-

1   achieving mobile marketing and advertising objectives expert help in developing strategies,

2   programs, and hosting services through its "services organization."

3       51.     Velti plc is incorporated under the laws of the Bailiwick of Jersey.  Its business

4   was first organized in 2000 with the incorporation of Velti S.A., a company organized under the

5   laws of Greece.  Velti plc was formed in 2005 under the laws of England and Wales under the

6   Companies Act 1985 as Brightmanner plc.  In 2006, Brightmanner plc changed its name to

7   Velti plc and later in 2006, Velti plc acquired all of the issued share capital of Velti S.A.  As a

8   result, Velti plc (England and Wales), became the holding company of Velti's various

9   subsidiaries.  Velti, plc's principal executive office is located at 28-32 Pembroke Street Upper,

10  Dublin 2, Republic of Ireland.  Velti maintains an office in the United States in San Francisco

11  and its registered agent is located at One Market Street, Suite 600 San Francisco, California

12  94105.

13  **VI.     DEFENDANTS' COURSE OF CONDUCT**

14      52.     During the Class Period, the Defendants engaged in a fraudulent scheme to

15  manipulate the Company's financial results.

16      53.     Specifically, the Defendants: (i) reported financial results that failed to comply

17  with GAAP; (ii) overstated the company's accounts receivable, revenue, income and shareholder

18  equity; (iii) failed to record a proper allowance for doubtful accounts; and (iv) mislead investors

19  regarding  the quality and collectability of Velti's receivables by reporting false and misleading

20  figures for the days sales outstanding, which is one of Velti's primary business metrics and is an

21  important measure of the Company's overall financial health.

22      54.     As a result of this fraudulent scheme, Defendants violated the federal securities

23  laws in several ways.

24      55.     First, Defendants issued or caused the issuance of false and misleading statements

25  identified in Section VIII, infra, and/or controlled persons who issued false and misleading

26  statements regarding the Company's financial condition and the quality of its internal controls in

27  violation of Rule 10b-5, Section 10(b) and Section 20(a) of the Exchange Act (17 C.F.R.

28

1  §240.10b-5; 15 U.S.C. §78t) and Sections 11, 12 and 15 of the Securities Act of 1933 (15 U.S.C.

2  §§77k & 77o).

3      56.    Second, Defendants issued or caused to be issued false and misleading financial

4  results.  As a result of the deceptive acts described herein, the Company's Class Period financial

5  statements were materially misleading and not presented in accordance with GAAP.  GAAP

6  consists of those principles recognized by the accounting profession as conventions, rules and

7  procedures necessary to define accounting practices at a particular time.  The SEC has the

8  statutory authority for the promulgation of GAAP for public companies and has delegated that

9  authority to the Financial Accounting Standards Board ("FASB").  The FASB issues concept

10 statements, which are the fundamental building blocks of GAAP.  SEC Regulation S-X (17

11 C.F.R. §210.4-01(a)(1)) provides that financial statements filed with the SEC that are not

12 presented in accordance with GAAP will be presumed to be misleading, despite footnotes or

13 other disclosures.

14     57.    Defendants also issued materially false and misleading statements regarding the

15 adequacy of the Company's internal controls.  Moreover, Defendants Moukas, Cheung and Ross

16 repeatedly signed sworn certifications regarding the accuracy of the Company's financial

17 statements and the adequacy of the Company's internal controls which were materially

18 misleading, as these sworn certifications failed to reveal Defendants' knowledge of Velti's

19 violations of GAAP and its own internal accounting procedures.

20     **A.    Defendants' Accounting Shenanigans Manipulated the Company's Financial
           Results and, Thereby, Misled the Investing Public**

21

22         **1.    Applicable Standards**

23     58.    Throughout the Class Period, Defendants knew or were deliberately reckless in

24 not knowing that the Company's accounts receivable, net income and shareholder equity were

25 materially overstated.  In particular, Velti's receivables were manipulated because Defendants

26 failed to cause the Company to record either a timely write-off or an adequate allowance for

27 doubtful accounts.  This inflated the Company's receivables, net income and shareholder equity

28 for GAAP and non-GAAP purposes.

59.     The foregoing, of course, was at odds with the Company's public representations – contained in public statements and filings throughout the Class Period – that its financial results were prepared in accordance with GAAP.

60.     GAAP rules required Velti to record a reserve for the uncertainty associated with the collectability of its outstanding receivables, particularly in light of its customers' economic condition and age of such receivables.  FASB Accounting Standard Codification ("ASC") 450-20-25-2 *Recognition of Loss Contingencies* requires that:

> An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met:
>
> a.     Information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25) indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. Date of the financial statements means the end of the most recent accounting period for which financial statements are being presented. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b.     The amount of loss can be reasonably estimated.

61.     When current information and events make it probable that an entity will be unable to collect amounts due according to the contractual terms of a receivable, a loss contingency should be accrued, ASC 310-10-35-10 *Receivables*:

> If, based on current information and events, it is probable that the entity will be unable to collect all amounts due according to the contractual terms of the receivable, the condition in paragraph 450-20-25-2(a) is met. As used here, all amounts due according to the contractual terms means that both the contractual interest payments and the contractual principal payments will be collected as scheduled according to the receivable's contractual terms. However, a creditor need not consider an insignificant delay or insignificant shortfall in amount of payments as meeting the condition in paragraph 450-20-25-2(a). Whether the amount of loss can be reasonably estimated (the condition in paragraph 450-20-25-2(b)) will normally depend on, among other things, the experience of the entity, information about the ability of individual debtors to pay, and appraisal of the receivables in light of the current economic environment. In the case of an entity that has no experience of its own, reference to the experience of other entities in the same business may be appropriate.

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-16-

62.     Throughout the Class Period, Defendants knew or were deliberately reckless in not knowing that Velti's allowance for doubtful accounts was inadequate.  First, the Company's outstanding receivables balance grew consistently and materially throughout the Class Period, yet Defendants did nothing to sound the alarm or to cause Velti to increase its reserve for doubtful accounts.  Second, according to ASC 310-10-35-10, information and events coming from Greece and Cyprus – most notably the near-total economic collapse of Greece by no later than the beginning of the Class Period – and the fact that the Company's books reflected outstanding receivables more properly measured in months than days pointed to an escalating and severely deteriorating financial condition throughout the Class Period and compelled Velti to accrue a loss contingency for outstanding receivables from the region.  But it did not.  Third, as Defendant Ross admitted at the end of the Class Period, a significant amount of Velti's receivables were "substantially old" and had been on Velti's books since before 2012.  Finally, Defendants' scienter is demonstrated by the fact that Velti's reported DSO metric was *intentionally* manipulated to conceal the real age of its outstanding accounts receivables from investors.

63.     Each of the foregoing is discussed in more detail, below.

## 2.     Defendants Violated GAAP By Failing to Record an Adequate Allowance for Doubtful Accounts

64.     Up until August 20, 2013, when the Company was forced to take a $111 million charge to its receivables, the Company had repeatedly assured investors that its receivables were collectable.  As just one example, during a May 22, 2012 Business Update call, the Company misleadingly boasted that: "[a]nother interesting data point is that, in the last 12 years we have collected hundreds of millions of revenue, yet we had to write-off less than $1 million of bad debt.  Again, our customers are big and they are consistently paying us."

65.     In reality, throughout the Class Period, the Company increasingly struggled to collect receivables, even on the "normally slow" terms that Velti was accustomed to.  This is evidenced by the Company's growing receivables balances, swelling DSO numbers, the decision, announced on November 14, 2012, to divest certain assets in Greece and the Balkans,

and the necessity of reclaiming $5.1 million in factored receivables announced at the same time. These allegations are bolstered by the Company's own financials, and by Defendant Ross' admission at the end of the Class Period, a significant amount of Velti's receivables were "substantially old" and had been on Velti's books since before 2012.

66.    As of December 31, 2010, the Company's allowance for doubtful accounts was a mere $135,000 against a total receivable balance of over $101 million; the allowance for doubtful accounts as a percentage of total receivables was only 0.13%. *Receivables accounted for 87% of Velti's total reported revenue for fiscal year 2010*; in other words, the receivables were Velti's business.  Velti's failure to adequately reserve for the uncertainty associated with collecting these receivables allowed the Company to claim an adjusted net income for fiscal 2010 of $3 million and adjusted earnings per share of $0.07.

67.    The following year, on December 31, 2011, Velti's allowance for doubtful accounts had crept up to $808,000 but the total receivable balance had catapulted to an astonishing $224 million; the allowance for doubtful accounts as a percentage of total receivables was 0.36%.  In other words, even well-after the Greek crisis had begun, Velti was effectively telling the market that it would be *perfect*, that it would nearly collect every cent it was owed.  Receivables accounted for 119% of Velti's total reported revenue for fiscal year 2011.  Velti's failure to adequately reserve for the uncertainty associated with collecting these receivables allowed the Company to claim an adjusted net income for fiscal 2011 of $29 million and adjusted earnings per share of $0.50.

68.    By year end 2012, Velti's allowance for doubtful accounts was still only $8 million against a total receivable balance of over $303 million; the allowance for doubtful accounts as a percentage of total receivables was 2.64%.  Thus, while the allowance for doubtful accounts was slowing increasing (in terms of a percentage of revenues), it really was like pushing back the ocean with a broom.  Receivables accounted for 112% of Velti's total reported revenue for fiscal year 2012.  Velti's failure to adequately reserve for the uncertainty associated

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-18-

with collecting these receivables allowed the Company to claim an adjusted net income for fiscal year 2012 of $22.2 million and adjusted EPS of $.34.

69.     After new CFO, Defendant Ross, joined the Company in January 2013, Velti's allowance for doubtful accounts slowly began creeping up.  By March 12, 2013, when the Company announced its Q4 2012 and year-end 2012 results, the figure was $8 million against a total receivable balance of over $303 million.  The next quarter, Q1 2013, the allowance was raised to $10 million against a total receivable balance of nearly $306 million; the allowance for doubtful accounts as a percentage of total receivables was 3.3%.  Receivables accounted for 118% of the Company's total reported revenue for the four quarters preceding and including Q1 2013, meaning that accumulated receivables were greater than the Company's total reported revenue for the four quarters preceding Q1 2013.

70.     On August 20, 2013, Velti announced that it had (unbeknownst to the market until then) engaged Deloitte Financial Advisory Services ("Deloitte") to undertake a formal review of its outstanding accounts receivable and that, as a result of Deloitte's review, the Company would write-off $111 million worth of its then $286 million worth of receivables.  The Company's allowance for doubtful accounts as a percentage of total receivables *skyrocketed to 43% – thirteen times what it had been in the previous quarter*.  The Company blamed the write-off on customers with business activities in Greece and Cyprus, saying the economic uncertainty in the region was contributing to a deterioration in collections; although this statement (and the conduct; a huge one-time write-down) was meant to suggest that Velti had been hit by a tidal wave, the truth was the waters had been, for years by this point, rising around them.

### 3.     The Greek and Cypriot Economic Crises Was Not to Blame

71.     Velti's blame of the Greek and Cypriot banking crisis for its sudden massive write-down was simply not true.  The Cypriot banking crisis was in full force and widely reported by the start of 2013 and the Greek economic crisis was in full swing by 2010, well before the IPO.  The Greek economic crisis did not suddenly occur in 2013; it was well known to anyone paying even passing attention to the news – and certainly inescapable to any business

operating in the region, let alone one that relies on the region for two thirds of its revenues. Defendants' suggestion that the sudden need for a massive write-off in 2013 was due to a rapidly emergent financial crisis at that time simply belies even the most generous credibility.  In truth, what really happened is that by August 2013, after Deloitte properly audited the Company, Velti could no longer conceal its fraud, and had to disclose it.

72.     Indeed, Velti's own public statements confirm that Defendants were well-aware of the financial crisis and was closely monitoring it and its impact on Velti.

73.     For example, on May 15, 2012, Defendant Moukas publicly stated: "Even in Continental Europe, even in the weaker parts of Continental Europe, our customers' budgets are significantly higher year-over-year despite the economic environment."

74.     And during a May 22, 2012 Business Update Call, Defendant Moukas presented a slide, first shown to investors in the fall of 2011, that analyzed the effect of a Greek and PIIGS default on Velti,[7] showing that even the worst case – a Greek default – would have a modest impact on Velti's business.  Such a statement could only be true if the Company was successful in migrating its business to the U.S. and Western Europe.

75.     Indeed, just a few months later, on November 14, 2012, Velti announced that it had decided to divest its Greek and Balkan subsidiaries attributing the move to the troubled economies of these regions, and emphasized that the majority of Velti's revenue was now derived from customers in the U.S. and the U.K.  According to the press release:

> Velti also announced today that it has entered into an agreement to divest certain declining assets, focused on geographies and customers with worsening economic and demand characteristics, to a group led by local, non-executive management and comprising approximately 75 employees in total.   These assets are characterized by very long revenue collection cycles (*DSOs: approximately 450 days*),[8] are located in troubled economies, and have heavy capital expenditure requirements.

---

[7] PIIGS is an economists' term used to refer collectively to Portugal, Italy, Ireland, Greece and Spain.

[8] All emphasis added unless otherwise noted.

Key aspects of the transaction:

\*       \*       \*

• Revenue from geographies characterized by high-DSOs, including the PIIGS countries, and other North African and Middle Eastern countries is expected to decline to 2 to 3 percent of total revenue for fiscal year 2013;

\*       \*       \*

• As a result of the divestiture and other operational improvements, Velti is targeting comprehensive DSOs below 180 days by Dec. 31, 2013;

• Revenue from the Americas and U.K., as a percentage of total revenue, are expected to increase to 55 to 60 percent in fiscal year 2012 and to 65 to 70 percent of total revenue in fiscal year 2013; and

• Velti's 2013 and 2014 revenue growth rates are expected to increase to the mid-30 percent range in both years (2013 versus proforma 2012, excluding divested assets). (emphasis added).

76.    In the same press release Defendant Moukas acknowledged the move was intended to remove "economically challenged geographies" from the Company's books, specifically Greece and the Balkans.

77.    Accordingly, there is no question that Defendants were – for years preceding this announcement – well-aware of the Greek and Cypriot economic crisis and any impact it might have had on the Company.  By virtue of this knowledge, Velti was required by GAAP to record an appropriate loss contingency.   Defendants' failure to do so was actionably false and misleading.

### 4.    Velti's Accrued Contract Receivables

78.    Defendants' also misled the market with respect to the reporting of its accounts receivable.   As described in the Introduction, Velti recorded two key types of receivables: accrued contracts receivable and trade receivables.  Velti booked revenue that had not been invoiced but for which it claimed all revenue recognition criteria had been met into accrued contracts receivable.  Once an invoice had been issued, the receivable was then moved from being an accrued contract receivable to a trade receivable.  Velti claimed that this two-tiered

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-21-

process was necessary because the amounts recorded in the accrued contracts receivable required reconciliation with the Company's customer before an invoice was sent.   Wilson Cheung explained this reconciliation process during the Company's Q2 2011 investor conference call:

> So, what a typical campaign we normally run is that after the campaign has ended, then we would begin to recognize that revenue assuming that all of the requirements have been met, so they would be recognized as revenue and accrued receivables.  Some of these campaigns, once they have ended usually it will take a couple of weeks for us to reconcile the data with our customers before we can actually invoice them.  So, we would start to see what we actually repocket some of the accrued receivables through trade receivables.  A lot of this change is between the two buckets is primarily due to timing of when the campaign actually ended.

79.    If the Company followed the reconciliation process as disclosed by Cheung and described in Velti's annual report on Form 20-F, it would take only a few weeks after the end of a campaign for Velti to invoice its customers.  Once the invoice was issued, the receivable should move from the accrued contract receivable category to the trade receivable category.  Any differences between Velti's numbers included in the accrued contract receivable and the ultimate number agreed to with its customer should have been immediately been written-off.

80.    From January 27, 2011 to August 20, 2013, however, Velti provided little to no reserve for its trade receivables, and *completely failed to record any type of reserve for its accrued contract receivables* until the last quarter of 2012.  Even then, the Company only recorded a $1 million reserve for an accrued contract receivable balance of $134 million.  This represented a reserve of less than 1%.  In other words, Velti historically had left almost no margin for error; if even a handful of its customers did not pay, it would have had a material effect on the Company's balance sheet and reported growth rates.

81.    Because the accrued contract receivable balance should only be a temporary account whereby the balance would be reclassified to trade receivables once the reconciliation process between Velti and its customers was completed, Velti especially shocked the market when it announced an increase in the allowance for doubtful accounts reserves for its accrued contract receivables from $1.4 million on an accrued contract receivable balance of $137.5 million, or 1%, to $77.8 million on an accrued contract receivable balance of $118.6 million, or a

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-22-

1  whopping 65.6%.  Simply, 70% of the $111 million write-off announced on August 20, 2013

2  was directed at the Company's accrued contract receivables.

3             **5.       Days Sales Outstanding**

4        82.     An analysis of Velti's DSO metric confirms that the Company was concealing its

5  aging accounts receivable in an effort to avoid taking a charge for doubtful accounts.

6        83.     Throughout the Class Period, Velti measured its ability to collect payment

7  through calculation of its Days Sales Outstanding.  The DSO ratio (also called average collection

8  period or days sales in receivables) is a measure of the average number of days that a company

9  takes to collect revenue after a sale has been made.  In other words, DSO measures the length of

10 time it takes a company to turn sales into cash. A low DSO number means a company is

11 collecting its accounts receivable quickly.  A high DSO number shows that a company is selling

12 its product to customers on credit and taking longer to collect money.  DSO is one of the most

13 useful means to understand a business' financial health and, in fact, was Velti's primary business

14 metric.

15       84.     Velti's DSO metric had been a constant focus for investors since the Company

16 went public in January 2011.  And, even then, the Company's DSO was misleading.

17       85.     From January 27, 2011 until May 22, 2012, Velti disclosed a DSO figure that

18 only related to its outstanding "trade receivables."   As explained above, the DSO for trade

19 receivables only tracks the receivable from the date of invoice, not from the date when the sale

20 was booked as an accrued contract (which occurred after a sale took place and the Company

21 claimed that its revenue recognition criteria had been met).  By disclosing the DSO only for trade

22 receivables Velti was able to portray a much shorter collection period than the true length of time

23 the Company was taking to convert sales into cash.

24       86.     Velti's manipulations left investors unaware that the Company had very old

25 receivables sitting on its books for which it was not carrying an appropriate reserve as required

26 by GAAP rules.  And these aged receivables were getting older every day in a terrible economic

27 climate (Greece, the Balkans) for many of its customers.

28

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

87.     Several days before the Company's Q1 2012 earnings conference call on May 15, 2012, a stock research firm specializing in forensic accounting reported that the Company's reported DSO only included trade receivables and *excluded* accrued contract receivables.  This information was slowly digested by the market, and was reflected in the price of the Company's securities, which materially declined in response over the next few days.

88.     On May 22, 2012, presumably in response to market turmoil, Velti held a special "Business Update Call" with investors in which it announced that it would begin to disclose a figure it called "comprehensive DSO."  That number included both trade receivables and accrued contracts receivables and was a more accurate depiction of the true length of time it was taking for Velti to collect.

89.     As soon as Velti transitioned to "comprehensive DSO," its DSO figure jumped from an already excessive 116 days *to 272 days*.  The change more than doubled Velti's DSO number revealing the Company was not collecting cash nearly as fast as it previously represented.

90.     During the same May 22, 2012 Business Update Call, the Company attributed the high comprehensive DSO figure to lengthy collection cycles in the PIIGS region, which includes Greece, one of two countries ultimately blamed for the $111 million charge more than one year later, in August 2013.  The Company, however, attempted to blunt the impact of the reporting change by falsely insisting that the number would drop as the Company continued to successfully move its business away from the PIIGS region.  For example, during the May 22, 2012 call Defendant Moukas told analysts:

> And if you look to our sort of earnings, it's clear that even though all of the geographies we have presence in are growing very fast. Geographies with lower DSOs, lower contribution DSOs are growing much faster.
>
> So, for instance, you are looking at Americas. ***That's going to be our biggest contributor of revenue this year,*** obviously primarily the U.S. has much lower DSOs than the other countries where we are present in. The countries with – or the regions, let's say, with the larger DSOs, like, for instance, Continental Europe, grows around 29%, everything else grows between two times and four times that. ***And so in our mind there is no significant risk there in terms of these adoptions.***

### 6.    Velti Violated Its Own Revenue Recognition Policy

91.    In addition to violating GAAP by failing to properly reserve for uncollectible accounts, Velti violated its own publicly stated revenue recognition policy by booking revenue when collectability was not reasonably assured.  In its Forms 20-F for fiscal years 2010, 2011 and 2012, Velti explained that it recognized revenue when the following conditions were satisfied:

(a)    there was persuasive evidence of an arrangement;

(b)    the service had been rendered or delivery had occurred;

(c)    the fee to be paid by the customer was fixed or determinable; and

(d)    collectability of the fee was reasonably assured.

92.    The assurances Velti provided that it had satisfied its revenue recognition policy were false.  Specifically, Velti did not satisfy the fourth prong of the test – i.e, that collectability of the fee was reasonably assured.   Accordingly, Velti's reported revenue numbers were materially inflated, and its allowance for doubtful accounts was materially understated.

### 7.    Internal Controls

93.    Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and SEC rules promulgated thereunder, the CEO and CFO of reporting corporations are required to certify the accuracy and completeness of the company's financial statements.  They are also required to certify the adequacy of the Company's internal controls.  Defendants issued false and misleading statements regarding the quality of the Company's internal controls and the accuracy of the Company's financial statements.

94.    Defendants Moukas, Cheung and Ross each signed sworn certifications attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls.   Those statements were materially false and misleading as those sworn certifications failed to reveal Defendants' knowledge of Velti's violations of GAAP and its own internal accounting procedures (as detailed in the foregoing pages).   Indeed, in 2013, the Company admitted that the very internal controls for which these Defendants had ultimate responsibility were inadequate.

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-25-

95.     Velti's statements dating back to the IPO regarding its purportedly effective internal controls (another key requirement for compliance with GAAP) were thus *also* necessarily materially false and misleading.  The Company's January 27, 2011 Form F-1 warned of the implications of the Company's failure to maintain effective internal controls over financial reporting.  Such a warning was false and misleading because it failed to disclose that the Company's internal controls over financial reporting were ineffective.

96.     The Company's 2010 Annual Report filed with the SEC on Form 20-F on April 12, 2011 revealed "[w]e have in the past and may in the future experience deficiencies, including material weaknesses, in our internal control over financial reporting" relating to, *inter alia*, Velti's "revenue recognition process."

97.     The Company's 2011 Annual Report filed with the SEC on Form 20-F on April 26, 2012 included no such detail regarding a material weakness suggesting that any such weaknesses had (purportedly) been corrected (which just so happened to be prior to the SPO when Moukas and Kaskavelis, among others, collectively sold Velti shares worth over $30 million).

### 8.     Additional Allegations of Scienter

98.     Numerous other facts support a strong inference that Defendants knew and/or were deliberately reckless in disregarding that the Company was improperly accounting for receivables:

(a)     First, the Company's receivables, revenue, net income and shareholder equity were critical financial metrics that were critical to the Company's business and Defendants repeatedly emphasized their significance in earnings calls, investor presentations and press releases.  These facts are the core of the Company.  And for a Company that, as detailed herein, was "single mindedly focused on cash flow," who was "100%" focused on collecting receivables and allegedly aware of any "worst case scenarios" – are necessarily facts of which Defendants could not credibly have been ignorant.

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-26-

(b)      Second, the sheer size of Velti's write-down provides additional evidence of scienter.  In fact, the $111 million write-off was greater than the total revenue recognized by the Company year to date.

(c)      Third, the Company was well aware of its DSO problems.  According to CW 2, a former Director of Human Resources based in San Francisco from June 2011 through March 2013, some time in Q1 2012 CW 2 began to hear that Velti customers had "credibility problems"  and that the Company was having trouble collecting receivables.  CW 2 also recalls emails sent around the Company discussing DSOs and how they needed to be shorter.   Also, during Q1 2012 CW 2 observed ad hoc meetings between Cheung, financial controller Dave Perna, and Paul Clausing, a Vice-President of Finance.  These meetings occurred in the conference room next to CW 2's office.  CW 2 knew there were collectability problems because CW 2 saw Cheung, Perna and Clausing meeting and overheard parts of their conversations.  According to CW 2, this was no secret because during this time CW 2 knew DSO's were a problem and CW 2 proposed a performance goal to shorten DSOs.

(d)      Fourth, Velti replaced two of its executive level employees in the months immediately preceding its decision to take the charge.  First, the Company hired Jeffrey Ross to serve as its CFO.  Immediately upon Ross' hire he began to slowly inch up the company's allowance for doubtful accounts.  Ross also engaged Deloitte to perform a review of the Company's books, a fact which the Company concealed from investors until August 20, 2013.  And it was Deloitte's work that ultimately forced Velti to take the $111 million write-off.  In addition, in May 2013, the Company hired Mari Baker, a member of its Board of Directors, to serve as interim COO.

(e)      Fifth, Defendants have acknowledged that during each quarter they monitored the ratio between trade contract receivables and accrued contract receivables.  Because they knew these categories were increasing (particularly the accrued receivables category) during each succeeding quarter, Defendants either knew, or were deliberately reckless in not knowing, that the escalating build-up in accrued contract receivables should have been

1   written off as they became increasingly uncollectible.  Further, Defendants concealed the build-

2   up by knowingly or with deliberate recklessness failing to record a sufficient allowance for

3   doubtful accounts.

4              (f)      Sixth, on November 14, 2012, Velti announced that it was taking back

5   $5.1 million in factored receivables.  This indicates that senior management was aware that

6   receivables were uncollectable and served as an inescapably obvious red flag with respect to the

7   problems afflicting the balance of Velti's receivables.  Indeed, it is highly unusual for a

8   Company to reclaim factored receivables and it is an indication that the receivable was not

9   collectable.  Defendant Cheung, the Company's CFO, tried to spin the event as a positive for the

10  Company, telling investors:

11          Basically to make the long story short, we had only about $5.1 million of
            receivables that we have already collected cash on from the factoring facility.
12          However, that factoring – those receivables, since they have not yet been
            collected by the factoring facility, we have to pay interest on that balance until it's
13          fully collected.  And given the fact that we are paying very high interest, it's only
            $5.1 million and we really wanted to close down the factoring arrangement, we
14          decided to take basically a onetime hit.  Take that receivables back on our books,
            put it in trade receivables, collect it on our side, and then basically move on.
15

16  However, Velti's borrowing arrangements from its factors were highly unusual and confirm that

17  the factors themselves had little confidence in the collectability of these accounts receivable as

18  adequate security for their loans.  Velti was borrowing from the factors at high interest rates by

19  pledging its accounts receivable and providing a guarantee for the full amount of the loan in

20  question.  By agreeing to these terms, Velti knew, or was deliberately reckless in not knowing,

21  that its accounts receivable were of questionable quality.  Further, by pledging its accounts

22  receivable and agreeing to these terms, and not having to write off its worthless accounts

23  receivable, Velti was able to defer the day of reckoning when it could no longer use this source

24  of asset based financing.

25

26

27

28

### B.   Baker Tilly Was Deliberately Reckless in Failing To Disclose The Inadequate Reserves, and to Question the Staggering Increase in Receivables and Their Ultimate Collectability

99.   By way of background, the Public Company Accounting Oversight Board ("PCAOB") was established by Congress to oversee the audits of public companies in order to protect investors and the public interest by promoting informative, accurate, and independent audit reports.  The Sarbanes-Oxley Act of 2002, which created the PCAOB, required that auditors of U.S. public companies be subject to external and independent oversight.  The five members of the PCAOB Board, including the Chairman, are appointed to staggered five-year terms by the SEC.  Audits in the U.S. must adhere to Generally Accepted Auditing Standards ("GAAS") expressed by the PCAOB.

100.   Auditors are required to exercise due professional care in the planning of the audit and the preparation of the report, GAAS Interim Auditing Standards ("AU") Section 230.07:

> Due professional care requires the auditor to exercise *professional skepticism*. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence.

101.   Velti's auditors, Baker Tilly, issued materially false and misleading audit opinions.  Baker Tilly issued clean audit opinions on the Company's financial statements for the years ended 2010, 2011 and 2012, thereby falsely assuring investors that the Company's financial statements were prepared in accordance with GAAP and accurately presented the financial position of the Company.

102.   These certifications were prepared without exercising due professional care and therefore were prepared in violation of GAAS.  Given the Company's history with internal control violations, the Company's Auditors should have been on alert to related problems.  Nevertheless Baker Tilly issued unqualified audit opinions attesting to the accuracy of the Company's financial results for the fiscal year 2010, 2011 and 2012.  In addition, the auditors issued an opinion attesting to the efficacy of the Company's internal controls over financial reporting in the financial report for fiscal year 2011.

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-29-

103.     Baker Tilly's responsibilities included testing to ensure both that Velti's customers with outstanding receivables actually owed the Company for services rendered, and in the case of older receivables to test for collectability.   Since accrued contract receivables have not been invoiced, Baker Tilly was required to confirm that the GAAP standards were adhered too, specifically regarding revenue recognition.

104.     Had Baker Tilly followed GAAS and exercised due professional care in discharging their duties, they would have uncovered the Company's collectability problems and insufficient reserves for trade receivables – as Deloitte was swiftly able to do with only the barest modicum of effort.   By failing to approach their work with the required diligence – or even minimal skepticism – Baker Tilly failed to perform the audit in accordance with GAAS, a failure which resulted in a build-up of uncollectable receivables and which ultimately necessitated the $111 million write-off.

105.     Baker Tilly had all appropriate documentation necessary to reach an informed and proper professional opinion.   CW 1, a former Director of Revenue from December 2009 through September 2012, traveled to Athens, Greece three times during 2010 for the express purpose of gathering Velti's customer contracts for Baker Tilly, so that Baker Tilly could review the accounting for the contracts and conform it to U.S. GAAP.   Baker Tilly was in the process of preparing the Company's financials for the IPO.

106.     Indeed, there can be no credible argument that Baker Tilly was anything other than clearly aware of the quarter-to-quarter reconciliations that the Company undertook concerning its accrued accounts receivables and its trade receivables, because the Company announced periodically in public statements that it had engaged in these reconciliations. Even the most cursory of examinations or audit testing of the reconciliation process – again, as evidenced by Deloitte's conclusions – would have revealed the rapidly burgeoning accrued accounts receivables balances from troubled businesses in admittedly troubled regions, and an obvious failure to take an adequate reserve against these uncollectable accounts. Accordingly, Baker Tilly

1   either knew, or, at the barest minimum, was deliberately recklessness in not knowing and not

2   disclosing these material failures.

3   **VII.   THE SECURITIES ACT CLAIMS**

4         107.   In the allegations and claims set forth in this part of the Complaint, Plaintiffs

5   assert claims under the Securities Act.  These claims are asserted against the Company, the

6   Company's auditors, Baker Tilly, the Underwriter Defendants, and the Individual Defendants

7   who signed the IPO Registration Statement and SPO Registration Statement.

8         108.   Each of these Defendants is statutorily liable under Section 11 of the Securities

9   Act for the materially inaccurate statements contained in the IPO Registration Statement and

10  SPO Registration Statement.

11        109.   Plaintiffs also assert claims under Section 12(a)(2) of the Securities Act against

12  the Underwriter Defendants, and Defendants Velti, Moukas, Kaskavelis, Mann, Goldstein,

13  Hobley, and Negroponte, and control person liability claims under Section 15(a) of the Securities

14  Act against the Individual Defendants.

15        110.   Plaintiffs expressly disclaim any allegations of scienter in these non-fraud claims

16  which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims except that

17  any challenged statement of opinion or belief made in connection with the Offerings are alleged

18  to have been materially misstated statements of opinion or belief when made.

19        **A.   The IPO**

20        111.   On January 27, 2011, the Company's final Registration Statement for its IPO was

21  declared effective by the SEC.  The final Prospectus for the IPO was filed with the SEC on

22  January 28, 2011, prior to the opening of the market, and was dated January 27, 2011.  The

23  offering was for 11,092,300 ordinary shares of Velti at $12 per share plus any over-allotment.

24        112.   The IPO Registration Statement included the following statement from Baker

25  Tilly:

26      In our opinion, the consolidated financial statements and financial statement

27      schedule referred to above present fairly, in all material respects, the consolidated
        financial position of Velti plc and its subsidiaries as of December 31, 2009 and

28      2008, and the results of their operations and cash flows for each of the three years

1  ended December 31, 2009, in conformity with accounting principles generally accepted in the United States of America.

2  113.    The IPO Registration Statement was negligently prepared and, as a result,

3  contained untrue statements of material facts or omitted to state other facts necessary to make the

4  statements made not misleading and was not prepared in accordance with the rules and

5  regulations governing its preparation.

6  114.    As discussed below in great detail in paragraphs 120-130, the untrue statements of

7  material fact and omitted material facts in the IPO Registration Statement relate to: (i) the

8  difficulty the Company was having collecting certain receivables; (ii) the fact that certain of the

9  Company's receivables were uncollectible; (iii) the fact that the Company's revenues and

10 receivables were overstated during the Class Period; (iv) that the Company lacked adequate

11 internal and financial controls; and (v) as a result of the foregoing, the Company's statements

12 and reported financial results were materially false and misleading at all relevant times.

13 **B.    The SPO**

14 115.    On June 15, 2011, the Company issued its final Prospectus for the SPO, which

15 was declared effective by the SEC on June 14, 2011.  The offering was for 8,000,000 ordinary

16 shares of Velti at $15.25 per share plus any over-allotment.

17 116.    The SPO Registration Statement also contained the following statement from

18 Baker Tilly:

19

20 In our opinion, the consolidated financial statements and financial statement schedule referred to above present fairly, in all material respects, the consolidated

21 financial position of Velti plc and its subsidiaries as of December 31, 2009 and 2008, and the results of their operations and cash flows for each of the three years

22 ended December 31, 2009, in conformity with accounting principles generally accepted in the United States of America.

23 117.    The SPO Registration Statement was negligently prepared and, as a result,

24 contained untrue statements of material facts or omitted to state other facts necessary to make the

25 statements made not misleading and was not prepared in accordance with the rules and

26 regulations governing its preparation.

27

28

118.     As discussed below in greater detail in paragraphs 157-168, the untrue statements of material fact and omitted material facts in the SPO Registration Statement relate to (i) the difficulty the Company was having collecting certain receivables; (ii) the fact that certain of the Company's receivables were uncollectible; (iii) the fact that the Company's revenues and receivables were overstated during the Class Period; (iv) that the Company lacked adequate internal and financial controls; and (v) as a result of the foregoing, the Company's statements and reported financial results were materially false and misleading at all relevant times.

## VIII.   FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS DURING THE CLASS PERIOD

119.     In regular press releases, conference calls and filings with the SEC, Defendants repeatedly made false and misleading statements and/or failed to disclose material adverse facts concerning Velti's financial results and business, particularly as they pertained to the Company's uncollectable accounts receivable, its failure to maintain an adequate reserve or allowance of doubtful accounts for these uncollectable accounts, and the geographic source of its revenues.

**The Initial Public Offering ("IPO"), January 27, 2011**

120.     Velti's January 27, 2011 IPO Registration Statement included Velti's financial results for the nine months ended September 30, 2010.  The Company reported revenue of $58.8 million, a net loss of $17.7 million, adjusted EBITDA of $4.7 million, EPS of $(0.47) and DSO of 110 days as of September 30, 2010.

121.     The IPO Registration Statement represented that Velti's financial results were prepared in accordance with GAAP:

> Beginning with the year ended December 31, 2009, we changed the preparation of our financial statements from being in accordance with international financial reporting standards, or IFRS, as adopted by the EU to being in accordance with accounting principles generally accepted in the United States, or U.S. GAAP. Accordingly, all prior period financial statements have been retrospectively adjusted to reflect the changes and disclosures required under U.S. GAAP. Please refer to Note 2 to the notes to consolidated financial statements for additional discussion of the change in basis of presentation.

122.     The Company also stated that it recognized revenue only when collectability of the fee was reasonably assured, among other factors:

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-33-

### Revenue Recognition

We derive our revenue from three sources:

(1) software as a service (SaaS) revenue, which consists of fees from customers who subscribe to our hosted mobile marketing and advertising platform, generally referred to as "usage-based" services, and fees from customers who utilize our software solutions to measure the progress of their transaction-based mobile marketing and advertising campaigns, generally referred to as "performance-based" services;

(2) license and software revenue, which consists of revenue from customers who license our mobile marketing and advertising platform and fees for customized software solutions delivered to and installed on the customers' server; and

(3) managed services revenue, which consists of fees charged to customers for professional services related to the implementation, execution, and monitoring of customized mobile marketing and advertising solutions.

We account for our revenue for these services and licenses in accordance with Accounting Standards Codification (ASC) Topic 605 — Revenue Recognition and ASC Topic 985-605 — Certain Revenue Arrangements that Include Software Elements. We recognize revenue when all of the following conditions are satisfied: (i) there is persuasive evidence of an arrangement; (ii) the service has been rendered or delivery has occurred; (iii) the fee to be paid by the customer is fixed or determinable; and (iv) collectability of the fee is reasonably assured. …

123. The IPO Registration Statement further stated that the Company accrued an allowance for doubtful accounts if there was "strong evidence" that the amounts due are unlikely to be collectible:

### Allowance for Doubtful Accounts

We evaluate the collectability of accounts receivable based on a combination of factors; an allowance for doubtful accounts is provided based on estimates developed using standard quantitative measures, which include historical write offs and current economic conditions. We also make a specific allowance if there is strong evidence indicating that the amounts due are unlikely to be collectible. As of September 30, 2010 and December 31, 2009 and 2008, the allowance for doubtful accounts was $135,000 (unaudited), $135,000 and $131,000, respectively

124. The IPO Registration Statement assured investors that the Company has always collected outstanding amounts due from its customers:

**We have *not historically incurred bad debt expense*,** none of our significant customers have historically failed to pay amounts due to us, and we do not believe that any of the customers contributing to our increased accounts receivable aging will fail to pay us in full. Accordingly, we have not determined that any slow-paying customers will require an allowance for bad debt against accounts

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-34-

receivable. In addition, our trade receivables balance increased from $24.4 million in June 30, 2010 to $38.2 million (excluding the impact of newly acquired Mobclix) in September 30, 2010 due to the timing of completing our campaigns and billing of our customers. As a result, our DSOs increased during the third quarter of 2010. However, we expect our DSOs to improve by the end of 2010 due to the increase in our fourth quarter collection efforts.

125.    The IPO Registration Statement also disclosed that Velti used its accounts receivable as security against various loans, and as of September 30, 2010, had pledged $9.1 million of its accounts receivable for that purpose:

As of September 30, 2010 we had pledged $9.1 million of our accounts receivable as security against long and short-term loans, issued a group guarantee for the long and short-term loan of $26.4 million, and secured letters of guarantees for various campaigns of $1.1 million (unaudited). As of December 31, 2009, we had pledged $7.6 million of our accounts receivable as security against long and short-term loans and issued a group guarantee for the long and short-term loan of $16.1 million. As of December 31, 2008, we had pledged $2.9 million of our accounts receivable as security against short-term loans and issued a group guarantee for the short-term loan of $7.0 million. The collateralized receivables are presented at their net present value. The interest rate implicit in the collateralized receivables was 6.0% as of September 30, 2010 (unaudited) and 8.0% as of December 31, 2009 and 2008. Proceeds from and payments on the secured borrowings are presented as components of cash flows from financing activities in the consolidated statements of cash flows. Reductions of secured borrowings are recognized as financing cash flows upon payment to the financial institution and operating cash flows from collateralized receivables are recognized upon customer payment of amounts due.

The average effective interest rates to finance our borrowing facilities as of September 30, 2010 ranged from 6.1% to 20% (unaudited). The average effective interest rates to finance our borrowing facilities as of December 31, 2009 ranged from 2.7% to 15%. The average effective interest rates to finance our borrowing facilities as of December 31, 2008 ranged from 5% to 6.4%. The average effective interest rates to finance our borrowing facilities as of December 31, 2007 ranged from 6% to 7.6%.

126.    The IPO Registration Statement also touted the Company's use of factoring as a means of reducing credit risk:

Concentration of Credit Risk

Financial instruments that potentially subject us to concentrations of credit risk consist primarily of cash and cash equivalents, to the extent that balances exceed insured limits, and accounts receivable.

***Our concentration of credit risk with respect to accounts receivable is limited as we have policies in place to ensure that sales are made to customers with a high credit standing, and we enter into factoring arrangements with local banks for a material portion of our accounts receivable.***

127.   The IPO Registration Statement stated the following regarding the Company's accounts receivable:

> Much of our business is in emerging markets where payment terms on amounts due to us may be longer than on our contracts with customers in other markets. Our days sales outstanding deteriorated during 2009 by increasing from 65 days to 131 days before improving to 77 days by the end of June 2010. Days sales outstanding has declined in the nine months ended September 30, 2010 to 110 days. The deterioration in days sales outstanding in the nine months ended September 30, 2010 is primarily due to outstanding amounts from five customers in the approximate aggregate amount of $5.9 million, the majority of which we have collected subsequent to September 30, 2010. The remaining amount due is from customers with whom we have a history of payment and expect to collect fully. *We have not historically incurred bad debt expense, none of our significant customers have historically failed to pay amounts due to us, and we do not believe that any of the customers contributing to our increased accounts receivable aging will fail to pay us in full. Accordingly, we have not determined that any slow-paying customers will require an allowance for bad debt against accounts receivable.* In addition, our trade receivables balance increased from $24.4 million in June 30, 2010 to $38.2 million (excluding the impact of newly acquired Mobclix) in September 30, 2010 due to the timing of completing our campaigns and billing of our customers. As a result, our DSOs increased during the third quarter of 2010. However, we expect our DSOs to improve by the end of 2010 due to the increase in our fourth quarter collection efforts.

128.   The IPO Registration Statement further stated under the heading "Liquidity and Capital Resources":

> In addition, our trade receivables balance increased from $24.4 million in June 30, 2010 to $38.2 million (excluding the impact of newly acquired Mobclix) in September 30, 2010 due to the timing of completing our campaigns and billing of our customers. As a result, our DSOs increased during the third quarter of 2010. However, we expect our DSOs to improve by the end of 2010 due to the increase in our fourth quarter collection efforts. *We believe that our increase in DSOs is temporary and will improve as the economic climate improves and as we expand our geographic reach into North America and Asia. In addition, we are working towards enhancing our billing processes, enabling us to invoice our customers more quickly, decreasing our accrued contract receivables and enhancing our cash flow. Since early 2010, we have also enhanced our collection efforts and focused on decreasing our DSOs as part of our key performance metrics resulting in an improvement in DSOs of 131 days as of December 31, 2009 to 110 days as of September 30, 2010.*

129.   By pledging its accounts receivable and providing a guarantee for the full amount of the loan in question, Velti's borrowing arrangements from its factors at interest rates were highly unusual and confirm that the factors themselves had little confidence in the collectability of these accounts receivable as adequate security for their loans. By agreeing to these terms,

Velti knew, or was deliberately reckless in not knowing, that its accounts receivable collateral were inadequate.  Further, by pledging its accounts receivable and agreeing to these terms, and not having to write off its worthless accounts receivable, Velti was able to defer the day of reckoning when it could no longer use this source of asset based financing.

130.   The statements contained in the Company's IPO Registration Statement concerning its financial results, its factoring activities, its revenue recognition procedures, its DSO, and its accounting for its allowance for doubtful accounts were false and misleading and deceptively assured and comforted the market that its receivables were collectible and within normal operating ranges given the Company's revenue and net income for the same period.  The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

(a)   the Company was having difficulty collecting its receivables;

(b)   a significant portion of the Company's receivables were owed by customers in dubious financial condition and were uncollectible;

(c)   as a result, the Company's revenues and receivables were materially overstated;

(d)   the Company's allowance for doubtful accounts was materially understated; and

(e)   by showing a DSO number based only on trade receivables and excluding accrued contracts receivables from the calculation, the IPO Registration Statement hid the true length of time it took the Company to collect its receivables, and presented a misleading picture to investors about the quality and collectability of Velti's receivables.

131.   The false and misleading positive statements and material omissions in its IPO Registration Statement concerning Velti's accounts receivables, allowance for doubtful accounts and DSO metric were perceived favorably by and deceived the market concerning the true financial health of Velti, as illustrated by the following analyst reports:

(a)   Canaccord initiated coverage of Velti on March 9, 2011 with a Buy rating and a $17 price target in a report entitled, "Poised to benefit from shift in marketing spend to mobile;

1  revenue model provides great visibility; initiating coverage with BUY rating and $17 price

2  target."  Canaccord analysts noted that "[t]he Company's building Saas revenue model, together

3  with 'same-store' campaign growth within its current customer base, offers good forward

4  visibility . . . ."

5      (b)    Jefferies initiated coverage of Velti on March 9, 2011 in a report entitled "Taking

6  Marketing Mobile; Initiate with Buy and $16.50 Target."  Analysts emphasized Velti's "solid

7  EBITDA margins" and noted their belief that the Company "should drive high revenue and EPS

8  growth."

9      (c)    RBC Capital Markets initiated coverage of Velti on March 9, 2011 in a report

10  entitled "Assuming Coverage with Outperform Rating, Speculative Risk Rating & $18 Price

11  Target."  Analysts cited Velti's "industry-high margins" and noted that "[u]nlike many of its

12  unprofitable start-up peers, Velti's EBITDA margin is currently 24% and we expect should

13  increase to ~35% longer term."

14      132.    The IPO Registration Statement also included the Audit Opinion of Defendant

15  Baker Tilly, that falsely informed investors that the IPO Registration Statement was prepared in

16  accordance with GAAP:

17
18  In our opinion, the consolidated financial statements and financial statement
   schedule referred to above present fairly, in all material respects, the consolidated
   financial position of Velti plc and its subsidiaries as of December 31, 2009 and
19  2008, and the results of their operations and cash flows for each of the three years
   ended December 31, 2009, in conformity with accounting principles generally
20  accepted in the United States of America.

21      133.    Baker Tilly's Audit Opinion was false and misleading because Baker Tilly failed

22  to exercise due professional care as required by GAAS AU Section 230.  By failing to approach

23  their work with the required skepticism the auditors failed to perform the audit in accordance

24  with GAAS AU 230.  This failure resulted in a build-up of uncollectable receivables which

25  ultimately necessitated the $111 million write-off.  Through its opinion, Baker Tilly falsely

26  assured investors that Velti's financial statements were prepared in accordance with GAAP,

27  when in fact they were not. Baker Tilly failed to examine the credit worthiness of Velti's

28

customers in the PIIGS regions in the face of numerous red flags, a critical inquiry in determining whether collectability would be reasonably assured under GAAP.  Even the most cursory of examinations or audit testing of the reconciliation process between accrued accounts receivable and trade accounts receivable would have revealed the rapidly burgeoning accrued accounts receivables balance, and an obvious failure to take an adequate reserve against or write-off those uncollectable accounts.  Accordingly, Baker Tilly either knew, or, at the barest minimum, was deliberately recklessness in not knowing and not disclosing that Velti's financial statements had not been prepared in accordance with GAAP.

**Q4 2010 and Fiscal Year End 2010 Earnings Release and Conference Call, March 16, 2011**

134.   On March 16, 2011, Velti issued a Press Release to announce its Q4 2010 and fiscal year end 2010 results.  The Company reported a trade receivables balance of $39.1 million and an accrued contract receivables balance of $33.6 million as of December 31, 2010.  Defendant Moukas praised the Company's results, saying, "2010 was a year of very significant growth and opportunity for Velti. . . . We recorded record revenue, while sharpening our focus on becoming the world's most widely distributed SaaS (software-as-a-service) platform for mobile marketing and advertising."

135.   The March 16, 2011 press release reported financial results, including Velti's accounts receivable, its fourth quarter and full year 2011 revenue, EBITDA, income and EPS that were materially misstated, and contained false and misleading statements about the Company's growth:

> **Financial Highlights**
> - Q4 2010 revenue of $57.5 million; **fiscal 2010 revenue of $116.3 million**
> - Q4 adjusted EBITDA of $22.5 million; **fiscal 2010 adjusted EBITDA of $27.2 million**
> - Q4 GAAP net income of $2.0 million and EPS of $0.05; **fiscal 20l0 GAAP net loss of $15.7 million** and EPS of $0.41
> - Q4 adjusted net income of $13.5 million and adjusted EPS of $0.34; **fiscal 2010 adjusted net income of $3.0 million** and adjusted EPS of $0.07
>
>        *     *     *
>
> **Velti's total revenue has grown to $116.3 million for the year ended December 31, 2010**, an increase of 29% from $90.0 million for the fiscal year

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-39-

ended December 31, 2009.   On a GAAP basis, net loss for fiscal year ended December 31, 2010 was $15.7 million or $0.41 per share, compared with a net income of $6.5 million, or $0.17 per share, in the 2009 fiscal year.

136.   On the same day, Velti held a conference call with investors to discuss Velti's fourth quarter and year end results.   During that call, Defendants repeated the false and misleading revenue, income, EBITDA and EPS numbers reported earlier.   In addition, Defendant Cheung told investors that the Company's DSO stood at 121 days and that the Company expected them to improve over time:

> Our trade DSOs, as of December 2010, were 121 days for the trailing 12 months in comparison to 131 days for the fiscal year ended December 31st, 2009.
>
> *     *     *
>
> Despite the seasonality with our revenue mix shifting more towards the U.S. and developed countries, and with our enhanced collection efforts, **we expect our DSOs to continue to improve naturally over time**.

137.   The statements contained in the Company's March 16, 2011 earnings release and conference call concerning the Company's growth were false and misleading and deceptively assured and comforted the market that its receivables were healthy and within normal operating ranges given the Company's revenue and net income for the same period.   The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

(a)   the Company was having difficulty collecting its receivables;

(b)   a significant portion of the Company's receivables were owed by customers in dubious financial condition and were uncollectible;

(c)   as a result, the Company's revenues and receivables were materially overstated;

(d)   the Company's allowance for doubtful accounts was materially understated; an

(e)   by showing a DSO number based only on trade receivables and excluding accrued contracts receivables from the calculation, Velti hid the true length of time it took the company to collect its receivables and presented a misleading picture to investors about the quality and collectability of Velti's receivables.

138.   Defendants false positive statements and material omissions concerning Velti's accounts receivable, allowance for doubtful accounts and DSO metric were perceived favorably by the market, as illustrated by the following analyst reports:

(a)   Canaccord concluded that Velti's valuation was attractive citing strong revenue and reduced DSOs in a March 17, 2011 report entitled "Strong Q4/10 Results and Accelerating Customer Growth; Better Q1/11 Guidance; Maintain Buy and $17 Target."

(b)   Jefferies maintained its 'Buy' rating and raised its target to $18.50 (from $16.50) in its report of March 17, 2011 entitled "Solid Q4 Results and Guidance; Raise Estimates and Target."

(c)   RBC Capital Markets raised its revenue estimate for 2011 in a March 17, 2011 report entitled "Velti Clears Its First Hurdle – Solid 4Q Results and Conservative Guidance."

139.   As a result of the Company's failure to follow GAAP and its own revenue recognition policy, the Company's reported financial results were materially false and misleading.

**2010 Annual Report, Filed With the SEC on April 12, 2011**

140.   On April 12, 2011, Velti filed its Annual Report on Form 20-F with the SEC for the 2010 fiscal year.  The Company's Form 20-F was signed by Defendants Moukas and Cheung, and reaffirmed the financial results previously announced on March 16, 2011.  The Company reported fiscal year 2010 revenue of $116.3, an increase of $26.3 or 29% compared to 2009, and trade and accrued contract receivables of $39 million and $33.6 million respectively.

141.   The 2010 Form 20-F covered a number of material subject matters including, for example, that its DSO number for 2010 had improved over 2009, that it had not historically incurred bad debt expense, and that no slow paying customers required an allowance for doubtful accounts:

> Much of our business is in emerging markets where payment terms on amounts due to us may be longer than on our contracts with customers in other markets. Our days sales outstanding (DSOs) as of December 31, 2010 was 121 days. This is an improvement from our DSOs as of December 31, 2009 which were 131 days. During 2009, our DSOs deteriorated by increasing from 65 days as of December 31, 2008 to 131 days as of December 31, 2009. We have not

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-41-

historically incurred material bad debt expense, none of our significant customers have historically failed to pay amounts due to us, and we do not believe that any of the customers contributing to our increased accounts receivable aging will fail to pay us in full. **Accordingly, we have determined that none of our slow-paying customers will require an allowance for bad debt against accounts receivable**. As our revenue mix changes in the future to a greater percentage of revenue from North America, where there is generally a shorter payment cycle, and Asia, **we expect our DSOs to improve**. In addition, **we continue to increase collection efforts worldwide, which we expect will enhance our ability to decrease DSOs in future periods**.

\*      \*      \*

**Allowance for Doubtful Accounts**

We evaluate the collectability of accounts receivable based on a combination of factors; an allowance for doubtful accounts is provided based on estimates developed using standard quantitative measures, which include historical write offs and current economic conditions. We also make a specific allowance if there is strong evidence indicating that the amounts due are unlikely to be collectible. As of December 31, 2010 and 2009, the allowance for doubtful accounts was $135,000.

142.    The Fiscal Year 2010 Form 20-F also falsely informed investors that under the terms of the Company's revenue recognition policy the Company only recognized revenue when certain criteria were met, including the existence of evidence to support the recognition of revenue as of the reporting date.   The Company also stated that revenue would only be recognized as accrued contract receivable when all of the revenue recognition criteria had been met:

The timing of revenue recognition in each case depends upon a variety of factors, including the specific terms of each arrangement and the nature of our deliverable and obligations, and the existence of evidence to support recognition of our revenue as of the reporting date. **For contracts with extended payment terms for which we have not established a successful pattern of collection history, we recognize revenue when all of the criteria are met and when the fees under the contract are due and payable**.

\*      \*      \*

Fees that have been invoiced are recorded in trade receivables and in revenue when all revenue recognition criteria have been met. Fees that have not been invoiced as of the reporting date but all revenue recognition criteria are met are accrued and reported as accrued contract receivables on the balance sheets and recognized as revenue in the period when the fees are earned.

143.    The 20-F also disclosed that Velti used accounts receivable as a security against various loans.  As of December 31, 2010, the Company had pledged $10.7 million of its accounts receivable as security against loans:

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-42-

As of December 31, 2010, we had pledged $10.7 million of our accounts receivable as security against long-term debt and short-term financings and issued group guarantees for long-term debt and short-term financings of $27.5 million. As of December 31, 2009, we had pledged $7.6 million of our accounts receivable as security against long-term debt and short-term financings and issued group guarantees for the long-term debt and short-term financings of $16.1 million. As of December 31, 2008, we had pledged $2.9 million of our accounts receivable as security against short-term loans and issued group guarantees for the short-term financings of $7.0 million. We repaid $51.1 million of the associated outstanding debt subsequent to year end with the proceeds from our public offering in the U.S. completed in January 2011.

144.    By pledging its accounts receivable and providing a guarantee for the full amount of the loan in question, Velti's borrowing arrangements from its factors at interest rates were highly unusual and confirm that the factors themselves had little confidence in the collectability of these accounts receivable as adequate security for their loans.  By agreeing to these terms, Velti knew, or was deliberately reckless in not knowing, that its accounts receivable collateral were inadequate.  Further, by pledging its accounts receivable and agreeing to these terms, and not having to write off its worthless accounts receivable, Velti was able to defer the day of reckoning when it could no longer use this source of asset based financing.

145.    The Form 20-F also acknowledged material weaknesses in Velti's internal control over financial reporting relating to its financial statement close process, but informed investors that it had taken steps to remediate those weaknesses including implementing additional control procedures in connection with its review of key financial estimates including accounts receivable and its allowance for doubtful accounts:

we are increasing the level of preparation and review of our financial statements, and in connection therewith, we are implementing additional control procedures as part of our quarter and year-end close processes as well as adding resources in connection with our review of key financial estimates, including accounts receivable, allowance for doubtful accounts, share-based compensation expense, indebtedness and treasury processes and tax estimates.

146.    The statements contained in the Company's 2010 Annual Report concerning the Company's growth, factoring activities, financial results, its revenue recognition procedures and its improvements to its internal controls over financial reporting deceptively assured and comforted the market that its receivables were within normal operating ranges given the

Company's revenue and net income for the same period.  The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

       (a)    the Company was having difficulty collecting its receivables;

       (b)    a significant portion of the Company's receivables were owed by customers in dubious financial condition and were uncollectible;

       (c)    as a result, the Company's revenues and receivables were overstated;

       (d)    the Company's allowance for doubtful accounts was understated; and

       (e)    by showing a DSO number based only on trade receivables and excluding accrued contracts receivables from the calculation, Defendants hid the true length of time it took the Company to collect its receivables and presented a misleading picture to investors about the quality and collectability of Velti's receivables.

147.   As a result of the Company's failure to follow GAAP and its own revenue recognition policy, the Company's reported financial results were materially false and misleading.

148.   In addition, the Company's Form 20-F also contained Sarbanes-Oxley required certifications, signed by Defendants Moukas and Cheung, who each certified:

1.   I have reviewed this annual report on Form 20-F of Velti plc, for the fiscal year ended December 31, 2010;

2.   Based on my knowledge, this report does not contain   any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of and for, the periods presented in this report;

4.   The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(t) and 15d-15(t)) for the Group and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its

consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the Audit Committee of the Board of Directors (or persons performing the equivalents functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

149.   These certifications were false and misleading because the Company failed to disclose and actively sought to conceal from investors: (i) that it was having difficulty collecting certain receivables; (ii) that certain of the Company's receivables were owed by customers in dubious financial condition and were uncollectible; (iii) that, as a result, the Company's revenues and receivables were overstated during the Class Period; (iv) that the Company's allowance for doubtful accounts was understated during the Class Period; and (v) that, as a result of the foregoing, the Company's statements and reported financial results were materially false and misleading.

150.   Velti's fiscal year 2010 Form 20-F also contained representations from the Company's auditors, Baker Tilly, that they had "conducted [its] audits in accordance with the

standards of the Public Company Accounting Oversight Board" and that "the consolidated financial statements . . . present fairly, in all material respects, the consolidated financial position of Velti."

151.   Defendant Baker Tilly's Audit Report was false and misleading because Baker Tilly failed to exercise due professional care as required by GAAS AU Section 230.  By failing to approach their work with the required skepticism the auditors failed to perform the audit in accordance with GAAS.  This failure resulted in a build-up of uncollectable receivables and which ultimately necessitated the $111 million write-down.  By issuing the clean audit opinion Baker Tilly falsely assured investors that Velti's 2010 Annual Report filed with the SEC on Form 20-F was prepared in accordance with GAAP, when in fact it was not.  Even the most cursory of examinations or audit testing of the reconciliation process between accrued accounts receivable and trade accounts receivable would have revealed the rapidly burgeoning accrued accounts receivables balance, and an obvious failure to take an adequate reserve against these uncollectable accounts. Accordingly, Baker Tilly either knew, or, at the barest minimum, was deliberately recklessness in not knowing and not disclosing that Velti's financial statements had not been prepared in accordance with GAAP.

**Q1 2011 Press Release and Earnings Call, May 12, 2011**

152.   On May 12, 2011, Velti issued a press release to announce its Q1 2011 results. The Company reported "record revenue" and "strong growth" with revenues of $29.6 million, an increase of 82% from the Q1 2010.  The Company also reported trade receivables of $40.7 million and accrued contract receivables of $35 million:

> **Financial Highlights**
> - Revenue of $29.6 million, an increase of 82% from Q1 2010 ($16.2 million);
> - Adjusted EBITDA of $1.3 million; an increase of 180% from Q1 2010 ($457 thousand);
> - GAAP net loss of $15.9 million and EPS of $(0.34);
> - Adjusted net loss of $5.2 million and adjusted EPS of $(0.11)

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-46-

153.     That same day Defendants held a conference call with investors to discuss Velti's Q1 2011 results.  The same false and misleading revenue, income, EBITDA and EPS figures were repeated during the call.  In addition, Defendant Cheung told investors that DSOs were 113 days and would continue to improve over time:

> Our trade DSOs as of March 31st, 2011 were 113 days for the trailing 12 months in comparison to 121 days as of December 31st, 2010. With our revenue mix shifting more towards the U.S. and developed countries and with our enhanced collection efforts, we expect our trade DSOs to continue to naturally improve over time.

154.     The statements contained in the Company's May 12, 2011 earnings release and conference call concerning the Company's growth and record revenues were false and misleading and deceptively assured and comforted the market that its receivables were within normal operating ranges given the Company's revenue and net income for the same period.  The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

(a)     that the Company was having difficulty collecting its receivables;

(b)     that a significant portion of the Company's receivables were owed by customers in dubious financial condition and were uncollectible;

(c)     that, as a result, the Company's revenues and receivables were overstated;

(d)     that the Company's allowance for doubtful accounts was understate; and

(e)     that by revealing only the DSO number for its trade receivables and excluding the DSO number associated with its accrued contracts receivables, Velti hid the true length of time it took the company to collect recognized revenue and misled investors about the quality and collectability of its receivables.

155.     Defendants false positive statements and material omissions concerning Velti's accounts receivables, allowance for doubtful accounts and DSO metric were perceived favorably by the market, as illustrated by the following analyst reports:

(a)     Canaccord raised its price target to $24.50 and maintained its Buy rating citing Velti's strong financial results and continued focus on lowering DSOs in a May 12, 2011 report

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-47-

entitled "Quarter Beat and Better Guidance; Acquires Remaining Stake in Casee; Maintain Buy, Raising Target to $24.50."

(b)     Jefferies raised its price target to $23.00 and maintained its Buy rating citing Velti's better-than-expected revenues, EBITDA, and EPS in a May 13, 2011 report entitled, "Q1 Results: Revenues, EBITDA, and EPS Exceed Consensus."

(c)     RBC Capital Markets raised its price target to $22.00 citing Velti's strong financial results in a May 13, 2011 report entitled, "Serves Up A Beat And Raise."

156.     As a result of the Company's failure to follow GAAP and its own revenue recognition policy, the Company's reported financial results were materially false and misleading.

**The Secondary Public Offering ("SPO"), June 15, 2011**

157.     On June 15, 2011, the Company issued the SPO Registration Statement, which was declared effective by the SEC on June 14, 2011.  The offering was for 9,828,505 ordinary shares of Velti at $15.25 per share plus any over-allotment.

158.     The SPO Registration Statement included Velti's financial results for the three months ended March 31, 2011.  The Company reported revenue of $29.6 million, net loss of $15.9 million, adjusted EBITDA of $1.3 million and EPS of $(0.34).

159.     The SPO Registration Statement reaffirmed to investors that under the terms of the Company's revenue recognition policy the Company only recognized revenue when certain criteria were met, including the existence of evidence to support the recognition of revenue as of the reporting date.  The Company also stated that revenue would only be recognized as accrued contract receivable when all of the revenue recognition criteria had been met:

> **Revenue Recognition**
>
> We account for our revenue for these services and licenses in accordance with Accounting Standards Codification (ASC) Topic 605 — Revenue Recognition and ASC Topic 985-605 — Certain Revenue Arrangements that Include Software Elements.  We recognize revenue when all of the following conditions are satisfied: (i) there is persuasive evidence of an arrangement; (ii) the service has been rendered or delivery has occurred; (iii) the fee to be paid by the customer is fixed or determinable; and (iv) collectability of the fee is reasonably assured.

*          *          *

The timing of revenue recognition in each case depends upon a variety of factors, including the specific terms of each arrangement and the nature of our deliverables and obligations, and the existence of evidence to support recognition of our revenue as of the reporting date. For contracts with extended payment terms for which we have not established a successful pattern of collection history, we recognize revenue when all of the criteria are met and when the fees under the contract are due and payable.

\*        \*        \*

Fees that have been invoiced are recorded in trade receivables and in revenue when all revenue recognition criteria have been met. Fees that have not been invoiced as of the reporting date but all revenue recognition criteria are met are accrued and reported as accrued contract receivables on the balance sheets and recognized as revenue in the period when the fees are earned

160.    The SPO Registration Statement also reported DSO of 113 days as of March 31, 2011, and a $419,000 increase to its allowance for doubtful accounts, but downplayed the small increase reassuring investors that the Company had always collected from its customers even from customers with old balances:

Some of our business is in emerging markets where payment terms on amounts due to us may be longer than on our contracts with customers in other markets. Our days sales outstanding (DSOs) is calculated based on trade receivables, which includes only amounts invoiced as of the balance sheet date. Our DSOs have historically decreased during the first and second quarter, and increased during the third and fourth quarters, due to the seasonal nature of our business. DSOs based on trailing 12 months' revenue were 113 as of March 31, 2011 compared to 121 and 131 as of December 31, 2010 and 2009, respectively. **We have historically collected all amounts due from our customers, even from those customers with balances with longer aging, as evidenced by our insignificant bad debt expense for 2010, 2009 and 2008.** We do evaluate receivables on a customer specific basis and record a reserve based on relevant facts and circumstances as deemed necessary. Accordingly, during the three months ended March 31, 2011 we recorded an increase in the provision for doubtful accounts by $419,000 primarily related to one customer subject to currency control restrictions.

161.    The SPO Registration Statement explained that Velti takes "historical write offs and current economic conditions" into account when setting an allowance for doubtful accounts as follows:

### Allowance for Doubtful Accounts

We evaluate the collectability of accounts receivable based on a combination of factors; an allowance for doubtful accounts is provided based on estimates developed using standard quantitative measures, which include historical write offs and current economic conditions. We also make a specific allowance if there is strong evidence indicating that the amounts due are unlikely to be collectible.

The allowance for doubtful accounts was $554,000, $135,000 and $135,000, as of March 31, 2011, and December 31, 2010 and 2009, respectively.

162.    The SPO Registration Statement further stated that as of March 31, 2011 Velti had factored $6.1 million in receivables noting that its credit risk with regard to its accounts receivable "is limited as we have policies in place to ensure that sales are made to customers with a high credit standing, and we enter into factoring arrangements with local banks for a material portion of our accounts receivable."

163.    In reality, Velti's borrowing arrangements from its factors with recourse and at high interest rates were highly unusual and confirm that the factors themselves had little confidence in the collectability of these accounts receivable as adequate security for their loans. By agreeing to these terms, Velti knew, or was deliberately reckless in not knowing, that its accounts receivable were of dubious quality.  Further, by pledging its accounts receivable and agreeing to these terms, and not having to write off its worthless accounts receivable, Velti was able to defer the day of reckoning when it could no longer use this source of asset based financing.

164.    The statements contained in the SPO Registration Statement concerning Velti's financial results, its factoring activities, its revenue recognition procedures and its accounting for its allowance for doubtful accounts deceptively assured and comforted the market that Velti's receivables were within normal operating ranges given the Company's revenue and net income for the same period.  The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

      (a)    that the Company was having difficulty collecting its receivables;

      (b)    that a significant portion of the Company's receivables were owed by customers in dubious financial condition and were uncollectible;

      (c)    that, as a result, the Company's revenues and receivables were overstated;

      (d)    that the Company's allowance for doubtful accounts was understated; and

      (e)    that by revealing only the DSO number for its trade receivables and excluding the DSO number associated with its accrued contracts receivables, Velti hid the true

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-50-

length of time it took the company to collect recognized revenue and misled investors about the quality and collectability of its receivables.

165.    As a result of the Company's failure to follow GAAP and its own revenue recognition policy, the Company's reported financial results were materially false and misleading.

166.    The Company's Auditors, Baker Tilly, issued a clean audit opinion, included in the SPO Registration Statement, informing investors that the Company's financial statements were prepared in accordance with GAAP:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Velti plc and its subsidiaries as of December 31, 2010 and 2009, and the results of their operations and cash flows for each of the three years ended December 31, 2010, in conformity with accounting principles generally accepted in the United States of America.

167.    Defendant Baker Tilly's Report was false and misleading because Baker Tilly failed to exercise due professional care as required by GAAS AU Section 230.  By failing to approach their work with the required skepticism the auditors failed to perform the audit in accordance with GAAS.  A failure which resulted in a build-up of uncollectable receivables and which ultimately necessitated the $111 million write-down.

168.    By issuing this opinion Baker Tilly assured investors that Velti's financial statements were prepared in accordance with GAAP, when in fact they were not.  Even the most cursory of examinations or audit testing of the reconciliation process between accrued accounts receivable and trade accounts receivable would have revealed the rapidly burgeoning accrued accounts receivables balance, and an obvious failure to take an adequate reserve against these uncollectable accounts. Accordingly, Baker Tilly either knew, or, at the barest minimum, was deliberately recklessness in not knowing and not disclosing that Velti's financial statements had not been prepared in accordance with GAAP.

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-51-

**Q2 2011 Press Release and Earnings Call, August 10, 2011**

169.    On August 10, 2011, Velti issued a press release to announce its Q2 2011 financial results.   The Company announced a 57% increase in revenue from Q2 2010.   The Company reported trade receivables of $31.9 million and accrued contract receivables of $34.1 million:

> **Financial Highlights**
> - Revenue of $34.4 million, an increase of 57% from Q2 2010;
> - Adjusted EBITDA of $3.1 million; an increase of 205% from Q2 2010;
> - GAAP net loss of $25.1 million and EPS of $(0.47); and
> - Adjusted net loss of $2.0 million and adjusted EPS of $(0.04)

170.    That same day Velti held a conference call with investors to discuss its Q2 2011 results.   The same false and misleading revenue, income, EBITDA and EPS figures were reported during the call.   The Company increased its revenue guidance to $172-177 million from $170-175 million.

171.    During the call Defendant Moukas said, ". . . we are really excited about our achievement during the second quarter. **Our revenue growth was really solid; DSOs reduced significantly.** Our internal product and infrastructure got expanded, and we are also excited about the customer-facing front."   Defendant Cheung echoed the sentiment when he told investors, **"We are very pleased with our revenue composition and its trajectory as well as our DSOs. As forecasted, DSOs were down from 129 days to less than 80 days."**

172.    Defendants' false positive statements and material omissions concerning its accounts receivables, allowance for doubtful accounts and DSO metric were perceived favorably by the market as illustrated by the following analyst reports:

(a)    Jefferies maintained its Buy rating and $23 price target noting that it concluded that Velti's raised full-year revenue guidance and maintained EBITDA guidance was "conservative" in an August 10, 2011 report entitled, "Better Revenues but Investments Impact Margins; Reiterate Buy."

(b)     Cannacord cited Velti's material DSO improvement in the quarter and maintained its Buy rating though it dropped its price target to $21 to reflect the Company's higher share count in a report entitled, "DSO Improvement Highlights The Quarter; Investment to Grow the Business Continues; Maintain Buy, Target to $21."

(c)     RBC Capital Markets maintained its Outperform rating citing the drop in DSOs to 80 from 114 but dropped its price target to $19.00 "due to a higher projected share count" in a report entitled, "Solid Revenue and Gross Profit Growth in 2Q, EBITDA In-Line – Sell-Off Overblown."

173.     The statements contained in the Company's March 16, Q2 2011 earnings release and conference call concerning the Company's growth and revenue were false and misleading and deceptively assured and comforted the market that its receivables were within healthy and in normal operating ranges given the Company's revenue and net income for the same period.  The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

(a)     that the Company was having difficulty collecting its receivables;

(b)     that a significant portion of the Company's receivables were uncollectible;

(c)     that, as a result, the Company's revenues and receivables were overstated;

(d)     that the Company's allowance for doubtful accounts was understated; and

(e)     that by revealing only the DSO number for its trade receivables and excluding the DSO number associated with its accrued contracts receivables, Velti hid the true length of time it took the company to collect recognized revenue and misled investors about the quality and collectability of its receivables.

174.     As a result of the Company's failure to follow GAAP and its own revenue recognition policy, the Company's reported financial results were materially false and misleading.

**Second Quarter 2011 Interim Report, August 29, 2011**

175.    On August 29, 2011, Velti filed with the SEC an Interim Report on Form 6-K for the 2011 fiscal second quarter ended June 30, 2011.  The Company reported revenue for the six months ended June 30, 2011 of $63.9 million, adjusted EBITDA of $4.4 million and EPS of $(0.82).   The interim report also reported trade receivables of 31.8 million, accrued contract receivables of $34.1 million and an allowance for doubtful accounts of $444,000.

176.    The August 9, 2011 Interim Report covered a number of material subject matters, for example, that DSOs had decreased to 79 as of June 30, 2011, down from 113 as of March 31, 2011.  The Company also noted that it had not historically incurred bad debt expense:

> Some of our business is in emerging markets where payment terms on amounts due to us may be longer than on our contracts with customers in other markets. Our days sales outstanding (DSOs) is calculated based on trade receivables, which includes only amounts invoiced as of the balance sheet date. Our DSOs have historically decreased during the first and second quarters, and increased during the third and fourth quarters, due to the seasonal nature of our business. **DSOs based on trailing 12 months' revenue were 79 as of June 30, 2011** compared to 113, 121 and 131 as of March 31, 2011, December 31, 2010 and 2009, respectively.  **We have historically collected substantially all amounts due from our customers**, even from those customers with balances with longer aging, as evidenced by our insignificant bad debt expense for 2010, 2009 and 2008.

> As our revenue mix changes in the future to a greater percentage of revenue from North America and Asia, where there is generally a shorter payment cycle, we expect our DSOs to continue to improve. In addition, we continue to increase collection efforts worldwide, which we expect will enhance our ability to decrease DSOs in future periods.

177.    The August 29, 2011 Interim Report falsely informed investors that under the terms of the Company's revenue recognition policy the Company only recognized revenue when certain criteria were met, including the existence of evidence to support the recognition of revenue as of the reporting date.   The Company also stated the revenue would only be recognized as accrued contract receivables when all of the revenue recognition criteria had been met:

> The timing of revenue recognition in each case depends upon a variety of factors, including the specific terms of each arrangement and the nature of our deliverable and obligations, and the existence of evidence to support recognition of our revenue as of the reporting date. For contracts with extended payment terms for which we have not established a successful pattern of collection history, we recognize revenue when all of the criteria are met and when the fees under the contract are due and payable.

*       *       *

Fees that have been invoiced are recorded in trade receivables and in revenue when all revenue recognition criteria have been met. Fees that have not been invoiced as of the reporting date but for which all revenue recognition criteria are met are reported as accrued contract receivables on the balance sheets.

178. The Company also acknowledged the finding of material weaknesses in its internal controls over financial reporting in its 2010 Annual Report, but assured investors that its financial statements were presented in accordance with GAAP:

The Company's management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial (and principal accounting) Officer, carried out an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this report. As previously disclosed in our annual report on Form 20-F for the year ended December 31, 2010, we have determined that we have inadequate controls related to our period end financial statement close process resulting from controls over the use of spreadsheets and controls over analysis of significant estimates and have determined that we have unremediated material weaknesses resulting from these processes. As a result, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are not effective at a reasonable level of assurance, as of June 30, 2011. Notwithstanding the continuation of these material weaknesses, however, our management has concluded that our consolidated financial statements for the periods covered by and included in this interim report are fairly stated in all material respects in accordance with accounting principles generally accepted in the U.S. for interim financial information.

179. The statements contained in the Company's August 29, 2011 Interim Report concerning the Company's financial performance and revenue recognition policies deceptively assured and comforted the market that its receivables were within normal operating ranges given the Company's revenue and net income for the same period. The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

(a)     that the Company was having difficulty collecting its receivables;

(b)     that a significant portion of the Company's receivables were owed by customers in dubious financial condition and were uncollectible;

(c)     that, as a result, the Company's revenues and receivables were overstated;

(d)     that the Company's allowance for doubtful accounts was understated; and

(e)    that by revealing only the DSO number for its trade receivables and excluding the DSO number associated with its accrued contracts receivables, Velti hid the true length of time it took the company to collect recognized revenue and misled investors about the quality and collectability of its receivables.

180.    As a result of the Company's failure to follow GAAP and its own revenue recognition policy, the Company's reported financial results were materially false and misleading.

181.    The Interim Report also contained SOX required certifications, signed by Defendants Moukas and Cheung, substantially similar to the certifications contained in ¶ 148, *supra*.

182.    The certifications were false and misleading because the Company failed to disclose and actively sought to conceal from investors: (i) that it was having difficulty collecting certain receivables; (ii) that certain of the Company's receivables were owed by customers in dubious financial condition and were uncollectible; (iii) that, as a result, the Company's revenues and receivables were overstated during the Class Period; (iv) that the Company's allowance for doubtful accounts was understated during the Class Period; and (v) that, as a result of the foregoing, the Company's statements and reported financial results were materially false and misleading.

**Q3 2011 Press Release and Earnings Call, November 15, 2011**

183.    On November 15, 2011, Velti issued a press release to announce its "record-setting" Q3 2011 financial results.  The Company announced an increase in revenue of 85% and increased revenue guidance for the year to $180-$185 million from $172-$177 million.  The Company reported improved DSOs of 82 days and that trade and accrued contract receivables were $36.5 million and $42.4 million respectively:

> **Q3 Financial Highlights**
> - Revenue of $38.2 million, an increase of 85% from Q3 2010, driven by overall growth in smart phones, increased mobile marketing spend, and new blue chip clients

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-56-

- Adjusted EBITDA of $5.6 million, compared with $3.3 million in Q3 2010, an increase of 73%;

- GAAP net income attributable to Velti of $0.6 million and EPS of $0.01 compared with a net loss of $6.0 million and EPS of $(0.16) for Q3 2010; and

- Adjusted net loss of $1.1 million and adjusted EPS of $(0.02) compared with an adjusted net loss of $3.9 million and adjusted EPS of $(0.10) for Q3 2010

184.   In the press release, Defendant Moukas referred to the "record-setting" results attributing them to "the strength of our technology platform, our expanded global footprint and rapid growth in our end markets."

185.   That same day, the Defendants held a conference call with investors to discuss Velti's Q3 2011 results.   During the call Defendant Cheung emphasized the Company's supposedly improving DSOs attributing them to enhanced collection efforts and a shift in revenue mix:

> Trade DSOs for the trailing 12-month period ended September 30 were 82 days, essentially flat, relative to our approximately 80 days DSOs at the end of Q2.   As we mentioned during our Q2 earnings call, our DSO improvement has been driven by enhanced collection efforts and ***an ongoing shift in our revenue mix towards the Americas.***   As we enter the fourth quarter, our heaviest seasonally, we expect trade DSOs to increase moderately quarter-over-quarter, but still decrease compared to Q4 of 2010, year-over-year.

186.   Defendant Moukas emphasized that the Company was reporting "record third quarter adjusted EBITDA of $5.6 million, an increase of 73% over the same period in 2010."

187.   The statements contained in the Company's March 16, 2011 earnings release and conference call concerning the Company's growth, financial results, and strength were false and misleading and deceptively assured and comforted the market that its receivables were within normal operating ranges given the Company's revenue and net income for the same period.   The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

(a)   that the Company was having difficulty collecting its receivables;

(b)   that a significant portion of the Company's receivables were owed by customers in dubious financial condition and were uncollectible;

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-57-

(c)     that, as a result, the Company's revenues and receivables were overstated;

(d)     that the Company's allowance for doubtful accounts was understated; and

(e)     that by revealing only the DSO number for its trade receivables and excluding the DSO number associated with its accrued contracts receivables, Velti hid the true length of time it took the company to collect recognized revenue and misled investors about the quality and collectability of its receivables.

188.    Defendants false positive statements and material omissions concerning its accounts receivables, allowance for doubtful accounts and DSO metric were perceived favorably as illustrated by the following analyst reports:

(a)     Canaccord maintained its Buy rating and $18 price target saying "macro-economic and company-specific concerns have contributed to an oversold stock, creating a very attractive entry point to build positions" and noting the Company's revenue beat and guidance raise in a November 15, 2011 report entitled, "Strong Q3/11 Results Should Help Eliminate Valuation Discount; Maintain Buy and $18 Target."

(b)     Jefferies cited Velti's revenue beat and guidance raise in maintaining its Buy rating and price target of $23 in a November 16, 2011 report entitled, "Strong Q3 Results; Set UP Well for Q4 and 2012."

(c)     RBC Capital Markets raised its 2012 revenue and EBITDA estimates in a November 16, 2011 report entitled, "Delivers in 3Q and Guides Well for 4Q; Mobile Marketing Growth Thesis Intact"

(d)     Wells Fargo maintained its Outperform rating noting Velti's "better-than-expected top- and bottom-line," in a November 16, 2011 report entitled, "VELT: Q3 Beat and Raise – Mobile Momentum Continues."

189.    As a result of the Company's failure to follow GAAP and its own revenue recognition policy, the Company's reported financial results were materially false and misleading.

**Third Quarter 2011 Interim Report, December 2, 2011**

190.    On December 2, 2011, Velti filed with the SEC an Interim Report on Form 6-K for the period ended September 30, 2011 that was signed by Defendant Cheung.   The Interim Report repeated the financial results announced on November 15, 2011; revenue of $102 million for the nine months ended September 30, 2011 along with EBITDA of $10 million and EPS of $(0.75).   The Interim Report also repeated the trade receivable number of $36.5 million and accrued contract receivables of $42.4 million as of September 30, 2011 along with an allowance for doubtful accounts of $632,000.

191.    The Company announced a trade DSO figure of 82 days based on the trailing 12 months' revenue and sought to reassure investors that there was no need to increase its reserves for outstanding receivables:

> Some of our business is in emerging markets where payment terms on amounts due to us may be longer than on our contracts with customers in other markets. Our DSOs based on trade receivables (trade DSOs) have historically decreased during the first and second quarters, and increased during the third and fourth quarters, due to the seasonal nature of our business.  ***Trade DSOs based on trailing 12 months' revenue were 82*** as of September 30, 2011 compared to 79, 113, 121 and 131 as of June 30, 2011, March 31, 2011, December 31, 2010 and 2009, respectively.  ***We have not historically incurred material bad debt expense, none of our significant customers have historically failed to pay amounts due to us, and we do not believe that any of the customers contributing to our increased accounts receivable aging will fail to pay us in full. Accordingly, we have determined that none of our slow-paying customers will require an allowance for bad debt against accounts receivable.***  As our revenue mix changes in the future to a greater percentage of revenue from the North America and Asia, we would expect our trade DSOs to improve as a result of the inherent shorter payment cycle experience in these geographies as well as our intent to increase collection efforts worldwide.   Additionally, we are working towards enhancing our billing processes, enabling us to invoice our customers more quickly, decreasing our accrued contract receivables and enhancing our cash flow.

192.    The Company also continued to falsely inform investors that under the terms of its revenue recognition policy, revenue would only be recognized as accrued contract receivables when all of the revenue recognition criteria had been met:

> The timing of revenue recognition in each case depends upon a variety of factors, including the specific terms of each arrangement and the nature of our deliverable and obligations, and the existence of evidence to support recognition of our revenue as of the reporting date. For contracts with extended payment terms for which we have not established a successful pattern of collection history, we

recognize revenue when all of the criteria are met and when the fees under the contract are due and payable. Fees that have been invoiced are recorded in trade receivables and in revenue when all revenue recognition criteria have been met. Fees that have not been invoiced as of the reporting date but for which all revenue recognition criteria are met are reported as accrued contract receivables on the balance sheets.

\* \* \*

A significant portion of our revenue is accrued but not billed as of each reporting date. As of September 30, 2011 and 2010, we had earned but un-invoiced contract revenue of $42.4 million and $33.6 million, respectively, from rendering services relating to projects that are completed or delivered but for which we had not yet invoiced the customer. ***We recognize uninvoiced contract revenue when all revenue recognition criteria are met***. However, accrued contract receivables are not included in trade receivables until the customer is invoiced.

193.    The Company also acknowledged the finding of material weaknesses in its internal controls over financial reporting in its 2010 Annual Report, but assured investors that its financial statements were presented in accordance with GAAP:

The Company's management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial (and principal accounting) Officer, carried out an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this report.  As previously disclosed in our annual report on Form 20-F for the year ended December 31, 2010, we have determined that we have inadequate controls related to our period end financial statement close process resulting from controls over the use of spreadsheets and controls over analysis of significant estimates and have determined that we have unremediated material weaknesses resulting from these processes. As a result, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are not effective at a reasonable level of assurance, as of September 30, 2011. Notwithstanding the continuation of these material weaknesses, however, our management has concluded that our consolidated financial statements for the periods covered by and included in this interim report are fairly stated in all material respects in accordance with accounting principles generally accepted in the U.S. for interim financial information.

194.    The statements contained in the Company's December 2, 2011 Interim Report concerning the Company's financial performance and revenue recognition policies deceptively assured and comforted the market that its receivables were within normal operating ranges given the Company's revenue and net income for the same period.  The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

(a)    that the Company was having difficulty collecting its receivables;

(b)     that a significant portion of the Company's receivables were owed by customers in dubious financial condition and were uncollectible;

(c)     that, as a result, the Company's revenues and receivables were overstated;

(d)     that the Company's allowance for doubtful accounts was understated; and

(e)     that by revealing only the DSO number for its trade receivables and excluding the DSO number associated with its accrued contracts receivables, Velti hid the true length of time it took the company to collect recognized revenue and misled investors about the quality and collectability of its receivables.

195.     As a result of the Company's failure to follow GAAP and its own revenue recognition policy, the Company's reported financial results were materially false and misleading.

196.     The Interim Report also contained SOX required certifications, signed by Defendants Moukas and Cheung, substantially similar to the certifications contained in ¶ 148, *supra*.

197.     The certifications were false and misleading because the Company failed to disclose and actively sought to conceal from investors: (i) that it was having difficulty collecting certain receivables; (ii) that certain of the Company's receivables were owed by customers in dubious financial condition and were uncollectible; (iii) that, as a result, the Company's revenues and receivables were overstated during the Class Period; (iv) that the Company's allowance for doubtful accounts was understated during the Class Period; and (v) that, as a result of the foregoing, the Company's statements and reported financial results were materially false and misleading.

**Fourth Quarter and Year End 2011 Press Release and Conference Call, March 12, 2012**

198.     On March 12, 2012, the Company issued a press release reporting 2011 full year and Q4 2011 results entitled, "Velti Announces a Strong Fourth Quarter and Fiscal Year 2011 With 63% Year on Year Revenue and 95% Adjusted EBITDA Growth, Provides Guidance for a Robust 2012." The Company announced fiscal year 2012 guidance of $280-$295 million:

**Fiscal Year 2011 Financial Highlights**

- **Revenue of $189.2 million**, an increase of 63% from fiscal year 2010;
- Revenue less 3rd party costs of $1353 million (resulting in a margin of 72% as a percentage of revenue), an increase of 70% from fiscal year 2010;
- Adjusted EBITDA of $53.1 million compared with $27.2 million in fiscal year 2010, an increase of 95%;
- GAAP net loss attributable to Velti of $15.4 million and EPS of$(0.28) compared with net loss of $15.7 million and EPS of$(0.41) for fiscal year 2010; and
- Adjusted net income of $29.0 million and adjusted diluted EPS of $0.50 compared with adjusted net income of $3.0 million and adjusted diluted EPS of $0.07 for 2010.

*      *      *

**Q4 Financial Highlights**

- **Revenue of $87.1 million**, an increase of 52% from Q4 2010;
- Revenue less 3rd party costs of $68.3 million (resulting in a margin of 78% as a percentage of revenue), an increase of 76% from Q4 2010;
- Adjusted EBITDA of $43.1 million, compared with $22.5 million in Q4 2010, an increase of 92%;
- GAAP net income attributable to Velti of $25.0 million and diluted EPS of $0.40 compared with net income of $2.0 million and EPS of $0.05 for Q4 2010;
- Adjusted net income of $37.3 million and adjusted diluted EPS of $0.59 compared with adjusted net income of $13.5 million and adjusted diluted EPS of $0.34 for Q4 2010;
- Mobile advertising revenue of $10.0 million, an increase of 67% from Q4 2010; and
- Mobile marketing revenue of $77.2 million, an increase of 50% from Q4 2010.

199.    Defendant Moukas attributed Velti's "revenue growth" to "a significant increase of our customers across brands and advertising agencies, with existing customers spending in 2011 44% more dollars for Velti software solutions that allow them to access the mobile market in a targeted and measureable way."

200.    That same day, the Company held a conference call with investors to discuss its fourth quarter and year end 2011 results. Defendant Moukas called the quarter a "tremendous quarter for Velti and a testimony to our results based mobile marketing advertising platform" and emphasized to investors that the Company was "well on our way to deliver free cash flow

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-62-

positive results by the end of the year and become operating cash flow positive before that point."

201.    During the conference call Defendant Cheung had the following exchange with an analyst:

> <Q>And then Wilson, the DSO increased its add in 4Q, yet your mix of revenue coming from the Americas region is also increasing pretty significantly. So is that just a timing thing or was there [audio gap] anything else to read into, and do you expect that DSO to continue to come down in 2012?
>
> <A-Wilson Wai Cheung> . . . It is definitely a timing issue and if you actually look at the deck that we put out there you can actually see a similar trend for last year where Q4, normally the DSOs would be higher because of the reasons Moukas mentioned earlier that there is a big chunk of performance campaigns that we ran. In the fourth quarter typically they end towards the end of the quarter and therefore we accrue a significant amount of revenues, and we won't be able to churn those into trade revenues before collections.
>
> So similar to last year I think going into the first quarter and second quarter of 2012, you should expect DSOs to improve from that point on, and my expectation is that every quarter on a trailing 12 month basis, our DSO – trade DSO should improve at least a couple of days and over the longer term, we'll try to bring that trade DSO number down to sub-70 days.

202.    Defendant Cheung told another analyst that the Company was *monitoring the ratio between trade receivables and accrued contracts receivables.* In other words, the Company was either well-aware of, or reckless in not knowing that its DSO metric was significantly understated by not including accrued contracts receivables in the calculation. Specifically Cheung said:

> I – just so you know in addition to factoring, ***I think we also are monitoring the ratio between trade receivables and accrued receivables***. Q4 is a typical quarter where we accrue a large proportion of accrued receivables, and as a result we would be spending a lot of time doing the invoicing in the first quarter, until we actually get the collections. So that's one of the things that we're focusing on. And internally obviously we are enhancing the collection efforts to – and invoicing efforts, so that we invoice our customers much more frequently, much more faster and also as we get into newer contracts in the newer geographies that we do business with. We will make sure that the payment terms are much more receptive to, like these from U.S. investors' viewpoint.

203.    The statements contained in the Company's March 12, 2012 earnings release and conference call concerning the Company's financial performance and revenue recognition

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-63-

policies were false and misleading and deceptively assured and comforted the market that its receivables were within normal operating ranges given the Company's revenue and net income for the same period.  The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

(a)     that the Company was having difficulty collecting its receivables;

(b)     that a significant portion of the Company's receivables were owed by customers in dubious financial condition and were uncollectible;

(c)     that, as a result, the Company's revenues and receivables were overstated;

(d)     that the Company's allowance for doubtful accounts was understated; and

(e)     that by revealing only the DSO number for its trade receivables and excluding the DSO number associated with its accrued contracts receivables, Velti hid the true length of time it took the company to collect recognized revenue and misled investors about the quality and collectability of its receivables.

204.     Defendants false positive statements and material omissions concerning its accounts receivables, allowance for doubtful accounts and DSO metric were perceived favorably as illustrated by the following analyst reports:

(a)     Canaccord raised its price target to $21 and maintained its Buy rating citing Velti's strong growth and belief that DSOs would continue to improve in a March 12, 2012 report entitled "Strong Organic Growth And New Revenue Disclosures Should Help Valuation Discount; Maintain Buy, Target To $21."

(b)     Jefferies maintained its Buy rating and $23 price target and raised its estimates citing Velti's revenue and EPS beat in a March 12, 2012 report entitled, "Strong Q4 Results and Solid 2012 Guidance.

(c)     Wells Fargo maintained its Outperform rating and raised its valuation rage to $17-19 from $11-12 citing Velti's strong growth and better-than-expected revenues, EBITDA and adjusted EPS in a March 12, 2012 report entitled, "VELT: Solid Quarter – Positive Guide – Operating Metrics Offered."

205.   As a result of the Company's failure to follow GAAP and its own revenue recognition policy, the Company's reported financial results were materially false and misleading.

**2011 Annual Report, April 26 2012**

206.   On April 26, 2012, Velti filed its Annual Report on Form 20-F for the year ended December 31, 2011 on Form 20-F with the SEC. The Company's Form 20-F was signed by Defendants Moukas and Cheung, and repeated the Company's financial results previously announced on March 12, 2012.  The Company reported fiscal year 2011 revenue of $189.2 million and trade and accrued contract receivables of $70.9 million and $98.2 million, respectively.   This compared with $39.1 million of trade receivables and $33.6 million of accrued contract receivables as of December 31, 2010.

207.   Despite the growing receivables figure, the 2011 Annual Report assured investors that the Company had evaluated the collectability of accounts receivable and that where there is "…strong evidence indicating that the amounts due are unlikely to be collectable, the Company makes a specific allowance for doubtful accounts" and had concluded that "[a]s of December 31, 2011 and 2010, the allowance for doubtful accounts was $808,000 and $135,000, respectively."

> **Allowance for Doubtful Accounts**
>
> We evaluate the collectability of accounts receivable based on a combination of factors; an allowance for doubtful accounts is provided based on estimates developed using standard quantitative measures, which include historical write offs and current economic conditions. We also make a specific allowance if there is strong evidence indicating that the amounts due are unlikely to be collectible. As of December 31, 2011 and 2010, the allowance for doubtful accounts was $808,000 and $135,000, respectively.

208.   The statements contained in the Company's 2011 Annual Report concerning the Company's growth, financial results and accounting for doubtful accounts were false and misleading and deceptively assured and comforted the market that its receivables were within normal operating ranges given the Company's revenue and net income for the same period.  The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-65-

1    (a)    that the Company was having difficulty collecting its receivables;

2    (b)    that a significant portion of the Company's receivables were owed by customers

3             in dubious financial condition and were  uncollectible;

4    (c)    that, as a result, the Company's revenues and receivables were overstated;

5    (d)    that the Company's allowance for doubtful accounts was understated; and

6    (e)    that by revealing only the DSO number for its trade receivables and excluding the

7             DSO number associated with its accrued contracts receivables, Velti hid the true

8             length of time it took the company to collect recognized revenue and misled

9             investors about the quality and collectability of its receivables.

10    209.    Velti's 2011 Form 20-F also reported that management had concluded that the Company's internal control over financial reporting was effective as of December 31, 2011.  In addition, the Company said it had taken steps to remedy the material weakness previously identified in its internal control over financial reporting:

> As previously disclosed in our 2010 Annual Report in connection with the material weakness identified therein, we implemented a number of measures to strengthen our internal controls over financial reporting. Management has implemented, or continued to implement, the following measures during 2011.
>
> we continue to recruit and hire additional accounting staff with technical expertise to ensure the proper application of accounting principles generally accepted in the United States, or U.S. GAAP, in the area of revenue recognition, and expect to continue to expand our finance and administrative staff globally and to enhance our enterprise resource planning systems;
>
> we have implemented revised policies and procedures and enhanced our review of complex revenue transactions to ensure consistent application of U.S. GAAP and enhanced internal control over financial reporting;  .  .  .
>
> \*    \*    \*
>
> • we have increased the level of preparation and review of our financial statements, and in connection therewith, we have implemented additional control procedures as part of our quarter and year-end close processes as well as adding resources in connection with our review of key financial estimates, including accounts receivable, allowance for doubtful accounts, share-based compensation expense, indebtedness and treasury processes and tax estimates

210.   The Company's statements regarding its internal controls were false and misleading as they suggest the internal controls would no longer pose a risk to the Company. The very same internal control violation the Company claimed to have remedied in its 2011 Annual Report, reappeared in its 2012 Annual Report.   In addition, (i) the Company did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed herein; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; and (iii) Defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP.   The lack of internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein.

211.   The Annual Report also contained SOX required certifications, signed by Defendants Moukas and Cheung, substantially similar to the certifications contained in ¶ 148, *supra*.

212.   The certifications were false and misleading because the Company failed to disclose and actively sought to conceal from investors: (i) that it was having difficulty collecting certain receivables; (ii) that certain of the Company's receivables were owed by customers in dubious financial condition and were uncollectible; (iii) that, as a result, the Company's revenues and receivables were overstated during the Class Period; (iv) that the Company's allowance for doubtful accounts was understated during the Class Period; and (v) that, as a result of the foregoing, the Company's statements and reported financial results were materially false and misleading.

213.   Velti's 2011 Form 20-F contained representations from Defendant Baker Tilly, the Company's auditors, that the audit had been conducted "in accordance with the standards of the Public Company Accounting Oversight Board."   The auditors also issued the following opinion on Velti's financial results and internal controls over financial reporting:

In our opinion, the consolidated financial statements and financial statement schedule referred to above present fairly, in all material respects, the financial

position of the Velti plc as of December 31, 2011 and 2010, and the consolidated results of their operations and cash flows for each of the three years in the period ended December 31, 2011 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule, in all material respects, presents fairly the information set forth therein when read in conjunction with the related consolidated financial statements. Also in our opinion, the accompanying financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein. Also in our opinion, Velti plc maintained, in all material respects, effective internal control over financial reporting as of December 31, 2011, based on criteria established in *Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission*.

214.   Defendant Baker Tilly's Audit Report was false and misleading because Baker Tilly failed to exercise due professional care as required by GAAS AU Section 230.  By failing to approach their work with the required skepticism the auditors failed to perform the audit in accordance with GAAS, failing both to properly test for collectability.  By issuing a clean audit opinion and a positive internal controls opinion Baker Tilly falsely assured investors that Velti's 2010 Annual Report filed with the SEC on Form 20-F was prepared in accordance with GAAP and that Velti had appropriate internal controls in place to ensure the accuracy of their financial statements.  Defendant Baker Tilly's statements regarding the Company's internal controls were false and misleading for the reasons stated below.  Even the most cursory of examinations or audit testing of the reconciliation process between accrued accounts receivable and trade accounts receivable would have revealed the rapidly burgeoning accrued accounts receivables balance, and an obvious failure to take an adequate reserve against these uncollectable accounts.  Accordingly, Baker Tilly either knew, or, at the barest minimum, was deliberately recklessness in not knowing and not disclosing that Velti's financial statements had not been prepared in accordance with GAAP.

**Jefferies Global Technology, Internet, Media & Telecom Conference, May 9, 2012**

215.   On May 9, 2012 Defendant Cheung spoke at the Jefferies Global Technology, Internet, Media & Telecom Conference.  At the conference Cheung reassured investors that Velti had remediated the material weaknesses identified in its 2010 Annual Report filed with the SEC on Form 20-F.  He also informed investors that Velti's 2011 revenues were $190 million, up

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-68-

63% from 2010.  He also announced 90% growth in EBITDA.  Cheung also addressed the Company's DSOs, which he said were improving:

> Lastly, our trade DSOs progressions, as I have reported our progress, our trade DSOs have been improving on a quarterly basis, this is on a trailing 12-month basis. Our trailing 12-months DSOs is roughly in the mid-80 days right now. With the revenues migrating into more this part of the world where payment terms are much more reasonable in our minds, the DSOs actually is going to improve over time, and my goal is to bring that number down probably in the 60s, in about a years' time, I think we can get that.

216.    Cheung's statements were false and misleading because the reported revenue, and EBITDA figures were inflated due to the Company's failure to properly account for uncertainties associated with the collectability of aging accounts receivable in violation of GAAP and the Company's own revenue recognition policy.   In addition, the statements regarding the Company's DSOs were false and misleading because they obscured from investors the truth about Velti's real revenue cycle.  By revealing only the DSO number for its trade receivables and excluding the DSO number associated with its accrued contracts receivables, Velti hid the true length of time it took the company to collect recognized revenue and misled investors about the quality and collectability of its receivables.

**Q1 2012 Earnings Release and Conference Call, May 15, 2012**

217.    On May 15, 2012, the Company issued a press release entitled, "Velti Announces Solid First Quarter 2012 Financial Results: 75% Year on Year Revenue and 260% Adjusted EBITDA Growth, Increases 2012 Guidance."  The press release quoted Defendant Moukas who touted Velti's "strong growth across products and geographies…"

218.    The press release highlighted Velti's strong financial performance:

**Q1 2012 Financial Highlights**

**Revenue of $51.8 million**, *an increase of 75%* from Q1 2011, with improving margins;

Revenue less 3rd party costs of $34.9 million, *an increase of 85%* from Q1 2011, and resultant margin of 67% as percentage of revenue, in comparison to 64% in Q1 2011;

**Adjusted EBITDA of $4.6 million**, compared with $1.3 million in Q1 2011, *an increase of 260%*;

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-69-

GAAP net loss attributable to Velti of $8.8 million and EPS of $(0.14) compared with a net loss of $15.9 million and EPS of$(0.34) for Q1 2011; and

Adjusted net loss of $1.1 million and adjusted EPS of $(0.02) compared with an adjusted net loss of $5.2 million and adjusted EPS of $(0.11) for Q1 2011.

219.    The press release also highlighted the purported shift in the source of Velti's revenue to countries and regions with more favorable payment terms:

**Reach and Revenue Contribution**

The Americas, ***which we expect to be our largest region globally in 2012***, contributed revenues of $13.3 million, compared to $8.2 million in Q1 2011;

Europe, excluding the U.K., contributed $15.2 million, compared to $11.8 million in the same period last year, ***a solid increase defying a hard macroeconomic environment***;

The U.K. contributed $16.0 million, compared to $7.0 million in the same period last year;

Asia and Africa revenue grew to $7.3 million, compared to $2.6 million in Q1 2011; and

220.    The press release touted "numerous new customer wins and incremental sales into existing customers, across geographies and product segments," and further offered a "Business Outlook" wherein the Company increased its Fiscal Year 2012 revenue guidance to between $283 and $296 million.

221.    The press release was accompanied by a slide presentation in which Velti graphically depicted certain financial metrics, including a pie chart showing the geographic breakdown of its source of revenue.  According to the 1Q 2012 pie chart, 26% of Velti's revenue for the quarter came from the Americas, and 31% came from the UK.  Only 29% came from Europe without the UK.  The pie chart falsely depicted that the majority – 57% – of Velti's revenue came from businesses in strong regions with favorable payment terms.

222.    The Company held a conference call with investors the same day to discuss its first quarter results.  During the call Defendant Moukas highlighted the Company's growth across the board and across all geographies:

In terms of geographical breakdown, we generated $15.2 million in Europe, excluding the U.K. versus $11.8 million in Q1 2011. As our UK revenue grew to $16 million, up from $7 million the same period of last year, and our Americas revenue, primarily US, grew to $13 million from approximately $8 million in Q1 of 2011.  As I mentioned before, again, ***we expect the Americas, meaning the US, to be our biggest revenue contributor this year with the UK following up***.

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-70-

I also want to mention here that we performed extraordinarily well in Europe outside the U.K., demonstrating that we can grow nearly 30% year-over-year, *even in a challenging macroeconomic environment. . . .*

*We're very pleased with our European results as a whole and expect strong continued growth out of that region, in UK and Western Europe in particular. We expect our European revenue, along with our US revenue to help us drive more favorable payment terms and resultant cash flow.*

*Remember, that the US also grew 63% year over year in Q1 of 2012 compared to Q1 of 2011. . . .*

223.   Defendant Cheung referenced the Company's growing receivables balance but attempted to ease investor concerns saying that the Company was making significant progress moving receivables through the collection process:

Recalling Q4, due to many performance-based campaigns completed in the later part of December, we recognized a large portion of accrued revenues, resulting in a large accrued receivables balance at year-end.  Subsequently, in the first quarter, a lot of invoicing took place, moving a large amount of balance from accrued to trade receivables.

As a result, for Q1 2012, our accrued receivables as a percentage of total AR, which is trade plus the accrued receivables, has decreased to 55% from 58% in Q4. *While we believe this percentage is still relatively high, bear in mind we had the strongest Q1 revenues ever in our history* and we managed to keep the accrued receivables balance roughly the same as Q4, while increasing our trade receivables balance by $14.5 million. *We are actively managing the percentage of accrued receivables versus trade receivables, so as to drive free cash flows to the company as quickly as possible.*

224.   In addition, Defendant Moukas addressed investor concerns about the "quality of revenue" head-on, denying that long DSOs signaled collectability concerns that should have caused the Company to increase its allowance for doubtful accounts:

Some folks out there are using some pseudo-DSO calculation as a proxy for quality of revenue, and *I would like to point out that in the 12 years we've been in operation, our customers always pay us.  Out of hundreds of millions of revenue since inception, we only had to write off less than $1 million throughout the 12 years.*  The vast majority of this revenue comes from our existing customers, where we had 90-plus-percent of retention rate and around 45% sales increase year-over-year.  The close of that topic, we have collected more than $130 million since the beginning of the year and in 2012, we will see an accelerated cash flow conversion cycle and turn free cash positive by Q4.

225.   The Company continued to present investors with an inaccurate picture of the true condition of its outstanding receivables by disclosing only the trade DSO figure, which, investors

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-71-

would later learn, only represented 43% of the real DSO figure at that time.  Announcing that trade DSOs stood at 116 days – relatively flat over the prior year period – Defendant Cheung stated that he considered it "encouraging" given Velti expected an increase in DSOs due to seasonality, Velti's strong year over year sales, and the "*company-wide mandate to move more quickly or to convert the accrued receivables into trade receivables, so as to rapidly convert the receivables to cash*":

> In other words, trade DSO's may suffer modestly in the short-term while we push accrued receivables to trade receivables to turn to cash more quickly.  Our long-term trade DSO goal, however, is still to reach below 70 days in 18 to 24 months.  So just to reconfirm, ***this will be driven by the lower DSO's and geographies such as US and the UK***, , , ,

226.    Discussing cash flow, Cheung again emphasized "*we are going to focus on revenue growth in geographies where we have much more favorable payment cycles.*"

227.    Later in the call Moukas referred analysts to the slide presentation accompanying Velti's press release that "talks about how quickly we grew in the different areas":

> If you look at Europe, in the UK we grew significantly, and a big driver for that was obviously the MIG acquisition.  We grew 129% compared to Q1 of last year.

228.    At the end of the call, in response to a question about what the Company was doing to address "the issue of accrued contract receivables," Cheung highlighted the intense focus the Company was placing on receivables:

> Internally, we have dedicated people basically looking at all the contracts and working with our sales force to ensure that nothing falls through the cracks.  We have been making a lot of phone calls as well, to make sure that we push the collections.  This is an ongoing process.  We now have the wherewithal to improve the – beef up the team, sales administration and what have you, to make sure we get the people and convert all that into cash on a much quicker cycle.

229.    Cheung also repeated on the call that the Company was *increasing revenue guidance* for the year to the range of $283 to $296 million.

230.    The statements contained in the May 15, 2012 press release, slide presentation and conference call concerning the Company's revenue, receivables and growth deceptively assured and comforted the market that its receivables were within normal operating ranges given

the Company's revenue and net income for the same period, and that the Company was successfully transiting away from customers in countries with weak economies with unfavorable payment terms, and growing its revenue in stronger regions.  The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

      (a)     that the Company was having difficulty collecting its receivables;

      (b)     that a significant portion of the Company's receivables were owed by customers in dubious financial condition and were  uncollectible and had been on Velti's books since 2011;

      (c)     that, as a result, the Company's revenues and receivables were overstated;

      (d)     that the Company's allowance for doubtful accounts was understated; and

      (e)     that by revealing only the DSO number for its trade receivables and excluding the DSO number associated with its accrued contracts receivables, Velti hid the true length of time it took the company to collect recognized revenue and misled investors about the quality and collectability of its receivables.

231.   In addition, Defendants' statements about the percentage of revenue generated by region and slide show pie charts depicting the same were false and misleading.  As Defendant Ross would later reveal, when the Company was presenting its geographic source of revenue to investors, it was reporting the location of the corporate parent of the entity which Velti was doing business, and *not* the actual region where the business was being conducted, even though the payment terms and true business risk were dictated by the region where the business was conducted.  The true percentage of Velti's revenue generated from high risk regions with unfavorable payment terms, and the true "business risk" of collecting those revenues was substantially higher than reported rendering Defendants' public statements about the "geographic breakdown" of its revenues materially false and misleading.

232.   As a result of the Company's failure to follow GAAP and its own revenue recognition policy, the Company's reported financial results were materially false and misleading.

233.   Defendants false positive statements and material omissions concerning Velti's accounts receivables, allowance for doubtful accounts and DSO metric were perceived favorably by and deceived the market concerning the true financial health of Velti, as illustrated by the following analyst reports:

(a)   Canaccord maintained its Buy rating and price target of $21 citing Velti's revenue beat and increased guidance in a May 15, 2012 report entitled "Solid Quarter; Moving Closer to Cash Flow Positive; Maintain Buy And $21 Price Target."  Analysts also noted, with regard to Velti's increased DSOs, that the Company "has only written off $1 million in the last 12 years" and management expects that long-term DSOS should approach the 70-day range.

(b)   Jefferies reiterated its Buy rating and price target of $23 in a May 16, 2012 report entitled, "Global Ad Agencies Generally Have High DSOs."  Analysts noted, "investor concerns following Velti's Q1 results have focused on Velti's high DSOs; however, DSOs are generally high for global ad agencies. . . .  We believe the selling on Velti is overdone and that cash flow generation this summer (possibly as early as Q2 vs. guidance of Q3) should calm investor concerns."

(c)   Wells Fargo maintained its Outperform rating and $17-$19 price range in a May 16, 2012 report entitled, "VELT: Solid Q1 Results – Full-Year Cash Flow Guide Raffirmed Adjusting Estimates."   In the report analysts noted that "growing balances in both trade receivables and accrued trade receivables have been receiving increased investor attention" but noted the Company's growth, revenue beat, and said management "strongly reaffirmed prior guidance."

**JP Morgan Global Technology, Media and Telecom Conference, May 17, 2012**

234.   On May 17, 2012 Defendant Moukas presented at the JP Morgan Global Technology, Media and Telecom Conference.  At the conference he told investors that Velti

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-74-

1  "grew from $116 million to $189 million, and the midpoint rate now is more than $290 million

2  for this year. Similarly, our EBITDA growth from $27 million to $53 million; and for this year,

3  the midpoint is around $86 million, $87 million."

4       235.    Moukas was asked to comment on Velti's DSO figure.  He responded by stating

5  "[o]ur customer retention is very high, more than 91%, and *we feel good about our – the quality*

6  *of our receivables* and the fact that they have always – our customers have always paid us."  He

7  reminded investors that although the Company's trade DSO figure was creeping up he did not

8  believe a write-off would be necessary, saying "since inception, 12 years ago, we have collected

9  hundreds of millions of dollars and we had less than $1 million with the write-off as sort of as

10  bad debt."

11       236.    Moukas attributed the slight DSOs increase between Q4 2011 and Q1 2012 to a

12  temporary distraction; Velti "sort of took our eye off the ball" while it was focused on integrating

13  an acquisition.  However, "since then we been collecting very aggressively."  He outlined the

14  aggressive efforts the Company was making to reduce DSOs:

15
16         We have assigned a subsidiary – a joint team of between sort of finance and the
       account managers that (inaudible) some of the customer relationships to improve
17         the comprehensive DSOs, weekly global monitoring, we're incentivizing the
       salespeople to push for collections, essentially help out on the collections.

18       237.    Moukas repeated Velti's commitment to putting a plan in place "*to make sure that*

19  *we drop that [DSO number] significantly within the next two quarters."*

20       238.    Moukas also made other false statements during the May 17, 2012 conference.

21       239.    For example, Moukas further emphasized that revenue from lower DSO regions

22  like the US and UK will continue to increase as a percentage of revenue, and will be "another

23  major driver" of Velti's business.

24       240.    Moukas' statements were false and misleading because the reported revenue, and

25  EBITDA figures were inflated due to the Company's failure to properly account for uncertainties

26  associated with the collectability of aging accounts receivable in violation of GAAP and the

27  Company's own revenue recognition policy.  In addition, the statements regarding the

28

1   Company's DSOs were false and misleading because they obscured from investors the truth

2   about Velti's ability to collect its outstanding accounts receivable.  Finally, the statement about

3   the US and UK becoming a "major driver" of Velti's business were false and misleading because

4   they referred to the location of the corporate parent of the entity which Velti was doing business,

5   and *not* the actual region where the business was being conducted, even though the payment

6   terms and true business risk were dictated by the region where the business was conducted.  The

7   true percentage of Velti's revenue generated from high risk regions with unfavorable payment

8   terms, and the true "business risk" of collecting those revenues were substantially higher than

9   represented.

10  **Business Update Call, May 22, 2012**

11      241.    On May 22, 2012 Velti hosted a business update call to announce a change in the

12  way the Company accounted for its important DSO metric.  The Company announced that it

13  would no longer share with investors only the trade DSO figure; it would begin providing

14  investors with a figure it called "Comprehensive DSO."  Comprehensive DSO included both

15  trade receivables and accrued contracts receivables.  Velti explained that Comprehensive DSO

16  would capture "the complete cycle from contract all the way down to cash conversion."

17      242.    Defendant Moukas again (falsely) assured investors that the revenue sitting in the

18  Company's accrued contract receivables was collectible:

19          Another interesting data point is that, ***in the 12 years we have collected hundreds***
20          ***of millions of revenue, yet we had to write-off less than $1 million of bad debt***.
            Again, our customers are big and they are consistently paying us.  Our DSOs are
21          quite high and the reason for that is, if you look at our comprehensive DSOs,
            right, the complete contract to cash cycle, there are primarily two reasons.

22          Number one, we operate in a different environment, where we're getting paid by
            the CMO organization, not the CIO organization, and that organization by default
23          has quite longer payment days. Number two, a lot of our revenue was coming
            from historically long DSO jurisdictions. As our revenue mix moves more and
24          more into the Americas, you're going to be seeing our effective DSO dropping
            significantly, and we're targeting a figure of 220 days in terms of our
25          comprehensive DSOs by the end of the year.

26

27

28

243.    In order to blunt the impact of the change that roughly doubled the DSO number, Moukas falsely reassured investors that the Company's DSO number would drop as the Velti moved business away from regions with longer collection cycles:

> And if you look to our sort of earnings, it's clear that even though all of the geographies we have presence in are growing very fast. Geographies with lower DSOs, lower contribution DSOs are growing much faster.
>
> So, for instance, you are looking at Americas. That's going to be our biggest contributor of revenue this year, obviously primarily the U.S. has much lower DSOs than the other countries where we are present in. The countries with – or the regions, let's say, with the larger DSOs, like, for instance, Continental Europe, grows around 29%, everything else grows between two times and four times that. *And so in our mind there is no significant risk there in terms of these adoptions.*

244.    Because the trade DSO figure was less than half of the Comprehensive DSO, until May 22, 2012, Velti was able to mislead investors into believing that it was taking a much shorter time to collect on outstanding receivables.  Disclosing only the trade DSO figure also enabled Velti to conceal that it had a large sum of aging, undisclosed receivables sitting in its accrued contract receivables.  Once accrued contract receivables were included, the DSO number jumped from 116 days for trade receivable DSOs at the end of the First Quarter 2012, to 266 days for Comprehensive DSOs at the end of the Second Quarter 2012.  This is a difference of 150 days, or approximately five months.

245.    The May 22, 2012 business update call was accompanied by a slide presentation where Velti discussed its cash collection cycle.  According to the slide, Velti's cash collection cycle is on average, nine months; invoicing after four months and collecting cash five months later.  Accordingly, since Velti typically experiences a revenue spike in Q4, Velti expected "most collections to occur in the third quarter."  Based on that, Defendants projected "[f]ree cash flow by Q4 [2012] and operating cash flow positive by Q3. *We are very confident in our execution.*"

246.    The slide presentation further modeled a "Greek Default Scenario" which projected Velti's revenue would be only "slightly reduced" in the event of a Greek default.  The final page of the slide presentation had a statement that *"[i]nsiders are buying shares after the announcement."*  The presentation was designed to assuage investors' concerns over long DSOs and Velti's exposure to customers in economically troubled regions.

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-77-

247.   Even after switching to disclosing comprehensive DSO, Velti continued to mislead investors about the collectability of its outstanding receivables and violated GAAP by failing to properly account for uncertainties associated with the collectability of aging accounts receivable.

248.   Defendants false positive statements and material omissions concerning Velti's accounts receivables, allowance for doubtful accounts and DSO metric were perceived favorably by and deceived the market concerning the true financial health of Velti, as illustrated by the following analyst reports:

(a)   Canaccord maintained its Buy rating and price target of $21 saying "we believe the improved disclosures will go a long way toward eliminating the current valuation discount" in a May 22, 2012 report entitled "We Continue To See FCF In Q4/12 As A Positive Catalyst For Shares; Maintain Buy And $21 Target."  Analysts also pointed to a "sensitivity analysis" the Company shared relating to "a Greek default scenario" which showed "a small reduction in revenue, but a larger positive impact on EBITDA."

(b)   Jefferies reiterated its Buy rating and price target of $23 noting "Management was confident that Q4:11's strong revenues would be collected as cash in Q3:12" in a May 23, 2012 "Flash Note" entitled, "Interim Conference Call Reveals Additional A/R Details."

(c)   Wells Fargo maintained its Outperform rating and $17-$19 valuation range, noting "[p]resentation and subsequent conversation with management leaves us incrementally positive on potential for company to make consistent progress" and noting that management reminded investors "that over course of 12-year operating history, that [the] company had recorded less than $1 million bad debt expense, and we note that that record was achieved ruing a period of far higher relative exposure to PIIGS nations. . . .   [W]e believe low levels of historical bad debt offer a level of comfort to those investors concerned with quality of receivables."

**First Quarter 2012 Interim Report, June 1, 2012**

249.    On June 1, 2012, Velti filed with the SEC an Interim Report on Form 6-K for the 2012 fiscal first quarter which ended March 31, 2012.  The Company's Interim Report was signed by Defendant Cheung and repeated the Company's financial results previously announced on May 15, 2012, and repeated the Company's prior statements that it only recognized revenue when certain criteria were met, including the existence of evidence to support the recognition of revenue as of the reporting date.

250.    The statements contained in the Company's June 1, 2012 Interim Report concerning the Company's financial performance and revenue recognition policy were false and misleading and deceptively assured and comforted the market that its receivables were within normal operating ranges given the Company's revenue and net income for the same period.  The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

(a)    that the Company was having difficulty collecting its receivables;

(b)    that a significant portion of the Company's receivables were owed by customers in dubious financial condition and were  uncollectible;

(c)    that, as a result, the Company's revenues and receivables were overstated; and

(d)    that the Company's allowance for doubtful accounts was understated.

251.    The Company's statements regarding its internal controls were also false and misleading because: (i) the Company did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed herein; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; and (iii) Defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP.  The lack of internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein.

252.    The Interim Report also contained SOX required certifications, signed by Defendants Moukas and Cheung, substantially similar to the certifications contained in ¶ 148, *supra*.

253.    The certifications were false and misleading because the Company failed to disclose and actively sought to conceal from investors that: (i) it was having difficulty collecting certain receivables; (ii) certain of the Company's receivables were uncollectible; (iii) as a result, the Company's revenues and receivables were overstated during the Class Period; (iv) the Company's allowance for doubtful accounts was understated during the Class Period; and (v) as a result of the foregoing, the Company's statements and reported financial results were materially false and misleading.

**Q2 2012 Earnings Release and Conference Call, August 14, 2012**

254.    On August 14, 2012, the Company issued a press release entitled, "Velti Announces Record Q2 Financial Results and Free Cash Flow Generation; Revenue Growth of 71 Percent and adjusted EBITDA of 100 Percent Year-Over-Year."   The Company announced an "excellent" Q2 2012 and highlighted Velti's strong financial performance:

**Q2 2012 Financial Highlights**

Revenue of $58.7 million, *an increase of 71 percent* from Q2 2011;

Revenue less 3rd party costs of $37.7 million, *an increase of 60 percent* from Q2 2011;

Adjusted EBITDA of $6.2 million, compared with $3.1 million in Q2 2011, *an increase of 100 percent*;

GAAP net loss attributable to Velti of $17.7 million and EPS of $(0.28) compared with a net loss of $25.1 million and EPS of $(0.47) for Q2 2011; and

Adjusted net loss of $0.9 million and adjusted EPS of $(0.01) compared with an adjusted net loss of $2.0 million and adjusted EPS of $(0.04) for Q2 2011.

255.    The press release also highlighted Velti's improved cash position, improved DSOs, and the purported shift in the source of Velti's revenues towards countries and regions with more favorable payment terms:

**Cash Flow, Cash Positions and Comprehensive DSOs**

*Operating cash flow generation of $25.0 million*, compared with $(15.9) million in Q1 of 2012, an improvement of $40.9 million;

*Free cash flow generation of $7.0 million* excluding acquisition and debt payments, compared with $(27.8) million in Q1 of 2012, an improvement of $34.7 million;

*Cash position of $44.7 million* **and a** *net cash position of $36.4 million*, an improvement of $5.1 million compared with Q1 2012;

*Comprehensive DSOs of 266 days*, compared with 272 days in Q1 of 2012; and

Comprehensive DSOs improvement throughout the year *driven by a gradual reduction in the proportion of our business that comes from legacy activities in high-DSO areas* and internal process improvements.

**Revenue Contribution and Mobile Advertising and Marketing Revenues and Margins**

*The Americas contributed a record 29 percent of revenues or $16.7 million*, compared with $7.4 million in Q2 2011. The U.S. will be our single largest market this year;

Europe, excluding the U.K., contributed $18.8 million, compared with $15.6 million in Q2 2011;

The *U.K. contributed $13.6 million, compared with $4.7 million in the same period last year*;

Asia and Africa revenue grew to $9.5 million, compared with $6.7 million in Q2 2011; . . .

256.    Defendant Moukas declared it an "excellent" quarter, and said that despite global macroeconomic weakness the Company experienced "healthy growth":

The second quarter was excellent for Velti. In addition to solid revenue and adjusted EBITDA growth, we achieved positive free and operating cash flow, reduced our comprehensive DSOs, successfully integrated our two recent acquisitions, Air2Web and Mobile Interactive Group (MIG), and signed up significant new customers that will drive Q4 revenue. *Despite global macro-economic weakness, the secular growth story of the mobile channel overwhelms any cyclical macro concerns. We experienced healthy growth across our products and geographies, especially in the Americas, Western Europe and Asia.*

257.    The press release was accompanied by a slide presentation in which Velti graphically depicted certain financial metrics, including a pie chart showing the geographic breakdown of its revenue.  According to the Q2 2012 pie chart, 29% of Velti's revenue for the quarter came from the Americas, and 23% came from the UK.  Only 32% came from Europe without the UK.  The pie chart falsely depicted a company deriving the majority of its revenue – 52% – from businesses in strong regions with favorable payment terms.

258.    That same day, the Company held a conference call with investors to discuss its Q2 2012 results.  Defendant Moukas touted the Company's 70% quarter over quarter revenue

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-81-

growth, its positive free and operating cash flows, reduced comprehensive DSOs, and "significant" new customer signings "that will drive revenue in Q4 and beyond." "Despite global macroeconomic weakness, the secular growth story of the mobile channels continued to trump the secular macro concerns." Moukas continued describing Velti's "healthy growth . . . throughout all geographies, especially in the Americas, Western Europe and Asia. . . ," and name-dropped new customer agreements with established companies such as Disney, Nestea, and incremental agreements with current customers such as Calvin Klein and Toyota.

259. Defendant Moukas also touted the Company's progress in improving cash flow; "we have attained positive operating cash flows in Q2 of $25 million, a full quarter ahead of our goal. *This was the result of concerted efforts across the Company that we launched after our May earnings call, particularly in the area of collections.*"

260. Regarding the reported improvement in DSOs, Moukas commented:

> We expect more significant improvements in the next two quarters given our focused efforts around comprehensive receivables and cash conversion that started in May of this year. *By Q3, most of our Q4 2011 revenues will have been collected* and this will positively impact our DSOs as a large portion of our accrued revenues for the year are typically generated in the fourth quarter given the seasonality of our business.

261. Moukas took the opportunity to falsely tout Velti's purported successful transition to customers in more desirable geographic regions:

> Turning to our geographically diversifying customer base, we're excited by the progress to expand and diversify into strategically important areas. *We were particularly pleased to see 126% year-over-year growth in Americas*, primarily the US market in Q2. *We continue to believe that revenues from the US will double this year, making the US our largest country by far*. This is very beneficial for Velti, both in terms of the exciting growth opportunity that it represents, as well as a positive income to our business model from better collection terms and strong margin performance.

> Further, we're also seeing healthy growth in the UK as a result of our acquisition of MIG....

> Outside the UK, we also continue to perform extraordinarily well in Europe, demonstrating that we can grow 30% year over year even in a challenging macroeconomic environment. *We are very pleased with our European results as a whole and expect strong continued growth out of the region, the UK and Western Europe in particular*.

262.   Defendant Cheung also spoke and emphasized, "[i]n 2012 we expect the Americas, primarily the US, to be our biggest revenue contributor, with the UK being our second biggest country.  **As a percentage of total Q2 2012 revenues, PIIGS countries represented approximately 10%.**"

263.   Defendant Cheung also touted the Company's "significant increase" in trade receivables and decrease in DSO due to Velti's "efforts to begin pushing more frequent invoicing of [its] customers since May 2012."  Cheung cautioned analysts to "bear in mind, we only significantly accelerated our efforts in the mid-May time frame. . . As Alex mentioned, as the aging of our trade receivables bears out, **we continue to believe that the quality of our receivables in total remains strong.**"

264.   Cheung continued with his prepared remarks noting "we are reiterating our intention and are more confident than ever in our ability to remain operating cash flow positive for the foreseeable future and become sustainably free cash flow positive by the end of this year."

265.   Cheung completed his prepared remarks by upping Velti's financial guidance projecting revenue for Q3 2014 in the range of $60 to $64 million and increasing the low end of revenue guidance for the year to $285 million and maintaining the high end of $296 million.

266.   Defendant Moukas closed the prepared remarks stating "our Q2 2012 performance sets the stage for a solid 2012, with improved visibility and consistent free cash flow generation from Q4 onwards.  **We're going to have a very strong year.**"

267.   In the Q and A session that followed, Moukas responded to a question about free cash flow noting, "**we heard loud and clear the message from the market and we're focusing 100% on, number one, collecting much faster**…"

268.   Moukas responded to another question touting Velti's purported transition to a stronger customer base in stronger regions; "[w]e're being right now very selective with our customers in Europe in terms not just their pedigree, but also in terms of the terms and conditions we can get for them in terms of their payments and accounts receivable."

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-83-

269.   In response to another question about Velti's "improved collection efforts," Moukas replied:

> Number one, **we started 100% focus on this sometime in mid May**. So since then we have been, as we discussed, approaching customers, starting to change some of the terms of our engagement with them.  Obviously, we only had 45 days in Q2 to essentially play with.  That's why… you are going to see most of the effect of that happening in Q3 and Q4.  **So that's going to be the major driver there**.
>
> And again, it's a combination of changing the structure of some of our contracts to allow us to invoice much quicker.  You're already seeing some of that because the accrued contracts receivable balance essentially was primarily into trade receivables, so a lot more invoicing, a lot faster invoicing, and you're going to see that starting to translate from Q3 and Q4 into much quicker collections as well.

270.   Finally, in response to a request for "a little more color" on what Velti is seeing from the PIIGS nations, Moukas responded (i) that the PIIGS revenues were approximately the same as the prior quarter; and (ii) Velti's customers there accounted for some of its longer DSOs.  However, Moukas concluded falsely stating that the **PIIGs region, which includes Portugal, Italy, Ireland, Greece and Spain, constituted only 10% of the Company's revenue in the quarter**.  Moukas concluded the call noting "**[w]e have very strong visibility into the second half of the year and well into next year.**"

271.   The statements contained in the Company's August 14, 2012 press release, slide presentation and conference call regarding the Company's financial performance, exposure to economic instability in the PIIGs region, and growth deceptively assured and comforted the market that its receivables were within normal operating ranges given the Company's revenue and net income for the same period, and that the Company had successfully transitioned away from customers in weak economies with unfavorable payment terms to customers in strong geographic regions.  The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows: that the Company was having difficulty collecting its receivables; that a significant portion of the Company's receivables were owed by customers in dubious financial condition and were uncollectable, and had been on Velti's books since 2011; that, as a result, the Company's

revenues and receivables were overstated, and the Company's allowance for doubtful accounts was understated.

272.   In addition, Defendants' statements about the percentage of revenue generated by region and slide show pie charts depicting the same were false and misleading.  As Defendant Ross would later reveal, when the Company was presenting its geographic source of revenue to investors, it was reporting the location of the corporate parent of the entity which Velti was doing business, and *not* the actual region where the business was being conducted, even though the payment terms and true business risk were dictated by the region where the business was conducted.   The true percentage of Velti's revenue generated from high risk regions with unfavorable payment terms – over 2/3 of Velti's revenue and receivables – and the true "business risk" of collecting those revenues was substantially higher than reported rendering Defendants' public statements about the "geographic breakdown" of its revenues materially false and misleading.

273.   As a result of the Company's failure to follow GAAP and its own revenue recognition policy, the Company's reported financial results were materially false and misleading.

274.   In fact, just three months later, on November 14, 2012, the Company would announce that it would divest its assets in certain "troubled economies" that had "very long revenue collection cycles," including Greece.

275.   Defendants' false positive statements and material omissions concerning its accounts receivables, allowance for doubtful accounts and DSO metric were perceived favorably by and deceived the market concerning the true financial health of Velti, as illustrated by the following analyst reports:

(a)   Jefferies maintained its Buy rating and price target of $23 and raised estimates in an August 14, 2012 report entitled "Q2 Results Solid with Surprisingly High $7M FCF."

(b)   Wells Fargo maintained its Outperform rating and valuation range of $17-$19 in an August 14, 2012 report entitled "VELT: Growth Profile Intact – Cash Dynamics Improving."

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-85-

(c)     ThinkEquity LLC maintained its Buy rating and price target of $22 in an August 15, 2012 report entitled, "VELT: Strong And Clean Q2; Reiterate Buy."  Analysts noted that Velti's fundamentals were strong, saying: "While we believe that it may take multiple quarters for VELT to fully reestablish bona fides given continuing concerns regarding the European macro and structurally high DSOS, we remain confident in VELT's fundamentals . . . ."

**Q2 2012 Interim Report, August 23, 2012**

276.    On August 23, 2012, Velti filed with the SEC an Interim Report on Form 6-K for Q2 2012 ending June 30, 2012.  The Interim Report was signed by Defendant Cheung and repeated the Company's financial statements previously announced on August 14, 2012, and repeated the Company's prior statements that it only recognized revenue when certain criteria were met, including the existence of evidence to support the recognition of revenue as of the reporting date.  The Company also reported no significant changes to its internal control over financial reporting.

277.    The statements contained in the Company's August 23, 2012 Interim Report concerning the Company's financial performance and revenue recognition policy deceptively assured and comforted the market that its receivables were within normal operating ranges given the Company's revenue and net income for the same period.  The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

(a)     that the Company was having difficulty collecting its receivables;

(b)     that a significant portion of the Company's receivables were owed by customers in dubious financial condition and were  uncollectible and had been on Velti's books since 2011;

(c)     that, as a result, the Company's revenues and receivables were overstated; and

(d)     that the Company's allowance for doubtful accounts was understated.

278.    The Company's statements regarding its internal controls were also false and misleading because: (i) the Company did not identify deficiencies or material weaknesses in the

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-86-

internal controls that resulted in the GAAP violations discussed herein; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; and (iii) Defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP. The lack of internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein.

279.    The Interim Report also contained SOX required certifications, signed by Defendants Moukas and Cheung, substantially similar to the certifications contained in ¶ 148, *supra*.

280.    The certifications were false and misleading because the Company failed to disclose and actively sought to conceal from investors: (i) that it was having difficulty collecting certain receivables; (ii) that certain of the Company's receivables were uncollectible; (iii) that, as a result, the Company's revenues and receivables were overstated during the Class Period; (iv) that the Company's allowance for doubtful accounts was understated during the Class Period; and (v) that, as a result of the foregoing, the Company's statements and reported financial results were materially false and misleading.

**Q3 2012 Earnings Release and Conference Call, November 14, 2012**

281.    On November 14, 2012, the Company issued a press release announcing Q3 2012 results. The press release quoted Defendant Moukas who touted Velti's "strong revenue" and new contracts signed with new and existing customers. Moukas touted Velti's "success in driving revenue from our target geographies, including the United States, United Kingdom and Western Europe." Moukas claimed that "[t]hese geographies provide great opportunities and better support our business model objective, including improved cash flow."

282.    Moukas also announced that because of the great opportunities in the regions identified above, Velti "made a key decision in the quarter to divest certain assets associated with economically challenged customers, such as Greece and the Balkan States."

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-87-

283.   The press release first focused on Velti's purportedly strong financial results, improving DSOs and cash position, and strong growth in the US and UK markets:

**Q3 2012 Financial Highlights**

***Record revenue*** of $62.4 million, ***an increase of 62 percent from Q3 2011***; $66.6 million or 74 percent on a constant currency basis;

Revenue less 3rd party costs of $39.7 million, ***an increase of 63 percent from Q3 2011***;

Adjusted EBITDA of $6.7 million, compared with $5.6 million in Q3 2011, ***an increase of 19 percent***;

\*        \*        \*

GAAP net loss attributable to Velti of $24.7 million and EPS of $(0.38) compared with a net income of $0.6 million and EPS of $0.01 for Q3 2011; included in the GAAP net loss is a $9.6 million non-cash expected loss on assets held for sale (primarily attributable to $7.8 million of discount associated with the deferred consideration from the company's divestiture), as well as a $5.3 million non-cash charge associated with the re-measurement of MIG's final deferred consideration; and

Adjusted net loss of $1.8 million and adjusted EPS of $(0.03) compared with an adjusted net loss of $1.1 million and adjusted EPS of $(0.02) for Q3 2011.

\*        \*        \*

**Cash and Comprehensive DSOs**

Cash position of $29.5 million as of Sept. 30, 2012;

Operating cash flow of $(4.9) million, or $1.4 million when adjusted for the strategic termination of legacy factoring arrangements and reduced capitalization of investment in internal software development;

During the third quarter, Velti made the decision to eliminate its remaining factored receivables. This significantly reduces the company's cash interest expense and simplifies its financing activities. As a result of this decision, the company incurred a one-time operating cash flow reduction of $5.1 million.

Comprehensive DSOs of 242 days, excluding the impact of terminating the company's factoring arrangements and considering the effect of the divestiture of assets;

Comprehensive DSOs improvement throughout the year driven by a gradual reduction in the proportion of Velti's business that comes from customer activities in high-DSO areas, more rapid reconciliation and invoicing and internal process improvements;

Velti expects to report positive operating cash flow in the fourth quarter with approximately neutral free cash flow, including an estimated $2 to $3 million negative impact from the divestiture. Excluding the divestiture, the company re-iterates previous guidance of both positive operating and free cash flow in Q4.

**Revenue Contribution and Mobile Advertising and marketing Revenue and Margins**

The Americas contributed 26 percent of revenue or $16.2 million, compared with $9.0 million in Q3 2011. **The US will be Velti's single largest market this year.**

The U.K. contributed 27 percent of revenue or $17.1 million, compared with $5.3 million in the same period last year.

284. The press release elaborated on the Company's "agreement to divest certain declining assets, focused on geographies and customers with worsening economic and demand characteristics" to a group led by certain non-executive management employees. Under the terms of the agreement, Velti would receive "$23.5 million payable in cash in three annual installments, with potential upside in the event that the divested operations exceed 2014 expectations." The press release emphasized that the transaction would (i) reduce the percentage of revenue Velti earned from troubled regions to a nominal amount, (ii) result in material cash savings, (iii) result in a substantial reduction of DSOs, to below 180 days by the end of 2013, (iv) that US and UK business would continue to increase as a percentage of revenue more than offsetting the revenue from the troubled regions; and (v) that Velti's revenue growth rates would increase to the mid-30 percent range for 2013 and 2014:

> ***Revenue from geographies characterized by high-DSOs, including the PIIGS countries, and other North African and Middle Eastern countries is expected to decline to 2 to 3 percent of total revenue for fiscal year 2013;***
>
> ***Total capital expenditures are expected to be materially reduced*** by approximately $6 million per year, reducing cash investment requirements; in addition, the company has avoided potential multi-million dollar severance costs that it would have incurred if the businesses had simply been wound down;
>
> As a result of the divestiture and other operational improvements, ***Velti is targeting comprehensive DSOs below 180 days*** by Dec. 31, 2013;
>
> ***Revenue from the Americas and U.K., as a percentage of total revenue, are expected to increase to 55 to 60 percent in fiscal year 2012 and to 65 to 70 percent of total revenue in fiscal year 2013***; and
>
> ***Velti's 2013 and 2014 revenue growth rates are expected to increase to the mid-30 percent range in both years*** (2013 versus proforma 2012, excluding divested assets).

285. Defendant Moukas further elaborated on many positive aspects of the transaction:

> We made a key decision in the quarter to divest certain assets associated with economically challenged geographies, including among others, Greece and the Balkan States. As we stated previously, we are focused on reworking contracts worldwide with existing customers to conform to the terms we are receiving from new customers. Quite a few of our customers in the regions where we are

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-89-

divesting assets are focusing on conserving cash above all else and therefore seem unwilling or unable to conform to our new payment requirements.   Our structuring the deal as a divestiture, as opposed to simply walking away from these customers, accomplishes five key goals:  First, *we are able to monetize the assets as opposed to shutting off these customers*.   Second, *we are able to maintain upside if the region recovers*.   Third, *we will be able to focus our business and cash investments on services and regions, such as the Americas and United Kingdom, that are best suited to our longer term business model*. Fourth, we are able to ensure continuity of customer service.  And finally, *we are able to eliminate any future severance or other downsizing liabilities associated with these assets.  The transaction is expected to help facilitate 2013 free cash flow generation, a reduction in DSOs and an accelerated growth profile*.

286.   In other words, the purpose of the divestiture was to remove previously undisclosed troubled assets from Velti's books and strengthen its financial position.

287.   Velti also announced that it would reclaim $5.1 million of factored receivables, an indication that the receivables were very old and uncollectible.

288.   In a typical factoring arrangement, accounts receivable are sold at a discount. But, had Velti used a typical factor structure, it would have had to write-off the loss attributable to the discount when it sold off the accounts receivable to the factor.  Instead, the mechanism used here was, in effect, a disguised interest-bearing loan secured by a pledge of the uncollected accounts receivable to the factor that ultimately had to be repaid if the accounts receivable were not collected.  In reclaiming the $5.1 million in receivables, Defendant Cheung placed a positive spin on this buy-back mechanism used to unravel the legerdemain used in setting up the earlier factoring arrangement to disguise the true state of the Company's accounts receivables

Basically to a make the long story short, we had only about $5.1 million of receivables that we have already collected cash on from the factoring facility. However, that factoring – those receivables, since they have not yet been collected by the factoring facility, we have to pay interest on that balance until it's fully collected.  And given the fact that we are paying very high interest, it's only $5.1 million and we really wanted to close down the factoring arrangement, we decided to basically take a onetime hit.  Take that receivables back on our books, put it in trade receivables, collect it on our side, and then basically move on.

289.   Velti's borrowing arrangements from its factors at interest rates were highly unusual and confirm that the factors themselves had little confidence in the collectability of these accounts receivable as adequate security for their loans.  By agreeing to these terms, Velti knew, or was deliberately reckless in not knowing, that its accounts receivable collateral were

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-90-

1    inadequate.  Further, by pledging its accounts receivable and agreeing to these terms, and not

2    having to write off its worthless accounts receivable, Velti was able to defer the day of reckoning

3    when it could no longer use this source of asset based financing.

4         290.   The press release was accompanied by a slide presentation in which Velti

5    graphically depicted certain financial metrics, including a pie chart showing the geographic

6    breakdown of its revenue.  According to the 3Q 2012 pie chart, 26% of Velti's revenue for the

7    quarter came from the Americas, and 27% came from the UK.  The pie chart continued to falsely

8    depict a company deriving the majority of its revenue (53%) from businesses in strong regions

9    with favorable payment terms.  Moreover, Defendants footnoted the chart stating "[t]he

10   Americas remain the fastest organically growing region, while the U.K. benefits from the

11   acquisition of MIG."

12        291.   That same day, the Company held a conference call with investors to discuss its

13   Q3 2012 results.  Moukas emphasized that Q3 "was a solid revenue growth quarter," Velti

14   "continued to experience strong demand," and "had a tremendous quarter in terms of contracts

15   signed with new and existing customers" and their geographic origin "reflecting our success in

16   driving revenue from our target geographies."

17        292.   Moukas described "three key decisions" Velti made during the quarter "that

18   impacted our overall financial results that we believe will simplify our business and provide

19   better clarity and more simplicity to our results going forward."  Among them was the "***winding***

20   ***down the remaining receivables and legacy partner arrangements***."  "[W]e believe now is the

21   right time to make these changes, as ***they will allow us to begin 2013 with a clear slate and***

22   ***provide further transparency to our reporting***."

23        293.   Moukas next touted a new $27 million contract Velti signed with a major US

24   brand, as the "largest mobile marketing deal ever signed," and it was significant because it

25   represented the "***successful penetration of the US market on a large-scale basis*** . . ."  He also

26   emphasized "strong growth" of 81% in revenues from the Americas' market year over year, and

27   Velti was "on track for excellent growth across the remainder of the year… ***Strong growth in***

28

1   *this area should make the US market our largest single market for 2012, and we believe that it*

2   *will continue to be that for 2013 and beyond.*"  "***This is particularly good for Velti,*** not just for

3   the opportunities it represents, but also ***because this region supports more favorable customer***

4   ***payment terms***, which we believe, will contribute to our improved cash flow objectives."

5   294.   Moukas continued that "[t]he UK is another excellent geography for us . . . and

6   we can request payment terms that are more favorable that other parts of Europe, and actually

7   very similar to the ones in the US."

8   295.   Describing the "divestiture" of certain customers in Greece and the Balkans,

9   Moukas said:

10   [I]n keeping with our strategy to align our business focus with the geographic
11   regions that can support our accelerated growth objectives, as well as our strong
     commitment to improving cash flow, we have made the decision to divest certain
12   assets and customers in the Greek, Balkin, and select North African and Middle
     Eastern geographies.

13   Fundamentally, we're following up on our commitment not to continue in
     customers and contracts that don't convert to the right payment terms, and to
14   focus our efforts on more advantageous geographies.

15   The contracts underlying these assets result in very high DSOs, approximately
     450 days, and also have very heavy CapEx requirements.  Furthermore, the
16   revenue streams associated with these contracts are deteriorating, primarily as a
     function of the economic conditions in these geographies.

17                                  *        *        *

18   This transaction is expected to help facilitate and accelerate 2013 free cash flow
     generation, a reduction, further reduction in DSOs, and an accelerated growth
19   profile.
                           *        *        *
20   As we've continually iterated, Velti's current geographic and product focus is on
21   stable, high growth markets with significantly better market dynamics, in
     particular the US, the UK, Western Europe, and Asia.  The objective of this
22   transaction is to help facilitate more focus on those markets, enabling sustainable
     free cash flow generation, a significant reduction in our DSOs, and an accelerated
23   growth profile.

24   296.   Cheung spoke next touting the "20 plus" days improvement in DSOs from Q2 and

25   claiming:

26   Now, we continue to see collection challenges in Europe over the next few
27   quarters, and we are targeting Q4 comprehensive DSOs to be approximately 230
     days and be positive operating cash flow and approximately neutral free cash

28

flow.  *We are also targeting comprehensive DSOs below 180 days by the end of 2013.*

297.    Cheung concluded his remarks by reducing guidance for the full year 2012. Specifically, he estimated total revenue in the range of $270 million to $286 million compared to guidance of $285 million to $296 million given at the end of the prior quarter, and EBITDA in the range of $68.3 million to $77.3 million compared to prior guidance of $82 million to $87 million.

298.    Moukas concluded the prepared remarks stating:

> Now, let me close by putting a stake in the ground for 2013.  Number one, DSOs *will drop to below 180 days.  Low DSO areas like the US and the UK will be making up 65% to 70% of our revenues, while Greece and other high DSO areas will drop to 2% to 3% of revenues,* while our seasonality will decrease.
>
> Finally, *our revenue rate will accelerate compared to consensus*.  *We will generate free cash while CapEx spending will decrease.*

299.    In the Q and A which followed, Moukas provided more color on the divestiture. Velti first approached certain customers and discussed whether they would modify their payment terms:

> As, based on that, we selected these customers.  We had a discussion with them, and rather than sort of shutting them down, we had the opportunity to, essentially, sell these assets that we're divesting to the existing management in the local region. So it's a very clean separation, and we have already separated these 75 people, along with the local management that was already managing these activities and these customers, and they're already ring-fenced.

300.    Much of the remaining Q and A was focused on liquidity concerns expressed by analysts, with Moukas denying any such concerns and denying that Velti would need to do an equity raise:

> No, absolutely not.  We see no need to do any equity raising.  Remember, we have an HSBC line that we only have drawn of $50 million, and we are forecasting free cash flow neutral for the year.  *So, there's sort of the worst is behind us.*

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-93-

301.   Moukas also emphasized that Velti would grow in 2013 at a 35% growth rate, with 65% to 70% of the business in the US and UK.  He concluded saying:

> *We're single mindedly focusing on our cash flow*.  Without the divestment, we'd have been free cash flow positive.  We're still guiding to approximately free cash flow neutral for the end of the year.  We're absolutely, obviously, going to be operating cash flow positive.
>
> *Our DSOs have dropped significantly*.  Remember, they dropped by more than 20 days quarter over quarter, and *we're guiding to a further drop down to 180 days by the end of next year.*
>
> *For next year again, the vast majority of our revenue, 65% to 70%, is going to be coming from the US and the UK markets, where we're enjoying, let's say, combined DSOs to the order of – let's say the mix is less than 90 days right now and while we're expecting our exposure to high-risk countries and other high DSO areas to drop to just 2% to 3% of revenue*.  We also expect seasonality to decrease.
>
> And then finally compared to where consensus is right now, *we're expecting our growth rate to increase to the mid-30%, for both 2013 and 2014*.

302.   Even with the spin-off of the troubled assets in Greece and the Balkans, Velti's financial statements continued to be false and misleading.  Rather than writing off the uncollectible receivables from the Greek and Balkan subsidiaries, the Company opted to divest the assets, which allowed Velti to remove the uncollectible receivables from its books.  The Company disclosed that the DSOs for the divested assets topped 450 days.  In other words, the receivables had been sitting on the Company's books for well over a year.  Had the Company followed GAAP rules it should have recorded a reserve to account for the risks associated with their collection.  Furthermore, the Company now publicly acknowledged that the receivables were too uncertain to stay on their books at all, yet Velti failed to record a reserve for the uncollectible receivables.  Similarly, the Company also failed to record a reserve for the reacquired factored receivables, even though the Company admitted that the factor had been unable to collect.  GAAP rules required Velti to record a reserve for the risks associated with these uncollectable receivables.

303.   In addition, Defendants' statements about the percentage of revenue generated by region and slide show pie charts depicting the same were false and misleading.  As Defendant Ross would later reveal, when the Company was presenting its geographic source of revenue to

investors, it was reporting the location of the corporate parent of the entity which Velti was doing business, and *not* the actual region where the business was being conducted, even though the payment terms and true business risk were dictated by the region where the business was conducted.   The true percentage of Velti's revenue generated from high risk regions with unfavorable payment terms – over 2/3 of Velti's revenue and receivables – and the true "business risk" of collecting those revenues was substantially higher than reported rendering Defendants' public statements about the "geographic breakdown" of its revenues materially false and misleading.

304.   Defendants' statements that Velti had "wound down" its troubled assets in Greece and the Balkans and was starting 2013 with a "clean slate" were false and misleading as a material amount of uncollectible accounts receivable remained on Velti's books.

305.   Defendant Moukas' statement that "the worst is behind us" regarding cash flow was false and misleading, as only six weeks later, Defendant Ross would reveal at a January 30, 2013 Investor Day presentation, Velti was facing an immediate cash crunch.

306.   Defendant Moukas' statements about the new $27 million contract Velti signed with a major US brand, as the "largest mobile marketing deal ever signed," and which represented Velti's "successful penetration of the US market on a large-scale basis" were false and misleading.   As Moukas would later reveal on Velti's March 12, 2013 earnings conference call, the customer decided to change the scope of the contract, and while it was "under review" the scope of the contract might be reduced on a meaningful level.

307.   Defendants false positive statements and material omissions concerning its accounts receivables, allowance for doubtful accounts and DSO metric deceived the market concerning the true financial health of Velti, as illustrated by the following analyst reports:

(a)   Jefferies maintained its Buy rating but dropped its price target $12 in a November 15, 2012 report entitled "Q3 Results: Messy but Necessary Changes."   Analysts believed that the divestiture remedied Velti's problems with high DSOS and exposure to Greece and other troubled areas:

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-95-

> Overhangs on Velti's stock include its exposure to Greece and other troubled areas, high DSOs, significant capitalized software costs, and A/R factoring. We had thought Velti would address these issues gradually but instead management ripped off the band-aid via a divestiture and quick changes. We think this will lead to a cleaner story in a couple of quarters, but the near-term will likely be dominated by the messy transition.

(b)      RBC Capital Markets maintained its Outperform rating and a price target of $14 in a November 15, 2012 report entitled, "It's Always Darkest Before the Dawn." Analysts noted that the divestiture, reclaiming of factored receivables and an accounting change on capitalized software "serve to simplify and strengthen the financial model in the long run."

(c)      Wells Fargo maintained its Outperform rating and lowered its valuation range to $10-$12 in a November 15, 2012 report entitled, "VELT: Messy Results But We're Staying Positive." Analysts reacted positively to news of the divestiture noting "the poor condition of the units receivables (450+ days) suggests to us that ultimate collection was in question."

308.      After the November 14, 2012 disclosures, shares of Velti declined $2.27 per share, more than 34%, to close on November 15, 2012 at $4.37 per share.

**Q3 2012 Interim Report, November 30, 2012**

309.      On November 30, 2012, Velti filed with the SEC an Interim Report on Form 6-K for Q3 2012 which ended September 30, 2012. The Company's Interim Report was signed by Defendant Cheung and repeated the Company's financial results previously announced on November 14, 2012.

310.      Defendants reported no significant changes to its internal controls over financial reporting and reiterated Velti's revenue recognition policy and told investors: "We recognize un-invoiced revenue when all revenue recognition criteria are met."

311.      The statements contained in the Company's November 30, 2012 Interim Report concerning the Company's financial performance and revenue recognition policy deceptively assured and comforted the market that its receivables were within normal operating ranges given the Company's revenue and net income for the same period. The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

(a)     that the Company was having difficulty collecting its receivables;

(b)     that a significant portion of the Company's receivables were owed by customers in dubious financial condition and were uncollectible, and had been on Velti's books since 2011; and

(c)     that, as a result, the Company's revenues and receivables were overstated, and that the Company's allowance for doubtful accounts was understated.

312.    The Company's statements regarding its internal controls were also false and misleading because: (i) the Company did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed herein; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; and (iii) Defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP.  The lack of internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein.

313.    The Interim Report also contained SOX required certifications, signed by Defendants Moukas and Cheung, substantially similar to the certifications contained in ¶ 148, *supra*.

314.    The certifications were false and misleading because the Company failed to disclose and actively sought to conceal from investors: (i) that it was having difficulty collecting certain receivables; (ii) that certain of the Company's receivables were uncollectible; (iii) that, as a result, the Company's revenues and receivables were overstated during the Class Period; (iv) that the Company's allowance for doubtful accounts was understated during the Class Period; and (v) that, as a result of the foregoing, the Company's statements and reported financial results were materially false and misleading.

**Velti Analyst Day – January 30, 2013**

315.    On January 30, 2013, Velti held a meeting open to stock market analysts.  Among the presenters were Defendant Moukas, and newly hired CFO, Jeff Ross.  The presenters

1    discussed Velti's business model and current financial position.  According to analyst reaction,

2    the presentation was upbeat until Ross was introduced at the end of the day, and gave a short

3    presentation.

4        316.    Defendant Ross began by noting he had only been on the job for seventeen days,

5    and that his comments would be general.  He continued that Velti's focus will be on reducing

6    expenses and pursuing businesses that lead to quick cash flow.  Ross also acknowledged that as a

7    result of the divestiture of certain clients in unfavorable geographic regions announced at the end

8    of Q3 2102, EBITDA for 2013 would be materially lower, and cash follow for the first half of

9    2013 would be tight:

10           So cash liquidity, I think there's sufficient liquidity to handle our needs for the
11           remainder part of the year.  **The rough patch is in the first half of the year** – we
            would be generating sufficient cash flow for the entire year, but in the first half
12           we need to be very careful about how we spend our money and judiciously do so.
            All that said, even including the cost of acquisition related payments, I'm
13           comfortable that we get through.  And again, as I stated I expect meaningful cash
            flow generation for the year.  I'm not going to, today, quantify what I mean by
14           meaningful, but it definitely is well into the positive territory.  So in the short
            term, again, the focus is on cash generation.  Everything that we're doing now,
15           from a deal rationalization and from a business pursuit, is based on focusing on
            those transactions that are positive from that perspective.  And again that means
16           that we are stepping away from some business in Europe that has attractive
            revenue and had attractive EBITDA but just didn't generate the cash.  **So what**
17           **that's going to mean**, being transparent, **is that EBITDA is likely to go down**
            **from where it was**.  **I expect the most material decline during 2013**, with the
18           expectation that that puts us on a solid ground moving forward as we re-pivot the
            business.   And then longer term, everything that I'm seeing from a model
19           perspective that I'm seeing from an opportunity perspective, that I'm seeing from
            a pipeline perspective, and that I'm seeing from a cost-model perspective, leads
20           me to believe that there's a substantial growth opportunity so that the longer term
            view will be back to substantial growth, substantial increases both in EBITDA
21           and cash flow.  **So 2013 is re-pivot, trying to put the business on substantially**
            **better footing both from a cash perspective, from a systems perspective, from a**
22           **profits perspective.**  And then put the business on the trajectory of being able to
            realize the potential that the market presents to us.  So with that I think I'm going
23           to close.

24        317.    Analysts reacted negatively to Ross' comments:

25    (a)      **Janney Capital Markets**, 1/31/13:

26    Lowered 2013 estimates and FV per share to $5 from $9 based on lower estimates
      and higher risk.  Velti's analyst day "did little on clarifying the financial prospects
27    for 2013 since the CFO had only been there for 17 days.  He did, however, state
      that Velti's EBITDA is likely to materially decline in 2013 although it would still

generate meaningful FCF. We remain on the sidelines until the CFO has had the time to thoroughly examine the financials and issue his 2013 outlook, and until we are confident the company can reach FCF profitability.

***One of the problems modeling 2013 is that Velti has not provided the expected contribution from the divested assets to 2012.***

Modeling risk is high. ***Many moving pieces and limited transparency***.

(b)     **Craig Hallum**, 1/31/13:

Lowered rating to Hold and target to $4 after company said it expects EBITDA to be "materially lower."

(c)     **RBC Capital Markets**, 1/31/13:

Velti analyst day largely positive until a comment on 2013 EBITDA clearly took the market by surprise.

The disconnect largely stems from the divestiture of certain clients, first noted on the 3Q 12 earnings call…. ***Current estimates likely did not account for this divested revenue, and this comment should not have been quite so surprising.***

(d)     **Wells Fargo Securities**, 1/31/13:

Downgraded to Market Perform from Outperform.

We expect greater discipline on contract quality and geographic mix will have significant negative impact on revenue and EBITDA.

***We remain concerned that the cash collection weakness that has challenged Velti over the last year has likely been due to an over-reliance on growth from customers (primarily in Eastern Europe/Middle East/Africa) with poorly structured contracts, where contracts with weak payment structures may have been renewed in exchange for headline growth increasing the level of delayed payment risk.***

Ross' comments were enough to move us to the sidelines as we believe the company's efforts to secure a higher growth profile over the last year resulted in weaker than expected cash flow dynamics.

(e)     **Jeffries**, 1/31/13:

Cut estimates on lower EBITDA outlook and target to $8 citing a "messy transition."

(f)     **Roth**, 2/5/13:

Noted that much of analyst day presentation focused on previously announced $27 million deal, that Roth learned was T Mobile. More important than 5% contribution to revenue in 2013 is the client relationship in the US where Velti seeks to grow.

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-99-

318.    Velti's stock price closed down over 25% on January 30, 2013, falling from a prior day close of $5.47 to $4.09 on very heavy volume.  Velti's stock price fell another 9% on January 31, 2013, closing at $3.72, again on heavy volume.

**Q4 and Fiscal Year 2012 Earnings Release and Conference Call, March 12, 2013**

319.    On March 12, 2013, the Company issued a press release reporting its financial and operating results for the Q4 2012 and fiscal year ended December 31, 2012. The Company acknowledged a disappointing fourth quarter, reporting revenue of $97.5 million for the quarter – at the low end of the guidance given on November 14, 2012 of $97.1 million to $113.1 million, and revenue for the year of $270.3 million, also at the bottom end of November 14, 2012 guidance.  EBITDA for the quarter was $25.1 million, sharply lower than the same quarter in the prior year, and less than half of the low end of guidance of $50.8 million to $59.8 million given on November 14, 2012, at the half way point in the quarter.  EBITDA for the year was $42.6 million compared to November 2012 guidance of $68.3 million to $77.3 million.  Revenue was lower than expected and operating expenses were higher.

320.    In a sharp reversal of what was represented to be a downward trend in DSOs, and Defendant Moukas' November 2012 forecast of DSOs at 180 days in 2013, Velti reported that *DSOs increased sharply to 311 days* in the quarter from 242 days at the end of Q3, as opposed to the "target" of 230 days by the end of Q4 Cheung articulated on November 14, 2012.

321.    However, Defendants expressed confidence in Velti's growth opportunities, and financial improvement in 2013, touting new contracts with solid customers like American Express, Discover, eTrade, Hertz, BBW, JC Penney, Subway, Armani Exchange, Bebe, Outback Steakhouse, and Academy.

322.    The press release was accompanied by a slide presentation in which Velti graphically depicted certain financial metrics, including a pie chart showing the geographic breakdown of its revenue for the year.  According to the FY 2012 pie chart, 23% of Velti's revenue for the year came from the Americas, and 28% came from the UK.  The pie chart

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-100-

1   continued to falsely depict a company deriving the majority of its revenue – 51% – from

2   businesses in strong regions with favorable payment terms.

3          323.    That same day, the Company held a conference call with investors to discuss its

4   FY and Q4 2012 results.  Ross opened the call with prepared remarks attributing Velti's lower

5   revenue and EBITDA for the quarter to Velti's "change in strategic direction" focusing on

6   customers in "key markets" such as the Americas, Western Europe, Brazil, India and China.

7   Gross margins for the quarter were negatively impacted "as a result of lower than expected

8   yields from certain campaigns late in the quarter."  Ross revealed that operating expenses were

9   higher than expected and included a charge of $6.4 million "to increase Velti's allowance for

10  doubtful accounts."  Ross further attributed the sharp increase in DSOs to "normal seasonality."

11         324.    Ross next focused his remarks on cash flow, revealing, contrary to what Moukas

12  said at the end of the third quarter about Velti's future cash needs, that Velti had a number of

13  acquisition-related obligations that became payable in both Q1 and early Q2 2013.  Ross also

14  revealed that Velti had "fully drawn down on its HSBC facility," that the first half of the year

15  would be a "rough patch" in terms of cash flow, and "catch-up payments for certain publisher

16  liabilities which are being paid in Q1 but relate to business in 2012" accounted for much of the

17  cash flow shortfall.

18         325.    Ross then focused on guidance, projecting revenue of $255 to $280 million for

19  2013, EBITDA between $5 and $15 million, and free cash flow between $5 and $15 million.

20  Ross also projected "[r]evenue for 2013 off of the divestiture-adjusted base" to be

21  "approximately 12% at the midpoint" compared to the 35% Moukas promised at the end of Q3

22  2012.

23         326.    Moukas spoke next and talked about the transition away from customers in

24  regions with longer payment terms negatively impacting profitability, and for the first time

25  acknowledging that the $27 million contract he touted at the end of Q3, experienced a "set back"

26  as the customer wanted to change the scope of the project.

27

28

327.   During the Q and A, Ross first responded to an analyst comment that it didn't look like Velti remained a "going concern" admitting "[*w*]*here we stand now, it will be tight.*" Contrary to what Moukas said at the end of Q3, Ross was far less certain that a capital raise would not be necessary; "we believe that now *we have the potential* of getting through this without a capital raise.  At this point we have no definitive plans one way or the other…"

328.   Next, in response to a question about how much cash collection could come from high-DSO areas that generated revenue last year, Ross admitted "*there is a meaningful amount in current year cash flow expected to come in from some of these older receivables.*"  In other words, Velti's then current cash flow projections were heavily dependent on collecting on the older receivables in weak geographic regions.

329.   Ross further responded to a question about his confidence in the financial model he articulated on the call voicing some discomfort with the Company's past accounting practices:

> Oh, how – my confidence in the model? Yeah, *we've spent a lot of time pressure testing the model here and I think we internally – the initial model was, shall I say, more robust. I've tried to take – I've tried to pressure test it in ways that would be more conservative and more aware of kind of worst case scenarios*. So, on a scale from 1 to 10, how comfortable I am with the model, 7 or 8. As you've said, I haven't been here all that long, so my institutional knowledge of just how good we are at predicting is maybe not as good as if I would have been here for five or six years, but again I'm trying to triangulate from a variety of different sources be a voice of skepticism on some of these assumptions, and based on that I'm pretty comfortable with where we came out from an operating model and we feel good about, if we get through this transition or once we get through this transition year, that we are operating on a much better model moving forward with better characteristics and better expectations and better ability to meet those expectations.

330.   In a reflection of Ross' skepticism, Velti announced fiscal year 2013 guidance of $255-$280 million, well below consensus estimates of $340 million.

331.   The Company also slightly increased its allowance for doubtful accounts associated with its trade receivables to $7 million and its accrued contracts receivables to $1 million.  Ross explained that size of the receivables on the Company's books required a larger reserve:

> The company has had very, very limited experience with bad debts. We've had very few instances where customers have ultimately been unable to pay, or even

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-102-

bankruptcy or something else. Often times it takes a heck of a long time, but very little experience. So if you sort of come up with a reserve based on your past experience, It's a rather – it's pretty dang closed to nothing. I – just looking at it, there – you look at the DSOs of the company and sort of say, they're a little bit older. I just pressure tested some of the assumptions, took mathematical percentages of balances over certain ages and came up with an amount that I felt more comfortable with, that provided us some cushion, when and if something happens. ***There wasn't much in the specific area that led me to say, oh my gosh, we have a huge problem. I want a big additional reserve. But with the magnitude of the reserve – with the AR on the company's books, I just thought it was more prudent to have a little bit more cushion with respect to those numbers***.

332.     The statements contained in the Company's March 12, 2013 earnings release, slide presentation, and conference call concerning the Company's financial performance and revenue recognition policies deceptively assured and comforted the market that its receivables were within normal operating ranges given the Company's revenue and net income for the same period.  The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

(a)     that the Company was having difficulty collecting its receivables;

(b)     that a significant portion of the Company's receivables were owed by customers in dubious financial condition and were uncollectible and had been on Velti's books since 2011;

(c)     that, as a result, the Company's revenues and receivables were overstated; and

(d)     that the Company's allowance for doubtful accounts was understated.

333.     Defendant Ross' statements were also materially false and misleading because they downplayed the magnitude of the problem and implied that the $8 million reserve was sufficient to account for the risk associated with collections on the aging receivables.  As investors would learn five months later when Velti announced a $111 million charge, a much larger reserve was required.  Further, Defendants' statements about the percentage of revenue generated by region were false and misleading. The true percentage of Velti's revenue generated from high risk regions with unfavorable payment terms, and the true "business risk" of collecting those revenues was substantially higher than reported rendering Defendants' public statements about the "geographic breakdown" of its revenues materially false and misleading.

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-103-

334.    Investors reacted negatively to the news:

(a)    **Jefferies** lowered its rating to Hold and dropped its price target to $2.15 in a March 13, 2013 report entitled "Q4 Miss & Disappointing 2013 Guidance: Downgrade to Hold on a Poor Transition." Analysts pointed out that "after saying that the company did not need to write off any A/R and did not need to sell shares, it wrote off $6M A/R and said it may sell shares."

(b)    **RBC Capital Markets** lowered its rating to Sector Perform and dropped its price target to $3 in a March 13, 2013 report entitled, "Downgrading to Sector Perform On Rebuilding Year."  Despite the disappointing announcement, Analysts noted that CFO Jeff Ross "feels he has captured all of the major adjustments needed."

(c)    **Wells Fargo** lowered its valuation range to $2-$3 with a Market Perform rating in a March 13, 2013 report entitled, "VELT: New CFO Ross Lowers The Bar Again – Reducing Est."  Despite the lowered price targets Analysts credited Ross saying, "we believe new CFO Ross is firmly in control of managing the guidance process, and we believe he has set a tone of conservatism that was lacking prior to his appointment."

335.    After the March 12, 2013 disclosures, shares of Velti declined $0.71 per share, more than 22%, to close on March 13, 2012 at $2.40 per share.

**2012 Annual Report, April 11, 2013**

336.    On April 11, 2013, Velti filed its Annual Report for the year ended December 31, 2012 on Form 20-F with the SEC.  The Company's Form 20-F was signed by Defendants Moukas and Cheung, and repeated the Company's financial results previously announced on March 12, 2013.

337.    The Annual Report falsely informed investors that under the terms of the Company's revenue recognition policy, the Company only recognized revenue when certain criteria were met, including the existence of evidence to support the recognition of revenue as of the reporting date.

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-104-

338.   The 2012 Annual Report assured investors that the Company evaluated the collectability of accounts receivable and mad a specific allowance if there was "strong evidence indicating that the amounts due are unlikely to be collectible."

339.   As of December 31, 2012 the Company's allowance for doubtful accounts for trade receivables and accrued contract receivables was $7 million and $0.8 million respectively. The Company also explained that it maintains an allowance for doubtful accounts to reflect the expected non-collection of accounts receivable and accrued contract receivables and writes off accounts receivable when it considers them uncollectible.

> **Accounts Receivable, Accrued Contract Receivables and Allowance for Doubtful Accounts**
>
> Accounts receivable consists primarily of amounts due to us from our normal business activities. Credit terms can vary between customers and between regions, but are generally 30 to 90 days. Our receivables are unsecured and not interest bearing. Fees that have not been invoiced as of the reporting date but for which all revenue recognition criteria are met are reported as accrued contract receivables. We maintain allowances for doubtful accounts to reflect the expected non-collection of accounts receivable and accrued contract receivables based on past collection history and specific risks identified in the portfolio. Additional allowances might be required if deteriorating economic conditions or other factors affect our customers' ability to make timely payments. **We write off accounts receivable when we consider them uncollectible.** As of December 31, 2012 and 2011, the allowance for doubtful accounts for trade receivables was $7.0 million and $0.8 million, respectively. The allowance for doubtful accounts for accrued contract receivables was $1.0 million and zero as of December 31, 2012 and 2011, respectively.

340.   Velti's fiscal year 2012 Form 20-F also reported that management had once again identified a material weakness in the Company's internal control over financial reporting related to deficiencies in the financial statement close process.  Specifically Velti said the following factors contributed to its finding of a material weakness in the financial statement close process:

- We did not maintain effective controls to provide reasonable assurance that there was adequate support for certain prepaid assets and deferred costs, that the aging of previously factored accounts receivable was adequate and that accounts receivables were effectively reconciled.
- We did not have adequate policies and procedures in place to ensure the timely, effective review of estimates, assumptions and related reconciliations of capitalized software, including tracking software asset cost by product and/or associated version release, and the timely review of revenue by product.

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-105-

- We did not have adequate policies and procedures in place to ensure the timely, effective review of estimates, assumptions and related reconciliations and analysis, relating to our tax provision calculations prepared by outside consultants.

341. Despite the material weakness in its internal controls, Velti stated that its "management has concluded that our consolidated financial statements for the periods covered by and included in this Annual Report on Form 20-F fairly stated in all material respects in accordance with generally accepted accounting principles in the U.S. for each of the periods presented herein."

342. The statements contained in the Company's 2012 Annual Report concerning the Company's financial results, factoring and accounting for doubtful accounts deceptively assured and comforted the market that its receivables were within normal operating ranges given the Company's revenue and net income for the same period. The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

(a) that the Company was having difficulty collecting its receivables;

(b) that a significant portion of the Company's receivables were owed by customers in dubious financial condition and were uncollectible and had been on Velti's books since 2011;

(c) that, as a result, the Company's revenues and receivables were overstated; and

(d) that the Company's allowance for doubtful accounts was understated.

343. The Company's statements regarding its internal controls were also false and misleading because: (i) the Company did not disclose the fraudulent scheme alleged herein; and (ii) Defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP.

344. The Annual Report also contained SOX required certifications, signed by Defendants Moukas and Cheung, substantially similar to the certifications contained in ¶ 148, *supra*.

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-106-

345.   The certifications were false and misleading because the Company failed to disclose and actively sought to conceal from investors: (i) that it was having difficulty collecting certain receivables; (ii) that certain of the Company's receivables were uncollectible; (iii) that, as a result, the Company's revenues and receivables were overstated during the Class Period; (iv) that the Company's allowance for doubtful accounts was understated during the Class Period; and (v) that, as a result of the foregoing, the Company's statements and reported financial results were materially false and misleading.

346.   Velti's fiscal year 2012 Form 20-F also contained representations from the Company's auditors that "we conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board" and that "the financial statements . . . present fairly, in all material respects, the consolidated financial position of Velti."

347.   Defendant Baker Tilly's Audit Report was false and misleading because Baker Tilly failed to exercise due professional care as required by AU Section 230 and GAAS.  By failing to approach their work with the required skepticism the auditors failed to perform the audit in accordance with GAAS.  A failure which resulted in a build-up of uncollectable receivables and which ultimately necessitated the $111 million write-down.  Even the most cursory of examinations or audit testing of the reconciliation process between accrued accounts receivable and trade accounts receivable would have revealed the rapidly burgeoning accrued accounts receivables balance, and an obvious failure to take an adequate reserve against these uncollectable accounts. Accordingly, Baker Tilly either knew, or, at the barest minimum, was deliberately recklessness in not knowing and not disclosing that Velti's financial statements had not been prepared in accordance with GAAP.

**Q1 2013 Earnings Release and Conference Call, May 13, 2013**

348.   On May 13, 2013, the Company issued a press release announcing disappointing Q1 2013 financial results with revenue of $41 million, net loss of $156.4 million, adjusted EBITDA of $(18.3) million and EPS of $(2.38).  Trade and accrued contract receivables were $146.8 million and $136.1 million respectively and the allowance for doubtful accounts

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-107-

associated with these receivables was $10.1 million with $8.7 million associated with trade receivables and $1.4 million with accrued contract receivables. DSOs remained high at 309 days.

**Q1 2013 Financial Highlights**

- Revenue of $41.0 million, *a decrease of 21 percent* from Q1 2012;
- Revenue less 3rd party costs in Q1 of $17.6 million;
- Adjusted EBITDA of ($18.3) million, or ($16.1) million excluding the bad debt provision compared with $4.6 million in Q1 2012;
- GAAP net loss attributable to Velti of $156.4 million and diluted EPS of ($2.38) during Q1 compared with a net loss of $8.8 million and EPS of ($0.14) for Q1 2012; Velti incurred a non-cash charge of $133.1 million related to the write-down of substantially all goodwill and other intangible assets, which was triggered by our decline in market value and was largely mechanical based on our stock price on March 31st. Notwithstanding the required accounting treatment, our view is that both the businesses acquired and the intangibles acquired or developed by the Company have substantial economic value in our ongoing business operations; and
- Adjusted net loss of $18.1 million and adjusted diluted EPS of ($0.27) compared with adjusted net loss of $1.1 million and adjusted diluted EPS of ($0.02) for Q1 2012.

\*       \*       \*

**<u>Cash, Comprehensive DSOs and Asset Impairment</u>**

- Cash position of $16.3 million as of March 31, 2013;
- Q1 operating cash flow of ($26.6) million, excluding a $6.0 million acquisition payment related to Mobclix;
- Comprehensive DSOs of 309 days; and
- Q1 free cash flow, excluding the impact of acquisition related obligations of ($34.3) million.

349. The press release was accompanied by a slide presentation in which Velti graphically depicted certain financial metrics, including a pie chart showing the geographic breakdown of its revenue for the year. According to the Q1 2013 pie chart, 29% of Velti's revenue for the quarter came from the Americas, and 36% came from Western Europe. The pie chart continued to falsely depict a company deriving the majority of its revenue – 65% – from businesses in strong regions with favorable payment terms.

350. That same day, the Company held a conference call with investors to discuss its Q1 2013 results. Ross led the prepared remarks emphasizing the geographic breakdown of

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-108-

revenue with 65% of revenue for the quarter coming from the US and UK.  Ross noted that Velti ended the quarter with $16.3 million cash on its books, but also revealed that in "late April," Velti did an equity raise via a private placement raising $24.8 million.  Ross repeated that Velti was operating cash flow negative of *$26.6 million* for the quarter, and free cash flow negative of *$34.3 million,* and repeated the guidance given in the press release of revenue for Q2 2013 of $42 to $45 million, and adjusted EBITDA of negative $8 million to negative $12 million.  For the year, Velti maintained its guidance for EBITDA and free cash flow of $5 million to $15 million.  Velti refused to offer revenue guidance for 2013.

351.   Defendant Moukas spoke next, emphasizing the success Velti was having achieving a "more optimal distribution of revenue…"  Moukas further commented on Velti's lower advertising revenue noting it was the result of a decision "to delay several publisher payments" to preserve cash.  Moukas, however, again touted Velti's "new seven figure deals with major brands" dropping the names of some of the world's largest companies including American Express, Ford, AT&T, Panasonic, Vodafone, Orange, Claro and Coca Cola.  He later added "we are seeing very solid traction from some very well-known names in terms of brands across a variety of different markets.  These markets are obviously the Americas, where you're seeing customers there like …. American Express, … AT&T, … Europe, where we have very solid growth from customers like Vodafone."  He then mentioned "solid folks" like Disney, like Toyota, like Unilever …. And growth in non-US and Western European markets where DSOs are around 90 days.

352.   In the Q and A that followed, an analyst asked a two part question; first about the types of contracts Moukas was describing, and second, about the additional $2.3 million added to "bad debt allocation expense" on to of the $7 million already there, and whether there were any more bad debt write-downs ahead?  Ross replied first about the reserve for doubtful accounts:

> *[W]e are not seeing a meaningful increase in specific instances of bad debt*, where customers are having financial difficulties, or are going into bankruptcy, or other like-situation where it's a definitive write-off of the bad debt.  *And even on those what we are reserving that are – because of their long life – in most instances we are receiving regular payments.  They're just not as quick or as large as we expect them to be, or would hope them to be, I guess…*

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-109-

1        353.    Moukas replied next noting the contracts he described were "multi-million dollar

2  engagements, seven figure engagements…" Moukas closed the call noting "[w]e continue to see

3  very strong demand from our customers, including multiple seven-figure deals I discussed."

4        354.    The statements concerning the Company's financial results deceptively assured

5  and comforted the market that its receivables were within normal operating ranges given the

6  Company's revenue and net income for the same period. The true facts, which were known to

7  and/or disregarded with deliberate recklessness by Defendants but concealed from the investing

8  public, were as follows:

9        (a)    that the Company was having difficulty collecting its receivables;

10       (b)    that a significant portion of the Company's receivables were owed by customers

11                   in dubious financial condition and were uncollectible and had been on Velti's

12                   books since 2011;

13       (c)    that, as a result, the Company's revenues and receivables were overstated; and

14       (d)    that the Company's allowance for doubtful accounts was understated.

15        355.    Providing additional support that Defendants knew that Velti's revenues and

16  receivables were overstated and its allowance for doubtful accounts was understated is the fact

17  that shortly after this earnings announcement Velti engaged Deloitte to "assist in evaluating the

18  near-term and long-term collectability of receivables on the books of our Greek and Cypriot

19  subsidiaries." Further, Defendants' statements about the percentage of revenue generated by

20  region were false and misleading. The true percentage of Velti's revenue generated from high

21  risk regions with unfavorable payment terms, and the true "business risk" of collecting those

22  revenues was substantially higher than reported rendering Defendants' public statements about

23  the "geographic breakdown" of its revenues materially false and misleading.

24  **Q1 2013 Interim Report, June 10, 2013**

25        356.    On June 10, 2013, Velti filed with the SEC an Interim Report on Form 6-K for the

26  quarter ended March 31, 2013. The interim report repeated the financial results reported on May

27  13, 2013, and repeated the Company's prior statements that it only recognized revenue when

28

1   certain criteria were met, including the existence of evidence to support the recognition of

2   revenue as of the reporting date.

3       357.    The Interim Report falsely assured investors that "[w]e write off accounts

4   receivable when we consider them uncollectible:"

> We maintain allowances for doubtful accounts to reflect the expected non-collection of accounts receivable and accrued contract receivables based on past collection history and specific risks identified in the portfolio. Additional allowances might be required if deteriorating economic conditions or other factors affect our customers' ability to make timely payments. We write off accounts receivable when we consider them uncollectible. As of March 31, 2013 and December 31, 2012, the allowance for doubtful accounts for trade receivables was $8.7 million and $7.0 million, respectively. The allowance for doubtful accounts for accrued contract receivables was $1.4 million and $1.0 million as of March 31, 2013 and December 31, 2012, respectively.

11      358.    As of March 31, 2013 the allowance for doubtful accounts for trade receivables

12  was $8.7 million and for accrued contract receivables it was $1.4 million.

13      359.    The Interim Report also reported that management had once again identified a

14  material weakness in the company's internal control over financial reporting as was reported in

15  the Company's Annual Report filed with the SEC on Form 20-F on April 11, 2013.

16      360.    The statements concerning the Company's financial results deceptively assured

17  and comforted the market that its receivables were within normal operating ranges given the

18  Company's revenue and net income for the same period.  The true facts, which were known to

19  and/or disregarded with deliberate recklessness by Defendants but concealed from the investing

20  public, were as follows:

21      (a)     that the Company was having difficulty collecting its receivables;

22      (b)     that a significant portion of the Company's receivables were owed by customers

23              in dubious financial condition and were  uncollectible; and

24      (c)     that, as a result, the Company's revenues and receivables were overstated.

25      361.    Providing additional evidence that the Company knew that its revenues and

26  receivables were overstated and its allowance for doubtful accounts was understated is the fact

27  that shortly after this Interim Report Velti announced that it had engaged Deloitte Financial

28

Advisory Services to "assist in evaluating the near-term and long-term collectability of receivables on the books of our Greek and Cypriot subsidiaries" and that as a result of that review the Company would take a $111 million charge to its allowance for doubtful accounts.

362.    The Company's statements regarding its internal controls were also false and misleading because: (i) the Company did not disclose the fraudulent scheme alleged herein; and (ii) Defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP.

363.    The Interim report also contained SOX required certifications, signed by Defendants Moukas and Ross, substantially similar to the certifications contained in ¶ 148, *supra*.

364.    The certifications were false and misleading because the Company failed to disclose and actively sought to conceal from investors: (i) that it was having difficulty collecting certain receivables; (ii) that certain of the Company's receivables were uncollectible; (iii) that, as a result, the Company's revenues and receivables were overstated during the Class Period; (iv) that the Company's allowance for doubtful accounts was understated during the Class Period; and (v) that, as a result of the foregoing, the Company's statements and reported financial results were materially false and misleading.

## IX.    THE CLASS PERIOD ENDING DISCLOSURES

365.    On August 20, 2013, Velti issued a press release announcing 2Q2013 financial results.  In the release, defendant Moukas revealed that during the quarter, Velti "began a major restructuring effort" to cut costs and reduce capital expenditures.  Moukas also delivered the stunning news that notwithstanding Velti's previously announced divestiture of its business with customers in Greece and Cyprus, those customers "continued to account for a significant portion of the Company's outstanding receivables," and "[d]ue to a deterioration in collections from these customers, and indications that future payments were at risk, *we made the decision to write-down more than $100 million in outstanding receivables*."

366.    The press release further revealed that Velti engaged an investment bank to help sell Mobclix, its supply-side U.S. advertising business, that Velti engaged Deloitte Financial Advisory Services to evaluate the collectability of receivable due from customers in Greece and Cyprus.   Moreover, the Company revealed that 2Q2013 revenues and free cash flow were substantially below prior quarters.

367.    That same day, Velti held a conference call with investors after the market close to discuss its second quarter 2013 results in which Defendants made additional shocking revelations.   Specifically, defendant Ross revealed for the first time, and contrary to prior Defendants' representations, that customers in Greece and Cyprus "*still held approximately two-thirds of our outstanding accounts receivable and accrued revenues*."

368.    On the call, a Wells Fargo Securities, LLC analyst questioned Defendant Ross about the seeming inconsistence between Defendant Moukas' prior statements, and Defendants' latest revelations:

> **Q:     Peter Stabler** – Wells Fargo Securities, LLS – Analyst
>
> … A couple of questions for Jeff.  Can you help me reconcile a couple of things here, or at least tell me what I'm misunderstanding here?  In the past, Alex, you referred to your exposure to Greece from a revenue perspective as being in the high-single-digit percent.  Yet, with the write-down here, we're being told that it's attributable almost entirely to Greek-related revenues. . . Can you help me reconcile why this is such a large number tied to such a small economy? . . .

In response, Ross made the further shocking admissions: (i) that the $111 million in receivables being written off were "substantially old" and had been on Velti's books since "before even 2012," and (ii) that Velti, at worst blatantly lied in its SEC filings and public statements, and at best blatantly misled investors by presenting revenue and receivables based on the location or jurisdiction of the parent corporation rather than the country where the subsidiaries or business was located:

> **A:     Jeff Ross** – Velti PLC  - CFO
>
> … These receivables, in many instances, are substantially old, accounting for our significant overall DSO.  ***Many of the receivables we're writing off relate to time periods before even 2012, although some relate into 2012.***  When we have internally and ***in SEC filings consistent with guidance reported revenue, it's been based on the location, the jurisdiction of the corporation of most of the***

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-113-

*companies, especially when we did business with them in multiple geographies. The revenue exposure from a technical SEC perspective was less than probably the business exposure that was at a higher level, along with the fact that some of these are significantly old.*

369.    Thus, Ross **admitted** that Velti's SEC filings and press releases misrepresented the true source of Velti's revenue, understated Velti's true exposure to its business in Greece and Cyprus, and that Velti was carrying a very large balance of uncollectable receivable from customers in Greece and Cyprus on its books for the entire Class Period.

370.    Moreover, Defendants revealed on the conference call, and contrary to prior public statements, that Velti was not having success growing its North American business, particularly its advertising business.  Defendants attributed that failure in substantial part to Velti's "***failure to make timely payments to publishers on [its] Mobclix ad exchange business, which resulted in a substantial decline in that business***."  Defendants also announced that Velti engaged an investment banker "to sell the remainder of [its] U.S. advertising business also known as Mobclix."

371.    At the conclusion of the Class Period, Velti was, and continues to be, a shell of its former self.  On November 4, 2013 the Company's U.S. arm, Velti, Inc., filed for bankruptcy protection.  The remainder of the Company is on perilous economic footing.  Had the Officer Defendants been forthright with the market, and tightened their belts *three years* ago, the Company's now present future would likely have been very different.  Instead, the Officer Defendants strove to conceal the Company's true financial condition from investors and when the truth ultimately emerged, Company was injured beyond repair.

## X.    LOSS CAUSATION

372.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

373.    During the Class Period, Plaintiffs and the Class purchased or acquired Velti's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof,

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-114-

1   were revealed, causing investors' losses. Following the disclosure of the massive $111 million

2   write-down, Velti common stock declined by more than 66% to close on August 21, 2013, at

3   $0.34 per share, on heavy trading volume.

4   **XI.   SCIENTER**

5          374.   As alleged herein, and except as with respect to Plaintiffs' claims alleged under

6   and/or pursuant to the Securities Act, which are expressly disclaimed with respect to scienter,

7   Defendants acted with scienter, as discussed herein, in that Defendants knew that the public

8   documents and statements issued or disseminated in the name of the Company were materially

9   false and/or misleading; knew that such statements or documents would be issued or

10  disseminated to the investing public; and knowingly and substantially participated or acquiesced

11  in the issuance or dissemination of such statements or documents as primary violations of the

12  federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their

13  receipt of information reflecting the true facts regarding Velti, their control over, and/or receipt

14  and/or modification of Velti's allegedly materially misleading misstatements and/or their

15  associations with the Company which made them privy to confidential proprietary information

16  concerning Velti, participated in the fraudulent scheme alleged herein.

17         375.   Indeed, as a result of the disclosures herein, the price of the Company's common

18  stock dropped 0.66 per share, more than 66%, to close on August 21, 2013, at $0.34 per share.

19  **XII.   UNDISCLOSED ADVERSE FACTS**

20         376.   The market for Velti's securities was open, well-developed and efficient at all

21  relevant times. As a result of these materially false and/or misleading statements, and/or failures

22  to disclose, Velti's securities traded at artificially inflated prices during the Class Period.

23  Plaintiffs and other members of the Class purchased or otherwise acquired Velti's securities

24  relying upon the integrity of the market price of the Company's securities and market

25  information relating to Velti, and have been damaged thereby.

26         377.   During the Class Period, Defendants materially misled the investing public,

27  thereby inflating the price of Velti's securities, by publicly issuing false and/or misleading

28

statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Velti's business, operations, and prospects as alleged herein.

378.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or cause to be made a series of materially false and/or misleading statements about Velti's financial well-being and prospects.   These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period results in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## XIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE WITH RESPECT TO EXCHANGE ACT CLAIMS

379.    Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 1288 (1972) because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

380.    In the alternative, Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud on the market doctrine for the following reasons set forth below.

381.    The market for Velti's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Velti's securities traded at artificially inflated prices during the Class Period, Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-116-

1  relying upon the integrity of the market price of Velti's securities and market information

2  relating to Velti, and have been damaged thereby.

3    382.    During the Class Period, the artificial inflation of Velti's stock was caused by the

4  material misrepresentation and omissions particularized in this Complaint caused the damages

5  sustained by Plaintiffs and other members of the Class.  As described herein, during the Class

6  Period, Defendants made or caused to be made a series of materially false and/or misleading

7  statements about Velti's business, prospects, and operations. These material misstatements

8  and/or omissions created an unrealistically positive assessment of Velti and its business,

9  operations, and prospects, thus causing the price of the Company's securities to be artificially

10  inflated at all relevant times, and when disclosed negatively affected the value of the Company

11  stock.  Defendants' materially false and/or misleading statements during the Class Period

12  resulted in Plaintiffs and other members of the Class purchasing the Company's securities at

13  such artificially inflated prices, and each of them has been damaged as a result.

14    383.    At all relevant times, the market for Velti's securities was an efficient market for

15  the following reasons, among others:

16    (a)    Velti stock met the requirements for listing, and was listed and actively traded on

17  the NASDAQ, a highly efficient and automated market;

18    (b)    As a regulated issuer, Velti filed periodic public reports with the SEC and/or the

19  NASDAQ;

20    (c)    Velti regularly communicated with public investors via established market

21  communication mechanisms, including through regular dissemination of press releases on the

22  national circuits of major newswire services and through other wide-ranging public disclosures,

23  such as communications with the financial press and other similar reporting services; and/or

24    (d)    Velti was followed by securities analysts employed by brokerage firms who

25  wrote reports about the Company, and these reports were distributed to the sales force and

26  certain customers of their respective brokerage firms.  Each of these reports was publicly

27  available and entered the public marketplace.

28

384.     As a result of the foregoing, the market for Velti's securities promptly digested current information regarding Velti from all publicly available sources and reflected such information in Velti's stock price.  Under these circumstances, all purchasers of Velti's securities during the Class Period suffered similar injury through their purchase of Velti's securities at artificially inflated prices and a presumption of reliance applies.

## XIV.   NO SAFE HARBOR

385.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Ve1ti who knew that the statement was false when made.  In addition, no safe harbor protection is available for oral or written statements (including the IPO Registration Statements) made in connection with the IPO.

## XV.   CLASS ACTION ALLEGATIONS

386.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure, rules 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Velti's securities between January 27, 2011 and August 20, 2013, inclusive, the Class Period, seeking to pursue remedies under the Exchange Act.  Plaintiffs also brings this action as a class action pursuant to Rules 23(a) and (b)(3) on behalf of a class consisting of  all persons  who

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-118-

1  purchased or otherwise acquired the securities of Velti pursuant and/or traceable to the

2  Company's registration statements and prospectuses issued in connection with the Company's

3  January 28, 2011 IPO, and/or pursuant and/or traceable to the Company's registration statement

4  and prospectuses issued in connection with the Company's June 14, 2011 SPO, seeking to pursue

5  remedies under the Securities Act, collectively the Class.  Excluded from the Class are

6  Defendants, the officers and directors of the Company, at all relevant times, members or their

7  immediate families and their legal representatives, heirs, successors or assigns and any entity in

8  which Defendants have or had a controlling interest.

9  387.    The members of the Class are so numerous that joinder of all members is

10  impracticable.  Throughout the Class Period, Velti's securities were actively traded on the

11  NASDAQ Stock Exchange (the "NASDAQ").  While the exact number of Class members is

12  unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery,

13  Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.

14  Millions of Velti shares were traded publicly during the Class Period on the NASDAQ.  As of

15  March 31, 2013, the Company had 65,622,141 shares of common stock outstanding. Record

16  owners and other members of the Class may be identified from records maintained  by Velti or

17  its transfer agent and may be notified of the pendency of this action by mail, using the form of

18  notice similar to that customarily used in securities class actions.

19  388.    Plaintiffs' claims are typical of the claims of the members of the Class as all

20  members of the Class are similarly affected by Defendants' wrongful conduct in violation of

21  federal law that is complained of herein.

22  389.    Plaintiffs will fairly and adequately protect the interests of the members of the

23  Class and have retained counsel competent and experienced in class and securities litigation.

24  390.    Common questions of law and fact exist as to all members of the Class and

25  predominate over any questions solely affecting individual members of the Class.  Among the

26  questions of law and fact common to the Class are:

27

28

(a)     Whether Defendants violated the federal securities laws by their acts as alleged herein;

(b)     Whether statements made by Defendants to the investing public during the Class Period omitted and/or contained untrue material facts about the business, operations, and prospects of Velti; and

(c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

391.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XVI.   CLAIMS FOR RELIEF

### COUNT I

### <u>Violation of Section 11 of the Securities Act</u>
**(Against All Defendants)**

392.    Plaintiffs repeat and re-allege each and every allegation above except for those alleging fraud.

393.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.  This particular cause of action is based on Defendants' lack of reasonable care, not fraud or intentional or reckless misconduct.

394.    The Registration Statements for the IPO and SPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

395.    Velti is the registrant for the IPO and SPO.  The Defendants named herein were responsible for the contents and dissemination of the IPO and SPO Registration Statements.

396.     As issuer of the shares, Velti is strictly liable to Plaintiffs and the Class for the misstatements and omissions.

397.     Baker Tilly audited Velti's financial statements for the three years in the period ended December 31, 2009, and provided an unqualified Report of Independent Registered Public Accounting Firm with respect to the financial statements and financial statement schedule of Velti, dated August 3, 2010 and September 3, 2010 (the "Baker Tilly Report"), which was incorporated by reference in the Registration Statements.  Baker Tilly expressly consented to the use of its name and the Baker Tilly Report in the Registration Statements and provided a letter dated August 3, 2010 and September 3, 2010 for inclusion in the Registration Statements and, which consented to the reference to Baker Tilly and to the incorporation by reference of the Baker Tilly Report.

398.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO and SPO Registration Statements were true and without omissions of any material facts and were not misleading.  This claim is not based on and does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that the Defendants named in this count acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

399.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

400.     Plaintiffs assert this claim on behalf of the members of the Class who purchased and/or acquired Velti shares pursuant and/or traceable to the Registration Statement for the IPO and/or the SPO.

401.     The Class has sustained damages.  The value of Velti common stock has declined substantially subsequent to and due to Defendants' violations.  On or about December 16, 2013, Velti stock was voluntarily delisted from NASDAQ.

402.     Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that

the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements. Less than three years elapsed between the time that the securities at issue were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements.

## COUNT II

### For Violations of Section 12(a)(2) of the Securities Act
**(Against The Underwriter Defendants, Velti, Moukas, Kaskavelis, Mann, Goldstein, Hobley, and Negroponte)**

403. Plaintiffs repeat and re-allege each and every allegation above except for those alleging fraud.

404. This Count is asserted against the Underwriter Defendants, Velti, Moukas, Kaskavelis, Mann, Goldstein, Hobley, and Negroponte for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Velti common stock in the Offerings and were damaged thereby.

405. This particular cause of action is based on Underwriter Defendants, Velti, Moukas, Kaskavelis, Mann, Goldstein, Hobley, and Negroponte lack of reasonable care, not fraud or intentional or reckless misconduct. For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that the Underwriter Defendants, Velti, Moukas, Kaskavelis, Mann, Goldstein, Hobley, and Negroponte acted with scienter or fraudulent intent which are not elements of a Section 12(a)(2) claim.

406. The Underwriter Defendants, Velti, Moukas, Kaskavelis, Mann, Goldstein, Hobley, and Negroponte were sellers of Velti common stock within the meaning of the Securities Act because they: (i) transferred title to St. Paul and/or other members of the Class who purchased in the IPO and SPO; and (ii) solicited the purchase of the common stock by St. Paul and other members of the Class and were financially benefitted thereby, including but not limited to receiving underwriting fees, commissions or discounts in connection with the IPO and SPO. The Registration Statements contained untrue statements of material fact and omitted other

1   facts necessary to make the statements not misleading, and failed to disclose material facts, as set

2   forth herein.

3       407.   The Underwriter Defendants, Velti, Moukas, Kaskavelis, Mann, Goldstein,

4   Hobley, and Negroponte used the means and instrumentalities of interstate commerce and the

5   U.S. mail.

6       408.   The Underwriter Defendants, Velti, Moukas, Kaskavelis, Mann, Goldstein,

7   Hobley, and Negroponte are unable to establish an affirmative defense based upon a reasonable

8   or diligent investigation of the statements contained in the Registration Statements.   The

9   Underwriter Defendants, Velti, Moukas, Kaskavelis, Mann, Goldstein, Hobley, and Negroponte

10  did not make a reasonable investigation or possess reasonable grounds to believe that the

11  statements contained therein and incorporated by reference in the Registration Statements at the

12  time of the IPO and SPO were true and that there were no omissions of any material fact.

13  Accordingly, each of the Underwriter Defendants, Velti, Moukas, Kaskavelis, Mann, Goldstein,

14  Hobley, and Negroponte are liable to St. Paul and/or other members of the Class who purchased

15  in the IPO and SPO in which that Defendant acted as an underwriter.

16      409.   St. Paul and other members of the Class purchased or otherwise acquired Velti

17  common stock issued in the IPO and SPO pursuant to materially inaccurate Registration

18  Statements  and did not know, or in the exercise of reasonable diligence could not have known,

19  of the untruths and omissions contained therein.

20      410.   The value of Velti common stock declined substantially subsequent to the

21  consummation of the IPO and SPO and St. Paul and the other members of the Class have

22  sustained damages.  Further, and as noted, above, Velti stock has been delisted from NASDAQ.

23      411.   Less than one year elapsed between the time that Plaintiffs discovered or

24  reasonably could have discovered the facts upon which this complaint is based and the time that

25  the first complaint was filed asserting claims arising out of the falsity of each of the Registration

26  Statements.  Less than three years elapsed between the time that the securities at issue were bona

27

28

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-123-

1   fide offered to the public and the time that the first complaint was filed asserting claims arising

2   out of the falsity of each of the Registration Statements.

3       412.    By reason of the foregoing, the Underwriter Defendants, Velti, Moukas,

4   Kaskavelis, Mann, Goldstein, Hobley, and Negroponte are liable under Section 12(a)(2) of the

5   Securities Act to St. Paul and the other members of the Class who purchased in the IPO and

6   SPO.   St. Paul and other members of the Class have the right to rescind and recover the

7   consideration paid for their securities on which they suffered damages.   In addition, St. Paul and

8   the members of the Class who have sold and suffered damages on their securities that they

9   originally purchased through the IPO and SPO are entitled to rescissory damages.

10   **COUNT III**

11   **Violation of Section 15 of The Securities Act**
   **(Against All Individual Defendants)**

12

13       413.    Plaintiffs repeat and re-allege each and every allegation above except for those

14   alleging fraud.

15       414.    This count is asserted against the Individual Defendants and is based upon Section

16   15 of the Securities Act.

17       415.    Individual Defendants, by virtue of their offices, directorship and specific acts

18   were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Velti

19   within the meaning of Section 15 of the Securities Act.   The Individual Defendants had the

20   power and influence and exercised the same to cause Velti to engage in the acts described herein.

21       416.    Individual Defendants position made them privy to and provided them with actual

22   knowledge of the material facts concealed from Plaintiffs and the Class.

23       417.    By virtue of the conduct alleged herein, the Individual Defendants are liable for

24   the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages.

25       418.    Less than one year elapsed between the time that Plaintiffs discovered or

26   reasonably could have discovered the facts upon which this complaint is based and the time that

27   the first complaint was filed asserting claims arising out of the falsity of each of the Registration

28

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-124-

1    Statements. Less than three years elapsed between the time that the securities at issue were bona

2    fide offered to the public and the time that the first complaint was filed asserting claims arising

3    out of the falsity of each of the Registration Statements.

4                                          **COUNT IV**

5             **Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
                                   **Promulgated Thereunder**
6                            **(Against Defendants Velti, Baker Tilly,**
                                  **and the Officer Defendants)**
7

8        419.    Plaintiffs repeat and re-allege each and every allegation above.

9        420.    During the Class Period, Defendants Velti, Baker Tilly and the Officer

10   Defendants carried out a plan, scheme and course of conduct which was intended to and,

11   throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other

12   Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to

13   purchase Velti's securities at artificially inflated prices. In furtherance of this unlawful scheme,

14   plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

15       421.    Defendants Velti, Baker Tilly and the Officer Defendants: (i) employed devices,

16   schemes, and artifices to defraud; (ii) made untrue statements of material filet and/or omitted to

17   state material facts necessary to make the statements not misleading; and (iii) engaged in acts,

18   practices, and a course of business which operated as a fraud and deceit upon the purchasers of

19   the Company's securities in an effort to maintain artificially high market prices for Velti's

20   securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants Velti,

21   Baker Tilly and the Officer Defendants are sued either as primary participants in the wrongful

22   and illegal conduct charged herein or as controlling persons as alleged below.

23       422.    Defendants Velti, Baker Tilly and the Officer Defendants, individually and in

24   concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce

25   and/or of the mails, engaged and participated in a continuous course of conduct to conceal

26   adverse material information about Velti's financial well-being and prospects, as specified

27   herein.

28

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

423.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Velti's value and performance and continued substantial growth, which included the making of or the participation in the making of untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Velti and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

424.     Each of the Officer Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Officer Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or with deliberate recklessness disregarded was materially false and misleading.

425.     Defendants Velti, Baker Tilly and the Officer Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with deliberate recklessness and disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness and

for the purpose and effect of concealing Velti's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' Velti, Baker Tilly and the Officer Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants Velti, Baker Tilly and the Officer Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were deliberately reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

426.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Velti's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants Velti, Baker Tilly and the Officer Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known or with deliberate recklessness disregarded by Defendants Velti, Baker Tilly and the Officer Defendants, but not disclosed in public statements by them during the Class Period, Plaintiffs and the other members of the Class acquired Velti's securities during the Class Period at artificially high prices and were damaged thereby.

427.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Velti was experiencing, which were not disclosed by Defendants Velti, Baker Tilly and the Officer Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Velti securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-127-

428. By virtue of the foregoing, Defendants Velti, Baker Tilly and the Officer Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

429. As a direct and proximate result of Defendants' Velti, Baker Tilly and the Officer Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

430. Less than two years elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the conduct alleged herein. Less than five years elapsed between the time that Defendants' actionable conduct occurred and the time that the first complaint was filed asserting claims in connection therewith.

## COUNT V

### Violation of Section 20(a) of The Exchange Act
**(Against the Officer Defendants)**

431. Plaintiffs repeat and re-allege each and every allegation above.

432. The Officer Defendants acted as controlling persons of Velti within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Officer Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-128-

1  and had the ability to prevent the issuance of the statements or cause the statements to be

2  corrected.

3      433.    In particular, each of these Defendants had direct and supervisory involvement in

4  the day-to-day operations of the Company and, therefore, is presumed to have had the power to

5  control or influence the particular transactions giving rise to the securities violations alleged

6  herein, and exercised the same.

7      434.    As set forth above, Velti and the Officer Defendants each violated Section 10(b)

8  and Rule 10b-5 by their acts and/or omissions alleged in this Complaint.  By virtue of their

9  positions as controlling persons, the Officer Defendants are liable pursuant to Section 20(a) of

10  the Exchange Act.   As a direct and proximate result of the Officer Defendants' wrongful

11  conduct. Plaintiffs and other members of the Class suffered damages in connection with their

12  purchases of the Company's securities during the Class Period.

13      435.    Less than two years elapsed between the time that Plaintiffs discovered or

14  reasonably could have discovered the facts upon which this complaint is based and the time that

15  the first complaint was filed asserting claims arising out of the conduct alleged herein.  Less than

16  five years elapsed between the time that Defendants' actionable conduct occurred and the time

17  that the first complaint was filed asserting claims in connection therewith.

18                          **PRAYER FOR RELIEF**

19      WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

20      A.    Determining that this action is a proper class action under Rule 23 of the Federal

21  Rules of Civil Procedure;

22      B.    Awarding compensatory damages in favor of Plaintiffs and the other Class

23  members, injunctive relief, rescission, and disgorgement of all ill-gotten gains and/or proceeds of

24  stock sales against all Defendants, jointly and severally, for all damages sustained as a result of

25  Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

26      C.    Awarding Plaintiffs, the Class their reasonable costs and expenses incurred in this

27  action, including counsel fees and expert fees;

28

1    D.    Requiring the imposition of additional corporate governance measures at Velti to

2  prevent future recurrences of the conduct alleged herein; and

3    E.    Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

4

5    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand

6  a trial by jury of all issues that may be so tried.

7  DATED:  April 22, 2014                    **THE WEISER LAW FIRM, P.C.**

8

9                                   */s/ Kathleen A. Herkenhoff*
                                      Kathleen A. Herkenhoff
10

11                                  12707 High Bluff Drive, Suite 200
                                    San Diego, CA 92130
12                                  Telephone:  (858) 794-1441
                                    Facsimile:  (858) 794-1450
                                    kah@weiserlawfirm.com
13

14                                  -- and --

15                                  Robert B. Weiser (admitted *Pro Hac Vice*)
                                    Joseph M. Profy (admitted *Pro Hac Vice*)
16                                  Christopher L. Nelson (admitted *Pro Hac Vice*)
                                    James M. Ficaro
17                                  22 Cassatt Avenue, First Floor
                                    Berwyn, PA 19312
18                                  Telephone: (610) 225-2677
                                    Facsimile:  (610) 408-8062
19                                  rbw@weiserlawfirm.com
                                    jmp@weiserlawfirm.com
20                                  cln@weiserlawfirm.com
                                    jmf@weiserlawfirm.com
21
                                    *Lead Counsel for Lead Plaintiff Bobby*
22                                  *Yadegar/Ygar Capital LLC*

23

24

25

26

27

28

Joseph J. Tabacco, Jr.
Christopher T. Heffelfinger
Nicole Lavallee
**BERMAN DEVALERIO**
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
jtabacco@bermandevalerio.com
cheffelfinger@bermandevalerio.com
nlavallee@bermandevalerio.com

-- and --

Wendy Zoberman (admitted *Pro Hac Vice*)
3507 Kyoto Gardens Drive, Suite 200
Palm Beach Gardens, FL 33410
Telephone: (561) 835-9400
Facsimile: (561) 835-0322
wzoberman@bermandevalerio.com

*Liaison Counsel and Attorneys for Plaintiff*
*St. Paul Teachers' Retirement Fund Association*

Jonathan Gardner (admitted *Pro Hac Vice*)
Paul Scarlato
Carol Villegas
**LABATON SUCHAROW LLP**
140 Broadway, 34th Floor
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0470
jgardner@labaton.com
pscarlato@labaton.com
cvillegas@labaton.com

*Attorneys for Plaintiffs Newport News*
*Employees' Retirement Fund and Oklahoma*
*Firefighters Pension and Retirement System*

[3:13-CV-03889-WHO] CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-131-

1

## ECF ATTESTATION

2          I, Christopher T. Heffelfinger, am the ECF User whose ID and Password are being used

3   to file this CONSOLIDATED COMPLAINT.  In compliance with Civil Local Rule 5.1(i)(3), I

4   hereby attest that Kathleen A. Herkenhoff has concurred in and authorized this filing.

5

6   Dated: April 22, 2014                    By:   */s/ Christopher T. Heffelfinger*
                                                      Christopher T. Heffelfinger

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28