THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (168562)
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone:  (858) 794-1441
Facsimile:  (858) 794-1450
kah@weiserlawfirm.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re VELTI PLC SECURITIES LITIGATION | Master File No. 3:13-cv-03889-WHO |
| | (Consolidated with Case Nos. 3:13-cv-03954-WHO 3:13-cv-04140-WHO 3:13-cv-04606-WHO 3:14-cv-00372-WHO) |
| This Document Relates To: | |
| ALL ACTIONS. | CLASS ACTION |
| | DECLARATION OF CHRISTOPHER L. NELSON IN SUPPORT OF PRELIMINARY APPROVAL OF PARTIAL SETTLEMENT |
| | DATE:        July 2, 2014 TIME:        2:00 p.m. CTRM:       2, 17th Floor JUDGE:       The Hon. William H. Orrick |
| | Date Action Filed: 8/22/13 |

I, Christopher L. Nelson, hereby declare:

The Weiser Law Firm, P.C. (the "Weiser Firm") serves as Lead Counsel for Plaintiffs in the above-captioned action (the "Action"). In connection with my work for the Weiser Firm and my active participation in the prosecution and partial settlement of this Action, I have personal knowledge of the following facts and, if called as a witness, could and would testify competently thereto:

1.      Attached as Exhibit A is a true and correct copy of Stipulation and Agreement of Partial Settlement executed on May 23, 2014.

2.      Attached as Exhibit B is a true and correct copy of Velti's Report on 6-K filed with the Securities and Exchange Commission on November 6, 2013.

3.      Attached as Exhibit C is a true and correct copy of the Declaration of Paul Mulholland, President of Strategic Claims Services.

4.      Attached as Exhibit D is a true and correct copy of Velti's Report on Form 20-F filed with the SEC on April 11, 2013.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 23rd day of May, 2014, at Berwyn, Pennsylvania.


                                        /S/ Christopher L. Nelson
                                        CHRISTOPHER L. NELSON

EXHIBIT A

1    THE WEISER LAW FIRM, P.C.
     KATHLEEN A. HERKENHOFF (168562)
2    12707 High Bluff Drive, Suite 200
     San Diego, CA 92130
3    Telephone: (858) 794-1441
     Facsimile:  (858) 794-1450
4    kah@weiserlawfirm.com

5    Lead Counsel for Plaintiffs

6    [Additional Counsel on Signature Page]

7              **UNITED STATES DISTRICT COURT**

8             **NORTHERN DISTRICT OF CALIFORNIA**

9                **SAN FRANCISCO DIVISION**

10

11    In re VELTI PLC SECURITIES LITIGATION    )    Master File No. 3:13-cv-03889-WHO
                                            )
12                                             )    Consolidated with Case Nos.
                                            )    13-cv-03954-WHO
13                                             )    13-cv-04140-WHO
     ─────────────────────────────── )    13-cv-04606-WHO
14                                             )    14-cv-00372-WHO
     This Document Relates To:             )
15                                              )    **STIPULATION AND AGREEMENT OF**
     All Actions                             )    **PARTIAL SETTLEMENT**
16                                              )
17      ─────────────────────────────── )

18

19

20

21

22

23

24

25

26

27

28

This Stipulation and Agreement of Partial Settlement dated May 23, 2014 (the "Stipulation" or the "Settlement Agreement"), submitted pursuant to Rule 23 of the Federal Rules of Civil Procedure and Rule 408 of the Federal Rules of Evidence, embodies a settlement (the "Partial Settlement") made and entered into by and among the following Settling Parties: (i) Bobby Yadegar ("Yadegar") and Ygar Capital LLC (collectively the "Lead Plaintiff"), plaintiff St. Paul Teachers' Retirement Fund Association, plaintiff Newport News Employees' Retirement Fund, and plaintiff Oklahoma Firefighters Pension and Retirement System (collectively with the Lead Plaintiff, "Plaintiffs"), on behalf of themselves and each of the members of the Settlement Class, as defined in ¶ 1.21, *infra*, on the one hand, and (ii) Velti plc ("Velti" or the "Company"), Wilson W. Cheung ("Cheung"), Jeffrey G. Ross ("Ross"), Winnie W. Tso ("Tso"), and Nicholas P. Negroponte ("Negroponte")[1] on the other hand, by and through their counsel of record in the above-captioned consolidated securities class action litigation pending in the United States District Court for the Northern District of California (the "Action").[2]  The Stipulation is intended by the Settling Parties to fully, finally, and forever resolve, discharge, and settle the Released Claims, upon and subject to the terms and conditions hereof and subject to the approval of the Court (as defined below).  Throughout this Stipulation, all capitalized terms used, but not immediately defined, have the meanings given to them in Section IV.1, *infra*.

## I.    THE LITIGATION

This case is currently pending before the Honorable William H. Orrick in the United States District Court for the Northern District of California.  On and after August 22, 2013, five putative

---

[1] Defendants Cheung, Ross, Tso, and Negroponte, together with Alex Moukas ("Moukas"), Chris Kaskavelis ("Kaskavelis"), David W. Mann ("Mann"), David C. Hobley ("Hobley"), and Jerry Goldstein ("Goldstein") are collectively referred to herein as the "Individual Defendants."  Mann, Hobley, Goldstein, and Negroponte are collectively referred to herein as the "Director Defendants."  Defendants Moukas, Cheung, Ross, Tso, and Kaskavelis are collectively referred to herein as the "Officer Defendants."

[2] Plaintiffs have likewise brought claims against Jefferies LLC, RBC Capital Markets, LLC, Needham & Company, LLC, and Canaccord Genuity Inc. (collectively, the "Underwriter Defendants"), and Baker Tilly Virchow Krause, LLP ("Baker Tilly").  The claims against the Underwriter Defendants and Baker Tilly are not released by this Settlement Agreement and Plaintiffs intend to continue their prosecution.

class action complaints (the "Related Actions") were filed in the Northern District of California (the "Court").[3]   On December 3, 2013, Judge Orrick entered an order consolidating the Related Actions on file as of that date, setting a procedure for the consolidation of future filed related actions, and appointing Yadegar and Ygar Capital LLC as Lead Plaintiff and The Weiser Law Firm, P.C. as Lead Counsel for the Lead Plaintiff and the putative class.

On March 14, 2014, counsel for Plaintiffs, Velti, and certain of the Individual Defendants participated in an in-person mediation (the "Mediation") before the Honorable Layn Phillips (the "Mediator").   While a settlement of the Action was not reached at the Mediation, the Settling Parties continued their ongoing dialogue with the Mediator and with each other.

On April 22, 2014, Lead Plaintiff filed a consolidated complaint (the "Complaint") in the Action.   The Complaint contains five counts.   Count One alleges violations of Section 11 of the Securities Act of 1933 (the "Securities Act") against all Defendants.   Count Two alleges violations of Section 12(a)(2) of the Securities Act against the Underwriter Defendants, Velti, Moukas, Kaskavelis, Mann, Goldstein, Hobley, and Negroponte.   Count Three alleges violations of Section 15 of the Securities Act against all Individual Defendants.   Count Four alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 against the Company, Baker Tilly, and the Officer Defendants.   Lastly, Count Five alleges violations of Section 20(a) of the Exchange Act against the Officer Defendants.

After the Complaint was filed, the Settling Parties continued their dialogue with the Mediator and ultimately agreed to the Partial Settlement outlined in this Settlement Agreement.

---

[3] The five actions are: (1) *Rieckborn v. Velti plc, et al.*, No. 3:13-cv-03889-WHO (filed Aug. 22, 2013); (2) *Vafinis v. Velti plc, et al.*, No. 4:13-cv-03954-WHO (filed Aug. 26, 2013); (3) *Lee v. Velti plc, et al.*, No. 3:13-cv-04140-WHO (filed Sept. 6, 2013); (4) *Manabat v. Velti plc, et al.*, No. 3:13-cv-04606-JSC (filed Oct. 4, 2013); and (5) *Yadegar v. Velti plc*, No. 3:14-cv-00372-WHO (filed January 24, 2014).

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

## II. CLAIMS OF LEAD PLAINTIFF AND BENEFITS OF PARTIAL SETTLEMENT

Lead Plaintiff and Lead Counsel believe that the claims asserted in the Action have merit. However, Lead Plaintiff and Lead Counsel recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the Action against the Released Defendants through discovery and trial. Lead Plaintiff and Lead Counsel also have taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as this Action, as well as the risks posed by the difficulties and delays inherent in such litigation. Lead Plaintiff and Lead Counsel also are aware of the defenses to the securities law violations asserted in the Action. Lead Plaintiff and Lead Counsel believe that the Partial Settlement set forth in this Stipulation confers substantial benefits upon the Settlement Class in light of the circumstances present here. Based on their evaluation, Lead Plaintiff and Lead Counsel have determined that the Partial Settlement set forth in this Stipulation is in the best interests of Plaintiffs and the Settlement Class.

## III. THE SETTLING DEFENDANTS' DENIALS OF WRONGDOING AND LIABILITY

The Settling Defendants have denied and continue to deny that they have violated the federal securities laws identified in the Action or any laws, and maintain that their conduct was at all times proper and in compliance with all applicable laws. The Settling Defendants have denied and continue to deny specifically each and all of the claims and contentions alleged in the Action, along with all charges of wrongdoing or liability against them arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Action. The Settling Defendants also have denied and continue to deny, *inter alia*, the allegations that any of them made any material misstatements or omissions; that any member of the Settlement Class has suffered any damages; that the price of Velti's stock was artificially inflated by reason of the alleged misrepresentations, omissions, or otherwise; or that the members of the Settlement Class were harmed by the conduct alleged in the Action or that could have been alleged as part of the

Action.  In addition, the Settling Defendants maintain that they have meritorious defenses to all claims alleged in the Action.

Nonetheless, taking into account the uncertainty, risks, and costs inherent in any litigation, especially in complex cases such as this Action, the Settling Defendants have concluded that further conduct of the Action could be protracted and distracting.  The Settling Defendants have, therefore, determined that it is desirable and beneficial to them that the Action be settled in the manner and upon the terms and conditions set forth in this Stipulation.  As set forth in ¶¶ 10.4-10.5 below, this Stipulation shall in no event be construed as or deemed to be evidence of an admission or concession by the Settling Defendants with respect to any claim of any fault or liability or wrongdoing or damage whatsoever.

**IV.    TERMS OF STIPULATION AND AGREEMENT OF PARTIAL SETTLEMENT**

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among Plaintiffs (for themselves and the members of the Settlement Class), on the one hand, and the Settling Defendants, on the other hand, by and through their respective counsel of record, that, subject to the approval of the Court, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, in consideration of the benefits flowing to the Settling Parties from the Partial Settlement set forth herein, the Released Claims shall be finally and fully compromised, settled, and released, and the Action shall be dismissed with prejudice, as to the Released Defendants, upon and subject to the terms and conditions of the Stipulation, as follows:

**1.    Definitions**

As used in the Stipulation the following terms have the meanings specified below:

1.1    "Authorized Claimant" means any member of the Settlement Class who submits a timely and valid Proof of Claim and Release form and whose claim for recovery has been allowed pursuant to the terms of the Stipulation.

1.2    "Claims Administrator" means the firm of Strategic Claims Services.

1.3     "Class Period" means the period from January 27, 2011 and August 20, 2013, inclusive.

1.4     "Defendants" means Velti, Alex Moukas, Wilson W. Cheung, Jeffrey G. Ross, Winnie W. Tso, Chris Kaskavelis, David Mann, David Hobley, Jerry Goldstein, Nicholas Negroponte, Jefferies LLC, RBC Capital Markets, LLC, Needham & Company, LLC, Canaccord Genuity Inc., and Baker Tilly.

1.5     "Effective Date" means the first date by which all of the events and conditions specified in ¶ 9.1 of the Stipulation have been met and have occurred.

1.6     "Escrow Agent" means PNC Financial Services Group, Inc.[4]

1.7     "Final" means when the last of the following with respect to the Judgment approving the Partial Settlement, in the form of Exhibit B attached hereto, shall occur: (i) the expiration of the time to file a motion to alter or amend the Judgment under Federal Rule of Civil Procedure 59(e) has passed without any such motion having been filed; (ii) the expiration of the time in which to appeal the Judgment has passed without any appeal having been taken; and (iii) if a motion to alter or amend is filed or if an appeal is taken, the determination of that motion or appeal in such a manner as to permit the consummation of the Partial Settlement, in accordance with the terms and conditions of this Stipulation.  For purposes of this paragraph, an "appeal" shall include any petition for a writ of certiorari or other writ that may be filed in connection with approval or disapproval of this Partial Settlement, but shall not include any appeal which concerns only the issue of attorneys' fees and expenses, or any Plan of Distribution of the Settlement Fund.

1.8     "Individual Defendants" means Alex Moukas, Wilson W. Cheung, Jeffrey G. Ross, Winnie W. Tso, Chris Kaskavelis, David Mann, David Hobley, Jerry Goldstein, and Nicholas Negroponte.

---

[4] Strategic Claims Services shall be listed as a custodian/trustee on the escrow account.

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

1.9    "Judgment" means the judgment and order of dismissal with prejudice to be rendered by the Court upon approval of the Partial Settlement, substantially in the form attached hereto as Exhibit B.

1.10    "Lead Counsel" means The Weiser Law Firm, P.C., 22 Cassatt Avenue, First Floor, Berwyn, PA 19312.

1.11    "Lead Plaintiff" means Bobby Yadegar/Ygar Capital LLC.

1.12    "Net Settlement Fund" means the portion of the Settlement Fund that shall be distributed to Authorized Claimants as allowed by the Stipulation, the Plan of Distribution, or the Court, after provision for the amounts set forth in ¶ 7.4 of this Stipulation.

1.13    "Non-Settling Defendants" means Baker Tilly and the Underwriter Defendants.

1.14    "Person(s)" means an individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and his, her or its spouses, heirs, predecessors, successors, representatives, or assignees.

1.15    "Plaintiffs' Counsel" means The Weiser Law Firm, Berman DeValerio, and Labaton Sucharow, LLP.

1.16    "Plan of Distribution" means a plan or formula of allocation of the Net Settlement Fund whereby the Settlement Fund shall be distributed to Authorized Claimants after payment of expenses of notice and administration of the Partial Settlement, Taxes and Tax Expenses and such attorneys' fees, costs, expenses, and interest and other expenses as may be awarded by the Court. Any Plan of Distribution is not part of the Stipulation and the Released Persons shall have no responsibility or liability with respect thereto.

1.17    "Related Persons" means, with respect to the Released Defendants, each and all of their respective present or former parents, subsidiaries, affiliates, successors and assigns and each and all of their respective present or former officers, directors, employees, employers, attorneys, accountants (except for Baker Tilly), financial advisors, commercial bank lenders, insurers (including Released Defendants' insurers and those insurers' respective businesses, affiliates,

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

subsidiaries, parents and affiliated corporations, divisions, predecessors, shareholders partners, joint venturers, principals, insurers, reinsurers, successors and assigns, and their respective past and present employees, officers, directors, attorneys, accountants, auditors, agents and representatives), reinsurers, investment bankers, representatives, general and limited partners and partnerships, heirs, executors, administrators, successors, affiliates, agents, spouses, associates and assigns of each of them or any trust of which any Released Defendant and/or their Related Persons is the settlor or which is for the benefit of any Released Defendant and/or their Related Persons and/or member(s) of his or her family and any entity in which any such Released Defendant and/or their Related Persons has a controlling interest.  The Non-Settling Defendants are specifically excluded from the definition of "Related Persons."

1.18   "Released Claims" means any and all claims (including Unknown Claims as defined in ¶ 1.28 hereof), demands, rights, liabilities, and causes of action of every nature and description whatsoever, whether known or unknown, contingent or absolute, mature or immature, discoverable or undiscoverable, whether concealed or hidden, suspected or unsuspected, whether arising under federal, state, common or foreign law, which now exist, or heretofore may have existed, asserted or that could have been asserted by Plaintiffs or any Settlement Class Member against the Released Persons, arising out of: (a) the purchase or acquisition of Velti Shares during the Class Period; and (b) the facts, events, transactions, statements, disclosures, acts, omissions, or failures to act that were or could have been alleged in the Action.  The Released Claims extend only to any and/or all Released Defendants and any and/or all of their Related Persons.  "Released Claims" includes "Unknown Claims" as defined in ¶ 1.28 hereof.

1.19   "Released Defendants" means Velti, Alex Moukas, Wilson W. Cheung, Jeffrey G. Ross, Winnie W. Tso, Chris Kaskavelis, David Mann, David Hobley, Jerry Goldstein, and Nicholas Negroponte.

1.20   "Released Persons" means each and all of Released Defendants in their individual and corporate capacities and each and all of their Related Persons.

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

1.21 "Settlement Class" means all Persons (defined above) who purchased or otherwise acquired the Shares of Velti between January 27, 2011 and August 20, 2013, inclusive. Excluded from the Settlement Class are:

(a) Persons who submit valid and timely requests for exclusion from the Settlement Class; and

(b) Defendants, members of the immediate family of any Defendant, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has or had a controlling interest, the officers and directors of any Defendant, and legal representatives, agents, executors, heirs, successors or assigns of any such excluded Person. The Defendants or any entity in which any of the Defendants has or had a controlling interest (for purposes of this paragraph, together a "Defendant-Controlled Entity") are excluded from the Settlement Class only to the extent that such Defendant-Controlled Entity itself purchased a proprietary (*i.e.*, for its own account) interest in the Company's Shares. To the extent that a Defendant-Controlled Entity purchased Velti Shares in a fiduciary capacity or otherwise on behalf of any third-party client, account, fund, trust, or employee benefit plan that otherwise falls within the Settlement Class, neither such Defendant-Controlled Entity nor the third-party client, account, fund, trust, or employee benefit plan shall be excluded from the Settlement Class with respect to such Velti Shares.

1.22 "Settlement Class Member" and "Settlement Class Members" means a Person or Persons who fall within the definition of the Settlement Class as set forth herein.

1.23 "Settlement Fund" means Nine Million Five Hundred Thousand Dollars ($9,500,000.00) in cash paid by or on behalf of the Settling Defendants pursuant to ¶ 3.1 of this Stipulation, together with all interest and income earned thereon. Such amount is paid in full and complete settlement of all the Released Claims.

1.24 "Settling Defendants" means Velti, Wilson W. Cheung, Jeffrey G. Ross, Winnie W. Tso, and Nicholas Negroponte.

1.25   "Settling Parties" means Settling Defendants and Plaintiffs on behalf of themselves and the Settlement Class Members.

1.26   "Shares" means securities of Velti.

1.27   "Underwriter Defendants" means Jefferies LLC, RBC Capital Markets, LLC, Needham & Company, LLC, and Canaccord Genuity Inc.

1.28   "Unknown Claims" means any Released Claims which Plaintiffs or any Settlement Class Member does not know or suspect to exist in his, her or its favor at the time of the release of the Released Persons which, if known by him, her or it, might have affected his, her or its settlement with and release of the Released Persons, or might have affected his, her or its decision not to object to this Partial Settlement.  With respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date, Plaintiffs shall expressly and each of the Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, expressly waived to the fullest extent permitted by law the provisions, rights, and benefits of California Civil Code §1542, which provides:

**A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor**.

Plaintiffs shall expressly and each of the Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, expressly waived any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to California Civil Code §1542.   Plaintiffs and Settlement Class Members may hereafter discover facts in addition to or different from those which he, she or it now knows or believes to be true with respect to the subject matter of the Released Claims, but Plaintiffs shall expressly, and each Settlement Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden,

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

1   which now exist, or heretofore have existed, upon any theory of law or equity now existing or

2   coming into existence in the future, including, but not limited to, conduct that is negligent,

3   intentional, with or without malice, or a breach of any duty, law, or rule, without regard to the

4   subsequent discovery or existence of such different or additional facts.  Plaintiffs acknowledge,

5   and the Settlement Class Members shall be deemed by operation of the Judgment to have

6   acknowledged, that the foregoing waiver was separately bargained for and a key element of the

7   Partial Settlement of which this release is a part.

8               **2.       CAFA Notice**

9               2.1       Pursuant to the Class Action Fairness Act ("CAFA"), no later than ten (10) days

10   after the Settlement Agreement is filed with the Court, the Settling Defendants shall serve proper

11   notice of the proposed Partial Settlement upon the United States Attorney General and each State

12   Attorney General.  Simultaneously, the Settling Defendants shall provide a copy of such notice as

13   well as proof of service of such notice to counsel for Lead Plaintiff.

14               **3.       The Partial Settlement**

15                     **a.       The Settlement Fund**

16               3.1       The Settling Defendants shall cause Nine Million Five Hundred Thousand Dollars

17   ($9,500,000.00) to be transferred to an account controlled by the Escrow Agent within 30 days

18   following the execution of this Settlement Agreement, provided however that the 30 days shall not

19   begin to run until Lead Counsel provides the necessary payment information.  It is understood that

20   the transfer of funds will be made by the Settling Defendants' insurers.  No Individual Defendant

21   shall be personally responsible for paying any portion of the Settlement Fund.  These funds,

22   together with any interest and income earned thereon, shall constitute the Settlement Fund.

23                     **b.       Voluntary Disclosure and Confirmatory Discovery**

24               3.2       (i)       The Settling Defendants shall provide reasonable voluntary disclosure and

25   discovery to Lead Counsel to confirm the facts and circumstances underlying this Action,

26   including making reasonable efforts upon reasonable notice to provide information from former

27   Velti directors and officers ("Potential Witnesses") who Lead Counsel reasonably and in good

28

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

faith believe to possess relevant information.  Settling Defendants shall further cooperate with Lead Counsel to provide information reasonably necessary for the ongoing litigation of the remaining claims against the Non-Settling Defendants.   All information provided through voluntary disclosure and discovery shall be subject to confidentiality agreements to be negotiated by the Settling Parties and/or protective orders.

(ii)     From the Effective Date through the conclusion of this Action against all Non-Settling Defendants, the Settling Defendants agree to make themselves available for service of process of document requests and deposition notices as if they were a party to the Action.

(iii)   The Settling Parties and their counsel agree that any statements made by Settling Defendants' counsel pursuant to the voluntary disclosure and confirmatory discovery provisions of this Stipulation shall be protected by Federal Rule of Evidence 408, and that no such statements may be admitted into evidence against the Released Persons in any subsequent proceeding in any forum.

### c.    The Escrow Agent

3.3     The Escrow Agent shall invest the Settlement Fund in instruments backed by the full faith and credit of the United States Government or fully insured by the United States Government or an agency thereof and shall reinvest the proceeds of these instruments as they mature in similar instruments at their then-current market rates.  All risks related to the investment of the Settlement Fund in accordance with the guidelines set forth in this paragraph shall be borne by the Settlement Fund.

3.4     The Escrow Agent shall not disburse the Settlement Fund except (a) as provided in the Stipulation, (b) by an order of the Court, or (c) with the written agreement of counsel for the Settling Parties.

3.5     Subject to further order(s) and/or directions as may be made by the Court, or as provided in the Stipulation, the Escrow Agent is authorized to execute such transactions as are consistent with the terms of the Stipulation.  The Released Persons shall have no responsibility for, interest in, or liability whatsoever with respect to, the actions of the Escrow Agent, or any

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

1  transaction executed by the Escrow Agent, including, but not limited to, the actions of the Escrow

2  Agent related to the investment of the Settlement Fund in accordance with ¶ 3.3.

3       3.6    All funds held by the Escrow Agent shall be deemed and considered to be in

4  *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such

5  time as such funds shall be distributed pursuant to the Stipulation and/or further order(s) of the

6  Court.

7       3.7    Prior to the Effective Date, the Escrow Agent, without further approval of Settling

8  Defendants or the Court, may pay from the Settlement Fund up to $500,000 in notice and

9  administration costs ("Class Notice and Administration Costs") associated with the administration

10  of the Partial Settlement, including, without limitation: the cost of identifying and locating

11  members of the Settlement Class, mailing the Notice of Pendency and Proposed Settlement of

12  Class Action and Proof of Claim and Release and publishing notice (such amount shall include,

13  without limitation, the actual costs of publication, printing and mailing the Notice, and

14  reimbursement to nominee owners for forwarding notice to their beneficial owners), soliciting

15  Settlement Class claims, assisting with the filing of claims, administering and distributing the Net

16  Settlement Fund to Authorized Claimants, processing Proof of Claim and Release forms, and

17  paying escrow fees and costs, if any, and the administrative expenses incurred and fees charged by

18  the Claims Administrator in connection with providing notice and processing the submitted

19  claims.   Prior to the Effective Date, payment of any Class Notice and Administration Costs

20  exceeding $500,000 shall require notice to and agreement from the Settling Defendants, through

21  Settling Defendants' counsel, which agreement shall not be unreasonably refused.   Subsequent to

22  the Effective Date, without further approval by Settling Defendants or the Court, the Settlement

23  Fund may be used by Lead Counsel to pay reasonable and necessary Class Notice and

24  Administration Costs in excess of $500,000.

25

26

27

28

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

### d. Taxes

**Qualified Settlement Fund**

3.8     (a)     The Settling Parties agree to treat the Settlement Fund as being at all times a "Qualified Settlement Fund" within the meaning of Treas. Reg. §1.468B-1.   In addition, the Escrow Agent shall timely make such elections as necessary or advisable to carry out the provisions of this ¶ 3.8, including the "relation-back election" (as defined in Treas. Reg. §1.468B-1) back to the earliest permitted date.   Such elections shall be made in compliance with the procedures and requirements contained in such regulations.   It shall be the responsibility of the Escrow Agent to timely and properly prepare and deliver the necessary documentation for signature by all necessary parties, and thereafter to cause the appropriate filing to occur.

(b)     For the purpose of §468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" shall be the Escrow Agent.   Lead Counsel shall timely and properly file all informational and other tax returns necessary or advisable with respect to the Settlement Fund (including, without limitation, the returns described in Treas. Reg. §1.468B-2(k)).   Such returns (as well as the election described in ¶ 3.8(a) hereof) shall be consistent with this ¶ 3.8 and in all events shall reflect that all Taxes (including any estimated Taxes, interest, or penalties) on the income earned by the Settlement Fund shall be paid out of the Settlement Fund as provided in ¶ 3.8(c) hereof.

(c)     All (a) Taxes (including any estimated Taxes, interest, or penalties) arising with respect to the income earned by the Settlement Fund, including any Taxes or tax detriments that may be imposed upon the Released Persons or their counsel with respect to any income earned by the Settlement Fund for any period during which the Settlement Fund does not qualify as a "Qualified Settlement Fund" for federal or state income tax purposes ("Taxes"), and (b) expenses and costs incurred in connection with the operation and implementation of this ¶ 3.8 (including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) the returns described in this ¶ 3.8) ("Tax Expenses"), shall be paid out of the Settlement Fund; in all events the Released

- 13 -

Persons and their counsel shall have no liability or responsibility for the Taxes or the Tax Expenses.  The Settlement Fund shall indemnify and hold each of the Released Persons and their counsel harmless for Taxes and Tax Expenses (including, without limitation, Taxes payable by reason of any such indemnification).  Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of the Settlement Fund and shall be timely paid by the Escrow Agent out of the Settlement Fund without prior order from the Court, and the Escrow Agent shall be obligated (notwithstanding anything herein to the contrary) to withhold from distribution to Authorized Claimants any funds necessary to pay such amounts, including the establishment of adequate reserves for any Taxes and Tax Expenses (as well as any amounts that may be required to be withheld under Treas. Reg. §1.468B-2(l)(2)); neither the Released Persons nor their counsel are responsible nor shall they have any liability therefore.  The Settling Parties hereto agree to cooperate with the Escrow Agent, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this ¶ 3.8.

(d)     For the purpose of this ¶ 3.8, references to the Settlement Fund shall include both the Settlement Fund and any earnings thereon.

**e.      Termination of Partial Settlement**

3.9     In the event that the Settlement Class is not certified for settlement purposes, or if the Stipulation: (i) is not approved; (ii) is terminated, canceled, or fails to become effective for any reason, including, without limitation, in the event the Judgment is reversed or vacated following any appeal taken therefrom; or (iii) is successfully collaterally attacked, the Settlement Fund (including accrued interest) less expenses actually incurred or due and owing for Class Notice and Administration Costs, Taxes or Tax Expenses pursuant to ¶ 3.7 or ¶ 3.8, shall be refunded pursuant to written instructions from Settling Defendants' counsel.

**4.      Notice Order and Settlement Hearing**

4.1     Promptly after execution of the Stipulation, Lead Counsel and Settling Defendants' counsel shall confer as to the timing for both the submission of the Stipulation, together with its exhibits (the "Exhibits"), to the Court and the filing of a motion seeking entry of an order (the

- 14 -

"Notice Order"), in the form of Exhibit A attached hereto, requesting, *inter alia*, the preliminary approval of the Partial Settlement set forth in the Stipulation, certification of the Settlement Class for settlement purposes, and approval for the mailing of a settlement notice (the "Notice") and publication of a summary notice, in the forms of Exhibits A-1 and A-3 attached hereto.   The Notice shall include the general terms of the Partial Settlement set forth in the Stipulation, the proposed Plan of Distribution, the general terms of the Fee and Expense Application, and the date of the Settlement Hearing.

4.2     Lead Counsel shall request that after Notice is given to the Settlement Class, the Court hold a hearing (the "Settlement Hearing") and approve the Partial Settlement of the Action as set forth herein.   At or after the Settlement Hearing, Lead Counsel also shall request that the Court approve the proposed Plan of Distribution and the Fee and Expense Application.

**5.     Releases**

5.1     Upon the Effective Date, Plaintiffs and each of the Settlement Class Members (who have not validly opted out of the Settlement Class) and their predecessors, successors, agents, representatives, attorneys, and affiliates, and the heirs, executors, administrators, successors, and assigns of each of them shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged against the Released Persons any and all Released Claims (including, without limitation, Unknown Claims), as well as any claims arising out of, relating to, or in connection with, the defense, the settlement, or the resolution of the Action or the Released Claims, and the distribution or investment of the Settlement Fund.   The release in this paragraph shall be effective whether or not such Settlement Class Members execute and deliver Proof of Claim and Release forms and whether or not such Settlement Class Members share in the Settlement Fund.   The Settling Parties acknowledge, and the Settlement Class Members shall be deemed by operation of law to acknowledge, that the waiver of Unknown Claims, and of the provisions, rights, and benefits of § 1542 of the California Civil Code, was bargained for and is a key element of the Partial Settlement of which the release in this paragraph is a part.

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

5.2     Upon the Effective Date, Plaintiffs and each of the Settlement Class Members and their predecessors, successors, agents, representatives, attorneys, and affiliates, and the heirs, executors, administrators, successors, and assigns of each of them who have not validly opted out of the Settlement Class shall be permanently barred and enjoined from the assertion, institution, maintenance, prosecution, or enforcement of any action or other proceeding asserting the Released Claims (including, without limitation, Unknown Claims), as well as any claims arising out of, relating to, or in connection with, the defense, settlement, or resolution of the Action or the Released Claims, against any Released Persons in any state or federal court or arbitral forum, or in the court of any foreign jurisdiction.

5.3     The Proof of Claim and Release to be executed by Settlement Class Members shall release all Released Claims against the Released Persons and shall be substantially in the form contained in Exhibit A-2 attached hereto.

5.4     Upon the Effective Date, each of the Released Persons shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged Plaintiffs, each and all of the Settlement Class Members, and Plaintiffs' Counsel from all claims (including, without limitation, Unknown Claims) arising out of, relating to, or in connection with, the institution, prosecution, assertion, settlement, or resolution of the Action or the Released Claims.

5.5     As provided by applicable laws, all Persons, including, but not limited to, Plaintiffs, on behalf of themselves and the Settlement Class, and the Non-Settling Defendants, shall be enjoined and barred from commencing or continuing any claim, cross-claim, third-party claim, claim over, or action in any forum against the Released Persons, seeking, as damages, indemnity, contribution, or otherwise, the recovery of all or part of any liability or settlement which such persons (i) paid, (ii) were obligated to pay or agreed to pay, or (iii) may become obligated to pay to the Settlement Class, as a result of such persons' liability for or participation in any acts, facts, statements or omissions that were or could have been alleged in the Action.

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

5.6     With respect to the Securities Exchange Act claims only:  Pursuant to 15 U.S.C. § 78u-4(f)(7)(B) and pursuant to federal common law, in the event Plaintiffs or the Settlement Class shall obtain a verdict or judgment against any of the Non-Settling Defendants in the Action, the verdict or judgment shall be reduced by the greater of (i) an amount that corresponds to the percentage of responsibility of the Released Persons, or (ii) the amount paid on behalf of the Released Persons in this Partial Settlement.  Furthermore, notwithstanding the foregoing, nothing in this Stipulation shall apply to bar or otherwise affect any claim of right to indemnification between Velti and any present or former officer or director of Velti, or any claim for insurance coverage by any of the Individual Defendants.  The Judgment shall include a bar order containing substantially similar language to that set forth herein.

5.7     With respect to the Securities Act claims only: Any person or entity so barred and enjoined pursuant to ¶ 5.5 shall be entitled to appropriate judgment reduction in accordance with applicable statutory or common law rule to the extent permitted under the Securities Act for the claims alleged herein.

**6.     Settlement Class Certification**

6.1     The Settlement Class shall have the meaning set forth above in ¶ 1.21.  Solely for purposes of the Partial Settlement and for no other purpose, and subject to the approval of the Court, the Settling Defendants stipulate and agree to: (a) certification of the Settlement Class as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Settlement Class; (b) appointment of Plaintiffs as Class Representatives; and (c) appointment of Lead Counsel as Class Counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure. For settlement purposes only, and for no other purpose than as set forth in and to effectuate this Stipulation, Settling Defendants will not object to such certification on the terms set forth in this Stipulation.  If the Settlement Class is not certified, the Action will, for all purposes with respect to the Settling Parties, revert to its status as of the day immediately preceding the execution of the Stipulation.  In such event: (i) Settling Defendants will not be deemed to have consented to the certification of any class; (ii) the Stipulation concerning the class definition or class certification

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

1    shall not be used as evidence or in an argument in support of class definition or class certification,

2    and (iii) Settling Defendants will retain all rights to oppose class certification.

3        **7.    Administration and Calculation of Claims, Final Awards, and Supervision and Distribution of the Settlement Fund**

4

5        7.1    The Claims Administrator, subject to such supervision and direction of the Court as

6    may be necessary or as circumstances may require, shall provide notice of the Partial Settlement to

7    the Settlement Class, shall administer and calculate the claims submitted by Settlement Class

8    Members, and shall oversee distribution of the Net Settlement Fund to Authorized Claimants.

9        7.2    Within five (5) days of the Court's preliminary approval of this Stipulation, Velti

10   will use reasonable efforts to cause its transfer agent to provide to Lead Counsel in a computer-

11   readable format the last known names and addresses of all Persons who purchased Shares in the

12   Class Period.  Velti shall bear the expense of providing such names and addresses.  No Released

13   Persons other than Velti shall bear any expenses in connection with the provisions of this ¶ 7.2.

14       7.3    In accordance with the schedule set forth in the Notice Order, Lead Counsel will

15   cause to be mailed by the Claims Administrator to all shareholders of record identified by Velti's

16   transfer agent the Notice, substantially in the form of Exhibit A-1 attached hereto, and a Proof of

17   Claim and Release, substantially in the form of Exhibit A-2 attached hereto.  The Notice shall set

18   forth the terms of the Stipulation, including the proposed Plan of Distribution and Lead Counsel's

19   request for attorneys' fees and expenses; the date and time of the Settlement Hearing; the right to

20   object to the Partial Settlement, proposed Plan of Distribution, or request for fees and expenses;

21   the right to appear at the Settlement Hearing; and the right to request exclusion from the

22   Settlement Class.  The Notice and Proof of Claim and Release form shall also be posted on the

23   Claims Administrator's website.  In accordance with the schedule set forth in the Notice Order, a

24   summary notice, substantially in the form of Exhibit A-3 attached hereto, will also be published

25   once in the national edition of *Investor's Business Daily* and once over *Business Wire*.  The cost of

26   providing such notice shall be paid out of the Settlement Fund.

27       7.4    The Settlement Fund shall be applied as follows:

28

- 18 -

(a)   to pay Plaintiffs' Counsel's attorneys' fees and expenses and Lead Plaintiff's time and expenses (the "Fee and Expense Award"), if and to the extent allowed by the Court;

(b)   to pay all the costs and expenses reasonably and actually incurred in connection with providing notice, including locating Settlement Class Members, soliciting Settlement Class claims, assisting with the filing of claims, administering and distributing the Net Settlement Fund to Authorized Claimants, processing Proof of Claim and Release forms, and paying escrow fees and costs, if any;

(c)   to pay the Taxes and Tax Expenses described in ¶ 3.8 hereof; and

(d)   to distribute the Net Settlement Fund to Authorized Claimants as allowed by the Stipulation, the Plan of Distribution, or the Court.

7.5    Upon the Effective Date and thereafter, and in accordance with the terms of the Stipulation, the Plan of Distribution, or such further approval and further order(s) of the Court as may be necessary or as circumstances may require, the Net Settlement Fund shall be distributed to Authorized Claimants, subject to and in accordance with the following provisions.

7.6    Each Person claiming to be an Authorized Claimant shall be required to submit to the Claims Administrator a completed Proof of Claim and Release, substantially in the form of Exhibit A-2 attached hereto, postmarked by no later than ninety (90) calendar days after the Notice Date (as defined in Exhibit A attached hereto), or such other time as may be set by the Court (the "Bar Date"), signed under penalty of perjury and supported by such documents as are specified in the Proof of Claim and Release and as are reasonably available to such Person.

7.7    Except as otherwise ordered by the Court, all Settlement Class Members who fail to submit a Proof of Claim and Release by the Bar Date, or such other period as may be ordered by the Court, or who submit a Proof of Claim and Release that is rejected, shall be forever barred from receiving any payments pursuant to the Stipulation and the Partial Settlement set forth herein, but will in all other respects be subject to and bound by the provisions of the Stipulation, the releases contained herein, and the Judgment.  Notwithstanding the foregoing, the Claims

- 19 -

Administrator and Lead Counsel may, in their discretion, accept for processing late-submitted Proofs of Claim or waive technical defects in any Proof of Claim submitted in the interests of achieving substantial justice, so long as the distribution of the Net Settlement Fund to Authorized Claimants is not materially delayed.

7.8     The Claims Administrator shall calculate the claims of Authorized Claimants in accordance with the Plan of Distribution.  Following the Effective Date, the Claims Administrator shall send to each Authorized Claimant his, her, or its *pro rata* share of the Net Settlement Fund.

7.9     Settling Defendants shall not have a reversionary interest in the Net Settlement Fund.  If there is any balance remaining in the Net Settlement Fund after six (6) months from the date of the initial distribution of the Net Settlement Fund, Lead Counsel shall, if feasible, distribute such balance among Authorized Claimants who negotiated the checks sent to them in the initial distribution in an equitable and economical fashion.  These redistributions shall be repeated until the balance remaining in the Net Settlement Fund is *de minimis* and such remaining balance shall then be donated to an appropriate 501(c)(3) non-profit organization designated by Lead Counsel and approved by the Court.

7.10    The Released Persons shall have no responsibility for, interest in, or liability whatsoever with respect to the distribution of the Net Settlement Fund, the Plan of Distribution, the determination, administration, or calculation of claims, the payment or withholding of Taxes, or any losses incurred in connection therewith.

7.11    Settling Defendants shall take no position with respect to the Plan of Distribution or any other such plan as may be approved by the Court.

7.12    It is understood and agreed by the Settling Parties that any proposed Plan of Distribution of the Net Settlement Fund including, but not limited to, any adjustments to an Authorized Claimant's claim set forth therein, is not a part of the Stipulation and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Partial Settlement set forth in the Stipulation, and any order or proceeding relating to the Plan of Distribution shall not operate to terminate or cancel the Stipulation or affect

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

the finality of the Court's Judgment approving the Stipulation and the Partial Settlement set forth therein, or any other orders entered pursuant to the Stipulation.  Settlement Class Members and Settling Defendants shall be bound by the terms of this Stipulation, irrespective of whether the Court disapproves or modifies the Plan of Distribution.

7.13   No Person shall have any claim against Lead Plaintiff, Plaintiffs' Counsel, Released Persons, Settling Defendants' counsel, or the Claims Administrator based on distributions made substantially in accordance with the Partial Settlement, the Stipulation, and the Plan of Distribution, or otherwise as further ordered by the Court.

## 8.   Lead Counsel's Attorneys' Fees and Expenses

8.1   Lead Counsel may submit an application or applications (the "Fee and Expense Application") for distributions from the Settlement Fund for (a) an award of attorneys' fees to be paid out of the Settlement Fund plus (b) expenses in connection with prosecuting the Action. Plaintiffs may submit a request for their time and expenses in representing the Settlement Class.

8.2   The attorneys' fees and expenses, and costs, as awarded by the Court, shall be paid to Lead Counsel from the Settlement Fund, as ordered, immediately after the Court executes an order awarding such fees and expenses.  This provision shall apply notwithstanding timely objections to, potential for appeal from, or collateral attack on, the Partial Settlement or the award of fees and expenses.  Lead Counsel shall thereafter allocate the attorneys' fees amongst other Plaintiffs' Counsel.  Any such awards shall be paid solely by the Settlement Fund.  In the event that the Judgment or the order awarding such fees and expenses paid to Lead Counsel pursuant to ¶ 8.1 is reversed or modified, or if the Partial Settlement is cancelled or terminated for any reason, then Lead Counsel shall, in an amount consistent with such reversal or modification, refund such fees or expenses to the Settlement Fund, plus interest thereon at the same rate as earned on the Settlement Fund, within twenty (20) business days from receiving notice from Settling Defendants' counsel or from a court of competent jurisdiction.  Any refunds required pursuant to this paragraph shall be the several obligation of each Plaintiffs' Counsel to make appropriate refunds or repayments to the Settlement Fund.

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

8.3     The procedure for and the allowance or disallowance by the Court of the Fee and Expense Application, to be paid out of the Settlement Fund, are not part of the Partial Settlement set forth in the Stipulation, and any order or proceeding relating to the Fee and Expense Application, or any appeal from any order relating thereto or reversal or modification thereof, shall not operate to terminate or cancel the Stipulation, or affect or delay the finality of the Judgment approving the Stipulation and the Partial Settlement of the Action.

8.4     Released Persons shall not have any responsibility for any payment of attorneys' fees and expenses to Lead Counsel or any Settlement Class Member's counsel apart from payment of the Settlement Fund pursuant to ¶ 3.1.

8.5     Released Persons shall have no responsibility for the allocation among Plaintiffs' Counsel or any Settlement Class Member's counsel, and/or any other Person who may assert some claim thereto, of any Fee and Expense Award that the Court may make in the Action.

**9.     Conditions of Partial Settlement, Effect of Disapproval, Cancellation, or Termination**

9.1     The Effective Date of the Stipulation shall be conditioned on the occurrence of all of the following events:

(a)     execution of the Stipulation and such other documents as may be required to obtain final Court approval of the Stipulation in a form satisfactory to the Settling Parties;

(b)     Settling Defendants have not exercised their option to terminate the Stipulation pursuant to ¶ 9.3 hereof;

(c)     Lead Counsel has not exercised its option to terminate the Stipulation pursuant to ¶ 9.7 hereof;

(d)     the Court has entered the Notice Order substantially in the form of Exhibit A hereto, as required by ¶ 4.1 hereof;

(e)     the Court has entered the Judgment that, *inter alia*, dismisses with prejudice the Action, as to Plaintiffs (on behalf of themselves and each of the members of the Settlement Class) and the Released Defendants, as set forth above; and

- 22 -

1         (f)      the Judgment has become Final, as defined in ¶ 1.7 hereof.

2         9.2     Upon the occurrence of all of the events referenced in ¶ 9.1 hereof, any and all

3 remaining interest or right of Settling Defendants in or to the Settlement Fund, if any, shall be

4 absolutely and forever extinguished.  If all of the conditions specified in ¶ 9.1 hereof are not met,

5 then the Stipulation shall be canceled and terminated subject to ¶ 9.4 hereof unless Lead Counsel

6 and counsel for Settling Defendants mutually agree in writing to proceed with the Partial

7 Settlement.

8         9.3     If, prior to the Settlement Hearing, Persons who otherwise would be members of

9 the Settlement Class have timely requested exclusion from the Settlement Class in accordance

10 with the provisions of the Notice Order and the Notice given pursuant thereto, and such Persons in

11 the aggregate purchased a number of Velti Shares in an amount greater than the percentage

12 specified in a separate Supplemental Agreement Regarding Requests for Exclusion

13 ("Supplemental Agreement") executed between Plaintiffs and Settling Defendants, by and through

14 their respective  Counsel, Settling Defendants shall have the option to terminate this Stipulation

15 and Partial Settlement in accordance with the procedures set forth in the Supplemental Agreement.

16 The Supplemental Agreement will not be filed with the Court unless and until a dispute between

17 Lead Plaintiff and Settling Defendants concerning its interpretation or application arises.  Copies

18 of all requests for exclusion received, together with copies of all written revocations of requests

19 for exclusion, shall be promptly delivered to Settling Defendants' counsel by Lead Counsel or the

20 Claims Administrator within three (3) days of receipt, but in no event later than ten (10) business

21 days before the Settlement Hearing.  Copies of untimely requests for exclusion shall be delivered

22 to Settling Defendants' counsel by Lead Counsel within two (2) days of receipt.   Settling

23 Defendants may terminate the Stipulation and Partial Settlement by serving written notice of

24 termination on the Court and Lead Counsel on or before five (5) business days after the receipt of

25 all of the copies of the requests for exclusion, on or before five (5) business days after the Court

26 grants additional time for exclusion for any reason, or on or before three (3) business days before

27 the Settlement Hearing, whichever occurs last.  In the event that the Settling Defendants terminate

28

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

the Stipulation and Partial Settlement pursuant to this ¶ 9.3, the Settlement Fund shall be refunded as set forth in ¶ 9.4.  In the event that the Settling Defendants serve a written notice of termination, the Settling Defendants may withdraw the written notice of termination by providing written notice of such withdrawal to Lead Counsel and to the Court by no later than 5:00 PM Eastern Time on the day prior to the Settlement Hearing, or by such later date as shall be agreed upon in writing as between Lead Counsel and Settling Defendants' counsel.  In the event of a termination of this Partial Settlement pursuant to the Supplemental Agreement, this Stipulation shall become null and void and of no further force and effect.

9.4     Unless otherwise ordered by the Court, in the event the Stipulation shall terminate, or be canceled, or shall not become effective for any reason, within five (5) business days after written notification of such event is sent by counsel for Settling Defendants or Lead Counsel to the Escrow Agent, the Settlement Fund (including accrued interest), less expenses which have either been incurred or disbursed pursuant to ¶ 3.7 or ¶ 3.8 hereof, shall be refunded pursuant to written instructions from Settling Defendants' counsel.  At the request of counsel for Settling Defendants, the Escrow Agent or its designee shall apply for any tax refund owed on the Settlement Fund and pay the proceeds, after deduction of any expenses incurred in connection with such application(s) for refund, at the written direction of Settling Defendants' counsel.

9.5     In the event that the Stipulation is not approved by the Court or the Partial Settlement set forth in the Stipulation is terminated or fails to become effective in accordance with its terms, the Settling Parties shall be restored to their respective positions in the Action as of the day immediately prior to the execution of the Stipulation.  In such event, the terms and provisions of the Stipulation, with the exception of ¶¶ 1.1-1.28, 3.7-3.9,  8.2,  9.3-9.5, 10.4-10.5, and 10.6 hereof, shall have no further force and effect with respect to the Settling Parties and shall not be used in this Action or in any other proceeding for any purpose, and any Judgment or order entered by the Court in accordance with the terms of the Stipulation shall be treated as vacated, *nunc pro tunc*, and the Settling Parties shall be deemed to return to their status as of the day immediately prior to the execution of the Stipulation, and shall be required to present an amended schedule to

the Court.  No order of the Court or modification or reversal on appeal of any order of the Court concerning the Plan of Distribution or the amount of any attorneys' fees, expenses, and interest awarded by the Court to Lead Counsel or Lead Plaintiff shall constitute grounds for cancellation or termination of the Stipulation.

9.6    Lead Counsel shall have the right but not the obligation to terminate the Partial Settlement thirty (30) calendar days after the deadline for the funding of the Partial Settlement Fund if no funds have been transferred by the deadline; provided, however, that Lead Counsel shall have no right to terminate the Partial Settlement if the delay in settlement funding is due, in whole or in part, to: (i) a stay of proceedings in the Action; or (ii) any bankruptcy proceedings by Velti.

9.7    Should Lead Plaintiff and the Settling Defendants disagree concerning the sufficiency of the Settling Defendants' voluntary disclosure or confirmatory discovery, such disagreements shall be presented to the Mediator for resolution.  Any fees or expenses incurred by Judge Phillips in resolving any such disagreements shall be deducted from the Settlement Fund.  Lead Counsel shall have the right but not the obligation to terminate the Partial Settlement if a determination is made by the Mediator that the Settling Defendants have failed to provide sufficient voluntary disclosure or confirmatory discovery.  Such election to terminate must be made within ten (10) business days of the issuance of a written finding by the Mediator of failure to cooperate but in no event later than the deadline for the mailing and publishing of the Notice.

**10.    Miscellaneous Provisions**

10.1    In the event any proceedings by or on behalf of the Company, whether voluntary or involuntary, are initiated under any chapter of the United States Bankruptcy Code, or any similar foreign law or code, including any act of receivership, asset seizure, liquidation, or similar federal, state, or foreign law or action ("Bankruptcy Proceedings"), the Settling Parties agree to use their reasonable best efforts to obtain all necessary orders, consents, releases, and approvals to the extent required by applicable law for effectuation of the Partial Settlement in a timely and expeditious manner.  The Settling Parties further agree that all dates and deadlines set forth herein

- 25 -

will be extended for such periods of time as are necessary to obtain any necessary orders, consents, releases and approvals to carry out the terms and conditions of this Settlement Agreement.

10.2    The Settling Parties (a) acknowledge that it is their intent to consummate this Stipulation; and (b) agree to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of the Stipulation and to exercise their best efforts to accomplish the foregoing terms and conditions of the Stipulation expeditiously.

10.3    As set forth in ¶ 5.5 herein, the Settling Parties agree that the Final Judgment shall contain a bar order that shall, to the fullest extent consistent with the Private Securities Litigation Reform Act (specifically 15 U.S.C. §78u-4(f)(7)) and other applicable laws, permanently and forever bar any claims for contribution or indemnity by any Person, including, but not limited to, Plaintiffs, on behalf of themselves and the Settlement Class, and the Non-Settling Defendants, against the Released Persons arising from the facts and circumstances of this action or the Released Claims.  In accordance with this material term of the Partial Settlement, language has been included in the [Proposed] Final Judgment and Order of Dismissal with Prejudice to accomplish this purpose. *See* Exhibit B attached hereto.

10.4    The Settling Parties intend this Partial Settlement to be a final and complete resolution of all disputes between them with respect to the Action.  The Partial Settlement compromises claims which are contested and shall not be deemed an admission by any Settling Party or any of the Released Persons as to the merits of any claim or defense.  The Settling Parties and their counsel agree that they shall not assert or allege in any action, proceeding, or claim that any party hereto violated Rule 11 of the Federal Rules of Civil Procedure, and the Final Judgment shall contain a finding that all Settling Parties and their counsel complied with the requirements of Rule 11 with respect to the institution, prosecution, defense, and resolution of the Action.  The Settling Parties agree that the amount paid to the Settlement Fund and the other terms of the Partial Settlement were negotiated in good faith at arm's length by the Settling Parties and reflect a settlement that was reached voluntarily after consultation with competent legal counsel.  The

- 26 -

Settling Parties reserve their right to rebut, in a manner that such party determines to be appropriate, any contention made in any public forum regarding the Action, including any contention that the Action was brought or defended in bad faith or without a reasonable basis.

10.5    Neither the Stipulation nor the Partial Settlement contained herein, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Partial Settlement (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claim, or of any wrongdoing or liability of the Released Persons; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Released Persons; or (c) is or may be deemed to be or may be used as an admission or evidence that any claims asserted by Lead Plaintiff were not valid or that the amount recoverable was not greater than the Partial Settlement amount, in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal.  The Released Persons may file the Stipulation and/or the Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

10.6    All agreements made and orders entered during the course of the Action relating to the confidentiality of documents and information shall survive this Stipulation.

10.7    All of the Exhibits to the Stipulation are material and integral parts hereof and are fully incorporated herein by this reference.

10.8    The Stipulation may be amended or modified only by a written instrument signed by or on behalf of all Settling Parties or their respective successors-in-interest.

10.9    The Stipulation and the Exhibits attached (together with the Supplemental Agreement referred to in ¶ 9.3) hereto constitute the entire agreement among the Settling Parties and no representations, warranties, or inducements have been made to any Settling Party concerning the Stipulation or its Exhibits other than the representations, warranties, and covenants contained and memorialized in such documents. Except as otherwise provided herein (or, as

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

1    between Settling Defendants, in any separate agreements between them), each of the Settling

2    Parties shall bear its own costs.

3         10.10  Neither the Settlement Class Members nor Settling Defendants shall be bound by

4    the Stipulation if the Court modifies material terms thereof, provided, however, that it shall not be

5    a basis for Plaintiffs to terminate the Partial Settlement if the Court modifies any proposed Plan of

6    Distribution or criteria for allocation of the Net Settlement Fund amongst Settlement Class

7    Members, or the Plan of Distribution is modified on appeal.  Nor shall it be a basis for any Settling

8    Party to terminate the Stipulation if the Court disapproves of or modifies the terms of this

9    Stipulation with respect to attorneys' fees or expenses or the distribution of the Net Settlement

10   Fund.  Notwithstanding any such modification of the terms or Plan of Distribution or the

11   Stipulation with respect to attorneys' fees or expenses, Settling Defendants shall be entitled to all

12   benefits of the Partial Settlement and shall not, under any circumstances, be called upon to

13   contribute additional funds to the Settlement Fund.

14        10.11  Lead Counsel, on behalf of the Settlement Class, is expressly authorized by Lead

15   Plaintiff to take all appropriate action required or permitted to be taken by the Settlement Class

16   pursuant to the Stipulation to effectuate its terms and also is expressly authorized to enter into any

17   modifications or amendments to the Stipulation on behalf of the Settlement Class which it deems

18   appropriate.

19        10.12  Plaintiffs and their counsel represent and warrant that none of the Plaintiffs' claims

20   or causes of action referred to in this Action or this Stipulation has been assigned, encumbered, or

21   in any manner transferred in whole or in part.

22        10.13  Each counsel or other Person executing the Stipulation or any of its Exhibits on

23   behalf of any Settling Party hereby warrants that such Person has the full authority to do so.

24        10.14  The Stipulation may be executed in one or more counterparts.  All executed

25   counterparts and each of them shall be deemed to be one and the same instrument.  A complete set

26   of executed counterparts shall be filed with the Court.

27

28

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

10.15   The Stipulation shall be binding upon, and inure to the benefit of, the heirs, successors, and assigns of the Settling Parties hereto.

10.16   The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of the Stipulation, and all Settling Parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the Partial Settlement embodied in the Stipulation.

10.17   Pending approval of the Court of the Stipulation and its Exhibits, all proceedings in this Action involving any of the Released Persons as defendants shall be stayed, and Plaintiffs and all members of the Settlement Class shall be barred and enjoined from prosecuting any of the Released Claims against any of the Released Persons.

10.18   This Stipulation and the Exhibits hereto shall be considered to have been negotiated, executed, and delivered, and to be wholly performed, in the State of California, and the rights and obligations of the parties to the Stipulation shall be construed and enforced in accordance with, and governed by, the internal, substantive laws of the State of California without giving effect to that state's choice-of-law principles.

IN WITNESS WHEREOF, the parties hereto have caused the Stipulation to be executed, by their duly authorized attorneys, dated May 23, 2014.

DATED:  May 23, 2014

THE WEISER LAW FIRM, P.C.
CHRISTOPHER L. NELSON

CHRISTOPHER L. NELSON

Robert B. Weiser
Joseph M. Profy
Christopher L. Nelson
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile:  (610) 408-8062

- 29 -
Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

1

2                     Kathleen A. Herkenhoff (168562)
12707 High Bluff Drive, Suite 200

3                     San Diego, CA 92130
Telephone:  (858) 794-1441

4                     Facsimile:  (858) 794-1450
kah@weiserlawfirm.com

5

6                     Lead Counsel for Plaintiffs and Counsel for Lead
Plaintiff Bobby Yadegar/Ygar Capital LLC

7                     **BERMAN DEVALERIO**

8

9                     NICOLE LAVALLEE

10                    Joseph J. Tabacco, Jr.
Christopher T. Heffelfinger

11                   Nicole Lavallee
One California Street, Suite 900

12                   San Francisco, CA 94111
Telephone: (415) 433-3200

13                   Facsimile: (415) 433-6382
jtabacco@bermandevalerio.com

14                   cheffelfinger@bermandevalerio.com
nlavallee@bermandevalerio.com

- 30 -

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

Wendy Zoberman
3507 Kyoto Gardens Drive, Suite 200
Palm Beach Gardens, FL 33410
Telephone: (561) 835-9400
Facsimile: (561) 835-0322
wzoberman@bermandevalerio.com

Attorneys for Plaintiff St. Paul Teachers'
Retirement Fund Association

**LABATON SUCHAROW LLP**

_____
JONATHAN GARDNER

Jonathan Gardner
Paul Scarlato
Carol Villegas
140 Broadway, 34th Floor
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0470
jgardner@labaton.com
pscarlato@labaton.com
cvillegas@labaton.com

Attorneys for Plaintiffs Newport News Employees'
Retirement Fund and Oklahoma Firefighters
Pension and Retirement System

**WILSON SONSINI GOODRICH & ROSATI,**
**Professional Corporation**

_____
BORIS FELDMAN

Boris Feldman
Cynthia A. Dy
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Facsimile: (650) 493-6811
boris.feldman@wsgr.com
cdy@wsgr.com

Attorneys for Velti plc, Wilson W. Cheung, Jeffrey
G. Ross, Nicholas P. Negroponte, and Winnie W.
Tso

Stipulation and Agreement of Partial Settlement
3:13-cv-03889-WHO

1

2       Wendy Zoberman
        3507 Kyoto Gardens Drive, Suite 200
3       Palm Beach Gardens, FL 33410
        Telephone: (561) 835-9400
        Facsimile: (561) 835-0322
4       wzoberman@bermandevalerio.com

5       Attorneys for Plaintiff St. Paul Teachers'
        Retirement Fund Association

6
        **LABATON SUCHAROW LLP**
7

8       _____

9               JONATHAN GARDNER

10      Jonathan Gardner
        Paul Scarlato
        Carol Villegas
11      140 Broadway, 34th Floor
        New York, NY 10005
12      Telephone: (212) 907-0700
        Facsimile: (212) 818-0470
13      jgardner@labaton.com
        pscarlato@labaton.com
14      cvillegas@labaton.com

15      Attorneys for Plaintiffs Newport News Employees'
        Retirement Fund and Oklahoma Firefighters
16      Pension and Retirement System

17      **WILSON SONSINI GOODRICH & ROSATI,
        Professional Corporation**

18

19      _Boris Feldman_ / by DMV
                BORIS FELDMAN

20

21      Boris Feldman
        Cynthia A. Dy
22      650 Page Mill Road
        Palo Alto, CA 94304
23      Telephone: (650) 493-9300
        Facsimile: (650) 493-6811
24      boris.feldman@wsgr.com
        cdy@wsgr.com

25      Attorneys for Velti plc, Wilson W. Cheung, Jeffrey
        G. Ross, Nicholas P. Negroponte, and Winnie W.
26      Tso

27

28
                            - 31 -
        Stipulation and Agreement of Partial Settlement
        3:13-cv-03889-WHO

THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (168562)
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: (858) 794-1441
Facsimile: (858) 794-1450
kah@weiserlawfirm.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE VELTI PLC SECURITIES LITIGATION | ) Master File No. 3:13-cv-03889-WHO )<br>)<br>) CLASS ACTION<br>) |
| This Document Relates To:<br><br>ALL ACTIONS. | ) [PROPOSED] ORDER PRELIMINARILY<br>) APPROVING PARTIAL SETTLEMENT<br>) AND PROVIDING FOR NOTICE<br>)<br>) EXHIBIT A<br>)<br>) |

WHEREAS, an action is pending before this Court styled *In re Velti PLC Securities Litigation*, Master File No. 3:13-cv-03889-WHO (the "Action");

WHEREAS, the Settling Parties having made application, pursuant to Federal Rule of Civil Procedure 23(e), for (i) an order preliminarily approving the settlement of this Action, in accordance with a Stipulation and Agreement of Partial Settlement dated May 23, 2014 (the "Settlement Agreement"), which, together with the Exhibits annexed thereto, sets forth the terms and conditions for a proposed settlement of the Action between the Settling Parties; (ii) for dismissal of the Action against the Released Defendants with prejudice upon the terms and conditions set forth therein; and (iii) certification of the Action as a class action for settlement

1   purposes only; and the Court having read and considered the Settlement Agreement and the

2   Exhibits annexed thereto; and

3           NOW, THEREFORE, IT IS HEREBY ORDERED:

4           1.       This order (the "Preliminary Approval Order" or "Notice Order") hereby

5   incorporates by reference the definitions in the Stipulation, and all terms used herein shall have

6   the same meanings as set forth in the Stipulation.

7           2.       The Court hereby preliminarily approves the Partial Settlement and Plan of

8   Distribution as being fair, just, reasonable and adequate to the Settlement Class, pending a final

9   hearing on the Partial Settlement.

10          **SETTLEMENT CLASS CERTIFICATION**

11          3.       Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court certifies

12  for purposes of settlement only a Settlement Class defined as all Persons who purchased or

13  otherwise acquired the Shares of Velti between January 27, 2011 and August 20, 2013, inclusive.

14  Excluded from the Settlement Class are:

15                  (a)      Persons who submit valid and timely requests for exclusion from the

16  Settlement Class; and

17                  (b)      Defendants, members of the immediate family of any Defendant, any

18  person, firm, trust, corporation, officer, director or other individual or entity in which any

19  Defendant has or had a controlling interest, the officers and directors of any Defendant, and legal

20  representatives, agents, executors, heirs, successors or assigns of any such excluded Person.  The

21  Defendants or any entity in which any of the Defendants has or had a controlling interest (for

22  purposes of this paragraph, together a "Defendant-Controlled Entity") are excluded from the

23  Settlement Class only to the extent that such Defendant-Controlled Entity itself purchased a

24  proprietary (*i.e.*, for its own account) interest in the Company's Shares.  To the extent that a

25  Defendant-Controlled Entity purchased Velti Shares in a fiduciary capacity or otherwise on

26  behalf of any third-party client, account, fund, trust, or employee benefit plan that otherwise falls

27  within the Settlement Class, neither such Defendant-Controlled Entity nor the third-party client,

28

account, fund, trust, or employee benefit plan shall be excluded from the Settlement Class with respect to such Velti Shares.

4.      Solely for purposes of this Partial Settlement and for no other purpose, the Court finds that the prerequisites for a class action under Rule 23 of the Federal Rules of Civil Procedure have been satisfied in that: (a) the members of the Settlement Class are so numerous that joinder of all Settlement Class Members in the class action is impracticable; (b) there are questions of law and fact common to the Settlement Class that predominate over any individual question; (c) the claims of Plaintiffs are typical of the claims of the Settlement Class; (d) Lead Plaintiff and his counsel have fairly and adequately represented and protected the interests of Settlement Class Members; and (e) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

5.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for the purposes of this Partial Settlement only, Plaintiffs are appointed as Class Representatives for the Settlement Class and The Weiser Law Firm, P.C. is appointed as counsel to the Settlement Class.

6.      Pursuant to Rule 23(c) of the Federal Rules of Civil Procedure, the Court approves the appointment of Strategic Claims Services as the "Claims Administrator" to supervise and administer the notice procedure, as well as the processing of claims as more fully set forth below:

(a)      No later than ten (10) business days after entry of this Preliminary Approval Order, the Claims Administrator shall cause a copy of the Notice and Claim Form, substantially in the forms annexed hereto as Exhibits A-1 and A-2, respectively, to be mailed by first-class mail, postage prepaid, to those members of the Settlement Class who may be identified through reasonable effort, including through the cooperation of Velti  and/or its agents as set forth below (the "Notice Date");

(b)      A summary notice (the "Summary Notice"), substantially in the form annexed hereto as Exhibit A-3, shall be published once in the national edition of *Investor's*

*Business Daily* and over the *Business Wire* no later than ten (10) business days after the Notice Date; and

        (c)    The Notice, the Summary Notice, and the Claim Form shall also be placed on the website created for this Partial Settlement, on or before the Notice Date.

## NOTICE TO THE CLASS

    7.    The Court approves the form of Notice and Summary Notice (together, the "Notices") and the Claim Form, and finds that the procedures established for publication, mailing, and distribution of such Notices substantially in the manner and form set forth in ¶ 6 of this Preliminary Approval Order meet the requirements of Rule 23 of the Federal Rules of Civil Procedure, Section 21D(a)(7) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(a)(7), the Securities Act of 1933 (the "Securities Act"), and the Constitution of the United States, and any other applicable law, and constitute the best notice practicable under the circumstances.

    8.    Not later than five (5) days after the entry of this Order, Velti shall cause its transfer agent to provide to Lead Counsel and/or the Claims Administrator, in an electronic format acceptable to the Claims Administrator, the last known names and addresses of all Persons who purchased or otherwise acquired Velti Shares during the Class Period.

    9.    No later than thirty-five (35) calendar days prior to the Settlement Hearing, Lead Counsel shall cause to be filed with the Clerk of this Court an affidavit or declaration of the person or persons under whose general direction the mailing of the Notice and the publication of the Summary Notice shall have been made, showing that such mailing and publication have been made in accordance with this Preliminary Approval Order.

    10.    Nominees who purchased Velti Shares for the benefit of another Person during the Class Period are directed to send the Notice and Proof of Claim and Release form to such beneficial owners of Velti Shares within ten (10) calendar days after receipt thereof, or send a list of the names and addresses of such beneficial owners to the Claims Administrator within ten

[PROPOSED] ORDER PRELIMINARILY APPROVING PARTIAL SETTLEMENT AND PROVIDING FOR NOTICE - EXHIBIT A
CASE NO. 3:13-CV-03889-WHO

4

(10) calendar days of receipt thereof, in which event the Claims Administrator shall promptly mail the Notice and Proof of Claim and Release form to such beneficial owners.

11.     Other than the cost of providing the names and addresses of Persons who purchased Velti Shares during the Class Period to Lead Counsel and/or the Claims Administrator, all fees, costs, and expenses incurred in identifying and notifying members of the Settlement Class shall be paid from the Settlement Fund and in no event shall any of the Released Persons bear any responsibility for such fees, costs, or expenses.

12.     All members of the Settlement Class (except Persons who request exclusion pursuant to ¶ 22 below) shall be bound by all determinations and judgments in the litigation concerning the Partial Settlement, including, but not limited to, the releases provided for therein, whether favorable or unfavorable to the Settlement Class, regardless of whether such Persons seek or obtain by any means, including, without limitation, by submitting a Proof of Claim and Release form or any similar document, any distribution from the Settlement Fund or the Net Settlement Fund.

13.     If not already done so prior to entry of this Preliminary Approval Order, no later than ten (10) calendar days after the Stipulation was filed with the Court, the Settling Defendants shall cause to be issued any settlement notice required by the Class Action Fairness Act of 2005.

## HEARING: RIGHT TO BE HEARD

14.     A hearing (the "Settlement Hearing") shall be held before this Court on _____, 2014, at ___ _.m., at the San Francisco Courthouse of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, Courtroom 2, San Francisco, CA, to determine whether the proposed Partial Settlement of the Action on the terms and conditions provided for in the Settlement Agreement is fair, reasonable, and adequate to the Settlement Class and should be approved by the Court; to determine whether a Judgment as provided in ¶ 1.9 of the Settlement Agreement should be entered; to determine whether the proposed Plan of Distribution should be approved; to determine any amount of fees and expenses that should be awarded to Lead Counsel for their service to the Settlement Class; to hear any

[PROPOSED] ORDER PRELIMINARILY APPROVING PARTIAL SETTLEMENT AND PROVIDING FOR NOTICE - EXHIBIT A
CASE NO. 3:13-CV-03889-WHO

5

objections by Settlement Class Members to the Settlement Agreement,  Plan of Distribution, or any award of fees and expenses to the Lead Counsel and to the Lead Plaintiff; and to consider such other matters as the Court may deem appropriate.

15.     Papers in support of the Partial Settlement, the Plan of Distribution, and Lead Counsel's application for attorneys' fees and reimbursement of expenses shall be filed no later than thirty-five (35) calendar days prior to the Settlement Hearing.  Reply papers shall be filed no later than seven (7) calendar days prior to the Settlement Hearing.

16.     At or after the Settlement Hearing, the Court shall determine whether the Plan of Distribution proposed by Lead Counsel, and any application for attorneys' fees and expenses should be approved.

17.     Any Member of the Settlement Class may appear at the Settlement Hearing and show cause why the proposed Partial Settlement embodied in the Stipulation should or should not be approved as fair, reasonable, adequate and in the best interests of the Settlement Class, or why the Judgment should or should not be entered thereon, and/or to present opposition to the Plan of Distribution or to the application of Lead Counsel for attorneys' fees and reimbursement of expenses.

18.     No Settlement Class Member or any other Person shall be heard or entitled to object to the approval of the terms and conditions of the Partial Settlement, or, if approved, the Judgment to be entered thereon approving the same, or the terms of the Plan of Distribution or the application by Lead Counsel for an award of attorneys' fees and reimbursement of expenses, *unless* that Settlement Class Member or Person has: (i) filed a written objection with the Clerk of the Court no later than _____, including the basis for such objection as well as copies of any papers and/or briefs in support of his, her, or its position, and (ii) served, by hand or first-class mail, the same to the following counsel for receipt no later than twenty-one (21) calendar days prior to the Settlement Hearing:

                    THE WEISER LAW FIRM, P.C.
                    ROBERT WEISER

22 Cassatt Avenue
Berwyn, PA 19312

***Counsel for Lead Plaintiff***

WILSON SONSINI GOODRICH
    & ROSATI, Professional Corporation
BORIS FELDMAN
CYNTHIA A. DY
650 Page Mill Road,
Palo Alto, CA 94304

***Counsel for Settling Defendants***

Any member of the Settlement Class who does not make his, her, or its objection in the manner provided herein shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness, reasonableness, or adequacy of the proposed Partial Settlement as incorporated in the Settlement Agreement, to the Plan of Distribution, and to the award of attorneys' fees and expenses to Plaintiffs' Counsel, unless otherwise ordered by the Court.

19.      The Court reserves the right to alter the time or the date of the Settlement Hearing without further notice to the members of the Settlement Class, provided that the time or the date of the Settlement Hearing shall not be set at a time or date earlier than the time and date set forth in ¶ 14 above, and retains jurisdiction to consider all further applications arising out of or connected with the proposed Partial Settlement.  The Court may, for good cause, extend any of the deadlines set forth in this Order without further notice to Settlement Class Members.  The Court may approve the Partial Settlement, with such modifications as may be agreed to by the Settling Parties, if appropriate, without further notice to the Settlement Class.

## CLAIMS PROCESS

20.      Settlement Class Members who wish to participate in the Partial Settlement shall complete and submit the Proof of Claim and Release form in accordance with the instructions contained therein.  Unless the Court orders otherwise, all Proofs of Claim and Release must be

[PROPOSED] ORDER PRELIMINARILY APPROVING PARTIAL SETTLEMENT AND PROVIDING FOR NOTICE - EXHIBIT A
CASE NO. 3:13-CV-03889-WHO

7

1   postmarked no later than [a date approximately 90 days from the Notice Date] _____,

2   2014.  Any Settlement Class Member who does not submit a Proof of Claim and Release within

3   the time provided shall be barred from sharing in the distribution of the proceeds of the Net

4   Settlement Fund, unless otherwise ordered by the Court, but shall nevertheless be bound by any

5   final judgment entered by the Court.  Notwithstanding the foregoing, Lead Counsel shall have

6   the discretion to accept late-submitted claims for processing by the Claims Administrator so long

7   as distribution of the Net Settlement Fund is not materially delayed or altered thereby.

8        21.    Any Settlement Class Member may enter an appearance in the Action, at his, her,

9   or its own expense, individually or through counsel of their own choice.  If they do not enter an

10  appearance, they will be represented by Lead Counsel.

11  **REQUESTS FOR EXCLUSION FROM THE CLASS**

12       22.    Any Person falling within the definition of the Settlement Class may, upon

13  request, be excluded or "opt out" from the Settlement Class.  Any such Person must submit to

14  the Claims Administrator a request for exclusion ("Request for Exclusion"), postmarked no later

15  than [a date approximately 55 days after the Notice Date] _____, 2014.  A Request for

16  Exclusion must be signed and state (a) the name, address, and telephone number of the Person

17  requesting exclusion; (b) the Person's purchases or acquisitions and sales of Velti Shares

18  between January 27, 2011 and August 20, 2013, inclusive, including the dates, the number of

19  Velti Shares purchased or sold, and price paid or received for each such purchase or sale; and

20  (c)  that the Person wishes to be excluded from the Settlement Class.  All Persons who submit

21  valid and timely Requests for Exclusion in the manner set forth in this paragraph shall have no

22  rights under the Settlement Agreement, shall not share in the distribution of the Net Settlement

23  Fund, and shall not be bound by the Settlement Agreement or any final judgment.

24       23.    Lead Counsel or the Claims Administrator shall cause to be provided to Settling

25  Defendants' counsel copies of all Requests for Exclusion, and any written revocation of Requests

26  for Exclusion within three (3) days of receipt, but in no event later than ten (10) business days

27  before the Settlement Hearing.  Copies of untimely Requests for Exclusion shall be delivered to

28

[PROPOSED] ORDER PRELIMINARILY APPROVING PARTIAL SETTLEMENT AND PROVIDING FOR NOTICE - EXHIBIT A
CASE NO. 3:13-cv-03889-WHO

8

Settling Defendants' counsel by Lead Counsel or the Claims Administrator within two (2) days of receipt.

**MISCELLANEOUS**

24.    All funds held by the Escrow Agent shall be deemed and considered to be in *custodia legis*, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant to the Settlement Agreement and/or further order(s) of the Court.

25.    The Released Persons shall have no responsibility for the Plan of Distribution or any application for attorneys' fees or expenses submitted by Plaintiffs' Counsel, and such matters will be considered separately from the fairness, reasonableness, and adequacy of the Partial Settlement.

26.    All reasonable expenses incurred in identifying and notifying Settlement Class Members as well as administering the Settlement Fund shall be paid as set forth in the Settlement Agreement.  In the event the Court does not approve the Partial Settlement, or it otherwise fails to become effective, neither Plaintiffs nor any of their counsel shall have any obligation to repay any amounts actually and properly incurred or disbursed pursuant to ¶ 3.7 or ¶ 3.8 of the Settlement Agreement.

27.    Neither the Settlement Agreement, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be construed as an admission or concession by the Released Defendants or any other Released Persons of the truth of any of the allegations in the Action, or of any liability, fault, or wrongdoing of any kind.

28.    All proceedings against the Released Defendants in the Action are stayed until further order of this Court, except as may be necessary to implement the Partial Settlement or comply with the terms of the Settlement Agreement.  Pending final determination of whether the Partial Settlement should be approved, neither Plaintiffs nor any Settlement Class Member, either directly, representatively, or in any other capacity shall commence or prosecute against

[PROPOSED] ORDER PRELIMINARILY APPROVING PARTIAL SETTLEMENT AND PROVIDING FOR NOTICE – EXHIBIT A
CASE NO. 3:13-cv-03889-WHO

9

any of the Released Persons any action or proceeding in any court or tribunal asserting any of the Released Claims.

29.     Nothing in the Partial Settlement or this Order shall resolve the class claims against the defendants Jeffries LLC, RBC Capital Markets, LLC, Needham & Company, Canaccord Genuity Inc., or Baker Tilly Virchow Krause, LLP.  The Action will continue as against these Non-Settling Defendants.

30.     Unless otherwise ordered by the Court, in the event the Stipulation shall terminate, or be canceled, or shall not become effective for any reason, within five (5) business days after written notification of such event is sent by counsel for Settling Defendants or Lead Counsel to the Escrow Agent, the Settlement Fund (including accrued interest), less expenses which have either been incurred or disbursed pursuant to the Stipulation, shall be refunded pursuant to written instructions from Settling Defendants' counsel.

31.     In the event that the Stipulation is not approved by the Court or the Partial Settlement set forth in the Stipulation is terminated or fails to become effective in accordance with its terms, the Settling Parties shall be restored to their respective positions in the Action as of the day immediately preceding the execution of the Stipulation.  In such event, the terms and provisions of the Stipulation, with the exception of ¶¶ 1.1-1.28, 3.7-3.9, 8.2, 9.3-9.5, 10.4-10.5, and 10.6, shall have no further force and effect with respect to the Settling Parties and shall not be used in this Action or in any other proceeding for any purpose, and the Settling Parties shall be deemed to return to their status as of the day immediately preceding the execution of the Stipulation , and shall be required to present an amended schedule to the Court.

IT IS SO ORDERED.

DATED: _____          _____
                                                                 THE HONORABLE WILLIAM H. ORRICK
                                                                 UNITED STATES DISTRICT JUDGE

[PROPOSED] ORDER PRELIMINARILY APPROVING PARTIAL SETTLEMENT AND PROVIDING FOR NOTICE - EXHIBIT A
CASE NO. 3:13-CV-03889-WHO

10

THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (168562)
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: (858) 794-1441
Facsimile: (858) 794-1450
kah@weiserlawfirm.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE VELTI PLC SECURITIES LITIGATION | ) Master File No. 3:13-cv-03889-WHO |
| | ) |
| | ) CLASS ACTION |
| | ) |
| This Document Relates To: | ) NOTICE OF PENDENCY AND |
| | ) PROPOSED PARTIAL SETTLEMENT OF |
| ALL ACTIONS. | ) CLASS ACTION |
| | ) |
| | ) EXHIBIT A-1 |
| | ) |
| | ) |

**TO:     ALL PERSONS OR ENTITIES WHO PURCHASED OR OTHERWISE ACQUIRED THE SECURITIES OF VELTI PLC ("SHARES") BETWEEN JANUARY 27, 2011 AND AUGUST 20, 2013, INCLUSIVE.**

IF YOU ARE A CLASS MEMBER, YOU MAY BE ENTITLED TO SHARE IN THE PROCEEDS OF THE SETTLEMENT DESCRIBED IN THIS NOTICE.  TO CLAIM YOUR SHARE OF THIS FUND, YOU MUST SUBMIT A VALID PROOF OF CLAIM AND RELEASE FORM POSTMARKED ON OR BEFORE _____, 2014.

**A federal court authorized this Notice.  This is not a solicitation from a lawyer.**

This notice is not intended to be and should not be construed as an expression of any opinion by the Court with respect to the truth of the allegations in the above-captioned action or the merits of the claims or defenses asserted. This notice is merely to advise you of the pendency of this action, the proposed settlement, and your rights with respect to the proposed settlement.

**NOTICE OF PARTIAL SETTLEMENT:** Please be advised that the Court-appointed Lead Plaintiff, Bobby Yadegar and Ygar Capital LLC, plaintiff St. Paul Teachers' Retirement Fund Association, plaintiff Newport News Employees' Retirement Fund, and plaintiff Oklahoma Firefighters Pension and Retirement System (collectively with the Lead Plaintiff, "Plaintiffs"), on behalf of themselves and the Settlement Class (defined below), have reached a proposed settlement of this Action with defendants Velti plc ("Velti" or the "Company"), Wilson W. Cheung ("Cheung"), Jeffrey G. Ross ("Ross"), Winnie W. Tso ("Tso"), and Nicholas P. Negroponte ("Negroponte") (the "Settling Defendants"), for a total of Nine Million Five Hundred Thousand Dollars ($9,500,000.00) in cash that will resolve certain claims in the Action (the "Partial Settlement").[1] THIS PARTIAL SETTLEMENT DOES NOT RESOLVE THE

---

[1]     Defendants Cheung, Ross, Tso, and Negroponte, together with Alex Moukas ("Moukas"), Chris Kaskavelis ("Kaskavelis"), David W. Mann ("Mann"), David C. Hobley ("Hobley"), and Jerry Goldstein ("Goldstein") are collectively referred to herein as the "Individual Defendants."  Mann, Hobley, Goldstein and Negroponte are collectively referred to herein as the "Director Defendants."  Defendants Moukas, Cheung, Ross, Tso, and Kaskavelis are collectively referred to herein as the "Officer Defendants."

CLASS CLAIMS AGAINST DEFENDANTS JEFFRIES LLC, RBC CAPITAL MARKETS, LLC, NEEDHAM & COMPANY, CANACCORD GENUITY INC., OR BAKER TILLY VIRCHOW KRAUSE,   LLP.  THE LITIGATION WILL CONTINUE AS AGAINST THOSE DEFENDANTS.

This Notice has been sent to you pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States District Court for the Northern District of California (the "Court").  The purpose of this Notice of Pendency and Proposed Partial Settlement of Class Action ("Notice") is to inform you of the proposed settlement of this securities class action litigation and of the hearing to be held by the Court to consider the fairness, reasonableness, and adequacy of the Partial Settlement.  This Notice explains important rights you may have, including your possible receipt of cash from the Partial Settlement.  **Your legal rights will be affected whether or not you act.  Please read this Notice carefully and in its entirety!**

The proposed Partial Settlement creates a fund in the amount of $9,500,000.00 plus interest earned.  Your recovery will depend on the number of Velti Shares you purchased or otherwise acquired, when and if you sold, and the timing and amount of those transactions.  It will also depend on the number of valid Claim Forms that Settlement Class Members submit and the amount of such claims. Assuming that all of the investors who purchased or otherwise acquired the Shares during the Class Period and allegedly were damaged by the alleged conduct participate in the Partial Settlement, Lead Counsel estimates that the estimated average distribution will be as described in the Plan of Distribution herein.  Historically, less than all eligible investors submit claims, resulting in higher average distributions per Share.  See the Plan of Distribution below for a more detailed description of how the settlement proceeds will be allocated among Settlement Class Members.

Plaintiffs believe that the proposed Partial Settlement is an excellent recovery and is in the best interests of the Settlement Class.  There were significant risks associated with continuing to litigate and proceeding through motions to dismiss and for summary judgment and trial, and if the Settling Defendants prevailed at any of those stages, the Settlement Class might receive

1    nothing.  One additional significant risk factor was the Company's deteriorating financial

2    condition and its rapidly decreasing ability to fund a judgment or settlement.  Other risk factors

3    included the location of key witnesses outside of the U.S., especially in Greece, and the fact that

4    much of the key information upon which Plaintiffs expect to rely is likely subject to stringent

5    privacy and data protection laws.  In addition, the amount of damages recoverable by the

6    Settlement Class was and is challenged by the Settling Defendants.  Recoverable damages in this

7    case are limited to alleged losses caused by the alleged improper conduct.  The Settling

8    Defendants deny that they are liable to Plaintiffs or the Settlement Class and deny that Plaintiffs

9    or any other member of the Settlement Class has suffered any damage, and had the Action gone

10   to trial, the Settling Defendants intended to assert that all of the losses of Settlement Class

11   Members were caused by non-actionable market, industry, general economic or company-

12   specific factors, other than the revelation of the facts alleged to be misleadingly stated or

13   omitted.

14         Plaintiffs' Counsel have not received any payment for their services in conducting this

15   Action on behalf of Plaintiffs and the members of the Settlement Class, nor have they been paid

16   their litigation expenses.  If the Partial Settlement is approved by the Court, Lead Counsel will

17   apply to the Court for attorneys' fees of 25% of the settlement proceeds plus expenses not to

18   exceed $225,000, plus interest on such amounts, all of which shall be paid from the Settlement

19   Fund.  Assuming that all of the investors who purchased or otherwise acquired Velti Shares

20   during the Class Period and allegedly were damaged as a result of the alleged conduct participate

21   in the Partial Settlement, and if the Court approves Lead Counsel's fee and expense application

22   as well the Notice and administration costs, Lead Counsel estimates that the average cost of such

23   fees and expenses will be approximately $0.03 per Share.

24         This Notice is not an expression of any opinion by the Court about the merits of any of

25   the claims or defenses asserted by any party in this Action or the fairness or adequacy of the

26   proposed Partial Settlement.

27

28

For further information regarding this Partial Settlement you may contact:  the claims administrator (Strategic Claims Services) at (866) 274-4004 or James M. Ficaro of The Weiser Law Firm, P.C., 22 Cassatt Avenue, Berwyn, PA 19312, Telephone: (610) 225-2677.  Please do not call any representative of the Defendants or the Court.

## I.   NOTICE OF HEARING ON PROPOSED PARTIAL SETTLEMENT

A hearing (the "Settlement Hearing") will be held on _____, 2014, at __:__ __.m., before the Honorable William Orrick, United States District Judge, at the San Francisco Courthouse of the United States District Court for the Northern District of California, Courtroom 2, 450 Golden Gate Avenue, San Francisco, CA.  The purpose of the Settlement Hearing will be to determine: (1) whether the Court should grant final certification of the Settlement Class for the purposes of the Partial Settlement; (2) whether the Partial Settlement consisting of $9,500,000 in cash plus accrued interest on the Settlement Fund should be approved as fair, reasonable, and adequate to the Settlement Class; (3) whether the proposed plan to distribute the settlement proceeds (the "Plan of Distribution") is fair, reasonable, and adequate; (4) whether the application by Lead Counsel for an award of attorneys' fees and expenses should be approved; and (5) whether the Action against the Released Defendants should be dismissed with prejudice. The Court may adjourn or continue the Settlement Hearing without further notice to the Settlement Class.

## II.   DEFINITIONS USED IN THIS NOTICE

1.      "Authorized Claimant" means any member of the Settlement Class who submits a timely and valid Proof of Claim and Release form and whose claim for recovery has been allowed pursuant to the terms of the Stipulation.

2.      "Claims Administrator" means the firm of Strategic Claims Services.

3.       "Class Period" means the period from January 27, 2011 and August 20, 2013, inclusive.

4.      "Defendants" means Velti, Alex Moukas, Wilson W. Cheung, Jeffrey G. Ross, Winnie W. Tso, Chris Kaskavelis, David Mann, David Hobley, Jerry Goldstein, Nicholas

1    Negroponte, Jefferies LLC, RBC Capital Markets, LLC, Needham & Company, LLC, Canaccord

2    Genuity Inc., and Baker Tilly Virchow Krause, LLP.

3         5.    "Effective Date" means the first date by which all of the events and conditions

4    specified in ¶ 9.1 of the Stipulation have been met and have occurred.

5         6.    "Escrow Agent" means the firm of Strategic Claims Services; the escrow bank

6    shall be PNC Financial Services Group, Inc.

7         7.    "Final" means when the last of the following with respect to the Judgment

8    approving the Partial Settlement, in the form of Exhibit B attached hereto, shall occur: (i) the

9    expiration of the time to file a motion to alter or amend the Judgment under Federal Rule of Civil

10   Procedure 59(e) has passed without any such motion having been filed; (ii) the expiration of the

11   time in which to appeal the Judgment has passed without any appeal having been taken; and

12   (iii) if a motion to alter or amend is filed or if an appeal is taken, the determination of that motion

13   or appeal in such a manner as to permit the consummation of the Partial Settlement, in

14   accordance with the terms and conditions of the Stipulation.  For purposes of this paragraph, an

15   "appeal" shall include any petition for a writ of certiorari or other writ that may be filed in

16   connection with approval or disapproval of this Partial Settlement, but shall not include any

17   appeal which concerns only the issue of attorneys' fees and expenses, or any Plan of Distribution

18   of the Settlement Fund.

19        8.    "Individual Defendants" means Alex Moukas, Wilson W. Cheung, Jeffrey G.

20   Ross, Winnie W. Tso, Chris Kaskavelis, David Mann, David Hobley, Jerry Goldstein, and

21   Nicholas Negroponte.

22        9.    "Judgment" means the judgment and order of dismissal with prejudice to be

23   rendered by the Court upon approval of the Partial Settlement, substantially in the form attached

24   hereto as Exhibit B.

25        10.   "Lead Counsel" means The Weiser Law Firm, P.C., 22 Cassatt Avenue, First

26   Floor, Berwyn, PA 19312.

27        11.   "Lead Plaintiff" means Bobby Yadegar /Ygar Capital LLC.

28

12.     "Net Settlement Fund" means the portion of the Settlement Fund that shall be distributed to Authorized Claimants as allowed by the Stipulation, the Plan of Distribution, or the Court, after provision for the amounts set forth in ¶ 7.4 of the Stipulation of Partial Settlement.

13.     "Non-Settling Defendants" means Baker Tilly and the Underwriter Defendants.

14.      "Person(s)" means an individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and his, her or its spouses, heirs, predecessors, successors, representatives, or assignees.

15.     "Plaintiffs' Counsel" means The Weiser Law Firm, Berman DeValerio, and Labaton Sucharow, LLP.

16.     "Plan of Distribution" means a plan or formula of allocation of the Net Settlement Fund whereby the Settlement Fund shall be distributed to Authorized Claimants after payment of expenses of notice and administration of the Partial Settlement, Taxes and Tax Expenses and such attorneys' fees, costs, expenses, and interest and other expenses as may be awarded by the Court.  Any Plan of Distribution is not part of the Stipulation and the Released Persons shall have no responsibility or liability with respect thereto.

17.     "Related Persons" means, with respect to the Released Defendants, each and all of their respective present or former parents, subsidiaries, affiliates, successors and assigns and each and all of their respective present or former officers, directors, employees, employers, attorneys, accountants (except for Baker Tilly), financial advisors, commercial bank lenders, insurers (including Released Defendants' insurers and those insurers' respective businesses, affiliates, subsidiaries, parents and affiliated corporations, divisions, predecessors, shareholders partners, joint venturers, principals, insurers, reinsurers, successors and assigns, and their respective past and present employees, officers, directors, attorneys, accountants, auditors, agents and representatives), reinsurers, investment bankers, representatives, general and limited partners and partnerships, heirs, executors, administrators, successors, affiliates, agents, spouses, associates and assigns of each of them or any trust of which any Released Defendant and/or their

Related Persons is the settlor or which is for the benefit of any Released Defendant and/or their Related Persons and/or member(s) of his or her family and any entity in which any such Released Defendant and/or their Related Persons has a controlling interest.  The Non-Settling Defendants are specifically excluded from the definition of "Related Persons."

18.     "Released Claims" means any and all claims (including Unknown Claims as defined in ¶ 1.28 in the Stipulation and below), demands, rights, liabilities, and causes of action of every nature and description whatsoever, whether known or unknown, contingent or absolute, mature or immature, discoverable or undiscoverable, whether concealed or hidden, suspected or unsuspected, whether arising under federal, state, common or foreign law, which now exist, or heretofore may have existed, asserted or that could have been asserted by Plaintiffs or any Settlement Class Member against the Released Persons, arising out of: (a) the purchase or acquisition of Velti Shares during the Class Period; and (b) the  facts, events, transactions, statements, disclosures, acts, omissions, or failures to act that were or could have been alleged in the Action.  The Released Claims extend only to any and/or all Released Defendants and any and/or all of their Related Persons.  "Released Claims" includes "Unknown Claims" as defined in ¶ 1.28 hereof.

19.      "Released Defendants" means Velti, Alex Moukas, Wilson W. Cheung, Jeffrey G. Ross, Winnie W. Tso, Chris Kaskavelis, David Mann, David Hobley, Jerry Goldstein, and Nicholas Negroponte.

20.     "Released Persons" means each and all of Released Defendants in their individual and corporate capacities and each and all of their Related Persons.

21.     "Settlement Class" means all Persons (defined above) who purchased or otherwise acquired the Shares of Velti between January 27, 2011 and August 20, 2013, inclusive. Excluded from the Settlement Class are:

(a)     Persons who submit valid and timely requests for exclusion from the Settlement Class; and

1          (b)     Defendants, members of the immediate family of any Defendant, any

2    person, firm, trust, corporation, officer, director or other individual or entity in which any

3    Defendant has or had a controlling interest, the officers and directors of any Defendant, and legal

4    representatives, agents, executors, heirs, successors or assigns of any such excluded Person.  The

5    Defendants or any entity in which any of the Defendants has or had a controlling interest (for

6    purposes of this paragraph, together a "Defendant-Controlled Entity") are excluded from the

7    Settlement Class only to the extent that such Defendant-Controlled Entity itself purchased a

8    proprietary (*i.e.*, for its own account) interest in the Company's Shares.  To the extent that a

9    Defendant-Controlled Entity purchased Velti Shares in a fiduciary capacity or otherwise on

10   behalf of any third-party client, account, fund, trust, or employee benefit plan that otherwise falls

11   within the Settlement Class, neither such Defendant-Controlled Entity nor the third-party client,

12   account, fund, trust, or employee benefit plan shall be excluded from the Settlement Class with

13   respect to such Velti Shares.

14          22.     "Settlement Class Member" and "Settlement Class Members" means a Person or

15   Persons who fall within the definition of the Settlement Class as set forth herein.

16          23.     "Settlement Fund" means $9,500,000 in cash paid by or on behalf of the Settling

17   Defendants pursuant to the Stipulation, together with all interest and income earned thereon.

18   Such amount is paid in full and complete settlement of all the Released Claims.

19          24.     "Settling Defendants" means Velti, Wilson W. Cheung, Jeffrey G. Ross, Winnie

20   W. Tso, , and Nicholas Negroponte.

21          25.     "Settling Parties" means Settling Defendants and Plaintiffs on behalf of

22   themselves and the Settlement Class Members.

23          26.     "Shares" means securities of Velti.

24          27.     "Underwriter Defendants" means Jefferies LLC, RBC Capital Markets, LLC,

25   Needham & Company, LLC, and Canaccord Genuity Inc.

26          28.     "Unknown Claims" means any Released Claims which Plaintiffs or any

27   Settlement Class Member does not know or suspect to exist in his, her or its favor at the time of

28

the release of the Released Persons which, if known by him, her or it, might have affected his, her or its settlement with and release of the Released Persons, or might have affected his, her or its decision not to object to this Partial Settlement.  With respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date, Plaintiffs shall expressly and each of the Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, expressly waived to the fullest extent permitted by law the provisions, rights, and benefits of California Civil Code §1542, which provides:

**A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

Plaintiffs shall expressly and each of the Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, expressly waived any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to California Civil Code §1542. Plaintiffs and Settlement Class Members may hereafter discover facts in addition to or different from those which he, she or it now knows or believes to be true with respect to the subject matter of the Released Claims, but Plaintiffs shall expressly, and each Settlement Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct that is negligent, intentional, with or without malice, or a breach of any duty, law, or rule, without regard to the subsequent discovery or existence of such different or additional facts.  Plaintiffs acknowledge, and the Settlement Class Members shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Partial Settlement of which this release is a part.

**III.     THE LITIGATION**

This case is currently pending before the Honorable William H. Orrick in the United States District Court for the Northern District of California.  On and after August 22, 2013, five putative class action complaints (the "Related Actions") were filed in the Northern District of California.   On December 3, 2013, Judge Orrick entered an order consolidating the Related Actions on file as of that date (the "Action"), setting a procedure for the consolidation of future filed Related Actions, and appointing Yadegar and Ygar Capital LLC as Lead Plaintiff and The Weiser Law Firm, P.C. as Lead Counsel for the Lead Plaintiff and the putative class.

On March 14, 2014, counsel for Plaintiffs, Velti, and certain of the Individual Defendants participated in an in-person mediation (the "Mediation") before the Honorable Layn Phillips (the "Mediator").  While a settlement of the Action was not reached at the Mediation, the Settling Parties continued their ongoing dialogue with the Mediator and with each other.

On April 22, 2014, Lead Plaintiff filed a consolidated complaint (the "Complaint").  The Complaint contains five counts.  Count One alleges violations of Section 11 of the Securities Act of 1933 (the "Securities Act") against all Defendants.  Count Two alleges violations of Section 12(a)(2) of the Securities Act against the Underwriter Defendants, Velti, Moukas, Kaskavelis, Mann, Goldstein, Hobley, and Negroponte.  Count Three alleges violations of Section 15 of the Securities Act against all Individual Defendants.  Count Four alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 against the Company, Baker Tilly, and the Officer Defendants.  Lastly, Count Five alleges violations of Section 20(a) of the Exchange Act against the Officer Defendants.

After the Complaint was filed, the Settling Parties continued their dialogue with the Mediator and ultimately agreed to the Partial Settlement outlined in the Settlement Agreement.

**IV.     CLAIMS OF THE LEAD PLAINTIFF AND BENEFITS OF PARTIAL SETTLEMENT**

Lead Plaintiff and Lead Counsel believe that the claims asserted in the Action have merit. However, Lead Plaintiff and Lead Counsel recognize and acknowledge the expense and length of

1    continued proceedings necessary to prosecute the Action against the Released Defendants

2    through discovery and trial.  Lead Plaintiff and Lead Counsel also have taken into account the

3    uncertain outcome and the risk of any litigation, especially in complex actions such as this

4    Action, as well as the risks posed by the difficulties and delays inherent in such litigation.  Lead

5    Plaintiff and Lead Counsel also are aware of the defenses to the securities law violations asserted

6    in the Action.  Lead Plaintiff and Lead Counsel believe that the Partial Settlement confers

7    substantial benefits upon the Settlement Class in light of the circumstances present here

8    including the Company's deteriorating financial situation.  Based on their evaluation, Lead

9    Plaintiff and Lead Counsel have determined that the Partial Settlement is in the best interests of

10    Lead Plaintiff and the Settlement Class.

11    **V.     THE SETTLING DEFENDANTS' DENIALS OF WRONGDOING AND**

12            **LIABILITY**

13        The Settling Defendants have denied and continue to deny that they have violated the

14    federal securities laws identified in the Action or any laws, and maintain that their conduct was

15    at all times proper and in compliance with all applicable laws.  The Settling Defendants have

16    denied and continue to deny specifically each and all of the claims and contentions alleged in the

17    Action, along with all charges of wrongdoing or liability against them arising out of any of the

18    conduct, statements, acts or omissions alleged, or that could have been alleged, in the Action.

19        In addition, the Settling Defendants maintain that they have meritorious defenses to all

20    claims alleged in the Action.

21        Nonetheless, taking into account the uncertainty, risks, and costs inherent in any

22    litigation, especially in complex cases such as this Action, the Settling Defendants have

23    concluded that further conduct of the Action could be protracted and distracting.  The Settling

24    Defendants have, therefore, determined that it is desirable and beneficial to them that the Action

25    be settled in the manner and upon the terms and conditions set forth in the Stipulation.

26

27

28

## VI.   DISAGREEMENT AS TO AMOUNT OF DAMAGES

The issues on which the parties disagree include: (1) whether the statements made or facts allegedly omitted were false, material, or otherwise actionable under the federal securities laws; (2) whether defendants were liable for any false or misleading statements; (3) the extent to which the various matters that Lead Plaintiff alleged were materially false or misleading influenced (if at all) the trading price of Velti Shares; (4) the extent to which external factors, such as general market conditions, influenced the trading price of Velti Shares; (5) the effect of various market forces influencing the trading price of Velti Shares; (6) whether the market was aware of the adverse facts about which Lead Plaintiff complains; and (7) the amount by which the price of Velti Shares was allegedly artificially inflated (if at all).  Lead Plaintiff and Settling Defendants do not agree on the average amount of damages per Share that would be recoverable if Lead Plaintiff were to have prevailed on each claim asserted.  The Settling Defendants deny that they have violated the federal securities laws or any laws.

## VII.   TERMS OF THE PROPOSED PARTIAL SETTLEMENT

The sum of $9,500,000 will be transferred to the Escrow Agent.  The principal amount of $9,500,000, plus any accrued interest, constitutes the Settlement Fund.  A portion of the settlement proceeds will be used for certain administrative expenses, including costs of printing and mailing this Notice, the cost of publishing a newspaper notice of the settlement, payment of any taxes assessed against the Settlement Fund, and costs associated with the processing of claims submitted.  In addition, as explained below, a portion of the Settlement Fund may be awarded by the Court to Lead Counsel as attorneys' fees and for reimbursement of expenses incurred in litigating the case.  The balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the Plan of Distribution described below to Settlement Class Members who submit valid and timely Proof of Claim and Release forms.

## VIII.   PLAN OF DISTRIBUTION

The Net Settlement Fund will be distributed to Settlement Class Members who submit valid, timely Proof of Claim and Release forms ("Authorized Claimants") under the Plan of

1   Distribution described below.  The Plan of Distribution provides that you will be eligible to

2   participate in the distribution of the Net Settlement Fund if you have a net loss arising out of all

3   transactions involving Velti Shares purchased pursuant to, or traceable to Velti's IPO, purchased

4   pursuant to, or traceable to Velti's SPO, or purchased on the open market during the Class

5   Period.  No distributions will be made to Authorized Claimants who would otherwise receive a

6   distribution of less than $10.00.

7          For purposes of determining the amount an Authorized Claimant may recover under the

8   Plan of Distribution, Lead Counsel has consulted with their damage consultant.  The Plan of

9   Distribution does not reflect an assessment of the damages that could have been recovered at trial

10  or Lead Plaintiff's counsel's assessment of the likelihood of establishing liability.

11         The Net Settlement Fund will be distributed to Settlement Class Members who submit

12  valid, timely Proof of Claim and Release forms ("Authorized Claimants") under the Plan of

13  Distribution described below. The Plan of Distribution provides that you will be eligible to

14  participate in the distribution of the Net Settlement Fund if you have a net loss arising out of all

15  transactions involving Velti Shares purchased during the Class Period.  No distributions will be

16  made to Authorized Claimants who would otherwise receive a distribution of less than $10.00.

17  For purposes of determining the amount an Authorized Claimant may recover under the Plan of

18  Distribution, Lead Plaintiff's counsel have consulted with their damage consultant. The Plan of

19  Distribution does not reflect an assessment of the damages that could have been recovered at trial

20  or Lead Plaintiff's counsel's assessment of the likelihood of establishing liability.

21         To the extent there are sufficient funds in the Net Settlement Fund, each Authorized

22  Claimant will receive an amount equal to the Authorized Claimant's claim, as defined below. If,

23  however, and as is more likely, the amount in the Net  Settlement Fund is not sufficient to permit

24  payment of the total claim of each Authorized Claimant, then each Authorized  Claimant shall be

25  paid the percentage of the Net Settlement Fund that each Authorized Claimant's claim bears to

26  the total of  the claims of all Authorized Claimants. Payment in this manner shall be deemed

27  conclusive against all Authorized Claimants.

28

The total of all profits shall be subtracted from the total of all losses from transactions involving Velti Shares purchased during the Class Period to determine if a Settlement Class Member has a claim. Only if a Settlement Class Member had a net loss from the Velti Shares purchased during the Class Period, will such Settlement Class Member be eligible to receive a distribution from the Net Settlement Fund. A claimant's Recognized Claim will be calculated as follows:

**1.     For shares of common stock purchased between January 27, 2011 and May 15, 2012, inclusive:**

A.     For shares retained at the end of trading on August 20, 2013, the Recognized Loss shall be the lesser of:

    (1)     $7.84 per share; or
    (2)     the difference between the purchase price per share and $.30.[2]

B.     For shares sold between January 27, 2011 and May 15, 2012, inclusive the Recognized Loss shall be zero.

C.     For shares sold between May 16, 2012 and November 14, 2012 inclusive, the Recognized Loss shall be the lesser of:

    (1)     $4.92 per share; or
    (2)     the difference between the purchase price per share and the sales price per share for each share sold.

D.     For shares sold on November 15, 2012, the Recognized Loss shall be the lesser of:

    (1)     $2.63 per share; or
    (2)     the difference between the purchase price per share and the sales price per share for each share sold.

E.     For shares sold between November 16, 2012 and January 30, 2013 inclusive, the Recognized Loss shall be the lesser of:

    (1)     $2.06 per share; or
    (2)     the difference between the purchase price per share and the sales price per share for each share sold.

---

[2] Pursuant to Section 21(D)(e)(1) of the Private Securities Litigation Reform Act of 1995, "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated." $.30 was the mean (average) daily closing trading price of Velti common stock during the 90-day period beginning on August 21, 2013 and ending on November 18, 2013.

F.   For shares sold between January 31, 2013 and August 20, 2013, inclusive, the Recognized Loss shall be the lesser of:

    (1)   $.66 per share; or
    (2)   the difference between the purchase price per share and the sales price per share for each share sold.

**2.   For shares of common stock purchased between May 16, 2012 and November 14, 2012, inclusive:**

A.   For shares retained at the end of trading on August 20, 2013, the Recognized Loss shall be the lesser of:

    (1)   $4.92 per share; or
    (2)   the difference between the purchase price per share and $.30.

B.   For shares sold between May 16, 2012 and November 14, 2012, inclusive, the Recognized Loss shall be zero.

C.   For shares sold on November 15, 2012, the Recognized Loss shall be the lesser of:

    (1)   $2.63 per share; or
    (2)   the difference between the purchase price per share and the sales price per share for each share sold

D.   For shares sold between November 16, 2012 and January 30, 2013 inclusive, the Recognized Loss shall be the lesser of:

    (1)   $2.06 per share; or
    (2)   the difference between the purchase price per share and the sales price per share for each share sold.

E.   For shares sold between January 31, 2013 and August 20, 2013, inclusive, the Recognized Loss shall be the lesser of:

    (1)   $.66 per share; or
    (2)   the difference between the purchase price per share and the sales price per share for each share sold.

**3.   For shares of common stock purchased on November 15, 2012:**

A.   For shares retained at the end of trading on August 20, 2013, the Recognized Loss shall be the lesser of:

    (1)   $2.63 per share; or
    (2)   the difference between the purchase price per share and $.30.

B.   For shares sold on November 15, 2012, the Recognized Loss shall be zero.

C.    For shares sold between November 16, 2012 and January 30, 2013 inclusive, the Recognized Loss shall be the lesser of:

    (1)    $2.06 per share; or
    (2)    the difference between the purchase price per share and the sales price per share for each share sold.

D.    For shares sold between January 31, 2013 and August 20, 2013, inclusive, the Recognized Loss shall be the lesser of:

    (1)    $.66 per share; or
    (2)    the difference between the purchase price per share and the sales price per share for each share sold.

**4.    For shares of common stock purchased between November 16, 2012 and January 30, 2013, inclusive:**

A.    For shares retained at the end of trading on August 20, 2013, the Recognized Loss shall be the lesser of:

    (1)    $2.06 per share; or
    (2)    the difference between the purchase price per share and $.30.

B.    For shares sold between November 16, 2012 and January 30, 2013, inclusive, the Recognized Loss shall be zero.

C.    For shares sold between January 31, 2013 and August 20, 2013, inclusive, the Recognized Loss shall be the lesser of:

    (1)    $.66 per share; or
    (2)    the difference between the purchase price per share and the sales price per share for each share sold.

**5.    For shares of common stock purchased between January 31, 2013 and August 20, 2013, inclusive:**

A.    For shares retained at the end of trading on August 20, 2013, the Recognized Loss shall be the lesser of:

    (1)    $.66 per share; or
    (2)    the difference between the purchase price per share and $.30.

B.    For shares sold between January 31, 2013 and August 30, 2013, inclusive, the Recognized Loss shall be zero.

**IX.    PARTICIPATION IN THE SETTLEMENT CLASS**

If you fall within the definition of the Settlement Class, you are a Settlement Class

Member unless you elect to be excluded from the Settlement Class pursuant to this Notice.  If

you do not request to be excluded from the Settlement Class, you will be bound by any judgment entered with respect to the Partial Settlement in the litigation whether or not you file a Proof of Claim and Release form.

*If you are a Settlement Class Member, you need do nothing (other than timely file a Proof of Claim and Release if you wish to participate in the distribution of the Net Settlement Fund).  Your interests will be represented by Lead Counsel.*  If you choose, you may enter an appearance individually or through your own counsel at your own expense.

TO PARTICIPATE IN THE DISTRIBUTION OF THE NET SETTLEMENT FUND, YOU MUST TIMELY COMPLETE AND RETURN THE PROOF OF CLAIM AND RELEASE THAT ACCOMPANIES THIS NOTICE.  The Proof of Claim and Release must be postmarked on or before _____, 2014, and be delivered to the Claims Administrator at the address below.  Unless the Court orders otherwise, if you do not timely submit a valid Proof of Claim and Release, you will be barred from receiving any payments from the Net Settlement Fund, but will in all other respects be bound by the provisions of the Settlement Agreement and the Final Judgment.

## X.       EXCLUSION FROM THE SETTLEMENT CLASS

You may request to be excluded from the Settlement Class.  To do so, you must mail a written request stating that you wish to be excluded from the Settlement Class to:

> *Velti Securities Litigation*
> Claims Administrator
> c/o Strategic Claims Services
> P.O. Box 230
> 600 N. Jackson Street, Suite 3
> Media, PA 19063

The request for exclusion must state: (1) your name, address, and telephone number; and (2) all purchases and sales of Velti Shares made from January 27, 2011 through August 20, 2013, inclusive, including all Shares purchased in the Velti IPO or SPO, the dates and prices of each purchase or sale, and the number of Shares purchased or sold.  YOUR EXCLUSION REQUEST MUST BE POSTMARKED ON OR BEFORE _____, 2014.  If you submit a valid

1  and timely request for exclusion, you shall have no rights under the Partial Settlement, shall not

2  share in the distribution of the Net Settlement Fund, and shall not be bound by the Settlement

3  Agreement or the Judgment.

4  **XI.   DISMISSAL AND RELEASES**

5      If the proposed Partial Settlement is approved, the Court will enter a Final Judgment.

6  The Judgment will dismiss the Released Claims with prejudice as to all Released Defendants as

7  provided in the Settlement Agreement.

8      The Judgment will provide that all Settlement Class Members who have not validly and

9  timely requested to be excluded from the Settlement Class shall be deemed to have released and

10  forever discharged all Released Claims (to the extent members of the Settlement Class have such

11  claims) against all Released Persons as provided in the Settlement Agreement.

12  **XII.   APPLICATION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF**

13        **EXPENSES**

14      At the Settlement Hearing, Lead Counsel will request the Court to award attorneys' fees

15  of 25% of the Settlement Fund, plus reimbursement of litigation expenses not to exceed

16  $225,000 plus interest thereon.  Settlement Class Members are not personally liable for any such

17  fees or expenses.

18      To date, Plaintiffs' Counsel have not received any payment for their services in

19  conducting this Action on behalf of Lead Plaintiff and the members of the Settlement Class, nor

20  have counsel been paid for their expenses.  The fee requested by Lead Counsel would

21  compensate counsel for their efforts in achieving this Partial Settlement for the benefit of the

22  Settlement Class, and for their risk in undertaking this representation on a contingency basis.

23  The fee requested is within the range of fees awarded to plaintiffs' counsel under similar

24  circumstances in litigation of this type.  Should any additional settlements or a judgment be

25  reached in this Action as against the Non-Settling Defendants, Plaintiffs' Counsel may seek

26  additional fees and reimbursement of additional expenses in achieving those settlements.

27

28

## XIII.   CONDITIONS FOR PARTIAL SETTLEMENT

The Partial Settlement is conditioned upon the occurrence of certain events described in the Settlement Agreement.  Those events include, among other things: (1) entry of the Judgment by the Court, as provided for in the Settlement Agreement; and (2) expiration of the time to appeal from or alter or amend the Judgment.  Pending the Court's consideration of this Partial Settlement, the Court has stayed all proceedings, and Settlement Class Members are precluded from bringing or pursuing any litigation that seeks to prosecute the Released Claims.

If, for any reason, any one of the conditions described in the Settlement Agreement is not met, the Settlement Agreement might be terminated and, if terminated, will become null and void, and the Settling Parties to the Settlement Agreement will be restored to their respective positions as of May 22, 2014.

## XIV.   THE RIGHT TO BE HEARD AT THE SETTLEMENT HEARING

Any Settlement Class Member who has not validly and timely requested to be excluded from the Settlement Class, and who objects to any aspect of the Partial Settlement, the Plan of Distribution, or the application for attorneys' fees and expenses may appear and be heard at the Settlement Hearing.   Any such Person must submit and serve a written notice of objection, to be received on or before _____, 2014, by each of the following:

> CLERK OF THE COURT
> UNITED STATES DISTRICT COURT
> NORTHERN DISTRICT OF CALIFORNIA
> 450 Golden Gate Avenue, Box 36060
> San Francisco, CA 94102-3489
>
> THE WEISER LAW FIRM, P.C.
> ROBERT WEISER
> 22 Cassatt Avenue
> Berwyn, PA 19312
>
> *Counsel for Lead Plaintiff*
>
> WILSON SONSINI GOODRICH
>    & ROSATI, Professional Corporation
> BORIS FELDMAN
> CYNTHIA A. DY
> 650 Page Mill Road,
> Palo Alto, CA 94304

*Counsel for Settling Defendants*

The notice of objection must demonstrate the objecting Person's membership in the Settlement Class, including the number of Velti Shares purchased and sold from January 27, 2011 through August 20, 2013, inclusive, and contain a statement of the reason(s) for objection. Only Settlement Class Members who have submitted written notices of objection in this manner will be entitled to be heard at the Settlement Hearing, unless the Court orders otherwise.

**XV.    SPECIAL NOTICE TO BANKS, BROKERS, AND OTHER NOMINEES**

If you hold or held any Velti ordinary Shares purchased between January 27, 2011 through August 20, 2013 as nominee for a beneficial owner, then, within ten (10) calendar days after you receive this Notice, you must either: (1) send a copy of this Notice and the Proof of Claim and Release by First-Class Mail to all such Persons; or (2) provide a list of the names and addresses of such Persons to the Claims Administrator:

> *Velti Securities Litigation*
> Claims Administrator
> c/o Strategic Claims Services
> P.O. Box 230
> 600 N. Jackson Street, Suite 3
> Media, PA 19063

If you choose to mail the Notice and Proof of Claim and Release yourself, you may obtain from the Claims Administrator (without cost to you) as many additional copies of these documents as you will need to complete the mailing.  Regardless of whether you choose to complete the mailing yourself or elect to have the mailing performed for you, you may obtain reimbursement for, or advancement of, reasonable administrative costs actually incurred or expected to be incurred in connection with forwarding the Notice and Proof of Claim and Release and which would not have been incurred but for the obligation to forward the Notice and Proof of Claim and Release, upon submission of appropriate documentation to the Claims Administrator.

## XVI.   EXAMINATION OF PAPERS

This Notice is a summary and does not describe all of the details of the Settlement Agreement.  For full details of the matters discussed in this Notice, you may review the Settlement Agreement filed with the Court, which may be inspected during business hours, at the office of the Clerk of the Court, United States District Court, Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102-3489.  The motion papers, with exhibits, including the Settlement Agreement, are also available on the Court's ECF website (for a fee). Certain papers relating to the Partial Settlement, including the Settlement Agreement, are also available for free at the Claims Administrator's website http://www.strategicclaims.net/.

If you have any questions about the Partial Settlement of the Action, you may contact a representative of Lead Counsel at (610) 225-2677.

**DO NOT TELEPHONE THE COURT REGARDING THIS NOTICE**

DATED: _____, 2014          BY ORDER OF THE COURT
                                       UNITED STATES DISTRICT COURT
                                       NORTHERN DISTRICT OF CALIFORNIA

1  THE WEISER LAW FIRM, P.C.
2  KATHLEEN A. HERKENHOFF (168562)
   12707 High Bluff Drive, Suite 200
   San Diego, CA 92130
3  Telephone: (858) 794-1441
   Facsimile: (858) 794-1450
4  kah@weiserlawfirm.com

5  Lead Counsel for Plaintiffs

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11 IN RE VELTI PLC SECURITIES        )  Master File No. 3:13-cv-03889-WHO
   LITIGATION                        )
12 _____  )  CLASS ACTION
                                     )
13 This Document Relates To:         )  PROOF OF CLAIM AND RELEASE
                                     )
14         ALL ACTIONS.              )  EXHIBIT A-2
                                     )
15                                   )
                                     )
16                                   )
                                     )
17 _____  )

18

19

20

21

22

23

24

25

26

27

28

1

**I.**       <u>**GENERAL INSTRUCTIONS**</u>

2

      1.      To recover as a member of the Settlement Class based on your claims in the

3

action entitled *In re Velti plc Securities Litigation*, Civil Action No. 3:13-cv-03889-WHO (the

4

"Action"), you must complete and, on pages 3-10 hereof, sign this Proof of Claim and Release

5

("Claim Form"). If you fail to file a properly addressed (as set forth in paragraph 3 below) Proof

6

of Claim and Release, your claim may be rejected and you may be precluded from any recovery

7

from the Net Settlement Fund created in connection with the proposed Partial Settlement of the

8

Action.

9

      2.      Submission of this Proof of Claim and Release, however, does not assure that you

10

will share in the proceeds of the Partial Settlement of the Action.

11

      3.      YOU MUST MAIL YOUR COMPLETED AND SIGNED PROOF OF CLAIM

12

POSTMARKED ON OR BEFORE _____, 2014, ADDRESSED AS FOLLOWS:

13

14

15

16

*In re Velti plc Securities Litigation*
Claims Administrator
c/o Strategic Claims Services
P.O. Box 230
600 N. Jackson Street, Suite 3
Media, PA 19063

17

18

19

20

If you are NOT a member of the Settlement Class (as defined in the Notice of Pendency and

Proposed Partial Settlement of Class Action (the "Notice")), DO NOT submit a Proof of Claim

and Release form.

21

      4.      If you are a member of the Settlement Class and you do not timely request

22

exclusion in connection with the proposed Partial Settlement, you will be bound by the terms of

23

any judgment entered in the Action, including the releases provided therein, WHETHER OR

24

NOT YOU SUBMIT A PROOF OF CLAIM AND RELEASE FORM.

25

26

27

28

## II.    CLAIMANT IDENTIFICATION

If you purchased or otherwise acquired the Shares[1] of Velti plc ("Velti" or the "Company") between January 27, 2011 and August 20, 2013, inclusive, and held the Shares in your name, you are the beneficial purchaser as well as the record purchaser.  If, however, you purchased Velti Shares that were registered in the name of a third party, such as a nominee or brokerage firm, you are the beneficial purchaser and the third party is the record purchaser.

Use Part I of this form entitled "Claimant Identification" to identify each purchaser of record ("nominee"), if different from the beneficial purchaser of the Shares which form the basis of this claim.  THIS CLAIM MUST BE FILED BY THE ACTUAL BENEFICIAL PURCHASER(S) OR THE LEGAL REPRESENTATIVE OF SUCH PURCHASER(S) OF THE SHARES UPON WHICH THIS CLAIM IS BASED.

All joint purchasers must sign this claim.  Executors, administrators, guardians, conservators, and trustees must complete and sign this claim on behalf of persons represented by them and their authority must accompany this claim and their titles or capacities must be stated. The Social Security (or taxpayer identification) number and telephone number of the beneficial owner may be used in verifying the claim.  Failure to provide the foregoing information could delay verification of your claim or result in rejection of the claim.

If you are acting in a representative capacity on behalf of a Settlement Class Member (for example, as an executor, administrator, trustee, or other representative), you must submit evidence of your current authority to act on behalf of that Settlement Class Member.  Such evidence would include, for example, letters testamentary, letters of administration, or a copy of the trust documents.

## III.    CLAIM FORM

Use Part II of this form entitled "Schedule of Transactions in Velti Shares" to supply all required details of your transaction(s) in Velti Shares.  If you need more space or additional

---

[1]      All capitalized terms not defined herein have the same meaning as set forth in the Settlement Agreement dated May 23, 2014.

schedules, attach separate sheets giving all of the required information in substantially the same form.  Sign and print or type your name on each additional sheet.

On the schedules, provide all of the requested information with respect to *all* of your purchases of Velti Shares between January 27, 2011 and August 20, 2013, inclusive, and *all* of your sales of Velti Shares between January 27, 2011 and August 20, 2013, inclusive, whether such transactions resulted in a profit or a loss.  You must also provide all of the requested information with respect to *all* of the Velti Shares you held at the close of trading on August 20, 2013.  Failure to report all such transactions may result in the rejection of your claim.

List these transactions separately and in chronological order, by trade date, beginning with the earliest.  You must accurately provide the month, day, and year of each transaction you list.

The date of covering a "short sale" is deemed to be the date of purchase of Velti Shares. The date of a "short sale" is deemed to be the date of sale of Velti Shares.

Copies of stockbroker confirmation slips, stockbroker statements, or other documents evidencing your transactions in Velti Shares should be attached to your claim.  If any such documents are not in your possession, please obtain a copy or equivalent documents from your broker because these documents are necessary to prove and process your claim.  Failure to provide this documentation could delay verification of your claim or result in rejection of your claim.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
*In re Velti plc Securities Litigation,*
Civil Action No. 3:13-cv-0889-WHO

**PROOF OF CLAIM AND RELEASE**

**Must Be Postmarked No Later Than:**

**_____, 2014**

Please Type or Print

**PART I: CLAIMANT IDENTIFICATION**

_____
Beneficial Owner's Name (First, Middle, Last)        / Joint Owner's Name

_____
Street Address

_____          _____
City                                  State              Zip Code

_____          _____
Foreign Province                      Foreign Country

_____          _____ (Daytime)
Area Code                             Telephone Number

_____          _____ (Evening)
Area Code                             Telephone Number

_____    _____
Last 4 digits of Claimant's Social Security Number/Taxpayer Identification Number

_____
Record Owner's Name (if known and different from Beneficial Owner listed above)

Check appropriate box (check only one box):
☐      Individual/Sole Proprietor          ☐     Joint Owners          ☐ Pension Plan
☐      Corporation                         ☐     Partnership           ☐ Trust
☐      IRA                                 ☐     Other (describe: _____ )

NOTE:  Separate Claim Forms should be submitted for each separate legal entity (_e.g._, a claim from Joint Owners should not include separate transactions of just one of the Joint Owners, an Individual should not combine his or her IRA transactions with transactions made solely in the Individual's name).

NOTICE REGARDING ELECTRONIC FILES:  Certain claimants with large numbers of transactions may request to, or may be requested to, submit information regarding their transactions in electronic files.  All claimants MUST submit a manually signed paper Proof of Claim and Release form listing all their transactions whether or not they also submit electronic copies.  If you wish to file your claim electronically, you must contact the Claims Administrator at (866) 274-4004 or visit their website at www.strategicclaims.net to obtain the required file format.  No electronic files will be considered to have been properly submitted unless the Claims

Administrator issues to the claimant a written acknowledgement of receipt and acceptance of electronically submitted data.

**PART II:    SCHEDULE OF TRANSACTIONS IN VELTI SHARES**

A.    Purchases of Velti Shares between January 27, 2011 and August 20, 2013, inclusive:

| Trade Date<br>Mo. Day Year | Number of Shares<br>Purchased | Total Purchase Price |
|---|---|---|
| 1. _____ | 1. _____ | 1. _____ |
| 2. _____ | 2. _____ | 2. _____ |
| 3. _____ | 3. _____ | 3. _____ |

IMPORTANT: Identify by number listed above all purchases in which you covered a "short sale": _____

B.    Sales of Velti Shares between January 27, 2011 and August 20, 2013:

| Trade Date<br>Mo. Day Year | Number of Shares<br>Purchased | Total Purchase Price |
|---|---|---|
| 1. _____ | 1. _____ | 1. _____ |
| 2. _____ | 2. _____ | 2. _____ |
| 3. _____ | 3. _____ | 3. _____ |

C.    Number of Velti Shares held at the close of trading on August 20, 2013: _____.

IF YOU NEED ADDITIONAL SPACE TO LIST YOUR TRANSACTIONS PLEASE PHOTOCOPY THIS PAGE, WRITE YOUR NAME ON THE COPY AND CHECK THIS BOX:

☐

IF YOU DO NOT CHECK THIS BOX THESE ADDITIONAL PAGES MAY NOT BE REVIEWED.

**III.**     **RELEASE OF CLAIMS AND SIGNATURE**

1.      I (We) hereby acknowledge full and complete satisfaction of, and do hereby fully, finally and forever settle, release and discharge from the Released Claims each and all of the Released Persons as provided in the Settlement Agreement.

2.      "Related Persons" means, with respect to the Released Defendants, each and all of their respective present or former parents, subsidiaries, affiliates, successors and assigns and each and all of their respective present or former officers, directors, employees, employers, attorneys, accountants, financial advisors, commercial bank lenders, insurers (including Released Defendants' insurers and those insurers' respective businesses, affiliates, subsidiaries, parents and affiliated corporations, divisions, predecessors, shareholders partners, joint venturers, principals, insurers, reinsurers, successors and assigns, and their respective past and present employees, officers, directors, attorneys, accountants, auditors, agents and representatives), reinsurers, investment bankers, representatives, general and limited partners and partnerships, heirs, executors, administrators, successors, affiliates, agents, spouses, associates and assigns of each of them or any trust of which any Released Defendant and/or their Related Persons is the settlor or which is for the benefit of any Released Defendant and/or their Related Persons and/or member(s) of his or her family and any entity in which any such Released Defendant and/or their Related Persons has a controlling interest.  The Non-Settling Defendants are specifically excluded from the definition of "Related Persons."

3.      "Released Claims" means any and all claims (including Unknown Claims as defined in ¶ 1.28 of the Settlement Agreement), demands, rights, liabilities, and causes of action of every nature and description whatsoever, whether known or unknown, contingent or absolute, mature or immature, discoverable or undiscoverable, whether concealed or hidden, suspected or unsuspected, whether arising under federal, state, common or foreign law, which now exist, or heretofore may have existed, asserted or that could have been asserted by Plaintiffs or any Settlement Class Member against the Released Persons, arising out of: (a) the purchase or acquisition of Velti Shares during the Class Period; and (b) the  facts, events, transactions, statements, disclosures, acts, omissions, or failures to act that were or could have been alleged in

1   the Action.  The Released Claims extend only to any and/or all Released Defendants and any

2   and/or all of their Related Persons.  "Released Claims" includes "Unknown Claims" as defined

3   in ¶ 1.28 of the Settlement Agreement.

4           4.       "Released Persons" means each and all of Released Defendants in their individual

5   and corporate capacities and each and all of their Related Persons.

6           5.       "Unknown Claims" means any Released Claims which Plaintiffs or any

7   Settlement Class Member does not know or suspect to exist in his, her or its favor at the time of

8   the release of the Released Persons which, if known by him, her or it, might have affected his,

9   her or its settlement with and release of the Released Persons, or might have affected his, her or

10  its decision not to object to this Partial Settlement.  With respect to any and all Released Claims,

11  the Settling Parties stipulate and agree that, upon the Effective Date, Plaintiffs shall expressly

12  and each of the Settlement Class Members shall be deemed to have, and by operation of the

13  Judgment shall have, expressly waived to the fullest extent permitted by law the provisions,

14  rights, and benefits of California Civil Code §1542, which provides:

15
16          **A general release does not extend to claims which the creditor does not know or
            suspect to exist in his or her favor at the time of executing the release, which if known
            by him or her must have materially affected his or her settlement with the debtor.**

17

18  Plaintiffs shall expressly and each of the Settlement Class Members shall be deemed to have, and

19  by operation of the Judgment shall have, expressly waived any and all provisions, rights, and

20  benefits conferred by any law of any state or territory of the United States, or principle of

21  common law, which is similar, comparable, or equivalent to California Civil Code §1542.

22  Plaintiffs and Settlement Class Members may hereafter discover facts in addition to or different

23  from those which he, she or it now knows or believes to be true with respect to the subject matter

24  of the Released Claims, but Plaintiffs shall expressly, and each Settlement Class Member, upon

25  the Effective Date, shall be deemed to have, and by operation of the Judgment shall have, fully,

26  finally, and forever settled and released any and all Released Claims, known or unknown,

27  suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden,

28  which now exist, or heretofore have existed, upon any theory of law or equity now existing or

coming into existence in the future, including, but not limited to, conduct that is negligent,

intentional, with or without malice, or a breach of any duty, law, or rule, without regard to the

subsequent discovery or existence of such different or additional facts.  Plaintiffs acknowledge,

and the Settlement Class Members shall be deemed by operation of the Judgment to have

acknowledged, that the foregoing waiver was separately bargained for and a key element of the

Partial Settlement of which this release is a part.

6.      This release shall be of no force or effect unless and until the Court approves the

Settlement Agreement and the Partial Settlement becomes effective on the Effective Date.

## **SIGNATURE AND CERTIFICATIONS**

By signing and submitting this Claim Form, the Claimant(s) or the person(s) who

represents the Claimant(s) certifies, as follows:

1.      I (We) submit this Claim Form under the terms of the Stipulation described in the

Notice.

2.      I (We) also submit to the jurisdiction of the United States District Court for the

Northern District of California, with respect to my (our) claim as a Settlement Class Member and

for purposes of enforcing the release set forth herein.

3.      I (We) further acknowledge that I (we) am (are) bound by and subject to the terms

of any judgment that may be entered in the Action.

4.      I (We) agree to furnish additional information to the Claims Administrator to

support this claim if requested to do so.

5.      I (We) have not submitted any other claim covering the same purchases or

acquisitions of the Shares and alleging the Released Claims (including Unknown Claims) and

know of no other person having done so on my (our) behalf.

6.      I (We) hereby acknowledge full and complete satisfaction of, and do hereby fully,

finally and forever release, relinquish, waive, discharge and dismiss each and every Released

Claim (including Unknown Claims) against each and all the Released Persons as defined above.

7.      That the Claimant(s) is a (are) Settlement Class Member(s), as defined herein and

in the Notice;

8.      That I (we) have not filed a request for exclusion from the Settlement Class and that I (we) do not know of any request for exclusion from the Settlement Class filed on my (our) behalf with respect to my (our) transactions in the Shares at issue herein;

9.      That I (we) own(ed) the Shares identified in the Proof of Claim Form, or that, in signing and submitting this Claim Form, I (we) have the authority to act on behalf of the owner(s) thereof;

10.     That Claimant(s) may be eligible to receive a distribution from the Net Settlement Fund;

11.     That I (we) agree to furnish such additional information with respect to this Claim Form as the parties, the Claims Administrator or the Court may require;

12.     That I (we) waive trial by jury for claims against the Released Parties, to the extent it exists, and agree to the Court's summary disposition of the determination of the validity or amount of the claim made by this Claim Form;

13.     That I (we) have not assigned or transferred or purported to assign or transfer, voluntarily or involuntarily, any matter released pursuant to this release or any other part or portion thereof;

14.     That I (we) have included information requested above about all of my (our) transactions in the Shares during the Class Period and as otherwise requested in this Claim Form; and

15.     That I (we) certify that I am (we are) not subject to backup withholding under the provisions of Section 3406(a)(1)(c) of the Internal Revenue Code.

**NOTE**: If you have been notified by the Internal Revenue Service that you are subject to backup withholding, please strike the language that you are not subject to backup withholding in the certification above.  The Internal Revenue Service does not require your consent to any provision other than the certification required to avoid backup withholding.

PROOF OF CLAIM AND RELEASE - EXHIBIT A-2

I (We) declare, under penalty of perjury under the laws of the United States of America, that the statements made and answers given in this Claim Form are true and correct and that the documents submitted herewith are true and genuine.

_____
Signature of Claimant

_____     _____
Print Name of Claimant                                                    Date

_____
Signature of Joint Claimant, if any

_____     _____
Print Name of Joint Claimant                                            Date

***If Claimant is other than an individual, or is not the person
completing this form, the following also must be provided:***

_____
Signature of Person Completing Form

_____     _____
Print Name of Person Completing Form                               Date

_____
Capacity of Person Signing (Executor, President, Trustee, etc.)

**ACCURATE CLAIMS PROCESSING TAKES A
SIGNIFICANT AMOUNT OF TIME.
THANK YOU FOR YOUR PATIENCE.**

**Reminder Checklist**:

    1.      Please sign the above release and declaration.

    2.      Remember to attach supporting documentation, if available.

    3.      Do not send original stock certificates.

    4.      Keep a copy of your claim form for your records.

    5.      If you desire an acknowledgment of receipt of your claim form, please send it
             Certified Mail, Return Receipt Requested.

    6.      If you move, please send us your new address.

10

1  THE WEISER LAW FIRM, P.C.
   KATHLEEN A. HERKENHOFF (168562)
2  12707 High Bluff Drive, Suite 200
   San Diego, CA 92130
3  Telephone: (858) 794-1441
   Facsimile: (858) 794-1450
4  kah@weiserlawfirm.com

5  Lead Counsel for Plaintiffs

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11  IN RE VELTI PLC SECURITIES          )   Master File No. 3:13-cv-03889-WHO
    LITIGATION                          )
12  _____)   CLASS ACTION
                                        )
13  This Document Relates To:           )   SUMMARY NOTICE
                                        )
14          ALL ACTIONS.                )   EXHIBIT A-3
                                        )
15                                      )
                                        )
16                                      )
    _____)
17

18

19

20

21

22

23

24

25

26

27

28

1  TO:     **ALL PERSONS AND ENTITIES WHO PURCHASED OR OTHERWISE**

2          **ACQUIRED THE SECURITIES OF VELTI PLC ("SHARES") BETWEEN**

3          **JANUARY 27, 2011 AND AUGUST 20, 2013, INCLUSIVE.**

4

5          YOU ARE HEREBY NOTIFIED that pursuant to an Order of the United States District

6  Court for the Northern District of California, a hearing will be held on _____, 2014, at

7  __:__ __.m., before the Honorable William H. Orrick, United States District Judge, at the San

8  Francisco Courthouse of the United States District Court for the Northern District of California,

9  450 Golden Gate Avenue, Courtroom 2, San Francisco, CA, for the purpose of determining:

10 (1) whether the Court should certify the Settlement Class for purposes of the Partial Settlement

11 pursuant to Federal Rule of Civil Procedure 23; (2) whether the Partial Settlement of the Action

12 consisting of Nine Million Five Hundred Thousand Dollars ($9,500,000.00) in cash plus accrued

13 interest on the Settlement Fund should be approved as fair, reasonable, and adequate;

14 (3) whether, thereafter, this Action should be dismissed with prejudice against the Released

15 Defendants as set forth in the Settlement Agreement dated May 23, 2014; (4) whether the Plan of

16 Distribution of settlement proceeds is fair, reasonable, and adequate and therefore should be

17 approved; (5) the reasonableness of the application of Lead Counsel for the payment of

18 attorneys' fees and expenses in connection with this Action, together with interest thereon; and

19 (5) such other matters as the Court may deem appropriate.

20         If you purchased Velti Shares, your rights may be affected by this Action and the

21 settlement thereof.  If you have not received a detailed Notice of Pendency and Proposed Partial

22 Settlement of Class Action and a copy of the Proof of Claim and Release Form, you may obtain

23 copies by writing to Velti Securities Litigation, Claims Administrator, c/o Strategic Claims

24 Services P.O. Box 230, 600 N. Jackson Street, Suite 3, Media, PA 19063, or by downloading this

25 information at www.strategicclaims.net.  If you are a Settlement Class Member, in order to share

26 in the distribution of the Net Settlement Fund, you must submit a Proof of Claim and Release

27 form postmarked no later than _____, 2014, establishing that you are entitled to a recovery.

28

1    You will be bound by any judgment rendered in the Action unless you request to be excluded, in

2    writing, to the above address, postmarked by _____, 2014.

3            Any objection to any aspect of the settlement must be filed with the Clerk of the Court no

4    later than _____, 2014, and received by the following law firms no later than

5    _____, 2014:

6            THE WEISER LAW FIRM, P.C.
             ROBERT WEISER
7            22 Cassatt Avenue
             Berwyn, PA 19312
8
             *Lead Counsel for Lead Plaintiff*
9
             WILSON SONSINI GOODRICH
10             & ROSATI, Professional Corporation
             BORIS FELDMAN
11           CYNTHIA A. DY
             650 Page Mill Road
12           Palo Alto, CA 94304

13           *Counsel for Settling Defendants*

14

15           PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE

16   REGARDING THIS NOTICE.

17   DATED: _____, 2014        BY ORDER OF THE COURT
                                                  UNITED STATES DISTRICT COURT
18                                                NORTHERN DISTRICT OF CALIFORNIA

19

20

21

22

23

24

25

26

27

28

1    THE WEISER LAW FIRM, P.C.
     KATHLEEN A. HERKENHOFF (168562)
2    12707 High Bluff Drive, Suite 200
     San Diego, CA 92130
3    Telephone: (858) 794-1441
     Facsimile: (858) 794-1450
4    kah@weiserlawfirm.com

5    Lead Counsel for Plaintiffs

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11   IN RE VELTI PLC SECURITIES        )  Master File No. 3:13-cv-03889-WHO
     LITIGATION                        )
12   _____      )  CLASS ACTION
                                       )
13   This Document Relates To:         )  [PROPOSED] FINAL JUDGMENT AND
                                       )  ORDER OF DISMISSAL WITH
14           ALL ACTIONS.              )  PREJUDICE
                                       )
15                                     )  EXHIBIT B
                                       )
16                                     )
     _____      )
17

18          This matter came before the Court for hearing pursuant to the Order Preliminarily

19   Approving Partial Settlement and Providing for Notice ("Preliminary Approval Order") dated

20   _____, 2014, on the application of the Settling Parties for approval of the settlement set

21   forth in the Stipulation and Agreement of Partial Settlement dated May 23, 2014 (the

22   "Stipulation" or the "Settlement Agreement").  Due and adequate notice having been given to the

23   Settlement Class as required in said Order, and the Court having considered all papers filed and

24   proceedings had herein and otherwise being fully informed in the premises and good cause

25   appearing therefore, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

26

27

28

     [PROPOSED] FINAL ORDER AND JUDGMENT
     CASE NO. 3:13-CV-03889-WHO

1.      This Final Judgment incorporates by reference the definitions in the Settlement Agreement, and all terms used herein shall have the same meanings as set forth in the Settlement Agreement, unless otherwise set forth herein.

2.      This Court has jurisdiction over the subject matter of the Action and over all Settling Parties to the Action, including all members of the Settlement Class.

3.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby certifies for purposes of settlement only a Settlement Class defined as all Persons who purchased or otherwise acquired Velti Shares between January 27, 2011 and August 20, 2013, inclusive. Excluded from the Settlement Class are:

(a)      Persons who submit valid and timely requests for exclusion from the Settlement Class, a list of which is attached hereto as Exhibit 1; and

(b)      Defendants, members of the immediate family of any Defendant, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has or had a controlling interest, the officers and directors of any Defendant, and legal representatives, agents, executors, heirs, successors or assigns of any such excluded Person.  The Defendants or any entity in which any of the Defendants has or had a controlling interest (for purposes of this paragraph, together a "Defendant-Controlled Entity") are excluded from the Settlement Class only to the extent that such Defendant-Controlled Entity itself purchased a proprietary (*i.e.*, for its own account) interest in the Company's Shares.  To the extent that a Defendant-Controlled Entity purchased Velti Shares in a fiduciary capacity or otherwise on behalf of any third-party client, account, fund, trust, or employee benefit plan that otherwise falls within the Settlement Class, neither such Defendant-Controlled Entity nor the third-party client, account, fund, trust, or employee benefit plan shall be excluded from the Settlement Class with respect to such Velti Shares.

4.      Solely for purposes of this Partial Settlement and for no other purpose, the Court finds that the prerequisites for a class action under Rule 23 of the Federal Rules of Civil Procedure have been satisfied in that: (a) the members of the Settlement Class are so numerous

1    that joinder of all Settlement Class Members in the class action is impracticable; (b) there are

2    questions of law and fact common to the Settlement Class that predominate over any individual

3    question; (c) the claims of Plaintiffs are typical of the claims of the Settlement Class;

4    (d) Plaintiffs and Class Counsel have fairly and adequately represented and protected the

5    interests of Settlement Class Members; and (e) a class action is superior to other available

6    methods for the fair and efficient adjudication of the controversy.

7        5.      Pursuant to Federal Rule of Civil Procedure 23, this Court hereby approves the

8    Partial Settlement set forth in the Settlement Agreement and finds that said Partial Settlement is,

9    in all respects, fair, reasonable, and adequate to the Settlement Class.

10       6.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court finds that

11   the Settlement Agreement and Partial Settlement are fair, reasonable, and adequate as to each of

12   the Settling Parties, and that the Settlement Agreement and Partial Settlement are hereby finally

13   approved in all respects, and the Settling Parties are hereby directed to perform its terms.

14       7.      Accordingly, the Court authorizes and directs implementation of all the terms and

15   provisions of the Settlement Agreement, as well as the terms and provisions hereof.  The Court

16   hereby dismisses, as to the Released Defendants, the Action and all Released Claims of the

17   Settlement Class with prejudice, without costs as to any of the Released Persons, except as and to

18   the extent provided in the Settlement Agreement and herein.

19       8.      Upon the Effective Date hereof, and as provided in the Settlement Agreement,

20   Plaintiffs and each of the Settlement Class Members (who have not validly opted out of the

21   Settlement Class) and their predecessors, successors, agents, representatives, attorneys, and

22   affiliates, and the heirs, executors, administrators, successors, and assigns of each of them shall

23   be deemed to have, and by operation of this Final Judgment shall have, fully, finally, and forever

24   released, relinquished, and discharged against the Released Persons any and all Released Claims

25   (including, without limitation, Unknown Claims), as well as any claims arising out of, relating

26   to, or in connection with, the defense, the settlement, or the resolution of the Action or the

27   Released Claims, and the distribution or investment of the Settlement Fund, whether or not such

28

1    Settlement Class Member executes and delivers the Proof of Claim and Release and whether or

2    not such Settlement Class Member shares in the Settlement Fund.

3        9.      Upon the Effective Date hereof, and as provided in the Settlement Agreement,

4    each of the Released Persons shall be deemed to have, and by operation of this Final Judgment

5    and Order of Dismissal with Prejudice shall have, fully, finally, and forever released,

6    relinquished, and discharged Plaintiffs, each and all of the Settlement Class Members, and

7    Plaintiffs' Counsel from all claims (including, without limitation, Unknown Claims) arising out

8    of, relating to, or in connection with, the institution, prosecution, assertion, settlement, or

9    resolution of the Action or the Released Claims.

10       10.     Upon the Effective Date hereof, and as provided in the Settlement Agreement,

11   Plaintiffs and each of the Settlement Class Members, and their predecessors, successors, agents,

12   representatives, attorneys and affiliates, and the heirs, executors, administrators, successors, and

13   assigns of each of them, shall also be deemed to have, and by operation of this Judgment shall

14   have, fully, finally, and forever released, relinquished, and discharged the Released Persons and

15   their counsel from all Released Claims (including, without limitation, Unknown Claims) arising

16   out of the defense, conduct, settlement, or resolution of the Action or the Released Claims.

17       11.     Upon the Effective Date, Plaintiffs and each of the Settlement Class Members

18   who have not timely opted out of the Settlement Class, and their predecessors, successors,

19   agents, representatives, attorneys, and affiliates, and the heirs, executors, administrators,

20   successors, and assigns of each of them, directly or indirectly, individually, representatively, or

21   in any other capacity, shall be permanently barred and enjoined from the assertion, institution,

22   maintenance, prosecution, or enforcement of any action or other proceeding against any Released

23   Persons in any state or federal court or arbitral forum, or in the court of any foreign jurisdiction,

24   of any and all Released Claims (including, without limitation, Unknown Claims), as well as any

25   other claims arising out of, relating to, or in connection with, the defense, settlement, or

26   resolution of the Action or the Released Claims.

27

28

12.     Upon the Effective Date, all Persons, including, but not limited to, Plaintiffs, on behalf of themselves and the Settlement Class, and the Non-Settling Defendants, shall be enjoined and barred from commencing or continuing any claim, cross-claim, third-party claim, claim over, or action in any forum against the Released Persons, seeking, as damages, indemnity, contribution, or otherwise, the recovery of all or part of any liability or settlement which such persons (i) paid, (ii) were obligated to pay or agreed to pay, or (iii) may become obligated to pay to the Settlement Class, as a result of such persons' liability for or participation in any acts, facts, statements or omissions that were or could have been alleged in the Action.  The Released Persons shall thus be released and discharged from all claims for indemnity or contribution or any other claim, however denominated, against the Released Persons that have been or may hereafter be brought by any Person, whether arising under state, federal, foreign or common law as claims, cross-claims, counterclaims, or third-party claims, in any state, federal, or foreign court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere, based upon, arising out of, relating to, or in connection with the Released Claims (collectively, the "Barred Claims"), and all such claims are permanently barred, and any Person seeking to bring such claims is permanently enjoined from doing so.

13.     Accordingly, to the full extent provided by Section 21D(f)(7)(A) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4(f)(7)(A), the Court hereby bars all Barred Claims against the Released Persons.

14.     Any final verdict or judgment obtained by or on behalf of Plaintiffs or the Settlement Class against any Person, other than the Released Persons, relating to the Released Claims, shall be reduced in accordance with applicable law.

15.     The Notice of Pendency and Proposed Partial Settlement of Class Action given to the Settlement Class in accordance with the Order Preliminarily Approving Partial Settlement and Providing for Notice entered on _____, 2014 was the best notice practicable under the circumstances, including the individual notice to all members of the Settlement Class who could be identified through reasonable effort.  Said notice provided the best notice practicable

under the circumstances of those proceedings and of the matters set forth therein, including the proposed Partial Settlement set forth in the Settlement Agreement, to all Persons entitled to such notice, and said notice fully satisfied the requirements of Federal Rule of Civil Procedure 23 and the requirements of due process.

16.    Any plan of distribution submitted by Lead Counsel or any order entered regarding any attorneys' fee and expense application shall in no way disturb or affect this Judgment and shall be considered separate from this Judgment.

17.    Neither the Settlement Agreement nor the Partial Settlement contained therein, nor any act performed or document executed pursuant to or in furtherance of the Settlement Agreement or the Partial Settlement (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claim, or of any wrongdoing or liability of the Released Persons; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Released Persons; or (c) is or may be deemed to be or may be used as an admission or evidence that any claims asserted by Plaintiffs were not valid or that the amount recoverable was not greater than the Partial Settlement amount, in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal.  The Released Persons may file the Settlement Agreement and/or this Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

18.    Without affecting the finality of this Judgment in any way, this Court hereby retains continuing exclusive jurisdiction over: (a) implementation of this Partial Settlement and any award or distribution of the Settlement Fund, including interest earned thereon; (b) disposition of the Settlement Fund; (c) hearing and determining applications for attorneys' fees, interest, and expenses in the Action; and (d) all Settling Parties hereto for the purpose of construing, enforcing, and administering the Settlement Agreement.

19.     The Court finds that during the course of the Action, the Settling Parties and their respective counsel at all times complied with the requirements of Federal Rule of Civil Procedure 11.

20.     In the event that the Partial Settlement does not become effective in accordance with the terms of the Settlement Agreement, or the Effective Date does not occur, or in the event that the Settlement Fund, or any portion thereof, is returned to the Settling Defendants, then this Judgment shall be rendered null and void to the extent provided by and in accordance with the Settlement Agreement and shall be vacated and, in such event, all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Settlement Agreement.

21.     Without further order of the Court, the Settling Parties may agree to reasonable extensions of time to carry out any of the provisions of the Settlement Agreement.

22.     The Action is hereby dismissed with prejudice as to the Released Defendants and without costs.

23.     The Court directs immediate entry of this Final Judgment by the Clerk of the Court.

IT IS SO ORDERED.


DATED: _____          _____
                                        THE HONORABLE WILLIAM H. ORRICK
                                        UNITED STATES DISTRICT JUDGE

EXHIBIT B

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 6-K

### REPORT OF FOREIGN PRIVATE ISSUER
### PURSUANT TO RULE 13a-16 OR 15d-16 UNDER
### THE SECURITIES EXCHANGE ACT OF 1934

**FOR THE MONTH OF NOVEMBER 2013**
**COMMISSION FILE NUMBER: 001-35035**

# Velti plc
(Exact name of Registrant as specified in its charter)

**Not Applicable**
(Translation of Registrant's name into English)

**First Floor, 28-32 Pembroke Street Upper**
**Dublin 2, Republic of Ireland**
**Attn: Alex Moukas, Chief Executive Officer**
**353 (0) 1234 2676**
(Address of principal executive offices)

Indicate by check mark whether the registrant files or will file annual reports under cover Form 20-F or Form 40-F.

Form 20-F  ☑ Form 40-F ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1):___

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7):___

Indicate by check mark whether the registrant by furnishing the information contained in this Form is also thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934.  Yes ☐   No ☑

If "Yes" is marked, indicate below the file number assigned to the registrant in connection with Rule 12g3-2(b):

Source: Velti plc, 6-K, November 06, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**INFORMATION CONTAINED IN THIS FORM 6-K REPORT**

**Agreement to Sell Certain Mobile Marketing Businesses; Filing of Chapter 11 Petitions under the U.S. Bankruptcy Code**

On November 4, 2013, Velti plc, a company organized under the laws of the Bailiwick of Jersey (the " ***Company")***, announced that affiliates of GSO Capital Partners LP ("*GSO*") have acquired the lenders' rights under the credit facility entered by and among the Company and some of its subsidiaries and HSBC Bank, National Association.  In addition, the Company has agreed to sell its U.S., U.K., and India mobile marketing businesses and certain of its U.S.-based advertising businesses to affiliates of GSO. Under the terms of the proposed asset purchase agreement and to facilitate the sale, the Company's U.S. operating companies filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code.

In connection with this proposed sale, Velti Inc., Air2Web, Inc., Air2Web Interactive, Inc., Velti North America Holdings, Inc., Velti North America, Inc. and Velti US Holdings, Inc. filed, on November 3, 2013, voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code with the bankruptcy court in Delaware.  In order to facilitate the bankruptcy process and the sale of the mobile marketing business, GSO has committed to provide up to $25 million in debtor-in-possession financing, including a $10 million cash injection to support the operations included in the proposed sale.

A copy of the press release announcing the agreement is filed herewith as Exhibit 99.1

**Cessation of Mobclix Operations; Filing of Chapter 7 Petition under the U.S Bankruptcy Code**

On November 3, 2013, Mobclix, Inc., a wholly-owned subsidiary of Velti plc, ceased operations, and filed a voluntary petition under Chapter 7 of the U.S. Bankruptcy Code to initiate an orderly wind-down of the business.

A copy of the press release announcing the filing of the petition is filed herewith as Exhibit 99.2

**EXHIBITS**

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Velti Press Release Announcing Agreement to Sell Mobile Marketing Businesses in U.S., U.K., and India to Affiliates of GSO Capital Partners LP |
| 99.2 | Velti Press Release Announcing Mobclix Ceases All Operations; Files Voluntary Chapter 7 Petition |

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

|  | **VELTI PLC** |
|---|---|
|  | (Registrant) |

| By: | /s/ Sally J. Rau |
|---|---|
| Name: | Sally J. Rau |
| Title: | *Chief Administrative Officer and General Counsel* |

Date: **November 5, 2013**

Source: Velti plc, 6-K, November 06, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.



Velti Announces Agreement to Sell Mobile Marketing Businesses in U.S., U.K., and India to Affiliates of GSO Capital Partners LP

- Affiliates of GSO Capital Partners LP acquire debt from HSBC
- Sale Expected to Close by End of 2013
- Operations for Acquired Businesses to Continue as Normal Throughout the Sale Process; Receive Additional Financing
- Velti's Other European, Asian, South American and Middle Eastern Businesses to Continue Operations as Normal

San Francisco - Nov. 4, 2013 - Velti plc (NASDAQ: VELT), a leading global provider of mobile marketing and advertising technology, announced today that it has agreed to sell its U.S., U.K., and India mobile marketing businesses and certain of its U.S.-based advertising businesses to affiliates of GSO Capital Partners LP ("GSO"), the credit division of Blackstone(NYSE: BX). The current proposed transaction includes the sale of business lines operated by Velti Inc. and Air2Web Inc. in the U.S., Air2Web India, and Velti DR Limited and Mobile Interactive Group, Ltd. in the U.K.

"We are pleased to have reached an agreement with GSO, a firm with substantial financial resources that understands the value of Velti's state-of-the-art technology, industry-leading solutions, and global presence," said Velti Chief Executive Officer Alex Moukas. "Both this sale agreement and GSO's recent acquisition of our secured debt demonstrate GSO's commitment to providing the business with the support necessary to grow and prosper."

All operations included in the proposed sale agreement will continue as normal throughout the sale process. The proposed sale is expected to close by the end of 2013.

"Importantly, this process will be virtually invisible to customers, all of whom can continue to rely on Velti to provide premier technology and solutions to support their own businesses," Mr. Moukas said.

Under the terms of the proposed asset purchase agreement and to facilitate the sale, Velti's U.S. operations, including Velti Inc. and Air2Web, Inc., today filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code with the U.S. Bankruptcy Court for the District of Delaware to implement the sale under Section 363 of the Bankruptcy Code. While the sale agreement includes the U.K.-based MIG business line and Air2Web India, the U.K. and India-based operations are not included in the Chapter 11 filing.

Additionally, GSO has committed to provide up to $25 million in debtor-in-possession financing, including a $10 million cash injection to support the operations included in the proposed sale.

The filing does not include any of the Company's operations in the U.K., Greece, India, China, Brazil, Russia, the United Arab Emirates, or any other jurisdictions outside the U.S. These entities, along with the mobile marketing businesses in the U.S., U.K., and India, are continuing normal business operations.

Additionally, the businesses not included in the current proposed sale agreement continue to grow and deliver improved results. Velti's Performance Mobile Marketing Business will also continue to provide services to the businesses named in the current purchase agreement.

"We look forward to working with the Company to execute on the growth potential of the mobile marketing industry," said Scott Eisenberg, of GSO Capital Partners. "The increasingly important need for businesses to have effective and reliable mobile communication with their customers requires a

Source: Velti plc, 6-K, November 06, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.



sophisticated and scalable technology. We believe that the Velti platform, including the Air2Web and Mobile Interactive Group acquisitions, is well positioned to grow share in this market."

For more information about this announcement, please visit www.velti.com. Additionally, the Company has set up a special information hotline at 866-618-4602.

**Forward-Looking Statements**

"Safe harbor" statement under the Private Securities Litigation Reform Act of 1995: This press release contains forward-looking statements about voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code filed by various of the company's subsidiaries in the United States, as well as concerning the proposed sale of assets owned or used in the company's mobile marketing business unit.  The achievement or success of the matters covered by such forward-looking statements involve risks, uncertainties and assumptions, and if any such risks or uncertainties materialize or if any of the assumptions prove incorrect, the Company's results could differ materially from the results expressed or implied by the forward-looking statements. These risks and uncertainties include - but are not limited to - our ability to consummate the sale of assets to GSO Capital Partners; our ability to continue operations during the pendency of the bankruptcy cases and the effect of actions of the Court on the Company's assets and operations; the adverse impact of the bankruptcy cases on the Company's business, financial condition and results of operations, including its ability to maintain contracts and other customer and supplier relationships critical to its business and the actions of the Company's creditors and other third parties with interests in the bankruptcy cases; the Company's ability to maintain adequate liquidity to fund operations during the bankruptcy cases; the Company's ability to obtain court approval with respect to motions in the bankruptcy cases prosecuted from time to time; the Company's ability to develop, prosecute, confirm and consummate a plan of reorganization with respect to the bankruptcy cases; and other risk factors contained in the Company's SEC filings including our Annual Report on Form 20-F and our current reports on Form 6-K filed with the Securities and Exchange Commission and in other filings we may make with the Securities and Exchange Commission from time to time. Velti assumes no obligation and does not intend to update these forward-looking statements, except as required by law.

**About Velti**

Velti is a leading global provider of mobile marketing and advertising technology and solutions that enable brands, advertising agencies, mobile operators and media to implement highly targeted, interactive and measurable campaigns by communicating with and engaging consumers via their mobile devices. The Velti platform, called Velti mGage™, allows customers to use mobile and traditional media to reach targeted consumers, engage the consumer through the mobile Internet and applications, convert them into customers and continue to actively manage the relationship through the mobile channel. Velti is a publicly held corporation based in Jersey, and trades on the NASDAQ Global Select Market under the symbol VELT. For more information, visit - www.velti.com.

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.



Media Contacts:

Tom Becker

Sitrick And Company

212.573.6100

Tom_Becker@sitrick.com


Danielle Newman

Sitrick And Company

212.573.6100

Danielle_Newman@sitrick.com

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.



## Mobclix Ceases All Operations; Files Voluntary Chapter 7 Petition

San Francisco - Nov. 4, 2013 - Velti plc (NASDAQ: VELT) announced today that wholly-owned subsidiary Mobclix has filed a voluntary petition under Chapter 7 of the U.S. Bankruptcy Code to initiate an orderly wind-down of the business.

The Chapter 7 petition was filed today with the U.S. Bankruptcy Court for the District of Delaware.  The wind-down will be administered under the oversight of a Court-appointed trustee. Additional information on the process can be obtained through the Court.

Mobclix is the only Velti business that will cease operations. Velti also announced today the Chapter 11 filing for Velti's other U.S. operations in conjunction with a sale of various Velti entities. All other Velti operations outside of the U.S. are continuing operations as usual.

**Forward-Looking Statements**

"Safe harbor" statement under the Private Securities Litigation Reform Act of 1995: This press release contains forward-looking statements about the voluntary petition filed under Chapter 7 of the U.S. Bankruptcy Code by Mobclix, Inc. in the United States and the ability of other Velti businesses to continue to operate and fulfill all customer obligations as normal.  The achievement or success of the matters covered by such forward-looking statements involves risks, uncertainties and assumptions, which, if proven incorrect, could cause the Company's results to differ materially from the results expressed or implied by the forward-looking statements. These risks and uncertainties include - but are not limited to - the Company's continued operations during the pendency of the Chapter 11 bankruptcy cases filed by affiliates of Mobclix and the effect of actions of the Court on the Company's assets and operations; the adverse impact of the bankruptcy cases on the Company's other businesses, financial condition and results of operations, and the actions of the Company's creditors and other third parties with interests in the bankruptcy cases; and other risk factors contained in the Company's SEC filings including our Annual Report on Form 20-F and our current reports on Form 6-K filed with the Securities and Exchange Commission and in other filings we may make with the Securities and Exchange Commission from time to time. Velti assumes no obligation and does not intend to update these forward-looking statements, except as required by law.

---

Source: Velti plc, 6-K, November 06, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.



Media Contacts:

Anita-Marie Laurie

Sitrick And Company

310.788.2850

AnitaMarie@sitrick.com


Wendy Tanaka

Sitrick And Company

415.369.8447

WTanaka@sitrick.com

Source: Velti plc, 6-K, November 06, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

EXHIBIT C

1    THE WEISER LAW FIRM, P.C.
     KATHLEEN A. HERKENHOFF (168562)
2    12707 High Bluff Drive, Suite 200
     San Diego, CA 92130
3    Telephone: (858) 794-1441
     Facsimile: (858) 794-1450
4    kah@weiserlawfirm.com

5    Lead Counsel for Plaintiffs

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11   IN RE VELTI PLC SECURITIES        )   Master File No. 3:13-cv-03889-WHO
     LITIGATION                        )
12   _____ )   CLASS ACTION
                                       )
13   This Document Relates To:         )   DECLARATION OF PAUL
                                       )   MULHOLLAND RE:
14          ALL ACTIONS.               )   PROPOSED PLAN OF DISTRIBUTION;
                                       )   PROCEDURES FOR THE NOTICE AND
15                                     )   ADMINISTRATION PROCESS; AND
                                       )   ESTIMATED OF FEES AND EXPENSES
16                                     )
17

18

19

20

21

22

23

24

25

26

27

28
     _____
     DECLARATION OF PAUL MULLHOLLAND
     CASE NO. 3:13-CV-03889-WHO

I, Paul Mulholland, declare:

1.    I submit this declaration to provide information regarding proposed plan of distribution; procedures for notice and administration services; and estimate of fees and expenses in this matter. I am over 21 years of age and am not a party to this action. I have personal knowledge of the facts set forth in this declaration.

2.    I am the President of Strategic Claims Services ("SCS"), a nationally recognized claims administration firm. I am a Certified Public Accountant with over twenty years of experience specializing in claims administration for class action settlements and I have administered over three hundred cases and have testified as an expert in class action administrative matters. Attached as Exhibit 1 is a SCS brochure and my curriculum vitae.

3.    The proposed plan of distribution is attached as Exhibit 2.

4.    Subject to Court approval, SCS will provide administrative services as part of the settlement administration process in the above-captioned litigation. Our services will include but are not limited to (1) the printing and labeling of the Notice of Pendency and Proposed Partial Settlement of Class Action ("Notice") and Proof of Claim and Release Form ("Claim Form) and mailing the Notice and Claim Form to the Class members; (2) notifying brokerage firms or other nominee accounts of the appropriate manner to provide individual Notice and Claim Form to Class members who are beneficial holders (3) set-up Class database, phone system and frequently asked questions; (4) process undeliverable notice mailings and re-mail if forwarding addresses are provided; (5) skip trace all other undeliverable Notice and Claim Form mailings and re-mail if updated addresses are provided; (6) set up website to provide the Complaint, settlement documents, Court orders and all other pertinent information for Class members; (7) publication of a Summary Notice in the Investor's Business Daily and Business Wire; (8) review and process all opt-out and objection requests; (9) process claims including handling cures and rejections; (10) update database to include updated addresses and other updated information regarding Class

members; (11) handle and respond to all phone call questions from Class members; (12) respond to all other questions via emails, letters and other correspondence from Class members; (13) set up escrow account and handle all banking matters; (14) cut, mail and process approximately checks for all four check distributions; (15) process all undeliverable check mailings and re-mail checks if forwarding addresses are provided for all four distributions; (16) skip trace all other undeliverable check mailings and re-mail if updated addresses are provided for all four distributions; (17) re-issue checks for lost checks, changes in name, death of Class members, or other valid changes requiring a new check subject to verification by SCS; (18) send out second notices for un-cashed checks for each of the four distributions (19) perform monthly bank reconciliations and handling of all other post distribution matters; (20) provide accounting and periodic status reports; (21) prepare declarations as required by the Court throughout the administrative process; (22) obtain an employer identification number and prepare and file federal and state income tax returns; (23) provide status reports to counsel; and (24) monitor and track all un-cashed checks and propose a method to the Court to either perform a another distribution to Class members or recommend a Cy Pres contribution after all efforts have been made to have Class members cash their checks.

5.      SCS estimates total fees and out of pocket expenses based on the assumptions and administrative services as detailed in paragraph four above to be less than $500,000 or 5% of the $9.5 million settlement amount.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 21st day of May 2014, in Media, Pennsylvania.

*Paul Mulholland*

Paul Mulholland, CPA

# EXHIBIT 1

# Strategic Claims Services

Phone: (866) 274-4004
Facsimile: (610) 565 7985

# COMPANY PROFILE

**OUR MISSION**

Strategic Claims Services strives to offer high quality claims administration and unmatched solutions to its clients while maintaining exceptional client relationships.

- We supply customized reports and detailed reviews of each claim to be sure that each is able to stand on its own.
- We provide unsurpassed customer relations through our fully trained claims administrators who answer each call personally and assist our clients with their knowledge and expertise.
- We believe we are not just providing a service but attempting to develop a tailored solution to fit all of our client's needs.

We are constantly adapting our process to the changing technology and needs of our clients.

**WHO WE ARE**

Strategic Claims Services (SCS) was established in 1999 to provide support in managing, planning, implementing and administering class action litigations. The highly skilled staff consists of Certified Public Accountants, Information Technology professionals, experienced managers, bookkeepers and support staff.

Since its inception, SCS has administered hundreds of cases involving notification, claims processing and distribution. SCS develops a custom solution for each and every client to ensure the highest quality service at a competitive price. SCS is devoted to offering paramount quality control throughout all dimensions of the claims administration process.

As an innovator in claims administration services, SCS is a technology driven organization with a proven track record to handle cases of all sizes in a cost-effective and efficient manner. The firm also provides tailored proposals, data management, and consultation.

# SCOPE OF SERVICES

Our staff is well trained in all aspects of the claims administration process, with focus on quality control and customer service. The scope of our work includes, but is not limited to the following:

- » Assistance in settlement language
- » Plan of Notice
- » Estimation of claims filed
- » Assistance with claim form design
- » Coordination of printing and publication process
- » Distribution of Notice and Claim Form
- » Management of Claims and Data
- » Communication with claimants
- » Quality control check
- » Preparation of final reports
- » Distribution of checks
- » Disposition of outstanding checks
- » Skip trace and reissue returned checks
- » Final disposition of settlement proceeds

During the administration process we are in constant communication with counsel concerning all matters. We provide regular status reports from the initial mailing through the final disposition of funds.

## TAXATION ISSUES
We handle all aspects of income taxation for settlement funds including:

- » Completing of federal and state income tax returns
- » Providing quarterly estimated income tax payments
- » Tax planning strategies while settlement fund is in existence

## PUBLICATION OF SUMMARY NOTICE
Whether it is a press release, newswire or publication in the Wall Street Journal, Investors Business Daily, USA Today or any local newspaper, we can negotiate rates and provide the type set for publication.

## CASH MANAGEMENT
Assist counsel in creating a cash management system for settlement funds.

## CONSULTING SERVICES
We can provide consulting services to assist counsel in any area of claims administration.

# KEY INDIVIDUALS

### Paul Mulholland, CPA – President

As the founder, Mr. Mulholland is the key liaison with counsel on all administrative cases. He holds a BS degree in Accounting from Wheeling Jesuit University and is a Certified Public Accountant and a member of the AICPA.

### Matthew Shillady – Director of Operations & Systems/Technology Manager

Matthew Shillady is a graduate of Penn State University. He holds a BS in Information Sciences and Technology Integration and specializes in data integration and database systems. Mr. Shillady has been with Strategic Claims since June of 2004.

### Josephine Bravata – Project & Quality Assurance Manager

Ms. Bravata is involved with all areas of claims administration. She supervises the claims processing, database management, notification, bank reconciliations, check distributions and preparation of reports. Ms. Bravata joined the Company in 2001 after graduating from Neumann College. She has a BS degree in Accounting and a Minor in Computer and Information Management.

### Margery Craig – Assistant Project Manager

Ms. Craig provides support services at SCS. She assists in all the day to day operations of broker and institutional activity, handling class member communications, and claims processing. Ms. Craig has over 15 years experience in customer service, accounting and project support.

# PAUL MULHOLLAND, CPA
## (CURRICULUM VITAE)

Mr. Mulholland is the President and founder of Strategic Claims Services (SCS) in April of 1999. SCS is a litigation support firm specializing in the administration of class action cases. SCS has administered over 275 class actions since its inception. The Company also specializes in providing publication of summary notice and other notice campaign matters. For more information on SCS visit its website at **www.strategicclaims.net**.

From 1992 to 1999, Mr. Mulholland was Senior Vice President of Valley Forge Administrative Services, Inc. Mr. Mulholland was responsible for overseeing all aspects of the claims processing and administration of class action settlements. He also was responsible for areas of federal and state income taxes for settlement funds and for compliance with all treasury regulations.

From 1986 to 1992, Mr. Mulholland was Chief Financial Officer of Terramics Property Company, a Philadelphia-based regional commercial real estate company with a $150 million real estate portfolio. He was responsible for asset management, financial reporting, budgets, bank and investor liaison, debt restructurings, refinancings, contract negotiations, tax matters, treasury functions and cash management.

From 1984 to 1986, Mr. Mulholland was Chief Financial Officer of American Health Systems, Inc., a $40 million (revenue) nursing home management company, and was responsible for financial reporting, taxation, budgeting, cash management, cost containment, risk management and regulatory reporting.

From 1980 to 1984, Mr. Mulholland was employed at Coopers & Lybrand. He planned and directed audit engagements in a variety of industries, including preparation of financial statements, SEC reporting, and evaluation of internal accounting systems and supervision of staff accountants.

Mr. Mulholland holds a BS in Accounting from Wheeling Jesuit University and is a Certified Public Accountant and a member of the AICPA.

PAUL MULHOLLAND, CPA

EXPERT TESTIMONY AND DEPOSITIONS

**Expert Testimony:**

Celia L. Hale., et al., v. Wal-Mart Stores, Inc
Jackson County, Missouri
Case No. 01-CV-218710 (Division 1)                          June 2008

Jitendra V. Singh v. vCustomer Corporation, et al.
Eastern District of Pennsylvania
Civil Action No. 03-4439                                    June 2004

Barter v. Southmoore Golf Associates                        March 21, 2000 and
(Common Pleas of Northhampton County (No. 199-C-1815)       March 22, 2000

Pearl and Hoffman v. Geriatric & Medical Center, Inc (Eastern
District of Pennsylvania (No.92-CV-5113 and No.93-CV-2129)  March 1995

**Depositions:**

Fosamax Products
Liability Litigation No. 1:06-MD-1789 (JFK)
(MDL No. 1789)
USDC for the Southern District of New York                  June 14, 2007

Aredia and Zometa Products
Liability Litigation No. 3:06-MD-1760
(MDL No. 1760)
USDC for the Middle District of Tennessee
at Nashville                                                May 31, 2007

Jitendra V. Singh v. vCustomer Corporation, et al.
Eastern District of Pennsylvania
Civil Action No. 03-4439                                    June 2004

In Re: Curative Health Services, Inc. Securities Litigation
(Master File No. CV99-2074) United States District Court
Eastern District of New York                                February 2002

Pearl and Hoffman v. Geriatric & Medical Center, Inc (Eastern
District of Pennsylvania (No.92-CV-5113 and No.93-CV-2129)  January 1995

# CURRENT CASES

- » Acura Pharmaceuticals, Inc. Securities Litigation
- » Alternate Energy Securities Litigation
- » Beneficial Settlement
- » Career Education Corp. Securities Litigation
- » Charleswell v. Chase Manhattan Litigation
- » China Century Dragon Media, Inc. Litigation
- » China Education Alliance Securities Litigation
- » China Electric Motor, Inc. Litigation
- » China Expert Technology, Inc. Securities Litigation
- » Colonial BancGroup, Inc. Securities Litigation
- » Deer Consumer Products, Inc. Litigation
- » DG Fastchannel, Inc. Securities Litigation
- » DVI, Inc.
- » DVI, Inc. Second Settlement
- » DVI, Inc. Third Settlement
- » DVI, Inc. Fourth Settlement
- » DVI, Inc. Fifth Settlement
- » DYP Securities Litigation
- » FalconStor Software, Inc. Securities Litigation
- » Genta Incorporated Litigation
- » GSI Group Securities Litigation
- » GT Solar Securities Litigation
- » Gulf Resources, Inc. Litigation
- » Hamm v. Blue Cross and Blue Shield of North Carolina
- » Harbin Electric, Inc. Shareholder Litigation

- » HeartWare Litigation Settlement
- » Hernandez v. Enhanced Recovery Company, LLC
- » HQSM Securities Litigation
- » HSTG/Woodcarvers Securities Litigation
- » IMAX Corporation Securities Litigation
- » In re HCC Insurance Holdings, Inc.
- » Mc Millan Settlement
- » Molson Coors Brewing Company Litigation Settlement
- » Monk v. Johnson & Johnson et al.
- » Motel 6
- » National Lampoon Securities Litigation
- » NexCen Brands Securities Litigation
- » NextWave Securities Litigation
- » Orient Paper, Inc. Litigation
- » Prosper.com Securities Litigation
- » Radient Pharmaceuticals Corporation Securities Litigation
- » RINO Securities Litigation
- » Robertson v. Sea Pines
- » Seymour and Seymour v. Nationwide
- » SkyPeople Fruit Juice, Inc. Litigation
- » Sogg v. Goodman
- » SupportSoft, Inc.
- » Thornburg Mortgage, Inc. Securities Litigation
- » TierOne Corporation Securities Litigation
- » Top Tankers, Inc. Securities Litigation
- » Wal-Mart Pennsylvania Class Action
- » Walker v. Cutolo Law Firm, LLC
- » Zuri and Cenci v. Nationwide

# EXHIBIT 2

## PROPOSED PLAN OF DISTRIBUTION OF THE NET SETTLEMENT FUND

The Plan of Distribution is a matter separate and apart from the proposed Settlement, and any decision by the Court concerning the Plan of Distribution shall not affect the validity or finality of the proposed Settlement. The Court may approve the Plan of Distribution with or without modifications agreed to among the Parties, or another plan of Distribution, without further notice to Settlement Class Members. Any orders regarding a modification of the Plan of Distribution will be posted to the Claims Administrator's website, www.strategicclaims.net.

The Claims Administrator shall determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's Recognized Claim. **Please Note**: The Recognized Claim formula, set forth below, is not intended to be an estimate of the amount of what a Settlement Class Member might have been able to recover after a trial, nor is it an estimate of the amount that will be paid to Authorized Claimants pursuant to the Settlement. The Recognized Claim formula is the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants. To the extent there are sufficient funds in the Net Settlement Fund, each Authorized Claimant will receive an amount equal to the Authorized Claimant's Recognized Claim. If, however, the amount in the Net Settlement Fund is not sufficient to permit payment of the total Recognized Claim of each Authorized Claimant, then each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's Recognized Claim bears to the total Recognized Claims of all Authorized Claimants (*i.e.*, "*pro rata* share"). Payment in this manner shall be deemed conclusive against all Authorized Claimants. No distribution will be made on a claim where the potential distribution amount is less than ten dollars ($10.00) in cash.

If any funds remain in the Net Settlement Fund by reason of uncashed checks, or otherwise, after the Claims Administrator has made reasonable and diligent efforts to have Authorized Claimants who are entitled to participate in the distribution of the Net Settlement Fund cash their distribution checks, then any balance remaining in the Net Settlement Fund six (6) months after the initial distribution of such funds shall be used: (i) first, to pay any amounts mistakenly omitted from the initial distribution to Authorized Claimants or to pay any late, but otherwise valid and fully documented claims received after the cut-off date used to make the initial distribution, provided that such distributions to any late post-distribution claimants meet all of the other criteria for inclusion in the initial distribution, including the $10.00 minimum check amount set forth in the Notice; (ii) second, to pay any additional Notice and Administration Costs incurred in administering the Settlement; and (iii) finally, to make a second distribution to Authorized Claimants who cashed their checks from the initial distribution and who would receive at least $10.00 from such second distribution, after payment of the estimated costs or fees to be incurred in administering the Net Settlement Fund and in making this second distribution, if such second distribution is economically feasible. If six (6) months after such second distribution, if undertaken, or if such second distribution is not undertaken, any funds shall remain in the Net Settlement Fund after the Claims Administrator has made reasonable and diligent efforts to have Authorized Claimants who are entitled to participate in this Settlement cash their checks, any funds remaining in the Net Settlement Fund shall be donated to a non-profit charitable organization(s) selected by Lead Counsel.

## THE BASIS FOR CALCULATING YOUR RECOGNIZED CLAIM:

Each Authorized Claimant shall be allocated a *pro rata* share of the Net Settlement Fund based on his, her or its Recognized Claim as compared to the total Recognized Claims of all Authorized Claimants. Recognized Claims will be calculated for those shares of Velti common stock purchased or otherwise acquired during the period January 27, 2011 and August 20, 2013, inclusive (the "Class Period").

A claimant's Recognized Claim will be calculated as follows:

1.   **For shares of common stock purchased between January 27, 2011 and May 15, 2012, inclusive:**

A.   For shares retained at the end of trading on August 20, 2013, the Recognized Loss shall be the lesser of:

    (1)   $7.84 per share; or
    (2)   the difference between the purchase price per share and $.30.[1]

B.   For shares sold between January 27, 2011 and May 15, 2012, inclusive the Recognized Loss shall be zero.

C.   For shares sold between May 16, 2012 and November 14, 2012 inclusive, the Recognized Loss shall be the lesser of:

    (1)   $4.92 per share; or
    (2)   the difference between the purchase price per share and the sales price per share for each share sold.

D.   For shares sold on November 15, 2012, the Recognized Loss shall be the lesser of:

    (1)   $2.63 per share; or
    (2)   the difference between the purchase price per share and the sales price per share for each share sold.

E.   For shares sold between November 16, 2012 and January 30, 2013 inclusive, the Recognized Loss shall be the lesser of:

    (1)   $2.06 per share; or
    (2)   the difference between the purchase price per share and the sales price per share for each share sold.

F.   For shares sold between January 31, 2013 and August 20, 2013, inclusive, the Recognized Loss shall be the lesser of:

    (1)   $.66 per share; or

---

[1] Pursuant to Section 21(D)(e)(1) of the Private Securities Litigation Reform Act of 1995, "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated."  $.30 was the mean (average) daily closing trading price of Velti common stock during the 90-day period beginning on August 21, 2013 and ending on November 18, 2013.

(2)   the difference between the purchase price per share and the sales price per share for each share sold.

2.   **For shares of common stock purchased between May 16, 2012 and November 14, 2012, inclusive:**

A.   For shares retained at the end of trading on August 20, 2013, the Recognized Loss shall be the lesser of:

(1)   $4.92 per share; or
(2)   the difference between the purchase price per share and $.30.

B.   For shares sold between May 16, 2012 and November 14, 2012, inclusive, the Recognized Loss shall be zero.

C.   For shares sold on November 15, 2012, the Recognized Loss shall be the lesser of:

(1)   $2.63 per share; or
(2)   the difference between the purchase price per share and the sales price per share for each share sold

D.   For shares sold between November 16, 2012 and January 30, 2013 inclusive, the Recognized Loss shall be the lesser of:

(1)   $2.06 per share; or
(2)   the difference between the purchase price per share and the sales price per share for each share sold.

E.   For shares sold between January 31, 2013 and August 20, 2013, inclusive, the Recognized Loss shall be the lesser of:

(1)   $.66 per share; or
(2)   the difference between the purchase price per share and the sales price per share for each share sold.

3.   **For shares of common stock purchased on November 15, 2012:**

A.   For shares retained at the end of trading on August 20, 2013, the Recognized Loss shall be the lesser of:

(1)   $2.63 per share; or
(2)   the difference between the purchase price per share and $.30.

B.   For shares sold on November 15, 2012, the Recognized Loss shall be zero.

C.   For shares sold between November 16, 2012 and January 30, 2013 inclusive, the Recognized Loss shall be the lesser of:

(1)   $2.06 per share; or
(2)   the difference between the purchase price per share and the sales price per share for each share sold.

D.   For shares sold between January 31, 2013 and August 20, 2013, inclusive, the Recognized Loss shall be the lesser of:

(1)   $.66 per share; or

   (2)      the difference between the purchase price per share and the sales price per share for each share sold.

**4.**     **For shares of common stock purchased between November 16, 2012 and January 30, 2013, inclusive:**

A.    For shares retained at the end of trading on August 20, 2013, the Recognized Loss shall be the lesser of:

   (1)      $2.06 per share; or
   (2)      the difference between the purchase price per share and $.30.

B.    For shares sold between November 16, 2012 and January 30, 2013, inclusive, the Recognized Loss shall be zero.

C.    For shares sold between January 31, 2013 and August 20, 2013, inclusive, the Recognized Loss shall be the lesser of:

   (1)      $.66 per share; or
   (2)      the difference between the purchase price per share and the sales price per share for each share sold.

**5.**     **For shares of common stock purchased between January 31, 2013 and August 20, 2013, inclusive:**

A.    For shares retained at the end of trading on August 20, 2013, the Recognized Loss shall be the lesser of:

   (1)      $.66 per share; or
   (2)      the difference between the purchase price per share and $.30.

B.    For shares sold between January 31, 2013 and August 30, 2013, inclusive, the Recognized Loss shall be zero.

In order to be eligible to receive a distribution from the Net Settlement Fund, you must have purchased or otherwise acquired Velti common stock during the Class Period. For purposes of calculating your Recognized Claim, the date of purchase, acquisition or sale is the "contract" or "trade" date and not the "settlement" or "payment" date. The receipt or grant by gift, inheritance or operation of law of Velti common stock purchased during the Class Period shall not be deemed a purchase, acquisition or sale of Velti common stock for the calculation of an Authorized Claimant's Recognized Claim nor shall such receipt or grant be deemed an assignment of any claim relating to the purchase or acquisition of such Velti common stock unless (i) the donor or decedent purchased or otherwise acquired Velti common stock during the Class Period; (ii) no Proof of Claim was submitted by or on behalf of the donor or decedent, or by anyone else with respect to such Velti common stock; and (iii) it is specifically so provided in the instrument of gift or assignment.

For purposes of calculating your Recognized Claim, all purchases, acquisitions and sales shall be matched on a First In First Out ("FIFO") basis. In the event that a claimant has more than one purchase or acquisition of Velti common stock during the Class Period, all purchases, acquisitions and sales will be

matched, in chronological order. Therefore, on the Proof of Claim enclosed with this Notice, you must provide all of your purchases and acquisitions of Velti common during the Class Period. Brokerage commissions and transfer taxes paid by you in connection with your purchases, acquisitions and sales of Velti common stock purchased should be excluded from the "total purchase price" and net of the "total proceeds."

Payment pursuant to the Plan of Distribution approved by the Court shall be conclusive against all Authorized Claimants. No person shall have any claim against Defendants, Defendants' Counsel, Lead Plaintiffs, Plaintiffs' Counsel or the Claims Administrator or other agent designated by Plaintiffs' Counsel based on the distributions made substantially in accordance with the Stipulation and the Settlement contained therein, the Plan of Distribution, or further orders of the Court. Each claimant shall be deemed to have submitted to the jurisdiction of the Court with respect to the claimant's Proof of Claim. All persons involved in the review, verification, calculation, tabulation, or any other aspect of the processing of the claims submitted in connection with the Settlement, or otherwise involved in the administration or taxation of the Settlement Fund or the Net Settlement Fund shall be released and discharged from any and all claims arising out of such involvement, and all Settlement Class Members, whether or not they are to receive payment from the Net Settlement Fund, will be barred from making any further claim against the Net Settlement Fund beyond the amount allocated to them as provided in any distribution orders entered by the Court.

EXHIBIT D

# EXHIBIT D

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

_____

# FORM 20-F

_____

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2012

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

OR

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of event requiring this shell company report _____

## Velti plc

(Exact name of Registrant as specified in its charter)

**Not Applicable**

(Translation of Registrant's name into English)

**Jersey**

(Jurisdiction of incorporation or organization)

**First Floor, 28-32 Pembroke Street Upper**
**Dublin 2, Republic of Ireland**
**Attn: Sally J. Rau, Chief Administrative Officer and General Counsel**
**353 (0) 1234 2676**

(Address of principal executive offices)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Class | Name of exchange on which registered |
|---|---|
| Ordinary Shares, £0.05 nominal value | NASDAQ |

Securities registered pursuant to Section 12(g) of the Act:
None
(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act: None

Indicate the number of outstanding shares of each of the Company's classes of capital or ordinary stock as of the close of the period covered by the annual report: 65,622,141 ordinary shares

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes  ☐  No  ☑

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.   Yes ☐  No  ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past ninety days.  Yes ☑   No   ☐

 Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).     Yes ☑ No  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer.  See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filer  ☐    Accelerated filer  ☑    Non-accelerated filer  ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP  ☑  International Financial Reporting Standards as issued by the International Accounting Standards Board  ☐

Other  ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

Indicate by check mark which financial statement item the registrant has elected to follow:    Item 17  ☐    Item 18 ☐
If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes  ☐  No ☑

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. Yes  ☑  No  ☐

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Velti plc**
**FORM 20-F Annual Report**
**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **Part I** | | |
| Item 1. | Identity of Directors, Senior Management and Advisors | 2 |
| Item 2. | Offer Statistics and Expected Timetable | 2 |
| Item 3. | Key Information | 2 |
| Item 4. | Information on the Company | 22 |
| Item 4A. | Unresolved Staff Comments | 33 |
| Item 5. | Operating and Financial Review and Prospects | 34 |
| Item 6. | Directors, Senior Management and Employees | 52 |
| Item 7. | Major Shareholders and Related Party Transactions | 70 |
| Item 8. | Financial Information | 72 |
| Item 9. | The Offer and Listing | 73 |
| Item 10. | Additional Information | 74 |
| Item 11. | Quantitative and Qualitative Disclosures About Market Risk | 82 |
| Item 12. | Description of Securities Other Than Equity Securities | 83 |
| **Part II** | | |
| Item 13. | Defaults, Dividend Arrearages and Delinquencies | 84 |
| Item 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | 84 |
| Item 15. | Controls and Procedures | 84 |
| Item 16. | Reserved | 85 |
| Item 16A. | Audit Committee Financial Expert | 85 |
| Item 16B. | Code of Ethics | 85 |
| Item 16C. | Principal Accountant Fees and Services | 86 |
| Item 16D. | Exemptions from the Listing Standards for Audit Committee | 86 |
| Item 16E. | Purchases of Equity Securities by Velti | 86 |
| Item 16F. | Changes in Velti's Certifying Accountant | 86 |
| Item 16G. | Corporate Governance | 86 |
| Item 16H | Mine Safety Disclosure | 86 |
| **Part III** | | |
| Item 17. | Financial Statements | 86 |
| Item 18. | Financial Statements | 86 |
| Item 19. | Exhibits | 88 |

1

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## PART I

**ITEM 1. IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISORS**

 Not applicable.

**ITEM 2. OFFER STATISTICS AND EXPECTED TIMETABLE**.

 Not applicable.

**ITEM 3. KEY INFORMATION**

**3.A.  Selected Financial Data**

We have derived the consolidated statement of operations data for the years ended  December 31, 2012,  2011 and 2010 and the consolidated balance sheet data as of December 31, 2012 and 2011 from our audited consolidated financial statements, which are included elsewhere in this Annual Report on Form 20-F(Annual Report). We have derived the consolidated statements of operations data for the years ended December 31,  2009 and 2008 and the consolidated balance sheet data as of December 31,  2009 and 2008 from our audited consolidated financial statements, which are not included in this Annual Report.

Our historical results are not necessarily indicative of the results to be expected in any future period and should be read in conjunction with "Operating and Financial Review and Prospects," and our consolidated financial statements and related notes included elsewhere in this Annual Report.

2

---

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| **Consolidated Statements of Comprehensive Loss Data:** | **2012** | **2011** | **2010** | **2009** | **2008** |
| | (in thousands, except per share amounts ) | | | | |
| Revenue | $ 270,344 | $ 189,202 | $ 116,269 | $ 89,965 | $ 62,032 |
| Costs and expenses: | | | | | |
|    Third-party costs | 91,404 | 53,901 | 36,658 | 27,620 | 32,860 |
|    Datacenter and direct project costs | 29,966 | 17,952 | 6,312 | 4,908 | 8,660 |
|    General and administrative expenses | 68,196 | 45,258 | 22,484 | 17,387 | 6,660 |
|    Sales and marketing expenses | 54,507 | 37,733 | 23,049 | 15,919 | 8,245 |
|    Research and development expenses | 21,236 | 13,060 | 7,840 | 3,484 | 1,884 |
|    Acquisition related and other charges | 9,950 | 8,890 | 5,364 | — | — |
|    Impairment of intangible assets | 16,902 | 1,500 | — | — | — |
|    Loss from disposal of assets | 10,532 | — | — | — | — |
|    Depreciation and amortization | 33,946 | 20,900 | 12,131 | 9,394 | 4,231 |
|     Total costs and expenses | 336,639 | 199,194 | 113,838 | 78,712 | 62,540 |
| Income (loss) from operations | (66,295) | (9,992) | 2,431 | 11,253 | (508) |
|    Interest expense, net | (1,830) | (7,389) | (8,069) | (2,370) | (1,155) |
|    Income (loss) from foreign currency transactions | 1,995 | 6,200 | (1,726) | 14 | (1,665) |
|    Other income (expenses) | 5,876 | (49) | — | — | (495) |
| Income (loss) before income taxes, equity method investments and non-controlling interest | (60,254) | (11,230) | (7,364) | 8,897 | (3,823) |
|    Income tax (expense) benefit | 2,835 | (3,808) | (3,771) | (410) | 26 |
|    Loss from equity method investments | (3,755) | (200) | (4,615) | (2,223) | (2,456) |
| Net income (loss) | (61,174) | (15,238) | (15,750) | 6,264 | (6,253) |
|    Income (loss) attributable to non-controlling interest | 53 | 130 | (81) | (191) | (123) |
| Net income (loss) attributable to Velti | $ (61,227) | $ (15,368) | $ (15,669) | $ 6,455 | $ (6,130) |
| | | | | | |
| Net income (loss) per share attributable to Velti[1]: | | | | | |
|    Basic | $ (0.96) | $ (0.28) | $ (0.41) | $ 0.18 | $ (0.18) |
|    Diluted | $ (0.96) | $ (0.28) | $ (0.41) | $ 0.17 | $ (0.18) |
| Weighted average number of shares outstanding for use in computing [1]: | | | | | |
|    Basic net income per share | 63,910 | 55,865 | 37,933 | 35,367 | 33,478 |
|    Diluted net income per share | 63,910 | 55,865 | 37,933 | 37,627 | 33,478 |

[1]  See Note 2 in the Notes to the Consolidated Financial Statements attached to this annual report for an explanation of the method used to calculate basic and diluted net income(loss) per share.

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | 2012 | 2011 | 2010 | 2009 | 2008 |
| **Consolidated Balance Sheet Data:** | | | (in thousands) | | |
| Cash and cash equivalents | $ 36,571 | $ 75,765 | $ 17,354 | $ 19,655 | $ 14,321 |
| Working capital | 152,746 | 186,659 | (3,816) | 22,847 | 6,875 |
| Total assets | 537,023 | 481,531 | 209,168 | 122,058 | 72,474 |
| Total debt | 28,193 | 9,740 | 70,115 | 38,861 | 17,420 |
| Total equity | 292,518 | 297,491 | 36,269 | 46,936 | 30,179 |

We present certain non-GAAP financial measures as a supplemental measure of our performance. These non-GAAP financial measures are not a measure of financial performance or liquidity calculated in accordance with accounting principles generally accepted in the U.S., referred to herein as GAAP, and should be viewed as a supplement to, not a substitute for, our results of operations presented on the basis of GAAP. Reconciliation of these non-GAAP financial measures to the most directly comparable GAAP financial measures is detailed in the table below.

| | Year ended December 31, | | |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| **Non-GAAP Measures:** | (in thousands except per share amounts) | | |
| Adjusted net income | $ 17,345 | $ 29,005 | $ 3,023 |
| Adjusted EBITDA | $ 42,625 | $ 53,077 | $ 27,198 |
| | | | |
| Adjusted net income per share - basic | $ 0.27 | $ 0.52 | $ 0.08 |
| Adjusted net income per share - diluted | $ 0.26 | $ 0.50 | $ 0.07 |

Our non-GAAP measures should be read in conjunction with the corresponding GAAP measures. These non-GAAP financial measures have limitations as an analytical tool and you should not consider them in isolation from, or as a substitute for, analysis of our results as reported in accordance with GAAP.

We define adjusted net income (loss) by excluding from net income(loss), foreign exchange gains or losses, share-based compensation expense, non-recurring and acquisition related expenses, deferrals of net profits of our equity method investments related to transactions with us, and acquisition-related depreciation and amortization.

We define adjusted EBITDA by excluding from adjusted net income (loss), gains or losses from our equity method investments, the remaining depreciation and amortization, the provision for income taxes, net interest expense, and other income.

Adjusted net income (loss) and adjusted EBITDA are not necessarily comparable to similarly-titled measures reported by other companies.

Adjusted income (loss) per share is adjusted net income (loss) divided by diluted shares outstanding.

We believe these non-GAAP financial measures are useful to management, investors and other users of our financial statements in evaluating our operating performance because these financial measures are additional tools to compare business performance across companies and across periods. We believe that:

- these non-GAAP financial measures are often used by investors to measure a company's operating performance without regard to items such as interest expense, taxes, depreciation and amortization and foreign exchange gains and losses, which can vary substantially from company to company depending upon accounting methods and book value of assets, capital structure and the method by which assets were acquired; and

- investors commonly use these non-GAAP financial measures to eliminate the effect of restructuring and share-based compensation expenses, one-time non-recurring expenses, and acquisition-related expenses, which vary widely from company to company and impair comparability.

We use these non-GAAP financial measures:

4

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- as a measure of operating performance to assist in comparing performance from period to period on a consistent basis;

- as a measure for planning and forecasting overall expectations and for evaluating actual results against such expectations;

- as a primary measure to review and assess the operating performance of our company and management team in connection with our executive compensation plan incentive payments; and

- in communications with our board of directors, shareholders and analysts concerning our financial performance.

The following is an unaudited reconciliation of adjusted EBITDA to net income (loss) before non-controlling interest, the most directly comparable GAAP measure, for the periods presented:

|  | Year Ended December 31, | | |
|---|---|---|---|
| **Reconciliation to adjusted EBITDA:** | **2012** | **2011** | **2010** |
|  | (in thousands except per share amounts) | | |
| Net income (loss) before non-controlling interest | $ (61,174) | $ (15,238) | $ (15,750) |
| Adjustments: | | | |
| Foreign exchange (gains) losses | (1,995) | (6,200) | 1,726 |
| Non-cash share based compensation [1] | 31,196 | 27,627 | 6,272 |
| Non-recurring and acquisition-related expenses [2] | 10,316 | 14,821 | 6,364 |
| Impairment of intangible assets | 16,902 | 1,500 | — |
| Loss from equity method investments [3] | 596 | 1,888 | 2,776 |
| Loss from disposal of assets | 10,532 | — | — |
| Depreciation and amortization - acquisition related | 10,972 | 4,607 | 1,635 |
| Adjusted net income | $ 17,345 | $ 29,005 | $ 3,023 |
| Loss (gain) from equity method investments - other | 3,159 | (1,688) | 1,839 |
| Depreciation and amortization - other | 22,974 | 16,293 | 10,496 |
| Income tax expense (benefit) | (2,835) | 3,808 | 3,771 |
| Interest expense, net | 1,830 | 5,610 | 8,069 |
| Other expense | 152 | 49 | — |
| Adjusted EBITDA | $ 42,625 | $ 53,077 | $ 27,198 |
| | | | |
| Adjusted net income per share - basic | $ 0.27 | $ 0.52 | $ 0.08 |
| Adjusted net income per share - diluted | $ 0.26 | $ 0.50 | $ 0.07 |
| Basic shares | 63,910 | 55,865 | 37,933 |
| Diluted shares | 65,475 | 58,071 | 40,382 |

[1]   The quarter and year ended December 31, 2012 include accrual of annual bonuses that are expected to be paid in shares. The year ended December 31, 2011 includes additional compensation expense of approximately $10.5 million relating to deemed modifications of performance-based deferred share awards.

[2]   Non-recurring and acquisition-related expenses in 2012 resulted primarily from re-measurement of contingent consideration for our Mobile Interactive Group acquisition, as a result of our agreement to set the amount of the consideration and remove the contingency, and for acquisition related expenses for completed acquisitions. These expenses were partially offset by a first quarter gain on re-measurement to fair value, of our pre-acquisition ownership interest in CASEE. Non-recurring and acquisition-related expenses in 2011 included acquisition related expenses related to our acquisition of Mobclix, interest expense to recognize the remaining discount upon repayment of certain loan facilities, interest expense related to a lender fee in connection with our U.S. public offering, and other non-recurring items offset by the reversal of a one-time tax liability related to pre-public offering performance share awards that were released to employees in 2010.

[3]   Loss from equity method investments represents deferral of our equity method investments' net profits related to transactions with Velti.

Share based expenses included in the consolidated statements of comprehensive loss for the quarters and years ended December 31, 2012 and 2011 were as follows:

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| | (in thousands) | | |
| Datacenter and direct project costs | $ 3,721 | $ 3,549 | $ 443 |
| General and administrative expenses | 11,923 | 11,735 | 2,613 |
| Sales and marketing expenses | 9,245 | 8,288 | 2,231 |
| Research and development expenses | 6,307 | 4,055 | 985 |
| | $ 31,196 | $ 27,627 | $ 6,272 |

### 3.B.  Capitalization and Indebtedness

 Not applicable.

### 3.C.  Reasons For The Offer And Use Of Proceeds

 Not applicable.

### 3.D.  Risk Factors

*The following section provides an overview of the risks to which our business is exposed. Shareholders should carefully consider the risk factors described below and all other information contained in this Annual Report, including the financial statements and related notes. The occurrence of the risks described below could have a material adverse impact on our business, financial condition or results of operations. Various statements in this Annual Report, including the following risk factors, contain forward-looking statements. Please also refer to "Part I-Item 5. Operating and Financial Review and Prospects-G. Safe harbor", elsewhere in this Annual Report.*

**Risks Related to Our Business**

**We will likely need to raise additional capital to meet our ongoing capital commitments and to fund our operations, and we may not be able to raise capital on terms acceptable to us or at all.**

As of December 31, 2012, we had cash and cash equivalents of $36.6 million and working capital of approximately $152.7 million. In connection with the acquisition of MIG in November 2011, we will be required to make cash payments of approximately $16.5 million to the former shareholders and key employees of MIG in April 2013. Although we obtained a $50.0 million credit facility with HSBC in August 2012, as of March 31, 2013, we have substantially utilized this revolving credit facility. Accordingly, we anticipate that we will need additional financing in the next three months to meet our ongoing capital commitments and to fund our operations.  In order to meet our ongoing capital commitments, we will need to seek additional capital, potentially through debt, or other equity financings. There can be no assurance that our efforts to find such financings will be successful or on terms favorable to us. Financings, if available, may be on terms that are dilutive to our shareholders, and the prices at which new investors would be willing to purchase our securities may be lower than the current price of our ordinary shares. The holders of new securities may also receive rights, preferences or privileges that are senior to those of existing holders of our ordinary shares. If new sources of financing are insufficient or unavailable, we may have to reduce substantially or eliminate expenditures or significantly modify our operating plans. See "Part I.  Item 5.B. - Liquidity and Capital Resources."

**The report of our independent public accounting firm includes a reference raising a substantial doubt about our ability to continue as a going concern.**

As a result of our existing cash balance as well as our acquisition payment obligations to MIG discussed above, substantial doubt about our ability to continue as a going concern is created.

Any substantial doubt about our ability to continue as a going concern could also affect our relationship with our partners and customers and their willingness to continue to conduct business with us on terms consistent with historical practice. Our partners might respond to an apparent weakening of our liquidity position and to address their own liquidity needs by

6

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

requesting faster payment of invoices, new or increased deposits or other assurances. If this were to happen, our need for cash would be intensified and we might be unable to make payments to our partners as they become due.

**We have identified a material weakness in our internal control over financial reporting which could, if not remediated, result in material misstatements in our financial statements.**

In connection with the audit of our financial statements as of and for the year ended December 31, 2012, we concluded there is a material weakness in internal control over financial reporting related to deficiencies in the financial statement close process. Under standards established by the Public Company Accounting Oversight Board, a material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected and corrected on a timely basis. See "Part I. Item 15 - Controls and Procedures."

We are working to remediate the material weakness. We have begun taking steps and plan to take additional measures to remediate the underlying causes of the material weakness, primarily through the continued development and implementation of formal policies, improved processes and documented procedures, as well as the continued hiring of additional finance personnel, such as our recent hiring of Jeffrey G. Ross as our new chief financial officer. The actions that we are taking are subject to ongoing senior management review, as well as audit committee oversight. Although we plan to complete this remediation process as quickly as possible, we cannot at this time estimate how long it will take, and our initiatives may not prove to be successful in remediating this material weakness. If our remedial measures are insufficient to address the material weakness, or if additional material weaknesses or significant deficiencies in our internal control over financial reporting are discovered or occur in the future, our consolidated financial statements may contain material misstatements and we could be required to restate our financial results.

**We have in the past and may in the future fail to comply with our financial covenants under our credit facility with HSBC, enabling our lender to exercise one or more of its available remedies, including the right to require the immediate repayment of all outstanding indebtedness under such facility.**

In August 2012, we entered into a $50.0 million credit facility with HSBC Bank USA, N.A., or HSBC. As of December 31, 2012, we had approximately $28.2 million of indebtedness with HSBC and subsequent to year-end we have substantially utilized the revolving credit facility. This indebtedness is secured by substantially all of our accounts and assets and is guaranteed by certain of our subsidiaries. Our loan agreement also includes financial covenants which require us to maintain compliance with certain financial ratios during the term of the loan agreement.  Failure to comply with the financial covenants is an event of default under the loan agreement. In an event of default, HSBC has the right to declare immediately due and payable all outstanding principal indebtedness and any accrued interest thereon, and to exercise any and all rights it may have as a secured creditor.

In December 2012, we entered into an amendment to the loan agreement relating to a violation of financial covenants for the period ended September 30, 2012. Under the amendment, HSBC agreed to waive non-compliance by us with certain financial covenants under our original loan agreement for the period ended September 30, 2012.

Although we continue to be current with all principal and interest payments under the loan agreement, as of December 31, 2012 we were in violation of certain financial covenants contained in the amended loan agreement that require us to maintain certain ratios of actual earnings before interest, taxes, depreciation and amortization (EBITDA) to projected EBITDA. HSBC has agreed to waive non-compliance by us with this financial covenant.  However, if we fail to comply with our financial covenants in future periods, there is no assurance that HSBC will give us a waiver or forbearance agreement in the future. Any future violations under this credit facility may result in an acceleration of our obligations under the amended loan agreement and HSBC may exercise other remedies for default.

**Our days sales outstanding, or DSOs, may fluctuate significantly from quarter to quarter. Deterioration in DSOs results in a delay in the cash flows we generate from our customers, which could have a material adverse impact on our financial condition and the results of our operations.**

The mobile advertising and marketing industry has historically been subject to seasonal fluctuations in demand, with a significant amount of the activity occurring in the second half of the year. In addition, a significant amount of our business is conducted in emerging markets. Typically payment terms in these regions are longer than payment terms in our other markets. These emerging markets have under -developed legal systems for securing debt and enforcing collection of debt. While we qualify customers that we do business with, their financial positions may change adversely over the longer time period given for payment.

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The effect of the seasonality in our business and the longer payment terms, combined with differences in the timing of invoicing and revenue recognition, has in the past and may in the future result in an increase in our DSOs. Any increase in our DSOs, or any delay in the conversion of our accrued contract receivables to trade receivables, could have a material adverse impact on our cash flows and working capital, as well as on our financial condition and the results of our operations, and could prevent us from achieving positive free cash flow.

**We depend on the services of key personnel to implement our strategy. If we change, or lose the services of, our key personnel or are unable to attract and retain other qualified personnel, we may be unable to implement our strategy.**

We believe that the future success of our business depends on the services and performance of a number of key management and operating personnel.  We recently transitioned both our chief financial officer and chief operating officer positions and there is no assurance that such changes will be successful.  In addition, we have reduced our overall headcount, which may prompt other key employees to reevaluate their continued employment with us.  We also may need to make additional management changes in the future that could also result in potential further disruption to our business or adverse public perception.  We have at-will employment relationships with all of our management and other employees, and we do not maintain any key-person life insurance policies. Some of these key employees have strong relationships with our customers and our business may be harmed if these employees leave us. The loss of members of our key management and certain other members of our operating personnel, particularly if we are unable to retain them or alternately need to transition certain of these personnel, could materially adversely affect our business, operating results and financial condition.

In addition, our ability to manage our growth depends, in part, on our ability to identify, hire and retain additional qualified employees, including a technically skilled development and engineering staff. We face intense competition for qualified individuals from numerous technology, marketing and mobile software and service companies. Competition for qualified personnel is particularly intense in many of the large, international metropolitan markets in which we have offices, including for example, London, New York and San Francisco. We require a mix of highly talented engineers as well as individuals in sales and support who are familiar with the marketing and advertising industry. In addition, new hires in sales positions require significant training and may, in some cases, take more than a year before they achieve full productivity. If we are unsuccessful in attracting and retaining these key personnel, our ability to operate our business effectively would be negatively impacted and our business, operating results and financial condition would be adversely affected.

**Charges to earnings resulting from acquisitions may adversely affect our operating results.**

For any business combination that we consummate, we will recognize the identifiable assets acquired, the liabilities assumed and any non-controlling interest in acquired companies generally at their acquisition date fair values and, in each case, separately from goodwill. Goodwill as of the acquisition date is measured as the excess amount of consideration transferred, which is also generally measured at fair value, and the net of the acquisition date amounts of the identifiable assets acquired and the liabilities assumed. Our estimates of fair value are based upon assumptions believed to be reasonable but which are inherently uncertain. Goodwill is tested for impairment on an annual basis and whenever there is an indication that goodwill may be impaired, relying on a number of factors including operating results, business plans and future cash flows. Impairment occurs when the carrying amount of a cash generating unit including the goodwill, exceeds the estimated recoverable amount of the cash generating unit or in certain cases when the book value of a company's equity exceeds the market value for such entity. The recoverable amount of a cash generating unit is the higher of its fair value less cost to sell and its value-in-use. Value-in-use is the present value of future cash flows expected to be derived from the cash generating unit, based upon a discount rate estimated by management. After we complete an acquisition, the following factors could result in material charges and adversely affect our business, operating results and financial condition and may adversely affect our cash flows:

- costs incurred to combine the operations of companies we acquire, such as employee retention; redeployment or relocation expenses;

- impairment of goodwill or intangible assets;

- amortization of intangible assets acquired;

- a reduction in the useful lives of intangible assets acquired;

- identification of assumed contingent liabilities after the measurement period (generally up to one year from the acquisition date) has ended;

- charges to our operating results to eliminate certain duplicative pre-merger activities, to restructure our operations or to reduce our cost structure;

- charges to our operating results due to changes in deferred tax asset valuation allowances and liabilities related to uncertain tax positions after the measurement period has ended;

8

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

- charges to our operating results resulting from expenses incurred to effect the acquisition; and
- charges to our operating results due to the expensing of certain equity awards assumed in an acquisition.

Substantially all of these costs will be accounted for as expenses that will decrease our net income and earnings per share for the periods in which those costs are incurred. Charges to our operating results in any given period could differ substantially from other periods based on the timing and size of our future acquisitions and the extent of integration activities.

**We may fail to realize some or all of the anticipated benefits of our acquisitions which may adversely affect our financial performance and the value of our ordinary shares.**

We have made several acquisitions, including the acquisition of CASEE in January 2012, Mobile Interactive Group Ltd., or MIG, in November 2011, and Air2Web, Inc., or Air2Web, in October 2011, and continue to integrate our acquired companies into our existing operations. These integrations have required and will continue to require significant efforts, including the coordination of future product development and sales and marketing efforts, as well as resources and management's time and efforts. The success of each of these acquisitions will depend, in part, on our ability to realize the anticipated benefits from combining their products and services into ours, and expanding our customer base by increasing the products and services we can provide to our existing and new customers as well as to the customers of the acquired companies. We also must retain key employees from the acquired businesses, as well as retain and motivate our existing executives and other key employees. If we are not able to successfully combine the acquired businesses with our existing operations and integrate our respective operations, technologies and personnel within the anticipated time frame, or at all, the anticipated benefits of the acquisitions may not be realized fully or at all or may take longer to realize than expected and the value of our ordinary shares may be adversely affected. It is possible that the integration process could result in the loss of key employees and other senior management, result in the disruption of our business or adversely affect our ability to maintain relationships with customers, suppliers, distributors and other third parties, or to otherwise achieve the anticipated benefits of each acquisition.

**Our business involves the use, transmission and storage of confidential information, and the failure to properly safeguard such information could result in significant reputational harm and monetary damages.**

Our business activities involve the use, transmission, transfer, sharing and storage of information as to which we may have various obligations, including information that may be considered confidential, personal or sensitive, and that may be subject to laws that apply to privacy, data protection and security breaches. Our efforts may not prove to be sufficient to protect the security, integrity and confidentiality of the information we collect and store, and there is no guarantee that inadvertent or unauthorized disclosure will not occur or that third parties will not gain unauthorized access to this information despite our efforts. If such unauthorized disclosure or access does occur, we may be required, under existing and proposed laws or contractual obligations, to notify parties whose information was disclosed or accessed and/or relevant government agencies. We may also be subject to claims of breach of contract or violation of privacy or data protection laws for such disclosure, investigation, penalties or fines by regulatory authorities; and potential claims by parties whose information was disclosed or accessed. The unauthorized disclosure of or access to information may result in the termination of one or more of our commercial relationships and/or a reduction in customer confidence and usage of our services. We may also be subject to litigation alleging the improper collection use, access, transfer, sharing, transmission or storage of confidential information, which could damage our reputation among our current and potential clients, require significant expenditures of capital and other resources and cause us to lose business and revenue.

**Our business depends on our ability to collect, share, transfer, store, transmit and use data, and any limitation on our ability to collect, share, transfer, store, transmit and use this data could significantly diminish the value of our services and cause us to lose customers and revenue.**

In our provision of mobile marketing and advertising services, we often collect or receive from publishers, advertisers and others, information about the mobile device user, including without limitation, interaction of the mobile device user with the content delivered, such as whether the user visited a landing page or watched a video. We may also be able to collect, or may be delivered, information about the user's mobile location and other information. As we collect and aggregate this data, including data provided by billions of ad impressions, we analyze it in order to optimize the services that we provide to customers.

The tracking of persistent and other identifiers, such as device identifiers, is important to our ability to optimize content and ad delivery and to track downloads and conversions and this ability is highly valued by our customers. The degree to which we will be able to continue doing so in compliance with third party carrier and platform rules and applicable laws and regulations may change.

9

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Furthermore, even absent legal requirements, our customers and others in the mobile ecosystem might decide not to allow us to collect some or all of the data with respect to which we currently have access or might limit our use of this data. Any limitation on our ability to collect, share, transfer, store, transmit and use data about user behavior and interaction with mobile device content could make it more difficult for us to deliver effective mobile advertising and marketing programs that meet the demands of our customers and this could hurt our business. In addition, consumer advocacy groups and class action plaintiffs' lawyers are pursuing an array of theories challenging online and mobile behavioral advertising, as well as tracking of user behavior even without targeting of ads based thereon. If we become subject to such litigation the cost of defending such actions, and the potential of costly settlements or adverse judgments, could have a material negative impact on our business.

Interruptions, failures or defects in our data collection, mining, analysis and storage systems, as well as privacy, data protection and security concerns and regulatory restrictions regarding the collection, sharing, transfer, storage and use of consumer data, could also limit our ability to aggregate and analyze mobile device user data from our customers' marketing and advertising campaigns. If that happens, we may not be able to optimize our services for the benefit of our customers, which could make our services less valuable, and, as a result, we may lose customers and our revenue may decline.

**Our business practices with respect to data could give rise to liabilities or reputational harm as a result of governmental regulation, legal requirements or industry standards relating to consumer privacy and data protection.**

In the course of providing our services, we collect, share, transfer, use, transmit and store information related to mobile devices and their users, including sometimes a device's geographic location, for the purpose of delivering targeted ads to the user of the device. Federal, state and foreign laws and regulations govern the collection, use, retention, sharing and security of data, including personal data that we collect across our mobile marketing and advertising platform. Any failure, or perceived failure, by us to comply with applicable U.S. federal, state, European Union or other international privacy, data protection or consumer protection-related laws, regulations or industry self-regulatory principles could result in proceedings or actions against us by governmental entities or others, which could potentially have an adverse effect on our business, operating results and financial condition. Additionally, we may also be contractually liable to indemnify and hold harmless our customers or others from the costs or consequences of inadvertent or unauthorized collection, use or disclosure of their customers' personal data which we store or handle as part of providing our services or otherwise relating to our data practices. We strive to comply with all applicable laws, regulations, policies and legal obligations relating to privacy and data protection. However, it is possible that these requirements may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another and/or may conflict with other rules or our practices. Furthermore, consumer data tracking and targeting is a developing business and the laws relating to it are also developing. It is unclear how existing laws that were passed before these practices and related technologies will be applied to us or what new laws and regulations may be passed. Any failure, or perceived failure, by us to comply with applicable U.S. federal, state, or laws in any other countries including laws and regulations regulating privacy, data protection or consumer privacy, could result in proceedings or actions against us by governmental entities or others.

The regulatory framework for privacy issues worldwide is evolving, and various government and consumer agencies and public advocacy groups have called for new regulation and changes in industry practices, including some directed at the mobile industry in particular. It is possible that new laws and regulations will be adopted in the United States and in other countries, or existing laws and regulations may be interpreted in new ways, that would affect our business, particularly with regard to location-based services and collection, sharing or use of data to track users and/or target ads and communication with consumers via mobile devices.

The U.S. government, including the Federal Trade Commission and the Department of Commerce, has announced that it is reviewing the need for greater regulation of the collection of consumer information, including regulation aimed at restricting some targeted advertising practices. The Federal Trade Commission has also proposed revisions to the Children's Online Privacy Protection Act, or COPPA, that could, if adopted, create greater compliance burdens on us and/or third parties we work with (e.g. publishers).  In addition states may pass new laws or interpret existing laws that could create burdens on mobile advertising providers.

As we expand our operations globally, compliance with regulations that differ from country to country may also impose substantial burdens on our business. In particular, the European Union has traditionally taken a broader view as to what is considered personal information (e.g. device identifiers) and has imposed greater obligations under data protection laws and regulations. In addition, individual EU member countries and/or their regulatory bodies, including data protection authorities, have had discretion with respect to their interpretation and implementation of the regulations, which has resulted in variation of privacy standards from country to country. New EU proposals may result in a greater compliance burden if we deliver ads to mobile device users in Europe. Complying with any new regulatory requirements could force us to incur substantial costs or require us to change our business practices in a manner that could compromise our ability to effectively pursue our growth strategy.

10

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In addition to compliance with government regulations, we voluntarily participate in several trade associations and industry self-regulatory groups that promulgate best practices or codes of conduct addressing the provision of location-based services, delivery of promotional content to mobile devices, and tracking of device users or devices for the purpose of delivering targeted advertising. We comply with wireless carrier technological and other requirements for access to their customer's mobile devices. We could be adversely affected by changes to these guidelines and codes in ways that are inconsistent with our practices or in conflict with the laws and regulations of U.S. or international regulatory authorities.

As privacy and data protection have become more sensitive issues, we may also become exposed to potential liabilities as a result of differing views on the privacy of personal information. These and other privacy concerns, including security breaches, could adversely impact our business, operating results and financial condition.

**The global nature of our business subjects us to additional costs and risks that can adversely affect our operating results.**

We have offices in multiple countries around the world and we derive a substantial majority of our revenue from, and have a significant portion of our operations outside of the U.S. Compliance with U.S. and foreign country laws and regulations that apply to our international operations increases our cost of doing business. These laws and regulations include U.S. laws such as the Foreign Corrupt Practices Act, and local laws and guidance which also prohibit certain payments to governmental officials and other parties, data protection and security requirements, consumer privacy and protection laws, labor relations laws, tax laws, anti-competition regulations, import and trade restrictions and export requirements. Violations of these laws and regulations could result in fines, criminal sanctions against us, our officers or our employees, and prohibitions on the conduct of our business. Any such violations could result in prohibitions on our ability to offer our products and services in one or more countries, could delay or prevent potential acquisitions and could also materially damage our reputation, our brand, our international expansion efforts, our ability to attract and retain employees, our business and our operating results. Our success depends, in part, on our ability to anticipate these risks and manage these compliance obligations and potential difficulties. We monitor our international operations and investigate allegations of improprieties relating to transactions and the way in which such transactions are recorded. Where circumstances warrant, we provide information and report our findings to government authorities, but no assurance can be given that action will not be taken by such authorities.

We are also subject to a variety of other risks and challenges in managing an organization operating in various countries, including those related to:

- challenges caused by distance, language and cultural differences;
- general economic conditions in each country or region;
- fluctuations in currency exchange rates;
- regulatory changes;
- political unrest, terrorism and the potential for other hostilities;
- public health risks, particularly in areas in which we have significant operations;
- longer payment cycles and difficulties in collecting accounts receivable;
- overlapping tax regimes and transfer pricing disputes;
- our ability to repatriate funds held by our international subsidiaries at favorable tax rates;
- difficulties in transferring funds from certain countries; and
- reduced protection for intellectual property rights in some countries.

If we are unable to manage the foregoing international aspects of our business, our operating results and overall business will be significantly and adversely affected.

**We operate in an industry with extensive intellectual property litigation. Claims of infringement against us may cause our business, financial condition and operating results to suffer.**

Our success depends, in part, upon us and our customers not infringing upon intellectual property rights owned by others and being able to resolve claims of intellectual property infringement without major financial expenditures or adverse consequences. The mobile telecommunications industry generally is characterized by extensive intellectual property litigation. Although our technology is relatively new and our industry is rapidly evolving, many participants that own, or claim to own, intellectual property historically have aggressively asserted their rights. For example, we were sued in the United States District Court for the District of Delaware by Augme Technologies, Inc. or Augme, alleging infringement of three patents held by

11

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Augme. We have also received letters on behalf of certain customers notifying us that the customer had received third party communications alleging that certain applications of the customer infringed the patent rights of the third party, and in turn, alleging that we are obligated to indemnify the customer relating to these matter as the claim allegedly relates to services that we provide to the customer. While we were able to settle the lawsuit with Augme, we cannot determine with certainty whether any other existing or future third party intellectual property rights would require us to alter our technologies, obtain licenses or cease certain activities.

Future litigation may be necessary to defend ourselves or our customers by determining the scope, enforceability and validity of third party proprietary rights or to establish our proprietary rights. Some of our competitors have substantially greater resources than we do and are able to sustain the costs of complex intellectual property litigation to a greater degree and for longer periods of time than we could. In addition, patent holding companies that focus solely on extracting royalties and settlements by enforcing patent rights may target us. Regardless of whether claims that we are infringing patents or other intellectual property rights have any merit, these claims are time-consuming and costly to evaluate and defend and could:

- adversely affect our relationships with our current or future customers;
- cause delays or stoppages in providing our mobile marketing services;
- divert management's attention and resources;
- require technology changes to our platform that would cause us to incur substantial cost;
- subject us to significant liabilities;
- require us to enter into royalty or licensing agreements on unfavorable terms; and
- require us to cease certain activities.

In addition to liability for monetary damages against us, which may be trebled and may include attorneys' fees, or, in certain circumstances, our customers, we may be prohibited from developing, commercializing or continuing to provide certain of our mobile marketing services unless we obtain licenses from the holders of the patents or other intellectual property rights. We cannot assure shareholders that we will be able to obtain any such licenses on commercially favorable terms, or at all. If we do not obtain such licenses, our business, operating results and financial condition could be materially adversely affected and we could, for example, be required to cease offering or materially alter our mobile marketing services in some markets.

**If we are unable to protect our intellectual property and proprietary rights, our competitive position and our business could be harmed.**

We rely primarily on a combination of patent laws, trademark laws, copyright laws, trade secrets, confidentiality procedures and contractual provisions to protect our proprietary technology. As of March 31, 2013, we had 10 granted patents and allowed applications and 17 pending patent applications on file. However, any future patents that may issue may not survive a legal challenge to their scope, validity or enforceability, or provide significant protection for us. The failure of our patents, or our reliance upon copyright and trade secret laws to adequately protect our technology might make it easier for our competitors to offer similar products or technologies. In addition, patents may not issue from any of our current or any future applications.

Monitoring unauthorized use of our intellectual property is difficult and costly. Our efforts to protect our proprietary rights may not be adequate to prevent misappropriation of our intellectual property. Further, we may not be able to detect unauthorized use of, or take appropriate steps to enforce, our intellectual property rights. Our competitors may also independently develop similar technology. In addition, the laws of many countries, including countries where we conduct business such as China and India, do not protect our proprietary rights to as great an extent as do the laws of European countries and the U.S. Further, the laws in the U.S. and elsewhere change rapidly, and any future changes could adversely affect us and our intellectual property. Any failure by us to meaningfully protect our intellectual property could result in competitors offering products that incorporate our most technologically advanced features, which could seriously reduce demand for our mobile marketing services. In addition, we may in the future need to initiate infringement claims or litigation. Litigation, whether we are a plaintiff or a defendant, can be expensive, time-consuming and may divert the efforts of our technical staff and managerial personnel, which could harm our business, whether or not such litigation results in a determination favorable to us. Further, litigation is inherently uncertain, and thus we may not be able to stop our competitors from infringing upon our intellectual property rights.

**We may not be able to enhance our mobile marketing and advertising platform to keep pace with technological and market developments, or to remain competitive against potential new entrants in our markets.**

The market for mobile marketing and advertising services is emerging and is characterized by rapid technological change, evolving industry standards, frequent new product introductions and short product life cycles. Our technology platform, Velti

12

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

mGage®, or future solutions we may offer, including technology platforms acquired from Mobclix, Air2Web or MIG, may not be acceptable to marketers and advertisers. To keep pace with technological developments, differentiate ourselves from our competitors, satisfy increasing customer requirements and achieve acceptance of our marketing and advertising campaigns, we will need to enhance our current mobile marketing and advertising solutions and continue to develop and introduce on a timely basis new, innovative mobile marketing and advertising services offering compatibility, enhanced features and functionality on a timely basis at competitive prices. Our inability, for technological or other reasons, to enhance, develop, introduce and deliver compelling mobile marketing services in a timely manner, or at all, in response to changing market conditions, technologies or customer expectations could have a material adverse effect on our operating results or could result in our mobile marketing and advertising platform becoming obsolete. Our ability to compete successfully will depend in large measure on our ability to maintain a technically skilled development and engineering staff and to adapt to technological changes and advances in the industry, including providing for the continued compatibility of our mobile marketing and advertising platform with evolving industry standards and protocols. In addition, as we believe the mobile marketing market is likely to grow substantially, although the industry is still fragmented, a rising number of competitors, some of whom have significantly more capital to invest than us, are creating integrated platforms. For example, Google, Inc. acquired Admob, Inc., Apple, Inc. acquired Quattro Wireless, Inc., Singapore Telecommunications Limited, or SingTel, acquired Amobee, Inc., Intel Corporation acquired appMobi's HTML5 tools and NTT Docomo, Inc. acquired of Buongiorno. Additionally, larger companies such as Samsung, Sprint, Telefonica, Vodafone, O2, Nokia, AOL, Microsoft and Yahoo! are entering the mobile marketing industry and could seek to gain market share by introducing new technology or reducing pricing. This may make it more difficult for us to sell our products and services, and could result in increased pricing pressure, reduced profit margins, increased sales and marketing expenses or the loss of market share or expected market share, any of which may significantly harm our business, operating results and financial condition.

**We do not have multi-year agreements with many of our customers and we may be unable to retain key customers, attract new customers or replace departing customers with customers that can provide comparable revenue.**

Our success requires us to maintain and expand our current, and develop new, customer relationships. Most of our contracts with our customers do not obligate them to long-term purchasing of our services and many of our contracts are specific to particular advertising or marketing campaigns. In addition, under the terms of many of our customer agreements, including certain multi-year agreements, the customer can terminate the agreement at its discretion prior to its expiration, without significant disadvantage to the customer. We cannot assure shareholders that our customers will continue to use our products and services or that we will be able to replace, in a timely or effective manner, departing customers with new customers that generate comparable revenue. Further, we cannot assure shareholders that we will continue to generate consistent amounts of revenue over time. Although none of our customers represented 10% or more of our revenues in the year ended December 31, 2012, if a major customer represents a significant portion of our business, the decision by such customer to materially reduce or to cease purchasing our products and services could cause our revenue to be adversely affected. Our failure to develop and sustain long-term relationships with our customers could materially affect our operating results.

**Our customer contracts lack uniformity and often are complex, which subjects us to business and other risks.**

Our customers include some of the largest wireless carriers and brands which have substantial purchasing power and negotiating leverage. As a result, we typically negotiate contracts on a customer-by-customer basis and our contracts lack uniformity and are often complex. Sometimes short-form insertion orders, purchase orders or work orders are used to document business relationships and these short-form documents may lack some of the protections we might otherwise seek in more detailed forms of contracts. We frequently rely on third parties, such as mobile app publishers, to have the authority to meet their obligations to us, including without limitation the authority to share or transfer consumer data with or to us in compliance with applicable laws and self-regulatory rules and without liability to the consumer or third parties. It is possible that some of these third parties will fail to comply with law or self-regulatory rules, or their own policies or representations, or otherwise expose us to claims as a result of their acts or omissions. Further, we may lack a meaningful ability to be indemnified by some of them in such instances. If we are unable to effectively negotiate, document, enforce and account and bill in an accurate and timely manner for contracts with our key customers or obtain and enforce meaningful indemnities from those with whom we do business, that expose us to risk or liability, our business and operating results may be adversely affected. In addition, we could be unable to timely recognize revenue from contracts that are not managed effectively and this would further adversely impact our financial results.

**Our customer contracts often require us to agree to incur indemnification obligations to our customers.**

We have contractual indemnification obligations to most of our customers. If we are required to fulfill our indemnification obligations (e.g. relating to third party content property, claims or operating systems or compliance with laws) that we provide to our customers, we would seek indemnification from our suppliers, vendors and content providers to the full extent of their

13

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

responsibility. Even if the agreement with such supplier, vendor or content provider contains an indemnity provision, such provision may not cover a particular claim or type of claim or may be limited in amount or scope or the indemnifying party may lack the financial ability or insurance coverage to fulfill their indemnity obligations. As a result, we may not obtain sufficient indemnification from third parties to cover fully the amounts or types of claims that might be made against us. In addition, we have contractual indemnification obligations with most of our customers relating to the products and services that we provide, including indemnification for infringing technology and compliance with applicable law and self-regulatory rules, and we may have an obligation to our customers for damages under these indemnification provisions. Any significant indemnification obligation to our customers could have a material adverse effect on our business, operating results and financial condition.

**Our sales efforts require significant time, expense and effort and could hinder our ability to expand our customer base and increase revenue.**

Attracting new customers requires substantial time and expense and we cannot assure that we will be successful in establishing new relationships, or maintaining or advancing our current relationships. For example, it may be difficult to identify, engage and market to customers who do not currently perform mobile marketing or advertising or are unfamiliar with our current services or platform. Further, many of our customers typically require input from one or more internal levels of approval. As a result, during our sales effort, we must identify multiple people involved in the purchasing decision and devote a sufficient amount of time to presenting our products and services to those individuals. The complexity of our different services, and the flexibility of our pricing model, often requires us to spend substantial time and effort assisting potential customers in evaluating our products and services including providing demonstrations and benchmarking against other available technologies. This process can be costly and time consuming. We expect that our sales process will become less burdensome as our products and services become more widely known and used. However, if this change does not occur, we may not be able to expand our sales effort as quickly as anticipated and our sales will be adversely affected.

**Our services are provided on mobile communications networks that are owned and operated by third parties who we do not control and the failure or security breach of any of these networks would adversely affect our ability to deliver our services to our customers.**

Our mobile marketing and advertising platform is partially dependent on the reliability of mobile operators who maintain sophisticated and complex mobile networks. Such mobile networks have historically, and particularly in recent years, been subject to both rapid growth and technological change. If the network of a mobile operator with which we are integrated should fail, including because of new technology incompatibility, the degradation of network performance under the strain of increased mobile consumer use, or a general failure from natural disaster or political or regulatory shut-down, we will not be able provide our services to our customers through such mobile network. Should data that resides on or is transmitted over the network be breached, there may also be limitations on our providing such services. These events, in turn, could impair our reputation and business, potentially resulting in a material, adverse effect on our financial results.

**The success of our business depends, in part, on wireless carriers continuing to accept our customers' messages for delivery to their subscriber base.**

In a portion of our business we depend on wireless carriers to deliver our customers' messages to their subscriber base. Wireless carriers often impose standards of conduct or practice that significantly exceed current legal requirements and potentially classify our messages as "spam," even where we do not agree with that conclusion. In addition, the wireless carriers use technical and other measures to attempt to block non-compliant senders from transmitting messages to their customers; for example, wireless carriers block short codes or Internet Protocol addresses associated with those senders. There can be no guarantee that we, or short codes registered to us, will not be blocked or blacklisted or that we will be able to successfully remove ourselves from those lists. Although our services typically require customers to opt -in to a campaign, minimizing the risk that our customers' messages will be characterized as spam, blocking of this type could interfere with our ability to market products and services of our customers and communicate with end users and could undermine the effectiveness of our customers' marketing campaigns. To date we have not experienced any material blocking of our messages by wireless carriers, but any such blocking could have an adverse effect on our business and results of operations.

**Many of our customers require us to maintain specified levels of service commitments and failure to meet these levels would both adversely impact our customer relationship as well as our overall business.**

Many of our customers require us to contractually commit to maintain specified levels of customer service under agreements commonly referred to as service level agreements. In particular, because of the importance that mobile consumers in general attach to the reliability of a mobile network, mobile operators are especially known for their rigorous service level

14

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

requirements. If we were to be unable to meet our contractually committed service level obligations, we would both be subject to fees, penalties, civil liability as well as adverse reputational consequences. We recognize these penalties, if and when incurred, as a reduction to revenue. These in turn could materially harm our business and operating results.

**Some of our programs are partially supported by government grants, which may be reduced, withdrawn, delayed or reclaimed.**

We have received grants from European Union programs administered by the Government of Greece in order to aid our technology development efforts. The first of these grants was for a total of approximately $4.5 million that has been paid in full to us. The second grant is for a total of approximately $8.5 million. That has also been paid in full. In 2009, we applied for a third grant and received acceptance of eligibility for up to an additional $12.0 million over four years. To date, approximately $6.2 million of this amount has been paid.  In addition, we have received a fourth grant in the amount of approximately $12 million, from the government of Greece to support our local capital expenditures.  Under the terms of all but the grant supporting capitalized expenditures, we are required to list these grants under a separate, specific reserve account on our balance sheets that we maintain for our Greek subsidiary under generally accepted accounting principles in Greece. If we fail to maintain this accounting treatment or meet the required criteria of these grants for five years following the final disbursement by the Greek government under each respective grant, we will be required to refund the entire amount of such grant. If we fail to maintain this accounting treatment or meet the required criteria of these grants between the fifth and tenth anniversaries of receiving the final disbursement under each grant, we will be required to pay a tax penalty. In October 2012, we successfully passed an audit by the Government of Greece and to date remain in compliance with these requirements. We do not anticipate being unable to remain in compliance for the duration of the requirement. However, in the event that we are unable to remain in compliance, a payment of refund or tax penalty would adversely affect our operating results. Further, were the Government of Greece to abrogate its commitment to provide the final disbursement of funds for the last two grants, our development efforts and ability to meet our timing expectations for new marketing and advertising services would be adversely affected.

**Failure to adequately manage our growth may seriously harm our business.**

We operate in an emerging technology market and have experienced, and may continue to experience, significant growth in our business globally. If we do not effectively manage our growth, the quality of our products and services may suffer, which could negatively affect our brand and operating results. Our growth has placed, and is expected to continue to place, a significant strain on our managerial, administrative, operational and financial resources and our infrastructure. Our future success will depend, in part, upon the ability of our senior management to manage growth effectively. This will require us to, among other things:

- implement additional management information systems;
- further develop our operating, administrative, legal, financial and accounting systems and controls, including compliance programs globally;
- hire additional personnel;
- develop additional levels of management within our company;
- locate additional office space in various countries; and
- maintain close coordination among our engineering, operations, legal, finance, sales and marketing and customer service and support organizations.

Moreover, as our sales increase, we may be required to concurrently deploy our services infrastructure at multiple additional locations or provide increased levels of customization. As a result, we may lack the resources to deploy our services on a timely and cost-effective basis. Failure to accomplish any of these requirements would seriously harm our ability to deliver our mobile marketing and advertising platform in a timely fashion, fulfill existing customer commitments or attract and retain new customers.

**We may be required to reduce our prices to compete successfully, or we may incur increased or unexpected costs, which could have a material adverse effect on our operating results and financial condition.**

The intensely competitive market in which we conduct our business may require us to reduce our prices, which could negatively impact our operating results. Our market is highly fragmented with numerous companies providing one or more competitive offerings to our marketing and advertising platform. New entrants seeking to gain market share by introducing new technology, products or services may make it more difficult for us to sell our products and services, and could result in

15

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

increased pricing pressure, reduced profit margins, increased sales and marketing expenses or the loss of market share or expected market share, any of which may significantly harm our business, operating results and financial condition.

Moreover, we may experience cost increases or unexpected costs which may also negatively impact our operating results, including increased or unexpected costs related to:

- the implementation of new data centers and expansion of existing data centers, as well as increased data center rent, hosting and bandwidth costs;
- the replacement of aging equipment;
- acquiring key technologies to support or expand our mobile marketing services solution; and
- acquiring new technologies to comply with newly implemented regulations.

Any unanticipated costs associated with the foregoing items would have a material adverse effect on our business, operating results and financial condition.

**Mergers or other strategic transactions by our competitors or mobile operator partners could weaken our competitive position or reduce our revenue.**

If two or more of our competitors were to merge or partner, the change in the competitive landscape could adversely affect our ability to compete effectively. In addition, consolidation could result in new, larger entrants in the market. For example, Google, Inc. acquired Admob, Inc., Apple, Inc. acquired Quattro Wireless, Inc., Singapore Telecommunications Limited, or SingTel, acquired Amobee, Inc., Intel Corporation acquired appMobi's HTML5 tools and NTT Docomo, Inc. acquired of Buongiorno. Although none of these companies directly compete with our full range of services, the transactions are indicative of the level of interest among potential acquirers in the mobile marketing and advertising industry. Our direct competitors may also establish or strengthen co-operative relationships with their mobile operator partners, sales channel partners or other parties with whom we have strategic relationships, thereby limiting our ability to promote our products and services. Disruptions in our business caused by these events could reduce revenue and adversely affect our business, operating results and financial condition.

**Acquisitions or investments may be unsuccessful and may divert our management's attention and consume significant resources.**

Any future acquisitions that we make, involve numerous risks, any of which could harm our business, including:

- difficulties in integrating the operations, technologies, services and personnel of acquired businesses;
- cultural challenges associated with integrating employees from the acquired business into our organization;
- ineffectiveness or incompatibility of acquired technologies or services;
- additional financing required to make contingent payments;
- potential loss of key employees of acquired businesses;
- inability to maintain the key business relationships and the reputations of acquired businesses;
- diversion of management's attention from other business concerns;
- inability to maintain our standards, controls, procedures and policies, which could affect our ability to receive an unqualified attestation from our independent accountants regarding management's required assessment of the effectiveness of our internal control structure and procedures for financial reporting;
- litigation for activities of the acquired business, including claims from terminated employees, customers, former shareholders or other third parties;
- in the case of foreign acquisitions, the need to integrate operations across different cultures and languages and to address the particular economic, currency, political and regulatory risks associated with specific countries;
- failure to successfully further develop the acquired technologies;
- increased fixed costs; and
- if any such acquisition include any earn out or contingent consideration, it may be difficult to determine in advance the amount of such contingent consideration.

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In the event we are not able to meet our ongoing capital commitments and to fund our operations by seeking additional capital, potentially through debt, or other potentially dilutive equity financings, it will make it harder for us to evaluate additional acquisitions or make investments in other businesses, or acquire individual products and technologies.

**Mobile connected device users may choose not to allow marketing or advertising on their devices.**

The success of our business model depends on our ability to deliver content to consumers on their mobile connected devices. Targeted delivery is done primarily through analysis of data, much of which is collected on the basis of third parties such as mobile app publishers obtaining user-provided permissions. Users may elect not to allow data sharing for a number of reasons, such as privacy and security concerns. Third parties we rely on may elect to discontinue providing us data about their users as a result of users' concerns, or otherwise. Further, third parties we rely on, such as app publishers, might provide us data in a manner that is inconsistent with what they represented to their users or with applicable law and we could get brought into claims or controversies related thereto. In addition, the designers of mobile device operating systems are increasingly promoting features that allow device users to disable some of the functionality that facilitates tracking and targeting and content delivery, which may impair or disable our services on their devices, and device manufacturers may include these features as part of their standard device specifications. Companies may develop products that enable users to prevent ads from appearing on their mobile device screens. If any of these developments were to occur, our ability to deliver effective mobile advertising campaigns on behalf of our customers would suffer, which could adversely impact our operating results.

**Our earnings may be adversely affected by fluctuations in foreign currency values.**

The majority of the value of our revenue transactions is conducted using the Euro, while the remaining is conducted using the U.S. dollar and currencies of other countries, and we incur costs in Euro, British pound sterling, the U.S. dollar and other local currencies. Changes in the relative value of major currencies, particularly the U.S. dollar, Euro and British pound sterling, can significantly affect revenue and our operating results. In 2012, approximately 49% of our revenue was payable in Euros, and in 2011, approximately 66% of our revenue was payable in Euros. We expect this concentration to continue to decrease over time as the percentage of our U.S. dollar denominated revenue grows. This will likely result in Euros comprising a smaller percentage of our revenue as we continue to increase sales to customers in geographies outside of Europe, with revenue payable in U.S. dollars or other currencies, as well as increase the number of contracts with European customers with revenue payable in U.S. dollars. As a substantial portion of our costs and expenses are incurred in Euros, any devaluation of the Euro will positively impact our financial statements as reported in U.S. dollars, and any decline in the value of the U.S. dollar compared to the Euro will result in foreign currency translation costs incurred by us. Unless the Euro materially fluctuates, however, we do not expect fluctuations of the Euro to have a material adverse effect on our results of operations or financial condition and the recent devaluation of the Euro has not materially adversely impacted our financial results. Our foreign currency transaction gains and losses are charged against earnings in the period incurred. We currently do not enter into foreign exchange forward contracts to hedge certain transactions in major currencies and even if we wished to do so in the future, we may not be able, or it may not be cost-effective, to enter into contracts to hedge our foreign currency exposure.

**Because of our revenue recognition policies, revenue may not be recognized in the period in which we contract with a customer, and downturns or upturns in sales may not be reflected in our operating results until future periods.**

Our SaaS revenue consists of usage-based fees recognized ratably over the period of the agreement and performance-based fees recognized as transactions are completed, specific quantitative goals are met or a performance milestone is achieved. As a result, we may be unable to rapidly increase our revenue through additional sales in any period, as revenue for performance-based fees will only be recognized if and when quantitative goals are met or a milestone is achieved. Revenue from our managed service arrangements is recognized either as the services are rendered for our time and material contracts or, for fixed price contracts, ratably over the term of the contract when accepted by the customer. Our license and software revenue is recognized when the license is delivered and on a percentage of completion basis for our services to customize and implement a specific software solution.

Because of these accounting policies, revenue generated during any period may result from agreements entered into during a previous period. A reduction in sales in any period therefore may not significantly reduce our revenue for that period, but could negatively affect revenue in future periods. In addition, since operating costs are generally recognized as incurred, we may be unable to quickly adjust our cost structure to match the impact of the reduction in revenue in future periods. Accordingly, the effect of significant downturns in our sales may not be fully reflected in our results of operations until future periods.

**Our geographically dispersed and historically rapidly growing business involves inherently complex accounting which if we fail to manage efficiently could adversely impact our financial reporting and business.**

17

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Since our inception, we have operated campaigns or provided marketing or advertising solutions to customers in many countries globally and we have offices in multiple countries and we continue to expand our operations geographically. We must maintain internal accounting systems to quickly and accurately track our financial performance, including our complex revenue transactions.  If we are unable to efficiently manage our accounting systems, our financial results could be materially misstated which in turn would impact both our financial reporting as well as have adverse reputational effects on our business.

**Activities of our customers and others in the mobile ecosystem we deal with could damage our reputation or give rise to legal claims against us.**

The products, services and activities of our customers and others in the mobile ecosystem may not comply with federal, state and local laws, including, but not limited to, laws and regulations relating to mobile communications, privacy and/or data protection. Failure of these parties to comply with applicable laws or our policies or contract terms could damage our reputation and adversely affect our business, operating results or financial condition. We cannot predict whether our role in facilitating our customers' marketing or advertising activities would expose us to liability under these laws. Any claims made against us could be costly and time-consuming to defend. If we are exposed to this kind of liability, we could be required to pay substantial fines or penalties, redesign our business methods, discontinue some of our services or otherwise expend resources to avoid liability.

We may potentially be subject to claims by third parties for content in the advertising we deliver on behalf of our customers if the music, artwork, text or other content involved violates the patent, copyright, trademark or other intellectual property rights of such third parties or if the content is defamatory, deceptive or otherwise violates applicable laws or regulations. Any claims or counterclaims could be time consuming, result in costly litigation or divert management's attention.

**Software and components that we incorporate into our mobile marketing services may contain errors or defects, which could have an adverse effect on our business.**

We use a combination of custom and third party software, including open source software, in building our mobile marketing and advertising platform. Although we test certain software before incorporating it into our platform, we cannot guarantee that all of the third party technology that we incorporate will not contain errors, defects or bugs. We continue to launch enhancements to Velti mGage, our integrated end-to-end mobile marketing and advertising platform, and we cannot guarantee any such enhancements will be free from errors, defects or bugs. If errors or defects occur in products and services that we utilize in our mobile marketing and advertising platform, it could result in damage to our reputation, lost revenue and diverted development resources.

**Our use of open source software could limit our ability to provide our platform to our customers.**

We have incorporated open source software into our platform. Although we closely monitor our use of open source software, the terms of many open source licenses to which we are subject have not been interpreted by U.S. or foreign courts, and there is a risk that such licenses could be construed in a manner that imposes unanticipated conditions or restrictions on our ability to provide our platform to our customers. We may also face claims regarding ownership of, or demanding release of, source code, open source software and/or derivative works that were developed using such open source software. These claims could result in litigation, our could require us to seek licenses from third parties in order to continue offering our platform, to re-engineer our platform or discontinue use of portions of the functionality provided by our platform, any of which could have a material adverse effect on our business, operating results or financial condition.

**We maintain a mix of cloud, managed hosting, colocation and in-house hosting to deliver our platform and services. Disruption of service or data breach at these facilities could harm our business.**

We currently maintain various datacenters around the world, including in the U.S., U.K., India, Russia and Greece, providing a mix of cloud, managed hosting, colocation and in-house hosting to deliver our platform and services.  Managed hosting and cloud services are provided by third-party vendors whose operations are not controlled by us. Our hosting solutions could be subject to physical or electronic break-ins, computer viruses, denial of service attacks, sabotage, intentional acts of vandalism and other misconduct. The occurrence of a natural disaster or an act of terrorism, a decision to close the third party facilities without adequate notice or other unanticipated problems could result in lengthy interruptions in our services or the loss or compromise of data. Although we maintain off-site backups and have implemented business continuity plans for several of our services, a second datacenter implementation is not available for all of our services. 'Interruptions in those services or data compromise or loss might harm our reputation, reduce our revenue, cause us to incur financial penalties, subject us to potential liability and cause customers to terminate their contracts.

18

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**We may have future exposure to greater than anticipated tax liabilities, and we could owe significant taxes even during periods when we experience low operating profit or operating losses.**

Our future income taxes could be adversely affected by earnings being lower than anticipated in jurisdictions where we have lower statutory tax rates and higher than anticipated in jurisdictions where we have higher statutory tax rates, by changes in the valuation of our deferred tax assets and liabilities or changes in tax laws, regulations, accounting principles or interpretations thereof. We cannot assure shareholders that we would not be impacted by changes in the tax regime of any jurisdiction where we do business and that such changes would not materially impact our effective tax rates. 'In addition, there is a risk that amounts paid or received under arrangements between our various international subsidiaries in the past and/or the future could be deemed for transfer tax purposes to be lower or higher than we previously recognized or expected to recognize. Our determination of our tax liability is always subject to review by applicable tax authorities. Any adverse outcome of such a review could have a negative effect on our operating results and financial condition. In addition, the determination of our worldwide provision for income taxes and other tax liabilities requires significant judgment, and there are many transactions and calculations where the ultimate tax determination is uncertain. Although we believe our estimates are reasonable, the ultimate tax outcome may differ from the amounts recorded in our financial statements and may materially affect our financial results in the period or periods for which such determination is made. Certain combinations of these factors could cause us to owe significant taxes even during period when we experience low income before taxes or loss before taxes.

**Continuing unfavorable global economic conditions could have a material adverse effect on our business, operating results and financial condition.**

Unfavorable economic conditions in the financial and credit markets in the U.S., Europe and Asia have led to a global economic slowdown, with the economies of Europe showing continued signs of weakness. In particular, certain member countries of the EU including Greece have experienced financial and economic difficulties and have imposed or discussed financial and other restrictions as a result. Recently, for example, Cyprus has required a bail out from the EU, and as part of this bailout has agreed to impose a one-off levy on all deposits over the insurance threshold of 100,000 Euros.  The amount of the one-off levy has not yet been determined. Although our exposure to Cyprus deposits is not material, there can be no assurance that future restrictions imposed by struggling economies may not have material impact on our financial results or results of operations. If these economies weaken further or fail to improve, our customers may reduce or postpone their marketing and advertising spending, or delay payments on amounts owed to us, which could materially adversely affect our business, operating results and financial condition.

### Risks Related to the Mobile Communications Industry

**Changes in government regulation of the wireless communications industry may adversely affect our business.**

Depending on the products and services that they offer, mobile data service providers are or may be subject to regulations and laws applicable to providers of mobile, Internet and VOIP services both domestically and internationally. In addition, the application of existing domestic and international laws and regulations relating to issues such as user privacy and data protection, defamation, pricing, advertising, taxation, gambling, sweepstakes, promotions, billing, real estate, consumer protection, accessibility, content regulation, quality of services, telecommunications, mobile, television and intellectual property ownership and infringement to wireless industry providers and platforms in many instances is unclear or unsettled. Further, the application to us of existing laws regulating or requiring licenses for certain businesses of our advertisers can be unclear.

It is possible that a number of laws and regulations may be adopted in the countries where we operate that may be inconsistent and that could restrict the wireless communications industry, including laws and regulations regarding lawful interception of personal data, taxation, content suitability, content marketing and advertising, copyright, distribution and antitrust. Furthermore, the growth and development of the market for electronic storage of personal information may prompt calls for more stringent consumer protection laws that may impose additional burdens, including costs on companies such as ours that store personal information. We anticipate that regulation of our industry will increase and that we will be required to devote legal and other resources to address this regulation. Changes in current laws or regulations or the imposition of new laws and regulations regarding the media and wireless communications industries may lessen the growth of wireless communications services and may materially reduce our ability to increase or maintain sales of our mobile marketing services. We may incur substantial liabilities for expenses necessary to investigate or defend such litigation or to comply with these laws and regulations, as well as potential substantial penalties for any failure to comply. Compliance with these laws and regulations may also cause us to change or limit our business practices in a manner adverse to our business.

19

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

A number of studies have examined the health effects of mobile device use, and the results of some of the studies have been interpreted as evidence that mobile device use causes adverse health effects. The establishment of a link between the use of mobile devices and health problems, or any media reports suggesting such a link, could increase government regulation of, and reduce demand for, mobile devices and, accordingly, the demand for our mobile marketing services, which could harm our business, operating results and financial condition.

**The mobile advertising or marketing market may deteriorate or develop more slowly than expected, any of which could harm our business.**

If the market for mobile marketing and advertising deteriorates, or develops more slowly than we expect, our business could suffer. Our future success is highly dependent on an increase in the use of mobile communications, the commitment of advertisers and marketers to mobile communications as an advertising and marketing medium, the willingness of our potential clients to outsource their mobile advertising and marketing needs, and our ability to sell our services to advertising agencies and brands. The mobile advertising and marketing market is relatively new and rapidly evolving. As a result, future demand and market acceptance for mobile marketing and advertising is uncertain. Many of our current or potential clients have little or no experience using mobile communications for advertising or marketing purposes and have allocated only a limited portion of their advertising or marketing budgets to mobile communications advertising or marketing, and there is no certainty that they will continue to allocate more funds in the future, if any. Also, we must compete with traditional advertising media, including television, print, radio and outdoor advertising, for a share of our clients' total advertising budgets.

Businesses, including current and potential clients, may find mobile advertising or marketing to be less effective than traditional advertising media or marketing methods or other technologies for promoting their products and services, and therefore the market for mobile marketing and advertising may deteriorate or develop more slowly than expected, or may develop using technology or functionality that we did not anticipate and may be unable to meet effectively and timely. Our current or potential customers may lose interest in our current or future solutions, or find that such solutions do not provide the benefits anticipated. These challenges could significantly undermine the commercial viability of mobile advertising and marketing and seriously harm our business, operating results and financial condition.

**If we fail to detect click fraud or other invalid clicks on ads, we could lose the confidence of our advertiser clients, which would cause our business to suffer.**

Our advertising business relies on delivering positive results to our advertiser clients. We are exposed to the risk of fraudulent and other invalid clicks or conversions that advertisers may perceive as undesirable. Because of their smaller sizes as compared to personal computers, mobile device usage could result in a higher rate of accidental or otherwise inadvertent clicks by a user. Invalid clicks could also result from click fraud, where a mobile device user intentionally clicks on ads for reasons other than to access the underlying content of the ads. If fraudulent or other malicious activity is perpetrated by others, and we are unable to detect and prevent it, the affected advertisers may experience or perceive a reduced return on their investment. High levels of invalid click activity could lead to dissatisfaction with our advertising services, refusals to pay, refund demands or withdrawal of future business. Any of these occurrences could damage our brand and lead to a loss of advertisers and revenue.

**Risks Related to Our Ordinary Shares**

**Our ordinary shares are issued under the laws of Jersey, which may not provide the level of legal certainty and transparency afforded by incorporation in a U.S. state.**

We are organized under the laws of the Bailiwick of Jersey, a British crown dependency that is an island located off the coast of Normandy, France. Jersey is not a member of the European Union. Jersey legislation regarding companies is largely based on English corporate law principles. However, there can be no assurance that Jersey law will not change in the future or that it will serve to protect investors in a similar fashion afforded under corporate law principles in the U.S., which could adversely affect the rights of investors.

**We may lose our foreign private issuer status in the future, which could result in significant additional costs and expenses.**

We are a "foreign private issuer," as such term is defined in Rule 405 under the Securities Act, and therefore, we are not required to comply with all the periodic disclosure and current reporting requirements of the U.S. Securities Exchange Act of 1934, as amended, and related rules and regulations. Under Rule 405, the determination of foreign private issuer status is made annually on the last business day of an issuer's most recently completed second fiscal quarter and, accordingly, our most recent determination was made on June 30, 2012. We expect that we will continue to be a foreign private issuer as of June 30, 2013.

20

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In the future, we would lose our foreign private issuer status if a majority of our shareholders and a majority of our directors or management are U.S. citizens or residents. If we were to lose our foreign private issuer status, we would have to mandatorily comply with U.S. federal proxy requirements, and our officers, directors and principal shareholders would become subject to the short-swing profit disclosure and recovery provisions of Section 16 of the Exchange Act. We would also be required to file periodic reports and registration statements on U.S. domestic issuer forms with the U.S. Securities and Exchange Commission, or SEC, which are more detailed and extensive than the forms available to a foreign private issuer. As a result, the regulatory and compliance costs to us under U.S. securities laws as a U.S. domestic issuer may be significantly higher. We may also be required to modify certain of our policies to comply with good governance practices associated with U.S. domestic issuers. Such conversion and modifications will involve additional costs.

**U.S. shareholders may not be able to enforce civil liabilities against us.**

A number of our directors and executive officers and a number of directors of each of our subsidiaries are not residents of the U.S., and all or a substantial portion of the assets of such persons are located outside the U.S. As a result, it may not be possible for investors to effect service of process within the U.S. upon such persons or to enforce against them judgments obtained in U.S. courts predicated upon the civil liability provisions of the federal securities laws of the U.S. We have been advised by our Jersey solicitors that there is doubt as to the enforceability in Jersey of original actions, or in actions for enforcement of judgments of U.S. courts, of civil liabilities to the extent predicated upon the federal and state securities laws of the U.S.

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ITEM 4. INFORMATION ON THE COMPANY**

**4.A. History and Development of the Company**

The legal and commercial name of the company is Velti plc. Velti plc's executive offices are located at:

First Floor, 28-32 Pembroke Street Upper
Dublin 2, Republic of Ireland
Attn: Sally J. Rau, Corporate Secretary
353 (0) 1234 2676

Our registered agent in the United States is:

Velti Inc.
Steuart Tower
One Market Street, Suite 600
San Francisco, California 94105
Attn: Sally J. Rau, Chief Administrative Officer and General Counsel
(415) 315-3400

Velti plc's Fiscal Year ends December 31.

Velti plc is incorporated under the laws of the Bailiwick of Jersey, the Channel Islands. Our business was first organized in 2000 with the incorporation of Velti S.A., a company organized under the laws of Greece. On April 20, 2006, Velti plc, a company formed in England and Wales under the Companies Act 1985 on September 2, 2005, acquired all of the issued share capital of Velti S.A. As a result, Velti plc (England and Wales) became the holding company of the Velti group.

On May 3, 2006, Velti plc was first admitted and commenced trading in its ordinary shares on the Alternative Investment Market of the London Stock Exchange, or AIM. On December 18, 2009, Velti plc completed a scheme of arrangements under the laws of England and Wales whereby Velti plc, a new company incorporated under the laws of Jersey, the Channel Islands, became our ultimate parent company. The ordinary shares of our new Jersey-incorporated parent were admitted for trading on AIM on December 18, 2009.

On January 28, 2011, Velti's ordinary shares commenced trading on the NASDAQ Global Select Market, or NASDAQ, under the symbol "VELT." We delisted and canceled our shares for trading on AIM as of May 3, 2011 and currently trade only on NASDAQ.

On September 30, 2010, we completed the acquisition of Mobclix, Inc., or Mobclix, an advertising exchange in the U.S. On October 4, 2011, we completed the acquisition of Air2Web, Inc. or Air2Web, a provider of mobile customer relationship management (mCRM) solutions in the United States and India for many of the world's most trusted consumer brands.

On November 14, 2011, we completed the acquisition of Mobile Interactive Group Limited, or MIG, the U.K.'s largest mobile marketing company. On January 23, 2012 we completed the acquisition of the remaining equity interests of CASEE, a mobile ad exchange and mobile ad network in China.

In December 2012, we completed the divestiture of certain non-strategic assets focused on geographies and certain customers in Southeast and Eastern Europe, to Starcapital Limited (Starcapital), a Cyprus company owned by certain former non- management employees of Velti.

22

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## 4.B.  Business Overview

### Description of the nature of the Company's operations and principal markets

Velti delivers mobile technology to transform communication, build connections and drive value for brands and consumers alike. The intimate, always-on mobile channel, combined with the power of today's data science, now makes it possible to unify advertising and marketing and deliver on the promise of individualized brand relationships spanning the full customer lifecycle.

Our mobile marketing and advertising technology and solutions help marketers reach new customers, drive consideration with interactive mobile marketing strategies, accelerate consumer actions using meaningful data, and nurture relationships through data-driven marketing programs. Powered by data, we enable brands to communicate more meaningfully, deliver greater customer value and inspire the behaviors and outcomes that matter to their business.

Our results-focused Velti mGage® platform allows marketers to execute highly personalized, enterprise mobile marketing programs across the marketing funnel including ad delivery and measurement, cross-channel messaging promotions, mobile site development, and cross-platform campaign data visualization. For businesses that want professional assistance in achieving mobile marketing and advertising objectives, our services organization offers expert assistance in developing strategies, programs, and hosting services. From account management to creative production to ad ops and technical resources, we support enterprise customers through a self-service or managed services model that augments customers' existing staff to support mobile initiatives.

With over 1,000 employees globally, Velti provides market-level expertise to help brands connect with consumers around the world, anywhere, any time, using the power of mobile technology to deliver better business results for brands and better experiences for consumers.

### Velti Solutions and Technology

### The Velti Technology Platform

Velti mGage is a software platform that enables brands to find, engage and convert customers into lifelong brand advocates. It enables marketers to harness the power of mobile to reach new customers, drive consideration with interactive mobile marketing strategies, accelerate consumer actions using meaningful data, and nurture relationships thru data-driven marketing programs. Our data and analytics engine enables marketers to optimize their digital spend with comprehensive insights that intelligently attributes media buys to actual conversions. We generate revenue from licensing our platform and by providing managed services to brands looking to mobilize their business.

With the huge number of mobile device types, platforms and screen resolutions, brands and agencies find it difficult to create and implement a cohesive, cross-channel mobile marketing strategy. Velti simplifies the most complex aspects of mobile marketing and advertising by providing a powerful, easy-to-use toolset for implementing cross-channel, personalized marketing campaigns. Whether it is ad delivery and measurement, cross-channel messaging campaigns, or simple mobile site development, our robust, secure and scalable platform enables brands and agencies to execute multi-channel campaigns across many device types and address every aspect of the mobile value chain.

### Velti Platform Overview

### Velti mGage

Velti mGage enables brands to build, plan, execute and measure integrated advertising and marketing campaigns across multiple channels. Velti mGage platform includes the following products:

*mGage Advertise.*  mGage Advertise is Velti's enterprise grade ad server that simplifies conversion tracking to provide brands insight into campaign performance beyond the impression and click. This flexible and scalable ad serving product provides advanced device detection and precise ad unit delivery. With a single piece of code, it enables brands to understand channel attribution and influence, and link consumer site behavior to conversion data for unrivaled insight into campaign performance across publishers, networks and ad placements.

*mGage Create.*  mGage Create is a mobile web development platform that enables brands and agencies to create deploy, host and measure mobile sites that can be dynamically rendered on many of the devices in the market. This web-based authoring platform simplifies the most complex aspects of mobile web development to quickly produce highly interactive rich media ad

23

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

units, landing pages and mobile sites. mGage Create enables brands to create mobile web apps for the rapidly growing smart devices including smartphones, tablets and Smart TVs, and dynamically render feature rich sites for the lower-end, still dominant feature phones.

*mGage Communicate.* mGage Communicate is a mobile messaging and mobile community management platform that allows brands to implement personalized messaging campaigns. From simple message delivery to complex relationship management, mGage Communicate streamlines planning, execution and reporting of mobile messaging campaigns using workflow management tools. It allows multi-channel customer opt-ins via SMS, traditional web, mobile web, mobile applications, IVR, QR Codes and more. With Velti's direct connection to major carriers globally, brands can execute cross-carrier messaging campaigns reliably. It applies strong rules, processes, firewalls and encryptions to ensure privacy and security for a brand's customers.

*mGage Inspire.* mGage Inspire is a multi-channel loyalty platform that enables brands to implement Loyalty and CRM programs with highly specialized tactics and sophisticated personalization. The platform is based on an open architecture that enables set-up and management of complex business rules to support targeted multi-channel micro-campaigns at all stages of the customer engagement lifecycle. Designed to leverage data, the platform rewards and measures incremental behavior to ensure positive impact on Customer Lifetime Value (CLV). It allows brands to reach and engage customers through multiple channels and devices such as Mobile Web, Social Media, USSD, IVR, Text Messaging and traditional channels. mGage Inspire's predictive analytics and machine learning algorithms enable targeted promotions and rewards to increase customer participation and uptake.

*mGage Excite.* Velti mGage Excite is a comprehensive platform that enables operators, agencies, media groups and brands to conduct robust and scalable promotions on a massive scale. It allows management of the entire campaign lifecycle from inception to execution. It enables creation of customer segments to target communication based on participants' profiling attributes to encourage participation and generate incremental revenue. It provides tools to maximize the effectiveness of every campaign, and can automatically leverage the results to deploy a holistic marketing strategy for brands and operators worldwide. It enables brands to stimulate user engagement, loyalty and stickiness by using fun game mechanics with achievements, appointments, community collaboration, leaderboards, levels, loss aversion, points and status among others. The platform is built to automatically test, identify and serve the best performing messages whether they are teasers, base bulks, activities and questions to increase playability, facilitate intelligent targeting and improve relevancy, uptake and redemption.

## Mobclix

Mobclix, our mobile ad exchange, is where publishers and advertisers are able to connect the best apps with the best ads via Mobclix' sophisticated open marketplace platform, along with comprehensive account management for mobile application developers, advertisers, ad networks, and agencies.

*Mobclix for Publishers.* Mobclix enables publishers and developers to monetize their mobile inventory on their apps and sites. With a single software development kit (SDK) integration, developers have instant access tonumerous ad networks for better performance. Its real-time bidding platform, backed by yield optimization technology, enables developers and publishers to get the highest paying ad for every impression served, helping them maximize their revenue potential. Mobclix also offers an intuitive dashboard that provides visibility into monetization tools, consolidated reporting and payments.

*Mobclix for Advertisers.* The Mobclix Exchange connects advertisers with the global inventory they need to reach their audience. Through a single integration with the Mobclix Exchange, advertisers have direct access to publishers, enabling them to make spot buys for successful targeting and optimized results. Using real-time bidding technology, advertisers are also able to reach the audience they want, at the price they want.

## Velti Media

Velti Media,our mobile advertising network, connects brands and agencies to mobile web sites or mobile applications that host advertisements typically through an advertising network or exchange. With this offering, we combine mobile advertising and marketing solutions in a single technology platform across a unified data model, providing a comprehensive suite of capabilities for brands to reach consumers. In combining mobile advertising and marketing with performance data and predictive analytics, we are now able to make recommendations to brands on the best types of campaigns to run in order to achieve a specific set of goals. Velti Media partners with various supply side platforms and exchanges, including Mobclix, to aggregate advertiser demand and match it with mobile ad space supply, providing access to inventory in key geographies.  Velti Media also works directly with premium publishers to secure inventory for advertisers.

24

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**The Velti Solution**

Mobile is transforming businesses worldwide. It is always on, highly personal-and exceptionally effective. Consumers are using mobile at every stage of purchasing, from product research to purchase, making it a powerful channel for brands to connect with consumers.

Our solutions help brands mobilize their consumer engagement funnel, transforming browsing into buying, communication into loyalty and behavioral insight into purchase influence. From strategic planning to cross-platform digital campaign execution, we help brands establish a cross-channel strategic framework based on a solid understanding of their customers' behavior.

*Awareness.* With device and location targeting, mobile presents a unique opportunity for brands to be highly efficient with their marketing spend. We help brands make the most of customer acquisition efforts. From mobile media and creative destination development to real-time tracking and optimization, our solutions take advantage of mobile's unique attributes and puts mobile acquisition tactics to work for brands. With access to highly targeted mobile advertising inventory through Velti owned Mobclix, we are able to drive volume and reach customers across multiple touch points to acquire customers and drive results.

*Engagement.* With consumers accessing mobile at every stage of the purchase funnel - from product research to purchase, the right mobile landing experience helps drive conversions, generate repeat visits and enhance customer loyalty. We help brands deliver an optimized mobile experience. From a simple product catalog to complex multi-channel interactive messaging, we help brands give their customers what they need, when they need it, to win their business and keep them coming back. The Velti mGage platform can be easily integrated into a brand's existing CRM, CMS and payment systems, allowing us to enable the brand to provide a seamless and cohesive experience to the customer across multiple touch points and devices while improving operational efficiency.

- **Mobile Sites & Applications**: From a simple campaign landing experience to a rich, fully integrated, HTML5-enabled enterprise mobile site, we help brands develop highly interactive mobile sites and applications that can be rendered on devices including feature phones, smartphones, tablets, desktops and even Smart TVs.

- **Mobile Messaging**: We make it simple for brands to execute cross-carrier messaging and large scale push notification programs. From short codes and keywords to carrier connectivity and program approval, we allow brands to configure and execute effective mobile messaging campaigns seamlessly around the world.

- **Mobilize Customer Care**: Velti's mobilized customer care solution helps brands deliver added value for customer care and after-sales services while reducing operational expenses. This solution provides advanced mobile technology to address evolving customer services challenges and is engineered to handle the needs of large enterprises with large customer care operations.

*Retention.* Mobile can give new life to loyalty programs, capturing new kinds of customer interactions and enabling more valuable rewards to win repeat business. We have unique expertise in customer loyalty from capturing customer data to increasing engagement and reducing churn. We create, implement and manage mobile led cross-channel loyalty programs that incorporate both rewards and personalized experiences to increase retention. Our programs which utilize our Velti mGage platform use a variety of interactive channels to stimulate consumer interaction, including SMS, web, mobile web, app, interactive voice response (IVR) and other channels to turn unknown customers into clearly defined brand advocates. Our performance-based programs have helped brands around the world not only enhance customer loyalty but also gain deep understanding of their customers.

**Customers**

We work with major brands and agencies, and many of the top operators around the world. Brands engage with us directly or through their digital marketing agencies. We work with many major agencies globally who use our proprietary mGage platform to plan, execute, manage and measure mobile marketing and advertising strategies and campaigns for their customers. We work with leading brands across a variety of verticals including automotive, financial services, retail, consumer packaged goods, operators, technology and more, to mobilize their marketing and advertising campaigns. Brands license our platform or purchase our fully managed solutions to acquire, engage, monetize and retain their customers. We work closely with CMOs, digital marketers and customer relationship management executives to understand their marketing and business objectives, develop a cohesive mobile marketing strategy to augment their marketing mix and execute cross-platform campaigns to drive results.

25

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Geographic Concentration**

We conduct our business primarily in three geographical areas: Europe, Americas, and Asia/Africa. The following table provides revenue by geographical area. Revenue from customers for whom we provide services in multiple locations is allocated according to the location of the respective customer's domicile. Revenue from customers for whom we provide services in a single or very few related locations is allocated according to the location of the respective customer's place of operations.

| Revenue: | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | | 2011 | | 2010 | |
| | (in thousands, except percentages) | | | | | |
| Europe: | | | | | | |
| United Kingdom | $ 74,731 | 27.6% | $ 37,758 | 20.0% | $ 34,105 | 29.3% |
| All other European countries | 97,799 | 36.2% | 86,318 | 45.6% | 55,299 | 47.6% |
| Total Europe | 172,530 | 63.8% | 124,076 | 65.6% | 89,404 | 76.9% |
| Americas | 63,597 | 23.5% | 41,114 | 21.7% | 9,150 | 7.9% |
| Asia/Africa | 34,217 | 12.7% | 24,012 | 12.7% | 17,715 | 15.2% |
| Total revenue | $ 270,344 | 100.0% | $ 189,202 | 100.0% | $ 116,269 | 100.0% |

We expect to continue to expand outside of Europe and anticipate that our geographic revenue concentration in Europe as a whole will continue to decrease as a percentage of our total revenue, with primary growth occurring in the Americas.

**Technology and Operations**

Our proprietary technology platform is the cornerstone of our business and it will continue to be a key differentiator for us. Our Velti mGage platform is built with a modular, distributed architecture which provides us considerable flexibility in deployment, and enables us to deploy individual software modules as a package or on a standalone basis. This in turn optimizes performance under various hardware and software configurations. Our highly scalable software solutions use a proprietary combination of commercially licensed, open source and custom programmed software, to optimize reliability, cost, efficiency, performance and scalability.

*Hosting infrastructure.* Our information technology, or IT, infrastructure is deployed utilizing solutions from industry leaders including Cisco, HP, Oracle, Microsoft, VMWare, Amazon, Redhat. We have designed and implemented a robust hosting infrastructure with a load-balanced cluster of application servers backed by redundant database servers to optimize uptime, and efficiently plan software upgrades. Our architecture allows components to be distributed between data centers for optimal performance and scalability, including cloud and traditional data-center configurations. Multiple database installations are segmented by geography, customer and application in order to provide additional scalability and flexibility, and to ensure compliance with applicable regulations and best practices regarding data collection and consumer privacy adopted by a number of countries that may restrict data collection and management.

*Data center facilities.* We outsource all of our data center facility management to third parties who host the actual servers and provide power and security in multiple data centers in each geographic location. This allows us to have redundant, duplicate systems without having to export personal consumer information across regulatory jurisdictions. We believe this is an important differentiator of our business. Not only do we maintain fully redundant hardware, but our data centers also have redundant power and connectivity. We contract with industry-recognized IT providers of enterprise-hosting solutions, customized managed-application services and remote operations services, which includes data centers in New Jersey, Atlanta, London and Athens. We also have data centers in Chennai, Mumbai, Moscow and Beijing. Every data center's HVAC (Heating Ventilation Air Conditioning) system is N+1 redundant with advanced fire suppression systems. All data centers' power systems are designed to run uninterrupted, with every server receiving conditioned UPS (Uninterruptible Power Supply) power. Daily backups of source and data files are performed on a timely basis and stored at appropriate offsite locations.

*Compliance & Security.* Our focus in maintaining compliance with information security management standards & practices is illustrated by specific regional/global requirements satisfied by data centers. All of the hosting providers are compliant/certified against ISO 27001 or SSAE-16 type II. Velti data centers (hosting customer facing production systems) incorporate keycard

26

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

protocols, biometric scanning protocols and round-the-clock interior and exterior surveillance monitor access to every one of our data centers. Only authorized data center personnel are granted access.

*Support Operations.* Our operations and customer service team is comprises high caliber, specially trained engineers providing support on a 24 x 7 basis. The team is responsible all maintenance-related customer communications, request submission, analysis and follow up, as well as incident handling, escalation and reporting. A centralized system monitors infrastructure and services on a 24 x7 basis, enabling timely detection, troubleshooting, recovery and reporting of failures with real-time status views and historic trend reporting.

**Competition**

The market for mobile marketing and advertising solutions is very competitive. There are many companies we consider competitors, from companies offering individual point solutions to companies who deliver a breadth of mobile marketing or advertising capabilities. Velti competes against mobile advertising networks, mobile ad serving and ad routing providers, mobile website and content creators, mobile payment providers, aggregators, providers of mobile publishing and application development, SMS aggregators, mobile CRM and loyalty solutions providers, and providers of mobile analytics. We compete at times with interactive and traditional advertising agencies who offer mobile marketing and advertising as part of their services to their customers.

Although the industry is still fragmented, we are seeing consolidation in this constantly-evolving space. A rising number of competitors are looking to create integrated platforms with features similar to ours, e.g., Google, Inc.'s acquisition of Admob, Inc., Apple, Inc.'s acquisition of Quattro Wireless, Inc., Opera's expansion of its mobile offering through AdMarvel and Mobile Theory, Augme's acquisition of Hipcricket, SingTel's acquisition of Amobee, Intel Corporation's acquisition of appMobi's HTML 5 developer tools, NTT Docomo, Inc.'s acquisition of Buongiorno s.P.a., and the entry of larger companies such as Samsung, Sprint, Telefonica, Vodafone, O2, Nokia, AOL, Microsoft and Yahoo! into the mobile media markets. Although we are increasingly viewing the above-mentioned companies as competitors, we believe we are still the only provider of an integrated, end-to-end mobile marketing and advertising platform with a significant global presence.

Our key competitive factors used by our customers when selecting solutions include the availability of:

- an integrated, scalable and relatively easy to implement platform that can expand the reach of their future campaigns;
- solutions providing high quality functionality that meet their immediate marketing and advertising needs;
- sophisticated analytics and reporting;
- results or outcome-based pricing;
- existing strategic relationships with customers globally;
- high levels of quality service and 24-hour support;
- a sophisticated provider with a proven track record; and
- over a decade of experience in mobile marketing and advertising.

**Seasonality**

Our business, as is typical of companies in our industry, is seasonal. This is primarily due to traditional marketing and advertising spend being heaviest during the holiday season with brands and advertising agencies often closing out annual budgets at the end of a given year. Seasonal trends have historically contributed, and we anticipate will continue to contribute, to fluctuations in our quarterly results, including fluctuations in sequential revenue growth rates.

**Sales and Marketing**

Our direct sales force is organized into three main customer categories, one selling to mobile operators TV broadcasters, another selling to media, publishers and ad agencies, and the other selling to brands. We are further organized along geographical regions for Europe, the Americas and the rest of the world. As of December 31, 2012, we had 314 employees engaged in sales, marketing and business development. As we evolve, in addition to continuing our focus on mobile operators and media (especially as they are tied to our global mobile advertising exchange), we expect to further focus our sales efforts within brands by certain industry verticals, such as retail, financial services and packaged goods, and to building a strong U.S. sales force for publishers and media customers. Direct sales personnel are supported by pre-sales managers who provide technical expertise and in-depth product knowledge, as well as creative pre-sales teams.

27

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

As part of our sales process, we typically explain the benefits of our platform and demonstrate our ability to deliver services to potential customers that meet their mobile marketing and advertising campaign goals. As a result, our sales cycle can be relatively long, and can vary significantly between different geographies and customer segments. Our customers may perform a pilot prior to full scale deployment, typically lasting one to three months. Major brands in particular generally have a rigorous, technology‐based sales process and complex decision‐making process, however, they are often less likely to switch incumbent vendors once one has been selected.

Velti has both corporate and product and solution-focused marketing support to reinforce the corporate image and brand, and help sales with demand and lead generation. From a corporate perspective, we are focused on leading the mobile marketing and advertising industry through thought-leadership initiatives including public relations, trade show representation and speaking opportunities, analyst events, social media presence and industry dialogue creation. Sales support includes developing cross-channel collateral packages for all products and solutions, delivering lead generating ad campaigns, webinars and promotions and ushering prospects through the marketing funnel via continuous engagement with the Velti e-newsletter, website and/or blog.

**Government Regulation**

Depending on the products and services that they offer, mobile data service providers are or may be subject to regulations, codes of practice and laws applicable to providers of mobile, Internet and voice over Internet protocol, or VOIP, services both domestically and internationally. In addition, the application of existing domestic and international laws and regulations relating to issues such as user privacy and data protection, defamation, pricing, advertising, taxation, gambling, sweepstakes, promotions, micropayments, billing, real estate, consumer protection, accessibility, content regulation, quality of services, telecommunications, mobile, television and intellectual property ownership and infringement to wireless industry providers and platforms in many instances is unclear or unsettled. Further, the application to us of existing laws regulating or requiring licenses for certain businesses of our advertisers can be unclear.

It is possible that a number of laws and regulations may be adopted in the countries where we operate, which may be inconsistent and which could restrict the wireless communications industry, including laws and regulations regarding network management and device interconnection, lawful interception of personal data, taxation, content suitability, copyright, distribution and antitrust. Furthermore, the growth and development of the market for electronic storage of personal information may prompt calls for more stringent consumer protection laws that may impose additional burdens on companies such as ours that store personal information. We anticipate that regulation of our industry generally will increase and that we will be required to devote legal and other resources to address this regulation.

We are subject to certain regulations and laws applicable to providers of Internet and mobile services both domestically and internationally. The application of existing domestic and international laws and regulations relating to issues such as user privacy and data protection, marketing, advertising, consumer protection and mobile disclosures in many instances is unclear or unsettled.

To date, we have earned a majority of our revenue in Europe and the U.S. However, we have the ability to conduct campaigns in numerous countries and many of these have large economies outside of North America and Europe, including Brazil, Russia, India and China, or the "BRIC" countries. Our revenue in countries outside of Europe and the U.S., both in an aggregate amount and as a percentage of our overall revenue, may grow substantially in the future. Each jurisdiction has unique regulatory bodies and levels of oversight. We anticipate that, while over time there may be a convergence of certain regulatory aspects, individual countries will continue to exercise substantial independent influence over mobile communications within their jurisdiction. The summary set forth below, while focusing in general on Europe and the U.S. is not intended to imply that regulation outside of these areas is not important to our business. Rather, we have found the issues that we present here to be generally applicable across jurisdictions, although the precise terminology and manner in which they are addressed may differ from country to country.

**European Regulatory Environment**

Member states of the EU regulate mobile marketing and advertising services both at the member state and EU levels. Member states generally need to transpose or apply legislation issued on the EU level (e.g. the Directives referred to below) in their national laws.If, however, the legislation is in the form of a regulation (e.g. the data protection Regulation referred to below), the regulations have a direct effect on the member states and do not need to be transposed into the member states' national laws.

At the EU level, there are various Directives which impact upon the regulation of mobile marketing and advertising generally and also Directives which control the use of electronic communications specifically.

28

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*European Marketing and Advertising.* Directives which are applicable to the use of mobile advertising and marketing include the E-Commerce Directive (Directive 2000/31/EC) and the E-Privacy Directive (Directive 2002/58/EC).

The basic principle regarding direct marketing through electronic mail (such as e-mail, SMS, MMS, etc.) is the need to obtain the recipient's prior consent, i.e. the so-called "opt-in requirement." Furthermore, the Directives require advertisers to provide consumers with certain information, the scope of which may vary depending upon how a particular EU member state has implemented the Directive. Some member states have taken a strict approach in implementing the Directives, and require additional information to be provided when compared with the minimum requirements set out in the Directives.

*European Electronic Communications.* The EU has standardized the general regulatory framework applicable to electronic communications and privacy further with Regulation 1211/2009 establishing the Body of European Regulators for Electronic Communications (or BEREC). BEREC became functional in 2010 and is tasked with the development and better functioning of the internal market for electronic communications networks and services by harmonizing and standardizing regulation of non-compliance with EU Electronic Communications Directives. BEREC has issued a Work Program for 2012, which includes tasks items such as international roaming, universal service provisions, access to special rate services, and next generation networks/access. BEREC's intent is to add transparency and clarity to the regulatory regime of the EU and ensure consistent application of EU Directives by the member states, while aiming to establish cooperation with regulatory authorities in regions outside the EU.

*European e-Privacy.* European standards can materially differ from those of the U.S. which may disproportionately affect us given that most of our business has historically been in Europe. For example, the use of data indicating the location of the user's mobile phone is strictly controlled by the E-Privacy Directive.

In addition, EU laws place restrictions on the use of cookies and similar technologies, which may affect our ability to implement behavioral advertising. These restrictions have been reviewed and amended by the European legislator with the Citizen's Rights Directive (Directive 2009/136/EC), which member states have implemented (or are implementing). This Directive provides, among other things, that user consent (or an explicit opt-in) must be obtained before placing any cookie on a user's machine. The EU member states have not implemented the law in a uniform manner, which some countries permitting an opt-out approach, while others mandate opt-in consent.  An exception to the opt-in requirement exist for cookies which are solely used for carrying out the transmission of a communication over an electronic communications network, or which are strictly necessary to provide an information society service explicitly requested by the subscriber or user.

The Citizen's Rights Directive also introduced amendments to the E-Privacy Directive so as to ensure that member states would introduce criminal sanctions and increased fines for non-compliance by May 2011.

*European Consumer Protection.* Furthermore, the Unfair Commercial Practices Directive (Directive 2005/29/EC), which acts as a tool against aggressive or misleading business-to-consumer marketing, also has an impact on the mobile advertising and marketing sector. For example, "making persistent and unwanted solicitations by telephone, fax, e-mail or other remote media (except in circumstances and to the extent justified under national law to enforce a contractual obligation)" is considered as a commercial practice which is in all circumstances unfair. Implementation of the Unfair Commercial Practices Directive varies across member states.

In some cases self-regulating bodies impose codes for advertising, sales promotion and direct marketing to ensure that advertisements are legal, decent, honest and truthful. An example is the so-called "CAP Code" of the Advertising Standards Authority in the U.K., which ensures that advertisements are legal, decent, honest and truthful.

*European Data Protection.* European data privacy standards can materially differ from those of the U.S., which also may further disproportionately affect us. European data protection law defines "personal data" more broadly than in the U.S. In particular the European Data Protection Directive (Directive 95/46/EC), which serves as the foundation for each EU country's data protection law, does not require that an individual be named for data to qualify as "personal data" as "personal data" is defined as "any information relating to an identified or identifiable natural person" (data subject); an "identifiable person" is one who can be "identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to his physical, physiological, mental, economic, cultural or social identity". Under the current framework as set out in the European Data Protection Directive, these principles of data protection do not apply to data that has been rendered anonymous in such a way that its data subject is no longer identifiable. However, it is unclear what process would satisfy the requirement for this anonymization criteria.

29

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

These standards can be interpreted and applied in conflicting ways from country to country and in a manner inconsistent with our current data protection practices or specific U.S. regulations. In particular IP addresses and the use of cookies and beacons have been determined to be subject to EU data protection laws.

One of the requirements which is most relevant for the purposes of mobile marketing/advertising is that personal data shall be obtained only for one or more specified and lawful purposes, and shall not be further processed in any manner incompatible with that purpose or those purposes. This means that where a 'data controller' wishes to use customer information for a purpose other than originally intended (for example, to send them marketing information), then the consent of the individual will be required. For the avoidance of doubt, these rules are without prejudice to the general opt-in requirement for direct marketing imposed by the e-Privacy Directive.

Enforcement of EU data protection laws vary widely between member states.  Fines of millions of Euros have been imposed in Spain, and in the U.K. the legislation was changed in 2010 to introduce more severe fines for serious breaches.

In January 2012 the European Commission announced a comprehensive reform of the EU's 1995 data protection rules to strengthen online privacy rights and boost Europe's digital economy through the adoption of a single Regulation, which will have the effect of law in all member states.  The European Commission aims to do away with the current fragmentation caused by the Data Protection Directive and the costly administrative burdens businesses undertake to comply with that Directive. The Regulation, according to the European Commission, will aim, among others, to reinforce individuals' rights, ensure a high level of data protection in all areas, ensuring proper enforcement of the rules and setting global data-protection standards.

While the Regulation will be automatically applicable to all 27 member states, which may result in the reduction of certain compliance costs, we anticipate that data protection rules will become stricter on businesses and more data subject friendly (i.e. the right of data subjects to be forgotten/have their personal data deleted from data bases, consent being explicit when required and not assumed, obligation of companies/organizations to report serious security breaches within 24 hours of occurrence, responsibility and accountability for those processing personal data etc.), which may have an impact on our ability to make use of our advertising and marketing solutions' to their full capacity and thus reduce their attractiveness to our customers within the EU and/or our ability to generate as much performance based revenue as anticipated.

Furthermore, the breadth and scope of the Regulation might impose additional regulatory and compliance burdens on us.  The European Commission intends to apply the Regulation to data controllers that process personal data of EU data subjects, even if that data controller is established outside of the EU, where the processing activities are related to the offering of goods or services to such EU data subjects. This means that if our products and services are offered from countries outside the EU to consumers located within the EU, we will need to comply with the EU data protection laws nevertheless.

EU data protection laws restrict the transfer of data from within the EEA to territories outside the EEA that do not offer an adequate level of protection (the U.S. is not considered adequate for these purposes). There are a number of options for complying with this restriction including obtaining consent, the use of model clauses and the use of safe harbor.  To date, we addressed this by using redundant data centers within the EU which avoids needing to share EU-originated data outside the EEA.

**United States Regulatory Environment**

**Regulatory Environment**

*Generally.* In addition to its regulation of wireless telecommunications providers generally, the U.S. Federal Communications Commission, or FCC, has shown interest in at least three areas that impact our business: research and development with regards to innovation, competition in the wireless industry and consumer protection with an emphasis on truth-in-billing. The FCC has examined, or is currently examining, how and when consumers enroll in mobile services, what types of disclosures consumers receive, what services consumers are purchasing and how much consumers are charged.

In addition, the Federal Trade Commission, or FTC, has been examining how mobile marketers can collect, share, transfer, use and store consumer data, including personal information, and what kind of notice, choice and consent should be required to do so.  In 2012, the FTC issued a report containing best practices in the children's mobile marketplace, and, in 2013, issued a report setting forth best practice recommendations for entities in the mobile marketplace (including, among others, platform providers and app developers)mobile app providers.  The FTC has expressed interest in particular in the mobile environment and services that collect sensitive data, such as location-based information and has recently issues a report outlining what it thinks are best-practices, including development of do not track mechanisms that give consumers tool to opt-out of tracking and targeting, and calling on Congress to pass baseline consumer data privacy and security legislation.  In addition,

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

several proposed bills currently are pending in Congress and in the states, which if enacted would materially burden companies wishing to collect, share, transfer, use and store consumer data, particularly for tracking and targeting.  Similar legislative and regulatory challenges exist in the European Union and other countries where we operate or may seek to operate.

*Deceptive Trade Practice Law.*  In the U.S. the FTC and state attorneys general are given broad powers by legislatures to curb unfair and deceptive trade practices. These laws and regulations apply to mobile marketing campaigns and behavioral advertising, and in particular consumer data privacy practices. The general guideline is that all material terms and conditions of the offer must be "clearly and conspicuously" disclosed to the consumer prior to the buying decision. In practice, the definition of clear and conspicuous disclosure is often a subjective determination. The balancing of the desire to capture a potential customer's attention, while providing adequate disclosure, can be even more challenging in the mobile context due to the lack of space.   State Attorney Generals may interpret existing laws and regulations, such as those applying to websites and online services, to mobile apps and mobile services, and this may materially burden our or third parties' ability to engage in activities that are crucial to our current business (e.g., tracking mobile user activities and targeting them with relevant ads). In many instances, we must rely on third parties that provide user data to us, such as app publishers, to provide adequate notice and have the requisite authority to collect and share consumer data with or transfer it to us.  It is possible that we may receive consumer data from app publishers or others who are accused or found to have not had sufficient authority to share the data with, or transfer it to, us or that have otherwise engaged in acts or omissions that put us at risk of claims.

*Behavioral Advertising.*  Behavioral advertising is a technique used by online and mobile publishers and advertisers to increase the effectiveness of their campaigns. Behavioral advertising uses information collected from an individual online or mobile behavior, such as the pages they have visited or the searches they have made, to select which advertisements to display to that individual. This data can be valuable for marketers looking to personalize advertising initiatives, including without limitation by providing geo-tags through mobile devices. Currently, behavioral advertising is not specifically regulated by the government in the U.S., but in the online space many businesses adhere to industry self-governing principles, including an opt-out regime whereby information may be collected until an individual indicates that he or she no longer agrees to have this information collected.  Such an industry self-regulatory notice and choice program is actively being addressed for the mobile marketplace.  In addition, laws and regulations in the U.S. of a more general nature, such as those concerning false, misleading or unfair advertising or business practices, may be interpreted in ways that could burden our ability to track and target consumers.

*Consumer Privacy Regulation.*  Our business is affected by U.S. federal and U.S. state, as well as EU member state and foreign country, laws and regulations governing the collection, use, retention, sharing and security of data that we receive from and about consumers.  There are also numerous pending bills at both the U.S. federal and state level on a myriad of issues, which, if enacted, might impose additional regulatory burdens on us.  In recent years, regulation has focused on the collection, use, disclosure and security of information that may be used to identify or that actually identifies an individual, such as an Internet Protocol address or a name. Although the mobile and Internet advertising privacy practices are currently largely self-regulated in the U.S., the FTC has conducted numerous discussions on this subject and issued reports suggesting that more rigorous privacy self-regulation and legislation is appropriate, possibly including more burdensome regulation of non-personally identifiable information. Within the EU, member state data protection authorities typically regard IP addresses and other persistent identifiers (such as mobile devise identifiers) as personal information, and legislation adopted recently in the EU requires consent for the placement of a cookie on a user device. In addition, EU data protection authorities are following with interest the FTC's discussions regarding behavioral advertising and may follow suit by imposing additional privacy requirements for mobile advertising practices.

*Marketing Regulation.*  In addition, there are U.S. federal and state laws and EU member state and other country laws that govern SMS and telecommunications-based marketing, generally requiring senders to transmit messages (including those sent to mobile devices) only to recipients who have specifically consented to receiving such messages. U.S. federal, EU member state and other country laws also govern e-mail marketing, generally imposing an opt-out requirement for emails sent within an existing business relationship.  One of our subsidiaries has been threatened with a class action lawsuit for alleged involvement in a U.S. campaign where its vendor is alleged to have failed to follow applicable law in implementing a campaign.

*SMS* and Location-Based Marketing Best Practices and Guidelines.  We are a member of the Mobile Marketing Association, or MMA, a global association of 700 agencies, advertisers, mobile device manufacturers, wireless operators and service providers and others interested in the potential of marketing via the mobile channel. The MMA has published a code of conduct and best practices guidelines for use by those involved in mobile messaging activities. The guidelines were developed by a collaboration of the major carriers and they require adherence to them as a condition of service. We voluntarily comply with the MMA code of conduct. In addition, the Cellular Telephone Industry Association, or CTIA, has developed Best Practices and Guidelines to promote and protect user privacy regarding location-based services. We also voluntarily comply with those guidelines, which generally require notice and user consent for delivery of location-based services. If we are alleged to have failed to follow

31

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

these self-regulatory guidelines, we could be subject to false advertising or unfair business practices claims and could be denied access by carriers whom we rely on in order to facilitate campaigns.

TCPA. The United States Telephone Consumer Protection Act, or TCPA, prohibits unsolicited voice and text calls to cell phones by use of an auto-dialing system unless the recipient has given prior consent. The statute also prohibits companies from initiating telephone solicitations to individuals on the national Do-Not-Call list, unless the individual has given prior express consent or has an established business relationship with the company, and restricts the hours when such messages may be sent. In the case of text messages, a company must obtain written opt-in consent to send messages to a mobile device. Violations of the TCPA can result in statutory damages of $500 per violation (i.e., for each individual text message). U.S. state laws impose additional regulations on voice and text calls. One of our subsidiaries has been threatened with a class action lawsuit for alleged involvement in a U.S. campaign where its vendor is alleged to have failed to follow applicable law in implementing a campaign.

CAN-SPAM. The U.S. Controlling the Assault of Non-Solicited Pornography and Marketing Act, or CAN SPAM, prohibits all commercial e-mail messages, as defined in the law, to mobile phones unless the device owner has given "express prior authorization." Recipients of such messages must also be allowed to opt-out of receiving future messages the same way they opted-in. Senders have ten days to honor opt-out requests. The FCC has compiled a list of domain names used by wireless service providers to which marketers may not send commercial e-mail messages. Senders have 30 days from the date the domain name is posted on the FCC site to stop sending unauthorized commercial e-mail to addresses containing the domain name. Violators are subject to fines of up to $6.0 million and up to one year in jail for some spamming activities. Carriers, the FTC, the FCC, and State Attorneys General may bring lawsuits to enforce alleged violations of the Act and if fraud or deception are alleged, consumers can bring a private action.

Communications Privacy Acts. U.S. federal and state laws, and in some instances foreign laws, impose consent requirements for disclosures of contents of electronic communications or customer record information in some instances. To the extent that we knowingly receive this information without the consent of customers or unless other exclusions apply, we could be subject to class action lawsuits for statutory damages or criminal penalties under these laws, which could impose significant additional costs and reputational harm. Some EU member state laws also require consent for our receiving certain information, and if our carrier customers fail to obtain such consent we could be subjected to civil or even criminal penalties.

Security Breach Notification Requirements. In the U.S., almost all states have enacted data breach notification laws, which require notification of individuals and sometimes state regulatory bodies in the event of data breaches involving certain defined categories of personal information. There are proposals at the federal level for a uniform data breach notification law. In addition, outside of the US, some EU member state laws require notice to the affected individual and/or state data protection authority of a data security breach involving personal data, especially if the breach poses a severe risk to individuals. Germany enacted a broad requirement to notify individuals in the event of a data security breach that is likely to be followed by notification requirements to data subjects in other EU member states. Austria and other countries have breach notification laws. Japan and Uruguay have also recently enacted security breach notice requirements. This trend suggests that breach notice statutes may be enacted in other jurisdictions, as well. Additional enforcement actions with fines, penalties and regulatory or civil litigation may result from current or future laws of this sort.

Children. U.S. federal privacy regulations implementing the Children's Online Privacy Protection Act prohibit the knowing collection of personal information from children under the age of 13 without verifiable parental consent, and strictly regulate the transmission of requests for personal information to such children. In 2013, the FTC strengthened and broadened its COPPA rules, which might impose additional costs if we were to direct any of our services to children. Other countries do not recognize the ability of children to consent to the collection of personal information. In addition, it is likely that behavioral advertising regulations will impose special restrictions on use of information collected from minors for this purpose.

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

### 4.C. Organization Structure

We conduct our business globally through various local subsidiaries.

As of December 31, 2012, the following are our significant subsidiaries that we included in our consolidated financial statements:

| Subsidiary name | Proportion held | Country of operation | Nature of activities |
|---|---|---|---|
| Velti Limited | 100% | U.K. | Holding company |
| Velti DR Limited | 100% | U.K. | Mobile marketing and advertising |
| Velti, Inc. | 100% | U.S. | Mobile marketing and advertising |
| Mobclix, Inc. | 100% | U.S. | Mobile marketing and advertising |
| Velti S.A. | 100% | Greece | Mobile marketing and advertising |
| Velti Platforms and Services Limited | 100% | Cyprus | Mobile marketing and advertising |
| Velti Mobile Platforms Limited | 100% | British Virgin Islands | Mobile marketing and advertising |
| Mobile Interactive Group Limited | 100% | U.K. | Mobile marketing and advertising |
| Velti Mobile Marketing Technology LLC | 100% | Russia | Mobile marketing and advertising |
| Velti India Private Limited | 100% | India | Mobile marketing and advertising |
| Velti FZ LLC | 100% | UAE | Mobile marketing and advertising |
| Velti Istanbul Mobil Teknolojileri | 100% | Turkey | Mobile marketing and advertising |
| Velti North America Inc. | 100% | U.S | Holding Company |
| Velti Ukraine Mobile Marketing Services LLC | 100% | Ukraine | Mobile marketing and advertising |
| Velti do Brasil Marketing Eletronico Ltda | 100% | Brazil | Mobile marketing and advertising |
| Casee (Beijing) Information Technology Company Limited | 100% | China | Mobile marketing and advertising |
| Velti Netherlands B.V. | 100% | Netherlands | Holding Company |
| Mobile Interactive Group Blgm N.V. | 100% | Belgium | Mobile marketing and advertising |
| ZayPay International B.V. | 100% | Netherlands | Mobile marketing and advertising |

### 4.D. Property, Plant and Equipment

We own no real estate. Our registered office is located in the Bailiwick of Jersey, the Channel Islands and our corporate headquarters are located in the Republic of Ireland. As of December 31, 2012, our leased facilities include our:

- corporate, sales, marketing, product development, professional services, support and administrative facilities in San Francisco, California where we lease approximately 48,000 square feet, Palo Alto, California where we lease approximately 4,000 square feet, Atlanta, GA where we lease approximately 14,000 square feet, and New York City, New York where we lease approximately 10,800 square feet;

- sales, marketing, professional services, support and administrative facilities in London where we lease approximately 12,000 square feet;

- research and development, sales, marketing, consulting and support facilities in Athens where we lease approximately 36,000 square feet;

- sales, marketing, product development, professional services, support and administrative facilities in Chennai where we lease approximately 10,000 square feet; and

- an executive office in Dublin where we lease approximately 108 square feet.

We and our subsidiaries also lease additional office space in various other locations in the U.S., Europe, and Asia used primarily for local sales, services, support and administrative services. We believe that our premises are sufficient for our needs in the near future and that additional space will be available on commercially reasonable terms as needed.

### ITEM 4A. UNRESOLVED STAFF COMMENTS

None.

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## ITEM 5.  OPERATING AND FINANCIAL REVIEW AND PROSPECTS

*Shareholders should read the following discussion and analysis of our financial condition and results of operations in conjunction with the section entitled "Selected Financial Data" and our Consolidated Financial Statements and the related notes thereto included elsewhere in this Annual Report. In addition to historical consolidated financial information, the following discussion contains forward -looking statements that reflect our plans, estimates and opinions. Our actual results could differ materially from those discussed in the forward -looking statements. Factors that could cause or contribute to these differences or cause our actual results or the timing of selected events to differ materially from those anticipated in these forward-looking statements include those set forth under "Risk Factors" and elsewhere in this Annual Report.*

### Overview

We are a leading global provider of mobile marketing and advertising technology and solutions that enable brands, advertising agencies, mobile operators and media to implement highly targeted, interactive and measurable campaigns by communicating with and engaging consumers via their mobile devices. The Velti platform, called Velti mGage, allows customers to use mobile and traditional media to reach targeted consumers, engage the consumer through mobile Internet and applications, convert them into customers and continue to actively manage the relationship through the mobile channel.

Our solutions help brands mobilize their consumer engagement funnel, transforming browsing into buying, communication into loyalty and behavioral insight into purchase influence. From strategic planning to cross-platform digital campaign execution, we help brands establish a cross-channel strategic framework based on a solid understanding of their customers' behavior. Our mGage platform allows marketers to execute highly personalized, enterprise mobile marketing programs across the marketing funnel including ad delivery and measurement, cross-channel messaging promotions, mobile site development, and cross-platform campaign data visualization. For businesses that want professional assistance in achieving mobile marketing and advertising objectives, our services organization offers expert assistance in developing strategies, programs, and hosting services. From account management to creative production to ad ops and technical resources, we support enterprise customers through a self-service or managed services model that augments customers' existing staff to support mobile initiatives.

### Corporate Highlights

During 2012 we continued to expand our presence across numerous geographies. We have had success in the United States and Asia, diversifying our global business. Our business in the U.K. grew substantially, in large part due to our acquisition of MIG in late 2011. Revenue in the U.K. in 2012 was 28% of total revenue (compared to 20% in 2011), and in the Americas was 24% of total revenue (compared to 22% in 2011).

Our full year 2012 results showed a 43% increase in revenue over 2011, despite a difficult operating environment in the fourth quarter, during which we saw delays in campaign launches and other challenges that negatively impacted our business.  In the fourth quarter, revenue came in at the low end of our expectations, which, in conjunction with higher third party costs and other operating expenses, contributed to significantly lower adjusted EBITDA.

In the fourth quarter of 2012, we completed the divestiture of certain non-strategic assets focused on geographies and certain customers in Southeast and Eastern Europe to Starcapital Limited (Starcapital), a Cyprus company owned by certain former non-management employees of Velti. As part of this divestiture, approximately 75 employees transferred from Velti to subsidiaries of Starcapital. The divested assets were characterized by long revenue collection cycles, are located in troubled economies, and have heavy capital expenditure requirements. We recorded a loss of $10.5 million on the sale of those assets. The consideration for the sale of assets was a $23.5 million non-interest bearing receivable, which is payable in cash in three installments through 2014. We received the first installment in December 2012.

Following the divestiture of these assets to Starcapital, we have been continuing to evaluate other customers and opportunities that we are pursuing in various geographies. We have decided not to pursue certain business opportunities or potential customers that do not meet our more rigorous cash investment requirements, and requirements for improved cash collections and reductions in business in economically challenged regions.

We expect to generate substantial negative cash flow in the first quarter of 2013, both inclusive and exclusive of certain cash acquisition-related liabilities that became payable in the quarter. In addition, as of the end of the first quarter of 2013, we have substantially utilized our revolving credit facility with HSBC. Based on our current business plan, we believe that we will, in the next three months, need to raise additional capital to supplement our existing cash balance and any cash generated from

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

operations, in order to meet our anticipated cash needs for working capital and capital expenditures. There is no assurance that such additional capital will be available to us or on terms acceptable to us.

**Basis of Presentation**

We have prepared our consolidated financial statements in accordance with accounting principles generally accepted in the United States of America (U.S. GAAP). Certain prior year balances have been reclassified to conform to the current year presentation. Such reclassifications did not affect total revenues, operating income or net income.

The accompanying consolidated financial statements include the results of Velti plc and all subsidiaries that we control. The statements also include the accounts of an entity in which we are deemed to have a "controlling interest" that is not based on voting rights or control. Intercompany accounts and transactions have been eliminated.

We evaluate our ownership, contractual rights and other interests in entities to determine if they are variable interest entities (VIEs), if we have a variable interest in those entities and the nature and extent of those interests. These evaluations are highly complex and involve judgment and the use of estimates and assumptions based on available historical information and management's judgment, among other factors. Based on our evaluations, if we determine we are the primary beneficiary of such VIEs we consolidate such entities into our financial statements.

**Critical Accounting Policies and Significant Judgments and Estimates**

Our consolidated financial statements have been prepared in accordance with U.S. GAAP. The preparation of our financial statements and related disclosures requires us to make estimates, assumptions and judgments that affect the reported amount of assets, liabilities, revenue, costs and expenses, and related disclosures. We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experience and various other assumptions that we believe to be reasonable under the circumstances. Significant estimates and assumptions made by management include revenue recognition, recognition of government grant income, income taxes, the allowance for doubtful accounts, intangible assets, goodwill and long-lived assets, contingent payments related to our recent acquisitions and the assumptions used to determined share-based compensation expense.   Since the use of estimates is an integral component of the financial reporting process, actual results could differ from those estimates.

The following discussion addresses our critical accounting policies and reflects those areas that require more significant judgments and use of estimates and assumptions in the preparation of our consolidated financial statements. See Note 2 in the Notes to the Consolidated Financial Statements included elsewhere in this Annual Report for additional information about these critical accounting policies.

*Revenue Recognition*

We derive our revenue from three sources:

- software as a service (SaaS) revenue, which consists of subscription fees from customers who utilize our mobile marketing and advertising platforms, generally referred to as "usage-based" services, and fees from customers who utilize our software solutions to manage and measure the progress of their transaction-based mobile marketing and advertising campaigns, which we refer to as "performance-based" services;

- license and software revenue, which consists of revenue from customers who license our mobile marketing and advertising platform and fees for customized software solutions delivered to and installed on the customers' server; and

- managed services revenue, which consists of fees charged to customers for professional services related to the implementation, execution, and monitoring of customized mobile marketing and advertising solutions as well as other client driven projects.

We account for revenue for these services and licenses in accordance with Accounting Standards Codification (ASC) Topic 605 - Revenue Recognition and ASC Topic 985-605 - Certain Revenue Arrangements that Include Software Elements. We recognize revenue when all of the following conditions are satisfied: (i) there is persuasive evidence of an arrangement; (ii) the service has been rendered or delivery has occurred; (iii) the fee to be paid by the customer is fixed or determinable; and (iv) collectibility of the fee is reasonably assured.

35

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

SaaS revenue is generated from our "usage-based" services, including subscription fees for use of individual software modules and our automated mobile marketing campaign creation templates, and fees charged for access to our technology platform.  These fees are recognized ratably over the contract term beginning on the commencement date of each contract as services are rendered.

SaaS revenue generated from our "performance-based" services is generally based on specified metrics, typically relating to the number of transactions performed during the campaign multiplied by the cost per transaction in accordance with the terms of the related contracts. Transactions can include SMS messages sent by participants in customer campaigns or advertisement impressions placed on mobile applications, among other types of performance-based transactions. Certain of our performance-based contracts include performance incentive provisions that link a portion of revenue that we may earn under the contract to the performance of the customer's campaign relative to quantitative or other milestones, such as the growth in the consumer base, reduced consumer churn, or the effectiveness of the end-user response. We consider the performance-based fees to be contingent fees. We recognize this revenue monthly based on actual performance, which is when the fees are earned and the amount of the fee can be reliably measured. Our performance-based arrangements are typically invoiced monthly, which can occur in a period subsequent to revenue being recognized.

License and software revenue consists of license fees charged for our mobile marketing and advertising technology.  We provide licenses on a perpetual or term basis. These types of arrangements do not, typically, include any ongoing support arrangements or rights to upgrades or enhancements and therefore revenue related to perpetual licensing arrangements is recognized upon the delivery of the license. Revenue from term based licenses is recognized over the related term of an arrangement. Fees charged to customize our software solution are, generally, recognized using the completed contract or percentage-of-completion method according to ASC 605-35, Revenue Recognition - Construction-Type and Production-Type Contracts, based on the ratio of costs incurred to the estimated total costs at completion.

Managed services revenue, when sold with software and support offerings, are accounted for separately when these services (i) have value to the customer on a standalone basis, (ii) are not essential to the functionality of the software and (iii) there is objective and reliable evidence of the selling price of each deliverable. When accounted for separately, revenue is recognized as the services are provided for time and material contracts, and ratably over the term of the contract when accepted by the customer for fixed price contracts. For revenue arrangements with multiple deliverables, such as an arrangement that includes license, support and professional services, we allocate the total amount the customer will pay to the separate units of accounting based on their relative selling prices, as determined by the price of the undelivered items when sold separately.

The timing of revenue recognition in each case depends upon a number of factors, including the specific terms of each arrangement and the nature of our deliverables and obligations, and the existence of evidence to support recognition of revenue as of the reporting date. For contracts with extended payment terms for which we have not established a successful pattern of collection history, we recognize revenue when all other criteria are met and when the fees under the contract become due. Fees that have been invoiced are recorded in trade receivables and in revenue when all revenue recognition criteria have been met.   When fees have been invoiced but not all revenue recognition criteria have been met, the invoice is recorded in trade receivables and in deferred revenue.   When all revenue recognition criteria are met, but fees have not been invoiced as of the reporting date, such fees are reported in accrued contract receivables and in revenue. We present revenue net of value-added tax, sales tax, excise tax and other similar assessments. Our revenue arrangements do not contain general rights of return.

Certain arrangements entered into by us are revenue sharing arrangements. As a result, we complete an analysis of the facts and circumstances to determine whether revenue earned from these arrangements should be recorded gross with the company performing as a principle, or recorded net of third party costs with the company performing as an agent, as required by ASC 605-45 Principal Agent Consideration.  When we are a principal in a transaction, we include all amounts paid on behalf of our customers in both revenue and costs.

We present revenue net of tax, sales tax, excise tax and other similar assessments.  Our revenue arrangements do not contain general rights of return.

### Government Grant Income Recognition

From time to time, we receive grants from the European Union for the development and roll-out of mobile and broadband services and m-commerce related services. We recognize grant income as an offset to costs and expenses in our consolidated statements of comprehensive loss in the period when the costs to be reimbursed by the grant are recognized as expense. When those costs are incurred, receivables from government grants are recognized, if there is reasonable assurance that the grant will be received and we are able to comply with all of the conditions imposed on the grant. We believe we have reasonable

36

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

assurance generally upon receiving notification of grant eligibility. Each grant provides income in the form of reimbursement of capital expenditures or of the costs incurred in the development of technology subject to the terms of the grant. Grants that reimburse costs related to depreciable assets, including capitalized software development costs, are recognized as income in the periods in which amortization and depreciation on these assets is charged.

### *Income Taxes - Estimates of Effective Tax Rates, Deferred Taxes and Valuation Allowance*

Income taxes are accounted for using the asset and liability method. Significant judgment is required in determining our worldwide income tax provision. We are subject to income taxes in multiple jurisdictions and we use estimates in determining our provision for income taxes. In the ordinary course of a global business, there are many transactions and calculations where the ultimate tax outcome is uncertain. Some of these uncertainties arise as a consequence of the process of identifying items of revenues and expenses that qualify for preferential tax treatment and the segregation of earnings and expenses between jurisdictions to avoid double taxation. Compliance with income tax regulations requires us to make decisions relating to the transfer pricing of revenue and expenses between our legal entities that are located in a variety of tax jurisdictions. Our determinations include many decisions based on our knowledge of the underlying assets of the business and the beneficial ownership of these assets. Although we believe that our estimates are reasonable, the final tax outcome of these matters could be different from that which is reflected in our historical income tax provisions and accruals. Such differences could have a material effect on our income tax provision and net income in the period in which such determination is made.

Deferred tax assets, related valuation allowances and deferred tax liabilities are determined separately by tax jurisdiction. This process involves estimating actual current tax liabilities together with assessing temporary differences of items for tax and accounting purposes. These differences result in deferred tax assets and liabilities which are recorded on the balance sheet. Our deferred tax assets consist primarily of net operating loss and tax credit carry forwards and temporary differences related to intangible assets and accrued expenses.

We record a valuation allowance to reduce our deferred tax assets to the amount that is more likely than not (a likelihood of more than 50%) to be realized. In order for us to realize our deferred tax assets, we must be able to generate sufficient taxable income in those jurisdictions where the deferred tax assets are located. Our valuation allowance relates primarily to certain U.S. federal tax loss carryforwards. We evaluate our valuation allowance based on factors such as the mix of earnings in the jurisdictions in which we operate, prudent and feasible tax planning strategies, current taxable income and forecasted taxable income. Forecasts of future taxable income are further refined as a result of each year's corporate budget and goal setting process, which generally occurs in the fourth quarter. Based on our evaluation of these factors, we reduced our valuation allowances in 2012. The portion credited to income tax benefit was approximately $0.8 million. In the event we were to determine that we would not be able to realize all or part of our net deferred tax assets in the future, an adjustment to the deferred tax assets valuation allowance would be charged to earnings in the period in which we make such a determination. Likewise, if we later determine that it is more likely than not that the net deferred tax assets would be realized, we would reverse the applicable portion of the previously provided valuation allowance.

The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax regulations in multiple tax jurisdictions. The amount of income tax we pay is subject to ongoing audits by the jurisdictions in which we operate. These audits include questions regarding the timing and amount of deductions and the allocation of income among various tax jurisdictions. Our estimate of the potential outcome for any uncertain tax issue is highly judgmental. We account for our uncertain tax issues using a two-step approach to recognize and measure uncertain tax positions taken or expected to be taken in a tax return. The first step is to determine if the weight of available evidence indicates that it is more likely than not (a likelihood of more than 50 percent) that the tax position will be sustained on audit, including resolution of any related appeals or litigation processes.  In this step, we assume that the tax position will be examined by the relevant taxing authority that has full knowledge of all relevant information. The second step is to measure the tax benefit as the largest amount that is more than 50% likely to be realized upon ultimate settlement. Although we believe we have adequately reserved for our uncertain tax positions, no assurance can be given with respect to the final outcome of these matters. We adjust reserves for our uncertain tax positions due to changing facts and circumstances, such as the closing of a tax audit, refinement of estimates or realization of earnings or deductions that differ from our estimates. To the extent that the final outcome of these matters is different than the amounts recorded, such differences will impact our provision for income taxes in the period in which such a determination is made. Our provisions for income taxes include the impact of reserve provisions and changes to reserves that are considered appropriate and also include the related interest and penalties.

As a part of our accounting for business combinations, some of the purchase price is allocated to goodwill and intangible assets. Impairment charges associated with goodwill are generally not tax deductible and will result in an increased effective income tax rate in the period that any impairment is recorded. Amortization expenses associated with acquired intangible assets are generally

37

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

not tax deductible pursuant to our existing tax structure; however, deferred taxes have been recorded for non-deductible amortization expenses as a part of the purchase price allocation process. We have taken into account the allocation of these identified intangibles among different taxing jurisdictions, including those with nominal or zero percent tax rates, in establishing the related deferred tax liabilities.

### Allowance for Doubtful Accounts

We record revenue for fees that have been invoiced to customers, for which payments have not been received in trade receivables. Our receivables are not interest bearing. Fees that have not been invoiced as of the reporting date but for which all revenue recognition criteria are met are reported as accrued contract receivables.

We evaluate the collectability of accounts receivable based on a combination of factors. We exercise judgment when determining the adequacy of these reserves as we evaluate historical bad debt trends, general economic conditions in the U.S. and internationally, and changes in customer financial conditions. An allowance for doubtful accounts is provided based on estimates developed using standard quantitative measures, which include historical write offs and current economic conditions. We also make a specific allowance if there is strong evidence indicating that the amounts due are unlikely to be collectible. Additional allowances might be required if deteriorating economic conditions or other factors affect our customers' ability to make timely payments. Our allowances have generally been adequate to cover our actual credit losses. However, since we cannot reliably predict future changes in the financial stability of our customers, we cannot guarantee that our allowance will continue to be adequate.

### Capitalized Software

*Internal Software Development Costs.*  Internal software development costs consist primarily of internal salaries and consulting fees for developing software platforms for sale to or use by customers in mobile marketing and advertising campaigns. We capitalize such costs as they are integral parts of products or processes to be sold or leased. We capitalize costs related to software developed for new products and significant enhancements of existing products once technological feasibility has been reached and all research and development for the components of the product have been completed.

*Computer Software.*  Computer software costs generally represent costs incurred to purchase software programs and packages that are used to develop and ultimately deliver our platforms sold to customers. Generally, costs associated with maintaining computer software programs are expensed as incurred. We capitalize the cost of software licenses that are complementary to or enhance the functionality of our existing technology platform and amortize such costs over the shorter of the contract term or the useful life of the license, but not to exceed three years.

*Licenses and Intellectual Property.*  We acquire know-how, intellectual property, and technical expertise generally through licensing arrangements with development partners. We capitalize the cost of the know-how and intellectual property licenses when the in-license expertise compliments and/or enhances our existing technology platform. Software licenses are amortized over the shorter of the contract term of the license agreement or the useful life of the license, but not to exceed three years.

Our total net capitalized software, including licenses and intellectual property acquired, totaled $70.6 million at December 31, 2012.  Capitalized development costs are then amortized over the product's estimated life, not to exceed three years, beginning upon general release of the product. Annually, we compare a product's unamortized capitalized cost to the product's net realizable value. To the extent unamortized capitalized cost exceeds net realizable value based on the product's estimated future gross revenues the excess is written off. This analysis requires us to estimate future gross revenues associated with certain products and the future costs of completing and selling certain products. Significant judgment is required in determining when a product becomes "technologically feasible" and its net realizable value. Changes in these estimates could result in write-offs of capitalized software costs.

### Impairment of Long-Lived Assets and Amortizable Intangible Assets

We evaluate long-lived assets such as property and equipment, and identifiable intangible assets that are subject to amortization for impairment when events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. An impairment loss is recognized when estimated future undiscounted cash flows expected to result from the use of the asset and its eventual disposition is less than the carrying amount. When undiscounted future cash flows are not expected to be sufficient to recover an asset's carrying amount, the asset is written down to its fair value. Where available, quoted market prices are used to determine fair value. When quoted market prices are not available, various valuation techniques, including the discounted value of estimated future cash flows, are utilized.

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

*Goodwill*

Goodwill is generated when the consideration paid for an acquisition exceeds the fair value of net assets acquired. Goodwill is recognized as an asset and reviewed for impairment at least annually, or whenever events or circumstances indicate that the carrying amount of goodwill may not be recoverable. We have selected December 31 as the date to perform the annual impairment testing of goodwill.

We adopted ASU No. 2011-08 in 2012, which amends existing guidance by giving an entity the option to first assess qualitative factors to determine whether it is more likely than not (that is, a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount, prior to performing the second step of the goodwill impairment assessment.

We completed our annual impairment test for fiscal 2012 and determined that there was no impairment. Based on fourth-quarter 2012 testing, our estimated fair value totals approximately $324.8 million, including a conservative control premium of approximately 10% percent, when compared to our market value of approximately $295.3 million at December 31, 2012. The control premium is defined as the value that may arise from an acquiring company's ability to take advantage of synergies and other benefits that flow from control over another entity.  An acquiring entity is often willing to pay more for equity securities that give it a controlling interest than an investor would pay for equity securities representing less than a controlling interest. Our fair value at December 31, 2012 was in excess of our book equity of approximately $292.4 million.

Our shares price remains extremely volatile and such activity is not unusual. If our market capitalization falls below our book value and remains at or below that price for a period of time indicating permanent impairment, then we will treat this data as an impairment indicator and will perform the required analysis to determine the amount of the impairment under ASC 350-20.

*Fair Value Measurements*

We report our financial and non-financial assets and liabilities that are remeasured and reported at fair value at each reporting period. We established a three-tier fair value hierarchy, which prioritizes the inputs used in the valuation methodologies in measuring fair value:

| | |
|---|---|
| **Level 1.** | Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets. |
| **Level 2.** | Include other inputs that are directly or indirectly observable in the marketplace. |
| **Level 3.** | Unobservable inputs which are supported by little or no market activity. |

Our financial assets and liabilities consist principally of cash and cash equivalents, accounts payable, accrued liabilities, current and non-current notes payable. Cash and cash equivalents include time deposits and readily marketable securities with original maturities of 90 days or less. Cash and cash equivalents are stated at cost, which approximates fair value. As of December 31, 2012 and 2011, we do not have readily marketable securities that are classified as cash equivalents.

Accounts payable and accrued liabilities are carried at cost that approximates fair value due to their expected short maturities. The carrying amount of long-term debt as of December 31, 2012 and 2011 approximates its fair value. As of December 31, 2012, we did not have any financial assets or liabilities for which Level 1 or Level 2 inputs were required to be disclosed. See Note 6 in the Notes to the Consolidated Financial Statements for our disclosure of Level 3 inputs used to revalue our contingent payments related to certain of our acquisitions.

*Share-Based Payments*

We measure and recognize share-based compensation expense related to share-based transactions, including employee and director equity awards, in the financial statements based on fair value. We use the Black-Scholes valuation model to calculate the grant date fair value of share options and deferred share awards, using various assumptions. We recognize compensation expense over the service period of the award using the "graded vesting attribution method" which allocates expense on a straight-line basis over the requisite service period for each separately vesting portion of the award as if the award was, in substance, multiple awards.

We account for equity instruments issued to non-employees as expense at their fair value over the related service period and periodically revalue the equity instruments as they vest, using a fair value approach. The value of equity instruments issued for consideration other than employee services is determined on the earlier of (i) the date on which there first exists a firm commitment for performance by the provider of goods or services, or (ii) on the date performance is complete, using the Black-

39

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Scholes valuation model. Changes in the subjective input assumptions can materially affect the fair value estimates determined under the Black-Scholes option valuation model. In the future, changes in the assumptions under the Black-Scholes valuation model, or our election to use a different valuation model, could result in a significantly different impact on our net income or loss.

### Purchase Accounting

We have made estimates of the fair values of purchased intangible and other assets acquired in conjunction with our purchase of companies after considering valuations prepared by independent third-party appraisers and certain internally generated information.

Purchased intangible assets, excluding goodwill, totaled $39.6 million at December 31, 2012. If the subsequent actual and updated projections of the underlying business activity are less as compared to the underlying assumptions and projections used to develop these values, then we could experience impairment losses, as described above. In addition, we have estimated the economic lives of certain of these assets and these lives were used to calculate depreciation and amortization expense. If our estimates of the economic lives change, then additional depreciation or amortization expense could be incurred on an annual basis. Historically, we have not made any changes in these areas.

### Contingencies and Liabilities

We are involved from time to time in various proceedings, lawsuits and claims involving our customers, products, intellectual property, shareholders and employees. We routinely review the status of each significant matter and assess our potential financial exposure.  When we reasonably determine that a loss associated with any of these matters is probable, and can reasonably estimate the loss, we record a reserve to provide for such loss contingencies. If we are unable to record a reserve because we are not able to estimate the amount of a potential loss in a matter, or if we determine that a loss is not probable, we are nevertheless required to disclose certain information regarding such matter if we determine that there is a reasonable possibility that a loss has been incurred. Because of the inherent uncertainties related to these types of matters, we base our loss reserves on the best information available at the time. As additional information becomes available, we may reevaluate our assessment regarding the probability of a matter or its expected loss. Our financial position, results of operations or cash flows could be materially and adversely affected by such revisions in our estimates. For further discussion of contingencies and liabilities, see the various risks described under "Risk Factors -- Risks Related to Our Business," above.

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**5.A. Operating Results**.

The following table sets forth our consolidated results of operations for the years ended December 31, 2012, 2011 and 2010:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2012** | **2011** | **2010** |
|  | (in thousands) | | |
| Revenue: | | | |
| Software as a service (SaaS) revenue | $ 204,210 | $ 139,024 | $ 77,202 |
| License and software revenue | 22,213 | 36,705 | 26,586 |
| Managed services revenue | 43,921 | 13,473 | 12,481 |
| Total revenue | 270,344 | 189,202 | 116,269 |
| Cost and expenses: | | | |
| Third-party costs | 91,404 | 53,901 | 36,658 |
| Datacenter and direct project costs | 29,966 | 17,952 | 6,312 |
| General and administrative expenses | 68,196 | 45,258 | 22,484 |
| Sales and marketing expenses | 54,507 | 37,733 | 23,049 |
| Research and development expenses | 21,236 | 13,060 | 7,840 |
| Acquisition related and other charges | 9,950 | 8,890 | 5,364 |
| Impairment of intangible assets | 16,902 | 1,500 | — |
| Loss from disposal of assets | 10,532 | — | — |
| Depreciation and amortization | 33,946 | 20,900 | 12,131 |
| Total cost and expenses | 336,639 | 199,194 | 113,838 |
| Income (loss) from operations | (66,295) | (9,992) | 2,431 |
| Interest expense, net | (1,830) | (7,389) | (8,069) |
| Gain (loss) from foreign currency transactions | 1,995 | 6,200 | (1,726) |
| Other income (expense) | 5,876 | (49) | — |
| Loss before income taxes, equity method investments and non-controlling interest | (60,254) | (11,230) | (7,364) |
| Income tax benefit (expense) | 2,835 | (3,808) | (3,771) |
| Loss from equity method investments | (3,755) | (200) | (4,615) |
| Net loss | (61,174) | (15,238) | (15,750) |
| Net income (loss) attributable to non-controlling interest | 53 | 130 | (81) |
| Net loss attributable to Velti | $ (61,227) | $ (15,368) | $ (15,669) |

**Revenue**

|  | Year Ended December 31, | | | Variance | | | |
|---|---|---|---|---|---|---|---|
|  | | | | 2012 vs 2011 | | 2011 vs 2010 | |
|  | **2012** | **2011** | **2010** | **$** | **%** | **$** | **%** |
|  | (in thousands, except percentages) | | | | | | |
| Software as a service (SaaS) revenue | $ 204,210 | $ 139,024 | $ 77,202 | $ 65,186 | 47 % | $ 61,822 | 80% |
| License and software revenue | 22,213 | 36,705 | 26,586 | (14,492) | (39)% | 10,119 | 38% |
| Managed services revenue | 43,921 | 13,473 | 12,481 | 30,448 | 226 % | 992 | 8% |
| Total revenue | $ 270,344 | $ 189,202 | $ 116,269 | $ 81,142 | 43 % | $ 72,933 | 63% |

Our total revenue for 2012 increased by $81.1 million, or 43%, compared to 2011. The increase was primarily the result of growth in SaaS revenue of $65.2 million; of which $53.0 million was from revenue generated from our recent acquisitions (MIG, Air2Web and CASEE), including revenue generated through these entities of sales of Velti products, and $12.2 million was from new and existing customers. License revenue decreased by $14.5 million or 39% for the year ended December 31, 2012, due to fewer license deals generating revenue as compared to the prior year as we encouraged more customers to utilize our hosted programs. Managed services revenue increased by $30.4 million or 226% compared to the prior year. The increase was due to organic growth.

41

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

For 2012, our revenue from existing customers was $173.0 million and from new customers was $97.4 million, compared to $145.2 million and $44.0 million, respectively, for the same period in 2011.

Our total revenue for 2011 increased by $72.9 million, or 63%, compared to 2010. This increase was primarily the result of growth in the number of campaigns from existing customers, the addition of new customers and revenue generated from our acquisitions of Mobclix in September 2010, Air2Web in October 2011 and MIG in November 2011. For 2011, our revenue from existing customers was $145.2 million and from new customers was $44.0 million, compared to $90.2 million and $26.1 million, respectively, for the same period in 2010.

**Geographic Concentration**

We conduct our business primarily in three geographical areas: Europe, Americas, and Asia/Africa. The following table provides revenue by geographic area. Revenue from customers for whom we provide services in multiple locations is allocated according to the location of the respective customer's domicile. Revenue from customers for whom we provide services in a single or very few related locations is allocated according to the location of the respective customer's place of operations.

| _Revenue:_ | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2012** | | **2011** | | **2010** | |
| | (in thousands, except percentages) | | | | | |
| Europe: | | | | | | |
| United Kingdom | $ 74,731 | 27.6% | $ 37,758 | 20.0% | $ 34,105 | 29.3% |
| All other European countries | 97,799 | 36.2% | 86,318 | 45.6% | 55,299 | 47.6% |
| Total Europe | 172,530 | 63.8% | 124,076 | 65.6% | 89,404 | 76.9% |
| Americas | 63,597 | 23.5% | 41,114 | 21.7% | 9,150 | 7.9% |
| Asia/Africa | 34,217 | 12.7% | 24,012 | 12.7% | 17,715 | 15.2% |
| Total revenue | $ 270,344 | 100.0% | $ 189,202 | 100.0% | $ 116,269 | 100.0% |

During 2012, we generated revenue of $63.6 million from the Americas, compared to $41.1 million during 2011. The $22.5 million increase is primarily the result of our expansion in the U.S. partly attributable to our 2011 acquisition of Air2Web. We also benefited from $48.5 million in increased revenue from the U.K. and other European countries as well as a $10.2 million increase from Asia/Africa. These increases were primarily due to the MIG acquisition and organic growth and revenue generated through the sale of legacy Velti products.

During 2011, we generated revenue of $41.1 million from the Americas, compared to $9.2 million during 2010, primarily as a result of the expansion of our U.S. operations following our recent acquisitions.

**Operating Costs and Expenses**

| | Year Ended December 31, | | | Variance | | | |
|---|---|---|---|---|---|---|---|
| | | | | 2012 vs 2011 | | 2011 vs 2010 | |
| | **2012** | **2011** | **2010** | **$** | **%** | **$** | **%** |
| | (in thousands, except percentages) | | | | | | |
| Third-party costs | $ 91,404 | $ 53,901 | $ 36,658 | $ 37,503 | 70% | $ 17,243 | 47% |
| Datacenter and direct project costs | 29,966 | 17,952 | 6,312 | 12,014 | 67% | 11,640 | 184% |
| General and administrative expenses | 68,196 | 45,258 | 22,484 | 22,938 | 51% | 22,774 | 101% |
| Sales and marketing expenses | 54,507 | 37,733 | 23,049 | 16,774 | 44% | 14,684 | 64% |
| Research and development expenses | 21,236 | 13,060 | 7,840 | 8,176 | 63% | 5,220 | 67% |
| Acquisition related and other charges | 9,950 | 8,890 | 5,364 | 1,060 | 12% | 3,526 | 66% |
| Impairment of intangible assets | 16,902 | 1,500 | — | 15,402 | 1,027% | 1,500 | 100% |
| Loss from disposal of assets | 10,532 | — | — | 10,532 | 100% | — | — |
| Depreciation and amortization | 33,946 | 20,900 | 12,131 | 13,046 | 62% | 8,769 | 72% |
| Total cost and expenses | $ 336,639 | $ 199,194 | $ 113,838 | $ 137,445 | 69% | $ 85,356 | 75% |

We incur certain operating costs that directly relate to revenue. These costs are classified into two categories: third-party, and datacenter and direct project.

42

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Third-party Costs**

Third party costs are paid to third parties to secure advertising space or content to obtain media inventory for the placement of advertising and media messaging services and for creative development and other services in connection with the creation and execution of marketing and advertising campaigns. Third party costs also include the costs of certain content, media, or advertising that we acquire for a campaign, and costs associated with incentives and promotional costs provided to consumers in order to participate in the campaigns as well as certain computer hardware or software that we might acquire for a customer. Third party costs relate primarily to SaaS revenue.

Third-party costs increased by $37.5 million, or 70%, from 2011 to 2012. These costs were 34% of revenue in 2012 compared to 28% of revenue in 2011. This increase was primarily due to $17.6 million in costs related to acquired companies including costs associated with the sale of Velti products through these acquired entities and the remaining $19.9 million related to overall revenue increase.

Third-party costs increased $17.2 million, or 47%, from 2010 to 2011. The increase was primarily due to $20.0 million associated with revenue generated from our advertising business and costs associated with the acquisition of Air2Web and MIG. These increased costs were partially offset by lower incentive and promotional costs used by our mobile marketing campaigns in 2011.

**Datacenter and Direct Project Costs**

Datacenter and direct project costs consist primarily of personnel and outsourcing costs for operating our datacenters, which host our Velti mGage platform on behalf of our customers. Additional expenses include costs directly attributable to a specific campaign as well as allocated facility rents, power, bandwidth capacity, IT maintenance and support. In addition, direct project costs include personnel costs to customize our software solutions for specific customer contracts. These costs may relate to SaaS revenue and/or license and software revenue. To date, the vast majority of these costs are related to SaaS revenue and the amount attributable to license and software revenue was immaterial.

Datacenter and direct project costs increased by $12.0 million, or 67%, from 2011 to 2012. This increase was primarily due to $9.1 million of expense related to acquisitions, particularly MIG, which has significant direct costs for its project business, as well as higher costs for delivery efforts in the U.S. and U.K. entities. The datacenter and direct costs as a percentage of SaaS revenue was 15% and 13% in 2012 and 2011, respectively. Share based compensation expense also increased slightly from the prior year.

Datacenter and direct project costs increased by $11.6 million, or 184% from 2010 to 2011. The increase was primarily due to a $3.1 million increase in share based compensation expense, a $3.8 million increase in personnel related expense due to an increase in headcount to support growth in our business, and a $4.7 million increase in datacenter and direct project costs necessary to support growth.

**General and Administrative Expenses**

General and administrative expenses increased by $22.9 million, or 51%, from 2011 to 2012. This increase was due to a $6.9 million increase in costs associated with newly acquired entities and increased overhead, a $6.8 million increase in bad debt expense, $6.1 million associated with the build out of our support team as well as increased facilities costs and a $3.1 million increase in facilities expenses due to our global office expansion.

General and administrative expenses increased by $22.8 million, or 101%, from 2010 to 2011.This increase was primarily due to a $9.1 million increase in share-based compensation expense, a $9.4 million increase in personnel related expense due to an increase in headcount to support growth in our business and as a result of our U.S. public offering, and a $3.1 million increase in professional services and other administrative expenses to support our growth.

**Sales and Marketing Expenses**

Sales and marketing expenses increased by $16.8 million, or 44%, from 2011 to 2012. This increase was due to a $10.4 million increase in expenses associated with our acquisitions and was consistent with the revenue growth of the business. The remaining $6.4 million related to growing both the sales and marketing team to support year over year revenue growth.

Sales and marketing expenses increased by $14.7 million, or 64%, from 2010 to 2011. This increase was primarily due to a $6.1 million increase in share-based compensation expense, $6.6 million increase in personnel -related expense due to an

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

increase in headcount to support growth in our business, and a $2.0 million increase in other sales and marketing expenses primarily due to our growth.

**Research and Development Expenses**

Research and development expenses increased by $8.2 million, or 63%, from 2011 to 2012. This increase consisted of approximately $5.1 million related to expenses for entities we acquired in 2011 and approximately $2.2 million in our share based compensation expense including bonuses expected to be paid in shares.

Research and development expenses increased by $5.2 million, or 67%, from 2010 to 2011. This increase was primarily due to a $3.1 million increase in share-based compensation expense, a $2.5 million increase in personnel -related expense due to an increase in headcount to support growth in our business, offset by a $0.4 million reduction in research and development expenses due to more effective cost management.

**Acquisition-Related and Other Charges**

Acquisition-related and other charges increased by $1.1 million or 12% from 2011 to 2012 primarily due to re-measurement of acquisition related costs.

Acquisition-related and other charges for 2011 were $8.9 million and $5.4 million in 2010, primarily related to the valuation of contingent payments for Mobclix acquisition. See Note 5 to the Consolidated Financial Statements.

**Impairment of Intangible Assets**

Impairment of intangible assets increased by $15.4 million from 2011 to 2012.The increase was primarily related to write-downs of certain capitalized software. The impairment in 2012 of $16.9 million is for certain software utilized in business activities which are no longer being pursued by us, in accordance with our strategic direction. For additional information, see Note 7 in the Notes to the Consolidated Financial Statements.

The impairment in 2011 of $1.5 million was related to the write-down of obsolete intangible assets related to the integration of Air2Web and MIG following their acquisitions. There were no impairments in 2010.

**Loss from Disposal of Assets**

The loss from disposal of assets of $10.5 million relates to the loss incurred by us upon the sale of certain assets to Starcapital Limited in the fourth quarter of 2012. For additional information refer to Note 8 in the Notes to the Consolidated Financial Statements. There were no such transactions in prior years.

**Depreciation and Amortization**

Depreciation and amortization expense increased by $13.0 million, or 62%, from 2011 to 2012. The increase primarily related to $8.4 million from acquisitions and the remaining due to continued software purchases, leasehold improvements on our U.S. facilities, as well as significant capital expenditures associated with our U.S. and European operations.

Depreciation and amortization expense increased by $8.8 million, or 72%, from 2010 to 2011. This increase was primarily due to higher capitalized software development costs related to the development of our mGage platform, as well as an increase in amortized intangible assets from our acquisitions.

44

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Other Income Expense**

| | | Year Ended December 31, | | | Variance | | | |
| | | | | | 2012 vs 2011 | | 2011 vs 2010 | |
| | 2012 | 2011 | 2010 | $ | % | $ | % |
| | | | | (in thousands, except percentages) | | | |
| Interest expense, net | $ (1,830) $ | (7,389) $ | (8,069) $ | (5,559) | (75)% $ | (680) | (8)% |
| Gain (loss) from foreign currency transactions | 1,995 | 6,200 | (1,726) | (4,205) | (68)% $ | 7,926 | 459 % |
| Other expenses | 5,876 | (49) | — | 5,925 | 12,092 % $ | 49 | 100 % |
| Income tax (expense) benefit | 2,835 | (3,808) | (3,771) | 6,643 | 174 % $ | 37 | 1 % |
| Loss from equity method investments | (3,755) | (200) | (4,615) | 3,555 | 1,778 % $ | (4,415) | (96)% |

**Interest Expense, net**

Interest expense, net decreased by $5.6 million, or 75%, from 2011 to 2012. Interest expense decreased by $2.6 million as a  result of repaying the majority of our outstanding debt towards the end of the first quarter of 2011, $1.7 million as a result of less accretion of debt discounts and $1.2 million from lower finance costs associated with factoring of receivables. The remaining decrease was the result of changes in interest income.

Interest expense, net decreased by $0.7 million, or 8%, from 2010 to 2011, primarily due to a decrease in our outstanding debt balances.

**Gain (loss) from Foreign Currency Transactions**

Gain (loss) from foreign currency transactions, a non-cash item, decreased by  $4.2 million, or 68%, from 2011 to 2012. The reduction in 2012 was primarily due to less volatility in foreign exchange rates, primarily those between the U.S. dollar and the Euro and to a decline in gains from foreign currency adjustments on smaller cash balances as compared to higher balances maintained in 2011, which were the result of our initial public offering in the U.S.

Gain (loss) from foreign currency transactions changed by  $7.9 million, or 459%, from 2010 to 2011. This change from a loss to a gain was primarily due to translation adjustments on cash balances denominated in currencies other than the functional currency during 2011, mostly from the decline of the Euro and British pound sterling against the U.S. dollar.

**Other Income (Expense)**

Other income (expense) increased by $5.9 million from 2011 to 2012 as a result of our remeasuring our previously held interest in Casee during 2012. There were no other income (expense) items recorded in 2010 and only minimal amounts recorded in 2011.

**Income Tax Expense**

We recorded income tax benefit of $2.8 million on a worldwide pre-tax loss of $64.0 million for 2012 compared to an income tax expense of $3.8 million on a world-wide pre-tax loss of $11.4 million for 2011.

We recorded income tax expense of $3.8 million on a worldwide pre-tax loss of $12.0 million for 2010.

For a description of the changes in our effective tax rates see Note 10 in the Notes to the Consolidated Financial Statements.

Our effective income tax rate was 4.3%, 32.9% and 31.5% for fiscal 2012, 2011 and 2010, respectively. The fiscal 2012 provision for taxes include certain tax benefits that caused the effective tax rates for the years to be less than the effective tax rate in fiscal years 2011 and 2010. During fiscal 2012, we recorded certain tax benefits totaling $4.9 million, primarily from net operating losses, reduction in our valuation allowance, and other deferred tax assets. We expect the fiscal 2013 annual effective tax rate to be similar to the 2012 tax rate.

Tax law requires items to be included in our tax returns at different times than the items are reflected in our financial statements. As a result, our annual tax rate reflected in our financial statements is different than that reported in our tax returns (our cash tax rate). Some of these differences are permanent, such as expenses that are not deductible in our tax return, and

45

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

some differences reverse over time, such as depreciation expense. These temporary differences create deferred tax assets and liabilities. Deferred tax assets generally represent items that can be used as a tax deduction or credit in our tax returns in future years for which we have already recorded the tax benefit in our income statement. We establish valuation allowances for our deferred tax assets if, based on the available evidence, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax liabilities generally represent tax expense recognized in our financial statements for which payment has been deferred, or expense for which we have already taken a deduction in our tax return but have not yet recognized as expense in our financial statements.

The benefits of uncertain tax positions are recorded in our financial statements only after determining under a more-likely-than-not probability that the uncertain tax positions will withstand challenge, if any, from taxing authorities. When facts and circumstances change, we reassess these probabilities and record any changes in the financial statements as appropriate. We account for uncertain tax positions by determining the minimum recognition threshold that a tax position is required to meet before being recognized in the financial statements. This determination requires the use of judgment in assessing the timing and amounts of deductible and taxable items.

**Loss from Equity Method Investments**

Our share of loss from equity method investments increased by  $3.6 million, or 1778%, from 2011 to 2012, primarily due to less favorable results from our equity method investments.

Our share of loss from equity method investments decreased  $4.4 million, or 96%, from 2010 to 2011, primarily due to improved results from our equity method investments.

**5.B. Liquidity and Capital Resources.**

Since our inception we have financed our operations and acquisitions primarily through the public offerings of equity in the U.S. and the U.K. and borrowings under our bank credit facilities. As of December 31, 2012, we had $36.6 million in cash and cash equivalents. In connection with the acquisition of MIG in November 2011, we will be required to make cash payments of approximately $16.5 million to the former shareholders of MIG by mid April 2013. We generally deposit our excess cash in interest bearing bank accounts, and did not have investments in marketable securities as of  December 31, 2012.

As of December 31, 2012, we had approximately $28.2 million indebtedness to HSBC. The effective interest rates to finance our borrowings as of December 31, 2012 ranged from 2.7% to 17.3%. Subsequent to December 31, 2012, we have substantially utilized our credit facility with HSBC. The weighted average effective interest rate for our outstanding debt with HSBC as of December 31, 2012 was  5.3%.

As of December 31, 2012, we had working capital of $152.7 million.  A significant portion of our current assets, however, are represented by trade receivables where the typical payment cycle is beyond one year. We expect to generate negative cash flow in the three months ended March 31, 2013, further eroding our cash position with increasing cash flow generation in the second half of the year.

Based on our current business plan, we believe that we will need to raise additional capital in the next three months to supplement our existing cash balances and any cash generated from operations, in order to meet our anticipated cash needs for working capital and capital expenditures as well as to pay our obligations to MIG. If we are unable to obtain financing, we may be unable to pay our MIG obligations when they come due. There is no assurance that MIG will waive or agree to a delay of our payment obligations if we are unable to obtain financing. As a result, the report of our independent public accounting firm includes a statement raising substantial doubt as to our ability to continue as a going concern, which may adversely affect our ability to conduct business with third parties, as well as our ability to attract new financing.

We intend to overcome any substantial doubt concerning our ability to continue as a going concern by continuing to pursue and execute our strategic operating goals and by obtaining new financing. However, there can be no assurance that our efforts to find such financings will be successful or on terms favorable to us. In addition, the terms of any financing may adversely affect the holdings or the rights of our shareholders.

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2012** | **2011** | **2010** |
|  | (in thousands) | | |
| **Net cash generated from (used in):** | | | |
| Operating activities | $ 10,648 | $ (67,321) | $ (9,870) |
| Investing activities | (69,894) | (80,845) | (23,734) |
| Financing activities | 17,521 | 209,037 | 32,186 |
| Effect of exchange rate fluctuations | 2,531 | (2,460) | (883) |
| Increase (decrease) in cash and cash equivalents | $ (39,194) | $ 58,411 | $ (2,301) |

*Operating Activities.* Net cash generated from operating activities for 2012 was $10.6 million, compared to net cash used in operating activities of $67.3 million for 2011. The increase in cash is attributable to increased sales and improved cash collection efforts over 2011, and lower prepaid balances and other cash management initiatives.

Comprehensive DSOs based on trailing 12 months' revenue were:

|  | Year Ended December 31, | |
|---|---|---|
|  | **2012** | **2011** |
|  | (in thousands) | |
| Comprehensive DSO | 311 | 261 |

Comprehensive DSO is calculated as follows: comprehensive receivables (consisting of trade receivables and accrued contract receivables, with reduction for agreements where we recognize revenue net of third party costs) divided by trailing twelve month revenue (which includes estimated revenue of acquired companies as though they had been consolidated for the entire twelve month period) multiplied by 360 days.

*Investing Activities.* Net cash used in investing activities for 2012 was $69.9 million compared to $80.8 million for 2011. This was primarily due a decline in our investment in property and equipment, software development, which we capitalized, and investment in subsidiaries, including the acquisition of MIG and Air2Web during 2011.

*Financing Activities.* Net cash generated from financing activities for 2012 was $17.5 million compared to $209.0 million for 2011. The cash generated from financing activities in 2012 was primarily from borrowings on our credit facility, partially offset by repayment of borrowings. The cash generated from financing activities in 2011 was primarily due to the proceeds from our public offerings completed during 2011, offset by the repayment of a significant amount of the debt outstanding as of December 31, 2010.

For further information about our outstanding long -term debt and short-term financings, see Note 9 in the Notes to the Consolidated Financial Statements.

Although we have an overall accumulated deficit of $96.0 million, we have unremitted positive earnings in certain jurisdictions of approximately $67.8 million. Management has assessed the requirements for indefinite reinvestment of these earnings, and has not provided for related taxes on such earnings for the following reasons: (1) based upon financial forecasts and budgets, we intend to permanently reinvest such earnings in the local geographies where the earnings are located to fund expansion and growth in the local markets, as well as retain sufficient working capital and fund other capital needs locally and (2) we will engage in intercompany financing as necessary for purposes of providing sufficient cash flow to non-income producing jurisdictions. There may also be local jurisdiction restrictions on our ability to remit dividends, including: (a) each company with positive unremitted earnings may not have sufficient distributable reserves to make such a distribution in the foreseeable future and (b) each company with unremitted earnings may not have sufficient cash available to make such a distribution.

**5.C. Research and Development, Patents and Licenses, etc.**

**Research and Development**

47

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We have built a strong internal software development team that has many years of experience in the technology and mobile advertising and marketing industries. We have 451 engineers and software developers in our development centers located in Palo Alto and San Francisco, California; Atlanta, Georgia; New York, New York; London and Manchester, England; Amsterdam, Netherlands; Athens, Greece; Kiev, Ukraine; Chennai and Mumbai, India; and Beijing, China.

Our recent research and development activities have been focused on enhancements to our platform, including adding functionality to the activities related to multichannel conversion tracking and multivariate testing. We are also adding functionality to our mobile marketing platform, providing an innovative set of tools needed to produce assets and create highly interactive communication and messaging campaigns. We continue to innovate in our data and analytics capabilities, allowing marketers to capture critical data about the performance of mobile campaigns. Dashboards and analytics provide key metrics that marketers can use to boost their efforts throughout the marketing cycle.

Current research and development initiatives are also focused on the integration of technology platforms acquired from Air2Web and MIG with Velti platforms, including additional advertising capabilities, as well as planning and content solutions. In addition, we have an internal advanced projects team that is focused on the development of new applications and next generation technologies. The core competence of the advanced projects team is mathematics and data science. This has enabled the implementation of consumer behavior models that can steer mobile marketing campaign execution towards specific outcomes to achieve business goals and KPIs. We believe that having a dedicated, highly-trained advanced projects team enables us to effectively address the rapidly evolving mobile marketing and advertising services market.

**Intellectual Property**

We regard the protection of our developed technologies and intellectual property rights as an important element of our business operations and as crucial to our success. We rely primarily on a combination of patent laws, trademark laws, copyright laws, trade secrets, confidentiality procedures and contractual provisions to protect our proprietary technology. We generally require our employees, consultants and advisors to enter into confidentiality agreements. These agreements provide that all confidential information developed or made known to the individual during the course of the individual's relationship with us is to be kept confidential and not disclosed to third parties except under specific circumstances. In the case of our employees, the agreements provide that all of the technology which is conceived by the individual during the course of employment is our exclusive property. The development of our technology and many of our processes are dependent upon the knowledge, experience and skills of key scientific and technical personnel.

As of March 31, 2013, we had 10 granted patents and allowed applications and 17 pending patent applications on file.  We cannot be sure that any additional patents will issue or that any future patents that may issue will survive a legal challenge to their scope, validity or enforceability, or provide significant protection for us. The failure of our patents, or our reliance upon copyright and trade secret laws to adequately protect our technology might make it easier for our competitors to offer similar products or technologies. In addition, patents may not be issued for any of our current or future applications.

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**5.D. Trend Information.**

**Selected Quarterly Results of Operation**

The following table sets forth our selected unaudited consolidated quarterly statements of operations for the eight quarters ended  December 31, 2012. The following information should be read in conjunction with our audited financial statements and related notes thereto included elsewhere in this Annual Report. We have prepared the selected unaudited consolidated quarterly financial information on the same basis as our audited consolidated financial statements included in this Annual Report, and reflect all adjustments, consisting only of normal recurring adjustments, that we consider necessary for a fair presentation of this data. Our financial results for the eight quarters ended  December 31, 2012 may not be indicative of our financial results for any future quarterly periods.

49

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | For the three months ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Dec 31, 2012 | Sep 30, 2012 | Jun 30, 2012 | Mar 31, 2012 | Dec 31, 2011 | Sep 30, 2011 | Jun 30, 2011 | Mar 31, 2011 |
| | | | | (unaudited, in thousands) | | | | |
| **Selected quarterly statement of operations data:** | | | | | | | | |
| Revenue: | | | | | | | | |
| Software as a service (SaaS) revenue | $ 59,956 | $ 48,540 | $ 48,946 | $ 46,768 | $ 62,650 | $ 25,545 | $ 27,550 | $ 23,279 |
| License and software revenue | 12,581 | 5,229 | 2,898 | 1,505 | 19,746 | 10,091 | 4,077 | 2,791 |
| Managed services revenue | 24,930 | 8,624 | 6,847 | 3,520 | 4,710 | 2,552 | 2,731 | 3,480 |
| **Total revenue** | **97,467** | **62,393** | **58,691** | **51,793** | **87,106** | **38,188** | **34,358** | **29,550** |
| Cost and expenses: | | | | | | | | |
| Third-party costs | 30,862 | 22,701 | 20,979 | 16,862 | 18,805 | 13,746 | 10,717 | 10,633 |
| Datacenter and direct project costs | 7,595 | 6,894 | 7,585 | 7,892 | 5,734 | 4,127 | 5,140 | 2,951 |
| General and administrative expenses | 21,408 | 15,516 | 16,140 | 15,132 | 11,121 | 10,260 | 14,409 | 9,468 |
| Sales and marketing expenses | 16,041 | 13,193 | 12,520 | 12,753 | 10,369 | 7,785 | 11,586 | 7,993 |
| Research and development expenses | 6,492 | 5,724 | 4,336 | 4,684 | 3,853 | 2,814 | 3,563 | 2,830 |
| Acquisition related and other charges | — | 5,622 | 2,131 | 2,197 | 2,787 | — | 6,142 | 1,461 |
| Loss on assets held for sale | — | 9,626 | — | — | — | — | — | — |
| Impairment of other assets | 16,902 | — | — | — | — | — | — | — |
| Loss from disposal of assets | 906 | — | — | — | — | — | — | — |
| Depreciation and amortization | 9,948 | 8,707 | 8,022 | 7,269 | 7,250 | 5,788 | 4,108 | 3,754 |
| Total cost and expenses | 110,154 | 87,983 | 71,713 | 66,789 | 59,919 | 44,520 | 55,665 | 39,090 |
| **Income (loss) from operations** | **(12,687)** | **(25,590)** | **(13,022)** | **(14,996)** | **27,187** | **(6,332)** | **(21,307)** | **(9,540)** |
| Interest expense, net | (414) | (257) | (416) | (743) | (1,026) | (1,482) | (1,398) | (3,483) |
| Gain (loss) from foreign currency transactions | (141) | 3,210 | (2,449) | 1,375 | (774) | 8,777 | (2,181) | 378 |
| Other income (expense) | (78) | (34) | (187) | 6,174 | (15) | (120) | 162 | (76) |
| **Income (loss) before income taxes, equity method investments and non-controlling interest** | **(13,320)** | **(22,671)** | **(16,074)** | **(8,190)** | **25,372** | **843** | **(24,724)** | **(12,721)** |
| Income tax (expense) benefit | 4,021 | (46) | (862) | (278) | (368) | (482) | (721) | (2,237) |
| Loss from equity method investments | (576) | (2,023) | (785) | (371) | 183 | 262 | 320 | (965) |
| **Net income (loss)** | **(9,875)** | **(24,740)** | **(17,721)** | **(8,839)** | **25,187** | **623** | **(25,125)** | **(15,923)** |
| Net income (loss) attributable to non-controlling interest | 119 | (23) | (21) | (21) | 205 | 25 | (49) | (51) |
| **Net income (loss) attributable to Velti** | **$ (9,994)** | **$ (24,717)** | **$ (17,699)** | **$ (8,818)** | **$ 24,982** | **$ 598** | **$ (25,076)** | **$ (15,872)** |

Our operating results may fluctuate due to a variety of factors, many of which are outside of our control. As a result, comparing our operating results on a period-to-period basis may not be meaningful.

**Quarterly Trends**

Our business, as is typical of companies in our industry, is seasonal. This is primarily due to traditional marketing and advertising spending being heaviest during the holiday season while brands and advertising agencies often close out annual budgets towards the end of a given year. Seasonal trends have historically contributed to, and we anticipate will continue to contribute to fluctuations in our quarterly results, including fluctuations in sequential revenue growth rates.

50

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

SaaS revenue for the quarter ended December 31, 2012 increased by $11.4 million, or 23.5%, compared to the quarter ended September 30, 2012. This increase was primarily related to the seasonality of our business.

Third-party costs are incurred primarily as a result of our executing on campaigns with incentives and promotional costs. These costs have increased over the eight quarters ended December 31, 2012 as a result of an increase in the number and the scope of these campaigns associated with the increase in revenue over the same period. The significant increase in third-party costs when compared to the third quarter of 2012 was the result of the seasonal trends discussed above as well as costs incurred for incentives and promotional items for large campaigns that we conducted during the period. These costs have increased when compared to the fourth quarter of 2011 in absolute U.S. dollars and in relation to revenue. The increase in third-party cost is due increased revenue and an increase in sales of lower margin business. We incur a higher amount of third-party costs in relation to campaigns where we were responsible for the majority of the incentives and promotional costs. We also incur third-party costs in advance of the revenue recognized on the campaigns to which such costs relate. As a result, our third-party costs have fluctuated over the eight quarters and may continue to fluctuate from period to period.

Datacenter and direct project costs generally increase as the number of campaigns increase and we allocate additional headcount to execute these campaigns.

General and administrative expenses have increased over the eight quarters ended December 31, 2012, The increases relate to increases in personnel worldwide to support growth in our business as well as increases associated with our acquisitions during the period. During the fourth quarter of 2012, general and administrative expense included $2.5 million in share-based compensation expense. The three months ended September 30, 2012 and December 31, 2011 included $2.6 million and $1.5 million, respectively, in share-based compensation expense.

Sales and marketing and research and development expenses increased over the eight quarters ended December 31, 2012 as we increased our sales and marketing headcount and allocated additional engineers from other internal business functions to the technology, innovation and product development groups to support our growth. During the fourth quarter of 2012 sales and marketing included $2.8 million in additional share based compensation expense. The three months ended September 30, 2012 and December 31, 2011 included $1.9 million and $1.3 million, respectively, in share-based compensation expense.

Interest expense, net has declined during 2012 as a result of our repayment of a significant amount of our debt outstanding during 2011. We expect these expenses to increase in 2013 as result of our drawing on our credit facility with HSBC.

## 5.E.  Off-Balance Sheet Arrangements.

Not applicable.

## 5.F.  Tabular Disclosure of Contractual Obligations:

Our contractual obligations and other commitments as of December 31, 2012 were as follows:

| | | Payments due by period | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 year | 1 - 3 years | 3 - 5 years | After 5 years |
| | | | (in thousands) | | |
| Borrowings | $ 28,193 | $ 851 | $ 27,342 | $ — | $ — |
| Interest payment obligations[1] | 2,594 | 1,035 | 1,559 | — | — |
| Operating lease obligations[2] | 25,251 | 5,087 | 11,869 | 3,222 | 5,073 |
| Acquisition related liabilities[3] | $ 16,500 | $ 16,500 | $ — | $ — | |
| Total | $ 72,538 | $ 23,473 | $ 40,770 | $ 3,222 | 5,073 |

[1]   Interest payment obligations are based on December 31, 2012 interest rates as disclosed in Note 9 in the Notes to the Consolidated Financial Statements.

[2]   Operating lease obligations consist of future minimum payments under non-cancellable operating leases. These amounts reflect only payment obligations that are fixed and determinable.

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

(3)        Deferred consideration related to the MIG acquisition.

Not included in the table above are payments for contingent consideration related to our recent acquisitions. These payments, will be paid in cash or shares of our capital stock and the amount and form of payment will be determined at the date of payment.

The table above reflects only payment obligations that are fixed and determinable.

## 5.G. Safe Harbor

### Forward-Looking Statements

This Annual Report contains forward-looking statements that reflect our current expectations and views of future events. These forward-looking statements can be identified by words or phrases such as "shall," "may," "will," "expect," "should," "anticipate," "aim," "estimate," "intend," "plan," "believe," "is/are likely to" or other similar expressions. These forward-looking statements include, among other things, statements relating to our goals and strategies, our competitive strengths, our expectations and targets for our results of operations, our business prospects and our expansion strategy. We have based these forward-looking statements largely on current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. Although we believe that we have a reasonable basis for each forward-looking statement contained in this Annual Report, we caution shareholders that these statements are based on our projections of the future that are subject to known and unknown risks and uncertainties and other factors that may cause our actual results, level of activity or performance expressed or implied by these forward-looking statements, to differ.

The forward-looking statements included in the Annual Report are subject to risks, uncertainties and assumptions about our company. Our actual results of operations may differ materially from the forward-looking statements as a result of risk factors described under "Risk Factors" and elsewhere in this Annual Report, including, among other things, our ability to:

- raise additional capital if needed to grow our business, on terms acceptable to us or at all;
- comply with the financial and operating covenants in our credit facility;
- manage acquisitions or investments, which may be unsuccessful and may divert our management's attention and consume significant resources, as well as result in a charge to our earnings in future periods;
- achieve the anticipated benefits of our acquisitions;
- properly safeguard confidential or personal information that we may use, transmit or store, which could cause us significant reputational harm and monetary damages if handled improperly;
- manage the global nature of our business, which subjects us to additional costs and risks that can adversely affect our operating results;
- defend ourselves against claims of infringement of the patent or other intellectual property rights of third parties;
- keep pace with technological developments and compete against potential new entrants, who may be much larger and better funded;
- continue our global business while expanding into new geographic regions;
- benefit from expected growth in general in the market for mobile marketing and advertising services;
- retain existing customers and attract new ones;
- protect our intellectual property rights; and
- comply with new and modified regulations in the jurisdictions in which we conduct business.

These risks are not exhaustive. Other sections of this Annual Report, including "Risk Factors" above, include additional factors that could adversely impact our business and financial performance. Moreover, we operate in an evolving environment and new risk factors emerge from time to time. It is not possible for our management to predict all risk factors, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause our actual results to differ materially from those contained in any forward-looking statement.

An investor in our ordinary shares should not rely upon forward-looking statements as predictions of future events. Unless required by law, we undertake no obligation to update or revise any forward-looking statements to reflect new information or future events or otherwise.

## ITEM 6. DIRECTORS, SENIOR MANAGEMENT, AND EMPLOYEES

### 6.A. Directors and Senior Management

52

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Executive Officers and Directors**

Set forth below is the name, age, position and a brief account of the business experience of each of our executive officers and directors.

| Name | Age | Position |
|---|---|---|
| Alex Moukas | 41 | Chief Executive Officer and Director |
| Jeffrey G. Ross | 48 | Chief Financial Officer |
| Mari Baker | 48 | Interim Chief Operating Officer and Director |
| Sally J. Rau | 54 | Chief Administrative Officer, General Counsel and Corporate Secretary |
| Menelaos Scouloudis | 39 | Chief Commercial Officer |
| David W. Mann | 68 | Non-Executive Chairman of the Board of Directors |
| David C. D. Hobley | 66 | Director |
| Nicholas P. Negroponte | 69 | Director |
| Phokion Potamianos | 49 | Director |

The address of each of our executive officers and directors is c/o First Floor, 28-32 Pembroke Street Upper, Dublin 2, Republic of Ireland.

*Alex Moukas* is one of our co-founders and has been our chief executive officer and a director since its inception in 2000. He previously co-founded, and served from 1998 to 2000 as the chief scientist of, Frictionless Commerce, Inc., a privately held, strategic sourcing software provider in Cambridge, Massachusetts, which was later acquired by SAP AG. He serves as a director on the Global Board of the Mobile Marketing Association, a global non-profit trade association of the mobile marketing industry. Mr. Moukas holds a B.S. in Business Administration and Computer Systems from the American College of Greece, an M.S. in Artificial Intelligence from the University of Edinburgh and an M.S. from the Massachusetts Institute of Technology.

*Jeffrey G. Ross* has been our chief financial officer since January 2013. He served as the Senior Vice President and Chief Financial Officer of Sybase, Inc. (Sybase) from November 2007 until May 2012. From August 2004 to November 2007 he served as Corporate Controller of Sybase. Mr. Ross held various other positions at Sybase from 1997 to August 2004. Before joining Sybase, Mr. Ross held several positions with PriceWaterhouse, including senior manager in international tax. Mr. Ross holds a B.S. in Business Administration from the University of California, Berkeley.

*Mari Baker* has been a member of our board of directors since August 2011. Ms. Baker was most recently CEO of PlayFirst, Inc. a leading game publisher, from March 2009 until December, 2011. Prior to that, she served as CEO of Navigenics, Inc. from 2007 to 2009, an executive-in-residence at the venture capital firm Kleiner Perkins Caufield & Byers, in 2006, and president of BabyCenter, LLC, a Johnson & Johnson company from 1999 to 2006. Prior to her tenure with BabyCenter and Johnson & Johnson, she was a Senior Vice President at Intuit, Inc., which she joined in 1989. Ms. Baker also held executive positions at Now Software, Migent Software, and E.F. Hutton. Ms. Baker received her B.A. from Stanford University, and served on the board of trustees of Stanford University from 1996 to 2003. Ms. Baker currently serves on the board of directors of John Wiley & Sons.

*Sally J. Rau* has been our chief administrative officer and general counsel since August 2010. From 1998 until 2010, Ms. Rau was a partner with DLA Piper LLP (US), a global law firm. From 1990 to 1996, Ms. Rau served as General Counsel of Cronos Containers Ltd., a container leasing company, where she was based in London. Ms. Rau holds a J.D. from the University of Oregon and an A.B. in History from the University of California, Berkeley.

*Menelaos Scouloudis* has been our chief commercial officer since 2002 and was a member of our board of directors until May 2010. From 1999 to 2002, Mr. Scouloudis served as an engagement manager with McKinsey & Company, a privately held global consulting firm. Mr. Scouloudis holds a Diploma in Chemical Engineering from the National Technical University of Athens, a M.S. in Chemical Engineering from the Massachusetts Institute of Technology and a M.B.A. from the Harvard Business School.

53

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*David W. Mann* has been chairman of our board of directors since 2006. From 1969 to 1994, Mr. Mann was employed by Logica plc, where he became group chief executive and then deputy chairman. Since 1994, Mr. Mann has served on the boards of several companies, including being a director of AVEVA Group Plc, an engineering technology provider listed on the London Stock Exchange from 1999 to July 2010. He is currently a director of Charteris plc, a technology consulting company quoted on AIM. Mr. Mann holds a degree in Mathematics and Theoretical Physics from Jesus College, Cambridge University, and is a past president of the British Computer Society.

*David C. D. Hobley* has been a member of our board of directors since 2006. Mr. Hobley served for more than 35 years in investment banking firms, having previously been with Deloitte and Touche LLP and Coopers and Lybrand (now PricewaterhouseCoopers). He was first with SG Warburg & Co. in London from 1972 to 1997, and was with Deutsche Bank AG in London from 1998 to 2011. He was an independent director and chairman of the audit committee of Orange S.A., a subsidiary of France Telecom from 2003 to 2007 and served on the boards of several France Telecom/Orange -related companies from 2003 to early 2013. He currently serves as the non-executive chairman of Incadea plc, a publicly traded company providing enterprise software solutions to the global automotive market, a director for Sonaecom S.A. a publicly traded Portuguese telecommunications company and several privately held companies. Mr. Hobley is a Fellow of the Institute of Chartered Accountants in England and Wales.

*Nicholas P. Negroponte* has been a member of our board of directors since 2006. He is the co-founder of the Massachusetts Institute of Technology Media Laboratory and has been a member of its faculty since 1966. Professor Negroponte is on the board of several privately held companies and is a published author and founder of WiReD magazine. He also founded in 2005 and continues to serve as chairman of One Laptop per Child, a non-profit association. Professor Negroponte holds a B.S. and an M.S. in Architecture from the Massachusetts Institute of Technology.

*Phokion Potamianos* has been a member of our board of directors since August 2011. Mr. Potamianos was a Partner at Francisco Partners from 2005 until January 2010. Prior to that Mr. Potamianos served as Head of the UBS global semiconductor investment banking group from 2004 to 2005. Earlier in his career, from 1997 to 2000 he served as an Institutional Investor Ranked Research Analyst of Donaldson, Lufkin & Jenrette. Mr. Potamianos is a former Director of Numonyx Corp and was a Director at MagnaChip Semiconductor from 2005 to 2008. Mr.Potamianos received his Masters of Science from the London School of Economics.

Mr. Jerry Goldstein retired from our board of directors effective January 23, 2012.

Mr. Wilson W. Cheung stepped down as our chief financial officer as of January 2013 and Mr. Chris Kaskavelis ceased employment as our chief operating officer as of April 2013. In conjunction with Mr. Kaskavelis' departure as our chief operating officer, Ms. Mari Baker has been appointed by the board of directors as interim chief operating officer while we conduct a search for a permanent chief operating officer.

## 6.B. Compensation

### Director Compensation

Our director compensation program is designed to enable us to attract and retain highly qualified directors who bring deep industry knowledge and global perspective. We target director compensation at the median of compensation paid by peer companies competing for similar director talent. Non-employee director compensation is determined by the non-interested members of the board, based upon the philosophy that annual compensation for non-employee directors should consist of both a cash component, designed to compensate members for their service on the board of directors and its committees, and an equity component, designed to align the interests of directors and shareholders and, by vesting over time, to create an incentive for continued service on the board. The non-interested members of the board review the compensation programs for non-employee directors on an annual basis.

We did not make any changes to our standard compensation arrangements and practices for non-employee directors in 2012. Our employee directors, Alex Moukas and Chris Kaskavelis, did not receive any compensation for their services as members of our board of directors in 2012.

Our standard annual compensation arrangement for non-employee directors during 2012 was payable one-third in cash, and two-thirds in share awards. During fiscal 2012, our non-employee directors were eligible to receive the annual compensation set forth below, allocated between cash and shares as described above:

54

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | |
|---|---|
| Member of the Board of Directors | $180,000 |
| Non-executive Chairman of the Company | $210,000 |
| Chair of the Audit Committee | $195,000 |
| Chair of the Remuneration Committee | $180,000 |
| Chair of the Corporate Governance and Nominating Committee | $180,000 |

We calculate the number of deferred share awards comprising the equity portion of annual compensation in accordance with the Black Scholes value of the target dollar amount on the grant date, based upon the closing price of our ordinary shares on the grant date.   Deferred shares vest over one year in equal monthly installments on the last day of the month during the year of grant, subject to continued service on the board of directors on the applicable vesting date. All deferred shares are granted under and subject to the terms and conditions of our Velti Incentive Share Plan and its related grant agreements.

We reimburse our directors for reasonable expenses in connection with attendance at board of directors and committee meetings.

The following table summarizes compensation paid to non-employee directors during the year ended December 31, 2012.

### DIRECTOR COMPENSATION FOR FISCAL YEAR 2012

| Name | Fees Earned or Paid in Cash ($)[1] | Share Awards ($)[2][3] | Total ($) |
|---|---|---|---|
| David Mann | 70,000 | 140,002 | 210,002 |
| David Hobley | 66,457 | 130,004 | 196,461 |
| Nicholas Negroponte | 60,000 | 119,996 | 179,996 |
| Jerry Goldstein[4] | 836 | 59,998 | 60,834 |
| Phokion Potamianos | 60,000 | 119,996 | 179,996 |
| Mari Baker | 60,388 | 119,996 | 180,384 |

[1]   Mr. Mann, Mr. Hobley, Mr. Negroponte, Mr. Potamianos and Ms. Baker were each paid $17,500, $16,250, $15,000, $15,000 and $15,000 respectively in 2012 for services performed in 2012.

[2]   Amounts reflect the aggregate grant date fair value of share awards computed in accordance with FASB ASC Topic 718 and are not necessarily an indication of any gains earned on previously granted equity awards. The grant date fair value of each deferred share award granted to our non-employee directors was $10.48.

[3]   At December 31, 2012, all deferred shares previously awarded to each of our non-employee directors was fully vested.   The number of deferred shares awarded to each non-employee director was as follows:

| | |
|---|---|
| David Mann | 13,359 |
| David Hobley | 12,405 |
| Nicholas Negroponte | 11,450 |
| Jerry Goldstein | 5,725 |
| Phokion Potamianos | 11,450 |
| Mari Baker | 11,450 |

[4]   Mr. Goldstein retired from our board of directors effective January 23, 2012. Mr. Goldstein was awarded deferred shares for his continuing role as an advisor following his retirement as a director.

5 5

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Executive Officer Compensation and Employment Agreements**

The Remuneration Committee approved the following total annual compensation payable to the executive officers for the year ended December 31, 2012:

| Name | Aggregate Dollar Value |
|---|---|
| Alex Moukas | $ 2,700,000 |
| Wilson W. Cheung | 1,000,000 |
| Chris Kaskavelis | 1,900,000 |
| Sally J. Rau | 1,250,000 |
| Menelaos Scouloudis | 1,600,000 |

The total annual compensation was paid to each executive officer as follows: 45% as annual compensation and 55% as long term compensation.  The annual compensation was paid to Mr. Cheung and Ms. Rau as $300,000 in cash and the remainder in deferred shares, and to Messrs. Moukas, Kaskavelis and Scouloudis in deferred shares.  Such deferred share awards vested in equal monthly tranches until vested in full on December 31, 2012. All long term compensation was paid in equity awards, with 50% payable as share options and 50% as deferred share awards, with vesting of each such option and deferred share award being in four annual installments of 25% on the anniversary of the date of grant. As the value of the equity awards is determined as of the date of grant, the values in the Summary Compensation Table below may differ slightly from the table above based on the share price as of the date of the award.

**Summary Compensation Table**

The following table sets forth information regarding the compensation to our named executive officers for the fiscal year ended December 31, 2012.

| Name and Principal Position | Year | Salary ($) | Bonus($) | Share Awards ($)[1] | Option Awards ($)[2] | All Other Compensation ($)[3] | Total ($) |
|---|---|---|---|---|---|---|---|
| Alex Moukas, | 2010 | 1 | — | 383,495 | 1,843,092 | 33,190 | 2,259,778 |
| Chief Executive Officer | 2011 | 1 | — | 1,504,976 | 579,034 | 34,828 | 2,118,839 |
| | 2012 | 1 | — | 2,299,720 | 356,566 | 34,828 | 2,691,115 |
| Wilson W. Cheung, [4] | 2010 | 300,000 | — | 219,199 | 441,223 | — | 960,422 |
| Chief Financial Officer | 2011 | 300,000 | — | 340,875 | 236,880 | — | 877,755 |
| | 2012 | 300,000 | — | 562,949 | 135,593 | — | 998,542 |
| Chris Kaskavelis, [5] | 2010 | 1 | — | 287,622 | 1,387,258 | 33,190 | 1,708,071 |
| Chief Operating Officer | 2011 | 1 | — | 1,084,312 | 421,114 | 34,828 | 1,540,255 |
| | 2012 | 1 | — | 1,609,733 | 248,088 | 34,828 | 1,892,650 |
| Sally J. Rau, [6] | 2010 | 118,269 | — | 585,625 | 1,243,119 | — | 1,947,013 |
| Chief Administrative Officer, General Counsel & Corporate Secretary | 2011 | 300,000 | — | 481,088 | 289,520 | — | 1,070,608 |
| | 2012 | 300,000 | — | 778,118 | 169,494 | — | 1,247,612 |
| Menelaos Scouloudis, | 2010 | 1 | — | 263,657 | 1,248,609 | 21,241 | 1,533,508 |
| Chief Marketing Officer | 2011 | 1 | — | 955,698 | 368,480 | 22,290 | 1,346,469 |
| | 2012 | 1 | — | 1,359,977 | 210,372 | 22,290 | 1,592,640 |

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

(1)   Amounts reflect the aggregate grant date fair value of share awards computed in accordance with FASB ASC Topic 718 and are not necessarily an indication of any gains earned on previously granted equity awards.

(2)   Amounts reflect the aggregate grant date fair value of option awards, computed in accordance with FASB ASC Topic 718 and are not necessarily an indication of any gains earned on previously granted equity awards. The fair value of each option grant is estimated based on the fair market value on the date of grant and using the Black-Scholes-Merton option pricing model.

(3)   All other compensation consists of private medical insurance, life insurance, and for Mr. Moukas, Mr. Kaskavelis and Mr. Scouloudis, a car allowance.

(4)   Mr. Cheung commenced employment with Velti in September 2009. He stepped down as our CFO in January 2013

(5)   Mr. Kaskavelis stepped down as our chief operating officer in April 2013.

(6)   Ms. Rau commenced employment with Velti in August 2010.

## Grants of Plan-Based Awards in 2012

The following table provides information regarding the amount of equity awards granted in 2012 for each of the named executive officers.  Our executive officers do not participate in an executive bonus plan.

| Name | Grant Date[(1)] | All Other Share Awards: Number of Shares or Units (#)[(2)] | All Other Option Awards: Number of Securities Underlying Options (#)[(3)] | Exercise or Base Price of Option Awards ($/sh) | Grant Date Fair Value of Share and Option Awards ($)[(4)] |
|---|---|---|---|---|---|
| Alex Moukas | 2/24/2012 | — | 61,316 | 10.48 | 356,566 |
| | 2/24/2012 | 104,300 | — | — | 1,084,720 |
| | 2/24/2012 | 116,827 | — | — | 1,215,001 |
| Wilson W. Cheung | 2/24/2012 | — | 23,317 | 10.48 | 135,593 |
| | 2/24/2012 | 39,663 | — | — | 412,495 |
| | 2/24/2012 | 14,423 | — | — | 149,999 |
| Chris Kaskavelis | 2/24/2012 | — | 42,662 | 10.48 | 248,088 |
| | 2/24/2012 | 72,570 | — | — | 754,728 |
| | 2/24/2012 | 82,212 | — | — | 855,005 |
| Sally J. Rau | 2/24/2012 | — | 29,147 | 10.48 | 169,494 |
| | 2/24/2012 | 49,579 | — | — | 515,622 |
| | 2/24/2012 | 25,240 | — | — | 262,496 |
| Menelaos Scouloudis | 2/24/2012 | — | 36,176 | 10.48 | 210,372 |
| | 2/24/2012 | 61,536 | — | — | 639,974 |
| | 2/24/2012 | 69,231 | — | — | 720,002 |

(1)   Grant date equals the date approved by our Remuneration Committee.

(2)   A portion of the shares vest over one year in equal monthly tranches through December 31, 2012. The remaining shares vest over four years at the rate of 25% per year on the anniversary of the date of grant.

(3)   Share options vest over four years at the rate of 25% per year on the anniversary of the date of grant.

(4)   The aggregate grant date fair value is computed in accordance with FASB ASC Topic 718, and are not necessarily an indication of any gains accrued from previously granted equity awards. The fair value of each option grant is estimated based on the fair market value on the date of grant and using the Black-Scholes option pricing model. The fair value of each share award is measured based on the closing price of our ordinary shares on the date of grant.

## Description of Plan-Based Awards

All options and deferred share awards granted to the named executive officers in fiscal year 2011 were granted under the Velti Share Incentive Plan or the Velti 2009 U.S. Employee Share Incentive Plan and are governed by the terms and conditions of such plan and the applicable award agreements. Total annual compensation established for each named executive officer was divided 45% into annual compensation and 55% into long term compensation, with the cash portion payable to Mr. Cheung and Ms. Rau paid as annual compensation. All equity-based annual compensation was payable as deferred share units; long term compensation was comprised of an equal mix of share options that vest over four years and deferred share units that vest over

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

four years. We believe the ratio of these awards offers an appropriate balance between a leveraged upside opportunity and a reliable level of income. A share option is the right to purchase shares of our shares at a fixed exercise price for a fixed period of time.  Deferred share awards are restricted stock unit awards of our ordinary shares.

Each named executive officer was awarded the following deferred share units as additional annual compensation, reflecting the reduced annual base salary cash compensation payable to each such named executive officer (but reflecting the cash compensation paid to Mr. Cheung and Ms. Rau), and accordingly the following deferred share awards vested in equal monthly amounts over the fiscal year ended December 31, 2012:

| Name | Number of Deferred Shares Awarded Vesting Over One Year |
| --- | --- |
| Alex Moukas | 116,827 |
| Wilson W. Cheung | 14,423 |
| Christos Kaskavelis | 82,212 |
| Sally J. Rau | 25,240 |
| Menelaos Scouloudis | 69,231 |

The remaining deferred share awards, and all share options, granted during 2012 vest in equal annual amounts over four years on the anniversary of the date of grant:

| Name | Deferred Shares | Share Options |
| --- | --- | --- |
| Alex Moukas | 104,300 | 61,316 |
| Wilson W. Cheung | 39,663 | 23,317 |
| Christos Kaskavelis | 72,570 | 42,662 |
| Sally J. Rau | 49,579 | 29,147 |
| Menelaos Scouloudis | 61,536 | 36,176 |

**Outstanding Equity Awards at 2012 Fiscal Year-End**

The following table provides information on the current holdings of share options and unvested deferred share awards by our named executive officers at December 31, 2012.

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any losses or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

## OUTSTANDING EQUITY AWARDS AT FISCAL YEAR END 2012

| Name | Option Awards | | | | Share Awards | |
|---|---|---|---|---|---|---|
| | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Shares That Have Not Vested (#) | Market Value of Shares or Units of Shares That Have Not Vested ($)[1] |
| Alex Moukas | 65,000 | — | 4.95 | 5/13/2020 [2] | | |
| | 276,498 | 276,497 | 4.95 | 5/13/2020 [2] | | |
| | 20,708 | 62,121 | 12.10 | 3/18/2021 [3] | | |
| | — | 61,316 | 10.48 | 2/24/2022 [4] | | |
| | | | | | 180,096 | 810,432 |
| Wilson W. Cheung | 30,000 | — | 4.95 | 5/13/2020 [2] | | |
| | 56,250 | 56,250 | 4.95 | 5/13/2020 [2] | | |
| | 8,264 | 24,792 | 12.10 | 3/18/2021 [3] | | |
| | 208 | 621 | 12.10 | 3/18/2021 [3] | | |
| | — | 17,488 | 10.48 | 2/24/2022 [4] | | |
| | — | 23,317 | 10.48 | 2/24/2022 [4] | | |
| | | | | | 73,347 | 330,062 |
| Chris Kaskavelis | 50,000 | — | 4.95 | 5/13/2020 [2] | | |
| | 207,374 | 207,373 | 4.95 | 5/13/2020 [2] | | |
| | 15,060 | 45,179 | 12.10 | 3/18/2021 [3] | | |
| | — | 42,662 | 10.48 | 2/24/2022 [4] | | |
| | | | | | 128,587 | 578,642 |
| Sally J. Rau | 8,264 | 24,792 | 12.10 | 3/18/2021 [3] | | |
| | 2,090 | 6,269 | 12.10 | 3/18/2021 [3] | | |
| | — | 21,861 | 10.48 | 2/24/2022 [4] | | |
| | — | 29,147 | 10.48 | 2/24/2022 [4] | | |
| | 93,750 | 93,750 | 9.45 | 9/12/2020 [5] | | |
| | 50,000 | — | 9.45 | 9/12/2020 [5] | | |
| | | | | | 99,081 | 445,865 |
| Menelaos Scouloudis | 40,000 | — | 4.95 | 5/13/2020 [2] | | |
| | 190,092 | 190,092 | 4.95 | 5/13/2020 [2] | | |
| | 13,178 | 39,532 | 12.10 | 3/18/2021 [3] | | |
| | — | 36,176 | 10.48 | 2/24/2022 [4] | | |
| | | | | | 111,779 | 503,006 |

[1] The market value of unvested shares is calculated by multiplying the number of unvested shares held by the applicable named executive officer by the closing price of our ordinary shares on December 31, 2012, which was $4.50.

[2] The share options and deferred share awards vest over four years at the rate of 25% per year on the anniversary of the date of grant, which was May 13, 2010.

[3] The share options and deferred share awards vest over four years at the rate of 25% per year on the anniversary of the date of grant, which was March 18, 2011.

[4] The share options and deferred share awards vest over four years at the rate of 25% per year on the anniversary of the date of grant, which was February 24, 2012.

[5] The share options and deferred share awards vest over four years at the rate of 25% per year on the anniversary of the date of grant, which was September 12, 2010.

**Option Exercises and Shares Vested in Fiscal 2012**

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The following table provides information for the named executive officers on share option exercises and sales of vested share options during the year ended December 31, 2012, including the number of shares acquired upon exercise and the value realized, before payment of any applicable withholding tax and broker commissions, and deferred share awards that vested during the same period.

## OPTION EXERCISES AND STOCK VESTED IN FISCAL YEAR 2012

| | Option Awards | | Share Awards | |
| Name | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
|---|---|---|---|---|
| Alex Moukas | — | | 148,642 | 1,273,046 |
| Wilson W. Cheung | — | — | 28,776 | 266,979 |
| Chris Kaskavelis | — | — | 105,797 | 907,977 |
| Sally J. Rau | — | — | 46,949 | 412,867 |
| Menelaos Scouloudis | — | — | 90,482 | 778,512 |

### Termination Benefits

If employment of any of our executive officers is terminated without cause or should such executive officer voluntarily terminate his or her employment for good reason, such executive officer is entitled to severance comprising continuing salary equal to nine months. In addition, such executive officer is entitled to continued health benefits under COBRA or similar provision for the severance term. In the event of a change of control, vesting of 50% of such executive officer's then outstanding unvested equity awards accelerates as of the effective date of the change of control. If such executive officer's employment is terminated without cause within 18 months following a change of control, such executive officer is entitled to receive severance equal to 12 months continuing salary, vesting of all then outstanding unvested equity awards and continuation of health benefits under COBRA or similar provision for the severance term.

### 6.C. Board Practices

### Composition and Operation of the Board of Directors

Our Articles of Association provide that the board of directors may consist of between two and 12 directors, and our board of directors currently has seven members, including our chief executive officer and chief operating officer. Mr. Jerry Goldstein retired from our Board effective January 23, 2012. The board of directors is responsible for formulating strategy, corporate and capital structure, overseeing financial reporting and auditing, external communication, board appointments, compensation policy and maintenance of corporate governance standards. The board of directors is also responsible for ensuring that the necessary internal control mechanisms are in place to identify business, financial and operating risks and developing adequate structures and policies to mitigate those risks.

### Terms of Directors; Nominations of Directors

At each annual meeting of our shareholders, one-third of our directors must "retire," whereby their terms essentially expire and, if they wish to continue to serve as a director, they become subject to re-election to the board of directors by our shareholders. To implement this staggered re-election process, any director who was elected or last re-elected to the board of directors at or before the annual meeting of shareholders held three years prior to the current year annual meeting of shareholders is required to retire. In addition, such additional number of directors will be required to "retire" or essentially resign, in the order of first re-election or appointment to the board in order to ensure the number of retiring directors is one-third of the total number of directors in office on the date of the notice of the annual meeting. In addition, any director appointed by the board (either as an additional director or to fill a vacancy) must retire at the first annual general meeting following his or her appointment. All such retiring directors are automatically eligible for re-election, except in any of the following cases:

- where at such annual meeting of shareholders it is expressly resolved not to fill the vacancy;
- where a resolution for the re-election of the retiring director is put to the meeting and the shareholders do not approve the re-election of such director; or

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- where the retiring director has given notice to us that he or she is unwilling to be re-elected to the board of directors.

Unless recommended by the board of directors, no person other than a retiring director is eligible for appointment as a director at any general meeting unless there is delivered to our registered offices a signed notice proposing a candidate for election by a shareholder who is qualified to attend and vote at the meeting as well as a signed consent by such candidate of his or her willingness to be elected to the board of directors. This notice and consent must be delivered not less than seven nor more than 42 full days before the day of the annual meeting.

The appointment of each director is subject to Velti's Articles of Association, which provide that a director's office shall be terminated if, among other things, the director is absent from board meetings for six months without leave or is prohibited by law from acting as a director. We may appoint another person to replace the removed director or appoint any additional number of directors, not to exceed the maximum number as set forth in our Articles of Association.

All directors other than Mr. Potamianos and Ms. Baker were appointed to the board at the same time in 2009; accordingly, the order of retirement is determined by agreement among the directors, with two directors retiring at each annual general meeting.

### Director Independence

Our board of directors has determined that each of Messrs. Mann, Hobley, Negroponte and Potamianos, our non-executive directors, has no relationship which, in the opinion of the board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and is an "independent director" as defined by the applicable rules of The NASDAQ Stock Market, Inc. Mr. Moukas and Ms. Baker, as chief executive officer and interim chief operating officer, respectively, are not independent for purposes of the applicable NASDAQ rules. In the event that Ms. Baker services as interim chief operating officer are for less than one year, and the board of directors determines there is no relationship which would interfere with the exercise of her independent judgment in carrying out her responsibilities as a director, Ms. Baker would be able to regain her "independent director" status as defined by the applicable rules of The NASDAQ Stock Market, Inc.

### Indemnification Agreements

We have entered into indemnification agreements with each of our directors to indemnify them against certain liabilities and expenses arising from their being a director (but specifically excluding any circumstance where they are determined to have violated their fiduciary duty to us). Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling us pursuant to the foregoing provisions, we have been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

### Meetings of Non-Executive Directors

Our independent directors meet in regularly scheduled sessions at which only independent directors are present.

### Committees of our Board of Directors

Our board of directors has a separately designated standing Audit Committee, Remuneration Committee and Nominating and Corporate Governance Committee. Each committee has a written charter that has been approved by the board of directors.

The following table sets forth the composition of each committee:

| Name | Audit Committee | Remuneration Committee | Nominating and Corporate Governance Committee |
|---|---|---|---|
| David W. Mann | Member | Chair | Member |
| Phokion Potamianos | Member | | Member |
| David C. D. Hobley | Chair | Member | |
| Nicholas P. Negroponte | | | Chair |
| Mari Baker | | Member | |

*Audit Committee*

61

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our Audit Committee consists of Messrs. Hobley, Potamianos and Mann. The board of directors has determined that each member of the Audit Committee satisfies the independence requirements of The NASDAQ Stock Market and Rule 10A -3(b)(1) under the Securities Exchange Act of 1934, as amended, or the Exchange Act, and meets the requirements for financial literacy under the requirements of The NASDAQ Stock Market and SEC rules and regulations. Mr. Hobley serves as the chairman of this committee, and the board of directors has determined that he qualifies as an "audit committee financial expert" as that term is defined in the rules and regulations established by the SEC.

Under the terms of the charter of our Audit Committee, its purpose is to provide an independent review of the effectiveness of the financial reporting process, internal control and risk management systems, whistleblowing procedures and oversee the audit process. The Audit Committee's primary duties and responsibilities are:

- monitoring the reliability and integrity of our accounting policies and financial reporting and disclosure practices;
- reviewing the effectiveness of our internal controls and risk management systems;
- reviewing our whistleblowing procedures;
- reviewing, assessing and monitoring the effectiveness of our internal and external audit function; and
- ensuring compliance by us with all applicable laws, regulations and corporate policies.

Under the terms of the Audit Committee charter, the Audit Committee shall make recommendations to the board of directors to submit to our shareholders for approval of our independent registered public accounting firm at the annual general meeting. The Audit Committee has the authority and direct responsibility to oversee the selection process, compensation, retention and oversight of the work of our independent registered public accounting firm. Commencing with our first report on internal control over financial reporting, the Audit Committee will also be responsible for discussing the effectiveness of our internal control over financial reporting with management and our independent registered public accounting firm.

*Remuneration Committee*

Our Remuneration Committee, which would commonly be referred to in the U.S. as the compensation committee, consists of Mr. Mann, Mr. Hobley and Ms. Baker. The board of directors has determined that each of the committee members, except for Ms. Baker, who became our interim chief operating officer in April 2013, satisfies the independence requirements of The NASDAQ Stock Market, qualifies as a non-employee director as defined pursuant to Rule 16b -3 promulgated under the Exchange Act. The board of directors expects that Ms. Baker will step down as a member of the Remuneration Committee while serving as our interim chief operating officer with the vacancy to be filled by another of our independent directors.

Under the terms of the Remuneration Committee's charter, its primary duties and responsibilities are to:

- assist and agree with the board of directors in discharging its responsibilities with respect to compensation of our chief executive officer, secretary and other executive officers;
- determine terms of and approve performance objectives under any performance related plans and the annual payments made under such plans;
- review and approve our equity incentive plans and any other plans and programs designed and intended to provide compensation for our officers; and
- determine the policy for, and scope of, pension arrangements for executive directors and senior executives.

In particular, the Remuneration Committee is responsible for, in consultation with the chairman and/or chief executive officer, determining the compensation of each director and other senior executives, including salary, bonus, incentive payments or other share awards.

*Nominating and Corporate Governance Committee*

Our Nominating and Corporate Governance Committee consists of Messrs. Negroponte, Potamianos and Mann. The board of directors has determined that each of the committee members satisfies the independence requirements of Rule 5605 of The NASDAQ Stock Market Marketplace Rules. The Nominating and Corporate Governance Committee is expected to assist our board of directors in identifying individuals qualified to become our directors and in determining the composition of the board and its committees. The Nominating and Corporate Governance Committee will be responsible for, among other things:

- identifying and recommending to the board nominees for election or re-election, or for appointment to fill any vacancy;
- reviewing annually with the board of directors the current composition of the board of directors in light of the characteristics of independence, skills, experience and availability of service to us;

62

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- identifying and recommending to the board of directors the names of directors to serve as members of the Audit Committee and the Remuneration Committee, as well as the Corporate Governance and Nominating Committee itself;
- advising the board of directors periodically with respect to significant developments in the law and practice of corporate governance as well as our compliance with applicable laws and regulations, and making recommendations to the board of directors on all matters of corporate governance and on any corrective action to be taken; and
- monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance.

*Committee Charters and Other Corporate Governance Materials*

The board of directors has adopted a written charter for each of the Audit Committee, the Remuneration Committee and the Nominating and Corporate Governance Committee. A copy of our charters is available on our corporate website at www.velti.com. We do not incorporate the information on our website into this Annual Report and shareholders should not consider any such information that can be accessed through our website as part of this Annual Report.

### Code of Business Conduct and Ethics

We have adopted a written code of business conduct and ethics, which outlines the principles of legal and ethical business conduct under which we do business. The code is applicable to all of our directors, officers and employees. A copy of our code of business conduct and ethics is available on our corporate website at www.velti.com. We do not incorporate the information on our website into this Annual Report and shareholders should not consider any such information that can be accessed through our website as part of this Annual Report. Any substantive amendment or waiver of the code relating to executive officers or directors will be made only after approval by a committee consists of a majority of our independent directors.

### Director Agreements

Directors who are employees do not receive additional compensation for service as members of our board of directors and the terms of their individual employment is described above under "Executive Officer Compensation and Employment Agreements." The appointment of each non-employee director may be terminated summarily by Velti if the director is, among other things, in serious breach of his or her obligations to Velti or is guilty of fraud or dishonesty. Termination of the appointment does not give rise to any right of compensation. In addition, a non-employee director's service is terminable upon three months' written notice from either the individual director or Velti. We reimburse each independent director for reasonable, routine travel expenses to attend official meetings of our board of directors or its committees.

### Compensation Committee Interlocks and Insider Participation

During 2012, David Mann, David Hobley and Mari Baker served on our Remuneration Committee. Except for Ms. Baker, who became our interim chief operating officer in April 2013, none of the members of the Remuneration Committee has been an officer or employee of Velti. None of our executive officers serves on the board of directors or compensation committee of a company that has an executive officer that serves on our board of directors or the Remuneration Committee.

### 6.D. Employees

The following table presents the number of our employees categorized by geographic location as of December 31, 2012:

| | |
|---|---|
| Americas | 264 |
| Europe | 649 |
| Asia/Africa | 222 |
| Total | 1,135 |

The following table presents the number of our employees categorized by activity as of December 31, 2012:

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | |
|---|---:|
| Research and development | 573 |
| Sales and marketing | 314 |
| General and administrative | 248 |
| Total | 1,135 |

Our goal is to attract, retain and motivate highly qualified technical, sales and management personnel, particularly highly skilled technical personnel and engineers involved in new product development and productive sales personnel. From time to time, we also employ independent contractors to support our research and development, marketing, sales and support and administrative organizations. Our employees are not subject to any collective bargaining agreement. We consider our relationship with our employees to be good and have never experienced a work stoppage.

**6.E. Share Ownership**

**Beneficial Ownership of Executive Officers and Directors**

The following table sets forth certain information as of March 28, 2013 regarding the beneficial ownership of our ordinary shares by each of our directors and executive officers:

| Name | Number of Ordinary Shares Beneficially Owned [1] | Percentage of Ownership [2] |
|---|---:|:---:|
| Alex Moukas[3][4] | 3,983,918 | 6.0 |
| Wilson W. Cheung[5] | 216,778 | * |
| Jeffrey G. Ross | 15,000 | * |
| Chris Kaskavelis[6] | 4,249,626 | 6.4 |
| Sally J. Rau[7] | 185,771 | * |
| Menelaos Scouloudis[8] | 884,862 | * |
| David Mann[9] | 155,192 | * |
| David Hobley | 144,819 | * |
| Nicholas Negroponte | 785,449 | * |
| Phokion Potamianos[10] | 247,550 | * |
| Mari Baker | 16,489 | * |

\* - Less than 1%

[1]    Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Ordinary shares relating to options currently exercisable or exercisable within 60 days of the date of this table are deemed outstanding for computing the percentage of the person holding such securities but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote, and subject to community property laws where applicable, the persons named in the table above have sole voting and investment power with respect to all shares shown as beneficially owned by them.

[2]    The percentages shown are based on 66,122,634 ordinary shares issued and outstanding as of March 28, 2013.

[3]    Under a decision of the Athens Court of Appeals passed on March 26, 2009 (decision 1593/2009) (the "Decision") Alex Moukas, Chris Kaskavelis and Menelaos Scouloudis have been ordered to deliver certain of our ordinary shares in which they are interested to two individuals (the "Claimants") in connection with a dispute between those directors and the Claimants related to the acquisition by those directors of certain shares in Velti S.A. from the Claimants in 2006. The disputed shares are to be delivered as follows: (i) 131,503 shares to be delivered by Mr. Moukas, (ii) 131,503 shares to be delivered by Mr. Kaskavelis, and (iii) 51,502 shares to be delivered by Mr. Scouloudis. These directors have lodged an appeal against the Decision under protocol number 1039/02 Oct 2009. In the event that the appeal is rejected and the claim is not otherwise settled, it is possible that these directors may be obliged to transfer the

64

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

disputed shares to the Claimants, which would commensurately reduce their respective shareholdings in us. The holdings of each of Messrs. Moukas, Kaskavelis and Scouloudis reflected in the table above include the shares subject to the decision.

(4)   Includes 536,491shares subject to currently exercisable options or options vesting within 60 days of March 28, 2013, granted under our Share Incentive Plan. Also includes 19,646 shares subject to vesting within 60 days of March 28, 2013.

(5)   Includes 137,148 shares subject to currently exercisable options or options vesting within 60 days of March 28, 2013, granted under our Share Incentive Plan. Also includes 9,375 deferred shares subject to vesting within 60 days of March 28, 2013.

(6)   Includes 401,847 shares subject to currently exercisable options or options vesting within 60 days of March 28, 2013, granted under our Share Incentive Plan. Also includes 14,735 deferred shares subject to vesting within 60 days of March 28, 2013.

(7)   Includes 171,745 shares subject to currently exercisable options or options vesting within 60 days of March 28, 2013, granted under our Share Incentive Plan.

(8)   Includes 360,538 shares subject to currently exercisable options or options vesting within 60 days of March 28, 2013, granted under our Share Incentive Plan. Also includes 13,507 deferred shares subject to vesting within 60 days of March 28, 2013.

(9)   Includes 15,000 shares held by the D W Mann Children's Trust 1985.

(10)  Includes 236,100 shares held by Sylvina Capital L.P., a Delaware limited partnership (Sylvina).  Mr. Potamianos is a general partner of Sylvina and as such, has shared voting and investment control over the shares held by Sylvina.  Mr. Potamianos disclaims beneficial ownership of these shares, except to the extent of any pecuniary interest therein.

**Equity Compensation Plans**

Our directors, executive officers and employees are eligible to receive equity incentives or participate in our equity incentive plan. The following describes our equity incentive plan in which many of our directors, executive officers and employees participate.

**Share Incentive Plan (the "General Share Incentive Plan")**

*General.* The purpose of the General Share Incentive Plan is to assist us in attracting, motivating, retaining and rewarding our employees and employee directors. The General Share Incentive Plan allows for the award of: (i) share options, (ii) deferred share awards, (iii) conditional share awards and (iv) share appreciation rights. All awards under the General Share Incentive Plan are granted in our ordinary shares. Awards are not assignable or otherwise transferable, except in the case of the death of a participant, in which case the personal representatives of the participant may exercise the award within 12 months of the date of the participant's death.

*Eligible Participants.* Only our employees and employee directors, and employees and employee directors of our affiliates (other than our joint ventures or entities in which we have a non-controlling stake), are eligible to receive awards under the General Share Incentive Plan.

*Administration.* Our board of directors has delegated administration of the General Share Incentive Plan to our Remuneration Committee. Subject to the terms of the General Share Incentive Plan, our Remuneration Committee has broad discretion to select participants, determine the types, terms and conditions of awards, prescribe form award agreements, and make all other determinations that may be necessary or advisable for the administration of the General Share Incentive Plan.

*Plan Limits.* The maximum number of shares which may be issued in aggregate under all of our share incentive plans must not exceed 15% of our outstanding ordinary share capital on the date of grant, less all equity awards made in the prior three years pursuant to such share incentive plans that have not yet vested or that are subject to share options that have not yet been exercised.  We currently maintain three share incentive plans, all of which are subject to this overall award limitation: the General Share Incentive Plan, the 2009 U.S. Employee Share Incentive Plan (the U.S. Employee Share Incentive Plan) and the 2009 U.S. Non-Employee Share Incentive Plan (the U.S. Non-Employee Share Incentive Plan).

*Share Options.* A share option is a contractual right that entitles a participant to purchase up to a stated number of our ordinary shares at a stated price, or the exercise price, that is determined on the date the share option is granted by reference to the average closing price of our shares in the 14 days prior to the date of grant; provided, however, the exercise price must be no less than the nominal (par) value of the shares.

65

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Share Appreciation Rights.* A share appreciation right is an option to acquire the number of shares that is equal in value to the difference between the fair market value of the shares at the date of exercise less the award price (normally the fair market value of the shares on the date the share appreciation right is granted).

*Conditional Share Awards.* Under a conditional share award, shares are issued or transferred to a participant, and such shares are forfeitable in the event the participant ceases employment (or other service) within a specified period and/or they may be subject to other forfeitable restrictions. In addition, these conditional shares shall be forfeitable if they become incapable of vesting. Conditional shares are awarded to a participant at no cost, except in the case of an award satisfied by the issue of shares directly to the participant, in which case the amount payable for the shares is no less than their nominal (par) value. Under certain circumstances, we may pay an additional bonus to the participant equal to the nominal (par) value of the shares to be acquired, which bonus will be used to pay for the shares. This sum will be "grossed-up" so that the participant is paid an amount which covers any income tax or social security contributions that are payable in respect of the bonus.

*Deferred Share Awards.* Under a deferred share award, shares are issued to a participant when the award vests in accordance with any vesting schedule specified in the relevant award agreement. On vesting, shares are issued to the participant upon payment of a subscription price equal to the nominal (par) value of the shares. The relevant award agreement may grant the participant a right to receive (in cash or shares) an amount equivalent to any cash dividends paid during the vesting period upon the award vesting.

*Grant of Awards.* Awards may only be granted: (i) within 42 days immediately following the date when the General Share Incentive Plan was adopted or the announcement of our final or interim results in respect of any financial year, (ii) within 14 days immediately following a participant becoming an eligible employee or (iii) on any day on which our board of directors resolves that exceptional circumstances exist which justify the grant of an award. No award can be granted later than April 26, 2016, or in circumstances which would breach our share dealing code, or constitute market abuse.

*Vesting of Awards.* An award vests in accordance with the vesting schedule established by our Remuneration Committee for such award. We can specify any performance targets which must be met before the award can vest, and such performance targets can be waived or amended if the Remuneration Committee reasonably concludes that a different performance target would be a fairer measure of performance and the new performance target is not more difficult to achieve than the old performance target. Share options and share appreciation rights can be exercised to the extent that they have vested. Deferred share awards and conditional share awards do not need to be exercised. If a participant ceases to be an employee or director for "good leaver" reasons, including death, injury, disability, retirement, redundancy or (at our sole discretion) any other reason other than dismissal for cause, we have discretion to permit unvested awards to vest in whole or in part.

*Lapse of Awards.* Awards lapse on the earliest of: (i) the tenth anniversary of the date of the award, or (ii) following a corporate transaction of one of the types described below, (iii) when the participant ceases to be an employee because of dismissal for cause, (iv) in respect of vested share options and share appreciation rights, six months following cessation of employment for one of the "good leaver" reasons other than death (unless we exercise discretion to permit these awards to remain exercisable for a longer period), (v) in respect of vested share options and share appreciation rights, one year following the participant's death, (vi) in respect of conditional share awards or deferred share awards, on cessation of employment (unless we exercise discretion to permit accelerated or continued vesting) or (vii) on our winding-up.

*Takeovers, Reconstructions, Liquidation and Variation of Share Capital.* If any of the following corporate transactions take place, awards continue to vest (and if relevant be exercisable) for the following periods, following which they lapse: (i) six months after a general offer to acquire shares becomes wholly unconditional, (ii) one month after a person becomes bound or entitled to acquire shares under Part 18 of the Jersey Companies Law, (c) one month after a court sanctions a scheme of arrangement under Part 18A of the Jersey Companies Law and (iii) one month after the passing of a resolution for our winding-up by way of summary winding-up. Any unvested awards which do not vest during the specified period are deemed to vest at the time of the corporate transaction on a pro rata basis unless we exercise discretion to permit them to vest in a greater amount or in full. Notwithstanding the foregoing, where a corporate transaction occurs, we may procure that the participants will be granted new rights in substitution for their existing rights, provided that the new rights are no less valuable overall than the prior rights. If there is any variation in our share capital, awards will be adjusted in such manner as our board of directors considers appropriate.

*Amendment.* Our board of directors may alter the rules of the General Share Incentive Plan from time to time, except that no alteration or addition may be made to the advantage of participants without the approval of our shareholders unless it is a minor amendment to benefit the administration of the General Share Incentive Plan. Additionally, no amendment can be made which would adversely affect the rights of participants without their consent.

<center>66</center>

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*U.S. Federal Income Tax Consequences of Awards.* U.S. participants only receive deferred share awards under the General Share Incentive Plan. Deferred share awards are generally subject to taxation at the time of payment in the amount of the fair market value of the shares issued at that time, and we generally are entitled to take a corresponding deduction at the same time.

**U.S. Employee Share Incentive Plan**

*General.* The purpose of the U.S. Employee Share Incentive Plan is to assist us in attracting, motivating, retaining and rewarding high-quality executives and other employees. The U.S. Employee Share Incentive Plan allows for the award of: (i) incentive share options, (ii) non-qualified share options, (iii) restricted share awards, (iv) unrestricted share award and (v) deferred share awards. All awards under the U.S. Employee Share Incentive Plan are granted in our ordinary shares. Share options are generally not assignable or otherwise transferable, other than in the event of the participant's death. However, our board of directors may in certain cases permit a non-qualified share option to be transferred to a member of a participant's family, family trust, or an entity solely owned by the participant's family members.

*Eligible Participants.* Only our employees, and employees of our affiliates, are eligible to receive awards under the U.S. Employee Share Incentive Plan.

*Administration.* Our board of directors has delegated administration of the U.S. Employee Share Incentive Plan to our Remuneration Committee. Subject to the terms of the U.S. Employee Share Incentive Plan, we have broad discretion to select participants, determine the types, terms and conditions of awards, prescribe award agreements, and make all other determinations that may be necessary or advisable for the administration of the U.S. Employee Share Incentive Plan.

*Plan Limits.* The maximum number of shares which may be issued pursuant to awards made under the U.S. Employee Share Incentive Plan is 5,250,000 shares. In addition, the maximum number of shares which may be issued in aggregate under all of our share incentive plans must not exceed 15% of our outstanding ordinary share capital on the date of grant, less all equity awards made in the prior three years pursuant to such share incentive plans that have not yet vested or that are subject to share options that have not yet been exercised.

*Share Options.* A share option is a contractual right that entitles a participant to purchase up to a stated number of ordinary shares at a stated price, or exercise price, that is determined on the date the share option is granted. Incentive share options, or ISOs, are intended to receive beneficial tax treatment, subject to satisfying all ISO qualifying criteria. ISOs must be granted with an exercise price at least equal to the fair market value of the shares on the date of grant; provided, however, for ISOs granted to owners of more than 10% of the combined voting power of our shares (or that of our parent or subsidiary corporations), the exercise price must be at least 110% of such share price. In addition, ISOs must expire no later than ten years following the date of grant, provided, however, for ISOs granted to owners of more than 10% of the combined voting power of our shares (or that of our parent or subsidiary corporations), the expiration of an ISO must be no later than five years following the date of grant. A share option generally terminates earlier than the stated expiration date in connection with the termination of the participant's employment. In no event shall the exercise price of any share option be less than the nominal (par) value of the ordinary shares. Non-qualified share options, or NQOs, are share options granted pursuant to the U.S. Employee Share Incentive Plan which do not qualify as ISOs. The aggregate fair market value as of the date of grant of the shares with respect to which ISOs may become exercisable for the first time by an employee in any calendar year may not exceed $100,000, and any excess shall be treated as NQOs.

*Share Awards.* Under a restricted share award, also known as a deferred share award, shares are issued or transferred to a participant, subject to such restrictions and conditions as we may impose, such as conditions based on continued employment and/or achievement of pre-established performance goals and objectives, and failure to satisfy such conditions shall result in the forfeiture of such shares. Subject to the foregoing, holders of restricted shares shall have all of the rights associated with being one of our shareholders. Participants may also be granted unrestricted share awards, and any such shares are not subject to any conditions and/or restrictions.

*Deferred Share Awards.* Under a deferred share award, shares are issued to a participant when the award vests in accordance with any vesting schedule specified in the relevant award agreement. On vesting, shares are issued directly to the participant upon payment of a subscription price equal to the nominal (par) value of the shares. The relevant award agreement may grant the participant a right to (in cash or shares) an amount equivalent to any cash dividends paid during the vesting period upon the award vesting.

*Vesting of Awards.* An award vests in accordance with the vesting schedule established by our Remuneration Committee for such award. Share options can be exercised to the extent that they have vested. In our sole discretion, we may accelerate the vesting of any awards if circumstances arise for which we decide that accelerated vesting is appropriate.

67

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Takeovers, Reconstructions, Liquidation and Variation of Share Capital.* If any of the following corporate transactions take place, awards continue to vest (and if relevant be exercisable) for the following periods, following which they lapse: (i) six months after a general offer to acquire shares becomes wholly unconditional, (ii) one month after a person becomes bound or entitled to acquire shares under Part 18 of the Jersey Companies Law, (iii) one month after a court sanctions a scheme of arrangement under Part 18A of the Jersey Companies Law and (iv) one month after the passing of a resolution for our winding-up by way of summary winding-up. We have the discretion to permit any unvested awards which do not vest during the specified period to vest in a greater amount or in full. Notwithstanding the foregoing, where a corporate transaction occurs, we may procure that existing awards will be assumed or substituted for rights in an acquiring company (if applicable), with such adjustment as we consider appropriate, or settled in cash, as our board of directors shall determine. If there are any capitalization changes in our shares, awards will be adjusted in such manner as our board of directors considers appropriate.

*Lapse of Awards.* Once any portion of an option becomes vested and exercisable, it generally shall continue to be exercisable by the grantee or his or her representatives and legatees at any time or times prior to the earliest of (1) the date which is (i) twelve months following the date on which the grantee's service terminates due to death or disability or (ii) three months following the date on which the grantee's service terminates if the termination is due to any other reason, or (2) the expiration date set forth in the option agreement, following which, to the extent that it has not been exercised, the option shall lapse, unless the grantee's employment is terminated for cause, in which case the option shall terminate immediately and be null and void upon the date of termination.

*Amendment and Termination.* Our board of directors may amend or terminate the U.S. Employee Share Incentive Plan or any individual award at any time, except that no action can adversely affect an outstanding award without the holder's consent unless: (a) required to ensure that a share option is treated as an ISO or (ii) to comply with applicable law. Additionally, none of the following amendments may be made without the approval of our shareholders: (a) an increase in the maximum share limits, (b) a modification for which shareholder approval is required by law or (c) an alteration of the class of employees eligible to receive ISOs. The U.S. Employee Share Incentive Plan shall continue in effect until the earliest of: (x) ten years after its adoption by our board of directors, (y) its termination by our board of directors or (z) the date on which all of the shares available for issuance under the U.S. Employee Share Incentive Plan have been issued and all restrictions on such shares under the terms of the U.S. Employee Share Incentive Plan and the applicable award agreements have lapsed.

*U.S. Federal Income Tax Consequences of Options.* Participants generally do not recognize taxable income upon grant of a share option. With respect to exercising NQOs, we are generally entitled to deduct, and the participant generally recognizes taxable income in, an amount equal to the excess (if any) between the fair market value of the shares at the time of exercise and the exercise price. With respect to exercising ISOs, if the underlying shares are held for a minimum of two years from the date of grant and one year from the date of exercise, the participant will not recognize taxable income at the time of exercise. However, the excess (if any) of the fair market value of the shares received at exercise over the option exercise price is an item of tax preference income potentially subject to the alternative minimum tax. Further, if shares acquired upon the exercise of an ISO are held for the holding periods referenced above, the gain or loss (in an amount equal to the difference between the fair market value on the date of sale and the exercise price) upon disposition of the shares will be treated as a long-term capital gain or loss, and we will not be entitled to any deduction. On the other hand, if the applicable ISO holding period requirements are not met, the ISO will be treated as an NQO, and such share option shall generally have the same tax consequences as described for NQOs above.

*U.S. Federal Income Tax Consequences of Awards other than Options.* A restricted share award subject to a substantial risk of forfeiture results in income recognition equal to the excess of the fair market value over the price paid for the restricted shares, if any, only at the time the restrictions lapse (unless the participant elects to accelerate income recognition as of the date of grant by timely filing an election under Section 83(b) of the Internal Revenue Code). Unrestricted share awards are generally subject to taxation at the time of payment, and we generally are entitled to take a corresponding deduction at the same time.

## U.S. Non-Employee Share Incentive Plan

*General.* The purpose of the U.S. Non-Employee Share Incentive Plan is to assist us in attracting, motivating, retaining and rewarding high-quality non-employee directors and consultants. The U.S. Non-Employee Share Incentive Plan allows for the award of: (i) share options, (ii) restricted share awards (iii) unrestricted share awards and (iv) deferred share awards. All awards under the U.S. Non-Employee Share Incentive Plan are granted in our ordinary shares. Share options are generally not assignable or otherwise transferable, other than in the event of the participant's death. However, our board of directors may in certain cases permit a share option to be transferred to a member of a participant's family, family trust or an entity solely owned by the participant's family members.

68

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Eligible Participants.* Only our non-employee directors and consultants, and non-employee directors and consultants of our affiliates, are eligible to receive awards under the U.S. Non-Employee Share Incentive Plan.

*Administration.* Our board of directors has delegated administration of the U.S. Non-Employee Share Incentive Plan to our Remuneration Committee. Subject to the terms of the U.S. Non-Employee Share Incentive Plan, we have broad discretion to select participants, determine the types, terms and conditions of awards, prescribe award agreements, and make all other determinations that may be necessary or advisable for the administration of the U.S. Non-Employee Share Incentive Plan.

*Plan Limits.* The maximum number of shares which may be issued pursuant to awards made under the U.S. Employee Share Incentive Plan is 750,000 shares. In addition, maximum number of shares which may be issued in aggregate under all of our share incentive plans must not exceed 15% of our outstanding ordinary share capital on the date of grant, less all equity awards made in the prior three years pursuant to such share incentive plans that have not yet vested or that are subject to share options that have not yet been exercised.

*Share Options.* A share option is a contractual right that entitles a participant to subscribe for a stated number of ordinary shares at a stated price, or the exercise price, that is determined on the date the share option is granted. A share option generally terminates earlier than the stated expiration date in connection with the termination of the participant's service relationship with us. In no event shall the exercise price of any share option be less than the nominal (par) value of the ordinary shares.

*Share Awards.* Under a restricted share award, also known as a deferred share award, shares are issued to a participant, subject to such restrictions and conditions as we may impose, such as conditions based on continued employment and/or achievement of pre-established performance goals and objectives, and failure to satisfy such conditions shall result in the forfeiture of such shares. Subject to the foregoing, holders of restricted shares shall have all of the rights associated with being one of our shareholders. Participants may also be granted unrestricted share awards, and any such shares are not subject to any conditions and/or restrictions.

*Deferred Share Awards.* Under a deferred share award, shares are issued to a participant when the award vests in accordance with any vesting schedule specified in the relevant award agreement. On vesting, shares are issued directly to the participant upon payment of a subscription price equal to the nominal (par) value of the shares. The relevant award agreement may grant the participant a right to receive (in cash or shares) an amount equivalent to any cash dividends paid during the vesting period upon award vesting.

*Vesting of Awards.* An award vests in accordance with the vesting schedule established by our Remuneration Committee for such award. Share options can be exercised to the extent that they have vested. In our sole discretion, we may accelerate the vesting of any awards if circumstances arise for which we decide that accelerated vesting is appropriate.

*Takeovers, Reconstructions, Liquidation and Variation of Share Capital.* If any of the following corporate transactions take place, awards continue to vest (and if relevant be exercisable) for the following periods, following which they lapse: (i) six months after a general offer to acquire shares becomes wholly unconditional, (ii) one month after a person becomes bound or entitled to acquire shares under Part 18 of the Jersey Companies Law, (iii) one month after a court sanctions a scheme of arrangement under Part 18A of the Jersey Companies Law and (iv) one month after the passing of a resolution for our winding-up by way of summary winding-up. We have the discretion to permit any unvested awards which do not vest during the specified period to vest in a greater amount or in full. Notwithstanding the foregoing, where a corporate transaction occurs, we may procure that existing awards will be assumed or substituted for rights in an acquiring company (if applicable), with such adjustment as we consider appropriate, or settled in cash, as our board of directors shall determine. If there are any capitalization changes in our shares, awards will be adjusted in such manner as our board of directors considers appropriate.

*Amendment and Termination.* Our board of directors may amend or terminate the U.S. Non-Employee Share Incentive Plan or any individual award at any time, except that no action can adversely affect an outstanding award without the holder's consent unless to comply with applicable law. The U.S. Non-Employee Share Incentive Plan shall continue in effect until the earliest of: (i) ten years after its adoption by our board of directors, (ii) its termination by our board of directors or (iii) the date on which all of the shares available for issuance under the U.S. Non-Employee Share Incentive Plan have been issued and all restrictions on such shares under the terms of the U.S. Non-Employee Share Incentive Plan and the applicable award agreements have lapsed.

*U.S. Federal Income Tax Consequences of Awards.* Participants generally do not recognize taxable income upon grant of a share option. With respect to exercising a share option, we are generally entitled to deduct, and the participant generally recognizes taxable income in, an amount equal to the excess (if any) between the fair market value of the shares at the time of exercise and the exercise price. A restricted share award subject to a substantial risk of forfeiture results in income recognition

69

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

equal to the excess of the fair market value over the price paid for the restricted shares, if any, only at the time the restrictions lapse (unless the participant elects to accelerate income recognition as of the date of grant by timely filing an election under Section 83(b) of the Internal Revenue Code). Unrestricted share awards are generally subject to taxation at the time of payment, and we generally are entitled to take a corresponding deduction at the same time.

## ITEM 7. MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS

### 7.A. Major Shareholders

The following table sets forth as of March 28, 2013 certain information regarding the beneficial ownership of our ordinary shares by all shareholders known to us to own beneficially 5.0% or more of our ordinary shares:

| Name | Number of Ordinary Shares Beneficially Owned [1] | Percentage of Ownership [2] |
|---|---|---|
| Alex Moukas[3] | 3,983,918 | 6.0 |
| Christos Kaskavelis[4] | 4,249,626 | 6.4 |
| FMR LLC[5] 82 Devonshire Street Boston, MA 02109 | 5,474,024 | 8.3 |
| Discovery Equity Partners, L.P.[6] 191 North Wacker Drive Suite 1685 Chicago, Illinois 60606 | 3,463,292 | 5.2 |
| Columbia Wanger Asset Management LLC[7] 227 Monroe Street Chicago, ILL 60606 | 3,295,000 | 5.0 |

[1] Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Ordinary shares relating to options currently exercisable or exercisable within 60 days of the date of this table are deemed outstanding for computing the percentage of the person holding such securities but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote, and subject to community property laws where applicable, the persons named in the table above have sole voting and investment power with respect to all shares shown as beneficially owned by them.

[2] The percentages shown are based on 66,122,634 ordinary shares issued and outstanding as of March 28, 2013.

[3] Includes 362,206 shares subject to currently exercisable options or options vesting within 60 days of March 28, 2013 granted under our Share Incentive Plan, and 68,313 deferred shares subject to vesting within 60 days of March 28, 2013.

[4] Includes 272,434 shares subject to currently exercisable options or options vesting within 60 days of March 28, 2013 granted under our Share Incentive Plan, and 48,990 deferred shares subject to vesting within 60 days of March 28, 2013.

[5] Based on Schedule 13G filed with the Securities and Exchange Commission on February 14, 2013. Includes 5,381,044 ordinary shares beneficially owned by Fidelity Management & Research Company (Fidelity), a wholly-owned subsidiary of FMR LLC (FMR), in its capacity as an investment adviser; 92,980 ordinary shares held by Pyramis Global Advisors Trust Company (PGATC), an indirect wholly-owned subsidiary of FMR, in its capacity as an investment advisor. Edward C. Johnson 3d, Chairman of FMR, and FMR, through its control of Fidelity and the funds each has sole power to dispose of the 5,381,044 shares owned by the Funds. Edward C. Johnson 3d and FMR, through its control of PGATC, each has sole dispositive power over 92,980 shares and sole power to vote or to direct the voting of 92,980 of the shares owned by the institutional accounts managed by PGATC. Members of the family of Edward C. Johnson 3d are the predominant owners, directly or through trusts, of Series B voting common shares of FMR, representing 49% of the voting power of FMR. The Johnson family group and all other Series B shareholders have entered into a shareholders' voting agreement under which all Series B voting common shares will be voted in accordance with the majority vote of Series B voting common shares. Neither FMR nor Edward C. Johnson 3d, has the sole power to vote or direct the voting of the shares owned directly by the Fidelity Funds, which power resides with the Funds' Boards of Trustees.

[6] Based on Schedule 13D filed with the Securities and Exchange Commission on February 15, 2013. This Schedule 13D was filed jointly by Discovery Equity Partners, L.P. (Discovery Equity Partners); Discovery Group I, LLC (Discovery Group); David J. Donoghue; and Michael R. Murphy. Includes 3,463,292 shares over which Discovery Equity Partners; Discovery Group; and Messrs. Donoghue and Murphy has shared voting and dispositive power. Discovery Group is the sole general partner of Discovery Equity Partners. Messrs. Donoghue and Murphy are the sole managing members of Discovery Group. As a consequence, Discovery Group and Messrs. Donoghue and Murphy may be deemed to share beneficial ownership of all the shares owned by Discovery Equity Partners.

[7] Based on Schedule 13G filed with the Securities and Exchange Commission on February 14, 2013. Includes 3,295,000 shares over which it has sole voting and dispositive power.

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Significant Changes in the Ownership of Major Shareholders**

On January 28, 2011, we issued 12.5 million additional shares in our initial public offering in the United States and our listing on the NASDAQ Global Select Market, for net proceeds of $134.1 million, resulting in a significant change in the percentage of our outstanding shares owned by major shareholders. We issued a further 9,474,275 ordinary shares on June 14, 2011 in a follow on offering in the United States, for net proceeds of $136.8 million.

**Major Shareholders Voting Rights**

Our major shareholders do not have different voting rights from any other of our shareholders.

**Record Holders**

Based on a review of the information provided to us by our U.S. transfer agent, as of March 28, 2013, there were approximately 284 record holders, of which 48 record holders holding approximately 99.0% of our ordinary shares had registered addresses in the United States. These numbers are not representative of the number of beneficial holders of our shares nor are they representative of where such beneficial holders reside, since many of these ordinary shares were held of record by brokers or other nominees (including one U.S. nominee company, CEDE & Co., which held approximately 97.9% of our outstanding ordinary shares as of such date).

## 7.B. Related Party Transactions

**Related Party Debt**

Please see Note 13 in the Notes to the Consolidated Financial Statements attached to this Annual Report for a discussion of related party transactions.

## 7.C. Interests of Experts and Counsel

Not applicable.

Source: Velti plc, 20-F, April 11, 2013 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## ITEM 8. FINANCIAL INFORMATION

### 8.A. Consolidated Statements and Other Financial Information

The consolidated financial statements for the Fiscal Years ended December 31, 2012, 2011 and 2010, as required under Item No. 18 are attached hereto and found immediately following the text of this Annual Report on Form 20-F. The audit report of Baker Tilly Virchow Krause LLP as of December 31, 2012 and 2011 and each of the three years in the period ended December 31, 2012, is included therein immediately preceding the financial statements.

### Legal Proceedings

From time to time, we and our subsidiaries are subject to legal, administrative and regulatory proceedings, claims, demands and investigations in the ordinary course of business, including claims with respect to intellectual property, contracts, employment and other matters. In addition to the below mentioned legal proceedings, we do not believe that the ultimate resolution of other legal proceedings involving our company, if any, will have a material adverse effect on our consolidated financial position, results of operations or cash flows.

### Indemnification Claims

We recently received letters on behalf of several of our customers notifying us that the customers had received letters from a third party which alleged that certain of our customer's applications infringed the patent rights of the third party. In turn, our customers have alleged that we are obligated to indemnify them relating to these matters as the claims allegedly relate to services that we provide to the customers. We are currently investigating the related issues.

### Patent Litigation

On March 9, 2012, Augme Technologies, Inc. filed a complaint against Velti USA, Inc. in the United States District Court for the District of Delaware (case no. 1:12cv294), alleging infringement of three patents held by Augme. On May 4, 2012, Velti responded to the complaint by filing a motion to dismiss and motion to strike certain claims in the complaint. On May 18, 2012, in response to the motion, Augme filed an opposition and also filed a First Amended Complaint. Velti responded to the First Amended Complaint (and asserted counterclaims of non-infringement and invalidity) on June 4, 2012. On March 22, 2013, Velti Limited and Velti entered into a settlement with Augme, pursuant to which Augme and Velti settled the two pending lawsuits as between each other. Pursuant to the settlement, (i) Augme has granted Velti a paid-up license in all patents owned by Augme with a priority date on or before March 22, 2013 for the life of those patents, (ii) Velti has granted Augme a paid-up license in all patents owned by Velti with a priority date on or before March 22, 2013, (iii) Augme and Velti have covenanted not to sue each other on such patents, (iv) Augme and Velti have dismissed the lawsuits as to each other with prejudice with each side to bear its own costs, (v) Augme and Velti have released each other as to the subject matter of the lawsuits with neither party making any admission of liability, and (vi) Velti will pay Augme a lump sum payment of $200,000 no later than 10 business days following the dismissal of the lawsuits. On March 29, 2013, the Court granted a joint motion to dismiss the case with prejudice, pursuant to the settlement agreement. The matter is now officially closed.

### In re A2P SMS Antitrust Litigation

On June 14, 2012, Air2Web, Inc., was named as a defendant in a consolidated class action complaint filed in the United States District Court for the Southern District of New York on behalf of a purported class of lessees of common short codes used in application-to-person SMS messaging. In re A2P SMS Antitrust Litigation, Case No. 12-cv-2656 (AJN). The plaintiffs allege that the defendants, which include all major U.S. wireless carriers, CTIA - The Wireless Association®, WMC Global, Inc., and certain aggregators (including Air2Web) violated federal antitrust law by conspiring to reduce competition and fix prices in, and conspiring to monopolize, the market for application-to-person SMS transmission in the United States. The plaintiffs seek injunctive relief and treble damages, in an undisclosed amount, jointly and severally from all defendants for injuries allegedly sustained from April 5, 2008, until the present. On August 14, 2012, several groups of defendants, including Air2Web, filed motions to dismiss the complaint in its entirety, and a number of defendants also filed motions to compel arbitration of this dispute and to stay these proceedings pending arbitration. A decision on those motions is pending. Plaintiffs have not yet responded to those motions. Because this action is in its very early stages, and due to the inherent uncertainties surrounding the litigation process, we are unable to reasonably assess the likelihood of any particular outcome at this time.

### Dividend Distributions Policy

72

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

We have never declared or paid any dividends, nor do we have any present plan to pay any dividends on our ordinary shares in the foreseeable future. We currently intend to retain our available funds and any future earnings to operate and expand our business.

Our board of directors has complete discretion as to whether we will distribute dividends in the future, subject to restrictions under Jersey law. Any payment of dividends would be subject to the Companies (Jersey) Law 1991, as amended, which requires that all dividends be approved by our board of directors. Moreover, under Jersey law, we may pay dividends on our shares only after our board of directors has determined that we are able to pay our debts as they become due and will continue to be able to do so for a 12 month period, determined in accordance with the Companies (Jersey) Law 1991, as amended and pursuant to applicable accounting regulations.

### 8.B. Significant Changes

None

### ITEM 9. THE OFFER AND LISTING

### 9.A. Ordinary Share Trading Information

Our ordinary shares were quoted on AIM from May 3, 2006, to May 3, 2011.  Our ordinary shares have traded on the NASDAQ Global Select Market since January 28, 2011 under the symbol "VELT."

The following table sets forth, for the periods indicated, the high and low market prices for our ordinary shares on AIM in British pounds sterling.

|  | High | Low |
| --- | --- | --- |
| **Fiscal Year Ended December 31, 2008** | 1.975 | 1.235 |
| **Fiscal Year Ended December 31, 2009** | 2.000 | 1.090 |
| First Quarter | 3.390 | 2.045 |
| Second Quarter | 5.100 | 2.960 |
| Third Quarter | 6.290 | 3.970 |
| Fourth Quarter | 6.160 | 4.695 |
| **Fiscal Year Ended December 31, 2010** | 6.290 | 2.045 |
| First Quarter | 8.883 | 4.950 |
| Second Quarter (up to May 3, 2011) | 10.420 | 7.505 |
| **Fiscal Year Ending December 31, 2011 (up to May 3, 2011)** | 10.420 | 4.950 |

The high and low prices listed represent the latest quotes obtained from Proquote International, a data vendor owned by the London Stock Exchange.

The following table sets forth, for the periods indicated, the high and low market prices for our ordinary shares on the NASDAQ Global Select Market in U.S. dollars, since our initial listing on January 28, 2011:

73

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

|  | High | Low |
|---|---|---|
| First Quarter 2011 (from January 28, 2011) | $ 15.89 | $ 9.91 |
| Second Quarter 2011 | 19.32 | 12.40 |
| Third Quarter 2011 | 20.00 | 6.22 |
| Fourth Quarter 2011 | 9.46 | 6.04 |
| **Fiscal Year Ended December 31, 2011** | 20.00 | 6.04 |
| First Quarter 2012 | 14.65 | 6.25 |
| Second Quarter 2012 | 13.62 | 5.61 |
| Third Quarter 2012 | 10.43 | 4.99 |
| For October 2012 | 9.11 | 6.93 |
| For November 2012 | 7.55 | 3.31 |
| For December 2012 | 5.99 | 3.07 |
| **Fiscal Year Ended December 31, 2012** | 14.65 | 3.07 |
| For January 2013 | 5.79 | 3.64 |
| For February 2013 | 4.39 | 3.41 |
| For March 2013 | 4.01 | 1.85 |

**9.B. Plan of Distribution**

Not applicable.

**9.C. Markets**

Velti's ordinary shares are traded on NASDAQ under the symbol "VELT."

**9.D Selling Shareholders**

Not applicable.

**9.E. Dilution**

Not applicable.

**9.F. Expenses of the issue**

Not applicable.

**ITEM 10. ADDITIONAL INFORMATION**

**10.A. Share Capital**

Not applicable.

**10.B. Memorandum and articles of association**

Information regarding Velti's memorandum and articles of incorporation is hereby incorporated by reference to the registration statement on Form F-1, as amended (Registration No. 333-166793), as originally filed with the Securities and Exchange Commission on May 13, 2010.

Our articles of incorporation were subsequently amended to (i) remove references to AIM, (ii) include provisions to better facilitate proxy voting by our beneficial holders in the Depository Trust Company system and (iii) address non-executive director fees.  A description of such changes is hereby incorporated by reference to Exhibit 1 on Form 6-K filed on June 15, 2011 and by reference to the amended articles filed as Exhibit 1.1 to Form 6-K filed on August 3, 2011.

A copy of our current memorandum and articles of association is also filed as Exhibit 1.1 to this Annual Report.

74

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## 10.C. Material Contracts

In addition to our financing agreements listed under Item 5, we have entered into the following material contracts since January 1, 2011:

- Lease agreements relating to our facilities in San Francisco, California and Athens, Greece;
- Agreement relating to the acquisition of Mobclix, Inc., dated September 30, 2010, as amended by Amendment No. 1 thereto, dated May 1, 2011;
- Agreement relating to the sale and purchase of the entire issued share capital of Mobile Interactive Group Limited dated November 14, 2011 by and among Barry Houlihan and others and Velti plc;
- Share Purchase Agreement among Velti plc, Ydon Holdings Ltd., the Shareholders of Ydon Holdings Ltd. and Xin Ye dated September 22, 2011;
- First Amendment to Lease Agreement dated November 15, 2011 between PPF Paramount One Market Plaza Owner, L.P. and Velti USA, Inc.
- Second Amendment to Lease Agreement dated May 18, 2012 between PPF Paramount One Market Plaza Owner, L.P. and Velti USA, Inc.
- Deed of Variation dated August 9, 2012 to Agreement to purchase shares of Mobile Interactive Group Limited;
- Credit Agreement dated as of August 10, 2012 among Velti Inc., Velti plc, Mobile Interactive Group Limited and Velti Mobile Platforms Limited as Borrowers, HSBC Bank plc, HSBC Bank USA, National Association and the lenders from time to time party thereto, and HSBC Bank USA, National Association, as Administrative Agent;
- Framework, Guarantee and Call Option Agreement dated November 12, 2012 between the Sellers and the Purchasers thereto;
- Offer Letter dated December 4, 2012 between Velti plc and Jeffrey G. Ross;
- First Amendment to Credit Agreement during December 2012 among Velti Inc., Velti plc, Mobile Interactive Group Limited and Velti Mobile Platforms Limited as Borrowers, HSBC Bank plc, HSBC Bank USA, National Association and the lenders from time to time party thereto, and HSBC Bank USA, National Association, as Administrative Agent.
- Limited Waiver dated April 3, 2013 to Credit Agreement dated August 10, 2012.

## 10.D. Exchange Controls

None.

## 10.E. Taxation

The following is a discussion of certain material income tax consequences of an investment in our ordinary shares based upon laws and relevant interpretations thereof in effect as of the date of this Annual Report, all of which are subject to change. This discussion does not address all possible tax consequences relating to an investment in our ordinary shares, such as the tax consequences under state, local and other tax laws. This discussion does not constitute legal or tax advice and shareholders should consult their tax advisors with respect to the consequences of acquisition, ownership and disposition of our ordinary shares. Shareholders should be aware that tax rules and practice and their interpretation may change.

### Jersey Taxation Consequences

### Holders of Ordinary Shares

We will be entitled to pay dividends to holders of our ordinary shares without any withholding or deduction for or on account of Jersey tax. Holders of our ordinary shares (other than residents of Jersey) will not be subject to any tax in Jersey with respect to the acquisition, ownership or other disposition of our ordinary shares.

### Jersey Taxation - Stamp Duty

No stamp duty is payable in Jersey on the issue or transfer of our ordinary shares during the holder's lifetime.

Upon the death of one of our shareholders, a grant of probate or letters of administration will be required to transfer the ordinary shares of the deceased person, *provided, however,* that where the deceased person was domiciled outside of Jersey at the time of death, we may (at our discretion) dispense with this requirement where the value of the deceased's movable estate in Jersey does not exceed £10,000.

75

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Upon the death of one of our shareholders, Jersey stamp duty will be payable on the registration in Jersey of a grant of probate or letters of administration, which will be required in order to transfer or otherwise deal with:

- *Where the deceased person was domiciled in Jersey at the time of death:* the deceased person's personal estate wherever situated (including any Velti shares) if the net value of such personal estate exceeds £10,000; or
- *Where the deceased person was domiciled outside of Jersey at the time of death:* the deceased person's personal estate situated in Jersey (including any Velti shares) if the net value of such personal estate exceeds £10,000.

The rate of stamp duty payable is:

- *Where the net value of the deceased person's relevant personal estate does not exceed £100,000:* 0.5% of the net value of the deceased person's relevant personal estate; or
- *Where the net value of the deceased person's relevant personal estate exceeds £100,000:* £500 for the first £100,000 plus 0.75% of the net value of the deceased person's relevant personal estate which exceeds £100,000.

In addition, application and other fees may be payable.

### Republic of Ireland Taxation - Tax on Chargeable Gains

Liability to Irish tax on chargeable gains will depend on the individual circumstances of our shareholders.

### Disposal of Our Shares by Irish-resident Velti Shareholders

A disposal of our ordinary shares by a Velti shareholder who is resident or ordinarily resident in the Republic of Ireland may, depending on individual circumstances (including the availability of exemptions), give rise to a chargeable gain or allowable loss for the purposes of the Irish taxation of chargeable gains.

It is expected that our share register will not be held in Ireland and, accordingly, individual shareholders who are resident or ordinarily resident in the Republic of Ireland, but not domiciled in the Republic of Ireland, will be liable to Irish chargeable gains tax only to the extent that the proceeds of the disposal of ordinary shares are remitted or deemed to be remitted to the Republic of Ireland.

### Disposal of Our Shares by non-Irish-resident Shareholders

Shareholders who are not resident or, in the case of individuals, ordinarily resident for tax purposes in the Republic of Ireland will not be liable for Irish tax on chargeable gains realized on a subsequent disposal of their ordinary shares unless such ordinary shares (i) derive their value or greater part of their value directly or indirectly from land in the Republic of Ireland or minerals in the Republic of Ireland or any rights, interests or other assets in relation to mining or minerals or the searching for minerals or (ii) are used, held or acquired for the purposes of a trade, profession or vocation carried on in the Republic of Ireland through a branch or agency. Such shareholders may be subject to foreign taxation on any gain under local law.

A shareholder who is an individual and who is temporarily a non-resident of the Republic of Ireland at the time of the disposal may, under legislation aimed at curbing tax avoidance, still be liable to Irish taxation on any chargeable gain realized (subject to the availability of exemptions).

### Republic of Ireland Taxation - Tax on Dividends

### Receipt of Dividends from Velti

*Dividend withholding tax.* Dividends paid by us will generally be subject to Irish dividend withholding tax, or DWT, at the standard rate of income tax (currently 20%) unless a shareholder is within one of the categories of exempt shareholders referred to below. Where DWT applies, we will be responsible for withholding DWT at source. For DWT purposes, a dividend includes any distribution made by us to shareholders, including cash dividends, non-cash dividends and additional shares taken in lieu of a cash dividend.

DWT is not payable where an exemption applies provided that we have received all necessary documentation required by the relevant legislation from a Velti shareholder prior to payment of the dividend.

76

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Certain categories of Irish resident shareholders are entitled to an exemption from DWT, including in general (but not limited to) Irish resident companies, qualifying employee share ownership trusts, charities and pension funds. Except in very limited circumstances, distributions by us to an Irish -resident shareholder who is an individual are not exempt from DWT.

Certain non-Irish resident shareholders (both individual and corporate) are also entitled to an exemption from DWT. In particular, a non-Irish resident shareholder is not subject to DWT on dividends received from us if the shareholder is:

- an individual shareholder who by virtue of the laws of the relevant country is resident for tax purposes in either a member state of the EU (apart from the Republic of Ireland) or in a country with which the Republic of Ireland has a double tax treaty (including the U.S.), and the individual is neither resident nor ordinarily resident in the Republic of Ireland;

- a corporate shareholder that is not resident for tax purposes in the Republic of Ireland and which is ultimately controlled, directly or indirectly, by persons who by virtue of the laws of the relevant country are resident in either a member state of the EU (apart from the Republic of Ireland) or in a country with which the Republic of Ireland has a double tax treaty (including the U.S.);

- a corporate shareholder that is not resident for tax purposes in the Republic of Ireland nor ultimately controlled by persons so resident and which is resident for tax purposes in either a member state of the EU (apart from the Republic of Ireland) or a country with which the Republic of Ireland has a double tax treaty (including the U.S.);

- a Velti shareholder that is not resident for tax purposes in the Republic of Ireland and whose principal class of shares (or those of its 75% parent) is substantially and regularly traded on a recognized stock exchange in: (i) the Republic of Ireland; (ii) a country with which the Republic of Ireland has a double tax treaty (including the U.S.); or (iii) an exchange approved by the Irish Minister for Finance; or

- a corporate shareholder that is not resident for tax purposes in the Republic of Ireland and is wholly owned, directly or indirectly, by two or more companies the principal class of shares of each of which is substantially and regularly traded on a recognized stock exchange in (i) the Republic of Ireland; (ii) a country with which the Republic of Ireland has a double tax treaty (including the U.S.); or (iii) an exchange approved by the Irish Minister for Finance, and provided that, in all cases noted above, the shareholder has made the appropriate declaration to us prior to payment of the dividend.

*Taxation on Dividends.* An Irish resident or ordinarily resident individual shareholder will be subject to Irish income tax on the gross dividend at their marginal rate of tax plus the universal social charge and, in certain circumstances, PRSI (pay related social insurance). The gross dividend is the dividend received plus DWT withheld. Irish resident individual shareholders are generally entitled to credit for the DWT deducted against their income tax liability and to have refunded to them any amount by which DWT exceeds such income tax liability.

Irish resident corporate shareholders should generally be exempt from Irish tax on dividends received from us on the assumption that we are tax resident in Ireland. If an Irish resident corporate shareholder is a close company for tax purposes, however, it may, in certain circumstances, be liable to a 20% investment income surcharge with respect to dividends received from us.

Non-Irish resident shareholders are, unless entitled to exemption from DWT, liable to Irish income tax on dividends received from us. However, the DWT deducted by us discharges such liability to Irish income tax. Where a non-resident shareholder is entitled to exemption from DWT, then no Irish income tax arises and, where DWT has been deducted by us, a claim may be made for a refund of the DWT.

## Republic of Ireland Taxation - Stamp Duty

No Irish stamp duty or capital duty should arise on the issue or transfer for cash of our ordinary shares provided such transactions do not relate to Irish stocks or securities of an Irish registered company.

## U.S. Federal Income Tax Consequences

The following discussion describes, as of the date of this filing, the material U.S. federal income tax considerations applicable to "U.S. Holders" of the purchase, ownership and disposition of interests in our ordinary shares.  This summary is directed only to shareholders, who are residents of the U.S., and is of a general nature only; it is not intended to be legal or tax advice to any prospective purchaser.

77

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

This summary is not exhaustive of all possible tax considerations, and therefore does not address all aspects of U.S. federal income taxation that may be relevant to U.S. Holders in light of their particular circumstances.  This summary is not directed to and does not address, except as provided herein, the United States federal income tax consequences of the purchase, ownership and disposition of our ordinary shares to U.S. Holders that are subject to special provisions under the Internal Revenue Code of 1986, as amended (the Code), including the following U.S. Holders that: (i) are tax-exempt organizations, qualified retirement plans, individual retirement accounts, or other tax-deferred accounts; (ii) are financial institutions, insurance companies, real estate investment trusts, or regulated investment companies, or that are broker-dealers, dealers, or traders in securities or currencies that elect to apply a mark-to-market accounting method; (iii) have a "functional currency" other than the U.S. dollar; (iv) are liable for the alternative minimum tax under the Code; (v) own our ordinary shares as part of a straddle, hedging transaction, conversion transaction, constructive sale, or other arrangement involving more than one position; and (f) hold our ordinary shares other than as a capital asset within the meaning of Section 1221 of the Code.  U.S. Holders that are subject to special provisions under the Code, including U.S. Holders described immediately above, should consult their own tax advisor regarding the U.S. federal, U.S. state and local, and foreign tax consequences of the purchase, ownership and disposition of our ordinary shares.  This summary also does not address the U.S. state or local income tax rules applicable to any U.S. Holders.

This summary is based on the Code, final, temporary and proposed Treasury Regulations, U.S. court decisions, and published rulings and administrative positions of the IRS interpreting the Code that are applicable and, in each case, as in effect and available, as of the date of this filing.

For purposes of this summary, a "U.S. Holder" means any shareholder that is a resident of the U.S. for purposes of the Code and is: (i) a citizen or individual resident in the U.S. for U.S. federal income tax purposes or a non-resident alien present in the U.S. for 183 days or more during the taxable year; (ii) a corporation or other entity taxable as a corporation created or organized under the laws of the U.S. or a political subdivision thereof; (iii) an estate, the income of which is subject to U.S. federal income tax regardless of the source; or (iv) a trust, if (A) a court within the U.S. is able to exercise primary supervision over the trust's administration and one or more U.S. persons have the authority to control all of its substantial decisions or (B) the trust has properly elected under applicable Treasury regulations to continue to be treated as a U.S. person.

**This discussion provides general information only and is not intended to be tax advice to any purchaser of our ordinary shares.  Any U.S. federal, state, or local tax advice included in this discussion was not intended or written to be used, and it cannot be used by any purchaser of our ordinary shares, for the purpose of avoiding any penalties that may be imposed by any U.S. federal, state or local governmental taxing authority or agency. Investors should consult their own independent tax advisors in determining the application to them of the U.S. federal income tax consequences set forth below and any other U.S. federal, state, local foreign or other tax consequences to them of the purchase, ownership and disposition of our ordinary shares.**

## U.S. Holders

*Dividends.* Subject to the "Status as a PFIC" discussion below, in the event a U.S. Holder receives a distribution, other than a *pro rata* distribution of our ordinary shares or rights with respect to our ordinary shares, the U.S. Holder will be required to include the gross amount of the distribution (including the amount of any non-U.S. taxes withheld therefrom) in gross income as a foreign source taxable dividend to the extent the distribution is paid from our current or accumulated earnings and profits as determined for U.S. federal income tax purposes. Dividends received by U.S. Holders that are corporations generally will not be eligible for a dividends received deduction. Subject to applicable limitations, dividends paid to a non-corporate U.S. Holder will constitute "qualified dividend income" subject to tax at capital gains rates (generally 20%) provided that (i) the ordinary shares are readily tradable on an established securities market in the U.S. (ii) we are not a PFIC (as discussed below) with respect to such U.S. Holder, for either our taxable year in which the dividend was paid or the preceding taxable year and (iii) certain holding period and other requirements are met. We expect our ordinary shares will be readily tradable on an established securities market in the U.S. Non-corporate U.S. Holders should consult their tax advisors regarding the availability of the lower income tax rate for dividends paid with respect to our ordinary shares.

Distributions in excess of our current and accumulated earnings and profits, as determined in accordance with U.S. tax principles, will first be treated as a nontaxable return of capital to the extent of the U.S. Holder's basis in our ordinary shares and thereafter as gain from the sale or exchange of a capital asset. The character of such gain is described below under "Sales and Other Dispositions of our Ordinary Shares."

As we do not calculate our earnings and profits in accordance with U.S. tax principles, the entire amount of any distributions will likely be reported to investors as taxable dividend distributions.

78

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The amount of any distribution paid in British pounds sterling or Euros will be equal to the U.S. dollar value of such British pounds sterling or Euros on the date such distribution is received by such U.S. Holder, regardless of whether the payment is in fact converted into U.S. dollars at that time. Gain or loss, if any, realized on the sale or other disposition of such British pounds sterling will be U.S. source ordinary income or loss, subject to certain exceptions and limitations. The amount of any distribution of property other than cash will be the fair market value of such property on the date of the distribution.

Any non-U.S. withholding taxes imposed on dividends paid to a U.S. Holder (at a rate applicable to U.S. Holders) shall generally be eligible for the foreign tax credit or as a deduction in computing such U.S. Holder's taxable income, subject to any applicable limitations. For foreign tax credit purposes, dividends distributed with respect to ordinary shares will generally constitute "passive category income," but could, in the case of certain U.S. Holders, constitute "general category income." If the dividends are qualified dividend income (as discussed above), the amount of the dividend taken into account for purposes of calculating the foreign tax credit limitation will generally be limited to the gross amount of the dividend, multiplied by the reduced rate divided by the highest rate of tax normally applicable to dividends. The rules relating to the determination of the U.S. foreign tax credit are complex and U.S. Holders should consult their tax advisors to determine whether and to what extent a credit would be available in their particular circumstances.

*Sales and Other Dispositions of our Ordinary Shares.* For U.S. federal income tax purposes, and subject to the "Status as a PFIC" discussion below, gain or loss recognized by a U.S. Holder on the sale or other disposition of our ordinary shares will be subject to U.S. federal income tax as capital gain or loss in an amount equal to the difference between that U.S. Holder's basis in our ordinary shares and the amount realized on the disposition. If the consideration a shareholder receives for the ordinary shares is not paid in U.S. dollars, the amount realized will be the U.S. dollar value of the payment received. A U.S. Holder's basis in our ordinary shares will generally equal the amount the U.S. Holder paid for such ordinary shares. Such capital gain or loss will be long-term capital gain or loss if the U.S. Holder has held our ordinary shares for more than one year at the time of the sale or exchange. The maximum rate of tax on long-term capital gain recognized before January 1, 2012 is generally reduced to 15% for taxpayers other than corporations. The deductibility of capital losses is subject to limitations. Generally, gain or loss recognized by a U.S. Holder will be treated as U.S. source gain or loss for U.S. foreign tax credit purposes. Shareholders should consult their tax advisors regarding the tax consequences if a foreign tax is imposed on gain on a disposition of our ordinary shares, including the availability of the foreign tax credit under their particular circumstances.

*Status as a PFIC.* Based on the projected composition of our income and valuation of our assets, we do not believe we were a PFIC in 2011 or will be in 2012, and we do not expect to become a PFIC in the foreseeable future, although there can be no assurance in this regard. A non-U.S. corporation is considered a PFIC for any taxable year if either:

- at least 75% of the non-U.S. corporation's gross income is passive income; or
- at least 50% of the average value of all the non-U.S. corporation's assets (based on an average of the quarterly values of the assets during a taxable year) produces or are held for the production of passive income.

For this purpose, passive income generally includes dividends, interest, royalties and rents that are derived in the active conduct of a trade or business. If we own directly or indirectly at least 25% (by value) of the shares of another corporation, we will be treated, for purposes of the PFIC tests, as owning our proportionate share of the other corporation's assets and receiving our proportionate share of the other corporation's income.

In determining that we are not a PFIC, we are relying on our business projections for the current year and for future years. If our actual business results do not match our projections, we may become a PFIC. We must make a separate determination each year as to whether we are a PFIC and, as a result, our PFIC status may change. Accordingly, it is possible that we may become a PFIC in the current or any future taxable year due to changes in our asset or income composition.

If we are a PFIC for any taxable year during which a shareholder holds ordinary shares, U.S. Holders will be subject to special tax rules with respect to any "excess distribution" that a shareholder receives and any gain they realize from a sale or other disposition (including a pledge) of our ordinary shares, unless such shareholder makes a mark-to-market election as discussed below. Any distribution a shareholder receives in a taxable year that is greater than 125% of the average annual distribution the shareholder received during the shorter of the three preceding taxable years or their holding period for the ordinary shares will be treated as an excess distribution. Under these special tax rules:

- the excess distribution or gain will be allocated ratably over the shareholder's holding period for the ordinary shares;
- the amount allocated to the current taxable year, and any taxable year prior to the first taxable year in which we were a PFIC, will be treated as ordinary income; and

79

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- the amount allocated to each other year will be subject to income tax at the highest rate in effect for that year and the interest charge generally applicable to underpayments of tax will be imposed on the resulting tax attributable to each such year.

The tax liability for amounts allocated to years prior to the year of disposition or excess distribution cannot be offset by any net operating loss, and gains (but not losses) realized on the transfer of the ordinary shares cannot be treated as capital gains, even if the shareholder holds the ordinary shares as capital assets. In addition, non-corporate U.S. Holders will not be eligible for reduced rates of taxation on any dividends received from us in taxable years beginning prior to January 1, 2011, if we are a PFIC in the taxable year in which such dividends are paid or in the preceding taxable year.

If we are a PFIC for any taxable year during which the shareholder holds our ordinary shares and any of our non-U.S. subsidiaries is also a PFIC, a U.S. Holder would be treated as owning a proportionate amount (by value) of the shares of the lower-tier PFIC for purposes of the application of these rules.

A U.S. Holder may avoid some of the adverse tax consequences of owning shares in a PFIC by making a "qualified electing fund" election. The availability of this election requires that we provide information to shareholders making the election. We do not intend to provide shareholders with the information shareholders would need to make or maintain a qualified electing fund election and shareholders will, therefore, not be able to make such an election with respect to their ordinary shares.

Alternatively, a U.S. Holder owning marketable stock in a PFIC may make a mark-to-market election for stock of a PFIC to elect out of the tax treatment discussed above. If shareholders make a valid mark-to-market election for the ordinary shares, the shareholder will include in income each year an amount equal to the excess, if any, of the fair market value of the ordinary shares as of the close of their taxable year over their adjusted basis in such ordinary shares. Shareholders are allowed a deduction for the excess, if any, of the adjusted basis of the ordinary shares over their fair market value as of the close of their taxable year. Deductions are allowable, however, only to the extent of any net mark-to-market gains on the ordinary shares included in their income for prior taxable years. Amounts included in their income under a mark-to-market election, as well as gain on the actual sale or other disposition of the ordinary shares, are treated as ordinary income. Ordinary loss treatment also applies to the deductible portion of any mark-to-market loss on the ordinary shares, as well as to any loss realized on the actual sale or disposition of the ordinary shares, to the extent the amount of such loss does not exceed the net mark-to-market gains previously included for such ordinary shares. A shareholder's basis in the ordinary shares will be adjusted to reflect any such income or loss amounts. If a shareholder makes a mark-to-market election, it will be effective for the taxable year for which the election is made and all subsequent taxable years unless ordinary shares are no longer regularly traded on The NASDAQ Global Select Market or the IRS consents to the revocation of the election.

The mark-to-market election is available only for stock which is regularly traded on (i) a national securities exchange that is registered with the SEC, (ii) The NASDAQ Global Select Market, or (iii) an exchange or market that the U.S. Secretary of the Treasury determines has rules sufficient to ensure that the market price represents a legitimate and sound fair market value. We expect that, the mark-to-market election would be available to shareholders regardless of whether or not we are considered a PFIC.

Although we do not believe we were a PFIC in 2012, 2011 or 2010, and we do not expect to become a PFIC in the foreseeable future, there can be no assurance in this regard. Shareholders are urged to consult their tax advisers concerning the U.S. federal income tax consequences of holding ordinary shares if we are considered a PFIC in any taxable year.

Under specified circumstances, certain financial information in respect of ownership in a PFIC is required to be reported on IRS Form 8621.  In December, 2012, The IRS revised Form 8621, *Information Return by a Shareholder of a Passive Foreign Investment Company or Qualified Electing Fund* and its associated instructions. A U.S. person files Form 8621 to report a direct or indirect interest in a PFIC (or a QEF). Importantly, the revised instructions to Form 8621 provide that the IRS will continue to suspend the potential expansion of the filing requirements authorized in 2010 by Section 1298(f) until the underlying regulations are published. The new Form 8621 includes a new Part I, Summary of Annual Information, that has expanded reporting requirements, but this section is reserved for future use. The new instructions provide that this new Part I is not required to be completed until such time the Section 1298(f) regulations are published. U.S. Holders that are individuals are urged to consult their tax advisors regarding the application of this reporting requirement to their ownership of ordinary shares.

*Medicare Tax.* For taxable years beginning after December 31, 2012, a United States person that is an individual or estate, or a trust that does not fall into a special class of trusts that is exempt from such tax, is subject to a 3.8% tax on the lesser of (1) the United States person's "net investment income" for the relevant taxable year and (2) the excess of the United States person's modified adjusted gross income for the taxable year over a certain threshold (which in the case of individuals will be between

80

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

$125,000 and $250,000, depending on the individual's circumstances). A United States person's net investment income will include its gross dividend income and its net gains from the disposition of stock, unless such dividends or net gains are derived in the ordinary course of the conduct of a trade or business (other than a trade or business that consists of certain passive or trading activities). If you are a United States person that is an individual, estate or trust, you are urged to consult your tax advisors regarding the applicability of the Medicare tax to your income and gains in respect of your investment in the ordinary shares.

*Information with Respect to Foreign Financial Assets*. Individuals who own "specified foreign financial assets" with an aggregate value in excess of $50,000 in taxable years beginning after March 18, 2010 will be required to file an information report (Form 8938) with respect to such assets with their tax returns. "Specified foreign financial assets" include any financial accounts maintained by foreign financial institutions, as well as any of the following, but only if they are not held in accounts maintained by financial institutions: (i) stocks and securities issued by non-U.S. persons, (ii) financial instruments and contracts held for investment that have non-U.S. issuers or counterparties and (iii) interests in foreign entities. The IRS recently clarified that individuals do not have to report any asset on Form 8938 if you report that assets on one or more of specified forms (including Form 8621) that you timely file with the IRS for the same tax year. U.S. Holders that are individuals are urged to consult their tax advisors regarding the application of this reporting requirement to their ownership of ordinary shares.

**Non-U.S. Holders**

Generally, shareholders will not be subject to U.S. federal income tax or withholding on dividends received from us with respect to our ordinary shares unless the dividends are effectively connected with their conduct of a trade or business in the U.S. and, if an applicable income tax treaty so requires as a condition for shareholders to be subject to U.S. federal income tax on a net basis with respect to such income, the dividends are attributable to a permanent establishment that shareholders maintain in the U.S. In such cases, shareholders will generally be taxed in the same manner as a U.S. Holder.

Generally, shareholders will not be subject to U.S. federal income tax or withholding on any gain realized on the sale or other disposition of our ordinary shares unless:

- the gain is effectively connected with their conduct of a trade or business in the U.S. and, if an applicable income tax treaty so requires as a condition for shareholders to be subject to U.S. federal income tax on a net basis with respect to such income, the gain is attributable to a permanent establishment that shareholders maintain in the U.S.; or
- the shareholder is an individual present in the U.S. for at least 183 days in the taxable year of sale or disposition and either their gain is attributable to an office or other fixed place of business that the shareholder maintains in the U.S. or the shareholder has a tax home in the U.S.

If the shareholder is a corporate non-U.S. Holder, their earnings and profits attributable to the effectively connected gain may be subject to an additional branch profits tax at a rate of 30% or a lower rate if the shareholder is eligible for the benefits of an applicable tax treaty.

**Backup Withholding and Information Reporting**

Payment of dividends and proceeds from the sale or other disposition of our ordinary shares that are made to shareholders in the U.S. (and in certain cases, outside the U.S.) will generally be subject to information reporting to the IRS, unless shareholders are an exempt recipient. In addition, a backup withholding tax generally will apply to those payments unless the beneficial owner provides an accurate taxpayer identification number and complies with certification procedures or otherwise establishes an exemption from backup withholding.

Any amount withheld under the backup withholding rules may be credited against a U.S. Holder's U.S. federal income tax liability, if any, or a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the IRS.

**10.F. Dividends and paying agents**

Not applicable.

**10.G. Statement by Experts**

81

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Not applicable.

## 10.H. Document on Display

Any statement in this Annual Report about any of our contracts or other documents is not necessarily complete. If the contract or document is filed as an exhibit to this Annual Report or is incorporated by reference, the contract or document is deemed to modify our description. Shareholders must review the exhibits themselves for a complete description of the contract or document.

Shareholders may review a copy of our filings with the SEC, including exhibits and schedules filed with this Annual Report, at the SEC's public reference facilities at 100 F Street, N.E., Washington, D.C. 20549. You may also request copies of these documents upon payment of a duplicating fee by writing to the SEC. For further information on the public reference facility, please call the SEC at 1-800-SEC-0330. Our SEC filings, including the registration statement, are also available to shareholders on the SEC's website at http://www.sec.gov.

Shareholders may read and copy any reports, statements or other information that we file with the SEC at the addresses indicated above and shareholders may also access some of them electronically at the website set forth above. These SEC filings are also available to the public from commercial document retrieval services.

Shareholders may access other information about Velti on our website at http://www.velti.com.

## 10.I. Subsidiary Information

No disclosure required.

## ITEM 11. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are exposed to several financial risks, including, among others, market risk (change in exchange rates, changes in interest rates, market prices, etc.), credit risk and liquidity risk. Our principal liabilities mainly consist of bank loans and trade payables. The main purpose of these liabilities is to provide the necessary funding for our operations. We have various financial assets such as trade receivables and cash and cash equivalents. Our cash and cash equivalent instruments are managed such that there is no significant concentration of credit risk in any one bank or other financial institution. Management monitors closely the credit quality of the financial institutions with which we hold deposits.

Our financing facilities are monitored against working capital and capital expenditure requirements on a rolling 12-month basis and timely action is taken to have the necessary level of available credit lines. Our policy is to diversify funding sources. Management aims to maintain an appropriate capital structure that ensures liquidity and long-term solvency.

### Foreign Currency Risk

We are exposed to several financial risks, including, among others, market risk (change in exchange rates, changes in interest rates, market prices, etc.), credit risk and liquidity risk. Our principal liabilities mainly consist of bank loans and trade payables. The main purpose of these liabilities is to provide the necessary funding for our operations. We have various financial assets such as trade receivables and cash and cash equivalents. Our cash and cash equivalent instruments are managed such that there is no significant concentration of credit risk in any one bank or other financial institution. Management monitors closely the credit quality of the financial institutions with which we hold deposits.

Our financing facilities are monitored against working capital and capital expenditure requirements on a rolling 12-month basis and timely action is taken to have the necessary level of available credit lines. Our policy is to diversify funding sources. Management aims to maintain an appropriate capital structure that ensures liquidity and long-term solvency.

### Interest Rate Risk

As of December 31, 2012, we had cash and cash equivalents of $36.6 million. These amounts are held in cash. We do not enter into investments for trading or speculative purposes. Due to the short-term nature and floating interest rates of these investments, we believe that we do not have any material exposure to changes in the fair value of our investment portfolio as a result of changes in interest rates. Due to the low margin earned on these funds we do not believe a 10% change in interest rates would have a significant impact on our operating results, future earnings, or liquidity.

We are exposed to interest rate risk related to our short term financing and long term debt, which are primarily denominated in U.S. dollars and Euros with floating interest rates that are linked to Libor rate plus a spread ranging from 2.25% to 2.75% or an adjusted base rate plus a spread ranging from 1.25% to 1.75%. The spread is dependent upon our leverage ratio, as calculated

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

according to the terms of the loan agreement. For variable rate debt, interest rate changes generally do not affect the fair value of the debt instrument, but do impact future earnings and cash flows, assuming other factors are held constant. A potential increase or decrease in Libor rates by 1% would not materially impact interest expense or cash paid for interest for the remainder of 2012 based on the $28.2 million of variable rate debt outstanding as of December 31, 2012.

**Credit Risk**

We do not have significant concentrations of credit risk relating to our trade receivables. The majority of our credit risk as of December 31, 2012 is attributable to trade receivables and accrued contract receivables amounting to $283 million in total. Trade receivables and accrued contract receivables are typically unsecured and are derived from revenue earned from customers. Credit risk is managed through credit approvals, establishing credit limits and continuously monitoring the creditworthiness of customers to which the company grants credit terms in the normal course of business. It is our policy that all customers who wish to transact on credit terms are subject to credit verification procedures. In addition, receivable balances are monitored on an ongoing basis and historically our exposure to bad debts has been minimal. Credit risk from cash balances is considered low. We restrict cash transactions to high credit quality financial institutions.

**Liquidity Risk**

As of December 31, 2012, we had cash and cash equivalents of $36.6 million and working capital of approximately $152.7 million. In connection with the acquisition of MIG in November 2011, we will be required to make cash payments of approximately $16.5 million to the former shareholders of MIG by mid April 2013. Although we obtained a $50.0 million credit facility with HSBC in August 2012, as of March 31, 2013, the revolving credit facility was substantially utilized. Accordingly, we anticipate that we will need additional financing in the future to meet our ongoing capital commitments and to fund our operations.

In order to meet our ongoing capital commitments, we will need to seek additional capital, potentially through debt, or other equity financings. There can be no assurance that our efforts to find such financings will be successful or on terms favorable to us. Financings, if available, may be on terms that are dilutive to our shareholders, and the prices at which new investors would be willing to purchase our securities may be lower than the current price of our ordinary shares. The holders of new securities may also receive rights, preferences or privileges that are senior to those of existing holders of our ordinary shares. If new sources of financing are insufficient or unavailable, we may have to reduce substantially or eliminate expenditures or significantly modify our operating plans. As a result, our independent public accounting firm has deemed that there is substantial doubt about our ability to continue as a going concern, which in turn would likely further adversely affect our ability to conduct business with third parties as well as attract new financing or secure waivers for potential violations of covenants in our existing credit facility. There can be no assurance that we will be able to raise additional capital if our current capital resources are exhausted. If the above strategies are not successful, we could be forced to restructure our obligations or seek protection under applicable bankruptcy laws.

## ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES

### 12.A. Debt Securities

Not applicable.

### 12.B. Warrants and Rights

Not applicable.

### 12.C. Other Securities

Not applicable.

### 12.D. American Depository Shares

Not applicable.

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**PART II**

## ITEM 13. DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES

Not applicable.

## ITEM 14. MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS

Not applicable.

## ITEM 15. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our chief executive officer and our chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2012. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act), means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost benefit relationship of possible controls and procedures. Based on this evaluation, management concluded as of December 31, 2012 that our disclosure controls and procedures were not effective at the reasonable assurance level due to a material weakness in our internal control over financial reporting, which is described below.

Notwithstanding this material weakness, however, our management has concluded that our consolidated financial statements for the periods covered by and included in this Annual Report on Form 20-F fairly stated in all material respects in accordance with generally accepted accounting principles in the U.S. for each of the periods presented herein.

### Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting for our company. Internal control over financial reporting is defined in Rule 13a-15(f) promulgated under the Exchange Act as a process designed by, and under the supervision of, a company's principal executive and principal financial officers, and effected by a company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles, and includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an assessment of the effectiveness of our internal control over financial reporting as of December 31, 2012. In making this assessment, our management used the criteria set forth in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this assessment, management

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

determined that we did not maintain effective internal control over financial reporting as of December 31, 2012, due to the material weaknesses described below.

Management reviewed the results of its assessment with our Audit Committee. The effectiveness of our internal control over financial reporting as of December 31, 2012 has been audited by Baker Tilly Krause Virchow LLP, an independent registered public accounting firm, as stated in its report which is included in below.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.   The primary factors contributing to the material weakness, which relates to our financial statement close process, were as follows:

- • We did not maintain effective controls to provide reasonable assurance that there was adequate support for certain prepaid assets and deferred costs, that the aging of previously factored accounts receivable was adequate and that accounts receivables were effectively reconciled.

- • We did not have adequate policies and procedures in place to ensure the timely, effective review of estimates, assumptions and related reconciliations of capitalized software, including tracking software asset cost by product and/or associated version release, and the timely review of revenue by product.

- • We did not have adequate policies and procedures in place to ensure the timely, effective review of estimates, assumptions and related reconciliations and analysis, relating to our tax provision calculations prepared by outside consultants.

Each of these factors combined together resulted in a material weakness in our financial close process and procedures and a determination that such close process was not adequately designed, documented and executed to support the accurate and timely reporting of our financial results.

With the oversight of senior management and our Audit Committee, we have begun taking steps and plan to take additional measures to remediate the underlying causes of the material weakness, primarily through the development and implementation of formal policies, improved processes and documented procedures, as well as the hiring of additional finance personnel. For example, we have recently hired a new chief financial officer who will be responsible for implementing some of these remedial measures.

Notwithstanding the identified material weakness, management believes the consolidated financial statements included in this Annual Report fairly represent in all material respects our financial condition, results of operations and cash flows as of and for the periods presented in accordance with U.S. GAAP.

**Changes in Internal Control over Financial Reporting**

Other than as described above, there was no change in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the year ended December 31, 2012 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## ITEM 16. RESERVED

## ITEM 16.A. AUDIT COMMITTEE FINANCIAL EXPERT

David Hobley serves as the chairman of the Audit Committee, and the board of directors has determined that he qualifies as an "audit committee financial expert" as that term is defined in the rules and regulations established by the SEC. Also, the board of directors has determined that Mr. Hobley satisfies the independence requirements of The NASDAQ Stock Market and Rule 10A-3(b)(1) under the Exchange Act.

## ITEM 16.B. CODE OF ETHICS

 We have adopted a written code of business conduct and ethics, which outlines the principles of legal and ethical business conduct under which we do business. The code is applicable to all of our directors, officers and employees. A copy of our code of business conduct and ethics is available on our corporate website at www.velti.com. We do not incorporate the information on our website into this Annual Report and shareholders should not consider any such information that can be accessed through our website as

85

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

part of this Annual Report. Any substantive amendment or waiver of the code relating to executive officers or directors will be made only after approval by a committee consists of a majority of our independent directors.

## ITEM 16.C. PRINCIPAL ACCOUNTING FEES AND SERVICES

We have engaged Baker Tilly Virchow Krause, LLP, as its independent registered public accounting firm.  The following table shows the aggregated fees billed by our principal accountant during the years ended  December 31, 2012 and 2011:

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2012 | | 2011 | |
| Audit Fees [1] | $ | 1,176,000 | $ | 1,123,300 |
| Audit Related Fees [2] |  | 12,100 |  | 79,000 |
| Tax Fees [3] |  | 94,100 |  | 145,200 |
| All Other Fees |  | — |  | — |
| Total | $ | 1,282,200 | $ | 1,347,500 |

(1)     Audit fees consist of fees billed for professional services rendered during the fiscal year.

(2)     Audit related fees consisted of additional assurance services performed and consents issued related to the filing of our registration statement on Form F-1 originally filed with the SEC on May 13, 2010 and our follow-on offering completed in June 2011.

(3)     Tax Fees consist of tax compliance and tax advice related to certain foreign subsidiaries.

Our Audit Committee approved the engagement of Baker Tilly Virchow Krause, LLP based on pre-approval policies and procedures which did not delegate either the Audit Committee or Board's responsibilities to management.  The policies and procedures include approval of a fee estimate, discussion of our key accounting policies, review of the auditor's professional qualifications and agreement on application of U.S. GAAP.

## ITEM 16.D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES

None.

## ITEM 16.E. PURCHASES OF EQUITY SECURITIES BY VELTI PLC/AFFILIATED PURCHASERS

Not applicable.

## ITEM 16.F. CHANGE IN REGISTRANT CERTIFYING ACCOUNTANT

There has been no change in certifying accountant.

## ITEM 16.G. CORPORATE GOVERNANCE

We are subject to a variety of corporate governance guidelines and requirements enacted by the NASDAQ Stock Market, Inc. and by the U.S. Securities and Exchange Commission under its rules and those mandated by the U. S. Sarbanes Oxley Act of 2002, as well as pursuant to Companies (Jersey) Law 1991, as amended and the rules and regulations of the Jersey Financial Services Commission. We believe that we meet corporate governance legal requirements in the United States and Jersey. We are listed on the NASDAQ Global Select Market and we meet all of the corporate governance requirements established by NASDAQ, even those corporate governance requirements to which we would be subject if we were a U.S. corporation, and that are not required of us as a foreign private issuer.

## ITEM 16.H. MINE SAFETY DISCLOSURE

Not Applicable

## PART III

## ITEM 17. FINANCIAL STATEMENTS

Not applicable, see Item 18.

## ITEM 18. FINANCIAL STATEMENTS

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The financial statements as required under Item No. 18 are attached hereto and found immediately following the text of this Annual Report. The audit report of Baker Tilly Virchow Krause, LLP, Independent Registered Public Accounting Firm, is included herein immediately preceding the audited financial statements.

87

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ITEM 19.   EXHIBITS**

| Exhibit Number | Description | Reference No. |
|---|---|---|
| 1.1 | Memorandum and Articles of Association | (4) |
| 4.1 | 2009 U.S. Employee Share Incentive Plan | (1) |
| 4.2 | 2009 U.S. Non-Employee Share Incentive Plan | (1) |
| 4.3 | English translation of Real Estate Lease relating to the first floor of 44 Kifisias Avenue and Gravias Street, Granikou Street and Fragoklisias Street, Athens, Greece | (1) |
| 4.4 | English translation of Assignment of Sub-Lease relating to the second floor of 44 Kifisias Avenue and Gravias Street, Granikou Street and Fragoklisias Street, Athens, Greece | (1) |
| 4.5 | English translation of Real Estate Lease relating to the first floor of 42 Kifisias Avenue and Fragoklisias Street, Athens, Greece | (1) |
| 4.6 | Lease Agreement relating to 150 California Street, San Francisco, California, as amended | (1) |
| 4.7 | Form of Indemnity Agreement between Velti plc and its officers, directors and key employees | (1) |
| 4.8 | Offer Letter dated August 2, 2010 between Velti plc and Sally J. Rau | (1) |
| 4.9 | Offer Letter dated December 4,2012 between Velti plc and Jeffrey G. Ross | + |
| 4.10 | Agreement relating to the sale and purchase of the entire issued share capital of Mobile Interactive Group Limited dated November 14, 2011 by and among Barry Houlihan and others and Velti*** | (5) |
| 4.12 | Share Purchase Agreement among Velti plc, Ydon Holdings Ltd., the Shareholders of Ydon Holdings Ltd. and Xin Ye dated September 22, 2011*** | (5) |
| 4.13 | Share Incentive Plan | (1) |
| 4.14 | Agreement and Plan of Reorganization by and among Velti plc, Vortex Acquisition Sub, Inc., Mobclix, Inc. and Richard Talley, as Stockholders' Agent, dated September 30, 2010 | (1) |
| 4.15 | Amendment No. 1 to Agreement and Plan of Reorganization, dated May 1, 2011 between Velti plc and Mobclix, Inc. | (3) |
| 4.16 | Office Lease Agreement between PPF Paramount One Market Plaza Owner, L.P., and Velti USA, Inc | (5) |
| 4.17 | First Amendment to Lease between PPF Paramount One Market Plaza Owner, L.P. and Velti USA, Inc. | + |
| 4.18 | Second Amendment to Lease between PPF Paramount One Market Plaza Owner, L.P. and Velti USA, Inc. | + |
| 4.19 | Deed of Variation dated August 9, 2012 to Agreement to purchase shares of Mobile Interactive Group Limited | (6) |
| 4.20 | Credit Agreement dated as of August 10, 2012 among Velti Inc., Velti plc, Mobile Interactive Group Limited and Velti Mobile Platforms Limited as Borrowers, HSBC Bank plc, HSBC Bank USA, National Association and the lenders from time to time party thereto, and HSBC Bank USA, National Association, as Administrative Agent | (4) |
| 4.21 | First Amendment to Credit Agreement dated December __, 2012 among Velti Inc., Velti plc, Mobile Interactive Group Limited and Velti Mobile Platforms Limited as Borrowers, HSBC Bank plc, HSBC Bank USA, National Association and the lenders from time to time party thereto, and HSBC Bank USA, National Association, as Administrative Agent | + |
| 4.22 | Limited Waiver dated April 3, 2013 to Credit Agreement dated August 10, 2012 | + |
| 4.23 | Framework, Guarantee and Call Option Agreement dated November 12, 2012 between the Sellers and the Purchasers thereto | + |
| 8.1 | List of Subsidiaries | + |
| 11.1 | Code of Business Conduct and Ethics | (2) |
| 12.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | + |
| 12.2 | Certification of Principal Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | + |
| 13.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | + |
| 13.2 | Certification of Principal Financial Officer pursuant to 18 U.S.C. section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | + |
| 15.0 | Consent of Independent Registered Public Accounting Firm | + |

+     Filed herewith

***   The Company has requested confidential treatment of the redacted portions of this exhibit pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended, and has separately filed a complete copy of this exhibit with the Securities and Exchange Commission.

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Referenced exhibit was previously filed with the Commission as an exhibit to the Company's filing indicated below and is incorporated herein by reference to that filing:

(1) Registration statement on Form F-1 (registration number 333-166793) originally filed on May 13, 2010

(2) Annual Report on Form 20-F for the year ended December 31, 2010 filed April 12, 2011

(3) Registration statement on Form F-1 (registration number 333-174461 originally file on May 25, 2011

(4) Exhibit 99.1 to Form 6-K filed on August 16, 2012

(5) Annual Report on Form 20-F for the year ended December 31, 2011 filed April 23, 2012

(6) Exhibit 99.5 to Form 6-K filed on August 23, 2012

89

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes any and all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Signatures**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this Annual Report on its behalf.

**VELTI PLC**

By: /s/ ALEX MOUKAS

Name: Alex Moukas

Title: Chief Executive Officer

**VELTI PLC**

By: /s/ WILSON W. CHEUNG

Name: Wilson W. Cheung

Title: Principal Financial Officer

Date: April 11, 2013

90

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Index to Financial Statements**

|  | **Page** |
|---|---|
| Consolidated Financial Statements of Velti plc: | |
| Report of Independent Registered Public Accounting Firm | F-1 |
| Consolidated Balance Sheets | F-3 |
| Consolidated Statements of Comprehensive Loss | F-4 |
| Consolidated Statements of Shareholders' Equity | F-5 |
| Consolidated Statements of Cash Flows | F-6 |
| Notes to Consolidated Financial Statements | F-7 |
| Schedule II Valuation and Qualifying Accounts | F-34 |

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

The Board of Directors and Stockholders of Velti plc

We have audited Velti plc's internal control over financial reporting as of December 31, 2012, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Velti plc's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weakness has been identified and included in management's assessment. Management has identified a material weakness in controls over the financial statement close process. We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Velti plc as of December 31, 2012 and 2011, and the related consolidated statements of comprehensive loss, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2012. This material weakness was considered in determining the nature, timing and extent of audit tests applied in our audit of the 2012 financial statements and this report does not affect our report dated April 11, 2013, which expressed an unqualified opinion on those financial statements.

In our opinion, because of the effect of the material weakness described above on the achievement of the objectives of the control criteria, Velti plc has not maintained effective internal control over financial reporting as of December 31, 2012, based on the COSO criteria.

/s/ Baker Tilly Virchow Krause, LLP
Minneapolis, Minnesota
April 11, 2013

F-1

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON THE CONSOLIDATED FINANCIAL STATEMENTS**

To the Board of Directors and Stockholders of Velti plc

We have audited the accompanying consolidated balance sheets of Velti plc as of December 31, 2012 and 2011, and the related consolidated statements of comprehensive loss, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2012. Our audits also included the financial statement schedule listed in the Index at Item 19. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements and financial statement schedule referred to above present fairly, in all material respects, the consolidated financial position of Velti plc at December 31, 2012 and 2011, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2012, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Velti plc's internal control over financial reporting as of December 31, 2012, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated April 11, 2013, expressed an adverse opinion on the effectiveness of internal control over financial reporting.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern.  As discussed in Note 2 to the consolidated financial statements, the Company has recurring operating losses, negative cash flows from operations and requires additional working capital to support future operations, which raises substantial doubt about its ability to continue as a going concern.  Management's plans in regards to these matters are also described in Note 2.  The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ Baker Tilly Virchow Krause, LLP
Minneapolis, Minnesota
April 11, 2013

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Velti plc**
**Consolidated Balance Sheets**
**(in thousands, except share and per share amounts)**

| | | December 31, | |
|---|---:|---:|---:|
| | | **2012** | **2011** |
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents (includes $1.1 million from VIE as of December 31, 2012) | $ | 36,571 | $ 75,765 |
| Trade receivables (includes $12.4 million from VIE as of December 31, 2012) | | 150,074 | 100,456 |
| Accrued contract receivables (includes $8.8 million from VIE as of December 31, 2012) | | 132,957 | 98,203 |
| Prepayments | | 12,733 | 22,664 |
| Other receivables and current assets (includes $1.3 million from VIE as of December 31, 2012) | | 12,353 | 26,638 |
| Total current assets | | 344,688 | 323,726 |
| Property and equipment, net (includes $0.2 million from VIE as of December 31, 2012) | | 13,073 | 5,922 |
| Intangible assets, net (includes $2.9 million from VIE as of December 31, 2012) | | 93,982 | 91,192 |
| Goodwill | | 70,498 | 52,956 |
| Other assets (includes $1.5 million from VIE as of December 31, 2012) | | 14,782 | 7,735 |
| **Total assets** | $ | 537,023 | $ 481,531 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | |
| Current liabilities: | | | |
| Accounts payable (includes $0.7 million from VIE as of December 31, 2012) | $ | 37,786 | $ 41,565 |
| Accrued liabilities (includes $0.5 million from VIE as of December 31, 2012) | | 97,374 | 49,621 |
| Deferred revenue and current portion of deferred government grant (includes $0.7 million from VIE as of December 31, 2012) | | 12,626 | 6,217 |
| Current portion of acquisition related liabilities | | 33,352 | 26,900 |
| Current portion of long-term debt and short-term financings | | 851 | 2,881 |
| Income tax liabilities (includes $0.9 million from VIE as of December 31, 2012) | | 9,953 | 9,883 |
| Total current liabilities | | 191,942 | 137,067 |
| Long-term debt | | 27,342 | 6,859 |
| Deferred government grant - non-current | | 1,297 | 3,162 |
| Acquisition related liabilities - non-current | | 2,221 | 18,772 |
| Other non-current liabilities (includes $4.8 million from VIE as of December 31, 2012) | | 21,703 | 18,180 |
| **Total liabilities** | | 244,505 | 184,040 |
| Commitments and contingencies (See Note 11) | | | |
| Shareholders' equity: | | | |
| Share capital, nominal value £0.05, 100,000,000 ordinary shares authorized; 65,622,141 and 61,790,985 shares issued and outstanding as of December 31, 2012 and December 31, 2011, respectively | | 5,462 | 5,148 |
| Additional paid-in capital | | 399,127 | 346,031 |
| Accumulated deficit | | (95,953) | (34,726) |
| Accumulated other comprehensive loss | | (16,242) | (19,046) |
| Total Velti shareholders' equity | | 292,394 | 297,407 |
| Non-controlling interests | | 124 | 84 |
| **Total equity** | | 292,518 | 297,491 |
| **Total liabilities and shareholders' equity** | $ | 537,023 | $ 481,531 |

The accompanying notes are an integral part of these consolidated financial statements.

F-3

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Velti plc**
**Consolidated Statements of Comprehensive Loss**
**(in thousands, except per share amounts)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| Revenue: | | | |
| Software as a service (SaaS) revenue | $ 204,210 | $ 139,024 | $ 77,202 |
| License and software revenue | 22,213 | 36,705 | 26,586 |
| Managed services revenue | 43,921 | 13,473 | 12,481 |
| Total revenue | 270,344 | 189,202 | 116,269 |
| Cost and expenses: | | | |
| Third-party costs | 91,404 | 53,901 | 36,658 |
| Datacenter and direct project costs | 29,966 | 17,952 | 6,312 |
| General and administrative expenses | 68,196 | 45,258 | 22,484 |
| Sales and marketing expenses | 54,507 | 37,733 | 23,049 |
| Research and development expenses | 21,236 | 13,060 | 7,840 |
| Acquisition related and other charges | 9,950 | 8,890 | 5,364 |
| Impairment of intangible assets | 16,902 | 1,500 | — |
| Loss from disposal of assets | 10,532 | — | — |
| Depreciation and amortization | 33,946 | 20,900 | 12,131 |
| Total cost and expenses | 336,639 | 199,194 | 113,838 |
| Income (loss) from operations | (66,295) | (9,992) | 2,431 |
| Interest expense, net | (1,830) | (7,389) | (8,069) |
| Gain (loss) from foreign currency transactions | 1,995 | 6,200 | (1,726) |
| Other income (expense) | 5,876 | (49) | — |
| Loss before income taxes, equity method investments and non-controlling interest | (60,254) | (11,230) | (7,364) |
| Income tax benefit (expense) | 2,835 | (3,808) | (3,771) |
| Loss from equity method investments | (3,755) | (200) | (4,615) |
| Net loss | (61,174) | (15,238) | (15,750) |
| Net income (loss) attributable to non-controlling interest | 53 | 130 | (81) |
| Net loss attributable to Velti | $ (61,227) | $ (15,368) | $ (15,669) |
| | | | |
| Comprehensive loss: | | | |
| Net loss | (61,174) | (15,238) | (15,750) |
| Foreign currency translation adjustment | 2,791 | (20,907) | (2,700) |
| Comprehensive loss | (58,383) | (36,145) | (18,450) |
| Comprehensive income (loss) attributable to non-controlling interests | (40) | 92 | 105 |
| Comprehensive loss attributable to Velti | (58,423) | (36,053) | (18,345) |
| | | | |
| Net loss per share attributable to Velti: | | | |
| Basic | $ (0.96) | $ (0.28) | $ (0.41) |
| Diluted | $ (0.96) | $ (0.28) | $ (0.41) |
| Weighted average number of shares outstanding for use in computing per share amounts: | | | |
| Basic | 63,910 | 55,865 | 37,933 |
| Diluted | 63,910 | 55,865 | 37,933 |

The accompanying notes are an integral part of these consolidated financial statements.

F-4

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Velti plc**
**Consolidated Statements of Shareholders' Equity**
**(in thousands, except share amounts)**

| | Velti Shareholders' Equity | | | | | | | |
| | Share Capital | | | | | | | |
| | Number of Shares | Amount | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Total Velti Shareholders' Equity | Non-controlling Interests | Total |
|---|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2010 | 37,530,261 | $ 3,339 | $ 42,885 | $ (3,689) | $ 4,315 | $ 46,850 | $ 86 | $ 46,936 |
| Net loss | — | — | — | (15,669) | — | (15,669) | (81) | (15,750) |
| Cumulative translation adjustment | — | — | — | — | (2,676) | (2,676) | (24) | (2,700) |
| Shares issued upon vesting of deferred share awards and option exercises | 641,279 | 44 | 14 | — | — | 58 | — | 58 |
| Shares issued in connection with acquisitions | 170,220 | 14 | 1,244 | — | — | 1,258 | 195 | 1,453 |
| Share-based compensation | — | — | 6,272 | — | — | 6,272 | — | 6,272 |
| Balance as of December 31, 2010 | 38,341,760 | 3,397 | 50,415 | (19,358) | 1,639 | 36,093 | 176 | 36,269 |
| Net loss | — | — | — | (15,368) | — | (15,368) | 130 | (15,238) |
| Change in cumulative translation adjustment | — | — | — | — | (20,685) | (20,685) | (222) | (20,907) |
| Shares issued in public offerings, net of issuance costs | 21,974,275 | 1,633 | 269,240 | — | — | 270,873 | — | 270,873 |
| Shares issued upon vesting of deferred share awards and option exercises | 1,474,950 | 118 | 382 | — | — | 500 | — | 500 |
| Share withholding in lieu of employee tax withholding | — | — | (1,633) | — | — | (1,633) | — | (1,633) |
| Share-based compensation | — | — | 27,627 | — | — | 27,627 | — | 27,627 |
| Balance as of December 31, 2011 | 61,790,985 | 5,148 | 346,031 | (34,726) | (19,046) | 297,407 | 84 | 297,491 |
| Net loss | — | — | — | (61,227) | — | (61,227) | 53 | (61,174) |
| Change in cumulative translation adjustment | — | — | — | — | 2,804 | 2,804 | (13) | 2,791 |
| Shares issued upon vesting of deferred share awards and option exercises | 1,692,072 | 143 | 1,297 | — | — | 1,440 | — | 1,440 |
| Shares issued in connection with acquisitions | 2,142,939 | 171 | 24,390 | — | — | 24,561 | — | 24,561 |
| Share withholding in lieu of employee tax withholding | (3,855) | — | (47) | — | — | (47) | — | (47) |
| Share-based compensation | — | — | 27,456 | — | — | 27,456 | — | 27,456 |
| Balance as of December 31, 2012 | 65,622,141 | $ 5,462 | $ 399,127 | $ (95,953) | $ (16,242) | $ 292,394 | $ 124 | $ 292,518 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Velti plc**
**Consolidated Statements of Cash Flows**
**(in thousands)**

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | **2012** | **2011** | **2010** |
| Cash flows from operating activities: | | | | |
| Net loss | $ | (61,174) $ | (15,238) $ | (15,750) |
| Non-cash items included in net loss: | | | | |
| Depreciation and amortization | | 33,946 | 20,900 | 12,131 |
| Non-cash loss from disposal of assets | | 9,912 | — | — |
| Change in fair value of contingent consideration | | 9,179 | 2,155 | 4,481 |
| Non-cash interest expense | | 985 | 2,621 | 1,576 |
| Share-based compensation | | 27,456 | 27,627 | 6,272 |
| Deferred income taxes and other tax liabilities | | (5,224) | 1,691 | 21 |
| Impairment of intangible assets | | 16,902 | 1,500 | — |
| Foreign currency transactions and other | | 1,761 | (5,878) | 6,290 |
| Provision for doubtful accounts | | 7,420 | 642 | 10 |
| Gain on previously held shares of CASEE | | (6,028) | — | — |
| Change in operating assets and liabilities: | | | | |
| Trade and accrued contract receivables | | (90,786) | (76,787) | (40,660) |
| Prepayments and other assets | | 19,188 | (23,575) | (13,544) |
| Accounts payable and other accrued liabilities | | 39,017 | (7,720) | 27,215 |
| Deferred revenue and government grant income | | 8,094 | 4,741 | 2,088 |
| Net cash generated by (used in) operating activities | | 10,648 | (67,321) | (9,870) |
| Cash flow from investing activities: | | | | |
| Purchases of property and equipment | | (10,828) | (2,582) | (1,063) |
| Investments in software development and purchased software | | (49,559) | (34,774) | (20,641) |
| Cash paid for acquisitions and equity method investments, net of cash acquired | | (9,507) | (43,489) | (2,030) |
| Net cash used in investing activities | | (69,894) | (80,845) | (23,734) |
| Cash flow from financing activities: | | | | |
| Net proceeds from issuance of ordinary shares | | 1,393 | 273,824 | 58 |
| Proceeds from borrowings and debt financing | | 27,575 | 917 | 46,166 |
| Repayment of borrowings | | (11,447) | (65,704) | (14,038) |
| Net cash generated from financing activities | | 17,521 | 209,037 | 32,186 |
| Effect of changes in foreign exchange rates | | 2,531 | (2,460) | (883) |
| Net increase (decrease) in cash and cash equivalents | | (39,194) | 58,411 | (2,301) |
| Cash and cash equivalents at beginning of period | | 75,765 | 17,354 | 19,655 |
| Cash and cash equivalents at end of period | $ | 36,571 $ | 75,765 $ | 17,354 |
| Supplemental cash flow information: | | | | |
| Interest paid | $ | 1,086 $ | 7,817 $ | 3,819 |
| Income taxes paid | $ | 2,182 $ | 858 $ | 554 |
| Non-cash investing and financing activities: | | | | |
| Shares issued in connection with acquisitions | $ | 24,561 $ | — $ | 1,454 |
| Shares issued upon tender of non-controlling interest in Velti North America, Inc. | $ | — $ | — $ | 124 |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**Velti plc**
**Notes to Consolidated Financial Statements**

## 1. Description of Business

Velti plc, (Velti or Company), is a leading global provider of mobile marketing and advertising technology and solutions that help marketers reach new customers, drive consideration with interactive mobile marketing strategies, accelerate consumer actions using meaningful data, and nurture relationships through data-driven marketing programs. We enable brands to communicate more meaningfully, deliver greater customer value and inspire the behaviors and outcomes that matter for their business.

## 2. Basis of Presentation and Summary of Significant Accounting Policies

### Basis of Presentation

We have prepared our consolidated financial statements in accordance with accounting principles generally accepted in the United States of America (U.S. GAAP). Certain prior year balances have been reclassified to conform to the current year presentation. Such reclassifications did not affect total revenues, operating income or net income.

### Principles of Consolidation

The accompanying consolidated financial statements include the results of Velti plc and all subsidiaries that we control. The statements also include the accounts of an entity in which we have a controlling interest that is not based on voting rights or control. Intercompany accounts and transactions have been eliminated.

We evaluate our ownership, contractual rights and other interests in entities to determine if they are variable interest entities (VIEs), if we have a variable interest in those entities and the nature and extent of those interests. These evaluations are highly complex and involve judgment and the use of estimates and assumptions based on available historical information and management's judgment, among other factors. Based on our evaluations, if we determine we are the primary beneficiary of such VIEs we consolidate such entities into our financial statements.

### Going Concern

The accompanying consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business.

During the year ended December 31, 2012, we generated $10.6 million in cash from operating activities and $17.5 million in cash from financing activities, and we used $69.9 million of cash for investing activities. As of the date of this filing on the Annual Report on Form 20-F, we have substantially utilized the $50.0 million revolving credit facility we obtained from HSBC in August 2012.

In connection with the acquisition of MIG in November 2011, we will be required to make cash payments of approximately $16.5 million to the former shareholders and key employees of MIG in April 2013. Based on our existing cash balances, this acquisition payment obligation creates substantial doubt about our ability to continue as a going concern.

The HSBC credit facility contains various loan covenants. We violated one of these covenants in the fourth quarter of 2012 and received a subsequent waiver from HSBC. If our existing HSBC covenants were not amended we would not be in the position to satisfy current 2013 covenants, as a result of our reduction in revenue and EBITDA guidance, which also creates substantial doubt about our ability to continue as a going concern. We do not anticipate violating the HSBC loan covenants in 2013, as HSBC has agreed to amend our 2013 covenants to levels that we believe we can satisfy; however, should we violate the covenants again, this could lead HSBC to accelerate our obligations under the credit facility upon such violation. There can be no assurances that a future covenant violation would not lead HSBC accelerate our obligation under our credit facility.

While we anticipate generating positive operating cash flow for the year, this positive cash flow is not expected until the third quarter of 2013. As a result, we believe we will need additional financing in the next three months to provide sufficient operational liquidity and fund the required payments. This additional financing may be facilitated through the issuance of equity or debt.

There can be no assurance that our efforts to find such financings will be successful or on terms favorable to us. Our ability to continue as a going concern is dependent upon our ability to agree on amended 2013 covenants with HSBC, and obtain the

F-7

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

necessary financing to meet our obligations arising from acquisitions, and from normal business operations when they come due and to generate profitable operations in the future.

### *Use of Estimates and Judgment*

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements. Management is also required to make certain judgments that affect the reported amounts of revenues and expenses during the period. We periodically evaluate our estimates, including revenue recognition, recognition of government grant income, income taxes, the allowance for doubtful accounts, intangible assets, goodwill and long-lived assets, contingent payments related to our recent acquisitions and the assumptions used to determine share-based compensation expense. We base our estimates on historical experience and various other assumptions that are believed to be reasonable on the specific circumstances. Actual results could differ materially from those estimates.

### *Foreign Currency Translation*

The functional currency of our major subsidiaries is generally the local currency. Adjustments resulting from translating functional currency financial statements into U.S. dollars are recorded as part of a separate component of shareholders' equity. Foreign currency transaction gains and losses as well as the gain or loss resulting from remeasuring assets and liabilities denominated in a currency other than the function currency into the functional currency are included in net income or less for the period.

All assets and liabilities denominated in a foreign currency are translated into U.S. dollars at the exchange rate on the balance sheet date. Revenues and expenses are translated at the average exchange rate during the period. Equity transactions are translated using historical exchange rates.

### *Cash and Cash Equivalents*

Cash and cash equivalents include time deposits and readily marketable securities with original maturities of 90 days or less.

### *Property and Equipment*

Property and equipment consists mainly of furniture and equipment, computers and telecommunications hardware, and are recorded at historical cost less depreciation and impairment losses. Property and equipment is depreciated on a straight-line basis over the expected useful life of the asset, generally over  four to ten years.

Gains and losses on disposal of property and equipment are determined by comparing proceeds with the carrying value of the respective asset, and are included in income from operations. All maintenance and repairs are expensed as incurred.

### *Accounts Receivable, Accrued Contract Receivables and Allowance for Doubtful Accounts*

Accounts receivable consists primarily of amounts due to us from our normal business activities **.** Credit terms can vary between customers and between regions, but are generally 30 to 90 days. Our receivables are unsecured and not interest bearing. Fees that have not been invoiced as of the reporting date but for which all revenue recognition criteria are met are reported as accrued contract receivables. We maintain allowances for doubtful accounts to reflect the expected non-collection of accounts receivable and accrued contract receivables based on past collection history and specific risks identified in the portfolio. Additional allowances might be required if deteriorating economic conditions or other factors affect our customers' ability to make timely payments. We write off accounts receivable when we consider them uncollectible. As of December 31, 2012 and 2011, the allowance for doubtful accounts for trade receivables was  $7.0 million and $0.8 million, respectively. The allowance for doubtful accounts for accrued contract receivables was $ 1.0 million and zero as of December 31, 2012 and 2011, respectively.

### *Intangible Assets*

F-8

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

Intangible assets that we acquire or develop are carried at historical cost less accumulated amortization and impairment loss, if any.

*Acquired Intangible Assets.* Intangible assets acquired through business combinations are reported at fair value. Amortization is expensed on a straight-line basis over the estimated economic lives of the assets acquired, as determined on the acquisition date.

Currently, our acquired intangible assets consist of customer relationships, developed technology, trademark and trade names and non-compete agreements. Customer relationships are estimated to provide benefits over  four to seven years, developed technology acquired is estimated to provide benefits over  three to five years, and trademark and trade name is estimated to provide benefits over  nine to eighteen months and non-compete agreements are estimated to provide benefits over nine months.

*Internal Software Development Costs.* Internal software development costs consist primarily of internal salaries and consulting fees for developing software platforms for sale to or use by customers in mobile marketing and advertising campaigns. We capitalize such costs as they are integral parts of products or processes to be sold or leased. We capitalize costs related to software developed for new products and significant enhancements of existing products once technological feasibility has been reached and all research and development for the components of the product have been completed. Such costs are amortized on a straight-line basis over the estimated useful life of the related product, not to exceed  three years, commencing with the date the product becomes available for general release to our customers.

*Computer Software.* Computer software costs generally represent costs incurred to purchase software programs and packages that are used to develop and ultimately deliver our platforms sold to customers. Generally, costs associated with maintaining computer software programs are expensed as incurred. We capitalize the cost of software licenses that are complementary to or enhance the functionality of our existing technology platform and amortize such costs on a straight line basis over the shorter of the contract term or the useful life of the license, but not to exceed  three years.

*Licenses and Intellectual Property.* We acquire know-how, intellectual property, and technical expertise generally through licensing arrangements with development partners. We capitalize the cost of the know-how and intellectual property licenses when the in-license expertise compliments and/or enhances our existing technology platform. Software licenses are amortized on a straight line basis over the shorter of the contract term of the license agreement or the useful life of the license, but not to exceed three years.

### Impairment of Long-Lived Assets and Amortizable Intangible Assets

We evaluate long-lived assets such as property and equipment, and identifiable intangible assets that are subject to amortization for impairment when events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. An impairment loss is recognized when estimated future undiscounted cash flows expected to result from the use of the asset and its eventual disposition is less than the carrying amount. When undiscounted future cash flows are not expected to be sufficient to recover an asset's carrying amount, the asset is written down to its fair value. Where available, quoted market prices are used to determine fair value. When quoted market prices are not available, various valuation techniques, including the discounted value of estimated future cash flows, are utilized.

### Goodwill

Goodwill is generated when the consideration paid for an acquisition exceeds the fair value of net assets acquired. Goodwill is recognized as an asset and reviewed for impairment at least annually, or whenever events or circumstances indicate that the carrying amount of goodwill may not be recoverable. We have selected December 31 as the date to perform the annual impairment testing of goodwill.

We adopted ASU No. 2011-08 in 2012, which amends existing guidance by giving an entity the option to first assess qualitative factors to determine whether it is more likely than not (that is, a likelihood of more than  50 percent) that the fair value of a reporting unit is less than its carrying amount, prior to performing the second step of the goodwill impairment assessment.

We completed our annual impairment test for fiscal 2012 and determined that there was  no impairment. Based on fourth-quarter 2012 testing, our estimated fair value totals approximately $324.8 million including a conservative control premium of

F-9

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Velti, plc
**Notes to Consolidated Financial Statements (Continued)**

approximately 10% percent, when compared to our market value of approximately $295.3 million at December 31, 2012. The control premium is defined as the value that may arise from an acquiring company's ability to take advantage of synergies and other benefits that flow from control over another entity. An acquiring entity is often willing to pay more for equity securities that give it a controlling interest than an investor would pay for equity securities representing less than a controlling interest. Our fair value at December 31, 2012 was in excess of our book equity of approximately $292.4 million.

Our shares price remains extremely volatile and such activity is not unusual.  If our market capitalization falls below our book value and remains at or below that price for a period of time indicating permanent impairment, then we will treat this data as an impairment indicator and will perform the required analysis to determine the amount of the impairment under ASC 350-20.

*Revenue Recognition*

We derive our revenue from three sources:

▪  software as a service (SaaS) revenue, which consists of subscription fees from customers who utilize our mobile marketing and advertising platforms, generally referred to as "usage‑based" services, and fees from customers who utilize our software solutions to manage and measure the progress of their transaction-based mobile marketing and advertising campaigns, which we refer to as "performance‑based" services;

▪  license and software revenue, which consists of revenue from customers who license our mobile marketing and advertising platform and fees for customized software solutions delivered to and installed on the customers' server; and

▪  managed services revenue, which consists of fees charged to customers for professional services related to the implementation, execution, and monitoring of customized mobile marketing and advertising solutions as well as other client driven projects.

We account for revenue for these services and licenses in accordance with Accounting Standards Codification (ASC) Topic 605 - Revenue Recognition and ASC Topic 985-605 - Certain Revenue Arrangements that Include Software Elements. We recognize revenue when all of the following conditions are satisfied: (i) there is persuasive evidence of an arrangement; (ii) the service has been rendered or delivery has occurred; (iii) the fee to be paid by the customer is fixed or determinable; and (iv) collectibility of the fee is reasonably assured.

SaaS revenue is generated from our "usage‑based" services, including subscription fees for use of individual software modules and our automated mobile marketing campaign creation templates, and fees charged for access to our technology platform. These fees are recognized ratably over the contract term beginning on the commencement date of each contract as services are rendered.

SaaS revenue generated from our "performance‑based" services is generally based on specified metrics, typically relating to the number of transactions performed during the campaign multiplied by the cost per transaction in accordance with the terms of the related contracts. Transactions can include SMS messages sent by participants in customer campaigns or advertisement impressions placed on mobile applications, among other types of performance-based transactions. Certain of our performance‑based contracts include performance incentive provisions that link a portion of revenue that we may earn under the contract to the performance of the customer's campaign relative to quantitative or other milestones, such as the growth in the consumer base, reduced consumer churn, or the effectiveness of the end-user response. We consider the performance‑based fees to be contingent fees. We recognize this revenue monthly based on actual performance, which is when the fees are earned and the amount of the fee can be reliably measured. Our performance‑based arrangements are typically invoiced monthly, which can occur in a period subsequent to revenue being recognized.

License and software revenue consists of license fees charged for our mobile marketing and advertising technology. We provide licenses on a perpetual or term basis. These types of arrangements do not, typically, include any ongoing support arrangements or rights to upgrades or enhancements and therefore revenue related to perpetual licensing arrangements is recognized upon the delivery of the license. Revenue from term based licenses is recognized over the related term of an arrangement. Fees charged to customize our software solution are, generally, recognized using the completed contract or percentage-of-completion method according to ASC 605-35, Revenue Recognition - Construction-Type and Production-Type Contracts, based on the ratio of costs incurred to the estimated total costs at completion.

F-10

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Velti, plc
**Notes to Consolidated Financial Statements (Continued)**

Managed services revenue, when sold with software and support offerings, are accounted for separately when these services (i) have value to the customer on a standalone basis, (ii) are not essential to the functionality of the software and (iii) there is objective and reliable evidence of the selling price of each deliverable. When accounted for separately, revenue is recognized as the services are provided for time and material contracts, and ratably over the term of the contract when accepted by the customer for fixed price contracts. For revenue arrangements with multiple deliverables, such as an arrangement that includes license, support and professional services, we allocate the total amount the customer will pay to the separate units of accounting based on their relative selling prices, as determined by the price of the undelivered items when sold separately.

The timing of revenue recognition in each case depends upon a number of factors, including the specific terms of each arrangement and the nature of our deliverables and obligations, and the existence of evidence to support recognition of revenue as of the reporting date. For contracts with extended payment terms for which we have not established a successful pattern of collection history, we recognize revenue when all other criteria are met and when the fees under the contract become due. Fees that have been invoiced are recorded in trade receivables and in revenue when all revenue recognition criteria have been met. When fees have been invoiced but not all revenue recognition criteria have been met, the invoice is recorded in trade receivables and in deferred revenue. When all revenue recognition criteria are met, but fees have not been invoiced as of the reporting date, such fees are reported in accrued contract receivables and in revenue.

Certain arrangements entered into by us are revenue sharing arrangements. As a result, we complete an analysis of the facts and circumstances to determine whether revenue earned from these arrangements should be recorded gross with the company performing as a principle, or recorded net of third party costs with the company performing as an agent, as required by ASC 605-45 Principal Agent Consideration.  When we are a principal in a transaction, we include all amounts paid on behalf of our customers in both revenue and costs.

We present revenue net of value-added tax, sales tax, excise tax and other similar assessments. Our revenue arrangements do not contain general rights of return.

### Government Grant Income Recognition

From time to time, we receive grants from the European Union for the development and roll-out of mobile and broadband services and m-commerce related services. We recognize grant income as an offset to costs and expenses in our consolidated statements of comprehensive loss in the period when the costs to be reimbursed by the grant are recognized as expense. When those costs are incurred, receivables from government grants are recognized, if there is reasonable assurance that the grant will be received and we are able to comply with all of the conditions imposed on the grant. We generally believe we have reasonable assurance that the grant will be received upon receiving notification of grant eligibility. Each grant provides income in the form of reimbursement of capital expenditures or of the costs incurred in the development of technology funded by the grant. Grants that reimburse costs related to depreciable assets, including capitalized software development costs, are recognized as income in the periods in which amortization and depreciation on these assets is charged.

For the years 2012, 2011 and 2010 we recognized $3.7 million, $3.2 million and $3.4 million respectively, as an offset to depreciation and amortization. In addition, in 2010 we recognized $0.3 million as an offset to operating expenses.

### Third Party, Datacenter, and Direct Project Costs

We incur certain operating costs that directly relate to revenue. These costs are classified into two categories: third-party, and datacenter and direct project.

*Third Party Costs.* Third party costs are paid to third parties to secure advertising space or content to obtain media inventory for the placement of advertising and media messaging services and for creative development and other services in connection with the creation and execution of marketing and advertising campaigns. Third party costs also include the costs of certain content, media, or advertising that we acquire for a campaign, and costs associated with incentives and promotional costs provided to consumers in order to participate in the campaigns as well as certain computer hardware or software that we might acquire for a customer. Third party costs relate primarily to SaaS revenue.

*Datacenter and Direct Project Costs.* Datacenter and direct project costs consist primarily of personnel and outsourcing costs for operating third party datacenters, that host our Velti mGage platform on behalf of our customers. Additional expenses

F-11

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

include costs directly attributable to a specific campaign as well as allocated facility rents, power, bandwidth capacity, IT maintenance and support. In addition, direct project costs include personnel costs to customize our software solutions for specific customer contracts. These costs may relate to SaaS revenue and/or license and software revenue. To date, the vast majority of datacenter and direct project costs are related to SaaS revenue and the amount attributable to license and software revenue was immaterial.

*Depreciation and Amortization*

Depreciation and amortization expenses consist primarily of depreciation on computer hardware and leasehold improvements, amortization of purchased intangibles and capitalized software development costs, offset by allocation of government grant income.

Much of our depreciation and amortization expense relates to the amortization of software developed for sale or for use in delivering mobile marketing and advertising campaigns for our customers, largely our mGage technology platform. We generate our revenue by providing services and products using this technology. However, we do not segregate or track the development costs by revenue type and are therefore unable to allocate these costs by revenue type.

*Research and Development Expenses*

We incur research and development expenses in the process of creating detailed program designs to be used for the development of our software platform, for other research activities, and for routine maintenance of our developed software. We expense research and development costs as incurred.

*Advertising Costs*

All advertising costs are expensed as incurred. We market our products primarily through a direct sales force and advertising expenditures are not material.

*Income Taxes*

Income taxes are accounted for using the asset and liability method. Deferred tax assets and liabilities are determined based on temporary differences between book and tax bases of assets and liabilities and net operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is recorded against deferred tax assets if it is more likely than not that all or a portion of the deferred tax assets will not be realized.

Tax positions for us and our subsidiaries are subject to income tax audits by multiple tax jurisdictions throughout the world. The impact of an uncertain income tax position on the income tax return must be recognized as the largest amount that is more-likely-than-not to be sustained upon audit by the relevant taxing authority. An uncertain income tax position will not be recognized if it has less than a 50% likelihood of being sustained.

*Concentration of Credit Risk*

No customer accounted for more than 10% of our revenues in 2012 or 2011. One customer accounted for 14% of our revenues during 2010. We had no customers that accounted for more than 10% our total receivables as of December 31, 2012 or as of December 31, 2011.

*Operating Leases*

Leases where a significant portion of the risks and rewards of ownership are retained by the lessor, are classified as operating leases. Payments made under operating leases are charged to the statement of comprehensive loss on a straight-line basis over the term of the lease. In the event that we receive lease incentives in connection with such operating leases, such incentives are recognized as a liability. The aggregate benefit of incentives is recognized as a reduction of rental expense on a straight-line basis over the term of the lease.

F-12

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

*Fair Value Measurements*

We report our financial and non-financial assets and liabilities that are re-measured and reported at fair value at each reporting period. We established a three-tier fair value hierarchy, which prioritizes the inputs used in the valuation methodologies in measuring fair value:

**Level 1.**     Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets.

**Level 2.**     Include other inputs that are directly or indirectly observable in the marketplace.

**Level 3.**     Unobservable inputs that are supported by little or no market activity.

Our financial assets and liabilities consist principally of cash and cash equivalents, accounts payable, accrued liabilities, current and non-current notes payable. Cash and cash equivalents include time deposits and readily marketable securities with original maturities of 90 days or less. Cash and cash equivalents are stated at cost, which approximates fair value. As of  December 31, 2012 and 2011, we did not have readily marketable securities that are classified as cash equivalents.

Accounts payable and accrued liabilities are carried at cost that approximates fair value due to their expected short maturities. Our long-term debt bears interest at rates which approximate the interest rates at which we believe we could refinance the debt. Accordingly, the carrying amount of long-term debt as of December 31, 2012 and 2011 approximates its fair value. As of December 31, 2012, we did not have any financial assets or liabilities for which Level 1 or Level 2 inputs were required to be disclosed. See Note 6 for our disclosure of Level 3 inputs used to revalue our contingent payments related to certain of our acquisitions.

*Share-Based Payments*

We measure and recognize share-based compensation expense related to share-based transactions, including employee and director equity awards, in the financial statements based on fair value. We use the Black-Scholes valuation model to calculate the grant date fair value of share options, using various assumptions. Grant date fair value for deferred share awards is determined by the grant date fair value. We recognize compensation expense over the service period of the award using the graded vesting attribution method, which allocates expense on a straight-line basis over the requisite service period for each separately vesting portion of the award as if the award was, in substance, multiple awards.

We account for equity instruments issued to non-employees as expense at their fair value over the related service period and periodically revalue the equity instruments as they vest, using a fair value approach. The value of equity instruments issued for consideration other than employee services is determined on the earlier of (i) the date on which there first exists a firm commitment for performance by the provider of goods or services, or (ii) on the date performance is complete, using the Black-Scholes valuation model.

*Net Income (Loss) per Share Attributable to Velti*

Basic net income (loss) per share attributable to Velti is computed by dividing net income (loss) attributable to Velti by the weighted-average number of common shares outstanding for the fiscal period. Diluted net income per share attributable to Velti is computed giving effect to all potential weighted average dilutive common stock, including options and other equity awards. The dilutive effect of outstanding awards is reflected in diluted earnings per share by application of the treasury stock method. For the years ended December 31, 2012, 2011 and 2010, all of the share awards outstanding are anti-dilutive. Had we incurred net profit in any of the prior three years, the shares used to calculate the dilutive effect on such net income would be  65,475,000, 58,071,000 and 40,382,000 for the fiscal years 2012, 2011 and 2010, respectively.

*Comprehensive Income (loss)*

Comprehensive income (loss) is comprised of net income (loss) and other comprehensive income (loss). The only component of our other comprehensive income (loss) is the effect of foreign currency translation.

*Recently Adopted Accounting Pronouncements*

F-13

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

In May 2011, an accounting standards update that provided guidance on achieving a consistent definition of, and common requirements for, measurement and disclosure of fair values was issued. The guidance expanded disclosures relating to fair value measurements that are estimated using significant unobservable (Level 3) inputs. The guidance also required categorization by level of the fair value hierarchy for items that are not measured at fair value but for which fair value is required to be disclosed. We adopted this guidance in fiscal 2012. The adoption of this guidance did not have a material impact on our Consolidated Financial Statements.

In June 2011, an accounting standards update related to the presentation of other comprehensive income was issued. The amended guidance requires that the components of comprehensive income be presented either in a single continuous statement of comprehensive income or in two separate but consecutive statements. While the new guidance changes the presentation of comprehensive income, there are no changes to the components that are recognized in net income or other comprehensive income as determined under current accounting guidance.

In September 2011, an accounting standards update on testing goodwill for impairment was issued. The guidance simplified how companies test goodwill for impairment by permitting an entity to first assess qualitative factors to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount as a basis for determining whether it is necessary to perform the second step of the two-step goodwill impairment test. The adoption of this guidance did not have a material impact on our consolidated financial statements.

***Recently Issued Accounting Pronouncements not yet Adopted***

In December 2011, an accounting standard update was issued requiring an entity to disclose information about offsetting and related arrangements for recognized financial and derivative instruments to enable a better understanding of the effect of those arrangements on its financial position. The amended guidance will be effective for us on a retrospective basis commencing in the first quarter of 2014. We are currently evaluating the impact of this new guidance on our consolidated financial statements and do not expect it to have a material impact on our consolidated financial statements.

In July 2012, an accounting standards update on testing indefinitely lived intangible assets for impairment was issued. The guidance simplified how companies test indefinitely lived intangible assets for impairment by permitting an entity to first assess qualitative factors to determine whether it is more likely than not that the fair value of the asset(s) is less than its carrying amount as a basis for determining whether it is necessary to perform the second step of the impairment test. The amended guidance will be adopted in 2013 and we do not expect the adoption of the guidance to have a material effect on our consolidated financial statements.

In January 2013, amended guidance was issued requiring an entity to provide information about the amounts reclassified out of accumulated other comprehensive income by component, either on the face of the statement where net income is presented or in the notes. The amended guidance will be effective for us on a retrospective basis commencing in the first quarter of 2013. We do not expect the adoption of the amended guidance to have a material effect on our consolidated financial statements.

**3. Segment and Geographic Information**

On December 17, 2012, we sold certain non-strategic and legacy assets and liabilities, focused on geographies and certain customers in Southeast and Eastern Europe, to Starcapital, a company incorporated in Cyprus and owned by certain former non-executive management of Velti (Starcapital). These divested assets are characterized by long revenue collection cycles, are located in troubled economies and have heavy capital expenditure requirements. Following completion of the sale of assets to Starcapital, we will continue to consolidate Starcapital because it is considered a VIE and we are considered the primary beneficiary (see footnote 8). Notwithstanding this characterization, Starcapital engages in a business activity separate from our business, and its operating and financial results are reviewed by Starcapital's chief executive officer and not by us. As a result, Starcapital is considered an operating segment, separate from our operating segment.

Our business is conducted in a single operating segment. Our chief operating decision maker (CODM), who is also our chief executive officer, reviews a single set of operating results and financial information of the entire organization, exclusive of Starcapital, in order to make decisions about allocating resources and assessing performance. Our CODM manages our business based primarily on broad functional categories of sales, marketing, software and technology platform development and strategy.

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

Starcapital's and our operating segments have similar economic characteristics and exhibit similar long-term financial performance. We are continuing to offer some products and services that are substantially identical product and services offered by Starcapital, a portion of our customer base overlaps with the Starcapital customer base, each company delivers its products and services to its customers in a similar manner, and each company is subject to a similar regulatory environment. As a result, our and Starcapital's operating segments have been aggregated into one reportable segment.

We conduct our business in three geographical areas: Europe, Americas, and Asia/Africa. The following table provides revenue by geographic area. Revenue from customers for whom we provide services in multiple locations is reported in the location of the respective customer's domicile; revenue from customers for whom we provide services in a single or very few related locations is reported in the location of the respective customer's place of operations.

| Revenue | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | | 2011 | | 2010 | |
| | (in thousands, except percentages) | | | | | |
| Europe: | | | | | | |
| United Kingdom | $ 74,731 | 27.6% | $ 37,758 | 20.0% | $ 34,105 | 29.3% |
| All other European countries | 97,799 | 36.2% | 86,318 | 45.6% | 55,299 | 47.6% |
| Total Europe | 172,530 | 63.8% | 124,076 | 65.6% | 89,404 | 76.9% |
| Americas | 63,597 | 23.5% | 41,114 | 21.7% | 9,150 | 7.9% |
| Asia/Africa | 34,217 | 12.7% | 24,012 | 12.7% | 17,715 | 15.2% |
| Total revenue | $ 270,344 | 100.0% | $ 189,202 | 100.0% | $ 116,269 | 100.0% |

The vast majority of our long-lived assets are located in Europe, primarily U.K. and Greece. Long-lived assets consist of property and equipment, net of related accumulated depreciation.

## 4. Balance Sheet Items

Details of our significant balance sheet line items consisted of the following:

| Property and equipment | December 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in thousands) | |
| Buildings and fixtures | $ 8,806 | $ 1,903 |
| Computer and telecommunication hardware | 9,457 | 6,853 |
| Office equipment | 2,554 | 2,544 |
| Total cost | 20,817 | 11,300 |
| Less: accumulated depreciation | (7,744) | (5,378) |
| Total property and equipment, net | $ 13,073 | $ 5,922 |

Depreciation expense during 2012, 2011 and 2010 was $3.3 million, $1.4 million and $1.3 million, respectively.

| Other receivables and current assets | December 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in thousands) | |
| Government grant receivables | — | 5,258 |
| Other receivables | 12,353 | 21,380 |
| Total other current receivables | $ 12,353 | $ 26,638 |

F-15

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Accrued liabilities | | December 31, | | |
|---|---|---|---|---|
| | | **2012** | | **2011** |
| | | (in thousands) | | |
| Professional fees | $ | 5,764 | $ | 703 |
| Employee related accruals | | 23,963 | | 5,232 |
| Accrued third-party costs | | 58,264 | | 35,135 |
| Other | | 9,383 | | 8,551 |
| Total accrued liabilities | $ | 97,374 | $ | 49,621 |

## 5. Acquisitions

### CASEE

On January 16, 2012, we completed the acquisition of the remaining equity interests in Ydon Holdings, Ltd. (CASEE), a mobile marketing and advertising exchange with operations based in Beijing, by acquiring all of the outstanding shares of CASEE which we did not previously own. We acquired this interest for an initial cash payment of $8.4 million and up to $20.3 million in contingent consideration. The transaction was accounted for using the purchase method of accounting. Transaction costs amounted to $0.9 million and were expensed as incurred.

Prior to the completion of the acquisition, we owned 33% of the outstanding shares and accounted for our investment in CASEE using the equity method. Upon completion of the acquisition, CASEE became our wholly-owned subsidiary. Immediately prior to the acquisition, we re-measured our interest in CASEE and recorded a gain of $6.0 million, which is included in other income (expense) in the consolidated statement of comprehensive loss. This fair value measurement was based on the per share consideration paid in the transaction, including the fair value of the contingent consideration, applied to the number of shares held by us immediately prior to closing.

The contingent consideration to be paid is based on CASEE's achievement of revenue and gross profit performance during the twelve months ended March 31, 2012 and 2013, with a maximum of $20.3 million. It is payable in two tranches, as soon as reasonably practical after the closing of the financial books for those periods, and may be paid in cash or up to 50% in our ordinary shares, at our discretion. We recorded the acquisition-date estimated fair value of the contingent payment of $6.4 million as a component of the consideration paid in exchange for the equity interests of CASEE. The acquisition-date fair value is measured at each quarter end based on the probability-adjusted present value of the consideration expected to be transferred. As of December 31, 2012 we have not paid any amount for contingent consideration as we are continuing to review whether all criteria required by the purchase agreement have been met. See disclosure of Level 3 fair value measurements in Note 6 for changes during the period.

Since the acquisition date through December 31, 2012, CASEE has generated revenue of $5.3 million and a net loss of $2.7 million, including acquisition related charges.

We acquired CASEE to support the expansion of our business in China. The acquisition is expected to significantly enhance our presence in China and increase the overall value of our platform to current and future customers. These factors contributed to establishing the purchase price, which resulted in the recognition of goodwill. The allocation of the total consideration of $22.8 million was as follows:

F-16

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Velti, plc
Notes to Consolidated Financial Statements (Continued)

|  | Fair Value |
|---|---|
|  | (in thousands) |
| Net assets acquired (liabilities assumed): |  |
| Cash and cash equivalents | $ 1,456 |
| Accounts receivable and other current assets | 1,213 |
| Property and equipment | 97 |
| Trade and other liabilities | (2,170) |
| Net assets acquired | 596 |
| Intangible assets acquired - customer relationships | 390 |
| Intangible assets acquired - trademark & trade name | 2,490 |
| Intangible assets acquired - developed technology | 3,020 |
| Goodwill | 17,741 |
| Deferred tax liability | (1,468) |
| Value of assets, net of deferred tax liabilities | $ 22,769 |
| Purchase price: |  |
| Cash | $ 8,400 |
| Contingent consideration (fair value) | 6,360 |
| Fair value of previously held interest | 8,009 |
| Total consideration | $ 22,769 |

The weighted average amortization period for total amortizable intangible assets acquired in connection with our acquisition of CASEE is  5.3 years. None of the goodwill is expected to be deductible for income tax purposes.

*Mobile Interactive Group, Ltd.*

On November 14, 2011, we completed the acquisition of Mobile Interactive Group Limited (MIG), the U.K.'s largest mobile marketing company, by acquiring all of the outstanding shares of MIG such that MIG became our wholly-owned subsidiary following the acquisition. In connection with the acquisition, we paid $25.2 million of cash and $5.1 million in initial consideration in our ordinary shares at closing. We owe $5.0 million in deferred consideration by April 2013, of which $2.5 million has been paid in December 2012. In addition, we will also pay a management bonus of  $2.0 million in cash in April 2013. The transaction was accounted for using the purchase method of accounting. Transaction costs amounted to  $0.9 million and were expensed as incurred.

Upon completion of the acquisition, we agreed to pay a contingent consideration based upon MIG achieving certain EBITDA targets during the period, up to a maximum of $26.0 million, with a portion payable in cash and a portion payable in Velti ordinary shares. We recorded the acquisition-date estimated fair value of the contingent consideration of $15.3 million as a component of the consideration paid in exchange for the equity interests of MIG. During the second quarter, we recorded $0.8 million in additional contingent consideration related to a working capital adjustment. The acquisition-date fair value is measured at each quarter end based on the probability-adjusted present value of the consideration expected to be transferred. In August 2012, we reached agreement with MIG to set the amount of the contingent payment at $26.0 million, payable $14.5 million in cash and $11.5 million in Velti ordinary shares in April 2013. The amount payable was determined based upon MIG's expected achievement of the contingent payment. Accordingly, we recorded a charge of  $5.3 million during the third quarter of 2012. See disclosure of Level 3 fair value measurements in Note 6 for changes during the period.

We acquired MIG to, among other things, expand our business in the U.K., expand our product offering to include mobile commerce and mobile billing services in the 44 countries MIG services, and gain access to the more than  300 enterprise customers that use MIG's technology platform.

F-17

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

The allocation of the total consideration of $51.2 million was as follows:

|  |  | Fair Value |
|---|---|---|
|  |  | (in thousands) |
| **Net assets acquired (liabilities assumed):** |  |  |
| Cash and cash equivalents | $ | 9,307 |
| Accounts receivable and other current assets |  | 40,076 |
| Property and equipment |  | 859 |
| Trade and other liabilities |  | (48,389) |
| Net assets acquired |  | 1,853 |
| Intangible assets acquired - customer relationships |  | 17,110 |
| Intangible assets acquired - trademark & trade name |  | 580 |
| Intangible assets acquired - non-compete agreement |  | 3,131 |
| Intangible assets acquired - developed technology | $ | 11,140 |
| Goodwill |  | 25,727 |
| Deferred tax liability | $ | (8,310) |
| Value of assets, net of deferred tax liabilities |  | 51,231 |
| **Purchase price:** |  |  |
| Cash | $ | 25,170 |
| Deferred consideration |  | 10,000 |
| Contingent consideration |  | 16,061 |
| Total consideration | $ | 51,231 |

The weighted average amortization period for total amortizable intangible assets acquired in connection with our acquisition of MIG is 4.9 years. None of the goodwill is expected to be deductible for income tax purposes.

### Air2Web, Inc. Acquisition

On October 4, 2011, we completed the acquisition of Air2Web, Inc. (Air2Web), a provider of mobile customer relationship management (mCRM) solutions in the United States and India for many of the world's most trusted consumer brands. In connection with the acquisition, we paid $18.9 million in cash for all the outstanding common stock of Air2Web. At the closing of the acquisition, Air2Web paid off its outstanding long term debt, totaling approximately $1.2 million, with cash provided by us.

We acquired Air2Web to, among other things, expand our business in U.S. and India and provide improved access to carriers and verticals such as the financial services industry. Transaction costs amounted to $1.1 million and were expensed as incurred.

F-18

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

The allocation of the total consideration of $18.9 million was as follows:

|  | Fair Value |
|---|---|
|  | (in thousands) |
| **Net assets acquired (liabilities assumed):** |  |
| Cash and cash equivalents | $ 600 |
| Accounts receivable and other current assets | 5,947 |
| Property and equipment | 1,221 |
| Trade and other liabilities | (5,273) |
| Net assets acquired | 2,495 |
| Intangible assets acquired - customer relationships | 1,920 |
| Intangible assets acquired - trademark & trade name | 110 |
| Intangible assets acquired - developed technology | 4,180 |
| Goodwill | 10,193 |
| Value of assets, net of deferred tax liabilities | $ 18,898 |
| **Purchase price:** |  |
| Cash | $ 18,898 |

The weighted average amortization period for total amortizable intangible assets acquired in connection with the acquisition of Air2Web is  5.1 years. None of the goodwill is expected to be deductible for income tax purposes.

### Mobclix, Inc. Acquisition

On September 30, 2010, we acquired Mobclix, Inc. (Mobclix) based in Palo Alto, CA. At closing, we paid  $1.1 million in cash and issued 150,220 ordinary shares, to former Mobclix stockholders and creditors, with a fair value of  $1.5 million. The fair value per share of £6.12 ($9.68) was based on the closing price of our ordinary shares as traded on AIM on the date of acquisition. We paid an additional $8.5 million of deferred consideration and an additional  $0.7 million in employee bonuses in March 2011. The transaction was accounted for using the purchase method of accounting. Transaction costs amounted to  $0.3 million and were expensed as incurred. After the acquisition, Mobclix became our wholly-owned subsidiary.

The agreement also provided for an amount payable on March 1, 2012 contingent upon the financial performance of Mobclix between January 1 and December 31, 2011. On May 1, 2011 we amended our agreement with Mobclix to change the terms of the contingent payment in order to facilitate our integration efforts. The terms of the amendment fixed the contingent payment at  $18.1 million, payable in cash or shares at our discretion, which we paid entirely in shares in April 2012. We estimated the fair value of the amended contingent consideration using a present value factor based on the cost of capital and the timing of the payments, which resulted in recording an additional  $6.1 million of acquisition related charges. As this became a fixed liability it is no longer considered a Level 3 fair value measurement as of December 31, 2011.

### Other Acquisitions

During 2010, we acquired a privately-held company for $1.0 million in aggregate purchase consideration. We accounted for this transaction using the purchase method. Of the $1.0 million, we allocated $0.3 million to acquired intangible assets with useful life of  5 years and $0.7 million to goodwill. The goodwill balances are not deductible for tax purposes. This transaction was not material.

### Unaudited Supplemental Pro Forma Financial Information

Unaudited supplemental pro forma financial information, prepared as though the acquisitions had been completed at the beginning of the immediately preceding fiscal year, is as follows:

F-19

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Velti, plc
**Notes to Consolidated Financial Statements (Continued)**

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2012** | | **2011**[1] | | **2010**[2] |
| | | | | (unaudited) | | |
| | | | | (in thousands) | | |
| Revenue | $ | 270,344 | $ | 223,430 | $ | 158,598 |
| Net income (loss) | | (61,174) | | (24,644) | | (32,484) |
| Net income (loss) attributable to Velti shareholders | | (61,227) | | (24,774) | | (32,403) |
| Net income (loss) per share attributable to Velti: | | | | | | |
| Basic | | (0.96) | $ | (0.44) | $ | (0.85) |
| Diluted | $ | (0.96) | $ | (0.44) | $ | (0.85) |

[1]  Assumes the acquisition of CASEE on January 1, 2011.
[2]  Assumes the acquisition of Mobclix, MIG and Air2Web on January 1, 2010

## 6. Fair Value Measurements

We consider fair value as the exchange price that would be received for an asset or paid to transfer a liability in the principal or most advantageous market in which we would transact business in an orderly transaction on the measurement date. We consider assumptions that market participants would use when pricing the asset or liability, such as inherent risk, transfer restrictions, and risk of nonperformance.

We use observable inputs whenever possible and minimize the use of unobservable inputs when measuring fair value. Observable inputs reflect readily obtainable data from independent sources, while unobservable inputs reflect the Company's market assumptions. The inputs are then classified into the following hierarchy: (1) Level 1 Inputs—quoted prices in active markets for identical assets and liabilities; (2) Level 2 Inputs—observable market-based inputs other than Level 1 inputs, such as quoted prices for similar assets or liabilities in active markets, quoted prices for similar or identical assets or liabilities in markets that are not active, or other inputs that are observable or can be corroborated by observable market data; (3) Level 3 Inputs —unobservable inputs that are supported by little or no market activity such as certain pricing and discounted cash flow models.

Our financial assets and liabilities consist principally of cash and cash equivalents, accounts payable, accrued liabilities, current and non-current notes payable. Cash and cash equivalents are stated at cost, which approximates fair value. As of  December 31, 2012 and 2011, we do not have readily marketable securities that are classified as cash equivalents. Accounts payable and accrued liabilities are carried at cost that approximates fair value due to their expected short maturities. The carrying amount of long-term debt approximates its fair value. As of  December 31, 2012, we did not have any financial assets or liabilities for which Level 1 or Level 2 inputs were required to be disclosed.

The fair value of our contingent payments associated with our recent acquisitions is determined based on an internal cash flow model using inputs based on estimates and assumptions developed by us and is remeasured on each reporting date. The rates used to discount net cash flows to their present value were based on our weighted average cost of capital for similar transactions and an assessment of the relative risk inherent in the associated cash flows. The inputs were current as of the measurement date. These inputs tend to be unobservable and, as such, are considered Level 3 in the fair value hierarchy. The contingent payment that may be due in connection with our acquisition of CASEE is our only Level 3 fair value measurement as of December 31, 2012. We agreed to fix the contingent consideration for MIG at $ 26.0 million, and as such we determined that it no longer requires unobservable inputs. As a result of this change, we have adjusted the impact of the MIG contingent consideration out of the Level 3 table below.

F-20

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

The following table provides a summary of changes in fair value of the contingent payments measured using significant unobservable inputs (Level 3):

|  | Fair Value |
|---|---:|
|  | (in thousands) |
| Balance as of January 1, 2010 | $ 41 |
| Additions to contingent payment liability for Mobclix acquisition | 5,135 |
| Change in fair value of contingent payment liabilities | 4,440 |
| Settlement of contingent payment | (500) |
| Balance as of December 31, 2010 | 9,116 |
| Reclassified to deferred consideration (which is not measured at fair value) | (10,290) |
| Additions to contingent consideration liability for MIG | 15,290 |
| Change in fair value of contingent payment liabilities | 2,155 |
| Balance as of December 31, 2011 | 16,271 |
| Change in fair value of contingent consideration liability related to MIG | 9,603 |
| MIG deferred consideration no longer measured at fair value | (26,000) |
| Additions to contingent consideration liability related to CASEE | 6,360 |
| Foreign exchange differences | 130 |
| Balance as of December 31, 2012 | $ 6,364 |

## 7. Goodwill and Intangible Assets

The following table provides a summary of changes to goodwill :

|  | Carrying Value |
|---|---:|
|  | (in thousands) |
| Balance as of December 31, 2010 | $ 18,451 |
| Acquisition of Air2Web, Inc. | 10,193 |
| Acquisition of Mobile Interactive Group, Ltd. | 24,956 |
| Foreign exchange differences | (644) |
| Balance as of December 31, 2011 | 52,956 |
| Acquisition of the remaining 67% of CASEE | 17,741 |
| Adjustment of MIG purchase consideration | 777 |
| Adjustment for the sale of assets to Starcapital | (2,028) |
| Foreign exchange differences | 1,052 |
| Balance as of December 31, 2012 | $ 70,498 |

Information regarding our intangible assets is a follows:

F-21

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

| Intangible Assets | Average Useful life | Gross Carrying Value | | Accumulated Amortization | | Net Carrying Amount | |
|---|---|---|---|---|---|---|---|
| | (in years) | | | (in thousands) | | | |
| **December 31, 2012** | | | | | | | |
| Internal software development costs | 3.0 | $ | 37,765 | $ | 22,329 | $ | 15,436 |
| Computer software | 3.0 | | 51,492 | | 17,774 | | 33,718 |
| Licenses and intellectual property | 5.0 | | 24,491 | | 19,233 | | 5,258 |
| Trademark, trade name and non-compete | 2.5 | | 6,960 | | 2,425 | | 4,535 |
| Customer relationships | 6.3 | | 25,360 | | 6,552 | | 18,808 |
| Developed technology | 4.6 | | 25,528 | | 9,301 | | 16,227 |
| Intangible assets | 4.2 | $ | 171,596 | $ | 77,614 | $ | 93,982 |
| **December 31, 2011** | | | | | | | |
| Internal software development costs | 3.0 | $ | 26,445 | $ | 16,884 | $ | 9,561 |
| Computer software | 5.0 | | 38,715 | | 12,961 | | 25,754 |
| Licenses and intellectual property | 5.0 | | 29,092 | | 16,806 | | 12,286 |
| Trademark, trade name and non-compete | 2.5 | | 4,334 | | 924 | | 3,410 |
| Customer relationships | 6.3 | | 24,295 | | 2,517 | | 21,778 |
| Developed technology | 4.6 | | 22,088 | | 3,685 | | 18,403 |
| Intangible assets | 4.6 | $ | 144,969 | $ | 53,777 | $ | 91,192 |

Amortization expense during 2012, 2011 and 2010 was $34.2 million, $22.7 million and $14.4 million, respectively.

*Impairment*

We evaluate long-lived assets that are subject to amortization for impairment when events or changes in circumstances indicate the carrying value of the assets may not be recoverable. As a result, in 2012 we recorded a $16.9 million charge for the impairment of capitalized software development. These charges are a result of a write-down of certain software utilized by the business which is no longer being pursued by us, in accordance with our strategic direction. A similar write-down of $1.5 million was recorded in 2011.

The annual estimated amortization expense for the above intangible assets as of December 31, 2012 is as follows:

| | Amount |
|---|---|
| | (in thousands)[1] |
| 2013 | $ 34,705 |
| 2014 | 26,896 |
| 2015 | 17,063 |
| 2016 | 5,473 |
| 2017 | 3,425 |
| Thereafter | 1,084 |
| Total | $ 88,646 |

[1]     Amount excludes the indefinitely lived assets of CASEE amounting to $2.5 million and the long lived assets of Starcapital amounting to $2.8 million.

**8. Variable Interest Entity**

F-22

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

On December 17, 2012, we sold certain non-strategic and legacy assets and liabilities, focused on geographies and certain customers in Southeast and Eastern Europe, to Starcapital, a Cyprus company owned by local, non-executive management of Velti. As a result of the divestment, approximately  75 of our employees transferred to Starcapital or its subsidiaries. The divested assets are characterized by long revenue collection cycles, are located in troubled economies, and have heavy capital expenditure requirements. We recorded a loss of  $10.5 million on the sale of those assets.

The consideration for the sale of assets was a  $23.5 million non-interest bearing receivable (the Note), issued by Starcapital or its subsidiaries payable in cash in three annual installments as follows: $3.0 million paid on December 31, 2012; $5.2 million to be paid on December 31, 2013, and $15.3 million to be paid on December 31, 2014. There is also potential upside in the event the financial results of the divested operations exceed 2014 expectations.

As part of the consideration for the divestment, we were also given 1) a call option to receive the shares in Starcapital sufficient to cover the outstanding balance on the deferred purchase price consideration, exercisable only upon a payment default by Starcapital 2) a call option to purchase up to   45% of the shares in Starcapital, exercisable in the event of a change of control of Starcapital prior to the third anniversary of completion of the divestment, and 3) cross pledges and guarantees from the shareholders of Starcapital and its subsidiaries for payment on the purchase price due to us.   No value was attributed to the upside contingent consideration, the call options, or the cross pledges and guarantees in determining the total consideration for accounting purposes because the likelihood of realizing the upside consideration was not viewed as likely.

At the time of completion of the divestment, Starcapital was thinly capitalized, with the transaction fully financed by the Note.   As a result, we determined that we hold a variable interest in Starcapital.

We further determined that while we have no ability to control the day-to-day operations of Starcapital, nor an obligation to absorb operating losses of Starcapital, we should be treated as the primary beneficiary of the Starcapital and required to consolidate its operations. This is based on a determination that Starcapital is thinly capitalized and has no equity a risk, leaving us as the primary beneficiary due to the presence of the remaining  $20.6 million balance on the Note. An infusion of sufficient equity by the owners of Starcapital, or a full repayment of the Note by Starcapital in some future period would result in a determination that the Company is no longer the primary beneficiary of Starcapital.

As of December 31, 2012, the net amount of capital at risk is equal to Velti's receivable from Starcapital, which is currently at  $20.6 million.

The assets of Starcapital that have been consolidated in our balance sheet can only be used to settle the obligations of Starcapital, and we have no control over the disposition of these assets. None of these assets are anticipated to become obligations of Velti. We are not obligated and do not intend to provide financial support to Starcapital.

The following are the assets and liabilities of Starcapital that have been consolidated in our balance sheet. A statement of operations is not provided because the results are not significant due to the transaction closing late in 2012.

<center>F-23</center>

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

|  | As of December 31, 2012 | | |
|---|---|---|---|
|  | Consolidated | Starcapital | Velti |
| ASSETS | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 36,571 | $ 1,146 | $ 35,425 |
| Trade receivables | 150,074 | 12,399 | 137,675 |
| Accrued contract receivables | 132,957 | 8,780 | 124,177 |
| Consideration receivable from Starcapital - current | — | — | 4,378 |
| Prepayments | 12,733 | — | 12,733 |
| Other receivables and current assets | 12,353 | 1,327 | 11,026 |
| Total current assets | 344,688 | 23,652 | 325,414 |
| Property and equipment, net | 13,073 | 210 | 12,863 |
| Intangible assets, net | 93,982 | 2,857 | 91,125 |
| Consideration receivable from Starcapital - non current | — | — | 16,187 |
| Goodwill | 70,498 | — | 70,498 |
| Other assets | 14,782 | 1,511 | 13,271 |
| Total assets | $ 537,023 | $ 28,230 | $ 529,358 |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | | |
| Current liabilities: | | | |
| Accounts payable | $ 37,786 | $ 704 | $ 37,082 |
| Accrued liabilities | 97,374 | 452 | 96,922 |
| Consideration payable to Velti - current | — | 4,378 | — |
| Deferred revenue and current portion of deferred government grant | 12,626 | 727 | 11,899 |
| Current portion of acquisition related liabilities | 33,352 | — | 33,352 |
| Current portion of long-term debt and short-term financings | 851 | — | 851 |
| Income tax liabilities | 9,953 | 883 | 9,070 |
| Total current liabilities | 191,942 | 7,144 | 189,176 |
| Long-term debt | 27,342 | — | 27,342 |
| Deferred government grant - non-current | 1,297 | — | 1,297 |
| Acquisition related liabilities - non-current | 2,221 | — | 2,221 |
| Consideration payable to Velti - non-current | — | 16,187 | — |
| Other non-current liabilities | 21,703 | 4,772 | 16,931 |
| Total liabilities | 244,505 | 28,103 | 236,967 |
| Total Velti shareholders' equity | 292,394 | 3 | 292,391 |
| Non-controlling interests and variable interest entities | 124 | 124 | — |
| Total equity | 292,518 | 127 | 292,391 |
| Total liabilities and shareholders' equity | $ 537,023 | $ 28,230 | $ 529,358 |

**9. Short-term financings and long-term debt**

F-24

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

Details of our short-term financings and long-term debt by facility as of  December 31, 2012 and 2011 are as follows (in thousands):

| Lender | Description / Term | Total Facility | Outstanding as of December 31, 2012 | Outstanding as of December 31, 2011 | Interest Rate | Security |
|---|---|---|---|---|---|---|
| **Short-term financings:** | | | | | | |
| HSBC Bank | Working capital | $    1,000 | $        839 | $        — | 13.25% + 4% | Indian facility supported by a $1.125 million letter of credit issued under the main credit facility that we have with HSBC |
| ICICI Bank | Working capital | 182 | closed | 182 | ICICI I-Base +5.5 % | Secured by assets of Air2Web India Pvt Ltd |
| Other | | 12 | 12 | — | | |
| **Long-term debt:** | | | | | | |
| HSBC | Revolving Credit | 50,000 | 27,328 | — | LIBOR +2.25% + Unused 0.75% | Substantially all assets of the company |
| Other | | 14 | 14 | — | | |
| BSTD | Term facility due September 2015 | 8,611 | closed | 8,611 | 3 month Euribor + 4% | Secured by assets of Mobile Interactive Group, Ltd. |
| ING | Term facility due April 2014 | 1,151 | closed | 1,151 | Fixed 4.05% to April 2012, then 3 month Euribor + 2.5% | Secured by assets of Mobile Interactive Group, Ltd. |
| Total debt: | | | $    28,193 | $    9,944 | | |

Future principal repayments under all debt arrangements as of  December 31, 2012 are as follows:

| | Amount |
|---|---|
| | (in thousands) |
| 2013 | $        851 |
| 2014 | — |
| 2015 | 27,342 |
| 2016 | — |
| Total | $    28,193 |

*Secured Borrowings and Collateralized Receivables*

As of December 31, 2012 our accounts receivable were pledged as security against borrowings from HSBC, and  none were pledged against borrowing as of December 31, 2011. The weighted average effective interest rate for our outstanding debt was  5.3% and 5.4% as of December 31, 2012 and 2011, respectively.

*Revolving Credit Facility*

In August 2012, we entered into a  $50.0 million multi-currency senior revolving credit facility (the Facility) with HSBC, which expires on August 10, 2015. The face amount may be increased by an additional  $50.0 million upon meeting certain requirements and obtaining additional commitments from the existing or new lenders. At the current time, we do not believe that an increase of the credit facility is likely in the near term. Borrowings under the Facility will bear interest at the LIBOR rate plus a spread ranging from  2.25% to 2.75% or an adjusted base rate plus a spread ranging from  1.25% to 1.75%. The spread is dependent upon our leverage ratio, as calculated according to the terms of the loan agreement. We are required to

F-25

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Velti, plc
**Notes to Consolidated Financial Statements (Continued)**

pay 0.50% per annum, on the unused portion of the facility, if utilization of the facility is greater than  50%, and 0.75% per annum if utilization is less than 50%.

The Facility contains a number of customary negative and affirmative covenants, including covenants that limit our ability to place liens on our assets, incur additional debt, make investments, enter into acquisitions, merge or consolidate, dispose of assets, pay dividends or make other restricted payments, all subject to certain exceptions. There are also several financial covenants that we are required to maintain, which includes a minimum fixed charge coverage ratio of 1.50 to 1.00, a maximum total leverage ratio of 2.50 to 1.00, a minimum liquidity ratio of 1.25 to 1.00, a minimum asset coverage ratio of 1.50 to 1.00, and a performance to plan test with respect to Consolidated Adjusted EBITDA. Our ability to use the Facility may be suspended and repayment of any outstanding balances may be required if we are unable to comply with these requirement in the future, or otherwise unable to obtain waivers or amendments.

The Bank approved the amendment of the Facility allowing us to complete the divestment of assets to Starcapital described in Note 8 above, as well as to allow us to increase the permitted software capital expenditures during 2012. As of December 31, 2012, we did not meet our performance to plan test with respect to Consolidated Revenue and Consolidated Adjusted EBITDA. The Bank has waived the event of default under the Facility occurring as a result of our failure to meet this financial covenant.

In connection with the execution of the Facility, we repaid the entire outstanding loan of €5.9 million (approximately $7.2 million) to Black Sea Trade and Development Bank during the third quarter of 2012. The total payment of  $7.3 million consisted of the outstanding principal balance, accrued interest and fees. We borrowed $7.3 million from the Facility to repay this loan.

**10. Income Taxes**

The components of our income or (loss) before income taxes were as follows:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2012** | **2011** | **2010** |
|  | (in thousands) | | |
| Country of domicile | $ (44,358) | $ (31,348) | $ (15,522) |
| Foreign | (19,651) | 19,918 | 3,543 |
|  | $ (64,009) | $ (11,430) | $ (11,979) |

The components of the provision (benefit) for income taxes are as follows:

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | **2012** | **2011** | **2010** |
|  | (in thousands) | | |
| Current |  |  |  |
| Country of domicile | $ — | $ — | $ — |
| Foreign | 5,456 | 2,180 | 1,230 |
| Reserves | 6,033 | 2,367 | 1,904 |
| Total current | $ 11,489 | $ 4,547 | $ 3,134 |
| Deferred |  |  |  |
| Country of domicile | $ — | $ — | $ — |
| Foreign | (14,324) | (1,608) | 6,112 |
| Reserves | — | 869 | (5,475) |
| Total deferred | $ (14,324) | $ (739) | $ 637 |
| Total provision (benefit) | $ (2,835) | $ 3,808 | $ 3,771 |

F-26

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Velti, plc
**Notes to Consolidated Financial Statements (Continued)**

A reconciliation between the statutory income tax rates of our country of domicile and our effective tax rates as a percentage of income (loss) before income taxes is as follows:

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | % | 2011 | % | 2010 | % |
| | (in thousands, except percentages) | | | | | |
| Tax at country of domicile statutory rate | $ — | — % | $ (1,445) | (12.5)% | $ (3,354) | (28.0)% |
| Foreign earnings at other than country of domicile statutory rates | (2,612) | 4.1 | (5,985) | (50.6) | (339) | (2.8) |
| Unrecognized tax Benefits | 6,374 | (10.0) | 2,503 | 21.7 | 3,853 | 32.2 |
| Rate changes | (23) | — | (250) | (2.2) | 17 | 0.1 |
| Permanent items | 4,156 | (6.5) | 5,668 | 47.8 | 14 | 0.1 |
| Deferred tax true-ups | (11,109) | 17.3 | 1,929 | 16.7 | — | — |
| Valuation allowance | 379 | (0.6) | 1,388 | 12.0 | 3,580 | 29.9 |
| | $ (2,835) | 4.3 % | $ 3,808 | 32.9 % | $ 3,771 | 31.5 % |

Our statutory tax rate is 0.0% in 2012 as our country of domicile is the Bailiwick of Jersey, which has no corporate income tax.  In 2011, our country of domicile was Ireland, which has a  12.5% corporate income tax rate. The foreign tax differential presented in the above rate reconciliation schedule is due to foreign income and losses in jurisdictions where the tax rates are significantly higher than the statutory rate.

The components of the current and long-term deferred tax assets and liabilities, net, consist of the following:

| | As of December 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in thousands) | |
| Current deferred tax assets: | | |
| Accrued expenses (including amounts subject to settlement) and allowances | $ 4,269 | $ 6,400 |
| Other | — | 526 |
| Total current deferred tax assets | 4,269 | 6,926 |
| Non-current deferred tax assets: | | |
| Depreciable assets | (401) | (2,083) |
| Net operating losses | 17,874 | 14,208 |
| Other | 3,632 | 547 |
| Total non-current deferred tax assets | 21,105 | 12,672 |
| Total deferred tax assets | 25,374 | 19,598 |
| Valuation allowance | (14,201) | (13,382) |
| Non-current deferred tax assets, net | 11,173 | 6,216 |
| Current deferred tax liabilities: | | |
| Accrued revenues | (2,628) | (6,186) |
| Non-current deferred tax liabilities: | | |
| Intangible assets | (6,139) | (10,180) |
| Deferred tax assets (liabilities), net | $ 2,406 | $ (10,150) |

The increase in valuation allowance was $0.8 million, $6.2 million, and $4.8 million during 2012, 2011 and 2010, respectively.

We had total net operating loss carryforwards of $99.6 million, $95.6 million and $71.8 million as of December 31, 2012, 2011, and 2010 respectively. These net operating loss carryforwards are available to offset taxable income in the future. As of December 31, 2012, we had  $64.6 million of U.S.net operating loss carryforwards which will expire in 2020 through 2032. We

F-27

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

also had $30.1 million of U.K. net operating loss carryforwards which have no expiration date. The remaining $4.9 million of net operating loss carryforwards in other jurisdictions will begin to expire in 2015.

Utilization of our net operating loss and tax credit carryforwards may be subject to substantial annual limitation due to the ownership change limitations provided under the law of various tax jurisdictions. Such an annual limitation could result in the expiration of the net operating loss and tax credit carryforwards before utilization.

We periodically evaluate the realizability of the deferred tax assets and recognize the tax benefit only as reassessment demonstrates that they are realizable. At such time, if it is determined that it is more likely than not that the deferred tax assets are realizable, the valuation allowance will be adjusted. Our deferred tax assets that were determined to be realizable in the future were $11.2 million and $6.2 million as of December 31, 2012 and 2011, respectively. The valuation allowance was $14.2 million and $13.4 million as of December 31, 2012 and 2011, respectively. A significant portion of the change in valuation allowance relates to tax assets established in accounting for our acquisitions.

As of December 31, 2012, $67.8 million of undistributed earnings for our foreign subsidiaries are considered indefinitely reinvested in the respective operations. No provision has been made for taxes that might be payable upon remittance of such earnings, nor is it practicable to determine the amount of this liability.

A reconciliation of the beginning and ending amounts of unrecognized tax benefits is as follows:

| | As of December 31, | | |
|---|---|---|---|
| | 2012 | | 2011 |
| | (in thousands) | | |
| Balance as of January, 1 | $  11,989 | $ | 7,641 |
| Gross increases — current year tax positions | 6,376 | | 3,375 |
| Gross increases — prior year tax positions | 187 | | 1,904 |
| Gross decreases — current year tax positions | (1,365) | | (931) |
| Balance as of December 31 | $  17,187 | $ | 11,989 |

The Company does not anticipate a significant change to the $17.2 million long-term uncertain income tax positions within the next 12 months.

Our policy for deducting interest and penalties is to treat interest as interest expense and penalties as taxes. As of December 31, 2012, we had $1.2 million accrued for the payment of interest and penalties related to unrecognized tax benefits.

We file income tax returns in various tax jurisdictions around the world. While we are not currently under audit in the major taxing jurisdictions in which we are subject to tax, the tax years 2008 to 2012 generally remain open to examination. However, we do not believe that the total amount of unrecognized tax benefits will significantly change within the next 12 months.

**11. Commitments and Contingencies**

*(a)*        *Operating Lease Commitments*

The future aggregate minimum lease payments under non-cancellable operating leases as of December 31, 2012 are as follows:

F-28

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

|  | Amount |
|---|---|
|  | (in thousands) |
| 2013 | $ 5,087 |
| 2014 | 4,515 |
| 2015 | 3,751 |
| 2016 | 3,603 |
| 2017 | 3,222 |
| Thereafter | 5,073 |

Rent expense was $6.0 million, $3.7 million and $2.6 million during 2012, 2011 and 2010, respectively.

*(b)*      *Guarantees and Indemnifications*

ASC 460, *Guarantees*, requires that upon issuance of a guarantee, the guarantor must recognize a liability for the fair value of the amount of obligations it assumes under that guarantee.

We periodically establish irrevocable bank guarantees in favor of a customer in connection with a campaign guaranteeing minimum net revenue or covering costs of a campaign. As of December 31, 2012 and 2011, the aggregate amount of our outstanding commitments under such letters of guarantee was $6.8 million and $2.7 million, respectively. We accrue for known obligations when a loss is probable and can be reasonably estimated. There were no accruals for expenses related to our performance guarantees for any period presented.

As permitted under the laws of the Bailiwick of Jersey and the Republic of Ireland, and in accordance with our bylaws, we indemnify our officers and directors for certain events or occurrences, subject to certain limits, while the officer or director is or was serving at our request in such capacity. The maximum amount of potential future indemnification is unlimited; however, we maintain director and officer liability insurance that limits our exposure and may enable us to recover a portion of any future amounts paid. We believe the fair value for these indemnification obligations is immaterial. Accordingly, we have not recognized any liabilities relating to these obligations as of December 31, 2012 and 2011.

**Pension and Other Post-Retirement Obligations**

We are required under Greek law to make a payment to employees on unfair dismissal or on attaining normal retirement age. The amount of the payment depends on the employees' monthly earnings (capped at €6,000 per month, or approximately $8,200) and a multiple which depends on length of service. The most recent independent actuarial valuation was carried out as of December 31, 2012. As of December 31, 2012 and 2011, we have included $494,000 and $551,000, respectively in other non-current liabilities for this obligation. As of December 31, 2012, our retirement benefits obligations were unfunded.

Our U.K. entities participate in a defined contribution scheme where the total pension obligation is charged to the income statement as it is incurred with no future obligation or prepaid amount. The value is based on a percentage of participating employee salaries and Velti's contribution totaled $12,000 in 2012.

**Indemnification Claims**

We have periodically received letters on behalf of customers notifying us that such customers had received letters from a third party alleging that certain of our customer's applications using our technology infringed the patent rights of the third party. In turn, our customers have alleged that we are obligated to indemnify them against any damages incurred relating to these matters as the claims allegedly relate to products or services that we provide to the customers. We are currently investigating the related issues.

**Patent Litigation**

On March 9, 2012, Augme Technologies, Inc. filed a complaint against Velti USA, Inc. in the United States District Court for the District of Delaware (case no. 1:12cv294), alleging infringement of three patents held by Augme. On May 4, 2012, Velti

F-29

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Velti, plc
**Notes to Consolidated Financial Statements (Continued)**

responded to the complaint by filing a motion to dismiss and motion to strike certain claims in the complaint. On May 18, 2012, in response to the motion, Augme filed an opposition and also filed a First Amended Complaint. The Company responded to the First Amended Complaint (and asserted counterclaims of non-infringement and invalidity) on June 4, 2012. On March 22, 2013, Velti Limited and Velti entered into a settlement with Augme, pursuant to which Augme and Velti settled the two pending lawsuits as between each other. Pursuant to the settlement, (i) Augme has granted Velti a paid-up license in all patents owned by Augme with a priority date on or before March 22, 2013 for the life of those patents, (ii) Velti has granted Augme a paid-up license in all patents owned by Velti with a priority date on or before March 22, 2013, (iii) Augme and Velti have covenanted not to sue each other on such patents, (iv) Augme and Velti have dismissed the lawsuits as to each other with prejudice with each side to bear its own costs, (v) Augme and Velti have released each other as to the subject matter of the lawsuits with neither party making any admission of liability, and (vi) Velti will pay Augme a lump sum payment of $200,000 no later than 10 business days following the dismissal of the lawsuits. On March 29, 2013, the Court granted a joint motion to dismiss the case with prejudice, pursuant to the settlement agreement. The matter is now officially closed.

**In re A2P SMS Antitrust Litigation**

On June 14, 2012, Air2Web, Inc., was named as a defendant in a consolidated class action complaint filed in the United States District Court for the Southern District of New York on behalf of a purported class of lessees of common short codes used in application-to-person SMS messaging. *In re A2P SMS Antitrust Litigation*, Case No. 12-cv-2656 (AJN). The plaintiffs allege that the defendants, which include all major U.S. wireless carriers, CTIA - The Wireless Association®, WMC Global, Inc., and certain aggregators (including Air2Web) violated federal antitrust law by conspiring to reduce competition and fix prices in, and conspiring to monopolize, the market for application-to-person SMS transmission in the United States. The plaintiffs seek injunctive relief and treble damages, in an undisclosed amount, jointly and severally from all defendants for injuries allegedly sustained from April 5, 2008, until the present. On August 14, 2012, several groups of defendants, including Air2Web, filed motions to dismiss the complaint in its entirety, and a number of defendants also filed motions to compel arbitration of this dispute and to stay these proceedings pending arbitration. A decision on those motions is pending. Plaintiffs have not yet responded to those motions. Because this action is in its very early stages, and due to the inherent uncertainties surrounding the litigation process, we are unable to reasonably assess the likelihood of any particular outcome at this time.

**12. Share-Based Compensation**

*Equity Incentive Plans*

Our General Share Incentive Plan allows for the award of (i) share options, (ii) deferred share awards, (iii) conditional share awards and (iv) share appreciation rights. Only our employees, certain advisors and consultants and employee directors are eligible to participate in this plan.   Vesting is allowed based on time-based or performance-based criteria.

Our 2009 U.S. Employee Share Incentive Plan allows for the award of: (i) incentive share options, (ii) non-qualified share options, (iii) restricted share awards and (iv) unrestricted share awards. Only our employees, certain advisors and consultants or employees of our affiliates are eligible to participate in this plan. The maximum number of shares which may be issued pursuant to awards made under the U.S. Employee Share Incentive Plan is  5,250,000 shares. Grants under this plan may have time-based or performance-based vesting.

Our 2009 U.S. Non-Employee Share Incentive Plan allows for the award of: (i) share options, (ii) restricted share awards and (iii) unrestricted share awards. Only our non-employee directors and consultants, and non-employee directors and consultants of our affiliates, are eligible to receive awards under the U.S. Non-Employee Share Incentive Plan. The maximum number of shares which may be issued pursuant to awards made under the U.S. Non-Employee Share Incentive Plan is 750,000 shares. Grants under this plan may have time-based or performance-based vesting.

The maximum number of shares which may be issued in aggregate under all of our share incentive plans must not exceed  15% of our outstanding ordinary share capital on the date of grant, less all equity awards made in the prior  three years pursuant to such share incentive plans that have not yet vested or that are subject to share options that have not yet been exercised.

We grant deferred share awards to our employees as part of our compensation package. We also grant share options to some of our employees and consultants in addition to deferred share awards. Our deferred share awards typically vest over  four years at the rate of 25% per year on the anniversary of the date of grant; however, our deferred share awards granted to our non-executive

F-30

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

directors and a portion of the deferred share awards granted to our executive officers, vest over one year in equal monthly tranches. In March 2012, we issued fully vested deferred share awards to employees as discretionary bonuses in lieu of payment of cash bonuses. We also periodically award fully vested shares as a sign on bonus to newly hired employees. Shares are only issued to a participant when the deferred share award vests in accordance with any vesting schedule specified in the award agreement following receipt of payment of the aggregate nominal (par) value of £0.05 per ordinary share. The deferred share award recipient is responsible for all applicable taxes payable on the award.

All of our share options have an exercise price equal to the market price of our ordinary shares on the date of grant. Our options typically vest over a four-year period at the rate of 25% per year on the anniversary of the date of grant, although from time to time we issue share options with shorter vesting terms.

*Deferred Share Awards*

Details of our deferred share awards are as follows:

| | Number of Shares | Weighted Average Exercise Price Per Share | Weighted Average Grant Date Fair Value Per Share | Weighted Average Remaining Contractual Life (in years) | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|---|
| **Outstanding as of January 1, 2010** | 2,155,366 | $ 0.09 | | | 6,162 |
| Share awards granted | 1,206,958 | $ 0.07 | $ 6.39 | | $ 7,711 |
| Forfeited | (670,056) | $ 0.09 | | | |
| Vested deferred share awards | (636,284) | $ 0.10 | | | $ 3,283 |
| **Outstanding as of December 31, 2010** | 2,055,984 | $ 0.08 | | 1.22 | $ 13,850 |
| Share awards granted | 1,768,299 | $ 0.08 | $ 11.17 | | $ 19,756 |
| Forfeited or failed to vest | (364,383) | $ 0.08 | | | |
| Vested deferred share awards | (1,454,455) | $ 0.08 | | | $ 24,347 |
| **Outstanding as of December 31, 2011** | 2,005,445 | $ 0.08 | | 1.80 | $ 13,287 |
| Share awards granted | 3,843,987 | $ 0.08 | $ 9.98 | | $ 38,356 |
| Forfeited or failed to vest | (728,976) | $ 0.08 | | | |
| Vested deferred share awards | (1,301,510) | $ 0.08 | | | $ 10,576 |
| **Outstanding as of December 31, 2012** | 3,818,946 | $ 0.08 | | 1.72 | $ 16,880 |

For deferred share awards, the fair value on the date of grant approximates market value as the exercise price equals the nominal (par) value of £0.05 (remeasured into U.S. dollars on grant date) per ordinary share. The aggregate estimated grant date fair value therefore approximates the intrinsic value disclosed in the table above.

*Share Options*

Details of share option activity are as follows:

F-31

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

| | Number of options | Weighted Average Exercise Price | Weighted Average Grant Date Fair Value | Weighted Average Remaining Contractual Life (in years) | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|---|
| Outstanding as of January 1, 2010 | 970,183 | $ 2.65 | | 6.16 | $ 565 |
| Share options granted | 3,035,587 | $ 5.47 | $ 3.45 | | |
| Forfeited share options | (507,955) | $ 3.24 | | | |
| Exercised options | (4,995) | $ 2.66 | | | $ 43 |
| Outstanding as of December 31, 2010 | 3,492,820 | $ 5.01 | | 8.90 | $ 10,140 |
| Share options granted | 1,822,812 | $ 11.17 | $ 6.40 | | |
| Forfeited share options | (519,533) | $ 6.48 | | | |
| Exercised options | (113,402) | $ 3.69 | | | $ 1,034 |
| Outstanding as of December 31, 2011 | 4,682,697 | $ 7.17 | | 8.49 | $ 6,028 |
| Share options granted | 1,256,823 | $ 10.33 | $ 5.73 | | |
| Forfeited share options | (648,388) | $ 9.10 | | | |
| Exercised options | (397,341) | $ 3.48 | | | $ 2,671 |
| Outstanding as of December 31, 2012 | 4,893,791 | $ 8.03 | | 7.81 | $ 265 |

The aggregate estimated grant date fair value was $7.2 million, $11.6 million and $10.4 million for options granted to employees during 2012, 2011 and 2010, respectively.

The following table summarizes information regarding our outstanding and exercisable options as of December 31, 2012:

| | Outstanding | | | Exercisable | | |
|---|---|---|---|---|---|---|
| Range of Exercise Prices | Number of Option Shares | Weighted-Average Exercise Price per Share | Remaining Weighted-Average Contractual Term (Years) | Number of Option Shares | Weighted-Average Exercise Price Per Share | Aggregate Intrinsic Value |
| $2.57 - $2.73 | 144,654 | $ 2.67 | 3.5 | 97,882 | $ 2.71 | |
| $4.95 - $4.95 | 2,004,743 | $ 4.95 | 7.3 | 1,115,420 | $ 4.95 | |
| $6.26 - $9.45 | 966,088 | $ 8.17 | 8.4 | 340,997 | $ 8.58 | |
| $9.46 - $11.95 | 877,328 | $ 10.74 | 9.0 | 34,833 | $ 10.04 | |
| $12.10 - $15.46 | 816,449 | $ 12.47 | 7.9 | 227,201 | $ 12.42 | |
| $15.58 - $18.47 | 84,529 | $ 17.26 | 8.5 | 21,135 | $ 17.26 | |
| | 4,893,791 | $ 8.03 | 7.8 | 1,837,468 | $ 6.67 | $ 175,496 |

The fair value of our share options was estimated at the date of grant using the Black-Scholes model with the following assumptions:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| **Share Options Valuation Assumptions** | | | |
| Expected volatility | 60% | 60% | 60% |
| Expected life in years | 6.21 | 6.25 | 6.25 |
| Risk free rate | 0.67% - 1.15% | 1.1% - 2.5% | 2.5% |
| Expected dividends | — | — | — |

F-32

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Velti, plc
**Notes to Consolidated Financial Statements (Continued)**

For share options, as we do not have sufficient historical information to develop reasonable expectations about future exercise patterns and post-vesting employment behavior, we estimate the expected term of options granted by taking the average of the vesting term and the contractual term of the options, referred to as the simplified method. We estimate the expected term of our share options using a blended volatility factor, which consists of our own share volatility from our trading history and expected future volatility. The risk-free interest rate assumption is based upon observed interest rates appropriate for the expected term of the deferred share award or share option. Expected dividends during the term of the options are based on our dividend policy. To date,  no dividends have been declared or paid and  none are expected to be declared or paid during the expected term. We estimated the forfeiture rate based on historical and anticipated levels of personnel turnover.

During 2012,  2011 and 2010 we recognized total share-based payment expense under equity incentive plans as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| | (in thousands) | | |
| Datacenter and direct project costs | $ 3,132 | $ 3,549 | $ 443 |
| General and administrative expenses | 10,912 | 11,735 | 2,613 |
| Sales and marketing expenses | 8,209 | 8,288 | 2,231 |
| Research and development expenses | 5,203 | 4,055 | 985 |
| | $ 27,456 | $ 27,627 | $ 6,272 |

There was no recognized tax benefit recorded during  2012,  2011 and 2010 related to share-based compensation expense. As of  December 31, 2012, there was $16.9 million, of total unrecognized share-based compensation expense related to deferred share awards awarded under our share incentive plans expected to be recognized over a weighted-average recognition period of  1.7 years. As of December 31, 2012, there was $6.5 million of total unrecognized share-based compensation expense related to share options expected to be recognized over a weighted-average recognition period of  1.3 years.

In March 2011, certain performance based deferred share awards granted to employees in 2009 were approved for vesting by our board of directors. The performance metrics of these awards were set at the time of grant based on then current projections of company performance under IFRS for 2009 and 2010. These metrics did not contemplate our conversion to U.S. GAAP, the impact of acquisitions completed during 2009 and 2010, or the impact on our results of preparing for and completing our U.S. public offering. Due to the judgment required to reconcile actual company performance with the original metrics, it was determined that any vesting would be required to be treated as a modification under the guidance in ASC 718. This required the fair value of the awards to be remeasured on the vesting approval date, with the incremental fair value charged to expense over the remaining vesting period. As a result, we recognized additional compensation expense of approximately $10.5 million during 2011.

In May 2010, we allowed for the vesting of certain deferred share awards granted to employees in 2008 under IFRS based on then current projections of company performance under IFRS for 2008 and 2009. Due to the judgment required to reconcile actual company performance with the original metrics, it was determined that any vesting would be required to be treated as a modification under the guidance in ASC 718. As a result of this modification, we recognized additional compensation expense of approximately  $1.1 million during 2010.

**13. Related Party Transactions**

Starcapital is an equity investor in several entities, each of which we divested and transferred to Starcapital or its subsidiaries in a transaction completed in December 2012. Previously, we have had sale and purchase transactions with these entities divested to Starcapital. The following is a summary of the transactions and balances:

F-33

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Velti, plc**
**Notes to Consolidated Financial Statements (Continued)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| | (in thousands) | | |
| Sales and services rendered | $ 3,931 | $ 6,012 | $ 6,228 |
| Purchases | $ 939 | $ 5,262 | $ 3,833 |

| | As of December 31, | |
|---|---|---|
| | **2012** | **2011** |
| | (in thousands) | |
| Trade receivables | $ 4,622 | $ 3,903 |
| Accrued and other receivables | $ 4,043 | $ 5,473 |
| Trade payables | $ 166 | $ 180 |

**Velti, plc**

**Schedule II**

**Valuation and Qualifying Accounts**

| | Balance at Beginning of Year | Additions and Charges to Expenses | Write-offs and Deductions | Total |
|---|---|---|---|---|
| | (in thousands) | | | |
| Allowance for doubtful accounts (trade and accrued contract) receivable: | | | | |
| Year ended December 31, 2012 | $ 808 | $ 7,420 | $ (223) | $ 8,005 |
| Year ended December 31, 2011 | $ 135 | $ 673 | $ — | $ 808 |
| Year ended December 31, 2010 | $ 135 | $ 10 | $ (10) | $ 135 |
| Deferred tax valuation allowance: | | | | |
| Year ended December 31, 2012 | $ 13,382 | $ 819 | $ — | $ 14,201 |
| Year ended December 31, 2011 | $ 7,220 | $ 6,162 | $ — | $ 13,382 |
| Year ended December 31, 2010 | $ 2,466 | $ 4,754 | $ — | $ 7,220 |

F-34

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Company no. 103899

**COMPANIES (JERSEY) LAW 1991**

**A PUBLIC COMPANY LIMITED BY SHARES**

# MEMORANDUM

# AND

# ARTICLES OF ASSOCIATION

**of**

# VELTI PLC

---

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Company no. 103899

**COMPANIES (JERSEY) LAW 1991**

**A PUBLIC COMPANY LIMITED BY SHARES**

# MEMORANDUM OF ASSOCIATION

# OF

# VELTI PLC

(Adopted by written special resolution passed on 13 October 2009)

1.      The name of the Company is Velti plc.

2.      The Company is a public company.

3.      The Company is a par value company.

4.      The share capital of the Company is £5,000,000 divided into 100,000,000 ordinary shares with a par value of £0.05 each.

5.      The liability of a member of the Company is limited to the amount unpaid (if any) on such member's share or shares.

---

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Company no. 103899

**COMPANIES (JERSEY) LAW 1991**

**A PUBLIC COMPANY LIMITED BY SHARES**

# ARTICLES OF ASSOCIATION

**of**

# VELTI PLC

(Adopted by a special resolution passed on 26 July 2011)

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## CONTENTS

| Article | Page |
|---|---|
| PRELIMINARY | 1 |
| SHARE CAPITAL | 7 |
| RIGHTS ATTACHED TO SHARES | 7 |
| UNISSUED SHARES | 7 |
| REDEMPTION AND PURCHASE OF SHARES | 8 |
| COMMISSIONS AND BROKERAGE | 8 |
| RENUNCIATION OF ALLOTMENT | 9 |
| VARIATION OF RIGHTS | 9 |
| ALTERATION OF SHARE CAPITAL | 10 |
| SHARE CERTIFICATES AND TITLE TO SHARES | 11 |
| CALLS ON SHARES | 12 |
| FORFEITURE AND LIEN | 13 |
| TRANSFER OF SHARES | 15 |
| UNCERTIFICATED SHARES | 18 |
| TRANSMISSION OF SHARES | 21 |
| UNTRACED SHAREHOLDES | 22 |
| GENERAL MEETINGS | 23 |
| NOTICE OF GENERAL MEETINS | 23 |
| PROCEEDINGS AT GENERAL MEETINGS | 24 |
| VOTING | 27 |
| VOTES OF MEMBERS | 28 |

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

PROXIES AND CORPORATE REPRESENTATIVES                           29
DTC SYSTEM VOTING ARRANGEMENTS                                 32
DIRECTORS                                                       34
APPOINTEMENT AND RETIREMENT OF DIRECTORS                        36
ALTERNATE DIRECTORS                                             38
PROCEEDINGS OF DIRECTORS                                        40
DIRECTOR'S INTERESTS AND CONFLICTS OF INTEREST                  41
DIRECTORS' FEES                                                 43
DIRECTORS' EXPENSES                                             43
BORROWING POWERS                                                43
GENERAL POWERS OF DIRECTORS                                     44
ASSOCIATE DIRECTORS                                             46
SECRETARY                                                       46
THE SEAL                                                        46
AUTHENTICATION OF DOCUMENTS                                     47
DIVIDENDS                                                       47
RESERVES                                                        50
CAPITALISATION OF RESERVES                                      51
RECORD DATES                                                    53
REGISTER                                                        53
MINUTES AND BOOKS                                               54
ACCOUNTS                                                        54
AUDITORS                                                        55
COMMUNICATIONS                                                  55
WINDING UP                                                      61
INDEMNITY AND INSURANCE                                         61

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

COMPANIES (JERSEY) LAW 1991

A PUBLIC COMPANY LIMITED BY SHARES

# ARTICLES OF ASSOCIATION

of

# VELTI PLC

(Adopted by a special resolution passed on 26 July 2011)

## PRELIMINARY

1.       This document comprises the articles of association of the Company. The regulations constituting the Standard Table in the Companies (Standard Table) (Jersey) Order 1992 shall not apply to the Company.

## INTERPRETATION

2.       In these Articles, unless the context requires otherwise:

**"address"** includes a number or address used for the purposes of sending or receiving documents or information by electronic means;

**"these Articles"** means these articles of association as altered from time to time;

**"Auditors"** means the auditors for the time being of the Company or, in the case of joint auditors, any one of them;

**"bankrupt"** has the meaning given to it in the Interpretation (Jersey) Law 1954;

**"Board"** means the board of directors for the time being of the Company or the Directors present or deemed to be present at a duly convened meeting of the Directors at which a quorum is present;

**"certificated share"** means a share which is not an uncertificated share and references in these Articles to a share being held in   **"certificated form"** shall be construed accordingly;

1

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**"clear days"** means, in relation to the giving of a notice, the period excluding the day on which a notice is given or deemed to be given and the day for which it is given or on which it is to take effect;

**"Companies Laws"** means the Law, the Uncertificated Securities Order, the Electronic Communications Law and all statutes adopted in Jersey (including any orders, regulations or other subordinate legislation made under such statutes) from time to time in force concerning companies in so far as they apply to the Company;

**"communication"** includes an electronic communication;

**"Director"** means a director for the time being of the Company;

**"dividend"** includes a bonus issue;

**"DTC"** means the Depositary Trust Company or any successor corporation;

**"DTC Depositary"** means Cede & Co. and/or any other custodian, depositary or nominee of DTC which holds Ordinary Shares under arrangements that facilitate the holding and trading of beneficial interests in such Ordinary Shares in the DTC System;

**"DTC Proxy"** means, in relation to any Ordinary Shares held by the DTC Depositary, any person who is, for the purposes of any general meeting or resolution, appointed a proxy (whether by way of instrument of proxy, power of attorney, mandate or otherwise) by:

(a)     the DTC Depositary; or

(b)     a proxy, attorney or other agent appointed by any other person whose authority is ultimately derived (whether directly or indirectly) from the DTC Depositary;

**"DTC System"** means the electronic system operated by DTC by which title to securities or interests in securities may be evidenced and transferred in dematerialised form;

**"electronic communication"** has the meaning given in the Electronic Communications Law;

**"Electronic Communications Law**" means the Electronic Communications (Jersey) Law 2000;

**"electronic signature"** has the meaning given in article 1(1) of the Electronic Communications Law;

2

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**"Group"** means the Company and its subsidiaries from time to time;

**"holder"** means, in relation to any shares, the member whose name is entered in the Register as the holder of those shares;

**"Jersey"** means the island of Jersey;

**"Law"** means the Companies (Jersey) Law 1991;

**"member"** means a member of the Company;

**"Memorandum of Association"** means the document of the same name of the Company, as altered from time to time;

**"month"** means calendar month;

**"NASDAQ"** means the NASDAQ Global Market;

**"NASDAQ Rules"** means the rules of NASDAQ;

**"Office"** means the registered office for the time being of the Company;

**"Operator"** has the meaning given to "**authorised operator**" in the Uncertificated Securities Order;

**"Operator-instruction"** means a properly authenticated de-materialised instruction attributable to the Operator;

**"ordinary resolution"** means a resolution of the Company in general meeting passed by a simple majority of the votes cast at that meeting;

**"Ordinary Shares"** means ordinary shares of £0.05 each in the capital of the Company;

**"paid up"** means paid up or credited as paid up;

**"Register"** means the register of members of the Company (and, unless the context requires otherwise, includes any overseas branch register) to be kept and maintained in accordance with these Articles and the Companies Laws;

**"relevant system"** means a computer based system and its related facilities and procedures that is provided by an Operator and by means of which title to units of a security can be evidenced and transferred, in accordance with the Uncertificated Securities Order, without a written instrument;

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**"Seal"** means any common or official seal that the Company has and is permitted to have under the Companies Laws;

**"special resolution"** means a special resolution as defined in Article 90 of the Law;

**"Transfer Office"** means:

(a)     in relation to the Register, the location in Jersey where the Register is kept and maintained; and

(b)     where the Company keeps an overseas branch register in respect of any country, territory or place outside of Jersey (not being in the United Kingdom or the Republic of Ireland), the location in that country, territory or place where that overseas branch register is kept and maintained;

**"Uncertificated Securities Order"** means the Companies (Uncertificated Securities) (Jersey) Order 1999 and any provisions of or under the Companies Laws which supplement or replace such order;

**"uncertificated share"** means a share title to which is recorded on the Register as being held in uncertificated form and references in these Articles to a share being held in **"uncertificated form"** shall be construed accordingly;

**"United Kingdom"** or **"UK"** means the United Kingdom of Great Britain and Northern Ireland;

**"USA"** means the United States of America and its territories and possessions, including the District of Columbia; and

**"year"** means calendar year.

3.     In these Articles, unless the context requires otherwise:

(a)     the expression **"debenture"** shall include debenture stock and the expression **"debenture holder"** shall include debenture stockholder;

(b)     the expression **"Secretary"** means the secretary for the time being of the Company and includes any person appointed by the Board to perform any of the duties of the secretary including a joint, assistant or deputy secretary;

(c)     the expression **"officer"** shall include, in relation to a body corporate, a Director, manager and the Secretary but shall not include the Auditors;

4

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(d)    references to **"writing"** mean the representation or reproduction of words, symbols or other information in a legible form by any method or combination of methods, whether sent or supplied in electronic form or otherwise, and **"written"** shall be construed accordingly;

(e)    references to a document or information being **"sent"**, **"supplied"** or **"given"** to or by a person mean such document or information, or a copy of such document or information, being sent, supplied, given, delivered, issued or made available to or by, or served on or by, or deposited with or by that person by any method authorised by these Articles, and **"sending", "supplying"** and **"giving"** shall be construed accordingly;

(f)    references to a document being "**signed**" or to "**signature**" include references to its being signed under hand or under Seal or by any other method and, in the case of an electronic communication, such references are to its being authenticated by electronic means as specified by the Board in accordance with these Articles or (where the Board has made no specification) to an electronic signature;

(g)    references to a meeting shall not be taken as requiring more than one person to be present if any quorum requirement can be satisfied by one person;

(h)    words importing the singular number include the plural and vice versa;

(i)    words importing one gender include all genders and words importing persons include a body corporate;

(j)    any word or expression defined in the Companies Laws on the adoption of these Articles shall, if not inconsistent with the subject or context and unless otherwise expressly defined in these Articles, bear the same meaning in these Articles except that **"company"** shall mean any body corporate;

(k)    a reference to any statute or statutory instrument or any provision of a statute or statutory instrument includes any modification or re enactment of that statute, statutory instrument or provision for the time being in force;

(l)    any reference to:

    (i)    rights attaching to any share;

    (ii)    members having a right to attend and vote at general meetings of the Company;

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(iii)      dividends being paid, or any other distribution of the Company's assets being made, to members; or

(iv)      interests in a certain proportion or percentage of the issued share capital, or any class of share capital,

shall, unless otherwise expressly provided by the Companies Laws, be construed as though any treasury shares held by the Company had to be cancelled;

(m)      headings are inserted for convenience only and do not affect the construction of these Articles; and

(n)      a special resolution shall be effective for any purpose for which an ordinary resolution is expressed to be required under any provision of these Articles.

4.      For the purposes of these Articles, unless the context requires otherwise:

(a)      a document or information is sent or supplied in **"electronic form"** if it is sent or supplied:

(i)      by electronic means (for example, by e-mail or fax); or

(ii)      by any other means while in an electronic form (for example, sending a disk by post),

and references to **"electronic copy"** have a corresponding meaning;

(b)      a document or information is sent or supplied by electronic means if it is:

(i)      sent initially and received at its destination by means of electronic equipment for the processing (which expression includes digital compression) or storage of data; and

(ii)      entirely transmitted, conveyed and received by wire, by radio, by optical means or by other electromagnetic means,

and references to **"electronic means"** have a corresponding meaning;

(c)      a document or information is sent or supplied in **"hard copy form"** if it is sent or supplied in a paper copy or similar form capable of being read, and references to **"hard copy"** have a corresponding meaning;

6

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(d)     a document or information authorised or required by these Articles to be sent or supplied in electronic form must be sent or supplied in a form, and by a means, that the sender or supplier reasonably considers will enable the recipient to read it and to retain a copy of it; and

(e)     a document or information can be read only if:

     (i)     it can be read with the naked eye; or

     (ii)     to the extent that it consists of images (for example photographs, pictures, maps, plans or drawings), it can be seen with the naked eye.

## SHARE CAPITAL

5.     The authorised share capital of the Company is as specified in the Memorandum of Association of the Company.

## RIGHTS ATTACHED TO SHARES

6.     Without prejudice to any rights for the time being attached to any existing shares or class of shares and subject to the provisions of the Company Laws, any share may be issued with such preferred, deferred or other special rights, or such restrictions, whether in regard to dividend, return of capital, transfer, voting, conversion or otherwise, as the Company may from time to time by special resolution determine or, if no such resolution has been passed or so far as the resolution does not make specific provision, as the Board may determine.

## UNISSUED SHARES

7.     Subject to the provisions of the Companies Laws and these Articles, all unissued shares of the Company (whether forming part of the existing or any increased capital) shall be at the disposal of the Board which may allot (with or without conferring a right of renunciation), grant options over, offer or otherwise deal with or dispose of such shares to such persons, at such times and generally on such terms and conditions as the Board may determine.  No share shall be issued at a discount.

8.     The Board may allot and issue shares in the Company to any person and without any obligation to offer such shares to the members (whether in proportion to the existing shares held by them or otherwise).

9.     The Company may issue fractions of shares in accordance with, and subject to the provisions of, the Law, provided that:

7

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(a)    a fraction of a share shall be taken into account in determining the entitlement of a member as regards dividends or on a winding up; and

(b)    a fraction of a share shall not entitle a member to a vote in respect thereof.

## REDEMPTION AND PURCHASE OF SHARES

10.    Subject to the provisions of the Companies Laws:

(a)    and to any rights attached to any existing shares, the Company may issue, or with the sanction of a special resolution convert any existing non-redeemable share (whether issued or not) into, a share which is to be redeemed, or is liable to be redeemed at the option of the Company or the holder;

(b)    the Company may purchase, or may enter into a contract under which it will or may purchase, any of its own shares of any class (including any redeemable shares) and in relation thereto, neither the Company nor the Board shall be required to select the shares to be purchased rateably or in any other particular manner as between the holders of shares of the same class or as between them and the holders of shares of any other class or in accordance with the rights as to dividends or capital conferred by any class of shares; and

(c)    the Company may hold as treasury shares any shares purchased or redeemed by it.

## COMMISSIONS AND BROKERAGE

11.    The Company may exercise all powers of paying commissions and brokerage conferred or permitted by the Companies Laws.  Subject to the provisions of the Companies Laws, any such commission or brokerage may be satisfied by the payment of cash, the allotment of fully or partly paid shares, the grant of an option to call for an allotment of shares or any combination of such methods.

## TRUSTS NOT RECOGNISED

12.    Except as required by law, no person shall be recognised by the Company as holding any share upon any trust, and the Company shall not be bound by or compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any share, or any interest in any fractional part of a share, or (save as otherwise provided by these Articles or by law) any other right in respect of any share, except an absolute right to the entirety thereof in the registered holder.

## RENUNCIATION OF ALLOTMENT

8

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

13.     The Board may at any time after the allotment of any share but before any person has been entered in the Register as the holder:

(a)     recognise a renunciation thereof by the allottee in favour of some other person and accord to any allottee of a share a right to effect such renunciation; and/or

(b)     allow the rights represented thereby to be one or more participating securities,

in each case upon and subject to such terms and conditions as the Board may think fit to impose.

**VARIATION OF RIGHTS**

14.     Whenever the share capital of the Company is divided into different classes of shares, any of the special rights attached to any class may, subject to the provisions of the Companies Laws, be varied or abrogated (either whilst the Company is a going concern or during or in contemplation of a winding up) either:

(a)     with the consent in writing of the holders of not less than two-thirds of the issued shares of the class (excluding any shares of that class held as treasury shares), which consent shall be in hard copy form or in electronic form sent to such address (if any) for the time being specified by or on behalf of the Company for that purpose or in default of any such specification to the Office; or

(b)     with the sanction of a special resolution passed at a separate general meeting of the holders of the shares of the class,

but not otherwise.

15.     To every such separate general meeting all the provisions of these Articles relating to general meetings of the Company and to the proceedings thereat shall apply mutatis mutandis, except that:

(a)     any holder of shares of the class present in person or by proxy may demand a poll; and

(b)     any holder of shares of the class shall, on a poll, have one vote in respect of every share of the class held by him.

16.     Article 14 shall apply to the variation or abrogation of the special rights attached to some only of the shares of such class as if the shares concerned and the remaining shares of such class formed separate classes, or to any scheme for the distribution (though not in accordance with legal rights) of assets in money or in kind in or before liquidation, or to

9

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

any contract for the sale or disposal of the whole or any part of the Company's property or business determining the way in which as between the several classes of shareholders the purchase considerations shall be distributed, and generally to any alteration, contract, compromise or arrangement which the persons voting thereon could, if sui juris and holding all the shares of the class, consent to or enter into, and such resolution shall be binding upon all holders of shares of the class.

17.   Save as otherwise provided in these Articles, the special rights attached to any class of shares having preferential rights shall not unless otherwise expressly provided by the terms of issue thereof be deemed to be varied or abrogated by the creation or issue of further shares ranking as regards participation in the profits or assets of the Company or voting in some or all respects pari passu therewith but in no respect in priority thereto, or by any reduction of the capital paid up thereon, or by any purchase or redemption by the Company of its own shares.

## ALTERATION OF SHARE CAPITAL

18.   The Company may from time to time by special resolution alter its Memorandum of Association to increase its capital by such sum to be divided into shares of such amounts as the resolution shall prescribe. All new shares shall, save in so far as may be otherwise provided by the terms of issue thereof, be subject to the provisions of these Articles with reference to allotment, payment of calls, lien, transfer, transmission, forfeiture and otherwise.

19.   The Company may from time to time by special resolution alter its Memorandum of Association to:

(a)     consolidate, or consolidate and divide, all or any of its share capital into shares of a larger amount than its existing shares;

(b)     cancel any shares which, at the date of the passing of the resolution, have not been taken, or agreed to be taken, by any person and diminish the amount of its capital by the amount of the shares so cancelled; and

(c)     sub-divide its shares, or any of them, into shares of smaller amount than is fixed by the Memorandum of Association of the Company provided that in the sub-division the proportion between the amount paid and the amount, if any, unpaid on each reduced share shall be the same as it was in the case of the share from which the reduced share is derived, and so that the resolution whereby any share is sub-divided may determine that, as between the holders of the shares resulting from such sub-division, one or more of the shares may, as compared with the others, have any such preferred, deferred or other special rights, or be subject to

10

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

any such restrictions, as the Company has power to attach to unissued or new shares; or

(d)     alter its share capital in any other way permitted by the Companies Laws.

20.     Whenever as a result of a consolidation, consolidation and sub-division or sub-division of shares any members would become entitled to fractions of a share, the Board may deal with the fractions as it thinks fit.  In particular the Board may sell the shares representing the fractions for the best price reasonably obtainable to any person (including, subject to the provisions of the Companies Laws, the Company) and distribute the net proceeds of sale in due proportion among those members and the Board may authorise some person to transfer or deliver the shares to, or in accordance with the directions of, the purchaser.  For the purposes of effecting the sale, the Board may arrange for the shares representing the fractions to be entered in the Register as certificated shares.  The person to whom any shares are transferred or delivered shall not be bound to see to the application of the purchase money nor shall his title to the shares be affected by any irregularity in, or invalidity of, the proceedings relating to the sale.  Subject to the Companies Laws, when the Board consolidates or sub-divides shares, it can treat certificated and uncertificated shares which a member holds as separate shareholdings.

21.     Subject to the provisions of the Companies Laws, the Company may by special resolution reduce its share capital or any capital redemption reserve or share premium account in any way.

22.     Subject to the provisions of the Companies Laws, the Company may make a distribution to its members from its share premium account or any other account, except its nominal capital account or capital redemption reserve.

## SHARE CERTIFICATES AND TITLE TO SHARES

23.     Every person whose name is entered as a member in the Register in respect of any shares of any class in certificated form (except a person in respect of whom the Company is not by law required to issue a share certificate) shall be entitled without payment to a certificate therefor, upon the issue thereof within two months after allotment (or such shorter period as the terms of issue shall provide), and upon the transfer thereof within two months after lodgement of transfer (not being a transfer which the Company is for any reason entitled to refuse to register and does not register) and, in the case of conversion thereof from uncertificated to certificated form, within two months of the date of conversion. The Company shall not be bound to register more than four persons as the joint holders of a share and in the case of a share held jointly by several persons the Company shall not be bound to issue more than one certificate therefor and delivery of a certificate to any one of such persons shall be sufficient delivery to all.

11

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

24.     Every share certificate shall be signed under a Seal or signed by two Directors or by one Director and the Secretary and shall specify the number and class of the shares to which it relates and the amount or respective amounts paid up on the shares and (if required by the Companies Laws) the distinguishing numbers of such shares.  The Board may by resolution decide, either generally or in any particular case or cases, that any signatures on any share certificates need not be autographic but may be applied to the certificates by some mechanical or other means or may be printed on them.

25.     Where a member transfers part only of the certificated shares comprised in a share certificate the old certificate shall be cancelled and a new certificate for the balance of such shares (to the extent that such balance is to be held in certificated form) issued in lieu without charge.

26.     Any two or more certificates representing certificated shares of any one class held by any member may at his request be cancelled and a single new certificate for such shares issued in lieu without charge.

27.     If any member shall surrender for cancellation a share certificate representing certificated shares held by him and request the Company to issue in lieu two or more share certificates representing such shares in such proportions as may be specified, the Board may, if it thinks fit, comply with such request.

28.     If a share certificate shall be damaged or defaced or alleged to have been lost, stolen or destroyed a new certificate representing the same certificated shares may be issued to the holder upon request subject to delivery up of the old certificate or (if alleged to have been lost, stolen or destroyed) compliance with such conditions as to evidence and indemnity and (in either case) the payment of any exceptional out-of-pocket expenses of the Company in connection with the request as the Board may think fit.  Subject as aforesaid no charge will be made for a new share certificate issued to replace one that has been damaged, lost or destroyed.

29.     In the case of certificated shares held jointly by several persons any such request may be made by any one of the joint holders except where the certificate is alleged to be lost, stolen or destroyed.

## CALLS ON SHARES

30.     The Board may from time to time make calls upon the members in respect of any moneys unpaid on their shares (whether on account of the nominal value of the shares or, when permitted, by way of premium) and not by the terms of issue thereof made payable at fixed times.   Each member shall (subject to receiving at least 14 clear days' notice

12

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

specifying the time or times and place of payment) pay to or as directed by the Company at the time or times and place so specified the amount called on his shares.

31.    A call shall be deemed to have been made at the time when the resolution of the Board authorising the call was passed and may be made payable by instalments.  A call may be wholly or in part revoked or postponed as the Board may determine.

32.    The joint holders of a share shall be jointly and severally liable to pay all calls in respect thereof.  Subject to the Companies Laws, a person upon whom a call is made shall remain liable for calls made upon him, notwithstanding the subsequent transfer of the shares on which the call was made.

33.    If a sum called in respect of a share is not paid before or on the day appointed for payment thereof, the person from whom the sum is due shall pay interest on the sum from the day appointed for payment thereof to the time of actual payment at such rate as the Board in its absolute discretion may determine, together with all expenses that may have been incurred by the Company by reason of such non-payment, but the Board shall be at liberty in any case or cases to waive payment of such interest and expenses wholly or in part.

34.    Any sum (whether on account of the nominal value of the share or by way of premium) which by the terms of issue of a share becomes payable upon allotment or at a fixed date shall for all the purposes of these Articles be deemed to be a call duly made and payable on the date on which by the terms of issue the same becomes payable.  In the case of non-payment all the relevant provisions of these Articles as to payment of interest and expenses, forfeiture or otherwise shall apply as if such sum had become payable by virtue of a call duly made and notified.

35.    The Board may on the issue of shares differentiate between the holders as to the amount of calls to be paid and the times of payment.

36.    The Board may if it thinks fit receive from any member willing to advance the same all or any part of the moneys (whether on account of the nominal value of the shares or by way of premium) uncalled and unpaid upon the shares held by him and such payment in advance of call shall extinguish pro tanto the liability upon the shares in respect of which it is made and upon the money so received (until and to the extent that the same would but for such advance become payable) the Company may pay interest at such rate as may be agreed between the member paying such sum and the Board but any such advance payment shall not entitle the holder of the share to participate in respect of such amount in any dividend.

### FORFEITURE AND LIEN

13

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

37.     If a member fails to pay in full any call or instalment of a call on the day appointed for payment thereof, the Board may at any time thereafter serve a notice on him requiring payment of so much of the call or instalment as is unpaid together with any interest which may have accrued thereon and any expenses incurred by the Company by reason of such non-payment.

38.     The notice shall name a further day (not being less than 14 clear days from the date of service of the notice) on or before which and the place where the payment required by the notice is to be made, and shall state that in the event of non-payment in accordance therewith the shares on which the call was made will be liable to be forfeited.

39.     If the requirements of any such notice as aforesaid are not complied with, any share in respect of which such notice has been given may at any time thereafter, before payment of all calls and interest and expenses due in respect thereof has been made, be forfeited by a resolution of the Board to that effect. Such forfeiture shall include all dividends declared and other moneys payable in respect of the forfeited share and not actually paid before forfeiture.  The Board may accept a surrender of any share liable to be forfeited.

40.     When any share has been forfeited, notice of the forfeiture shall be served upon the person who was before forfeiture the holder of the share but no forfeiture shall be invalidated by omission or neglect to give such notice.

41.     A share so forfeited or surrendered shall be deemed to be the property of the Company and may be sold, re-allotted or otherwise disposed of either to the person who was before such forfeiture or surrender the holder thereof or entitled thereto or to any other person upon such terms and in such manner as the Board thinks fit, and at any time before a sale, re-allotment or disposal the forfeiture or surrender may be cancelled on such terms as the Board thinks fit.  The Board may, if necessary, authorise some person to transfer a forfeited or surrendered share to any such other person as aforesaid.

42.     A person whose shares have been forfeited or surrendered shall cease to be a member in respect of the shares (and shall, in the case of shares held in certificated form, surrender to the Company for cancellation the certificate for such shares) but shall notwithstanding the forfeiture or surrender remain liable to pay to the Company all moneys which at the date of forfeiture or surrender were presently payable by him to the Company in respect of the shares with interest thereon at such rate as the Board may in its absolute discretion determine from the date of forfeiture or surrender until payment, but the Board may waive payment of such interest either wholly or in part.  The Board may enforce payment, without any allowance for the value of the shares at the time of forfeiture or surrender.

43.     The Company shall have a first and paramount lien on every share (not being a fully paid share) for all moneys payable to the Company (whether presently or not) in respect of

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

such share. The Company's lien on a share shall extend to all dividends or other moneys payable thereon or in respect thereof.  The Board may waive any lien which has arisen and may resolve that any share shall for some limited period be exempt wholly or partially from the provisions of this Article.

44.   The Company may sell in such manner as the Board thinks fit any share on which the Company has a lien, but no sale shall be made unless the period for the payment or discharge of some part at least of the debt or liability in respect of which the lien exists shall have actually arrived nor until the expiration of 14 clear days after a notice stating and demanding payment or discharge thereof and giving notice of intention to sell in default shall have been given to the holder for the time being of the share or the person entitled thereto by reason of his death or bankruptcy.

45.   The net proceeds of such sale after payment of the cost of such sale shall be applied in or towards payment or satisfaction of the debts or liabilities in respect whereof the lien exists so far as the same are presently payable and any residue shall upon surrender (in the case of shares held in certificated form) to the Company for cancellation of the certificate for the shares sold and (in any case) subject to a like lien for debts or liabilities the period for the payment or discharge of which has not actually arrived as existed upon the shares prior to the sale be paid to the person entitled to the shares at the time of the sale.  For giving effect to any such sale the Board may authorise some person to sign an instrument of transfer to transfer the shares sold to the purchaser.

46.   A statutory declaration or affidavit that the declarant is a Director or the Secretary and that a share has been duly forfeited or surrendered or sold to satisfy a lien of the Company on a date stated in the declaration shall be conclusive evidence of the facts therein stated as against all persons claiming to be entitled to the share.  Such declaration and the receipt of the Company for the consideration (if any) given for the share on the sale, re-allotment or disposal thereof together with the share certificate (in the case of shares in certificated form) delivered to a purchaser or allottee thereof shall (subject to the execution of an instrument of transfer if the same be required) constitute a good title to the share and the person to whom the share is sold, re-allotted or disposed of shall be registered as the holder of the share and shall not be bound to see to the application of the purchase money (if any) nor shall his title to the share be affected by any irregularity or invalidity in the proceedings in reference to the forfeiture, surrender, sale, re-allotment or disposal of the share.

**TRANSFER OF SHARES**

47.   All transfers of shares which are in uncertificated form may be effected by means of a relevant system in accordance with the Companies Laws and the rules of the relevant system.

15

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

48.    A transfer of shares in certificated form may be effected by an instrument of transfer in any usual or common form or in any other form acceptable to the Board and may be under hand only.  The instrument of transfer shall be signed by or on behalf of the transferor and (except in the case of fully paid shares) by or on behalf of the transferee.  The transferor shall remain the holder of the shares concerned until the name of the transferee is entered in the Register in respect thereof.

49.    The registration of transfers may be suspended at such times and for such periods (not exceeding 30 days in any year) as the Board may from time to time determine either generally or in respect of any class of shares, save that the Board may not suspend the registration of transfers of any shares which are participating securities without the consent of the Operator.

50.    The Board may, in its absolute discretion, refuse to register any transfer of an uncertificated share where permitted by these Articles and the Companies Laws.

51.    The Board may, in its absolute discretion, refuse to register any instrument of transfer of a certificated share:

(a)    which is not fully paid up; and

(b)    on which the Company has a lien.

52.    The Board may decline to recognise any instrument of transfer relating to certificated shares unless the instrument:

(a)    has been left at the Office, the Transfer Office or at such other place as the Board may decide, for registration;

(b)    is accompanied by the certificate for the shares to be transferred and such other evidence (if any) as the Board may reasonably require to prove the title of the intending transferor or his right to transfer the shares; and

(c)    is in respect of only one class of shares.

53.    Unless otherwise agreed by the Board in any particular case, the maximum number of persons who may be entered on the Register as joint holders of a share is four.

54.    For all purposes of these Articles relating to the registration of transfers of shares, the renunciation of the allotment of any shares by the allottee in favour of some other person shall be deemed to be a transfer and the Board shall have the same powers of refusing to give effect to such a renunciation as if it were a transfer.

16

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

55.    If the Board refuses to register a transfer then, within two months after the date on which:

(a)    the transfer was lodged with the Company (in the case of shares held in certificated form); or

(b)    the Operator-instruction was received by the Company (in the case of shares held in uncertificated form);

the Board shall send to the transferee notice of the refusal together with (in the case of shares held in certificated form) the instrument of transfer.

56.    Subject to Article 57, all instruments of transfer which are registered may be retained by the Company; and subject to the Companies Laws, the Company shall be entitled to destroy:

(a)    all instruments of transfer which have been registered at any time after the expiration of ten years from the date of registration thereof;

(b)    all dividend mandates and notifications of change of address at any time after the expiration of two years from the date of recording thereof;

(c)    all share certificates which have been cancelled at any time after the expiration of one year from the date of cancellation thereof;

(d)    all appointments of proxy which have been used for the purposes of a poll, at any time after the expiration of one year from the date of such use, and all appointments of proxy which have not been used for the purposes of a poll, at any time after one month from the end of the meeting to which the appointments of proxy relates and at which no poll was demanded; and

(e)    any other document on the basis of which any entry in the Register is made at any time after the expiry of ten years from the date an entry in the Register was first made in respect of it,

and it shall conclusively be presumed in favour of the Company that every entry in the Register purporting to have been made on the basis of an instrument of transfer or other document so destroyed was duly and properly made and every instrument of transfer so destroyed was a valid and effective instrument duly and properly registered and every share certificate so destroyed was a valid and effective certificate duly and properly cancelled and every other document hereinbefore mentioned so destroyed was a valid and effective document in accordance with the recorded particulars thereof in the books or records of the Company.

17

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

57.     Article 56 applies only to the destruction of a document in good faith and without notice of any claim (regardless of the parties thereto) to which the document might be relevant and nothing in Article 56 shall be construed as imposing upon the Company any liability in respect of the destruction of any such document earlier than as aforesaid or in any other circumstances which would not attach to the Company in the absence of Article 56.

58.     References in Articles 56 and 57 to the destruction of any document include references to the disposal thereof in any manner.

59.     No fee will be charged by the Company in respect of the registration of any instrument of transfer, probate, letters of administration, certificate of marriage or death, stop notice, power of attorney or other document relating to or affecting the title to any shares or otherwise for making any entry in the Register affecting the title to any shares.

## UNCERTIFICATED SHARES

60.     Subject to the Companies Laws, the Board may resolve that a class of shares is to become a participating security and may at any time determine that a class of shares shall cease to be a participating security.

61.     No provision of these Articles shall apply to shares of any class which are in uncertificated form to the extent that such Article is inconsistent with:

(a)     the holding of shares of that class in uncertificated form;

(b)     the transfer of title to shares of that class by means of a relevant system;

(c)     any provision of the Uncertificated Securities Order; or

(d)     the exercise of any powers or functions of the Company or the effecting by the Company of any actions by means of a relevant system.

62.     Any share of a class which is a participating security may be changed from an uncertificated share to a certificated share and from a certificated share to an uncertificated share in accordance with the Uncertificated Securities Order and the rules of any relevant system.

63.     For the purpose of effecting any action by the Company, the Board may determine that shares held by a person in uncertificated form shall be treated as a separate holding from shares held by that person in certificated form but shares of a class held by a person in uncertificated form shall not be treated as a separate class from shares of that class held by that person in certificated form.

18

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

64.     Unless the Board otherwise determines or the Uncertificated Securities Order or the rules of the relevant system concerned otherwise require, any shares issued or created out of or in respect of any uncertificated shares shall be uncertificated shares and any shares issued or created out of or in respect of any certificated shares shall be certificated shares.

65.     In relation to any share in uncertificated form:

(a)     the Company may utilise the relevant system to the fullest extent available from time to time in the exercise of any of its powers or functions under the Companies Laws or these Articles or otherwise in effecting any actions and the Company may from time to time determine the manner in which such powers, functions and actions shall be so exercised or effected;

(b)     the Company may, by notice to the holder of that share, require the holder to change the form of that share to certificated form within such period as may be specified in the notice; and

(c)     the Company shall not issue a share certificate.

The Company may by notice to the holder of any share in certificated form, direct that the form of such share may not be changed to uncertificated form for a period specified in such notice.

66.     Subject to the Companies Laws, the Board may lay down regulations not included in these Articles which (in addition to, or in substitution for, any provisions in these Articles):

(a)     apply to the issue, holding or transfer of shares in uncertificated form;

(b)     set out (where appropriate) the procedures for conversion and/or redemption of shares in uncertificated form; and/or

(c)     the Board considers necessary or appropriate to ensure that these Articles are consistent with the Uncertificated Securities Order and/or the Operator's rules and practices.

67.     Any such regulations made by the Board pursuant to Article 66 will apply instead of any relevant provisions in these Articles which relate to the transfer, conversion and redemption of shares in uncertificated form or which are not consistent with the Uncertificated Securities Order, in all cases to the extent (if any) stated in such regulations.  If the Board make any such regulations, Article 68 will (for the avoidance of doubt) continue to apply, when read in conjunction with those regulations.

19

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

68.     Any instruction given by means of a relevant system shall be a dematerialised instruction given in accordance with the Uncertificated Securities Order, the facilities and requirement of a relevant system and the Operator's rules and practices.

69.     Where the Company is entitled under the Companies Laws and the rules, procedures or practices of any relevant system or under these Articles to dispose of, forfeit, accept the surrender of, enforce a lien over, re-allot or sell, transfer or otherwise procure the sale of any shares which are held in uncertificated form, the Board shall have the power (subject to the Companies Laws and the rules, procedures or practices of the relevant system) to take such steps as the Board considers appropriate, by instruction by means of a relevant system or otherwise, to effect such disposal, forfeiture, surrender, enforcement, re-allotment sale or transfer and such powers shall (subject as aforesaid) include the right to:

(a)     request or require the deletion of any computer based entries in the relevant system relating to the holding of such shares in uncertificated form; and/or

(b)     alter such computer based entries so as to divest the registered holder of such shares of the power to transfer such shares to a person other than the transferee, purchaser or his nominee identified by the Company for this purpose; and/or

(c)     require any holder of any uncertificated shares which are the subject of any exercise by the Company of any such entitlement, by notice to the holder concerned, to convert his holding of such uncertificated shares into certificated form within such period as may be specified in the notice prior to completion of any disposal, sale or transfer of such shares or direct the holder to take such steps as may be necessary to sell or transfer such shares; and/or

(d)     otherwise rectify or change the Register in respect of any such shares in such manner as the Board considers appropriate (including, without limitation, by entering the name of the transferee into the Register as the next holder of such shares); and/or

(e)     appoint any person to take such steps in the name of the holder of such shares as may be required to effect the conversion and/or transfer of such shares and such steps shall be effective as if they had been taken by the registered holder of the uncertificated shares concerned.

70.     The Company shall not issue to any person a certificate in respect of an uncertificated share.

## TRANSMISSION OF SHARES

20

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

71.   In the case of the death of a shareholder, the survivors or survivor where the deceased was a joint holder, and the executors or administrators of the deceased where he was a sole or only surviving holder, shall be the only persons recognised by the Company as having any title to his interest in the shares, but nothing in this Article shall release the estate of a deceased holder (whether sole or joint) from any liability in respect of any share held by him.

72.   Any guardian of an infant member, any curator bonis or guardian or other legal representative of a member under legal disability and any person becoming entitled to a share in consequence of the death or bankruptcy of a member or otherwise by operation of law may (subject as hereinafter provided) upon supplying the Company with such evidence as the Board may reasonably require to show his title to the share either require to be registered himself as a holder of the share by giving to the Company notice to that effect or transfer such share to some other person (in any case in the event of the share being in uncertificated form subject always to the Companies Laws and to the rules of any relevant system). All the limitations, restrictions and provisions of these Articles relating to the right to transfer and the registration of transfers of shares shall be applicable to any such notice or transfer as aforesaid as if the event giving rise thereto had not occurred and the notice or transfer were a transfer executed by such member.

73.   Save as otherwise provided by or in accordance with these Articles, a person becoming entitled to a share in consequence of any event giving rise to transmission by operation of law shall upon supplying the Company with such evidence as the Board may reasonably require to show his title to the share be entitled to the same dividends and other advantages as those to which he would be entitled if he were the registered holder of the share, but he shall not be entitled in respect thereof to exercise any right conferred by membership in relation to meetings of the Company until he shall have been registered as a member in respect of the share.  Provided always that the Board may at any time give notice requiring such person to elect either to be registered himself or to transfer the share, and if within 60 days the notice is not complied with, the Board may in its absolute discretion withhold payment of dividends and other moneys payable in respect of such share until such time as the notice is complied with. Where two or more persons are jointly entitled by transmission to a share they shall for the purposes of these Articles be treated as if they were joint holders of such share registered in the order in which their names have been supplied to the Company or such other order as the person requiring to be registered may by notice to the Company have prescribed at that time.

### UNTRACED SHAREHOLDERS

74.   The Company shall be entitled to sell at the best price reasonably obtainable any share of a member or any share to which a person is entitled by transmission if and provided that:

21

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

(a)     during a period of 12 years at least three cash dividends have become payable in respect of the share to be sold and have been sent by the Company in accordance with these Articles;

(b)     during that period of 12 years no cash dividend payable in respect of the share has been claimed, no cheque, warrant, order or other payment for a dividend has been cashed, no dividend sent by means of a funds transfer system has been paid and no communication has been received by the Company from the member or the person entitled by transmission to the share;

(c)     the Company has, at the expiration of the said period of 12 years by advertisement in at least one newspaper with a national circulation in each of the United Kingdom and the USA and in a newspaper circulating in the area in which the address on the Register or otherwise the last known postal address given by the member or the person entitled by transmission is located, given notice of its intention to sell such share; and

(d)     the Company has not during the further period of three months after the date of publication of the advertisements (or the later publication date if the two advertisements are not published on the same day) and prior to the exercise of the power of sale received any communication from the member or person entitled by transmission.

75.     To give effect to any sale under Article 74 the Company may appoint any person to execute as transferor an instrument of transfer of such share and such instrument of transfer shall be as effective as if it had been executed by the registered holder of or person entitled by the transmission to such share. The Company shall account to the member or other person entitled to such share for the net proceeds of such sale by carrying all moneys in respect thereof to a separate account which shall be a debt of the Company and the Company shall be deemed to be a debtor and not a trustee in respect thereof for such member or other person. Moneys carried to such separate account may either be employed in the business of the Company or investments (other than shares of the Company or its holding company if any) as the Board may from time to time think fit. No interest shall be paid in respect of such moneys and the Company shall not be bound to account for any money earned thereon.

## GENERAL MEETINGS

76.     The Board shall convene and the Company shall hold general meetings as annual general meetings in accordance with the requirements of the Companies Laws.

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

77.   The Board may convene any other general meeting whenever it thinks fit and at such time and place as the Board may determine.   On the request of members pursuant to the provisions of the Companies Laws, the Board shall convene a general meeting in accordance with the requirements of the Companies Laws.

78.   Subject to the Companies Laws, a resolution in writing signed by or on behalf of each member who would have been entitled to vote upon it if it had been proposed at a general meeting at which he was present shall be as effectual as if it had been passed at a general meeting properly convened and held and may consist of several instruments in the like form each signed by or on behalf of one or more of the members.

## NOTICE OF GENERAL MEETINGS

79.   An annual general meeting and any other general meeting (whether convened for the passing of an ordinary or a special resolution) shall be called by at least 14 clear days' notice.

80.   Notice of every general meeting shall be given to all members (other than those who under the provisions of these Articles or any restrictions imposed on any shares are not entitled to receive such notices from the Company), to each Director and to the Auditors provided that the Company may determine that only those persons entered on the Register at the close of business on a day determined by the Company, such day being no more than 21 days before the day that notice of the meeting is sent, shall be entitled to receive such notice.

81.   The accidental omission to give notice of a meeting or to send any document or other information relating to the meeting to any person entitled to receive it, or the non-receipt of any such notice, document or information, whether or not the Company is aware of such omission or non-receipt, shall not invalidate the proceedings at any general meeting.

82.   Every notice calling a general meeting shall specify the place of the meeting and the time and date of the meeting, and there shall appear with reasonable prominence in every such notice a statement to the effect that a member is entitled to appoint one or more proxies (who need not be members) to exercise all or any of his rights to attend and to speak and vote at the meeting, provided that each proxy is appointed to exercise the rights attached to a different share or shares held by him.

83.   Every notice calling an annual general meeting shall specify the meeting as such.

84.   Every notice calling a general meeting at which business other than routine business is to be transacted shall specify the general nature of such business and, if any resolution is to be proposed as a special resolution, shall contain a statement to that effect.

23

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

85.   Routine business shall mean and include only business transacted at an annual general meeting of the following classes, that is to say:

(a)   declaring dividends;

(b)   considering and adopting the accounts, the reports of the Directors (if any) and Auditors and other documents required to be annexed to the accounts;

(c)   appointing or re-appointing Directors to fill vacancies arising at the meeting on retirement by rotation or otherwise;

(d)   re-appointing the retiring Auditors unless they were last appointed otherwise than by the Company in general meeting;

(e)   fixing the remuneration of the Auditors or determining the manner in which such remuneration is to be fixed;

(f)   the grant, renewal, extension or variation of any authority for the Company to make purchases of shares in its own capital and to hold any shares so purchased as treasury shares; and

(g)   the renewing or regranting of an existing authority for a scrip dividend alternative.

86.   Any member present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

87.   For the purposes of determining which persons are entitled to attend or vote at a meeting and how many votes such person may cast, the Company may specify a time in the notice of the meeting, not more than 48 hours before the time fixed for the meeting, by which a person must be entered on the Register in order to have the right to attend or vote at the meeting.

## PROCEEDINGS AT GENERAL MEETINGS

88.   No business (other than the appointment of a chairman) shall be transacted at any general meeting unless a quorum is present at the time when the meeting proceeds to business.  The quorum for any general meeting shall be at least two members present in person or by proxy who are entitled to vote and who represent between them not less than one third of the shares in issue as at the date of such general meeting (but so that not less than two individuals shall constitute a quorum).

24

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

89.     The chairman of the Board, failing whom a deputy chairman (to be chosen, if there be more than one, by agreement amongst them or, failing agreement, by lot) shall preside as chairman at a general meeting.  If there be no such chairman or deputy chairman, or if at any meeting none be present within five minutes after the time appointed for holding the meeting or none be willing to act, the Directors present shall choose one of their number or, if no Director be present or if all the Directors present decline to take the chair, the members present shall choose one of their number to be chairman of the meeting.

90.     If within 15 minutes from the time appointed for a general meeting (or such longer period as the chairman of the meeting may think fit to allow) a quorum is not present, the meeting, if convened by or on the request of members pursuant to the provisions of the Companies Laws, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, or to such day and at such time and place as the chairman of the meeting may determine, and if at such adjourned meeting a quorum is not present within 15 minutes from the time appointed for holding the meeting, the meeting shall be dissolved.

91.     The chairman of the meeting may at any time without the consent of the meeting adjourn any general meeting (whether or not it has commenced or a quorum is present) either indefinitely or to another time or place where it appears to him that the members wishing to attend cannot conveniently be accommodated in the place appointed for the meeting or where the conduct of persons present prevents or is likely to prevent the orderly continuation of business or where an adjournment is otherwise necessary so that the business of the meeting may be properly conducted. In addition the chairman of the meeting may with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting) adjourn the meeting from time to time (or indefinitely) and from place to place, but no business shall be transacted at any adjourned meeting except business which might lawfully have been transacted at the meeting from which the adjournment took place. Where a meeting is adjourned indefinitely, the time and place for the adjourned meeting shall be fixed by the Board.

92.     When a meeting is adjourned for 30 days or more or indefinitely, not less than seven clear days' notice of the adjourned meeting (exclusive of the day on which it is served or deemed to be served and of the day for which it is given) shall be given as in the case of the original meeting, but it shall not be necessary to specify in such notice the nature of the business to be transacted at the adjourned meeting.  Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

93.     In the case of any general meeting the Board may, notwithstanding the specification in the notice of the place of the general meeting (the **"principal place"**) at which the chairman of the meeting shall preside, make arrangements for simultaneous attendance and

25

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

participation at other places by members and proxies entitled to attend the general meeting but excluded from the principal place under the provisions of this Article. Such arrangements for simultaneous attendance at the meeting may include arrangements regarding the level of attendance at places other than the principal place provided that they shall operate so that any member and proxy excluded from attendance at the principal place is entitled to attend at one of the other places.  For the purpose of all other provisions of these Articles any such meeting shall be treated as being held and taking place at the principal place.

94.  The Board may, for the purpose of facilitating the organisation and administration of any general meeting to which any of the arrangements referred to in Article 93 apply, from time to time make arrangements, whether involving the issue of tickets (on a basis intended to afford to all members and proxies entitled to attend the meeting an equal opportunity of being admitted to the principal place) or the imposition of some random means of selection or otherwise as the Board shall in its absolute discretion consider to be appropriate, and may from time to time vary any such arrangements or make new arrangements in their place and the entitlement of any member or proxy to attend a general meeting at the principal place shall be subject to such arrangements as may be for the time being in force whether stated in the notice convening the meeting to apply to that meeting or notified to the members concerned subsequent to the notice convening the meeting.

95.  If it appears to the chairman that the meeting place specified in the notice convening the meeting is inadequate to accommodate all members entitled and wishing to attend, the meeting is duly constituted and its proceedings valid if the chairman is satisfied that adequate facilities are available to ensure that a member who is unable to be accommodated is able:

(a)  to participate in the business for which the meeting has been convened;

(b)  to hear and see all persons present who speak (whether by the use of microphones, loud-speakers, audio-visual communications equipment or otherwise), whether in the meeting place or elsewhere; and

(c)  to be heard and seen by all other persons present in the same way.

96.  The Board may make any arrangement and impose any restriction it considers appropriate to ensure the security of a meeting including, without limitation, the searching of a person attending the meeting and the restriction of the items of personal property that may be taken into the meeting place. The Board is entitled to refuse entry to a meeting to a person who refuses to comply with these arrangements.

26

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

97.    The Board may direct that members or proxies wishing to attend any general meeting should provide such evidence of identity and submit to such searches or other security arrangements or restrictions as the Board shall consider appropriate in the circumstances and shall be entitled in its absolute discretion to refuse entry to any general meeting to any member or proxy who fails to provide such evidence of identity or to submit to such searches or otherwise to comply with such security arrangements or restrictions or to eject any such member or proxy from any general meeting.

**VOTING**

98.    At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands unless (before or immediately following the declaration of the result of the vote on a show of hands) a poll is duly demanded.  Subject to the provisions of the Companies Laws, a poll may be demanded by either:

(a)    the chairman of the meeting; or

(b)    not less than five members present in person or by proxy and entitled to vote on the resolution; or

(c)    a member or members present in person or by proxy and representing not less than 10 per cent. of the total voting rights of all the members having the right to vote on the resolution (excluding any voting rights attached to shares in the Company held as treasury shares); or

(d)    a member or members present in person or by proxy and holding shares conferring a right to vote on the resolution being shares on which an aggregate sum has been paid up equal to not less than 10 per cent. of the total sum paid up on all the shares conferring that right (excluding any shares in the Company conferring a right to vote on the resolution which are held as treasury shares).

99.    A demand for a poll may, before the poll is taken, be withdrawn only with the consent of the chairman.  A demand so withdrawn shall not be taken to have invalidated the result of a show of hands declared before the demand was made, which result shall be effective.  Unless a poll is so demanded (and the demand is not withdrawn) a declaration by the chairman of the meeting that a resolution has been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the minute of the meeting, shall be conclusive evidence of that fact without proof of the number or proportion of the votes recorded for or against such resolution.

100.    If a poll is duly demanded (and the demand is not withdrawn) it shall be taken in such manner (including the use of ballot or voting papers or tickets) as the chairman of the

27

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

meeting may direct, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.  The chairman of the meeting may (and if so directed by the meeting shall) appoint scrutineers (who need not be members) and may adjourn the meeting to some place and time fixed by him for the purpose of declaring the result of the poll.

101.   A poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith.  A poll demanded on any other question shall be taken either immediately or at such subsequent time (not being more than 30 days from the date of the meeting) and place as the chairman may direct. No notice need be given of a poll not taken immediately. The demand for a poll shall not prevent the continuance of the meeting for the transaction of any business other than the question on which the poll has been demanded.

102.   If an amendment is proposed to any resolution under consideration but is in good faith ruled out of order by the chairman of the meeting, the proceedings on the substantive resolution shall not be invalidated by any error in such ruling.  With the consent of the chairman of the meeting, an amendment may be withdrawn before it is voted on.  No amendment to a resolution duly proposed as a special resolution (other than a mere clerical amendment to correct a patent error) may in any event be considered or voted on.  No amendment to a resolution duly proposed as an ordinary resolution (other than a mere clerical amendment to correct a patent error) may be considered or voted on unless either:

(a)   at least 48 hours prior to the time appointed for holding the meeting or adjourned meeting at which such ordinary resolution is to be proposed notice of the terms of the amendment and intention to move the same has been delivered in hard copy form to the Office or to such other place as may be specified by or on behalf of the Company for that purpose or received in electronic form at such address (if any) for the time being specified by or on behalf of the Company for that purpose; or

(b)   the chairman of the meeting in his absolute discretion decides that it may be considered or voted upon.

103.   If any votes shall be counted which ought not to have been counted, or might have been rejected, the error shall not vitiate the result of the voting unless it is pointed out at the same meeting, or at any adjournment thereof, and not in that case unless it shall in the opinion of the chairman of the meeting be of sufficient magnitude to affect the result of the voting.

**VOTES OF MEMBERS**

28

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

104.   Subject to Article 87 and to any special rights or restrictions as to voting attached by or by virtue of these Articles to any shares or any class of shares, on a show of hands every member who is present in person and every proxy present who has been duly appointed by a member entitled to vote on the resolution shall have one vote and on a poll every member who is present in person or by proxy shall have one vote for every share of which he is the holder.

105.   In the case of joint holders of a share, the vote of the senior who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders.  For this purpose seniority shall be determined by the order in which the names of the holders stand in the Register in respect of the joint holding.

106.   Where in Jersey or elsewhere an attorney, receiver, curator bonis or other person (by whatever name called) has been appointed by any court claiming jurisdiction in that behalf (whether in Jersey or elsewhere) to exercise power with respect to the property or affairs of any member on the ground (however formulated) of mental disorder, the Board may in its absolute discretion, upon or subject to production of such evidence as they may require, permit such attorney, receiver, curator bonis or other person to vote in person or by proxy on behalf of such member at any general meeting.

107.   No member shall, unless the Board otherwise determines, be entitled to be present or to vote at any general meeting either in person or by proxy or upon any poll or to exercise any other right conferred by membership in relation to meetings of the Company in respect of any shares held by him if any call or other sum presently payable by him to the Company in respect of such shares remains unpaid.

108.   No objection shall be raised as to the admissibility of any vote except at the meeting or adjourned meeting or poll at which the vote objected to is or may be given or tendered and every vote not disallowed at such meeting shall be valid for all purposes.  Any such objection shall be referred to the chairman of the meeting whose decision shall be final and conclusive.

109.   On a poll a person present in person or by proxy and entitled to more than one vote need not use all his votes or cast all his votes in the same way.

### PROXIES AND CORPORATE REPRESENTATIVES

110.   A proxy need not be a member of the Company. A proxy shall be entitled to speak and vote on a show of hands.

111.   A member may appoint more than one person as his proxy in respect of the same meeting or resolution provided that the appointment of the proxy shall specify the number of shares

29

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

in respect of which the proxy is appointed and only one proxy shall be appointed in respect of any one share.  When two or more valid but differing appointments of proxy are delivered or received (regardless of its date or of the date of its signature) in respect of the same share for use at the same meeting, the one which is last delivered or received shall be treated as replacing and revoking the others as regards that share. Subject to the Companies Laws, the Board may determine at its discretion when a proxy appointment shall be treated as delivered or received for the purposes of these Articles. If the Company is unable to determine which was last delivered or received, none of them shall be treated as valid in respect of that share.

112.    The appointment of a proxy shall be made in writing and shall be in any usual or common form or in any other form or forms which the Board may approve.  Subject thereto, the appointment of a proxy may be:

(a)      in hard copy form; or

(b)      if the Company so agrees, in electronic form (including by means of a relevant system or a website).

113.    The appointment of a proxy, whether made in hard copy form or in electronic form, shall be executed or authenticated in such manner as may be approved by or on behalf of the Board from time to time.

114.    The Board may, if it thinks fit (but subject to the provisions of the Companies Laws), at the Company's expense send forms of proxy in hard copy form for use at the meeting and issue invitations in electronic form to appoint a proxy in relation to the meeting in such form as may be approved by the Board.  The appointment of a proxy shall not preclude a member from attending and voting in person at the meeting or on the resolution concerned.

115.    The appointment of a proxy shall:

(a)      if in hard copy form, be delivered by hand or by post to the Office or such other place as may be specified by or on behalf of the Company for that purpose:

(i)       in the notice convening the meeting; or

(ii)      in any form of proxy sent by or on behalf of the Company in relation to the meeting,

not less than 48 hours before the time appointed for holding the meeting or adjourned meeting at which the person named in the appointment proposes to vote; or

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(b)     if in electronic form, be received at any address specified by or on behalf of the Company for the purpose of receiving the appointment of a proxy in electronic form in:

   (i)     the notice convening the meeting; or

   (ii)    any form of proxy sent by or on behalf of the Company in relation to the meeting; or

   (iii)   any invitation to appoint a proxy issued by the Company in relation to the meeting,

   not less than 48 hours before the time appointed for holding the meeting or adjourned meeting at which the person named in the appointment proposes to vote; or

(c)     in either case, where a poll is taken more than 48 hours after it is demanded, be delivered or received as aforesaid after the poll has been demanded and not less than 24 hours before the time appointed for the taking of the poll; or

(d)     if in hard copy form, where a poll is not taken forthwith but is taken not more than 48 hours after it was demanded, be delivered at the meeting at which the poll was demanded to the chairman of the meeting.

A proxy appointment which is not delivered or received in accordance with this Article  shall be invalid.  The Board may decide (in its absolute discretion), either generally or in any particular case, to treat a proxy appointment as valid, notwithstanding that the proxy appointment or any document or evidence has not been received in accordance with the requirements of these Articles.

116.    Where the appointment of a proxy is expressed to have been or purports to have been made, sent or supplied by a person on behalf of the holder of a share:

(a)     the Company may treat the appointment as sufficient evidence of the authority of that person to make, send or supply the appointment on behalf of that holder;

(b)     that holder shall, if requested by or on behalf of the Board at any time, send or procure the sending of any written authority under which the appointment has been made, sent or supplied or a copy of such authority certified notarially or in some other way approved by the Board, to such address and by such time as may be specified in the request (being a time no earlier than the time by which the appointment of proxy is required to be delivered or received) and, if the request

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

is not complied with in any respect, the appointment may be treated as invalid; and

(c)   whether or not a request under paragraph (b) of this Article has been made or complied with, the Company may determine that it has insufficient evidence of the authority of that person to make, send or supply the appointment on behalf of that holder and may treat the appointment as invalid.

117.   The appointment of a proxy to vote on a matter at a meeting confers on the proxy authority to demand, or join in demanding, a poll on that matter. The appointment of a proxy shall also, unless it provides to the contrary, be deemed to confer authority on the proxy to vote or abstain from voting as the proxy thinks fit on any amendment of a resolution and on any procedural motion or resolution put to the meeting to which it relates and on any other business not referred to in the notice of meeting which may properly come before the meeting to which it relates. The appointment of a proxy shall, unless it provides to the contrary, be valid for any adjournment of the meeting as well as for the meeting to which it relates.

118.   Any member or other person which is a body corporate may, by resolution of its directors or other governing body, authorise a person to act as its representative at any meeting of the Company or at any separate meeting of the holders of any class of shares.   A person so authorised and present at any such meeting shall be entitled to exercise the same powers on behalf of the body corporate which he represents as that body corporate could exercise if it were an individual member personally present, save that a Director, the Secretary or other person authorised for the purpose by the Secretary may require such person to produce a certified copy of the resolution of authorisation before permitting him to exercise his powers.  A body corporate shall for the purposes of these Articles be deemed to be present in person at any such meeting if the person so authorised by it is present at the meeting.

119.   A vote given or poll demanded by a proxy or by the duly authorised representative of a body corporate shall be valid notwithstanding the previous determination of the authority of the person voting or demanding the poll unless notice of the determination was either delivered or received as mentioned in the following sentence at least three hours before the start of the meeting or adjourned meeting at which the vote is given or the poll demanded or (in the case of a poll taken otherwise than on the same day as the meeting or adjourned meeting) the time appointed for taking the poll. Such notice of determination shall be either by means of a document in hard copy form delivered to the Office or to such other place as may be specified by or on behalf of the Company in accordance with Article 115 or in electronic form received at the address (if any) specified by or on behalf of the Company in accordance with Article 115, regardless of whether any relevant proxy appointment was effected in hard copy form or in electronic form.

32

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## DTC SYSTEM VOTING ARRANGEMENTS

120.     Subject to the Companies Laws, for the purpose of facilitating the giving of voting instructions for any general meeting by any person who holds, or holds interests in, beneficial interests in Ordinary Shares that are held and traded in the DTC System:

(a)      each DTC Proxy may appoint (whether by way of instrument of proxy, power of attorney, mandate or otherwise) more than one person as its proxy in respect of the same general meeting or resolution provided that the instrument of appointment shall specify the number of shares in respect of which the proxy is appointed and only one proxy may attend the general meeting and vote in respect of any one share;

(b)      each DTC Proxy may appoint (by power of attorney, mandate or otherwise) an agent (including, without limitation, a proxy solicitation agent or similar person) for the purposes of obtaining voting instructions and submitting them to the Company on behalf of that DTC Proxy, whether in hard copy form or electronic form;

(c)      each instrument of appointment made by a DTC Proxy or its agent shall, unless the Company is notified to the contrary in writing at least three hours before the start of the meeting (or adjourned meeting), be deemed to confer on the relevant proxy or agent the power and authority to appoint one or more sub-proxies or sub-agents or otherwise sub-delegate any or all of its powers to any person;

(d)      the Board may accept any instrument of appointment made by a DTC Proxy or its agent as sufficient evidence of the authority of that DTC Proxy or agent or require evidence of the authority under which any such appointment has been made; and

(e)      the Board may, to give effect to the intent of this Article:

(i)      make such arrangements, either generally or in any particular case, as it thinks fit (including, without limitation, making or facilitating arrangements for the submission to the Company of voting instructions on behalf of DTC Proxies, whether in hard copy form or electronic form);

(ii)     make such regulations, either generally or in any particular case, as it thinks fit, whether in addition to, or in substitution for, any other provision of these Articles; and

(iii)    do such other acts and things as it considers necessary or desirable (including, without limitation, approving the form of any instrument of

33

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

appointment of proxy or agent, whether in hard copy form or electronic form).

121.     If any question arises at or in relation to a general meeting as to whether any person has been validly appointed as a proxy or agent by a DTC Proxy or its agent to vote (or exercise any other right) in respect of any Ordinary Shares:

(a)     if the question arises at a general meeting, the question will be determined by the chairman of the meeting in his sole discretion; or

(b)     if the question arises otherwise than at a general meeting, the question will be determined by the Board in its sole discretion.

The decision of the chairman of the meeting or the Board (as applicable), which may include declining to recognise a particular appointment as valid, will, if made in good faith, be final and binding on all persons interested.

## DIRECTORS

122.     The number of Directors shall not be less than two nor more than 12.  The Company may by ordinary resolution from time to time vary the minimum or maximum number of Directors.

123.     A Director and an alternate Director shall not require a share qualification but nevertheless shall be entitled to attend and speak at any general meeting of the Company and at any separate meeting of the holders of any class of shares in the Company.

124.     Any Director who is appointed to any executive office (including for this purpose the office of the chairman or deputy chairman whether or not such office is held in an executive capacity) or who serves on any committee or who otherwise performs services which in the opinion of the Board are outside the scope of the ordinary duties of a Director may be paid remuneration (in addition to any amounts receivable under Article 161) by way of salary, commission, bonus or otherwise (whether exclusive or inclusive of his remuneration (if any) under these Articles) as the Board may determine.

125.     A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director, and may act in a professional capacity to the Company, on such terms as to tenure of office, remuneration and otherwise as the Board may determine.

126.     The Board may establish and maintain, or procure the establishment and maintenance of, any pension or superannuation funds (whether contributory or otherwise) for the benefit of, and give or procure the giving of donations, gratuities, pensions, allowances and

34

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

emoluments to, any persons who are or were at any time in the employment or service of the Company, or of any company which is a subsidiary of the Company or is allied to or associated with the Company or any such subsidiary or of any of the predecessors in business of the Company or any such other company as aforesaid, or who may be or have been Directors or officers of the Company or of any such other company as aforesaid and who hold or have held executive positions or agreements for services with the Company or any such other company as aforesaid, and the wives, husbands, widows, widowers, families and dependants of any such persons, and also establish, subsidise and subscribe to any institutions, associations, societies, clubs or funds calculated to be for the benefit of, or to advance the interests and well-being of the Company or of any such other company as aforesaid, or of any such person as aforesaid, and make payments for or towards the insurance of any such person as aforesaid and subscribe or guarantee money for charitable or benevolent objects, or for any exhibition or for any public, general or useful object, and do any of the matters aforesaid either alone or in conjunction with any such other company as aforesaid.  Subject to particulars with respect to the proposed payment being disclosed to the members of the Company and to the proposal being approved by the Company by ordinary resolution, if the Companies Laws or the NASDAQ Rules (if applicable) shall so require, any Director who holds or has held any such executive position or agreement for services shall be entitled to participate in and retain for his own benefit any such donation, gratuity, pension, allowance or emolument.

127.   Subject to the provisions of the Companies Laws and these Articles, the Board may from time to time appoint one or more of its body to be holder of any executive office (including, where considered appropriate, the office of chairman or deputy chairman or chief executive) on such terms and for such period as they may determine and, without prejudice to any claim for damages under any contract entered into in any particular case, may at any time revoke any such appointment.

128.   The appointment of any Director to the office of chairman or deputy chairman or managing or joint managing or deputy or assistant managing director or chief executive shall automatically terminate if he ceases to be a Director, but without prejudice to any claim by either the Company or the Director for damages for breach of any contract between him and the Company.

129.   The appointment of any Director to any executive office shall automatically terminate if he ceases from any cause to be a Director, unless the contract or resolution under which he holds office shall expressly state otherwise, in which event such termination shall be without prejudice to any claim by either the Company or the Director for damages for breach of any contract between him and the Company.

## APPOINTMENT AND RETIREMENT OF DIRECTORS

35

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

130.    At each annual general meeting:

(a)    any Director who was elected or last re-elected a Director at or before the annual general meeting held in the third calendar year before the current year shall retire by rotation; and

(b)    such further Directors (if any) shall retire by rotation as would bring the number retiring by rotation up to one-third of the number of Directors in office at the date of the notice of annual general meeting (or if their number is not a multiple of three, the number nearest to but not greater than one-third).

131.    The Directors to retire by rotation shall include (so far as necessary to obtain the number required) any Director who wishes to retire and not to offer himself for re-election. Any further Directors so to retire shall be those of the other Directors subject to retirement by rotation who have been longest in office since their last re-election or appointment and so that as between persons who became or were last re-elected Directors on the same day, those to retire shall (unless they otherwise agree among themselves) be determined by lot. A retiring Director shall be eligible for re-election.

132.    The Company at the meeting at which a Director retires under any provisions of these Articles may by ordinary resolution fill the vacated office by electing thereto the retiring Director or some other person eligible for appointment. In default the retiring Director shall be deemed to have been re-elected except in any of the following cases:

(a)    where at such meeting it is expressly resolved not to fill the vacancy;

(b)    where a resolution for the re-election of the retiring Director is put to the meeting and lost; or

(c)    where the retiring Director has given notice to the Company that he is unwilling to be re-elected.

133.    The retirement shall not have effect until the conclusion of the meeting except where a resolution is passed to elect some other person in the place of the retiring Director or a resolution for his re-election is put to the meeting and lost and accordingly a retiring Director who is re-elected or deemed to have been re-elected (and his alternate, if any) will continue in office without break.

134.    The Company may by ordinary resolution remove any Director from office notwithstanding any provision of these Articles or of any agreement between the Company and such Director, but without prejudice to any claim he may have for damages for breach of any such agreement, and appoint another person in place of a Director so removed from office. Any person so appointed shall be treated for the purpose of determining the time

36

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

at which he or any other Director is to retire by rotation as if he had become a Director on the day on which the Director in whose place he is appointed was last elected a Director. In default of such appointment the vacancy arising upon the removal of a Director from office may be filled as a casual vacancy.

135.   Subject to the provisions of the Companies Laws and of these Articles, the Company may by ordinary resolution appoint any person to be a Director either to fill a casual vacancy or as an additional Director but so that the total number of Directors shall not at any time exceed the maximum number (if any) fixed by or in accordance with these Articles.

136.   Without prejudice to the power of the Company to appoint any person to be a Director pursuant to these Articles but subject to the provisions of the Companies Laws and of these Articles, the Board may at any time appoint any person to be a Director either to fill a casual vacancy or as an additional Director, but so that the total number of Directors shall not at any time exceed the maximum number (if any) fixed by or in accordance with these Articles. Any Director so appointed shall hold office only until the next annual general meeting and shall then be eligible for re-election but shall not be taken into account in determining the number of Directors who are to retire by rotation at such meeting.

137.   A resolution for the appointment of two or more persons as Directors by a single resolution shall not be moved at any general meeting unless a resolution that it shall be so moved has first been agreed to by the meeting without any vote being given against it; and any resolution moved in contravention of this provision shall be void.

138.   No person other than a Director retiring at the meeting shall, unless recommended by the Board for election, be eligible for appointment as a Director at any general meeting unless not less than seven nor more than 42 clear days before the day appointed for the meeting there shall have been left at the Office notice signed by some member (other than the person to be proposed) duly qualified to attend and vote at the meeting for which such notice is given of his intention to propose such person for election and also notice in writing signed by the person to be proposed of his willingness to be elected.

139.   The office of a Director shall be vacated in any of the following events, namely:

(a)      if he shall become prohibited or disqualified by law or the NASDAQ Rules (if applicable) from acting as a Director;

(b)      if he shall resign in writing under his hand left at the Office or if he shall tender his resignation and the Board shall resolve to accept the same;

(c)      if he shall become bankrupt or shall make any arrangement with or compound with his creditors generally;

37

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(d)     if he is, or may be, suffering from mental disorder and either:

    (i)     he is admitted to hospital in pursuance of an application for admission for treatment under any statute relating to mental health; or

    (ii)    an order is made by a Court having jurisdiction (whether in the Jersey or elsewhere) in matters concerning mental disorder for his detention or for the appointment of a receiver, curator bonis or other person to exercise powers with respect to his property or affairs;

(e)     if he shall be absent from meetings of the Board for six months without leave (and his alternate Director, if any, shall not during such period have attended in his stead) and the Board shall resolve that his office be vacated;

(f)     if when there are at least four Directors he shall be requested in writing by all his co-Directors to resign;

(g)     if any contract with the Company relating to his appointment to any executive office is terminated by the Company, unless the Board resolves that he should continue in office as a Director; or

(h)     if he shall be removed from office as provided by Article 134.

## ALTERNATE DIRECTORS

140.    Any Director may appoint any person to be his alternate Director and may remove from office an alternate Director so appointed by him. Such appointment, unless the appointee has been previously approved by the Board or is another Director, shall have effect only upon and subject to being so approved.

141.    The appointment of an alternate Director shall terminate:

(a)     if his appointor ceases to be a Director but, if a Director retires by rotation or otherwise but is reappointed or is deemed to be reappointed at the meeting at which he retires, any appointment by such Director of an alternate Director made by him which was in force immediately prior to his retirement shall continue after his reappointment; or

(b)     on the happening of any event which if he were a Director would cause him to vacate his office as a Director; or

(c)     if he resigns his office by notice to the Company.

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

142.    Any appointment or removal of an alternate Director shall be by notice to the Company by the Director making or revoking the appointment and shall take effect in accordance with the terms of the notice (subject to any approval required by Article 140) on receipt of such notice by the Company. Any such notice shall be in hard copy form or in electronic form sent to such address (if any) for the time being specified by or on behalf of the Company for that purpose or, in default of such specification, to the Office.

143.    An alternate Director shall be entitled to receive notice of all meetings of the Board.

144.    An alternate Director shall be entitled to attend and vote as a Director at any meeting of the Board at which the Director appointing him is not personally present and generally at such meeting to perform all functions of his appointor as a Director and for the purposes of the proceedings at such meeting the provisions of these Articles shall apply as if he were a Director.  If his appointor is for the time being temporarily unable to act through ill-health, disability or any other reason his signature to any resolution under Article 153 of the Directors shall be as effective as the signature of his appointor.  To such extent as the Board may from time to time determine in relation to any committee of the Board the provisions of Article 143 and this Article  shall also apply to any meeting of any such committee of which his appointor is a member. An alternate Director shall not (save as aforesaid) have power to act as a Director nor shall he be deemed to be a Director for the purposes of these Articles.

145.    An alternate Director shall be an officer of the Company and shall alone be responsible to the Company for his own acts and defaults and he shall not be deemed an agent of or for the Director appointing him.  An alternate Director may be interested in contracts, arrangements and other proposals with the Company, may be repaid expenses by the Company and shall be entitled to be indemnified by the Company to the same extent as if he were a Director, but he shall not be entitled to receive from the Company in respect of his appointment as alternate Director any remuneration except only such proportion (if any) of the remuneration otherwise payable to his appointor as such appointor may by notice to the Company from time to time direct.

146.    Where an alternate Director is the alternate of more than one Director and attends a meeting of the Board or a meeting of a committee of the Board which the Board has determined he is entitled to attend in his capacity as an alternate, he shall in the absence of more than one appointor have a separate vote for each appointor for whom he is attending (but he shall only count as one Director for the purposes of determining whether a quorum is present); if he is himself a Director his vote or votes as an alternate Director shall be in addition to his own vote as a Director.

## PROCEEDINGS OF DIRECTORS

39

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

147.   The Board may meet for the despatch of business, adjourn and otherwise regulate its proceedings as it thinks fit.   Questions arising at any meeting shall be determined by a majority of votes.   In the case of an equality of votes the chairman of the meeting shall have a second or casting vote. A Director may, and the Secretary on the requisition of a Director shall, at any time summon a meeting of the Board.   Any Director may waive notice of any meeting and any such waiver may be retrospective.

148.   Notice of a meeting of the Board shall be deemed to be properly given to a Director if given to him personally or by word of mouth or sent in hard copy form to him at his last known address or at any other address given by him to the Company for this purpose or sent in electronic form to the address (if any) notified by him to the Company for that purpose.

149.   All or any of the Directors may participate in a meeting of the Board by any lawful means including by means of a conference telephone or any communication equipment which allows all persons participating in the meeting to hear and speak to each other at the same time.   A person so participating shall be deemed to be present in person at the meeting and shall be entitled to vote and be counted in the quorum accordingly. Such a meeting shall be deemed to take place where the largest group of those participating is assembled or, if there is no such group, where the chairman of the meeting then is.

150.   The quorum necessary for the transaction of the business of the Board may be fixed by the Board and unless so fixed at any other number shall be two. For the purposes of this Article an alternate Director shall be counted in a quorum, but so that not less than two individuals shall constitute the quorum. A meeting of the Board at which a quorum is present shall be competent to exercise all authorities, powers and discretions for the time being vested in or exercisable by the Board.

151.   The continuing Directors may act notwithstanding any vacancy in their number, but if and so long as the number of Directors is reduced below the minimum number fixed by or in accordance with these Articles the continuing Directors or Director may act for the purpose of filling up such vacancies or of summoning general meetings of the Company, but not for any other purpose.   If there be no Directors or Director able or willing to act, then any two members may summon a general meeting for the purpose of appointing Directors.

152.   The Board may elect a chairman and, if thought fit, one or more deputy chairmen and determine the period for which each is to hold office. The chairman, failing whom a deputy chairman (to be chosen, if there be more than one, by agreement amongst them or failing agreement by lot), shall preside at all meetings of the Board, but if no chairman or deputy chairman shall have been elected, or if at any meeting none be present within five minutes after the time appointed for holding the meeting or none be willing to act, the Directors present may choose one of their number to be chairman of the meeting.

40

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

153. A resolution in writing signed or approved by a majority of the Directors entitled to vote on that resolution shall be as valid and effective as a resolution passed at a meeting of the Directors duly convened and held. The resolution may be contained in one document (whether in hard copy or in electronic form) or in several documents (whether in hard copy or electronic form) each signed or approved by one or more of the Directors concerned. For this purpose:

(a) the signature or approval of an alternate director (if any) shall suffice in place of the signature of the Director appointing him; and

(b) the approval of a Director or alternate director shall be given in writing or by electronic means (including approval given in an email).

## DIRECTORS' INTERESTS AND CONFLICTS OF INTEREST

154. Subject to Article 155:

(a) a Director who is in any way, directly or indirectly, interested in a proposed transaction or arrangement with the Company or any of its subsidiaries must declare the nature and extent of that interest to the other Directors before the Company enters into the transaction or arrangement; and

(b) a Director who is in any way, directly or indirectly, interested in a transaction or arrangement that has been entered into by the Company or any of its subsidiaries must, unless the interest has already been declared pursuant to paragraph (a) of this Article, declare the nature and extent of that interest to the other Directors as soon as is practicable,

in each case in accordance with the requirements of the Companies Laws. If any such declaration under this Article proves to be, or becomes, inaccurate or incomplete, a further declaration must be made thereunder.

155. Subject to the Companies Laws, a Director shall not be required to declare an interest:

(a) if the Director is not aware of the interest or of the transaction or arrangement in question (and, for this purpose, a Director is treated as being aware of matters of which he ought reasonably to be aware); or

(b) if the interest cannot reasonably be regarded as likely to give rise to a conflict of interest; or

41

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(c)     if, or to the extent that, the other Directors are already aware of the interest (and, for this purpose, the other Directors are treated as aware of anything of which they ought reasonably to be aware); or

(d)     if, or to the extent that, the interest concerns the terms of his service contract that have been or are to be considered by a meeting of the Board or by a committee of the Board appointed for the purpose under these Articles.

156.     Subject to the provisions of the Companies Laws and provided that he has declared the nature and extent of any direct or indirect interest of his in accordance with Article 154, a Director, notwithstanding his office, may:

(a)     be a party to or otherwise interested in any transaction or arrangement with the Company or in which the Company is directly or indirectly interested;

(b)     hold any other office or place of profit with the Company (except that of auditor) in conjunction with the office of Director for such period and on such terms, including as to remuneration, as the Board may determine;

(c)     act by himself or through a firm with which he is associated in a professional capacity for the Company or any of its subsidiaries or any company in which the Company is directly or indirectly interested (otherwise than as auditor) on such terms, including as to remuneration, as the Board may determine;

(d)     be or become a director or other officer of, or employed by, or a party to any transaction or arrangement with, or otherwise interested (including by the holding of shares or other securities) in, any subsidiary of the Company or any company in which the Company is directly or indirectly interested; and

(e)     be or become a director of any company in which the Company is not directly or indirectly interested if, at the time of his appointment as a director of that other company, such appointment cannot reasonably be regarded as giving rise to a conflict of interest.

157.     A Director shall not, by reason of his office or the fiduciary relationship thereby established, be liable to account to the Company for any remuneration or other benefit which he derives from any transaction or arrangement or from any office, employment, position or relationship or from any interest in any company which he is permitted to hold or enter into by virtue of Article 156 or otherwise pursuant to these Articles, nor shall the receipt of any such remuneration or other benefit constitute a breach of his duties under the Companies Laws or otherwise. No transaction or arrangement shall be liable to be avoided

42

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

on the grounds of a Director having an interest therein (including deriving a benefit therefrom) if the interest is permitted under Article 156.

158.     A Director may, notwithstanding his interest, be counted in the quorum in relation to any resolution of the Board or a committee of the Board concerning any transaction or arrangement in which he is directly or indirectly interested and, subject to the provisions of Article 154, he may vote in respect of any such resolution.

159.     A Director may, notwithstanding his interest, be counted in the quorum in relation to any resolution of the Board or a committee of the Board concerning his own appointment (or the settlement or variation of the terms of, or the termination of, his own appointment) as the holder of any office or place of profit with the Company or any subsidiary of the Company or any company in which the Company is directly or indirectly interested, but he may not vote in respect of any such resolution.

160.     Where proposals are under consideration concerning the appointment (or the settlement or variation of the terms of the appointment or the termination of the appointment) of two or more Directors to offices or places of profit with the Company or any subsidiary of the Company or any company in which the Company is directly or indirectly interested, such proposals may be divided and considered in relation to each Director separately. In such a case, each of the Directors concerned shall be entitled to vote in respect of each resolution except that concerning his own appointment (or the settlement or variation of the terms, or the termination, of his own appointment).

## DIRECTORS' FEES

161.     Without prejudice to Articles 124, 125 and 162, the Directors (other than alternate Directors) shall be entitled to receive by way of fees for their services as Directors such sum as the Board may from time to time determine.  Any fees payable pursuant to this Article shall be distinct from any salary, remuneration or other amounts payable to a Director pursuant to any other provisions of these Articles and shall accrue from day to day.

## DIRECTORS' EXPENSES

162.     Each Director shall be entitled to be repaid all reasonable travelling, hotel and other expenses properly incurred by him in or about the performance of his duties as Director, including any expenses incurred in attending meetings of the Board or any committee of the Board or general meetings or separate meetings of the holders of any class of shares or of debentures of the Company.

## BORROWING POWERS

43

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

163.   The Board may exercise all the powers of the Company to borrow money, and to mortgage or charge its undertaking, property and assets (present and future) and uncalled capital or any part thereof and to issue debentures and other securities whether outright or as collateral security for any debt, liability or obligation of the Company or of any third party.

## GENERAL POWERS OF DIRECTORS

164.   The business of the Company shall be managed by the Board, who may exercise all such powers of the Company as are not by the Companies Laws or by these Articles required to be exercised by the Company in general meeting, subject nevertheless to any regulations of these Articles, to the provisions of the Companies Laws and to such regulations, being not inconsistent with the aforesaid regulations or provisions, as may be prescribed by an ordinary resolution of the Company, but no regulation so made by the Company shall invalidate any prior act of the Board which would have been valid if such regulation had not been made.  The general powers given by this Article shall not be limited or restricted by any special authority or power given to the Board by any other Article.

165.   The Board may delegate any of its powers to committees consisting of such person or persons (whether Directors or not) upon such terms and conditions and with such restrictions as it thinks fit provided that the majority of the members of the committee are Directors.  Any such delegation (which may include authority to sub-delegate all or any of the powers so delegated) may be collateral with, or to the exclusion of, the powers which are the subject of the delegation (or sub-delegation).  Any committees so formed shall in the exercise of the powers so delegated conform to any regulations which may from time to time be imposed by the Board and any or all of the powers so delegated may be altered, waived, withdrawn or revoked by the Board.

166.   The meetings and proceedings of any such committee consisting of two or more members shall be governed by the provisions of these Articles regulating the meetings and proceedings of the Directors, so far as the same are applicable.

167.   The Board may delegate any of its powers to any Director upon such terms and conditions and with such restrictions as they think fit.  Any such delegation (which may include authority to sub-delegate all or any of the powers so delegated) may be collateral with, or to the exclusion of, the powers which are the subject of the delegation (or sub-delegation).  Any or all of the powers so delegated may be altered, waived, withdrawn or revoked by the Board.

168.   The Board may establish any local boards or agencies for managing any of the affairs of the Company and may appoint any persons to be members of such local boards, or any managers or agents, and may fix their remuneration.  The Board may delegate to any local board, manager or agent any of the powers, authorities and discretions vested in the Board,

44

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

with power to sub-delegate, and may authorise the members of any local boards, or any of them, to fill any vacancies therein, and to act notwithstanding vacancies, and any such appointment or delegation may be made upon such terms and subject to such conditions as the Board may think fit, and the Board may remove any person so appointed, and may annul or vary any such delegation, but no person dealing in good faith and without notice of any annulment or variation shall be affected thereby.

169.    The Board may by power of attorney, mandate or otherwise appoint any person to be the agent of the Company on such terms (including terms as to remuneration) as it may decide and may delegate to any person so appointed any of its powers, authorities and discretions (with power to sub-delegate). The Board may remove any person appointed under this Article and may revoke or vary the delegation, but no person dealing in good faith shall be affected by the revocation or variation.

170.    Any power of the Board to delegate any of its powers under these Articles (and the power to sub-delegate any of such powers) shall be effective in relation to the powers, authorities and discretions of the Board generally and shall not be limited by the fact that in certain Articles, but not in others, express reference is made to particular powers, authorities or discretions being exercised by the Board or by a committee of the Board.

171.    All acts done by or in pursuance of a resolution of any meeting of the Board or of a committee of the Board or by a person acting as a Director or alternate Director or as a member of a committee shall, notwithstanding that there was some defect in the appointment of any Director or alternate Director or member of a committee or that any such person was disqualified or had vacated office or was not entitled to vote, be as valid as if every such person had been duly appointed and was qualified and had continued to be a Director or alternate Director or member of a committee and had been entitled to vote.

172.    All cheques, promissory notes, drafts, bills of exchange and other negotiable or transferable instruments, and all receipts for moneys paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as the Board shall from time to time determine.

173.    If any uncalled capital of the Company is included in or charged by any mortgage or other security, the Board may delegate to the person in whose favour such mortgage or security is executed, or to any other person in trust for him, the power to make calls on the members in respect of such uncalled capital, and to sue in the name of the Company or otherwise for the recovering of moneys becoming due in respect of calls so made and to give valid receipts for such moneys, and the power so delegated shall subsist during the continuance of the mortgage or security, notwithstanding any change of Directors, and shall be assignable if expressed so to be.

45

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

174.    The Board may from time to time elect a president of the Company and may determine the period for which he shall hold office.   Such president may be either honorary or paid such remuneration as the Board in its discretion shall think fit, and need not be a Director but shall, if not a Director, be entitled to receive notice of and attend and speak, but not to vote, at all meetings of the Board.

## ASSOCIATE DIRECTORS

175.    The Board may at any time and from time to time appoint any person (other than a Director) to any office or employment with the Company having a designation or title which includes the word  **"director"**  or attach to any existing office or employment with the Company such a designation or title and may at any time terminate any such appointment or the use of such designation or title.   The inclusion of the word **"director"** in the designation or title of the office or employment of any person shall not imply that such person is, or is deemed to be, or is empowered in any respect to act as, a director of the Company for any of the purposes of the Companies Laws or these Articles.   Subject as aforesaid, the powers and duties of any such person shall be determined by the Board.

## SECRETARY

176.    The Secretary shall be qualified in accordance with the provisions of the Companies Laws and shall be appointed by the Board on such terms and for such period as it may think fit.  The Secretary may at any time be removed from office by the Board, but without prejudice to any claim for damages for breach of any contract between him and the Company.  The Board may appoint one ore more deputy or assistant secretaries.

177.    Any provision of the Companies Laws or of these Articles requiring or authorising a thing to be done by or to a Director and the Secretary shall not be satisfied by its being done by or to the same person acting both as Director and as, or in the place of, the Secretary.

## THE SEAL

178.    The Company may exercise the powers conferred by the Companies Laws with regard to seals and such powers shall be vested in the Board.

179.    The Board shall provide for the safe custody of every Seal.

180.    The Board may determine who shall sign any instrument to which a Seal is applied, either generally or in relation to a particular instrument or type of instrument, and may also determine, either generally or in any particular case, that such signatures shall be dispensed with.

46

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

181.    Unless otherwise decided by the Board:

(a)     certificates for shares, debentures or other securities of the Company issued under Seal need not be signed; and

(b)     every other instrument to which a Seal is applied shall be signed by at least one Director and the Secretary or by at least two Directors or by one Director in the presence of a witness who attests the signature.

## AUTHENTICATION OF DOCUMENTS

182.    Any Director or the Secretary or any person appointed by the Board for the purpose shall have power to authenticate and certify as true copies of and extracts from any document affecting the constitution of the Company (whether in hard copy form or in electronic form) and any resolution passed by the Company or the holders of any class of shares in the capital of the Company or the Board or any committee of the Board (whether in hard copy form or in electronic form), and any book, record, document relating to the business of the Company (whether in hard copy form or in electronic form and including without limitation the accounts).  Where any books, records, documents or accounts are elsewhere than at the Office the local manager or other officer of the Company having the custody thereof shall be deemed to be a person appointed by the Board as aforesaid (whether in hard copy form or in electronic form and including without limitation the accounts). If certified as aforesaid, a document purporting to be a copy of a resolution, or an extract from the minutes of a meeting of the Company or of the Board or any committee of the Board (whether in hard copy form or in electronic form) shall be conclusive evidence in favour of all persons dealing with the Company in good faith and relying thereon that such resolution has been duly passed or, as the case may be, that such minutes are or extract is true and accurate record of proceedings at a duly constituted meeting.

## DIVIDENDS

183.    Subject to the provisions of the Companies Laws, the Company may by ordinary resolution declare dividends and fix the time for payment thereof, but no dividend shall be payable in excess of the amount, or at any earlier date than, recommended by the Board.

184.    Unless and to the extent that the rights attached to any shares or the terms of issue thereof otherwise provide, a dividend or any other money payable in respect of a share can be declared in any currency and paid in any currency or currencies.  The Board shall have the power to decide the basis of conversion for any currency conversions that may be required and how any costs involved are to be met (including whether such costs shall be payable by the member) and to make such arrangements as it thinks fit to enable any dividend or other money payable in respect of a share to be paid in a currency or currencies

47

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

other than that in which the dividend is declared or other money is expressed to be payable.  The Board may deduct from the amount of any dividend or other money payable in respect of a share any fees, expenses, taxes or governmental charges payable by the member in respect of that dividend.

185.   Unless and to the extent that the rights attached to any shares or the terms of issue thereof all dividends shall (as regards any shares not fully paid throughout the period in respect of which the dividend is paid) be apportioned and paid pro rata according to the amounts paid on the shares during any portion or portions of the period in respect of which the dividend is paid.  For the purposes of this Article no amount paid on a share in advance of call shall be treated as paid on the share.

186.   Subject to the provisions of the Companies Laws, if and so far as in the opinion of the Board the financial position of the Company justifies such payments, the Board may pay the fixed dividend on any class of shares carrying a fixed dividend expressed to be payable on fixed dates on the half-yearly or other dates prescribed for the payment thereof and may also from time to time pay interim dividends of such amounts and on such dates and in respect of such periods as it thinks fit. A resolution of the Board declaring any such dividend shall (once published with their authority) be irrevocable and have the same effect as if such dividend had been declared upon the recommendation of the Board by an ordinary resolution of the Company. Provided the Board acts bona fide it shall not incur any responsibility to the holders of shares conferring a preference for any damage they may suffer by reason of the payment of any interim dividend on any shares having deferred or non-preferred rights.

187.   Subject to the provisions of the Companies Laws, where any asset, business or property is bought by the Company as from a past date the profits and losses thereof as from such date may at the discretion of the Board in whole or in part be carried to revenue account and treated for all purposes as profits or losses of the Company.  Subject as aforesaid, if any shares or securities are purchased cum dividend or interest, such dividend or interest may at the discretion of the Board be treated as revenue, and it shall not be obligatory to capitalise the same or any part thereof.

188.   No dividend or other moneys payable on or in respect of a share shall bear interest as against the Company.

189.   The Board may retain any dividend or other moneys payable on or in respect of any share:

(a)      on which the Company has a lien, and may apply the same in or towards satisfaction of the debts, liabilities, or engagements in respect of which the lien exists; or

48

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(b)   in respect of which any person is under the provisions as to the transmission of shares hereinbefore contained entitled to become a member, or which any person is under those provisions entitled to transfer, until such person shall become a member in respect of such shares or shall transfer the same.

190.   The Company may cease to send any cheque or warrant through the post for any dividend or other moneys payable on or in respect of any share if in respect of at least 2 consecutive dividends payable on those shares the cheques or warrants have been returned undelivered or remain uncashed, or the cheque or warrant in respect of any one dividend has been returned undelivered or remains uncashed and reasonable enquiries have failed to establish any new address of the holder, but may recommence sending cheques or warrants in respect of dividends payable on those shares if the holder or person entitled thereto requests such recommencement by notice to the Company.

191.   All unclaimed dividends or other moneys payable on or in respect of a share may be invested or otherwise made use of by the Board for the benefit of the Company until claimed. The payment by the Board of any such dividend or other moneys into a separate account shall not constitute the Company a trustee in respect thereof and any dividend unclaimed after a period of 12 years from the date of declaration of such dividend or the date on which such dividend became due for payment shall be forfeited and shall revert to the Company, but the Board may at its discretion pay any such dividend or such other moneys or some part thereof to a person who would have been entitled thereto had the same not reverted to the Company.

192.   Subject to the Companies Laws, the Company may, upon the recommendation of the Board, by ordinary resolution direct payment of a dividend in whole or in part by the distribution of specific assets (and in particular of paid up shares or debentures of any other company) and the Board shall give effect to such resolution. The Board shall have the power to decide how any costs relating to the distribution of such assets will be met, to sell all or a portion of such assets to fund the payment of any applicable taxes or governmental charges and generally to make such arrangements in connection with the distribution of such assets as it thinks fit. Where any legal, regulatory, technical or practical difficulty arises in regard to such distribution under the laws of, or the requirements of any relevant regulatory body or any stock exchange in, any jurisdiction, the Board may make such exclusions or arrangements to settle the same as it thinks expedient and may, in particular, authorise any person to sell and transfer any assets or fractions or ignore fractions altogether, fix the value for distribution purposes of such specific assets or any part thereof to be distributed and may determine that cash payments shall be made to any members upon the footing of the value so fixed in order to adjust the rights of all parties and may vest any such specific assets in trustees as may seem expedient to the Board. The Board may authorise any person to sign any instrument of transfer for the purposes of effecting a sale and transfer of any assets or fractions thereof pursuant to this Article.

49

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

193.   Any dividend or other moneys payable in cash or in respect of a share may be paid by cheque or warrant sent through the post to or left at the registered address of the member or person entitled thereto (or, if two or more persons are registered as joint holders of the share or are entitled thereto in consequence of the death or bankruptcy of the holder, to any one of such persons) or to such person and such address as such member or person may by notice direct.  Every such cheque or warrant shall be made payable to the order of the person to whom it is sent or to such persons as the holder or joint holders or person or persons entitled to the share in consequence of the death or bankruptcy of the holder may by notice direct and payment of the cheque or warrant by the banker upon whom it is drawn shall be a good discharge to the Company. Every such cheque or warrant shall be sent at the risk of the person entitled to the moneys represented thereby.  In addition any such dividend or other moneys may at the discretion of the Board be paid by any bank or other funds transfer system or such other means and to or through such person as the holder or joint holders or person or persons entitled to the relevant share in consequence of the death or bankruptcy of the holder may by notice direct and the Company shall have no responsibility for any sums lost or delayed in the course of any such transfer or where it has acted on any such directions.

194.   In respect of shares in uncertificated form, where the Company is authorised to do so by or on behalf of the holder or joint holders in such manner as the Company shall from time to time consider sufficient, the Company may pay any such dividend, interest or other moneys by means of the relevant system (subject always to the facilities and requirements of that relevant system).

195.   If two or more persons are registered as joint holders of any share, or are entitled jointly to a share in consequence of the death or bankruptcy of the holder, any one of them may give effectual receipts for any dividend or other moneys payable or property distributable on or in respect of the share.

196.   The waiver in whole or in part of any dividend on any shares by any document shall be effective only if such document is signed by the shareholder (or the person entitled to the share in consequence of the death or bankruptcy of the holder or otherwise by operation of law) and delivered to the Company and if or to the extent that the same is accepted as such or acted upon by the Company.

## RESERVES

197.   The Board may from time to time set aside out of the profits of the Company and carry to reserve such sums as they think proper which, at the discretion of the Board, shall be applicable for any purpose to which the profits of the Company may properly be applied and pending such application may either be employed in the business of the Company or be invested.  The Board may from time to time designate the reserves or any part thereof

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

for such purposes or in such manner as they think fit.  The Board may also without placing the same to reserve carry forward any profits.  In carrying sums to reserve and in applying the same the Board shall comply with the provisions of the Companies Laws.

## CAPITALISATION OF RESERVES

198.  The Company may upon the recommendation of the Board by ordinary resolution resolve to capitalise any sum standing to the credit of any of the Company's reserve accounts (including share premium account and capital redemption reserve fund) or any sum standing to the credit of the profit and loss account (provided that such sum is not required for paying the dividends on any shares carrying a fixed cumulative preferential dividend) and authorise the Board to appropriate the sum resolved to be capitalised to the holders of shares in the proportions in which such sum would have been divisible amongst them had the same been a distribution of profits by way of dividend on the shares and to apply such sum on their behalf either in or towards paying up the amounts (if any) for the time being unpaid on any shares held by them respectively or in or towards paying up in full unissued shares or debentures of the Company of a nominal amount equal to such sum, such shares or debentures to be allotted and distributed credited as fully paid up to and amongst them in the proportion aforesaid or partly in one way and partly in the other (and provided that any sum standing to the credit of share premium account or capital redemption reserve fund and any other undistributable reserves shall for the purposes of this Article only be applied in or towards the paying up of unissued shares to be allotted as fully paid).

199.  Subject to approval by the Company in general meeting by way of ordinary resolution, the Board may, in respect of any dividend or dividends specified by the ordinary resolution, offer to holders of Ordinary Shares the right to elect to receive in lieu of such dividend (or part thereof) an allotment of additional Ordinary Shares credited as fully paid.  In any such case the following provisions shall apply:

(a)   the basis of allotment shall be determined by the Board so that each holder of Ordinary Shares is entitled to such number of new Ordinary Shares whose aggregate value is as nearly as possible equal to (but not greater than) the cash amount (disregarding any tax credit) of the dividend that such holder has elected to forgo.  For this purpose, the value of an Ordinary Share shall be equal to the final reported per share closing price as quoted for the Ordinary Shares on NASDAQ, on the day on which quotations in respect of the Ordinary Shares are first given ex the relevant dividend and the four subsequent dealing days or calculated in such other manner as may be specified by the ordinary resolution;

(b)   the Board shall give notice to holders of Ordinary Shares of the right of election accorded to them and shall send with or following such notice forms of election

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

and specify the procedure to be followed and the place at which and the latest date and time by which duly completed forms of election must be lodged in order to be effective;

(c)   the dividend (or that part of the dividend in respect of which a right of election has been accorded) shall not be payable in cash on Ordinary Shares in respect of which an election has been made and in lieu thereof additional Ordinary Shares shall be allotted to the holders of such shares on the basis of allotment determined as aforesaid.  For that purpose, the Board shall appropriate out of any amount for the time being standing to the credit of reserves (including any share premium account or capital redemption reserve fund) or profit and loss account as the Board may determine a sum equal to the aggregate nominal amount of additional Ordinary Shares to be allotted on such basis and apply the same in paying up in full the appropriate number of new Ordinary Shares on such basis;

(d)   the additional Ordinary Shares so allotted shall rank pari passu in all respects with the fully paid Ordinary Shares then in issue save only as regards participation in the relevant dividend (or share election in lieu); and

(e)   the Board may on any occasion determine that rights of election shall not be made available to any holders of Ordinary Shares with registered addresses in any territory where in the absence of a registration statement or other special formalities the circulation of an offer of rights of election would or might be unlawful, and in such event the provisions aforesaid shall be read and construed subject to such determination.

200.   Whenever a resolution as mentioned in Articles 198 and/or 199 shall have been passed, the Board shall make all necessary appropriations, applications and allotments to give effect to such resolution.  The Board shall have the power to decide how any costs relating to the distribution will be met and to sell all or a portion of such shares or debentures to fund the payment of any applicable taxes or governmental charges and generally make such arrangements in connection with the distribution as it thinks fit.  Without limiting the generality of the foregoing, the Board may:

(a)   make such exclusions or arrangements as it thinks fit to settle any legal, regulatory, technical or practical difficulty arising in relation to the distribution under the laws of, or the requirements of any relevant regulatory body or any stock exchange in, any jurisdiction;

(b)   make such arrangements as it thinks fit in the case of shares or debentures becoming distributable in fractions (including provisions whereby the benefit of

52

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

fractional entitlements accrues to the Company rather than to the members concerned);

(c)   authorise any person to enter, on behalf of all relevant members, into an agreement with the Company providing for the allotment to them respectively, credited as fully paid, of any further shares or debentures to which they may be entitled upon such capitalisation or (as the case may require) for the payment by the Company on their behalf, by the application thereto of their respective interests in such capitalised sum, of the amounts or any part of the amounts remaining unpaid on their existing shares and for matters incidental thereto and any agreement made under any such authority shall be effective and binding on all concerned; and

(d)   authorise any person to sign any instrument of transfer for the purposes of effecting a sale and transfer of any shares or debentures or fractions thereof pursuant to this Article.

## RECORD DATES

201.   Notwithstanding any other provision of these Articles, the Company or the Board may fix any date as the record date for any dividend, distribution, offer, allotment or issue and such record date may be on or any time before or after any date on which the dividend, distribution, offer, allotment or issue is declared, paid or made.

## REGISTER

202.   The Directors shall keep, or cause to be kept, at the Office or at the Transfer Office (but not, for the avoidance of doubt, at a place outside Jersey), the Register in the manner required by the Companies Laws.  The Directors may rely upon the information provided to them from time to time by the Operator for the purposes of keeping the Register up to date in accordance with the Companies Laws.  Except as provided by Article 203 below, no counter-part or branch of the Register shall be maintained outside Jersey and no copy of the Register, list, record or information in respect of the members of the Company kept or maintained outside Jersey shall constitute the Register or any part of the Register. The Company shall not be bound to recognise any interest or right in respect of any share by virtue of it being contained or recorded in such copy of the Register or that list, record or information (as the case may be) kept or maintained outside Jersey.

203.   Subject to the provisions of the Companies Laws, the Company may keep an overseas branch register in any country, territory or place (other than in the United Kingdom or the Republic of Ireland) in respect of the members resident in such country, territory or place.  The Board may (subject to the requirement that no overseas branch register shall be kept

53

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

in the United Kingdom or the Republic of Ireland) make and vary such regulations as it may think fit in relation to the keeping of any such overseas branch register.

## MINUTES AND BOOKS

204. The Board shall cause minutes to be made:

    (a)    of all appointments of officers made by the Board;

    (b)    of the names of the Directors present at each meeting of the Board and of any committee of the Board; and

    (c)    of all resolutions and proceedings at all meetings of the Company and of any class of members of the Company and of the Board and of committees of the Board.

Any such minutes if purporting to be signed by the chairman of the meeting at which the proceedings took place, or by the chairman of the next following meeting, shall be sufficient evidence, without any further proof, of the facts therein stated.

205. Any register, index, minute book, book of account or other book required by these Articles or the Companies Laws to be kept by or on behalf of the Company may be kept either by making entries in bound books or by recording them in any other manner.  In any case in which bound books are not used, the Board shall take adequate precautions for guarding against falsification and for facilitating its discovery.

206. Any register, index, minute book, book of account or other book or document of the Company shall always be open to the inspection of the officers of the Company. Subject as aforesaid no member of the Company or other person shall have any right of inspecting any book or document of the Company except as conferred by the Companies Laws or as ordered by a Court of competent jurisdiction or as authorised by the Board and the Board shall (subject to the provisions of the Companies Laws) determine at what times and under what conditions any such right may be exercised.

## ACCOUNTS

207. Accounting records sufficient to show and explain the Company's transactions and otherwise complying with the Companies Laws shall be kept at the Office or (subject to the provisions of the Companies Laws) at such other place as the Board thinks fit.

208. The Company shall send to each member of the Company and to the Auditors and to every other person who is entitled to receive notice of general meetings copies of the Company's annual accounts, the Directors' report (if any) and the Auditors' report not less than 14 clear days before the date of the general meeting before which they are to be laid.  Nothing

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

in this Article shall require the Company to send a copy of those documents to any person who under these Articles is not entitled to be sent notices from the Company or of whose address the Company is unaware or to any holder of debentures of whose address the Company is unaware or to more than one of the joint holders of any shares or debentures.  No accidental non-compliance with the provisions of this Article shall invalidate the proceedings at the meeting.

209.   Every account of the Company when audited and approved by the Company in general meeting shall be conclusive except as regards any error discovered therein within three months next after the approval thereof.  Whenever such an error is discovered within that period, the account shall forthwith be corrected and thereupon shall be conclusive.

## AUDITORS

210.   Auditors shall be appointed and their duties, powers, rights and remuneration regulated in accordance with the provisions of the Companies Laws.

211.   Subject to the provisions of the Companies Laws, all acts done by persons acting as Auditors shall, as regards all persons dealing in good faith with the Company, be valid, notwithstanding that there was some defect in their appointment or that they were at the time of their appointment not qualified for appointment.

212.   The Auditors shall be entitled to attend any general meeting and to receive all notices of and other communications relating to any general meeting which any member is entitled to receive, and to be heard at any general meeting on any part of the business of the meeting which concerns them as Auditors.

## COMMUNICATIONS

### Communications to be in writing

213.   Any notice or other communication to be given to or by any person pursuant to these Articles (other than a notice convening a meeting of the Board or of a committee of the Board) shall be in writing.

### Communications to the Company

214.   Subject to the Companies Laws and except where otherwise expressly stated in these Articles, any document or information to be sent or supplied to the Company (whether or not such document or information is required or authorised under the Companies Laws) shall be in hard copy form or, subject to Article 215, be sent or supplied in electronic form or by means of a website.

55

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

215.   Subject to the Companies Laws, a document or information may be given to the Company in electronic form only if it is given in such form and manner and to such address as may have been specified by the Board from time to time for the receipt of documents in electronic form. The Board may prescribe such procedures as it thinks fit for verifying the authenticity or integrity of any such document or information given to it in electronic form.

216.   A communication sent to the Company by electronic means shall not be treated as received by the Company if it is rejected by computer virus protection arrangements.

**Communications by the Company**

217.   The Company may send or supply any document or information to a member in hard copy form:

(a)       personally; or

(b)       by sending or supplying it by post in a pre-paid envelope addressed to the member at his registered address or by leaving it at that address in an envelope addressed to the member;

218.   Subject to the Companies Laws, a document or information may be sent or supplied by the Company in electronic form to any member who has agreed (generally or specifically) that a document or information may be sent or supplied in electronic form and has not revoked that agreement. Where a document or information is sent or supplied by electronic means, it may only be sent or supplied to an address specified for that purpose by the member.

219.   A document or information may be sent or supplied by the Company to a member by being made available on a website if the member has agreed (generally or specifically), or pursuant to Article 222 below is deemed to have agreed, that documents or information can be sent or supplied to the member in that form and has not revoked such agreement. A document or information sent or supplied by means of a website must be made available in a form, and by a means, that the Company reasonably considers will enable the recipient:

(a)       to read it; and

(b)       to retain a copy of it.

220.   If a document or information is sent or supplied by means of a website, the Company must notify the intended recipient of:

(a)       the presence of the document or information on the website;

56

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(b)     the address of the website; the place on the website where it may be accessed; and

(c)     how to access the document or information.

221.     Any document or information made available on a website will be maintained on the website for the period of 28 days beginning with the date on which notification is given under Article 220 above, or such shorter period as may be decided by the Board.  A failure to make a document or information available on a website throughout the period mentioned in this Article  shall be disregarded if:

(a)     it is made available on the website for part of that period; and

(b)     the failure to make it available throughout that period is wholly attributable to circumstances that it would not be reasonable for the Company to prevent or avoid.

222.     If a member has been asked individually by the Company to agree that the Company may send or supply documents or information generally, or specific documents or information, to the member by means of a website and the Company does not receive a response within a period of 28 days beginning with the date on which the Company's request was sent (or such longer period as the Board may specify), such member will be deemed to have agreed to receive such documents or information by means of a website in accordance with Article 219 above (save in respect of any documents or information as may be required to be sent in hard copy form pursuant to the Companies Laws).   A member can revoke any such deemed election in accordance with Article 223 below.

223.     Any amendment or revocation of a notification given to the Company or agreement (or deemed agreement) under these Articles shall only take effect if in writing, signed (or authenticated by electronic means) by the member and on actual receipt by the Company thereof.

224.     Where these Articles require or permit a document to be authenticated by a person by electronic means, to be valid it must incorporate the electronic signature or personal identification details of that person, in such form as the Directors may approve, or be accompanied by such other evidence as the Directors may require to satisfy themselves that the document is genuine.

225.     In the case of joint holders of a share:

(a)     all documents or information shall be given to the joint holder whose name stands first in the Register in respect of the joint holding and any document or information so given shall be deemed for all purposes given to all the joint holders; and

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

(b)     anything to be agreed or specified in relation to any document or information to be given to them may be agreed or specified by any one of the joint holders and any such agreement or specification shall be deemed for all purposes to be agreed or specified by all the joint holders. The agreement or specification of the joint holder whose name stands first in the Register in respect of the joint holding shall be accepted to the exclusion of the agreement or specification of any of the other joint holders.

226.    If a member (or, in the case of joint holders, the person first named in the Register) has a registered address outside of Jersey, the Republic of Ireland, the United Kingdom or the USA but has notified the Company of an address within Jersey, the Republic of Ireland, the United Kingdom or the USA at which documents or information may be given to him, he shall be entitled to have documents or information given to him at that address or, where applicable, to be notified at that address of the availability of documents or information on a website. Alternatively, if a member has a registered address outside Jersey, the Republic of Ireland, the United Kingdom or the USA, he may give the Company an address for the purposes of communications in electronic form in which event, subject to these Articles, documents or information may, at the Company's absolute discretion, be sent to him at that address.  Otherwise, no such member shall be entitled to receive any document or information from the Company.

227.    If on at least three consecutive occasions any document or information sent to a member by post at his registered address or his address at which documents or information may be given to him has been returned undelivered, such member shall not thereafter be entitled to receive any document or information from the Company until he shall have communicated with the Company and supplied the Company with a new registered address within Jersey, the Republic of Ireland, the United Kingdom or the USA or an address within Jersey, the Republic of Ireland, the United Kingdom or the USA at which documents or information may be given to him.

228.    If on at least two consecutive occasions the Company has attempted to send a document or information by electronic means to an address for the time being notified to the Company by a member for that purpose but the Company is aware that there has been a failure of delivery of such document or information, the Company shall, subject to the provisions of these Articles, thereafter send documents and information to such member by post at his registered address or his address at which documents or information may be given to him.

229.    The provisions of Articles 217 to 237 do not affect any provision of the Companies Laws requiring documents or information to be served on or given, sent, supplied or delivered to a member in a particular manner.

58

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Notice to persons entitled by transmission**

230.    The Company may give a document or information to the person entitled by transmission to a share by sending it in any manner authorised by these Articles for the giving of a document or information to a member, addressed to that person by name or by the title of representative of the deceased or trustee of the bankrupt or representative by operation of law or by any similar description, at the address (if any) in Jersey, the Republic of Ireland, the United Kingdom or the USA supplied for that purpose by the person claiming to be so entitled.   Until such an address has been supplied, a document or information may be given in any manner in which it might have been given if the death or bankruptcy or other event giving rise to the transmission of entitlement had not occurred.

**Record date for communications**

231.    For the purposes of giving notices of meetings, or of sending or supplying other documents or other information, whether under the Companies Laws, any other applicable law or regulation, a provision in these Articles or any other instrument, the Company may determine that persons entitled to receive such documents or information are those persons entered on the Register at the close of business on a day determined by it.  The day determined by the Company for the purposes of this Article may not be more than 21  days before the day that the notice of the meeting, document or other information is given.

**Evidence of service**

232.    Any document or information:

(a)    addressed to a member at his registered address or address at which documents or information may be given to him in Jersey, the Republic of Ireland, the United Kingdom or the USA shall, if sent by post, be deemed to have been given to or received by the intended recipient (where first class post is employed) on the day after the day on which it was posted or (where second class post is employed) on the second day after the day on which it was posted and, in proving service, it shall be sufficient to prove that an envelope containing the document or information was properly addressed, pre-paid and put into the post;

(b)    not sent by post but addressed to a member but left at his registered address or address at which documents or information may be given to him in Jersey, the Republic of Ireland, the United Kingdom or the USA shall be deemed to have been given to or received by the intended recipient on the day on which it was so left;

(c)    sent or supplied by electronic means shall be deemed to have been given to or received by the intended recipient on the day it was sent even if the Company

59

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

subsequently sends a hard copy of such document or information by post.  In proving service, it shall be sufficient to show that the document or information was properly addressed and sent;

(d)     sent or supplied by the Company by means of a relevant system, that document or information shall be deemed to have been given to or received by the intended recipient when the Company or any sponsoring system-participant acting on its behalf sends the issuer's instruction relating to the document or information; and

(e)     sent or supplied by being made available on a website shall be deemed to have been given to or received by the intended recipient on the day on which the document or information was first made available on the website or, if later, when the recipient received (or is deemed to have received) notification of the fact that the  document or information was available on the website.

233.    A member present, either in person or by proxy, at any meeting of the Company shall be deemed to have been received due notice of the meeting and, where requisite, of the purposes for which the meeting was called.

234.    Proof that a notice contained in an electronic communication was sent in accordance with guidance issued by the Institute of Chartered Secretaries and Administrators shall be conclusive evidence that the notice was given.

235.    Any document or other information sent or supplied by the Company by any other means authorised in writing by the member concerned shall be deemed to have been received when the Company has carried out the action it has been authorised to take for that purpose.

**Notice binding on transferees**

236.    Every person who, by operation of law, transfer or any other means, becomes entitled to a share shall be bound by any notice in respect of that share which, before his name is entered in the Register, has been given to a person from whom he derives his title.

**Notice during disruption of services**

237.    If at any time by reason of the suspension, interruption or curtailment of postal services or the electronic communications system in Jersey, the Republic of Ireland, the United Kingdom or the USA, the Company is or would be unable effectively to convene a general meeting by notices sent through the post or by electronic means, notice of the general meeting may be given by a notice advertised in at least one newspaper with a national circulation in each of the United Kingdom and the USA.  Such notice shall be deemed to have been duly served on all persons who are entitled to have notice of meetings sent to them at noon on the day when the advertisement (or, where applicable, the first of such

60

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

advertisements) appears.  In any such case, the Company shall send confirmatory copies of the notice by post or by electronic means if, at least seven clear days before the meeting, the posting of notices to addresses throughout Jersey, the Republic of Ireland, the United Kingdom or the USA or, as the case may be, the sending of such notices by electronic means again becomes practicable.

<div align="center">

**WINDING UP**

</div>

238.   The Board shall have power in the name and on behalf of the Company to present a petition to the Court for the Company to be wound up. Subject to any particular rights or limitations for the time being attached to any shares, as may be specified in these Articles or upon which such shares may be issued, if the Company is wound up, the assets available for distribution among the members shall be distributed to the members pro rata to the number of shares held by each member at the time of the commencement of the winding up.   If any share is not fully paid up, that share shall only carry the right to receive a distribution calculated on the basis of the proportion that the amount paid up on that share bears to the issue price of that share.

239.   If the Company shall be wound up (whether the liquidation is voluntary, under supervision, or by the Court) the liquidator (or the Directors, where no liquidator is appointed) may, with the authority of a special resolution, divide amongst the members in specie the whole or any part of the assets of the Company (whether or not the assets shall consist of property of one kind or shall consist of properties of different kinds) and may for such purpose set such value as he deems fair upon any one or more class or classes of property and may subject to any special rights attached to any shares or the terms of issue thereof determine how such division shall be carried out as between the members or different classes of members. The liquidator (or the Directors, where no liquidator is appointed) may, with the like authority, vest any part of the assets in trustees upon such trusts for the benefit of members as the liquidator with the like authority shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no contributory shall be compelled to accept any shares or other property in respect of which there is a liability.

<div align="center">

**INDEMNITY AND INSURANCE**

</div>

240.   Subject to the provisions of and to the extent permitted by the Companies Laws, the Company may:

(a)      indemnify any Director of the Company (or of a subsidiary) against any liability;

(b)      indemnify a Director of a company that is a trustee of an occupational pension scheme for employees (or former employees) of the Company (or of an associated

<div align="center">

61

</div>

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

body corporate) against liability incurred in connection with the company's activities as trustee of the scheme;

(c)     purchase and maintain insurance against any liability for any Director referred to in  paragraph (a) or (b) above; and

(d)     provide any Director referred to in paragraph (a) or (b) above with funds (whether by loan or otherwise) to meet expenditure incurred or to be incurred by him in defending any criminal, regulatory or civil proceedings or in connection with an application for relief (or to enable any such Director to avoid incurring such expenditure).

241.     Subject to the Companies Laws, the powers given by Article 240 shall not limit any general powers of the Company to grant indemnities, purchase and maintain insurance or provide funds (whether by way of loan or otherwise) to any person in connection with any legal or regulatory proceedings or applications for relief.

62

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.



December 4, 2012

**PERSONAL AND CONFIDENTIAL**

**Jeffrey Ross**

Re: Employment Agreement

Dear Jeffrey:

We are very pleased to offer you a full-time position with Velti, Inc. (the "Company") as a **Chief Financial Officer, CFO** at our offices in **San Francisco**, starting on **January 1, 2013**. The Company reserves the right to assign your employment to any of its subsidiaries or affiliated entities, as it deems necessary or appropriate. We trust that your knowledge, skills and experience will be among our most valuable assets.

Please find below a brief description of the compensation and benefits that will be provided to you in conjunction with your employment, as well as the terms and conditions that govern our employment relationship.  Please note that the Company may, in its discretion, change its benefit plans from time to time.

**Base Pay:** You will be paid a monthly base salary of **$29,166** which is equivalent to **$350,000** on an annualized basis. As an exempt employee, you will not be eligible to receive any overtime pay. You will be paid in accordance with the Company's regular payroll schedule on the 15 th and last day of the month, and your base pay will be subject to applicable tax and other withholdings.

**Performance Bonus:** You will be eligible to earn an annual discretionary performance bonus (calendar year) of up to **$175,000**, based upon your achievement of performance targets determined by the Company and the Company's achievement of its financial and other goals. The determination of whether you earn an annual bonus as well as the amount and composition (cash or immediately vesting shares) of any bonus will be determined by the Company in its sole discretion. You must be employed by the Company on December 31 of the applicable year in order to be eligible to earn any bonus. If you resign from your employment prior to the bonus payment date, you will not earn or receive any bonus for the prior year.

**First Year Equity Award:** Subject to the approval of the Board, you will be awarded an initial equity award of  **100,000** Company restricted shares. Provided you remain employed by the Company, the awards will vest over a four-year period, with 25% vesting on each of the first four anniversaries of the award grant date.

You shall become eligible for additional yearly equity grants in the future as part of our annual appraisal and salary review process, based upon your performance and other relevant criteria up to a value of $750,000 payable in Company ordinary shares with such number of shares determined based upon the Black-Scholes valuation at the time of grant based. Determinations to grant additional equity awards (as well as the value of any such awards) are made by the Company in its sole discretion and are subject to the approval of the Board, the Remuneration Committee of the Board, or the Share Award Committee.

**Sign on Equity Award:** You will also be awarded an additional equity award of **100,000** deferred share units. The award will be made in accordance with the Company's 2009 US Employee Share Incentive Plan (as amended and restated through the date of grant) (the "Plan"). As a condition of your option grant, you will be required to sign the Company's standard form of deferred share unit agreement, and the award will be subject to the terms and conditions

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.



velti

of the Plan and the Applicable agreement. Provided you remain employed by the Company, the award will vest over a four-year period, with 25% vesting on each of the first four anniversaries of the award grant date.

**Paid Time Off:** You will be subject to the Company's vacation and time off policy as applied to all other employees of the Company at the same grade level within the Company as you. Currently, under such policy, although Velti believes that taking time off for relaxation, vacation and other personal needs is essential to the health and productivity of every employee, Velti no longer has a vacation policy for its exempt US employees at your grade level and above. As a result, you will not earn vacation or have a vacation accrual balance. You will be paid your regular base salary at all times while you are actively employed by Velti (including while on Velti holidays). If you wish to take time off from work for purposes of relaxation, vacation, or other personal reasons, you may do so with the prior approval of your supervisor, and you will continue to be paid your base salary during the approved time of period.

Approval of an employee's request for time off will be subject to the terms of the Company's Vacation Policy and will be based on your supervisor's review of appropriate business considerations including, without limitation, the needs of your business unit, your work performance and workload, your ability to meet your work commitments and duties, and the amount of time off previously taken by you.

As an exempt U.S. employee, you will earn 10 days of paid sick time off per calendar year (.833 days per month from the start of employment) up to a maximum accrual of 10 days. Sick leave is subject to the terms and conditions of the Company's Sick Time Off Policy.

**Healthcare Plan:** The Company will provide you with the opportunity to participate in its group health insurance plan currently available to other similarly situated employees, subject to any eligibility requirements imposed by such plan(s).

**Phone, Computer, Internet, and Travel Expenses:** Documented and reasonable business expenses will be reimbursed on a monthly basis in accordance with Company policy as established and/or modified from time to time.

**Proof of Right to Work:** For purposes of federal immigration law and as a condition of your employment, you will be required to complete a Form I-9 and provide the Company with sufficient documentation establishing your identity and eligibility to work in the United States within three (3) business days of your date of hire, or our employment relationship with you may be terminated.

**Non-Disclosure Agreement:** As a condition of your employment, on or before your start date, you must sign and return to the Company a copy of its Employee Non-Disclosure and Invention Assignment Agreement (the "ENIAA" or the "Restrictive Covenant Agreement") prior to your employment start date, which provides for standard confidentiality, non-solicitation and assignment of inventions obligations in favor of the Company. In addition, for purposes of federal immigration law, on or before your start date, you must provide to the Company documentary evidence of your identity and eligibility for employment in the United States. Your failure to timely execute such Restrictive Covenant Agreement and/or provide adequate documentation will result in your immediate termination for Cause.

**Termination of Employment**: Our employment relationship is "at-will." You may terminate your employment with the Company for any reason. Subject to the remainder of this Section, the Company may terminate your employment at any time and for any reason whatsoever, with or without cause or advance notice.

***Termination Without Cause or Following a Change in Control***

**Severance:** Notwithstanding the at-will relationship, if your employment is terminated by the Company without Cause or within one year following a Change in Control (and other than as a result of your death or disability), and such termination is deemed to be a "separation from service" (within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended, and any successor statute, regulation and guidance thereto ("Section 409A")), you will be eligible to receive the following severance benefits for a period of 6 months (the "Severance Period") following your termination: (a) severance payments at your monthly base salary rate in effect as of your date of termination, payable

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

in equal installments during the Severance Period in accordance with the Company's payroll practices at the time; and (b) subject to, and contingent upon, your timely election to continue group health plan benefits pursuant to the terms, conditions and requirements of COBRA (if and only to the extent applicable) and/or any applicable state law governing continuation coverage of group health plan benefits, and your continued eligibility for such benefits, payment by the Company of the monthly insurance premiums necessary to continue such group health coverage for you and/or your dependents (if and as applicable) during the Severance Period. Your eligibility to receive the foregoing severance benefits is conditioned upon (c) your entering into and not revoking a general release of all claims and Restrictive Covenant Agreement, in form acceptable to the Company in its sole discretion, within the time period required by the Company, but in no event later than 45 days following your termination date, and (d) your compliance with the obligations under a Restrictive Covenant Agreement to be entered into as a condition to receiving such severance benefits. In the event you breach the obligations under such Restrictive Covenant Agreement, you will have no right to receive, and the Company shall not pay you, any severance benefits following the date of such breach. Such cessation of payments shall be in addition to, and not in lieu of, any and all other remedies, whether at law or in equity, available to the Company for such breach.

In addition, notwithstanding any provision to the contrary contained in any plan or agreement evidencing an equity award granted to you, but subject to compliance with the provisions of Section 40A of the U.S. Internal Revenue Code as amended ("Section 409A"), the vesting and exercisability of your outstanding equity awards shall be accelerated fifty percent immediately prior to but conditioned upon the consummation of a Change in Control of the Company (assuming for the purpose of determining the extent of such acceleration, if applicable, that fifty percent (50%) of the target level of performance has been achieved on any performance-based awards), provided that you remain an employee with the Company immediately prior to the Change in Control. Should your employment be terminated without Cause within 12 months following a Change in Control of the Company, the vesting, exercisability and settlement of each of your outstanding equity awards which were not otherwise accelerated shall be accelerated in full so that each equity award held by you shall be immediately exercisable and fully vested (and, in the case of Restricted Share Units or Deferred Share Units, performance shares, performance units and similar share-based compensation, shall be settled in full), as of the date on which the release required to be signed you becomes effective (provided, however, that with respect to Section 409A Deferred Compensation, the effective date of the vesting and settlement shall be the date which is sixty (60) days following your termination without Cause within 12 months after a Change in Control), and you shall have a period of twelve (12) months following the date of such termination following a Change in Control to exercise any of your vested share options.

For purposes of this Agreement, "Cause" means: (i) your conviction of, guilty or no contest plea to, or public confession of guilt to, a felony; (ii) an act or omission by you which constitutes fraud, gross negligence or willful misconduct, or dishonesty which is materially injurious to the Company's business, prospects or reputation; (iii) a failure by you to substantially perform your duties or failure to comply with any lawful directive of the Board consistent with your position and duties; (iv) your material breach of this Agreement or your Restrictive Covenant Agreement; (vi) your willful disclosure of the Company's confidential or proprietary information; (vii) a material breach of any agreement between you and the Company, including this Agreement; (viii) a material violation of any Company policy; (ix) your death or Complete Disability or (x) the taking by you of any action on behalf of the Company or any of its affiliates without appropriate authority to take such action, which either singularly or combined with any other action(s) is materially harmful to the Company or any of its affiliates.

"Change in Control" means the occurrence of any of the following: (i) any "person" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), other than a trustee or other fiduciary holding securities of the Company under an employee benefit plan of the Company, acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person) "beneficial ownership" (as defined in Rule 13d 3 promulgated under the Exchange Act), directly or indirectly, of ordinary shares of the Company representing more than fifty percent (50%) of the total combined voting power of the Company's then outstanding ordinary shares entitled to vote generally in the election of directors; (ii) the Company is party to a merger or consolidation which results in the holders of the ordinary shares of the Company outstanding immediately prior thereto failing to retain immediately after such merger or consolidation direct or indirect beneficial ownership of more than sixty percent (60%) of the total combined voting

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.



power of the shares entitled to vote generally in the election of directors of the Company or the surviving entity outstanding immediately after such merger or consolidation; (iii) the sale or disposition of all or substantially all of the Company's assets or consummation of any transaction having similar effect (other than a sale or disposition to one or more subsidiaries of the Company); or (iv) the shareholders of the Company or the Board approve a plan of complete liquidation or dissolution of the Company;

provided, however, that a Change in Control shall be deemed not to include a transaction described in subsections (i) or (ii) of this Section in which a majority of the members of the board of directors of the continuing, surviving or successor entity, or parent thereof, immediately after such transaction is comprised of directors who were members of the Board immediately prior to consummation of such transaction.  Notwithstanding the foregoing, to the extent that any amount constituting deferred compensation pursuant to and not exempted from the requirements of Section 409A of the Internal Revenue Code, as amended, would become payable pursuant hereto by reason of a Change in Control, such amount shall become payable only if the event constituting a Change in Control would also constitute a change in ownership or effective control of the Company or a change in the ownership of a substantial portion of the assets of the Company within the meaning of Section 409A of the Internal Revenue Code, as amended.

Termination without Cause or within one year following a Change in Control includes a termination by the Company of your employment for any reason other than Cause, or your resignation for Good Reason, provided that such resignation occurs no later than thirty (30) days following the expiry of the 30 day notice period following the initial occurrence of the condition constituting Good Reason.

For purposes hereof, "Good Reason" means the occurrence of any of the following conditions without your informed written consent, which condition(s) remain(s) in effect fifteen (15) days after written notice to the Company from you of such condition(s) and which notice must have been given within thirty (30) days following the initial occurrence of such condition(s): (i)   a material diminution in your title, authority, duties or responsibilities, causing your position to be of materially lesser rank or responsibility within the Company or an equivalent business unit of its parent, as measured against your authority, duties or responsibilities at any time during the ninety (90) day period prior to the date on which the required notice of Good Reason is delivered by you; (ii)   a material decrease in your base salary or long-term or other incentive compensation opportunity (subject to applicable performance requirements with respect to such incentive compensation opportunity earned and paid); or (iii)   the relocation of your work place for the Company to a location that increases the regular commute distance between your residence and work place by more than fifty (50) miles (one-way).

Notwithstanding any other provision with respect to the timing of payments under this section, if, at the time of your termination, you are deemed to be a "specified employee" (within the meaning of Section 409A) of the Company, then only to the extent necessary to comply with the requirements of Section 409A, any payments to which you may become entitled under this section which are subject to Section 409A (and not otherwise exempt from its application) will be withheld until the first business day of the second month following the termination of your employment hereunder, at which time you shall be paid an aggregate amount equal to withheld payments otherwise due to you under the terms of this Section during the initial 1-month period following your termination.

**General Obligations:** As an employee, you will be expected to adhere to all of the Company's policies, and to conduct yourself in accordance with the Company's standards of professionalism, loyalty, integrity, honesty, reliability and respect for all. The Company does not permit, and will not tolerate, the unlawful discrimination or harassment of any of its employees or contractors on the basis of sex, race, color, religion, age, national origin or ancestry, marital status, veteran status, mental or physical disability, medical condition, sexual orientation, pregnancy, childbirth or related medical condition, or any other status protected by applicable law.

You agree that you will at all times, to the best of your ability and experience, loyally and conscientiously perform all of the duties and obligations required of and from you pursuant to the express and implicit terms hereof to the reasonable satisfaction of the Company. During the term of your employment, you agree that (i) you will devote all of your business time and attention to the business of the Company, (ii) the Company will be entitled to all of the benefits and profits

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.



arising from or incident to all such efforts by you, (iii) you will not render commercial or professional services of any nature to any person or organization, whether or not for compensation, without the prior written consent of the Company's Chief Executive Officer or Senior Vice President of Human Resources, and (iv) you will not directly or indirectly engage or participate in any business that is competitive in any manner with the business of the Company.

**Entire Agreement and Modification:** You acknowledge that this letter agreement, along with the other agreements referenced above, constitutes the entire agreement between you and the Company concerning our employment relationship.  Unless they are expressly included in this letter agreement, no verbal, written, or implied agreements, promises or representations are or will be effective or binding upon the Company.  This letter agreement may not be modified or amended except by a subsequent written agreement between the parties signed by you and an authorized officer of the Company.  Notwithstanding the previous sentence, the Company may change your position, duties, compensation, or benefits from time-to-time as it deems necessary or appropriate.

**Duties to Third Parties:** The Company is an ethical competitor, and will not tolerate any unlawful activities by its employees in connection with the performance of their duties for the Company. By accepting this offer, you represent and warrant that you are able to perform your duties for the Company without breaching any legal obligations that you have to any third party, including any obligations to your current or former employers.  You agree that you will not, in the course of your employment with the Company, use any proprietary information of any third party, including your current or former employers. This offer of employment will remain open until the close of business on  **September 10, 2012**. If this offer is not accepted at or before that time, it will expire and be of no further force or effect.
We are delighted to be able to extend you this offer of employment and look forward to welcoming you aboard.  To accept this offer, please sign and date the enclosed copy of this letter where indicated below and return it to me.

Your immediate supervisor will be Alex Moukas, Chief Executive Officer. Please feel free to call me if you have questions or concerns at 617-953-9677.


Yours sincerely,

/s/ Alex Moukas
Alex Moukas

*Accept Job Offer*

I agree to and accept employment with Velti USA on the terms and conditions set forth in this agreement.  I understand and agree that my employment with the Company is at-will.


Signature:      /s/ Jeffery G. Ross                               Date:      December 10, 2012

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## FIRST AMENDMENT TO LEASE

**THIS FIRST AMENDMENT TO LEASE ("First Amendment")** is made and entered into to be effective as of November 15, 2011 (the **"First Amendment Effective Date"**) by and between PPF PARAMOUNT ONE MARKET PLAZA OWNER L.P. (**"Landlord"**) and VELTI USA, INC. **"Tenant"**).

**WHEREAS**, Landlord and Tenant are parties to that certain lease dated September 29,2011 (the **"Lease"**), pursuant to which Landlord leases to Tenant certain office suites described as Suites 600 and 700A (the **"Premises"**), located on the 6th and 7th floors of the Steuart Tower in the building located at One Market Street, San Francisco, CA (the **"Building");** and

**WHEREAS**, Landlord and Tenant desire to modify Section 4.1 in Exhibit B-2 of the Lease;

**NOW, THEREFORE**, in consideration of the above recitals which are incorporated herein by reference, and for other good and valuable consideration, receipt of which is hereby acknowledged, subject to all of the terms, covenants and conditions herein and in the Lease, the parties agree that the Lease shall be and hereby is modified, amended and superseded in the following particulars:

l. <u>Defined Terms</u>. Each capitalized term used in this First Amendment shall have the same meaning as is ascribed to such capitalized term in the Lease, unless otherwise modified herein.

2. <u>Work Agreement- Design Matters</u>. Section 4-1 in Exhibit B-2 of the Lease currently requires the Landlord to select the Contractor by submitting work of Tenant Improvements to at least three (3) general contractors for competitive bidding. In an effort to provide a more cohesive team structure for the project, the parties have agreed that Landlord will be permitted to select the Contractor based upon negotiations with several general contractors regarding the proposed fees to be charged by said general contractors and their respective estimated budgets, schedules and scopes of work with respect to the performance of the Tenant Improvements. Landlord will notify Tenant of Landlord's selection as the Contractor, and will require Contractor to procure competitive bids from all major subtrades once the Construction Drawings have been completed.

3. <u>Miscellaneous.</u>

(a) This First Amendment and the attached exhibits, which are hereby incorporated into and made a part of this First Amendment, set forth the entire agreement between the parties with respect to the matters set forth herein. There have been no additional oral or written representations or agreements.

(b) Tenant represents to Landlord that as of the First Amendment Effective Date: (a) Tenant is not in Default under any of the terms and provisions of the Lease; (b) Landlord is not in default in the performance of any of its obligations under the Lease; and (c) Tenant is unaware, absent independent inquiry, of any condition or circumstance which, with the giving of notice or the passage of time or both, would constitute a Landlord Default under the Lease. Tenant further acknowledges that as of the First Amendment Effective Date, Tenant has no current defenses, offsets, liens, claims or counterclaims against Landlord under the Lease or against the obligations of Tenant under the Lease.

(c) Except as herein modified or amended, the provisions, conditions and terms of the Lease shall remain unchanged and in full force and effect.

(d) In the case of any inconsistency between the provisions of the Lease and this First Amendment, the provisions of this First Amendment shall govern and control.

(e) Tenant hereby represents to Landlord that Tenant has dealt with no broker in connection with this First Amendment. Tenant agrees to defend, indemnify and hold Landlord harmless from all claims of any brokers claiming to have represented Tenant in connection with this First Amendment. Landlord hereby represents to Tenant that Landlord has dealt with no broker in connection with this Fist Amendment. Landlord agrees to defend, indemnify and hold Tenant harmless from all claims of any brokers claiming to have represented Landlord in connection with this First Amendment.

(f) Each signatory of this First Amendment represents hereby that he or she has the authority to execute and deliver the same on behalf of the party hereto for which such signatory is acting.

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(g) This First Amendment may be executed in multiple counterparts each of which is deemed an original but together constitute one and the same instrument. This First Amendment may be executed in so-called "pdf" format and each party has the right to rely upon a pdf counterpart of this First Amendment signed by the other party to the same extent as if such party had received an original counterpart.

IN WITNESS WHEREOF, the parties have executed this FIRST AMENDMENT TO LEASE to be effective as of the last date signed below.

LANDLORD                                              TENANT

PPF PARAMOUNT ONE MARKET PLAZA OWNER
L.P., a Delaware limited partnership                  VELTI USA, INC.


By: PPF PARAMOUNT GP, LLC                             By: /s/ Sally Rau
By: /s/ Jolanta Bott                                      Sally Rau
Name: Jolanta K. Bott                                 Chief Administrative Officer and General Counsel
Title: Vice President

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## SECOND AMENDMENT TO LEASE

   **THIS SECOND AMENDMENT TO LEASE ("Second Amendment")** is entered into as of May 18, 2012 (the **"Second Amendment Effective Date"),** by and between **PPF PARAMOUNT ONE MARKET PLAZA OWNER, L.P.,** a Delaware limited partnership **("Landlord")** and **VELTI USA, INC.,** a Delaware corporation **("Tenant")** with reference to the following facts:

A      Landlord and Tenant are parties to that certain lease dated as of September 29, 2011 (the **"Original Lease"),** which lease has been previously amended by that certain First Amendment to Lease dated as of November 15, 2011 (the **"First Amendment")** (the Original Lease, as so amended, being referred to herein as the **"Lease"),** pursuant to which Landlord leases to Tenant space currently containing 37,521 rentable square feet (the **"Current Premises")** described as Suite Nos. 600 and 700A on the sixth (6th) and seventh (7th) floors, respectively of the Steuart Tower in the building commonly known as One Market, located at One Market Street, San Francisco, California (the **"Building").**

B.      Pursuant to the provisions of Section 52(a) of the Original Lease, Tenant was granted a Right of First Offer with respect to Offering Space located on the fifth (5th) floor of the Steuart Tower (the **"Right of First Offer").** In accordance with the provisions of the Right of First Offer, Landlord delivered an Advice (the **"Advice")** to Tenant; pursuant to which Landlord offered to lease to Tenant certain Offering Space designated as Suite

   500, more particularly described in **Exhibit A** attached hereto, consisting of 36,436 rentable square feet of space (and hereinafter referred to as the **"Expansion Space");** Tenant has timely exercised its Right of First Offer to lease such Expansion Space in accordance with the terms of the Advice. Accordingly, Landlord and Tenant agree that the Expansion Space shall be added to the Premises on the terms and conditions set forth in this Second Amendment.

   **NOW, THEREFORE,** in consideration of the above recitals which by this reference are incorporated herein, the mutual covenants and conditions contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

   I. **Expansion.** Effective as of May 1, 2013 (the **"Expansion Date"),** the Premises, as defined in the Lease, is increased by the addition of the Expansion Space, and from and after the Expansion Date, the Current Premises and the Expansion Space, collectively, containing 73,957 rentable square feet, shall be deemed the "Premises" for all purposes under the Lease. The term for the Expansion Space shall commence on the Expansion Date and end on the Expiration Date.  The Expansion Space is subject to all the terms and conditions of the Lease except as expressly modified herein. The Expansion Date shall be delayed to the extent that Landlord fails to deliver possession of the Expansion Space due to holding over by prior occupants.  Any such delay in the Expansion Date shall not subject Landlord to any liability for any loss or damage resulting therefrom.

   2. **Base Rent.** From and after August 1, 2013 (the **"Expansion Rent Commencement Date"**), in addition to Tenant's obligation to pay Base Rent for the Current Premises, Tenant shall pay Landlord Base Rent for the Expansion Space as follows:

66281005\!805152.3

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

| Months From and After Rent Commencement Date | Annual Rate Per Rentable Square Foot | Monthly Base Rent |
|---|---|---|
| 1 - 12 | $57.50 | $174,589.17 |
| 13-24 | $58.50 | $177,625.50 |
| 25-36 | $59.50 | $180,661.83 |
| 37-48 | $60.50 | $183,698.16 |
| 49-60 | $61.50 | $186,734.50 |
| 61 - Expiration Date | $62.50 | $189,770.83 |

3. **Expenses, Taxes and Insurance Expenses.** From and after the Expansion Date, (a) Tenant's Share will be increased to 4.61% to reflect the addition of the Expansion Space to the Premises and (b) the Tax Base Year, Operating Expense Base Year and Insurance Expense Base Year for the Expansion Space will each be the calendar year 2013 (i.e., the same as the Tax Base Year, Operating Expense Base Year and Income Expense Base Year for the Current Premises).

4. **Letter of Credit.**

(a) **Initial Increase.** Pursuant to the provisions of the Original Lease, Landlord delivered to Tenant a Letter of Credit in the amount of $1,031,827.50 (the **"Letter of Credit"**). On or before the Expansion Date, Landlord shall cause the face amount of the Letter of Credit to be increased to $2,000,000.00. Such increase shall be effected by an amendment to the existing Letter of Credit in form and substance reasonably satisfactory to Landlord.

(b) **Reduction in Letter of Credit Amount.** From and after the Expansion Date, Section 10(f) of the Original Lease shall be deemed deleted and replaced with the following:

Provided that Tenant has not previously been in Default prior to the effective date of the applicable reduction request and further provided that Tenant is not in Default at the time of such request, upon written request by Tenant, the face amount of the Letter of Credit (as increased pursuant to Section 4(a) above) may be reduced, at each anniversary of the Expansion Date, by an amount equal to two hundred fifty thousand dollars ($250,000.00); provided, however, that in no event will the Letter of Credit Amount be reduced below one million two hundred fifty thousand dollars ($1,250,000.00).

5. **Improvements to Expansion Space.**

(a) **Condition of Expansion Space.** Tenant has inspected the Expansion Space and agrees to accept the same "as is" without any agreements, representations, understandings or obligations on the part of Landlord to (i) perform any alterations, additions, repairs or improvements, (ii) fund or otherwise pay for any alterations, additions, repairs or improvements to the Expansion Space, or (iii) grant Tenant any free rent, concessions, credits or contributions of money with respect to the Expansion Space, except as may be expressly provided otherwise in this Second Amendment.

- 2 -

6628100511805152 3

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(b) Landlord has agreed to provide an allowance to Tenant to be applied towards certain costs associated with the design and construction of improvements in the Expansion Space (the **"Tenant Improvements,"** and said allowance being referred to as the **"Allowance").** Tenant may elect to perform the Tenant Improvements itself, in which event the Work Agreement attached hereto as **Exhibit B-1** shall apply. Alternatively, Tenant may elect to have Landlord manage the construction of the Tenant Improvements, in which event, the Work Agreement attached hereto as **Exhibit B-2** shall apply. Tenant shall have the right to the Allowance, and to construct the Tenant Improvements, at any time following the Expansion Date provided that, prior to any disbursement of Allowance by Landlord, (i) Tenant must have delivered the amendment to Letter of Credit described in Section 4(a) above and (ii) Tenant shall notify Landlord as to whether Tenant has elected to manage the construction of the Tenant Improvements or has elected to retain Landlord to manage the construction of Tenant Improvements. Following delivery of any such notice described in clause (ii) of the immediately preceding sentence, the applicable Work Agreement (i.e., either **Exhibit B-1** or **Exhibit B-2)** will govern the design and construction of the Tenant Improvements and the disbursement of the Allowance.

6.    **Parking.** From and after the Expansion Date, the aggregate number of Spaces to be licensed by Tenant from Landlord will be:

(a)    Six (6) unreserved Spaces in the On-Site Garage; and

(b)    Twenty Four (24) unreserved Spaces in the Off-Site Garage.

7.    **Deleted Provisions.** Section 52(a) of the Original Lease is deleted, null and void and of no further force or effect.

8.    **Miscellaneous.**

(a) This Second Amendment and the attached exhibits, which are hereby incorporated into and made a part of this Second Amendment, set forth the entire agreement between the parties with respect to the matters set forth herein.  There have been no additional oral or written representations or agreements.

(b) Except as herein modified or amended, the provisions, conditions and terms of the Lease shall remain unchanged and in full force and effect.

(c) In the case of any inconsistency between the provisions of the Lease and this Second Amendment, the provisions of this Second Amendment shall govern and control.

(d) Submission of this Second Amendment by Landlord is not an offer to enter into this Second Amendment but rather is a solicitation for such an offer by Tenant. Landlord shall not be bound by this Second Amendment until Landlord has executed and delivered the same to Tenant.

(e) The capitalized terms used in this Second Amendment shall have the same definitions as set forth in the Lease to the extent that such capitalized terms are defined therein and not redefined in this Second Amendment.

- 3-

6628100511805152 3

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(f) Tenant hereby represents to Landlord that Tenant has dealt with no broker in connection with this Second Amendment, other than Cushman & Wakefield of California, Inc. **("Tenant's Broker").** Tenant agrees to defend, indemnify and hold Landlord harmless from all claims of any brokers, other than Tenant's Broker, claiming to have represented Tenant in connection with this Second Amendment. Landlord hereby represents to Tenant that Landlord has dealt with no broker in connection with this Second Amendment, other than Jones Lang LaSalle Americas, Inc. **("Landlord's Broker").** Landlord agrees to defend, indemnify and hold Tenant harmless from all claims of any brokers claiming to have represented Landlord in connection with this Second Amendment.  Following the mutual execution and delivery of this Second Amendment, Landlord will pay a commission to Landlord's Broker, who will compensate Tenant's Broker with a portion of such commission, pursuant to the terms of a separate agreement.

(g) Each signatory of this Second Amendment represents hereby that he or she has the authority to execute and deliver the same on behalf of the party hereto for which such signatory is acting.

(h) This Second Amendment shall be of no force and effect unless and until accepted by Velti Plc **("Guarantor"),** who by signing below shall agree that the Guaranty executed by Guarantor in connection with the execution of the Original Lease shall apply to the Lease, as amended herein.

(i) Tenant represents and warrants to Landlord that Tenant is currently in compliance with and shall at all times through and including the Termination Date (including any extension thereof), remain in compliance with the regulations of the Office of Foreign Asset Control **("OFAC")** of the Department of the Treasury and any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto.

(j) This Second Amendment may be executed in multiple counterparts each of which is deemed an original but together constitute one and the same instrument.  This Second Amendment may be executed in so-called "pdf" format and each party has the right to rely upon a pdf counterpart of this Second Amendment signed by the other party to the same extent as if such party had received an original counterpart.

## [SIGNATURES ARE ON FOLLOWING PAGE]

- 4 -

6628100511805152 3

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**IN WITNESS WHEREOF,** Landlord and Tenant have duly executed this Second Amendment as of the Second Amendment Effective Date.

**LANDLORD:**

**PPF PARAMOUNT ONE MARKET PLAZA OWNER, L.P.,** a Delaware limited partnership

By:    PPF PARAMOUNT GP, LLC, a Delaware limited liability company

      By: /s/ Jolanta K. Bott
      Name: Jolanta K. Bott
      Title: Vice President


**TENANT:**

**VELTI USA, INC.,**
a Delaware corporation

| By: | /s/ Sally Rau |
| Print Names: | Sally J. Rau |
| Its: | Chief Administrative Officer & General Counsel |

**GUARANTOR:**

Guarantor hereby acknowledges the terms and conditions of the foregoing Second Amendment and agrees that the Continuing Guaranty of Lease, executed by Guarantor in favor of Landlord will guaranty the obligations of Tenant under the Lease, as amended by this Second Amendment.

**VELTI pic**

| By: | /s/ Alex Moukas |
| Print Names: | Alex Moukas |
| Its: | Chief Executive Officer |

- 5 -

6628100511805152 3

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## VELTI INC.

## FIRST AMENDMENT
## TO CREDIT AGREEMENT

This **FIRST AMENDMENT TO CREDIT AGREEMENT** (this "**Amendment**") is dated as of December ___, 2012 (the "**Effective Date**") and entered into by and among Velti Inc., a Delaware corporation, Velti plc, a company formed under the laws of the Bailiwick of Jersey, Channel Islands, Mobile Interactive Group Limited, a company formed under the laws of England and Wales with registered number 04572067, and Velti Mobile Platforms Limited, a company formed under the laws of the British Virgin Islands (collectively, the "**Borrowers**" and each an individual "**Borrower**"), the financial institutions listed on the signature pages hereof ("**Lenders**") and HSBC Bank USA, National Association, as Administrative Agent (the "**Administrative Agent**"), and is made with reference to that certain Credit Agreement dated as of August 10, 2012 (the "**Credit Agreement**"), by and among Borrowers, Lenders, and Administrative Agent. Capitalized terms used herein without definition shall have the same meanings herein as set forth in the Credit Agreement.

### RECITALS

**WHEREAS**, Borrowers and Lenders desire to amend the Credit Agreement to permit certain asset sales and additional Capital Expenditures, and to make certain other changes, in each case as set forth below;

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

**Section 1.**          **AMENDMENTS TO THE CREDIT AGREEMENT**

**1.1**  **Amendment to Section 7.06: Asset Sales.** Section 7.06 of the Credit Agreement is hereby amended by (i) deleting the word "and" from the end of clause (j) thereof, (ii) replacing the period at the end of clause (k) thereof with "; and", and (iii) adding a new clause (l) to the end thereof as follows:

"(l) Disposition of the assets of the business units known as "VCI Greece" and "Velti Bulgaria" owned by Velti Greece and Velti M-Telecom Ltd, provided that (i) the maximum net book value of the assets disposed of pursuant to this clause (l) does not exceed $24,160,000, (ii) the assets to be disposed of have been identified in writing to and approved in advance by the Administrative Agent and (iii) the consideration received in respect thereof is in an amount at least equal to the fair market value thereof and consists of not less than 100% cash."

**1.2**  **Amendment to Section 7.10      Financial Covenants**. Section 7.10(d) of the Credit Agreement is hereby amended and restated as follows:

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

"(d)   The Borrowers shall not permit Performance to Plan, with respect to both Consolidated Revenue and Consolidated Adjusted EBITDA, as determined at the end of each fiscal quarter of the Parent as set forth below, commencing with the fiscal quarter ending June 30, 2012, to be less than: (i) 70%, for the three months ending March 31 of each fiscal year; (ii) 75%, for the six months ending June 30 of each fiscal year; (iii) 80%, for the nine months ending September 30 of each fiscal year; and (iv) 85%, for the twelve months ending December 31 of each fiscal year thereafter; provided, however, that for the twelve months ending December 31, 2012, Performance to Plan shall instead be 90%."

**1.3   Amendment to Section 7.11: Capital Expenditures**. Section 7.11 of the Credit Agreement is hereby amended and restated in its entirety as follows:

"The Borrowers shall not, and shall not permit their Subsidiaries to, make or become legally obligated to make any Capital Expenditure, except for Capital Expenditures in the ordinary course of business not exceeding (a) in fiscal year 2012, $50,000,000 for software development and purchases and $17,000,000 for all other Capital Expenditures and (b) $40,000,000 for each fiscal year thereafter, in each case in the aggregate for the Parent and its Subsidiaries; provided, however, that so long as no Default has occurred and is continuing or would result from such expenditure, up to an aggregate of $10,000,000, if not expended in the fiscal year for which it is permitted, may be carried over for expenditure in the next following fiscal year (excluding any carry forward available from any prior fiscal year); and provided, further, with respect to any fiscal year, Capital Expenditures made during any such fiscal year shall be deemed to be made first with respect to the applicable limitation for such year and then with respect to any carry forward amount to the extent applicable."

**Section 2.   BORROWERS' REPRESENTATIONS AND WARRANTIES**

In order to induce Lenders to enter into this Amendment and to amend the Credit Agreement in the manner provided herein, each Borrower represents and warrants to each Lender that the following statements are true, correct and complete:

**A.   Existence, Qualification and Power**. Each Borrower (a) is duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation, organization or formation, (b)  has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to execute, deliver and perform its obligations under this Amendment, and (c) is duly qualified and licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business so requires, except to the extent failure to do so could not reasonably be expected to have a Material Adverse Effect.

**B.   Authorization; No Contravention**.  The execution, delivery and performance by each Borrower of this Amendment has been duly authorized by all necessary corporate or other organizational action, and does not and will not contravene (a) the terms of any

- 2 -

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

of the Borrowers' Organizational Documents or (b) any material applicable Law or any material contractual restriction binding on or affecting it.

**C. G o v e r n m e n t a l   A u t h o r i z a t i o n ;   O t h e r   C o n s e n t s** by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Borrowers of this Amendment, except for such approvals which have been obtained prior to the date of this Amendment and remain in full force and effect.

**D.   Binding Obligation**. This Amendment has been duly authorized, executed and delivered by each Borrower and this Amendment and the Credit Agreement, as amended hereby (the "**Amended Agreement**") are the legal, valid and binding obligations of each such Borrower enforceable against it in accordance with their terms, subject to the effect of applicable bankruptcy, insolvency, arrangement, moratorium and other similar laws affecting creditors' rights general and to the application of general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**E.   Incorporation of Representations and Warranties From Credit Agreement**. The representations and warranties contained in Section 5 of the Credit Agreement are and will be true, correct and complete in all material respects on and as of the Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case they were true, correct and complete in all material respects on and as of such earlier date; <u>provided</u> that, if a representation and warranty, covenant or condition is qualified as to materiality, the applicable materiality qualifier set forth above shall be disregarded with respect to such representation and warranty, covenant or condition for purposes of this condition.

**F.   Absence of Default**. No event has occurred and is continuing or will result from the consummation of the transactions contemplated by this Amendment that would constitute a Default or an Event of Default.

**Section 3.   MISCELLANEOUS**

**A.   Reference to and Effect on the Credit Agreement and the Other Loan Documents.**

1.   On and after the Effective Date, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import referring to the Credit Agreement, and each reference in the other Loan Documents to the "Credit Agreement", "thereunder", "thereof" or words of like import referring to the Credit Agreement shall mean and be a reference to the Amended Agreement.

2.   Except as specifically amended by this Amendment, the Credit Agreement and the other Loan Documents shall remain in full force and effect and are hereby ratified and confirmed.

- 3 -

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

3.     The execution, delivery and performance of this Amendment shall not, except as expressly provided herein, constitute a waiver of any provision of, or operate as a waiver of any right, power or remedy of Administrative Agent or any Lender under, the Credit Agreement or any of the other Loan Documents.

**B.    Fees and Expenses**. Each Borrower acknowledges that all costs, fees and expenses as described in subsection 10.04 of the Credit Agreement incurred by Administrative Agent and its counsel with respect to this Amendment and the documents and transactions contemplated hereby and any other fees otherwise agreed to by each Borrower shall be for the account of each such Borrower.

**C.    Headings**. Section and subsection headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purpose or be given any substantive effect.

**D.    Applicable Law**.  THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK.

**E.    Counterparts; Effectiveness**.  This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.   This Amendment shall become effective upon the execution of a counterpart hereof by each of Borrowers, Administrative Agent, Required Lenders and each of the Loan Parties and receipt by Borrowers and Administrative Agent of written or telephonic notification of such execution and authorization of delivery thereof.

**Section 4.    ACKNOWLEDGEMENT AND CONSENT BY GUARANTORS**

Each guarantor listed on the signature pages hereof (" **Guarantors** ") hereby acknowledges that it has read this Amendment and consents to the terms thereof, and hereby confirms and agrees that, notwithstanding the effectiveness of this Amendment, the obligations of each Guarantor under the Guarantee and Collateral Agreement and the other Loan Documents to which it is a party shall not be impaired or affected and the Guarantee and Collateral Agreement and the other Loan Documents to which it is a party are, and shall continue to be, in full force and effect and are hereby confirmed and ratified in all respects.  Each Guarantor further agrees that nothing in the Credit Agreement, this Amendment or any other Loan Document shall be deemed to require the consent of such Guarantor to any future amendment to the Credit Agreement.

[remainder of page intentionally left blank]

- 4 -

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the date first above written.

VELTI INC., a Delaware corporation, as Borrower

By: /s/ Sally Rau
Name: Sally J. Rau
Title: President

VELTI PLC, a company formed under the laws of the Bailiwick of Jersey, Channel Islands, as Borrower

By: /s/ Alex Moukas
Name: Alex Moukas
Title: Chief Executive Officer

MOBILE INTERACTIVE GROUP LIMITED, a company incorporated under the laws of England and Wales, as Borrower

By: /s/ Barry Houlihan
Name: Barry Houlihan
Title: General Manager

VELTI MOBILE PLATFORMS LIMITED, a company incorporated under the laws of the British Virgin Islands, as Borrower

By: /s/ Shirleen White
Name: Shirleen While
Title: Director

Signature Page to First Amendment to Credit Agreement

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

HSBC BANK USA, NATIONAL ASSOCIATION, as Administrative Agent, Issuing Bank, Swingline Lender and Lender

By: /s/ Christopher Moore
Name: Christopher Moore
Title: Vice President


HSBC Bank plc,
as Lender

By: /s/ James Shepherd
Name: James Shepherd
Title: Senior Corporate Banking Manager

Signature Page to First Amendment to Credit Agreement

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**Solely as to Section 4 hereof:**

**GUARANTORS**:

**VELTI MOBILE VALUE ADDED SERVICES LIMITED,** a company incorporated under the laws of the British Virgin Islands, as Guarantor

**VELTI DR LIMITED**, a company incorporated under the laws of England and Wales, as Guarantor

By: /s/ Shirleen White .

Name: Shirleen White .

Title: Director .

By: /s/ Menelaos Scouloudis .

Name: Menelaos Scouloudis .

Title: Director .

Signature Page to First Amendment to Credit Agreement

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**VELTI LIMITED**, a company incorporated under the laws of England and Wales, as Guarantor

By: /s/ Menelaos Scouloudis .
Name:   Menelaos Scouloudis .
Title:   Director .

**VELTI PLATFORMS AND SERVICES LIMITED**, a company formed under the laws of the Republic of Cyprus, as Guarantor

By: /s/ Soterakis Koupepides .
Name: /s/ Soterakis Koupepides .
Title:   Director .

**AIR2WEB, INC.**, a Delaware corporation, as Guarantor

By: /s/ Sally Rau .
Name:   Sally J. Rau .
Title:   President .

**MOBILE INTERACTIVE GROUP NETHERLANDS B.V.,** a company formed under the laws of the Netherlands, as Guarantor

By: /s/ Barry Houlihan
Name:  Barry Houlihan
Title: Authorized signatory on behalf of MOBILE INTERACTIVE GROUP HOLDINGS NETHERLANDS B.V.

**VELTI SOFTWARE PRODUCTS AND RELATED PRODUCTS AND SERVICES S.A.**, a company formed under the laws of the Hellenic Republic, as Guarantor

By: /s/ Menelaos Scouloudis .
Name:   Menelaos Scouloudis .
Title:   Chairman & Managing Director .

**MOBCLIX, INC.**, a Delaware corporation, as Guarantor

By:   Sally Rau .
Name:  Sally J. Rau .
Title:   President .

**MOBILE INTERACTIVE GROUP HOLDINGS NETHERLANDS B.V.,** a company formed under the laws of the Netherlands, as Guarantor

By: /s/ Barry Houlihan
Name:   Barry Houlihan
Title: Authorized signatory on behalf of MOBILE INTERACTIVE GROUP HOLDINGS NETHERLANDS B.V.

**VELTI US HOLDINGS, INC.**, a Delaware corporation, as Guarantor

By: /s/ Sally Rau .
Name:    Sally Rau .
Title:   President .

Signature Page to First Amendment to Credit Agreement

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

April 3, 2013

Velti Inc.
Steuart Tower
1 Market Street
Suite 600
San Francisco, California 94105

      Re:   <u>Limited Waiver – Credit Agreement dated as of August 10, 2012</u>

Ladies and Gentleman:

      Reference is hereby made to the Credit Agreement (as amended to the date hereof, the " *Credit Agreement*") dated as of August 10, 2012, between Velti Inc., a Delaware corporation, ("*Borrower Representative*"), Velti plc, a company formed under the laws of the Bailiwick of Jersey, Channel Islands, Mobile Interactive Group Limited, a company formed under the laws of England and Wales with registered number 04572067, and Velti Mobile Platforms Limited, a company formed under the laws of the British Virgin Islands (collectively, the "*Borrowers*"), each lender from time to time a party thereto, and HSBC Bank USA, National Association, a national banking association, (the "*Administrative Agent*"). Capitalized terms used in this limited waiver letter (this " *Waiver Letter*") shall have the meanings ascribed thereto in the Credit Agreement.

      Borrowers have informed the Administrative Agent that the Borrowers' Performance to Plan, with respect to Consolidated Adjusted EBITDA, is less than 90% for the twelve months ending December 31, 2012. Such Performance to Plan is below the amount permitted under Section 7.10(d) (iv) of the Credit Agreement for such period (the " *Designated Default*"). Borrowers have requested that Administrative Agent waive the Event of Default arising solely as a result of the Designated Default.

      Pursuant to the request of Borrowers and subject to the terms and conditions of this Waiver Letter, Administrative Agent hereby waives the Event of Default under Section 8.01(c) of the Credit Agreement directly resulting from the Designated Default occurring as of December 31, 2012.

      The obligations of the Administrative Agent under this Waiver Letter are subject to the fulfillment to the Administrative Agent's satisfaction of all of the following conditions on or before April 5, 2013:

(a)     The Administrative Agent shall have received, in form and substance satisfactory to the Administrative Agent, each of the following, duly executed:

        (i)     This Waiver Letter;

        (ii)    Such other documents as the Administrative Agent may require under any other paragraph of this Waiver Letter.

US_ACTIVE-111190377

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(b)     As of the date of this Waiver Letter, no Default or Event of Default (other than the Designated Default) shall have occurred and be continuing.

This waiver set forth in this Waiver Letter shall (i) be limited precisely as written, (ii) shall not be deemed to be an amendment, consent or waiver of any other terms or conditions of the Credit Agreement or any Loan Document, (iii) not extend nor be deemed to extend to any other Default or Event of Default that may now exist or hereafter arise under the Credit Agreement, whether similar or dissimilar to the Designated Default, (iv) not impair, restrict or limit any right or remedy of the Administrative Agent with respect to any other Default or Event of Default that may now exist or hereafter arise under the Credit Agreement, and (v) not constitute any course of dealing or other basis for altering any obligation of the Borrowers or any right, privilege or remedy of the Administrative Agent under the Credit Agreement or any Loan Document.  Except as expressly stated herein, Administrative Agent reserves all rights, privileges and remedies under the Credit Agreement and all other Loan Documents. Except as expressly set forth in this Waiver Letter, the Credit Agreement and the other Loan Documents shall continue in full force and effect.

After giving effect to this Waiver Letter, Borrowers hereby remake all representations and warranties contained in the Credit Agreement and reaffirm all covenants set forth therein. Borrowers further certify as of the date of this Waiver Letter that no Default or Event of Default (other than as a result of the Designated Default) has occurred and is continuing.  Borrowers agree to pay on demand all costs and expenses of, or incurred by, the Administrative Agent in connection with the preparation, execution and delivery of this Waiver Letter, including, without limitation, the fees and expenses of counsel to the Administrative Agent.

This Waiver Letter may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto. Any signature delivered by a party by facsimile transmission shall be deemed to be an original signature hereto. This Waiver Letter shall constitute a Loan Document.

[Signature pages follow.]

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Please acknowledge Borrowers' acceptance of the terms and conditions contained herein by dating and signing one copy below and returning it to the Administrative Agent on or before April 5, 2013.

Very truly yours,

HSBC BANK USA, NATIONAL ASSOCIATION, as                    Administrative Agent

By: /s/ Christopher Moore

Name: Christopher Moore
Title: Vice President

Acknowledged and Agreed as of the date first written above:

VELTI INC., as Borrower Representative

By:   /s/ Sally Rau

Name: Sally J. Rau
Title: Chief Administrative Officer

US_ACTIVE-111190377

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Acknowledged and Agreed as of the date first written above:

HSBC Bank plc, as Lender

By:  /s/ James Shepherd
      Name: James Shepherd
      Title: Senior Corporate Banking
              Manager

US_ACTIVE-111190377

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

**Framework, Guarantee & Call Option Agreement**

**In regard to the Sale and Purchase of certain Shares and certain Assets**

dated November 12, 2012

**The Sellers & VPS (the "Secured Parties")**

**and**

**The Purchasers & Guarantors (the "Debtors")**

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

*EXECUTION COPY*

# TABLE OF CONTENTS

**1   PREAMBLE   8**

**2   INTERPRETATION AND DEFINITIONS   10**

2.1   INTERPRETATION   10

2.2   DEFINITIONS   10

**3   ACQUISITION CONSIDERATION   21**

3.1   ACQUISITION CONSIDERATION   21

3.2   LIMITATION OF SELLERS' LIABILITY   23

3.2.1   *Time Limit for Claims   23*

3.2.2   *Aggregate Maximum Liability   23*

**4   CLOSING OF THE ACQUISITION   23**

4.1   CLOSING   23

4.2   TERRITORIAL ACTIVITIES - LICENSED "VELTI" USE   26

4.3   ALTERNATIVE PROPOSALS   27

**5   THE DIGITAL RUM DEBT   27**

**6   CALL OPTIONS   28**

6.1   GENERAL   28

6.2   THE CALL OPTION SHARES   28

6.3   EXERCISE PERIOD   29

**7   CALL OPTION CLOSING   31**

**8   GUARANTEE   32**

8.1   THE GUARANTEES   32

8.2   GENERAL PROVISIONS FOR THE GUARANTEES   37

8.3   PAYMENTS UNDER THE GUARANTEE   42

**9   PLEDGES   44**

9.1   THE PLEDGES TO VELTI S.A.   44

9.1.1   *Pledge given by K1   44*

9.1.2   *Pledge given by K2   45*

2

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

*9.1.3   Pledge given by CY2   46*

*9.1.4   Pledge given by VCI   47*

9.2   THE PLEDGES TO VHC   48

*9.2.1   Pledges given by MCY   48*

*9.2.2   Pledge given by CY1   48*

*9.2.3   Pledges given by CY2   49*

*9.2.4   Pledge given by VELTI E.O.O.D   50*

9.3   PLEDGE AGREEMENTS   50

*9.3.1   VELTI S.A. Pledge Agreements   50*

*9.3.2   The VHC Pledge Agreements   51*

*9.3.3   Safekeeping of Pledged Shares   51*

**10   REPRESENTATIONS AND WARRANTIES UNDER THIS FRAMEWORK, CALL OPTION AND GUARANTEE AGREEMENT   52**

10.1   REPRESENTATIONS CONCERNING THE DEBTORS   52

10.2   REPRESENTATIONS CONCERNING THIS AGREEMENT AND THE FRAMEWORK DOCUMENTS   53

10.3   REPRESENTATIONS CORRECT   54

**11   COVENANTS UNDER THE GUARANTEE & THIS AGREEMENT AS A WHOLE   54**

11.1   INFORMATION COVENANTS   54

11.2   NO FURTHER FINANCIAL EXPOSURE   55

11.3   MAINTENANCE OF CORPORATE AND BUSINESS STRUCTURE   56

11.4   NO SUBORDINATION   57

**12   FURTHER ASSURANCE   57**

**13   DEBTORS' INDEMNIFICATION - LIMITATION OF LIABILITY   58**

**14   ASSIGNMENT   58**

14.1 ASSIGNMENT, PARTICIPATION, CHANGE OF BENEFICIARY   58

**15   WAIVER, REMEDIES & AMENDMENTS   59**

15.1 WAIVER & REMEDIES   59

15.2 AMENDMENTS   60

**16   CONFIDENTIALITY – NON SOLICITATION   60**

3

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

**17   DEBTORS' REPRESENTATIVE & SELLERS' REPRESENTATIVE   61**

17.1   DEBTORS' REPRESENTATIVE   61

17.2   SELLERS' REPRESENTATIVE   62

**18   NOTICES, COMMUNICATIONS   63**

**19   COSTS   65**

**20   GOVERNING LAW & DISPUTE RESOLUTION   65**

20.1 GOVERNING LAW   65

20.2 SETTLEMENT OF DISPUTES   65

20.2.1 *Arbitration*   65

20.2.2 *Seat of arbitration*   65

20.3 AWARD FINAL AND BINDING   66

20.3.1 *Award*   66

20.3.2 *Judgment*   66

20.3.3 *Cost of Dispute*   66

20.3.4 *Confidentiality of Proceedings.*   66

**SCHEDULE (A) - VCI SPA   72**

**SCHEDULE (B) – "VELTI E.O.O.D SPA"   73**

**SCHEDULE (C) - "AR TRANSFER AGREEMENT" ……………………………………………74**

**SCHEDULE (D) – "IP TRANSFER AGREEMENT"   75**

**SCHEDULE (E) - "ADVENT SPA"   76**

**SCHEDULE (F) –"CY1 & CY 2 SPA"   77**

**SCHEDULE (G) – "VELTI S.A. PLEDGE ON STARCAPITAL SHARES OF K1"   78**

**SCHEDULE (H) – "VELTI S.A. PLEDGE ON STARCAPITAL SHARES OF K2"   79**

**SCHEDULE (I) - "VELTI S.A. PLEDGE ON VCI SHARES"   80**

**SCHEDULE (J) - "VELTI S.A. PLEDGE ON VCI BUSINESS RECEIVABLES"   81**

**SCHEDULE (K) - "VHC PLEDGE ON I-VCI SHARES"   82**

**SCHEDULE (L) - "VHC PLEDGE ON ROSSVAYS SHARES"   83**

**SCHEDULE (M) - "VHC FIXED AND FLOATING CHARGE ON I-VCI ASSETS"   84**

**SCHEDULE (N) - "VHC FIXED AND FLOATING CHARGE ON ROSSVAYS ASSETS"   85**

4

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

**SCHEDULE (O) - "VHC PLEDGE ON VELTI E.O.O.D SHARES"   86**

**SCHEDULE (P) - "VHC FLOATING PLEDGE ON VELTI E.O.O.D BUSINESS RECEIVABLES"   87**

**SCHEDULE (Q) - EBITDA   88**

**SCHEDULE (R) - "DIGITAL RUM"   92**

**SCHEDULE (S$_1$) - "DIGITAL RUM DEBT TO VELTI S.A."   93**

**SCHEDULE (S$_2$) - "DIGITAL RUM DEBT TO VPS"   94**

**SCHEDULE (T) - "EXERCISE NOTICE"   95**

**SCHEDULE (U) - "DEBTORS' BANK ACCOUNTS"   96**

**SCHEDULE (V) - "DIGITAL RUM LOAN"   97**

**SCHEDULE (W) – "AGREED UPON PROCEDURES"   97**

5

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

*EXECUTION COPY*

This **Agreement** made this 12th day of November 2012 by and between:

A. "**VELTI HOLDINGS CYPRUS LIMITED**", a limited liability by shares company, duly registered with the Companies Registrar of the Republic of Cyprus under number 241384 and having its registered office situated at Artemidos Tower, 3 Artemidos Avenue, 7th & 8th Floors, CY-6020 Larnaca Cyprus, herein represented by Emilios Kallenos, Director (hereinafter "**VHC**");

B. "**VELTI SOCIETE ANONYME OF SOFTWARE PRODUCTS AND RELATED PRODUCTS AND SERVICES**", a company established and operating under the laws of Greece, having its registered office at Maroussi Attica Greece, 44 Kifissias Avenue 15125, with tax registration No (AFM) 099756001/FAE Tax Office, herein represented by Menelaos Scouloudis, Chairman & CEO (hereinafter " **VELTI S.A.**");

C. "**VELTI M-TELECOM LIMITED**", a limited liability company incorporated, registered and existing under the laws of England, under company number 6113284, whose registered office is at 4th floor, Bastille Court, 2 Paris Garden, London SE1 8ND, herein represented by Menelaos Scouloudis, Director of the company (hereinafter " **M-TELECOM LTD**");

(The parties hereinafter referred to jointly as the "**Sellers**" and individually as a "**Seller**")

D. "**VELTI PLATFORMS AND SERVICES LTD**",  a limited liability by shares company duly registered with the Companies Registrar of the Republic of Cyprus under number 203280 and having its registered office situated at Grivas Dighenis Avenue 81-83, Jacovides Tower, Nicosia, CY-1090, Cyprus, herein represented by Soterakis Koupepides, Director of the company (hereinafter **VPS**")

(The Sellers and VPS hereinafter referred to jointly sometimes as the " **Secured Parties**" and individually as a "**Secured Party**")

E. "**STARCAPITAL LIMITED**", a limited liability by shares company duly registered with the Companies Registrar of the Republic of Cyprus under number 309631 and having its registered office situated at 48, Inomenon Ethnon, Guricon House, 2 & 3 floor, 6042, Larnaca, Cyprus, herein represented by Georgios Karantonis, Director of the company (hereinafter "**STARCAPITAL**" or "**MCY**");

6

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

F.  **"I-VCI LIMITED"**, a limited liability by shares company duly registered with the Companies Registrar of the Republic of Cyprus under number 309629 and having its registered office situated at 48, Inomenon Ethnon, Guricon House, 2 & 3 floor, 6042, Larnaca, Cyprus, herein represented by Theodoros Louka, Director of the company (hereinafter " **I-VCI**" or "**CY1**");

G.  **"ROSSVAYS INVESTMENTS LIMITED"** a limited liability by shares company duly registered with the Companies Registrar of the Republic of Cyprus under number 309687 and having its registered office situated at 48, Inomenon Ethnon, Guricon House, 2 & 3 floor, 6042, Larnaca, Cyprus, herein represented by Andreas Charalambous, Director of the company (hereinafter "**ROSSVAYS**' or "**CY2**"); (The parties under D, E, F hereinafter referred to jointly as the " **Purchasers**" and individually as a "**Purchaser**");

H.  Mr. Georgios **Karantonis** of Antonios, born in Aigion Ahaia in 1967, resident of Pikermi Attica Greece, 2A Makrygianni Str. 19009, holder of the police identity card no. AI 082132/30.10.2009 issued by the police precinct of Rafina, and with tax reg. no. (AFM) 039107722 – Pallinis Tax Office (hereinafter "**K1**");

I.  Mr. Nikolaos **Karapanagou** of Georgios, born in Lamia in 1971, resident of Nea Erythrea Attica Greece, 9 Ritsou Str. 14671, holder of the police identity card no. AH 120399/26-11-2008 issued by the Police Precinct of Nea Erythrea and with tax reg. no. (AFM) 073431831 – Zografou Tax Office (hereinafter "**K2**");

J.  "**VELTI INNOVATIVE ENTEPRISES SOCIETE ANONYME OF VENTURE CAPITAL AND INVESTMENTS**" and the trade name "**VCI S.A.**", having its registered seat at 5 Xeimaras str., Maroussi, Attica, Greece, with corporate registration number 58204/01AT/B/05/81 and tax registration number (AFM) 999078135/FAE Athens Tax Office, duly represented by Georgios Karantonis, Managing Director (hereinafter " **VCI**");

K.  "**VELTI E.O.O.D**", a privately owned limited liability company incorporated and existing under the laws of Bulgaria pursuant to Court Decision dated 07.06.2001 and a Certificate of Current Legal Status dated 02.05.2006, registered with the Commercial Register to the Registry Agency under UIC (unified identity code) No 130544891, with registered office at 9 Fritjoff Nansen str., floor 6, Region Sredets, City of Sofia, Republic

7

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

of Bulgaria, duly represented by Emmanouil Orfanoudakis, Manager of the company (hereinafter " **VELTI E.O.O.D**"); (The parties under H, I, J, K, and the Purchasers hereinafter referred to jointly as the " **Debtors**"(and/or "**Guarantors**") and individually as a "**Debtor**" (and/or a "**Guarantor**")

(all the above hereinafter sometimes referred to individually as a " **Party**" and collectively as the "**Parties**")

## 1   PREAMBLE

A.  MCY wishes to acquire regional strength in the Activities (defined hereunder), in the Territory (defined hereunder).

B.  The Velti Group (Velti), wishes to divest certain shares and certain assets in the Territory owned by the Sellers, which are not core to Velti's strategy.

C.  The Sellers agree to sell and the Purchasers agree to purchaser such shares and assets as contemplated in the Transfer Agreements, which comprise the following:

  a.  The sale by VELTI S.A. to CY2 of the VCI Shares, by virtue of the "VCI SPA", attached hereto and incorporated by reference herein as Schedule (A);

  b.  The sale by M-TELECOM LTD to CY2 of the VELTI E.O.O.D Shares, by virtue of the "VELTI E.O.O.D SPA", attached hereto and incorporated by reference herein as Schedule (B);

  c.  The sale by VELTI S.A. to CY1 by virtue of the "AR Transfer Agreement", attached hereto and incorporated by reference herein as Schedule (C) of the VELTI S.A. Business Receivables (as defined thereunder);

  d.  The sale by VELTI S.A. to CY1 by virtue of the "IP Transfer Agreement", attached hereto and incorporated by reference herein as Schedule (D) of the Intellectual Property (as defined thereunder);

  e.  The sale by VELTI S.A. to VCI of the ADVENT Shares by virtue of the "ADVENT SPA", attached hereto and incorporated by reference herein as Schedule (E), in the event that such sale shall not have been already completed;

8

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

f.   The sale by VHC to MCY of the CY1 Shares and CY2 Shares by virtue of the "CY1 & CY2 SPA", attached hereto and incorporated by reference herein as Schedule (F);

D.   VHC wishes to be vested with call options (the "Call Options" defined hereunder) to purchase Shares (defined hereunder) on the occurrence of certain Trigger Events (defined hereunder), in accordance with the terms hereunder and the Debtors agree to vest VHC with such Call Options in accordance with the terms hereunder.

E.   The Parties aim to the implementation of the Acquisition as a whole; therefore the Purchasers, as well as the Guarantors (in view of the Acquisition) intend and agree to undertake and provide security to all Secured Parties, which aims to cover any and all liabilities of the Sellers in relation to the Acquisition as well as various (direct or indirect) liabilities of the Companies towards the Secured Parties.

F.   Each of the Debtors wishes to guarantee the due and timely performance of all obligations of all other Debtors towards the respective Secured Party (defined hereunder), as contemplated in Clause 8 of this Agreement; each of the Debtors agrees hereunder that it shall be liable vis a vis the respective Secured Party (defined hereunder) jointly, severally and in whole under such guarantee;

G.   Each of the Debtors wishes to provide further security to VHC and VELTI S.A. by granting pledges on certain shares and (fixed and) floating charges on certain assets and business receivables, as contemplated in Clause 9 of this Agreement.

H.   Each of the Debtors acknowledges and agrees hereunder that any default of any other Debtor hereunder or under the other Framework Documents (defined hereunder), shall constitute a default of each of the other Debtors.


**IN VIEW OF THE FOREGOING THE PARTIES AGREE AS FOLLOWS**


**2    INTERPRETATION AND DEFINITIONS**


*2.1    Interpretation*


In this Agreement, unless the context otherwise requires, it is agreed that:

(a)  singular, etc.: words in the singular include the plural, words in the plural include the singular;

9

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

(b) headings, etc.: headings and paragraphs are for the purpose of organisation only and shall not be used to interpret this Agreement;

(c) <u>incorporation by reference, amendments</u>: references to "this Agreement" include its Preamble, Recitals and Schedules (which are incorporated herein by reference) and this Agreement as from time to time amended, unless otherwise stated;

(d) <u>sections, articles, clauses, etc</u>.: references in this Agreement to Preamble, Recitals, Sections, Articles, Clauses, Sub-Clauses and Schedules are to the preamble, recitals, sections, articles, clauses and sub-clauses of, and schedules to, this Agreement, unless otherwise stated;

(e) <u>modification or amendment of statutes</u>: references to a law, statute or statutory provision include that law, statute or provision as from time to time modified, completed or replaced.

(f) persons: references to persons include their universal successors and their universal title successors.

*2.2   Definitions*

In this Agreement, the following capitalized terms shall, unless the context otherwise requires or it is otherwise provided, have the following meanings:

**"Acceleration Event"**          has the meaning ascribed to such term in Clause 3.1.4;

**"Accounts Settlement Date"**          has the meaning ascribed to such term in **Schedule (Q)**;

**"Acquired Shares"**          means the VCI Shares, the VELTI E.O.O.D Shares, CY1 Shares and the CY2 Shares;

**"Acquisition"**          means the sale and purchase of the CY1 Shares, the CY2 Shares, the VCI Shares, the VELTI E.O.O.D Shares, the ADVENT Shares, the VELTI S.A. Business Receivables (defined in the AR Transfer Agreement), and the Intellectual Property (defined in the IP Transfer Agreement), all the above as contemplated in the Transfer Agreements;

10

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

| | |
|---|---|
| **"Activities"** | means products and services in the following sectors: |

        a)  **Banking Platforms**, including: Business Process management, On-line automation in the Territory;

        b)  **On-line Platforms**, including: Electronic Bill Presentment and Payment, Self-service Portals in the Territory;

        c)  **Regional Mobile Platforms**, including: legacy offering around feature phones, rendering, content management, text-focused, re-seller-focused solutions, in the Territory;

        d)  **E-Government**, including: ongoing subsidized projects , in the Territory;

        e)  **Content Business**, including: Carrier mobile content provision in the Territory,

| | |
|---|---|
| **"ADVENT Shares"** | means 49,467 ordinary registered shares of nominal value one Euro (€1.00) each, representing 6.72% in the share capital (comprising in total 736,336 shares) of the Société Anonyme with the registered name «Advanced Energy Technologies Ανώνυμη Εταιρεία Έρευνας & Ανάπτυξης Υλικών & Προϊόντων Ανανεώσιμων Πηγών Ενέργειας & Συναφών Συμβουλευτικών Υπηρεσιών» and the distinctive title «ADVENT TECHNOLOGIES», with corporate registry no. (ARMAE) 58206/01AT/B/05/82, tax reg. no. (AFM) 999078123/ Athens FAE Tax Office, and registered offices at 44 Kifissias Avenue Maroussi, Attica Greece; |
| **"Agreed Upon Auditor"** | means for the purposes of **Schedule (Q) and Schedule (W)**, a certified public accountant (CPA, ACCA, ACA), from PriceWaterhouseCoopers Greece; |
| **"Agreed Upon Procedures"** | means the procedures applied by the Agreed Upon Auditor, set out in **Schedule (W)**, for the determination of the Call Option Price, based on market value, as contemplated in Clause 6.2; |
| **"Agreement"** | means this Framework, Guarantee & Call Option Agreement by and between the Parties, including all Schedules attached hereto, as amended from time to time pursuant to Clause 15.2 hereof; |

11

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

*EXECUTION COPY*

| | |
|---|---|
| **"Applicable Law"** | means the law of Greece, taking into account at all times the provisions of EU Regulation 0593/2008 (Rome I), and provided than on corporate matters, the law of the seat of each respective Company shall apply; |
| **"Authorisation"** | means any authorisation, consent, approval, concession right, resolution, license, permit, registration or similar act; |
| **"Business Day"** | means a day on which banks in Bulgaria, Cyprus, Greece and the UK, and are generally open for business; |
| **"Call Option Closing Date"** | ; |
| **"Call Option Closing"** | ; |
| **"Call Options"** | means the Call Options of VHC, to acquire the Shares or any of them, on a Trigger Event as detailed in Clause 6 and on the other terms and conditions hereof; |
| **"Change of Control"** | means in regard to a Company, the PCPs (i) ceasing to hold shares representing, directly or indirectly, at least 51% of the issued and paid up share capital of such Company *OR* /and (ii) ceasing to possess the voting rights of the above shares *OR* /and (iii) the management of such Company is not controlled by the PCPs; |
| **"Closing"** | has the meaning ascribed to such term in Clause 4 hereof; |
| **"Companies"** | means MCY, CY1, CY2, VCI and VELTI E.O.O.D, and "**Company**" shall mean any of them; |

12

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

*EXECUTION COPY*

| | |
|---|---|
| **"Considerations"** | means: (i) the purchase price due and payable for the VCI Shares under the VCI SPA (the "VCI SPA Consideration"); (ii) the purchase price due and payable for the VELTI E.O.O.D Shares under the VELTI E.O.O.D SPA (the "VELTI E.O.O.D SPA Consideration") ; (iii) the consideration due and payable for the Business Receivables under the AR Transfer Agreement (the "AR Consideration"); (iv) the consideration due and payable for the Intellectual Property under the IP Transfer Agreement (the "IP Consideration"); (v) the purchase price due and payable for the ADVENT Shares under the ADVENT SPA (the "ADVENT SPA Consideration") in the event that such sale shall not have been already completed; and (vi) the purchase price payable to VHC for the CY1 Shares and the CY2 Shares under the CY1-CY2 SPA, including the Contingent Consideration (the "CY1 & CY2 Considerations"); |
| | the sum of the above is the "**Acquisition Consideration**", while "**Consideration**" means any of the foregoing; |
| **"Consolidated EBITDA"** | means the sum of the EBITDA of each of the Operating Companies, consolidated at the level of MCY; |
| **"Contingent Consideration"** | ; |
| **"Control"** | means in relation to any Company, the power of the PCPs to secure that the affairs of such Company are conducted in accordance with the wishes of the PCPs, by means of cumulatively: (i) holding shares representing directly, or indirectly at least 51% of the issued and paid up share capital of such Company and (ii) possessing the voting rights of the above shares and (iii) by procuring in their capacity of shareholders of such Companies, that the management is exercised by the Managers; |
| **"CY1 Shares"** | means 1,000 ordinary voting shares, of a nominal value of Euro one (€1.00) each, issued in a materialized form, representing 100% of the fully paid up capital of CY1; |
| **"CY2 Shares"** | means 1,000 ordinary voting shares, of a nominal value of Euro one (€1.00) each, issued in a materialized form, representing 100% of the fully paid up capital of CY2; |
| **"Debtors' Representative"** | means the common Representative and Service Agent of all Debtors, to be jointly appointed and reappointed throughout the term hereof, in accordance with Clause 17 hereof; |

13

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

| | |
|---|---|
| **"Debtors" or "Guarantors"** | shall have the meaning ascribed to it in the preamble to this Agreement; and " **Debtor**" shall mean any one of them; |
| **"DIGITAL RUM Debt to VELTI S.A."** | means cumulatively liabilities of DIGITAL RUM towards VELTI S.A. as set out in **Schedule (S₁)**; |
| **"DIGITAL RUM Debt to VPS"** | means cumulatively liabilities of DIGITAL RUM towards VPS as set out in **Schedule (S₂)**; |
| **"Deed of Deposit"** | means a simple Notary Deed of Deposit, drafted by a Notary seated in Athens, Greece, evidencing the deposit of the Pledged Shares by the respective Pledgee for safekeeping with such Notary; |
| **"DIGITAL RUM"** | means the company further details of which are set out in **Schedule (R)**; |
| **"EBITDA"** | means the operating income of each of the Operating Companies, which will be determined under Greek GAAP and will be calculated as follows: revenue, minus third party direct costs, relevant bad debt deductions, relevant foreign exchange gains, or losses, payroll and other operating expenses attributed to, for delivery, sales, pre-sales, account management, R&D (not deducting software capitalizations out of revenue under Greek GAAP), general & administrative expenses (corporate, finance, legal, human resources, IT and other general & administrative expenses). The calculation of EBITDA will exclude (not deduct from revenue) depreciation and amortization, income taxes, interest income or expenses, share-based compensation expenses, and transaction related costs; |
| **"Encumbrance"** | means any lien, pledge, mortgage, legal or actual defect, burden, contest, attachment, claim, option, charge, restriction or other encumbrances or third party interests or rights; |
| **"Enforcement Event"** | Means, in relation to each Debtor any default under this Framework Agreement and the other Framework Documents, including: (i) any default of such Debtor's respective Secured Obligations, including a default arising from any Acceleration Event caused by any other Debtor, and (ii) any "cross-default" of any other Debtor of his respective Secured Obligations, and (iii) any other event which is stated in this Agreement to constitute an Enforcement Event. |
| **"Euro" / "€"** | means the currency defined in Article 2 of Council Regulation (EC) No. 974/98 of 3 May 1998; |
| **"Exercise Notice"** | ; |
| **"Exercise Period"** | ; |

14

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

---

| | |
|---|---|
| **"Fixed Consideration"** | means the total sum of Considerations **except for** the Contingent Consideration, i.e. the total amount of US Dollars twenty-three million five hundred thousand ($23,500,000.00) as contemplated in Clause 3 hereof; |
| "Framework Documents" | means this Framework, Guarantee & Call Option Agreement and the following agreements contemplated hereby: the Transfer Agreements (defined below), the Pledge Agreements (defined below) and any other agreements, instruments, certificates or documents executed and delivered in connection with any of the foregoing; and  **"Framework Document"** means any of them; |
| **"Group"** | (or a "Group of companies") means a collection of parent and subsidiary corporations that function as a single economic entity through a common source of control; |
| **"Guarantees"** | means the joint and several guarantees of the Debtors, given to the Secured Parties under Clause 8; |
| **"ICC"** | means the International Chamber of Commerce, established in 1919, having its international headquarters in Paris, France; |

15

---

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

|  | means the aggregate of all obligations of a company outstanding for the payment or repayment of money including, without limitation: |
|---|---|
| **"Indebtedness"** | a) any amounts payable by the company under loans or similar arrangements to banks and other financial institutions; <br> b) any amounts payable in respect of bonds or other evidence of indebtedness issued by the company; <br> c) any amount payable by the company under leases or similar arrangements; <br> d) any credit to the company from a supplier of capital goods or under any instalment hire purchase or other similar arrangements for capital goods; <br> e) the aggregate amount then outstanding of liabilities and obligations of third parties to the extent they are guaranteed by the company; and f) the aggregate of any other amount which, under generally accepted accounting principles, are liabilities related to money borrowed or the acquisition of capital goods by the company; |
| **"Licensed "Velti" Use"** | means the limited license contemplated under Clause 4.2; |
| **"Lock In Period"** | ; |

16

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

**"Lock In Restrictions"**          means the following restrictions applying to the Debtors, during the Lock In Period, not to be lifted in whole or in part, without VHC' s written consent:

    a)  the PCPs shall jointly control no less than 51% of the issued and paid up MCY common voting shares

    b)  The PCP's shall control directly, or indirectly 51% of the issued and paid up shares of CY1;

    c)  The PCP's shall control directly, or indirectly 51% of the issued and paid up shares of CY2.;

    d)  The PCP's shall control directly, or indirectly 51% of the issued and paid up shares in VCI;

    e)  The PCP's shall control directly, or indirectly 51% of the issued and paid up shares in VELTI E.O.O.D;

    f)  None of the Companies shall give or issue options, warrants shares and/or convertible bonds maturing within the Lock In Period, unless the fully diluted control of the PCP's following such issue, directly, or indirectly exceeds 51% of the share capital of the Companies;

    g)  The Companies shall be free of Encumbrances, save for the Encumbrances established under the Pledge Agreements;

    h)  For the avoidance of doubt, any new shares issued by any of the Companies directly or indirectly to the Debtors during the Lock in Period, shall be subject to the respective Pledges, as the originally Pledged Shares;

17

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

| | |
|---|---|
| **"MCY Shares"** | means one thousand (1,000) registered ordinary voting shares, of a nominal value of Euro one (€1.oo) each, all above represented by one Share Certificate, representing 100% of the fully paid up capital of MCY; |
| **"Operating Companies"** | means VCI, VELTI E.O.O.D, CY1 and CY2; |
| **"Permitted Controlling Persons" or "PCPs"** | means the Management and the Employees; for the purposes of the present definition, "**Management**" means K1 and K2, and "**Employees**" means any persons employed or otherwise retained by the Companies who shall have acquired, at any time, shares in the Companies, provided they are engaged with any of the Companies, or any of the Velti Group entities, for at least 24 (twenty four) consecutive months; |
| **"Person"** | means any natural or legal person, trust or governmental entity or any other entity (whether incorporated or not) having legal personality; |
| **"Pledge Agreements"** | means the agreements analytically set out in Clause 9 of this Agreement, namely : |

(a) the "VHC Pledge Agreements" in the form and substance attached hereto and incorporated by reference herein in Schedules (G) to (J) inclusive, and

(b) the "VELTI S.A. Pledge Agreements" in the form and substance attached hereto and incorporated by reference herein in Schedules (K) to (P) inclusive.

and "**Pledge Agreement**" means any of the above;

| | |
|---|---|
| **"Pledgee" and/or "Chargee"** | Means VHC and VELTI S.A. each of which shall receive the pledges on certain shares and (fixed and) floating charges on certain assets and business receivables, as contemplated in Clause 8 of this Agreement and the Security Agreements; |
| **"Pledges"** | means the pledges on certain shares and (fixed and) floating charges on certain assets and business receivables, established under the Pledge Agreements; |

18

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

means : (i) the due and timely payment in full of all Considerations, and all other monetary obligations under the Transfer Agreements by the relevant Debtors to the Sellers; (ii) the due and timely performance and discharge in full of all other non-monetary obligations under the Transfer Agreements by the relevant Debtors to the Sellers; (iii) the due and timely payment in full of the "VCI Debt" by VCI to VELTI S.A., and the due and timely performance and discharge in full of all other non-monetary obligations under the "VCI Loan Agreement" by VCI to VELTI S.A.; (iv) the due and timely payment in full of the "DIGITAL RUM Debt to VELTI S.A." by DIGITAL RUM to VELTI S.A.; (v) the due and timely payment in full of the "DIGITAL RUM Debt to VPS" by DIGITAL RUM to VPS; and (vi) the due and timely performance and discharge in full of the obligations of the Debtors under this Agreement and the other Framework Documents towards each and any of the Secured Parties;

| | |
|---|---|
| "**Secured Obligations**" | and any of the foregoing is a "Secured Obligation". |
| "**Secured Party**" | Means VHC, VELTI S.A., M-TELECOM LTD and VPS to whom all Debtors give the Guarantees under Clause 8 hereunder; |
| "**Sellers' Representative**" | means the common Representative and Service Agent of all the Sellers and Secured Parties (in whichever capacity of the respective Party), to be jointly appointed and reappointed by all Sellers and Secured Parties, throughout the term hereof, in accordance with Clause 17 hereof; The first Sellers' Representative is VHC. |
| "**Sellers**" | means all, or each of VHC, VELTI S.A. and M-TELECOM as contemplated in the preamble hereof; |
| "**Share Certificates**" | means the share certificates issued for the Shares of a Company; |
| "**Shareholders' Register**" | means a Company's register of shareholders, which is maintained by such Company; |
| "**Shares**" | means the <u>Acquired Shares and all other additional shares</u> owned by the Debtors in the share capital of all of the Companies at any time; |

19

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

| | |
|---|---|
| **"Subsidiary"** | means in relation to a company (the holding company), any other company in which the holding company (or a person acting on its behalf) directly or indirectly holds or controls either: (i) a majority of the voting rights exercisable at shareholder meetings of the company; or (ii) the right to appoint or remove directors having a majority of the voting rights exercisable at meetings of the board of directors of the company; and any company which is a Subsidiary of another company is also a Subsidiary of that company's holding company. Unless the context otherwise requires, the application of the definition of Subsidiary to any company at any time shall apply to the company as it is at that time; |
| **"Tax Return"** | means any tax return or report with respect to a Person that it is required by law to file with relevant Taxation authorities; |
| **"Tax" or "Taxation"** | means all taxes, levies, duties, imposts, charges and withholdings in the nature of taxation imposed by any governmental local or regulatory authority, body or instrumentality, including (without limitation) health insurance, social security, employment and similar payments and taxes on gross or net income, profits or capital gains and taxes on receipts, sales, use, occupation, franchise (ad valorem) transfer, value added and personal property and any and all other measure of an effect equivalent to the above, together with all penalties, charges, additions to tax and interest relating to any of them; |
| **"Territory"** | ; |

20

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

means: (i) the "VCI SPA" for the sale by VELTI S.A. of the VCI Shares to CY2, in the form and substance attached hereto and incorporated by reference herein as Schedule (A); (ii) the VELTI E.O.O.D SPA for the sale by M-TELECOM LTD of the VELTI E.O.O.D Shares to CY2 in the form and substance attached hereto and incorporated by reference herein as Schedule (B); (iii) the "AR Transfer Agreement" for the sale by VELTI S.A. to CY1 of the VELTI S.A. Business Receivables (defined thereunder), in the form and substance attached hereto and incorporated by reference herein as Schedule (C); (iv) the "IP Transfer Agreement" for the sale by VELTI S.A. to CY1 of the Intellectual Property (defined thereunder), in the form and substance attached hereto and incorporated by reference herein as Schedule (D); (v) the "ADVENT SPA" for the sale by VELTI S.A. to VCI of the ADVENT Shares in the form and substance attached hereto and incorporated by reference herein as Schedule (E); (vi) the "CY1 & CY2 SPA" for the sale by VHC to MCY of all the CY1 Shares and CY2 Shares in the form and substance attached hereto and incorporated by reference herein as Schedule (F);

"**Transfer Agreements**"          and "Transfer Agreement" means any of them;

21

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

| | |
|---|---|
| **"Trigger Event"** | Means any of the following (cumulatively the "**Trigger Events**"): |

    (a)   A default in the payment of any part of the Consideration, whether Fixed Consideration or Contingent Consideration (hereinafter the "**Consideration Default Trigger Event**");

    (b)   A Change of Control or a violation of a Lock In Restriction in any Company (hereinafter the "**Change of Control Trigger Event**");

| | |
|---|---|
| **"United States Dollar or "USD**" or "$"** | means the official currency of the United States of America; |
| **"VCI Debt"** | means any and all amounts owing by VCI to VELTI S.A. under the 14/09/2007 dated loan agreement whereby VELTI S.A. granted a loan to VCI for the amount of Euro 5,000,000.00 (five million) (the "**VCI Loan Agreement**"); |
| **"VCI Shares"** | means 2,500,000.00 (two million five hundred thousand) registered ordinary voting shares, of a nominal value of Euro one (€1.00) each, issued in a materialized form, representing 100% of the issued and fully paid up share capital of VCI; |
| **"VELTI E.O.O.D Shares"** | means 100 (one hundred) share parts with nominal value BGN 50 (fifty) each, representing 100% of the issued and paid up capital of the VELTI E.O.O.D; |
| **"VHC Bank Account"** | means following bank account of VHC in Cyprus: |

Bank:  Marfin Popular Bank Public Co Ltd
Account no.: 177-32-024621 (USD)
SWIFT: LIKICY2N
IBAN USD: CY16 0030 0177 0000 0177 3202 4621
Account holder: VELTI HOLDINGS CYPRUS LIMITED, or such other bank account that VHC notifies to the Debtors' Representative in accordance with Clause 18;

| | |
|---|---|
| **"Warranties"** | means the representations and warranties of the Debtors set forth in Clause 10. |

22

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

## 3    ACQUISITION CONSIDERATION

### 3.1    *Acquisition Consideration*

3.1.1    Without prejudice to the payment schedule in each individual Transfer Agreement, the  minimum consideration  for the Acquisition shall equal the Fixed Consideration payable by the Purchasers to the Sellers under the Transfer Agreements, amounting to USD twenty three million and five hundred thousand ($23,500,000.00), while the  maximum consideration  for the Acquisition shall equal the sum of the Fixed Consideration plus the Contingent Consideration.

3.1.2    Without prejudice to the payment schedule in each individual Transfer Agreement, the Fixed Consideration is payable as follows:

(a)    USD three million ($3,000,000.00) on December 31, 2012  (the First Tranche Consideration);

(b)    USD five million two hundred and twenty five thousand ($5,225,000.00) on December 31, 2013 (the Second Tranche Consideration); and

(c)    USD fifteen million two hundred and seventy five thousand ($15,275,000.00) on December 31, 2014 (the Third Tranche Consideration).

3.1.3    Without prejudice to the payment schedule in the CY1 & CY2 SPA, the Contingent Consideration is payable on September 30, 2015.

3.1.4    Any default of a Debtor under his respective Transfer Agreement(s), and/or under this Framework Agreement and the other Framework Documents, shall accelerate the Fixed Consideration (i.e. each and every Consideration under the Transfer Agreements constituting a part of the Fixed Consideration according to Clause 2.2 above), which shall become due and payable immediately upon the occurrence of an event constituting an Acceleration Event.

3.1.5    The Fixed Consideration is based on the following estimated book values of the transferred shares and assets for September 30, 2012.

23

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

*EXECUTION COPY*

| Transferred assets | $ million |
|---|---|
| VCI (including share capital increase, M-Point and Advent shares) | (1.30$) |
| Velti Bulgaria (net of $2 million of goodwill) | $3.5 |
| IP's | $4.3 |
| Net Receivables | $15.6 |
| **Impact on Transferred Assets** | **$22.1** |

Until Closing, a final calculation of those assets will be made based on Euro/USD exchange rate of September 30, 2012, and if the aggregate amount of transferred assets exceeds $23,500,000, any such excess amount, will be adjusted to the Fixed Consideration, which however shall have a minimum agreed upon value at least equal to or greater than USD twenty three million and five hundred thousand ($23,500,000.00) in aggregate.

### 3.2   *Limitation of Sellers' Liability*

The Sellers' liability under each and all Transfer Agreements are subject to the following restrictions:

### 3.2.1   *Time Limit for Claims*

No Seller shall be liable for any breach under the respective Transfer Agreement(s) (including a breach of any warranty given thereunder) in respect of any claim unless a notice of the claim is given by the relevant Purchaser to the relevant Seller, with a copy to the Sellers' Representative, within a period of one (1) year commencing as of the Closing Date (hereinafter a " **Claim**").

### 3.2.2   *Aggregate Maximum Liability*

(a)   De minimis limitation: Each Claim needs to be in excess of a minimum threshold, agreed at €100,000.00 (one hundred thousand Euros) per Claim; for the avoidance of doubt Claims of any Purchaser falling short of this threshold, are non recoverable by such Purchaser.

(b)   Maximum limitation: the aggregate amount of Claims payable by the Sellers to the Purchasers under all Transfer Agreements (i.e. Sellers' total maximum aggregate liability in relation to the Acquisition), shall not exceed a maximum amount (a cap) of (the equivalent of) €500,000 (five hundred thousand Euros).

## 4   CLOSING OF THE ACQUISITION

24

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

4.1   *Closing*

4.1.1   Closing shall take place within three (3) Business Days as of satisfaction or waiver of the conditions precedent stipulated in the Transfer Agreements and the conditions precedent set out hereunder, or such other date as VHC notifies to all Parties, and in no case later than December 15th 2012 (the "**Closing Date**"). Closing shall take place at the offices of VHC or at the offices of an attorney appointed by VHC and notified to the Debtors, starting at 11 a.m. on the Closing Date, or via fax or electronic mail (if feasible under Applicable Law and agreed between the Parties).

4.1.2   Conditions precedent: (i) the delivery by each Party hereto of the requisite corporate resolutions, as per its applicable law, which shall validly approve and authorize the execution of this Agreement and all other Framework Documents, including without limitation, the Transfer Agreements and Pledge Agreements which each Party shall enter into as contemplated hereunder, and (ii) any consents, authorisations or similar clearances have been granted: (a) that are required by any government, or regulatory body or authority or lender, for Closing; or (b) all those that are, in the reasonable opinion of VHC, necessary or desirable for Closing. The Parties shall prepare a list ("Closing Checklist") setting out all documents, acts and things that each is required to execute, sign, perfect, deliver, perform and do to give full force and effect to the transactions contemplated in this Agreement and Framework Documents.

4.1.3   Subject to any chronological order specifically depicted in the Closing Checklist, all actions to be taken at Closing as set forth herein and in the Transfer Agreements, and all agreements, documents and instruments delivered and payments made with respect thereto shall be considered to have been taken and delivered or made and shall be effective simultaneously, and no such action, delivery or payment shall be considered complete until all such actions, deliveries and payments incidental to Closing have been completed.

4.1.4   Prior to Closing Velti S.A. will have proceeded to a share capital increase in VCI for the amount of $ 1,292,000. From this amount, $134,400 will be a capital increase in VCI, by the capitalisation of an equal amount of the VCI Loan Agreement (as defined above), while the amount of $1,157,600 can be alternatively a capital increase in either of VCI, CY1 or CY2, and shall be paid in cash. For the sake of clarity, the amount of $157,600

25

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

*EXECUTION COPY*

will (or shall have already been used prior to Closing, in the event that the ADVENT Shares is already completed) be used by VCI for the payment of the ADVENT SPA Consideration, while $134,400 constitutes VCI's participation in ADVENT's bond loan which was already paid, through the VCI Loan Agreement. All above amounts expressed above in USD shall be converted into Euros, at the pre-agreed rate of 30/09/2012, being $1.286 per €1.00.

4.1.5   Subject as provided in the Closing Checklist, prior to Closing the relevant Purchasers and Sellers shall execute and deliver the VCI SPA, the VELTI E.O.O.D SPA, the AR Transfer Agreement and the IP Transfer Agreement. More in particular:

(a)     CY1 shall execute the AR Transfer Agreement and the IP Transfer Agreement, with VELTI S.A.

(b)     CY2 shall execute the VCI SPA with VELTI S.A., and the VELTI E.O.O.D SPA, with M-TELECOM LTD.

4.1.6   Subject as provided in the Closing Checklist, prior to or on Closing each of the Purchasers and Sellers under the Transfer Agreements stated in Clause 4.1.4 shall execute such documents and perform all actions as contemplated to be executed and to be performed under such Transfer Agreements on Closing. More in particular:

(a)     CY2 and VELTI S.A. shall execute the short form transfer agreement and all other documents and shall perform all actions as contemplated in clause 3 of the VCI SPA;

(b)     CY2 and M-TELECOM LTD shall execute the short form transfer agreement and all other documents and shall perform all actions as contemplated in clause 3 of the VELTI E.O.O.D SPA;

(c)     CY1 and VELTI S.A. shall proceed to any actions to be performed on Closing under the AR Transfer Agreement and the IP Transfer Agreement.

(d)     in the event that ADVENT Shares sale shall not have been already completed, VCI shall execute the ADVENT SPA with VELTI S.A., and shall sign all other

26

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

documents and proceed to all actions necessary to give full effect to the sale and transfer of the ADVENT Shares.

4.1.7   On Closing, MCY and VHC shall execute the CY1 & CY2 SPA, and execute such documents and perform all actions as contemplated to be executed and to be performed under such Transfer Agreement on Closing.

4.1.8   On Closing the relevant Debtors and the Pledgees/Chargees shall execute the Pledge Agreements and all other documents and instruments contemplated thereunder, and shall perform all actions to register and perfect the Pledges, as contemplated thereunder.

4.1.9   Considering that one of the Pledgees, namely VHC, is seated outside Greece, on Closing , VHC and VELTI S.A. (being the "Pledgees") shall execute a simple Deed of Deposit for the safekeeping of the Pledged Shares (defined below) and the relevant Shares Certificates, as contemplated in Clause 9.3.3.

4.1.10  All Transfer Agreements and other Framework Documents executed prior to or on Closing, and all Shares Certificates and other documents and instruments to be delivered thereunder, shall be delivered to and remain in the hands of VHC, who shall safe-keep the same (including by deposit with a Notary) and deliver them to the relevant Parties once all Framework Documents (including the Pledge Agreements) are duly executed and registered, as necessary, and all relevant Debtors have performed all necessary actions to give full force and effect to the Framework Documents.

   *4.2*   *Territorial Activities - Licensed "Velti" Use*

4.2.1   For the duration of the "Licensed "Velti" Use" without prejudice to the provisions of the VCI SPA and the VELTI E.O.O.D SPA, and subject to Closing, VCI and VELTI E.O.O.D are granted a fixed term non-assignable, non-exclusive license to use the word "Velti" until December 31, 2014, and provided that no Trigger Event or Enforcement Event has occurred, under the following terms:

4.2.2   the registered name of Velti E.O.O.D shall have changed to VCI E.O.O.D or a similar name containing the word "VCI";

27

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

4.2.3.   the word "Velti" can only be used as part of the acronym VCI and only together and in conjunction with the other words of such acronym, i.e. "Velti Center of Innovation";

4.2.4.   the naked use of the word "Velti" is not permitted.

4.2.5   The license to use the word "Velti" applies only in relation to the Activities including the following Products/Services and only within the Territory: Products/Services: Banking and Financial Services, On-line Web Self-Service Platforms, Regional Mobile Platforms, E-Government, Content Business, Business Process Management, Document Management, Enterprise Portals, Media Content Delivery, Customer Lifecycle Management, Identity Management, Business Intelligence, Electronic Bill Presentment & Payment, e-Marketing, Mobile Internet, Mobile Value Added Services.

### 4.3   *Alternative Proposals*

4.3.1   The Sellers may receive evaluate and enter into negotiations with respect to alternative proposals through as of signing and until December 15th, 2012. The Sellers also have the right to extend the above period up to a total of 30 days from signing date hereof, if at Sellers' discretion they receive indications by December 15th, 2012 that they believe are likely to lead to a superior proposal.

4.3.2   Although there is no assurance that a superior offer will materialize, this Agreement allows the Sellers to accept a superior offer without being liable to pay a break-up fee or any other indemnity.

4.3.3   If there is no superior offer, the transaction is expected to close on December 15th, 2012 subject to customary approvals and Closing conditions.

## 5   THE DIGITAL RUM DEBT

5.1   The Digital Rum Debt to Velti S.A. is depicted in Schedule S1.

5.2   The Digital Rum Debt to VPS is depicted in Schedule S2.

5.3   The Debtors acknowledge and guarantee that the aforesaid amounts depicted in Schedules S1 and S2 will be fully repaid by June 30, 2013.

28

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

5.4     Without prejudice to Clause 5.3 above, the Debtors undertake in regard to the Digital Rum Debt to Velti S.A. and the Digital Rum Debt to VPS (both being Secured Obligations under this Agreement, and cumulatively referred to in this Clause 5 as the "**Digital Rum Debt**"), the Guarantees contemplated in Clause 8 and provide the specific Pledges contemplated in Clause 9.

5.5     If necessary, VCI will provide a 5 - year, $3.5 million balloon facility to Digital Rum, to repay the Digital Rum Debt, according to the "Digital Rum Loan Agreement" in form and substance attached hereto as **Schedule (V)** and incorporated by reference herein. Sellers shall have no obligation under this Digital Rum Loan Agreement.

5.6     Digital Rum shall treat the respective draw down as contemplated in the "Digital Rum Loan Agreement".

5.7     VCI undertakes that in the case of bankruptcy of Digital Rum, it shall assume the Digital Rum Debt.

## 6     CALL OPTIONS

### 6.1     *General*

6.1.1   The Debtors hereby grant to VHC or a Person designated by VHC, two (2) distinct irrevocable call options: the Consideration Default Call Option and the Change of Control Call Option (the "**Call Options**") to purchase the Shares upon the occurrence of a Trigger Event, as set out in this Clause 6.

6.1.2   The Debtors irrevocably undertake to sell to VHC or a Person designated by VHC, the Call Option Shares (defined hereunder), according to the terms and conditions set out hereunder.

### 6.2     *The Call Option Shares*

6.2.1   In the event of a default in the payment of any Consideration payable under the Transfer Agreements (whether it constitutes part of the Fixed Consideration or part of the Contingent Consideration), the Debtors hereby grant to VHC an irrevocable option (the "**Consideration Default Call Option**") to purchase (including by set-off), such number

29

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

of Shares in any of the Companies, as is sufficient to cover the total balance of outstanding payments under the Transfer Agreements and the Guarantees, plus accrued interest and expenses (the " **Consideration Default Call Option Shares** "). The Debtors irrevocably undertake to sell to VHC all the Consideration Default Call Option Shares called as above, at the Call Option Price contemplated in Clause 6.2.4. VHC shall determine at its discretion from which Company(ies) and in what quantities it shall call the Consideration Default Call Option Shares.

6.2.2    Without prejudice to its right to call the Shares as above, VHC shall have a Drag Along Right, whereby in case that VHC shall decide to sell the Consideration Default Call Option Shares, the Debtors, upon receiving notice of exercise of the Drag Along Right by VHC (the **"Drag Along Notice"** ), shall be obliged to sell all, but not less than all of the Shares for which the Drag Along Right has been exercised by VHC, simultaneously and at the same consideration per Share and other terms (the **"Drag Along Terms"** ) as VHC, provided however that the Debtors, each have a pro rata right of first refusal to redeem the Consideration Default Call Option Shares, at the Drag Along Terms, within thirty (30) Business Days as of the Drag Along Notice.

6.2.3    In the event of a Change of Control in any of MCY, CY1, CY2, VCI and VELTI E.O.O.D, the Debtors hereby grant to VHC an irrevocable option (the "**Change of Control Call Option**") to purchase up to 45% of the Shares in the Companies in which the Change of Control occurs (the "**Change of Control Call Option Shares**"). The Debtors irrevocably undertake to sell to VHC or any Person designated by VHC the Change of Control Call Option Shares called as above, at the Call Option Price contemplated in Clause 6.2.4, which may be set off against an equal part of the consideration owing to the Sellers.

6.2.4    The Call Option Price for each of the Call Options shall be based on market value of the relevant Call Option Shares, and shall be determined in US Dollars. VHC and the relevant Debtor-seller of the Call Option Shares, will seek for a commonly agreed valuation of the market value of the Call Option Shares within ten (10) days as of the date of the Exercise Notice, and if dispute prevails, the Call Option Price shall be determined by the Agreed Upon Auditor by application of the Agreed Upon Procedures, within thirty (30) calendar days, as of the date of the Exercise Notice. The cost of the determination of the Call Option Price shall be borne equally (50-50) by VHC and the Debtor who is the owner

30

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

of the relevant Call Option Shares. In case of more Debtors-sellers of Call Option Shares, they shall be jointly and in whole liable for the 50% cost allocated as above to the Debtor(s)-sellers. The Call Option Price shall be payable in US Dollars.

### 6.3   *Exercise Period*

6.3.1   VHC shall have the right to exercise the Call Option within the following exercise period (the " **Exercise Period**"):

(a)   as regards the Consideration Default Call Option, during the period starting as of the due date for the payment of the First Tranche Considerations, until the 30th Business Day following the Settlement Date and further, for as long as any of the Considerations, together with any other monetary obligations under this Agreement or any the other Framework Documents, is outstanding;

(b)   as regards the Change of Control Call Option, during a period starting from Closing and ending on the 3 $^{rd}$ anniversary as of Closing.

6.3.2   VHC shall exercise its Call Option for the Call Option Shares, by notice to the relevant Debtors in writing in the form of **Schedule (T)**, attached hereto and incorporated by reference herein, served according to Clause 18 below, to be received by the Debtors Representative within the Exercise Period (the " **Exercise Notice**"). In the event the relevant Debtor(s)-seller(s) of the Call Option Shares and VHC fail to reach a commonly agreed valuation of the market value of the Call Option Shares as contemplated in Clause 6.2.4, then VHC, upon determination of the Call Option Price by the Agreed Upon Auditor, shall notify to the relevant Debtors such Call Option Price and the number of Call Option Shares for which the Call Option is exercised, together with a copy of the relevant Agreed Upon Auditor's report.

6.3.3   The transaction for the implementation of the Call Option, i.e. the transfer of the Call Option Shares to VHC or the Person designated by VHC will be completed within forty five (45) calendar days as of the date of receipt of the Exercise Notice according to Clause 18 (the "**Call Option Closing Date**"), unless the relevant Trigger Event has been fully remedied within twenty (20) calendar days, as of receipt of the Exercise Notice.

6.6   The Call Option Price shall be payable in cash or shall be set off against the Consideration(s) owing to any of the Sellers by any of the Purchasers, on the Call Option Closing Date

31

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

by wire transfer, in immediately available funds, in the bank accounts of the relevant Debtor(s), set out in **Schedule (U)**, attached hereto and incorporated by reference herein, or such other bank accounts notified by such Debtor(s) to VHC at least thirty (30) Business Days in advance and otherwise in accordance with Clause 18 (the **"Debtors Bank Accounts"**).

6.7    Any costs and Taxes relating to the transfer of the Call Option Shares to VHC or any Person designated by VHC, shall be borne by the Debtors.

**7    CALL OPTION CLOSING**

7.1    The Call Option Closing shall take place at the offices of VHC or at the offices of an attorney appointed by VHC and notified to the Debtors, in Athens Greece, starting at 11 a.m. on the Call Option Closing Date, or via fax or electronic mail (if feasible under Applicable Law and agreed between the Parties).

7.2    At the Call Option Closing, each of the Debtors and VHC shall fill in, sign and submit any transfer Tax Returns required under applicable law, and complete and sign short form transfer agreements, and/or instruments of transfer, as the case may be, with the minimum necessary contents required by applicable law in the form and substance to the satisfaction of VHC (the " **Call Option Share Transfer Agreement(s)**"), in three (3) originals of each such Agreement for each one of the Debtors.

7.3    At the Closing, VHC or any Person designated by VHC shall pay the Call Option Price by wire transfer, in immediately available funds, in the relevant Debtors Bank Accounts and deliver the bank extract evidencing the wire transfer of the Call Option Price to the Debtors Bank Accounts. Alternatively, VHC or any Person designated by VHC may at its discretion execute a set –off of the Call Option Price against any amount owing by any of the Debtors to any Seller.

7.4    At the Closing, the relevant Debtors-sellers of Call Option Shares shall:

(i)    Pay any tax due and deliver one (1) original of the Transfer Tax Returns certified by the competent tax authority, as per applicable law;

(ii)    register together with VHC the transfer of the relevant Call Option Shares to VHC in the Shareholders Register of the relevant Company;

32

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

(iii)     perform all other actions necessary under applicable law to give full force and effect to the transfer of the relevant Call Option Shares.

7.5     Within (10) Business Days from Closing, each Debtor shall deliver to VHC one (1) original copy of the Call Option Share Transfer Agreement duly certified by the competent tax authorities, as per applicable law.

7.6     Failure by any of the Debtors to comply with any of their respective obligations under any Call Option exercised by VHC constitutes an event of default hereunder and the Guarantee of Clause 8.

7.7     Failure by any of the Debtors to comply with any of their respective obligations under any Call Option shall constitute an Enforcement Event, and VHC shall be entitled to proceed to the enforcement of any or all the Pledges pursuant to the Pledge Agreements.

7.8     If VHC elects to specify a new date for the Call Option Closing, this may not be interpreted as a waiver or any limitation of the rights of VHC to enforce the Call Option and the Pledges in the future, and the provisions of Clause 15 shall apply,

7.9     This clause shall apply mutatis mutandis in the case of exercise of a Drag Along Right by VHC or in the case of a redemption by the Debtors, as per Clauses 6.2.2 above.


**8     GUARANTEE**

*8.1     The Guarantees*

8.1.1     Each of the Debtors guarantees to each of the Secured Parties, jointly and severally with all other Debtors (establishing hereby a cross – guarantee), as primary obligor and not merely as surety, irrevocably and unconditionally, waiving any and all objections of the primary obligor, including but not limited to the objection of division and distraint, the due and punctual payment, performance and discharge in full of any and all Secured Obligations of each of the other Debtors, in accordance with the terms of this Clause 8 (hereinafter the "**Guarantee**").

More specifically:

8.1.2     K1 Guarantees to VHC, VELTI S.A., to M-TELECOM LTD and VPS:


33

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(i) the due and timely payment in full of all Considerations, and specifically the VCI SPA Consideration, the VELTI E.O.O.D SPA Consideration, the ADVENT SPA Consideration, the AR Transfer Consideration, the IP Transfer Consideration and the CY1 & CY2 SPA Considerations, and all other monetary obligations under the Transfer Agreements by the relevant Debtors to the Sellers; (ii) the due and timely performance and discharge in full of all other non-monetary obligations under the Transfer Agreements by the relevant Debtors to the Sellers; (iii) the due and timely payment in full of the "VCI Debt" by VCI to VELTI S.A., and the due and timely performance and discharge in full of all other non-monetary obligations under the "VCI Loan Agreement" by VCI to VELTI S.A.; (iv) the due and timely payment in full of the "DIGITAL RUM Debt to VELTI S.A." by DIGITAL RUM to VELTI S.A.; (v) the due and timely payment in full of the "DIGITAL RUM Debt to VPS" by DIGITAL RUM to VPS; and (vi) the due and timely performance and discharge in full of the obligations of the other Debtors under this Agreement and the other Framework Documents towards each and any of the Secured Parties. It is specifically and expressly agreed that this guarantee of K1 is a LIMITED guarantee, exclusively up to the value of any shares owned by K1 in any Company from time to time and does not involve any other assets owned by K1.

8.1.3    K2 Guarantees to VHC, VELTI S.A., to M-TELECOM LTD and VPS:

(i) the due and timely payment in full of all Considerations, and specifically the VCI SPA Consideration, the VELTI E.O.O.D SPA Consideration, the ADVENT SPA Consideration, the AR Transfer Consideration, the IP Transfer Consideration and the CY1 & CY2 SPA Considerations, and all other monetary obligations under the Transfer Agreements by the relevant Debtors to the Sellers; (ii) the due and timely performance and discharge in full of all other non-monetary obligations under the Transfer Agreements by the relevant Debtors to the Sellers; (iii) the due and timely payment in full of the "VCI Debt" by VCI to VELTI S.A., and the due and timely performance and discharge in full of all other non-monetary obligations under the "VCI Loan Agreement" by VCI to VELTI S.A.; (iv) the due and timely payment in full of the "DIGITAL RUM Debt to VELTI S.A." by DIGITAL RUM to VELTI S.A.; (v) the due and timely payment in full of the "DIGITAL RUM Debt to VPS" by DIGITAL RUM to VPS; and (vi) the due and timely performance and discharge in full of the obligations of the other Debtors under this Agreement and the other Framework Documents towards each and any of the Secured Parties. It is specifically and expressly agreed that this guarantee of K2 is a LIMITED guarantee,

34

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

exclusively up to the value of any shares owned by K2 in any Company from time to time and does not involve any other assets owned by K2.

8.1.4    MCY Guarantees to VHC, VELTI S.A., to M-TELECOM LTD and VPS:

(i) the due and timely payment in full of all Considerations of all other Debtors, and specifically the VCI SPA Consideration, the VELTI E.O.O.D SPA Consideration, the ADVENT SPA Consideration, the AR Transfer Consideration, the IP Transfer Consideration, and all other monetary obligations under such Transfer Agreements by the relevant Debtors to the Sellers; (ii) the due and timely performance and discharge in full of all other non-monetary obligations under such Transfer Agreements by the relevant Debtors to the Sellers; (iii) the due and timely payment in full of the "VCI Debt" by VCI to VELTI S.A., and the due and timely performance and discharge in full of all other non-monetary obligations under the "VCI Loan Agreement" by VCI to VELTI S.A.; (iv) the due and timely payment in full of the "DIGITAL RUM Debt to VELTI S.A." by DIGITAL RUM to VELTI S.A.; (v)the due and timely payment in full of the "DIGITAL RUM Debt to VPS" by DIGITAL RUM to VPS; and (vi) the due and timely performance and discharge in full of the obligations of the other Debtors under this Agreement and the other Framework Documents towards each and any of the Secured Parties.

For the avoidance of doubt MCY has undertaken directly (i) as Purchaser of CY1 and CY2,  the due and timely payment in full of the CY1 & CY2 SPA Considerations, and all other monetary obligations under the CY1 & CY2 SPA, as well as the due and timely performance and discharge in full of all other non-monetary obligations thereunder towards the Seller, being VHC; and (ii) as a Party hereunder, the due and timely performance and discharge in full of its own obligations under this Agreement and the other Framework Documents.

8.1.5    CY1 Guarantees to VHC, VELTI S.A., to M-TELECOM LTD and VPS:

(i) the due and timely payment in full of all Considerations of all other Debtors, and specifically the VCI SPA Consideration, the VELTI E.O.O.D SPA Consideration, the ADVENT SPA Consideration and the CY1 & CY2 SPA Considerations, and all other monetary obligations under such Transfer Agreements by the relevant Debtors to the Sellers; (ii) the due and timely performance and discharge in full of all other non-monetary obligations under such Transfer Agreements by the relevant Debtors to the Sellers; (iii) the due and timely payment in full of the

35

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

"VCI Debt" by VCI to VELTI S.A., and the due and timely performance and discharge in full of all other non-monetary obligations under the "VCI Loan Agreement" by VCI to VELTI S.A.; (iv) the due and timely payment in full of the "DIGITAL RUM Debt to VELTI S.A." by DIGITAL RUM to VELTI S.A.; (v) the due and timely payment in full of the "DIGITAL RUM Debt to VPS" by DIGITAL RUM to VPS; and (vi) the due and timely performance and discharge in full of the obligations of the other Debtors under this Agreement and the other Framework Documents towards each and any of the Secured Parties.

For the avoidance of doubt CY1 has undertaken directly (i) as Purchaser of the Business Receivables and the Intellectual Property, the due and timely payment in full of the AR Transfer Consideration & IP Transfer Consideration, and all other monetary obligations under the AR Transfer Agreement and the IP Transfer Agreement, as well as the due and timely performance and discharge in full of all other non-monetary obligations thereunder towards the Seller, being VELTI S.A.; and (ii) as a Party hereunder, the due and timely performance and discharge in full of its own obligations under this Agreement and the other Framework Documents.

8.1.6   CY2 Guarantees to VHC, VELTI S.A., to M-TELECOM LTD and VPS:

(i) the due and timely payment in full of all Considerations of all other Debtors, and specifically the ADVENT SPA Consideration, the AR Transfer Consideration, the IP Transfer Consideration and the CY1 & CY2 SPA Considerations, and all other monetary obligations under such Transfer Agreements by the relevant Debtors to the Sellers; (ii) the due and timely performance and discharge in full of all other non-monetary obligations under such Transfer Agreements by the relevant Debtors to the Sellers; (iii) the due and timely payment in full of the "VCI Debt" by VCI to VELTI S.A., and the due and timely performance and discharge in full of all other non-monetary obligations under the "VCI Loan Agreement" by VCI to VELTI S.A.; (iv) the due and timely payment in full of the "DIGITAL RUM Debt to VELTI S.A." by DIGITAL RUM to VELTI S.A.; (v) the due and timely payment in full of the "DIGITAL RUM Debt to VPS" by DIGITAL RUM to VPS; and (vi) the due and timely performance and discharge in full of the obligations of the other Debtors under this Agreement and the other Framework Documents towards each and any of the Secured Parties.

For the avoidance of doubt CY2 has undertaken directly (i) as Purchaser of VCI and VELTI E.O.O.D, the due and timely payment in full of the VCI SPA Consideration and the VELTI

36

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

E.O.O.D SPA Consideration, and all other monetary obligations under the VCI SPA and the VELTI E.O.O.D SPA as well as the due and timely performance and discharge in full of all other non-monetary obligations thereunder towards the respective Sellers, being VELTI S.A. and M-TELECOM LTD; and (ii) as a Party hereunder, the due and timely performance and discharge in full of its own obligations under this Agreement and the other Framework Documents.

8.1.7   VCI Guarantees to VHC, VELTI S.A., to M-TELECOM LTD and VPS:

(i) the due and timely payment in full of all Considerations, and specifically the VCI SPA Consideration, the VELTI E.O.O.D SPA Consideration, the AR Transfer Consideration, the IP Transfer Consideration and the CY1 & CY2 SPA Considerations, and all other monetary obligations under the Transfer Agreements by the relevant Debtors to the Sellers; (ii) the due and timely performance and discharge in full of all other non-monetary obligations under the Transfer Agreements by the relevant Debtors to the Sellers; (iii) the due and timely payment in full of the "DIGITAL RUM Debt to VELTI S.A." by DIGITAL RUM to VELTI S.A.; (iv) the due and timely payment in full of the "DIGITAL RUM Debt to VPS" by DIGITAL RUM to VPS; and (v) the due and timely performance and discharge in full of the obligations of the other Debtors under this Agreement and the other Framework Documents towards each and any of the Secured Parties.

For the avoidance of doubt VCI has undertaken directly (i) as a Purchaser of ADVENT, the due and timely payment in full of the ADVENT SPA Consideration and all other monetary obligations under the ADVENT SPA, as well as the due and timely performance and discharge in full of all other non-monetary obligations thereunder towards the respective Seller being VELTI S.A.; (ii) as a debtor under the VCI Loan Agreement, the due and timely payment in full of the "VCI Debt" to VELTI S.A., and the due and timely performance and discharge in full of all other non-monetary obligations under the "VCI Loan Agreement" to VELTI S.A.; and (iii) as a Party hereunder, the due and timely performance and discharge in full of its own obligations under this Agreement and the other Framework Documents.

8.1.8   VELTI E.O.O.D Guarantees to VHC, VELTI S.A., to M-TELECOM LTD and VPS:

(i) the due and timely payment in full of all Considerations, and specifically the VCI SPA Consideration, the VELTI E.O.O.D SPA Consideration, the ADVENT SPA Consideration, the

37

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

AR Transfer Consideration, the IP Transfer Consideration and the CY1 & CY2 SPA Considerations, and all other monetary obligations under the Transfer Agreements by the relevant Debtors to the Sellers; (ii) the due and timely performance and discharge in full of all other non-monetary obligations under the Transfer Agreements by the relevant Debtors to the Sellers; (iii) the due and timely payment in full of the "VCI Debt" by VCI to VELTI S.A., and the due and timely performance and discharge in full of all other non-monetary obligations under the "VCI Loan Agreement" by VCI to VELTI S.A.; (iv) the due and timely payment in full of the "DIGITAL RUM Debt to VELTI S.A." by DIGITAL RUM to VELTI S.A.; (v) the due and timely payment in full of the "DIGITAL RUM Debt to VPS" by DIGITAL RUM to VPS; and (vi) the due and timely performance and discharge in full of the obligations of the other Debtors under this Agreement and the other Framework Documents towards each and any of the Secured Parties.

For the avoidance of doubt VELTI E.O.O.D has undertaken directly as a Party hereunder, the due and timely performance and discharge in full of its own obligations under this Agreement and the other Framework Documents.

8.2    *General Provisions for the Guarantees*

8.2.1    The guarantee regarding the "DIGITAL RUM Debt to VPS" is given by each Debtor to VPS, independently from the knowledge and/or consent of DIGITAL RUM; Each Debtor is aware that due to the above, in case this guarantee is paid in whole or in part by a Debtor, the recourse of such Debtor to DIGITAL RUM shall be prejudiced.

8.2.2    Each of the Debtors confirms and agrees that the liability of each Debtor hereunder shall not be discharged or diminished by any failure or default by any other Debtor to perform its obligations hereunder or by the release of any other Debtor from its obligations hereunder, by any Secured Party.

8.2.3    This Guarantee is a continuing guarantee and shall remain in full force and effect until all Secured Obligations shall have been paid, performed and satisfied in full, and is in addition to and not in substitution for, and shall not be prejudiced or affected by, any other security or guarantee now or hereafter held by a Secured Party for the payment and performance of the Secured Obligations.

38

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

8.2.4   The liability of each Debtor hereunder shall not be lessened or impaired and the Debtor shall not be exonerated by any time, indulgence or relief being given by any relevant Secured Party to the Debtor(s), any other Debtor or any other person, by any amendment of or supplement to this Agreement or any other Framework Document or any other document, by the taking, variation, compromise, renewal or release of or refusal or neglect to perfect or enforce any rights, remedies or securities against the other Debtor(s), the Debtor or any other person or by anything done or omitted which but for this provision might operate to exonerate the Debtor.

8.2.5   The obligations of each Debtor hereunder shall not be affected by any legal limitation, disability, incapacity (including, without limitation, any irregular exercise or absence of corporate power or lack of authority of or any breach of duty by any person purporting to act on behalf of any other Debtor(s), death, unsoundness of mind, bankruptcy, administration, receivership, liquidation and dissolution) or other circumstances relating to the Debtor(s), any other Debtor or any other person, whether known or not to the relevant Secured Person, by any invalidity in or irregularity or unenforceability of the Secured Obligations, by any change in the constitution of, or any amalgamation or reconstruction of the Debtor(s), any other Debtor, any Secured Party or any other person.

8.2.6   Each Debtor hereby waives all rights the Debtor may have of first requiring a Secured Party to proceed against or enforce any guarantee or security of, or claim payment from, the Debtor(s) or any other person before enforcing this Guarantee and no action taken or omitted by any Secured Party in connection with any other guarantee or security or other means of payment in respect of the Secured Obligations shall discharge, reduce, prejudice or affect the liability of the Debtor under this Guarantee or shall a Secured Party be obliged to apply any money or other property received in consequence of any enforcement or realisation of any other guarantee or security or other means of payment in reduction of the Secured Obligations.  .

8.2.7   Until all Secured Obligations have been paid or discharged in full, each Debtor agrees not to exercise or enforce any rights of subrogation and indemnity or contribution against the Debtor(s) or any other Debtor and agrees not to claim any set-off or counterclaim against any other Debtor or the Debtor(s) or to claim or prove in competition with a

39

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Secured Party in the event of the bankruptcy, insolvency, creditors' protection scheme or liquidation of any other Debtor or the Debtor(s) but, if so directed by a Secured Party, it will prove for the whole or any part of its claim in the bankruptcy, insolvency, creditors' protection scheme or liquidation of any other Debtor or the Debtor(s) on terms that the benefit of such proof and of all moneys received by it in respect thereof shall be held on trust for the Secured Party and applied in such manner as the Secured Party shall deem appropriate or have any benefit of or any share in any other guarantee or security now or hereafter held by the Secured Party. Any moneys received by the Secured Party from the Debtor may be placed to the credit of a suspense account with a view to preserving any of its rights to prove for the whole of its claims against the Debtor(s).

8.2.8    Any release, settlement or discharge between a Secured Party and a Debtor shall be conditional upon no security or payment to the Secured Party by the Debtor(s) or any other Debtor or any other person being void or set aside or ordered to be refunded or reduced by virtue of any provision or enactment relating to bankruptcy, insolvency, creditors' protection scheme or liquidation for the time being in force or for any other reason whatsoever and the Secured Party shall be entitled to enforce this Guarantee subsequently as if such release, discharge or settlement had not occurred and any such payment had not been made.

8.2.9    Each Debtor agrees to pay the applicable interest to the extent that such interest is not paid by the Debtor(s) from the date of the failure of the Debtor(s) to make payment under this Agreement or any other Framework Documents (or, if earlier, from the date when the legal liability of the Debtor(s) to pay interest under this Agreement ceased by reason of provisions or enactments relating to bankruptcy, insolvency, liquidation, creditors protection scheme or otherwise) until payment has been effected in full of all Secured Obligations hereby guaranteed, such interest to be payable  before and after judgment at such rate as would at that time be equal to the rate of interest payable under this Agreement or any other Framework Document.

8.2.10   Each Debtor has not taken or received and undertakes not to take or receive, any security or lien from the Debtor(s) or any other person in respect of the granting of this Guarantee or for any liability whatsoever hereunder until all Secured Obligations has been paid.

40

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

8.2.11   In addition to the guarantee contained herein and separate therefrom each Debtor hereby irrevocably agrees to indemnify each Secured Party against all expenses, (including legal expenses on a full indemnity basis) which the Secured Party may incur in proceeding against the Debtor(s) and the Debtor or any of them. This liability shall be limited in the case of K1 and K2, up to the amount of their respective Guarantee under Clauses 8.1.2 and 8.1.3 above

8.2.12   Any admission of liability by one Debtor will be binding automatically on all the Debtors.

8.2.13   It is hereby expressly agreed and admitted by each Debtor that abstracts or photocopies of the books of a Secured Party as well as statements of accounts or a certificate signed by an authorized officer of a Secured Party shall be conclusive, binding and shall constitute full evidence on the Debtor as to the existence and/or the amount of the Secured Obligations, of the applicable interest rate or default rate or any other rate provided for or referred to in this Agreement or any other Framework Document, the payment or non payment of any amount and/or the occurrence of any other Trigger Event and/or Enforcement Event but the Debtor shall be allowed to rebut such evidence by any means of evidence with the express exclusion of witnesses.

8.2.14   As a separate and independent stipulation, each Debtor agrees that if any purported obligation or liability of the Debtor(s) which would have been the subject of this Guarantee had it been valid and enforceable is not or ceases to be valid or enforceable against the Debtor(s) on any ground whatsoever whether or not known to any Secured Party (including, without limitation, any irregular exercise or absence of any corporate power or lack of authority of, or breach of duty by, any person purporting to  act on behalf of the Debtor(s) or any legal or other limitation, whether under compulsory applicable law or otherwise or any disability or incapacity or any change in the constitution of the Debtor(s)) the Debtor shall, nevertheless, be liable to the Secured Parties in respect of that purported obligation or liability as if the same were fully valid and enforceable and the Debtor were the  principal debtor in respect thereof. The Debtor hereby agrees to keep the Secured Parties fully indemnified on demand against all damages, losses, costs and expenses arising from any failure of the Debtor(s) to perform or discharge any such purported obligation or liability.

41

---

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

8.2.15  If, contrary to this Guarantee, a Debtor takes or receives the benefit of any security or receives or recovers any money or other property, such security, money or other property shall be held on trust for the Secured Parties and shall be delivered to the Secured Parties on demand.

8.2.16  Without prejudice to the generality of any waivers included in the preceding Clauses each Debtor hereby specifically waives without reservation, absolutely and unconditionally:

    a.  The benefit of discussion and any other rights, benefits or privileges granted to the Debtor as guarantor under Applicable Law; ;

    b.  Any right to object to any payment to any Secured Party resulting from any counter claim which the Debtor as guarantor might have against such Secured Party;

    c.  Any right to object to any payment, as a result of errors or omissions made by any Secured Party, which caused the Debtor as a guarantor to lose any right or recourse against the Debtor(s) or any other person;

Any other right, benefit or privilege which the Debtor as a guarantor has under the law and which can be validly waived.   .

8.2.17  It is specifically agreed by the Parties herein that after the occurrence of an Enforcement Event and before enforcing the Guarantees undertaken hereby against the relevant Debtor(s)/Guarantor(s), the relevant Secured Party(ies) will give a thirty calendar days prior written notice to the relevant Debtor(s)/Guarantor(s) stating the Enforcement Event.

*8.3*  *Payments under the Guarantee*

8.3.1  All moneys to be paid by each Debtor under the Guarantee shall be paid the respective Secured Party in the currency in which the respective Secured Obligation is denominated in immediately available funds.

8.3.2  All payments due shall be made on a Business Day. If the due date for payment falls on a day which not a Business Day, the payment or payments due shall be made on the first Business Day thereafter, provided that this falls in the same calendar month. If it does

42

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

not, payments shall fall due and be made on the last Business Day before the said due date. Payment shall be made to the account, which the Secured Party shall designate.

8.3.3   All payments of the Secured Obligations by the Debtor shall be made without any set-off or counterclaim whatsoever, and free and clear of, and without withholding or deduction now or hereafter, Taxes or withholdings and any restrictions or conditions resulting in any charge whatsoever imposed, either now or hereafter, by any sovereign state or by any political sub-division or taxing authority of any sovereign state or any other deductions or withholdings (collectively referred to below as "**Governmental Withholdings**").

8.3.4   If at any time any law, regulation, regulatory requirement or requirement of any governmental authority, monetary agency, central bank or the like compels the Debtor to make payment subject to non recoverable by the Secured Party (under bilateral tax treaties or otherwise) Governmental Withholdings, or any other deduction or withholding, the Debtor shall in addition pay to the Secured Party on the due date for payment such additional amounts as may be necessary to ensure that there will be received by the Secured Party (and retained by it, free from any liability in respect of any Governmental Withholdings or any other deduction or withholding) a net amount equal to the full amount which would have been received had payment not been made subject to such Governmental Withholdings or other deduction or withholding. The Debtor shall indemnify the Secured Party against any losses or costs incurred by the Secured Party by reason of any failure of the Debtor to make any such Governmental Withholdings or other deduction or withholding or by reason of any increased payment not being made on the due date for such payment. The Debtor shall, not later than 30 days after each deduction, withholding or payment of any Governmental Withholdings, forward to the Secured Party official receipts and any other documentary receipts and any other documentary evidence reasonably required by the Secured Party in respect of the payment of any Governmental Withholdings or other deduction or withholding. The obligations of the Debtor under this provision shall, subject to applicable law, remain in force notwithstanding the repayment of the Secured Obligations.

43

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

8.3.5   If, under any applicable law or regulation or pursuant to a judgment or order being made or registered against the Debtor or the receiver of the Debtor or without limitation for any other reason, any payment under or in connection with this Guarantee is made or falls to be satisfied in a currency (the " **Payment Currency**") other than the currency in which such payment is expressed to be due under this Agreement or the other Framework Documents (the " **Contractual Currency**") then, to the extent that the amount of such payment actually received by the Secured Party, when converted into the contractual currency at the rate of exchange, falls short of the amount due under this Agreement or the other Framework Documents, as the case may be, the Debtor, as a separate and independent obligation, shall indemnify and hold harmless the Secured Party against the amount of such shortfall. For the purpose of this Sub-Clause, "rate of exchange" means the rate at which the Secured Party is able on or about the date of such payment to purchase, in accordance with the normal practice, the Contractual Currency with the Payment Currency and shall take into account (and the Debtor shall be liable for) any premium and other costs of exchange including any taxes or duties incurred by reason of any such exchange.

## 9   PLEDGES

Each of the Debtors wishes to provide further security to VHC and VELTI S.A. by granting the Pledges that are contemplated hereunder and the Pledge Agreements. All Pledges shall have 1st priority. To this end, the Debtors shall:

- enter on Closing, into the Pledge Agreements contemplated in Clause 9.3 below;
- ensure and procure the compliance with all requisite formalities and registration under applicable law; and
- without prejudice to the foregoing, VCI shall provide an irrevocable power of attorney to VELTI S.A. for the registration of the Pledge established by virtue of the "VELTI S.A. Pledge on VCI Business Receivables" as required by applicable law.

9.1   *The Pledges to VELTI S.A.*

9.1.1   *Pledge given by K1*

44

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

K1 shall provide a pledge on the MCY Shares it owns, as a continuing security to VELTI S.A., of the following Secured Obligations:

(i) the due and timely payment in full of all Considerations due to VELTI S.A., and specifically the VCI SPA Consideration by CY2, the ADVENT SPA Consideration by VCI, the AR Transfer Consideration by CY1, the IP Transfer Consideration by CY1 and all other monetary obligations under the relevant Transfer Agreements by the above Debtors to VELTI S.A.;

(ii) the due and timely performance and discharge in full of all other non-monetary obligations under the above Transfer Agreements by the relevant Debtors, namely CY2, VCI and CY1 to VELTI S.A.;

(iii) the due and timely payment in full of the "VCI Debt" by VCI to VELTI S.A., and the due and timely performance and discharge in full of all other non-monetary obligations under the "VCI Loan Agreement" by VCI to VELTI S.A.;

(iv) the due and timely payment in full of the "DIGITAL RUM Debt to VELTI S.A." by DIGITAL RUM to VELTI S.A.;

(v) the due and timely performance and discharge in full of the obligations of the other Debtors under this Agreement and the other Framework Documents towards each and any of the Secured Parties; and

(vi) the due and timely performance and discharge in full of its own obligations under this Agreement and the other Framework Documents towards VELTI S.A.

### 9.1.2    *Pledge given by K2*

K2 shall provide a pledge on the MCY Shares it owns, as a continuing security to VELTI S.A., of the following Secured Obligations:

(i) the due and timely payment in full of all Considerations due to VELTI S.A., and specifically the VCI SPA Consideration by CY2, the ADVENT SPA Consideration by VCI, the AR Transfer Consideration by CY1, the IP Transfer Consideration by CY1 and all other monetary obligations under the relevant Transfer Agreements by the above Debtors to VELTI S.A.;

45

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

(ii) the due and timely performance and discharge in full of all other non-monetary obligations under the above Transfer Agreements by the relevant Debtors, namely CY2, VCI and CY1 to VELTI S.A.;

(iii) the due and timely payment in full of the "VCI Debt" by VCI to VELTI S.A., and the due and timely performance and discharge in full of all other non-monetary obligations under the "VCI Loan Agreement" by VCI to VELTI S.A.;

(iv) the due and timely payment in full of the "DIGITAL RUM Debt to VELTI S.A." by DIGITAL RUM to VELTI S.A.;

(v) the due and timely performance and discharge in full of the obligations of the other Debtors under this Agreement and the other Framework Documents towards each and any of the Secured Parties; and

(vi) the due and timely performance and discharge in full of its own obligations under this Agreement and the other Framework Documents towards VELTI S.A.

*9.1.3*   *Pledge given by CY2*

CY2 shall provide a pledge on the VCI Shares it shall acquire by virtue of the VCI SPA, as a continuing security to VELTI S.A., of the following Secured Obligations:

*As a Purchaser for*

(i) the due and timely payment in full of all Considerations due by CY2 as a Purchaser to VELTI S.A., and specifically the VCI SPA Consideration and all other monetary obligations of CY2 under such Transfer Agreement to VELTI S.A.;

*As a Guarantor and a Party hereunder for*

(ii) the due and timely payment in full of all Considerations due to VELTI S.A. by the other Debtors, and specifically the AR Transfer Consideration by CY1, the IP Transfer Consideration by CY1, and the ADVENT SPA Consideration by VCI and all other monetary obligations under the relevant Transfer Agreements by the above Debtors to VELTI S.A.;

46

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(iii) the due and timely performance and discharge in full of all other non-monetary obligations under the above Transfer Agreements by the relevant Debtors, namely CY1 and VCI, to VELTI S.A.;

(iv) the due and timely payment in full of the "VCI Debt" by VCI to VELTI S.A., and the due and timely performance and discharge in full of all other non-monetary obligations under the "VCI Loan Agreement" by VCI to VELTI S.A.;

(v) the due and timely payment in full of the "DIGITAL RUM Debt to VELTI S.A." by DIGITAL RUM to VELTI S.A.;

(vi) the due and timely performance and discharge in full of the obligations of the other Debtors under this Agreement and the other Framework Documents towards each and any of the Secured Parties; and

(vii) the due and timely performance and discharge in full of its own obligations under this Agreement and the other Framework Documents towards VELTI S.A.

### 9.1.4    *Pledge given by VCI*

VCI shall provide a floating pledge on its business receivables, as a continuing security to VELTI S.A., of the following Secured Obligations:

*As a Purchaser for*

(i) the due and timely payment in full of the ADVENT SPA Consideration by VCI and all other monetary obligations under the ADVENT SPA by VCI to VELTI S.A.;

(ii) the due and timely performance and discharge in full of all other non-monetary obligations under the ADVENT SPA by VCI to VELTI S.A.;

*As direct debtor for*

(iii) the due and timely payment in full of the "VCI Debt" to VELTI S.A., and the due and timely performance and discharge in full of all other non-monetary obligations under the "VCI Loan Agreement" by VCI to VELTI S.A.;

*As a Guarantor and a Party hereunder for*

47

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(iv) the due and timely payment in full of all Considerations due to VELTI S.A., and specifically the VCI SPA Consideration by CY2, the AR Transfer Consideration by CY1, the IP Transfer Consideration by CY1 and all other monetary obligations under the relevant Transfer Agreements by the above Debtors to VELTI S.A.;

(v) the due and timely performance and discharge in full of all other non-monetary obligations under the above Transfer Agreements by the relevant Debtors, namely CY1 and CY2, to VELTI S.A.;

(vi) the due and timely payment in full of the "DIGITAL RUM Debt to VELTI S.A." by DIGITAL RUM to VELTI S.A.;

(vii) the due and timely performance and discharge in full of the obligations of the other Debtors under this Agreement and the other Framework Documents towards each and any of the Secured Parties; and

(viii) the due and timely performance and discharge in full of its own obligations under this Agreement and the other Framework Documents towards VELTI S.A.

### 9.2 *The Pledges to VHC*

#### 9.2.1 *Pledges given by MCY*

MCY shall provide a pledge on the CY1 Shares and a pledge on the CY2 Shares it shall acquire by virtue of the CY1 & CY2 SPA, as a continuing security to VHC, of the following Secured Obligations:

*As a Purchaser for*

(i) the due and timely payment in full of all Considerations due by MCY as a Purchaser to VHC, and specifically the CY1 & CY2 SPA Considerations and all other monetary obligations under the CY1 & CY2 SPA by MCY to VHC;

(ii) the due and timely performance and discharge in full of all other non-monetary obligations of MCY under the above Transfer Agreement to VHC; and

*As a Party & Guarantor hereunder for*

48

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(iii) the due and timely performance and discharge in full of its own obligations and all other Debtors' obligations under this Agreement and the other Framework Documents towards VHC and each and any of the Secured Parties.

### 9.2.2    *Pledge given by CY1*

CY1 shall provide a fixed and floating pledge on its assets, as a continuing security to VHC, of the following Secured Obligations:

*As a Guarantor & Party hereunder for*

(i) the due and timely payment in full of all Considerations due to VHC by MCY, and specifically the CY1 & CY2 SPA Considerations and all other monetary obligations under the CY1 & CY2 SPA by MCY to VHC;

(ii) the due and timely performance and discharge in full of all other non-monetary obligations of MCY under the above Transfer Agreement to VHC;

(iii) the due and timely performance and discharge in full of the obligations of MCY and all other Debtors under this Agreement and the other Framework Documents towards VHC and each and any of the Secured Parties; and

(iv) the due and timely performance and discharge in full of its own obligations under this Agreement and the other Framework Documents towards VHC.

### 9.2.3    *Pledges given by CY2*

CY2 shall provide a fixed and floating pledge on its assets, and a pledge on the VELTI E.O.OD. Shares it shall acquire by virtue of the VELTI E.O.O.D SPA, as a continuing security to VHC, of the following Secured Obligations:

*As a Guarantor & Party hereunder for*

(i) the due and timely payment in full of all Considerations due to VHC by MCY, and specifically the CY1 & CY2 SPA Considerations and all other monetary obligations under the CY1 & CY2 SPA by MCY to VHC;

(ii) the due and timely performance and discharge in full of all other non-monetary obligations of MCY under the above Transfer Agreement to VHC;

49

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(iii) the due and timely performance and discharge in full of the obligations of MCY and all other Debtors under this Agreement and the other Framework Documents towards VHC and each and any of the Secured Parties; and

(iv) the due and timely performance and discharge in full of its own obligations under this Agreement and the other Framework Documents towards VHC.

### 9.2.4    *Pledge given by VELTI E.O.O.D*

VELTI E.O.O.D. shall provide a floating pledge on its business receivables, as a continuing security to VHC, of the following Secured Obligations:

*As a Guarantor & Party hereunder for*

(i) the due and timely payment in full of all Considerations due to VHC by MCY, and specifically the CY1 & CY2 SPA Considerations and all other monetary obligations under the CY1 & CY2 SPA by MCY to VHC;

(ii) the due and timely performance and discharge in full of all other non-monetary obligations of MCY under the above Transfer Agreement to VHC;

(iii) the due and timely performance and discharge in full of the obligations of MCY and all other Debtors under this Agreement and the other Framework Documents towards VHC and each and any of the Secured Parties; and

(iv) the due and timely performance and discharge in full of its own obligations under this Agreement and the other Framework Documents towards VHC.

### 9.3    *Pledge Agreements*

According to the foregoing, the Debtors shall enter into the following Pledge Agreements:

### 9.3.1    *VELTI S.A. Pledge Agreements*

These comprise the following agreements:

    a)  "VELTI S.A. Pledge on STARCAPITAL Shares of K1" entered with K1, in the form and substance attached hereto as Schedule (G)

    b)  "VELTI S.A. Pledge on STARCAPITAL Shares of K2" entered with K1, in the form and substance attached hereto as Schedule (H)

50

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

*EXECUTION COPY*

---

c)   "VELTI S.A. Pledge on VCI Shares" entered with CY2, in the form and substance attached hereto as Schedule (I)

d)   "VELTI S.A. Pledge on VCI Business Receivables" entered with VCI in the form and substance attached hereto as Schedule (J).

### 9.3.2    *The VHC Pledge Agreements*

These comprise the following agreements:

e)   "VHC Pledge on I-VCI Shares" entered with MCY, in the form and substance attached hereto as Schedule (K)

f)   "VHC Pledge on ROSSVAYS Shares" entered with MCY, in the form and substance attached hereto as Schedule (L)

g)   "VHC Fixed and Floating Charge on I-VCI Assets" entered with CY1, in the form and substance attached hereto as Schedule (M)

h)   "VHC Fixed and Floating Charge on ROSSVAYS Assets" entered with CY2, in the form and substance attached hereto as Schedule (N)

i)   "VHC Pledge on VELTI E.O.O.D Shares" entered with CY2, in the form and substance attached hereto as Schedule (O)

j)   "VHC Floating Pledge on VELTI E.O.O.D Business Receivables" entered with VELTI E.O.O.D, in the form and substance attached hereto as Schedule (P).

### 9.3.3    *Safekeeping of Pledged Shares*

(a)    The shares certificates of the shares pledged under the Pledge Agreements (the "Pledged Shares") shall be kept by a Greek Notary, in accordance with Applicable Law, appointed to that effect by VHC and VELTI S.A. at the discretion of VHC and VELTI S.A. (being the "Pledgees" as contemplated in this Agreement and the Pledge Agreements), in Athens, Greece solely for the purpose of securing the location of the Pledged Shares and otherwise on terms satisfactory to VHC. For the avoidance of doubt the pledged shares shall not be kept in escrow and the respective Pledgee shall be in continuing possession of the pledged shares.

(b)    For the avoidance of doubt, the Pledged Shares shall be deemed possessed by the respective Pledgees and shall not be deemed to be jointly held in escrow by the Parties.

51

---

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(c)   The Pledged Shares shall be delivered by the Notary to the respective Pledgee (namely VHC and VELTI S.A., according to the Pledge Agreements) immediately, on first demand, at the discretion of the relevant Pledgee, upon delivery by the relevant Pledgee to the Notary, of a simple delivery request in writing.

(d)   Unless all the Secured Obligations have been discharged in full, the Debtors waive any right they may have under applicable law, to challenge the possession of the Pledged Shares by the Secured Parties or impede the delivery thereof by the Notary in any manner.

## 10   REPRESENTATIONS AND WARRANTIES UNDER THIS FRAMEWORK, CALL OPTION AND GUARANTEE AGREEMENT

Each Debtor hereby represents and warrants to VHC and the Sellers that:

### 10.1   *Representations concerning the Debtors*

(a)   The Debtors are incorporated and duly organised and validly existing and in good standing under the laws of their respective countries of incorporation, with power to own their property and assets, to carry on their business as the same is now being lawfully conducted.

(b)   This Agreement constitutes valid and binding obligations of each of the Debtors in accordance with its terms. The entry into and performance of this Agreement and all the other Framework Documents are within the corporate powers of the relevant Debtor, the other Debtors and any other party thereto and have been duly authorised by all corporate, shareholders' and other necessary action required for the authorization and do not and would not contravene or result in breach of any applicable law, regulation, rule, judgment, decree or permit or contractual restriction which does, or may, bind any one or more of them or their shareholders or their subsidiaries, or the documents defining the respective constitutions of any of them and do not and will not result in the creation or imposition of any security, interest, lien, charge, or encumbrance on any of their assets or those of any of their Subsidiaries in favor of any party other than VHC and/or the other Secured Parties, as contemplated hereunder and the Pledge Agreements.

(c)   None of the Debtors or any other party is in default under any agreement to which it is a party or by which it may be bound and no litigation, arbitration, tax claim or administrative proceeding is current or pending or (to its or its officers' knowledge) threatened, which, if

52

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

adversely determined, would have a materially detrimental effect on the business assets or the financial condition of any of them.

(d)   All information, accounts, statements of financial position, exhibits and reports furnished by or on behalf of the Debtors or any other party to VHC (and the Sellers) in connection with this Agreement and each of the other Framework Documents are true and accurate in all material respects and not misleading, do not omit material facts and all reasonable enquiries have been made to verify the facts and statements contained therein; there are no other facts to the knowledge of the Debtors, the omission of which would make any fact or statement therein misleading and, in the case of accounts and statements of financial position, they have been prepared in accordance with generally accepted accounting principles which have been consistently applied.

(e)   Neither the Debtors or any other party nor any of their respective assets are entitled to immunity on the grounds of sovereignty or otherwise from any legal action or proceeding (which shall include, without limitation, suit, attachment prior to judgment, execution or other enforcement).

(f)   The giving of the Guarantee, the Pledges and the Call Option by each Debtor is to the commercial benefit of the Debtor in that the Debtor belong, or shall ultimately belong, to the same Group of companies as the other Debtors and has close financial cooperation and mutual assistance with the Debtors and that by lending its support to the Debtors through such Guarantee, the Pledges and Call Option it furthers its own business interests within the scope of its constitutional documents.

10.2   *Representations Concerning this Agreement and the Framework Documents*

(a)   All licences, authorizations, consents or approvals necessary for the execution, validity, enforceability or admissibility in evidence of this Agreement or any other Framework Document and all other documents executed or to be executed in connection therewith, have been obtained and complied with by each of the Debtors and any other party.

(b)   When duly executed (and registered as appropriate), the Pledge Agreements (and related Framework Documents) will create a perfected security interest in favour of VHC and VELTI S.A. (the "Pledgees/Chargees"), with 1st priority, in the assets and revenues intended

53

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

to be covered, valid and enforceable against the relevant Debtor and any other party, as contemplated in Clause 9 above and the Pledge Agreements.

(c)    Without limitation to the generality of this Clause 10 more specifically the Guarantee constitutes valid and legally binding guarantee and obligation of each Debtor enforceable in accordance with its terms.

10.3   *Representations Correct*

(a)    Each Debtor acknowledges that all representations and warranties made by it and the other Debtors in this Agreement and the Framework Documents, are true and accurate and the Debtor represents and warrants that it has no knowledge of any additional facts or matters the omission of which makes any of such representation and warranties misleading or inaccurate.

(b)    At the time of entering into this Agreement all above representations and warranties or any other information given by the Debtors to VHC and the other Secured Parties are true and accurate and there has not occurred and/or is continuing any Trigger Event or Enforcement Event under this Agreement and/or any Framework Document or any event which would constitute a Trigger Event or an Enforcement Event with the passage of time or the giving of notice or both.

(c)    The representations and warranties in this Clause 10 shall be deemed to be repeated by each Debtor on and as of each day from the date of this Agreement until all Secured Obligations, including the payment of the Contingent Consideration, have been conclusively and fully discharged under this Agreement and all other Framework Documents as if made with reference to the facts and circumstances existing on each such day.

## 11   COVENANTS UNDER THE GUARANTEE & THIS AGREEMENT AS A WHOLE

It is hereby undertaken by each Debtor that, from the date hereof and as long as any of the Secured Obligations (including payment of the Contingent Consideration) is due and/or owing, and for the purposes of consistency of the Accounts in regard to  **Schedule (Q)**, it will:

11.1   *Information Covenants*

54

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

(a)  Furnish VHC, in form and substance satisfactory to VHC, with the annual, audited, pro-forma consolidated financial statements of the Debtor at latest within 120 days after the end of the financial year concerned, audited by auditors acceptable to VHC and prepared under applicable national accounting principles consistently applied.

(b)  Provide VHC annually and in substance satisfactory to VHC with information on the financial conditions, cash flow position, commitments and operations of the Debtor and its Subsidiaries including cash flow analysis with a breakdown of income and running expenses showing net trading profit, trade payables and trade receivables, such financial details to be certified by one of the Directors of the Debtor as to their correctness.

(c)  Promptly inform VHC of any occurrence of which the Debtor becomes aware which might adversely affect the ability of the Debtors to perform its respective obligations under this Agreement, the Pledge Agreements and/or any of the other Framework Documents and of any Trigger Event or an Enforcement Event thereunder forthwith upon becoming aware thereof.

(d)  Compile for each Operating Company and MCY, c/o its Board of Directors, a set of financial statements under applicable national accounting principles, based on the information and guidance provided herein, solely for the accurate determination of the EBITDA.

(e)  Following the preparation of the aforementioned financial statements, prepare c/o the Board of Directors a separate statement (the "EBITDA Statement"), stating clearly the EBITDA for the year 2014, for each Operating Company.

(f)  Prepare c/o the Board of Directors of MCY, a separate EBITDA statement, consolidating the above EBITDA statements of all Operating Companies in MCY for the year 2014 in accordance with the Greek GAAP.

11.2  *No Further Financial Exposure*

(a)  Incur no further Indebtedness (either directly or though its Subsidiaries) nor authorize or accept any capital commitments by the Debtor or its Subsidiaries, other than that normally associated with the day to day operations of their business, or give any guarantees without the prior written consent of VHC, not to be unreasonably withheld. .

55

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(b) Not make any loans or advances to, or any investments in any person, firm, corporation, joint venture or other entity including (without limitation) any loan or advance to any officer, director, stockholder or employee or other member of their Group without the prior written consent of VHC, not to be unreasonably withheld.

(c) Except pursuant to this Agreement and any other of the Framework Documents (or as expressly permitted by the same) not pay out any funds to any company or person, other than that normally associated with the day operation of their businesses without the prior written consent of VHC, which shall not be unreasonably withheld.

### 11.3   *Maintenance of Corporate and Business Structure*

(a) Not change the corporate organization nor discontinue the business of the Debtor and its Subsidiaries.

(b) Without prejudice to stock options issued to the employees of the Companies, which are permitted across the Companies, not allow any equity participation or quasi equity contribution resulting in or capable of causing the dilution of the joint participation of K1 and K2 or any PCPs in MCY as well as any downstream direct, or indirect participation of the Companies, below 51% of the voting shares in each participation.

(c) That none of the documents defining the constitution of the Debtors and the Debtor shall be altered in any manner whatsoever without the prior written consent of VHC, not to be unreasonably withheld.

(d) Ensure that no Change of Control or any other event which violates the Lock In Restrictions shall be made directly or indirectly in the Companies or any share therein, without the prior written consent of VHC; and

(e) Not merge or consolidate with any other company or person without the prior written consent of VHC.

(f) In the event of any of the Sellers lending any of the Debtors its technical and/or financial experience palmarès, for the purpose of assisting the participation of such Debtor in private and/or public procurement tenders, provide the respective Seller with such security and indemnity in regard to relevant liability and risk, including reputational risk, as such Seller shall deem reasonably sufficient.

56

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

(g) Subject, and to the extent permissible under the **Licensed "Velti" Use**, the Debtors may freely carry out any kind of business and develop and sell new products in the territory they wish, even if that business and products are other than the business carried on and the products developed and sold as at the date of this Agreement, as long as this business remains under the Control of the Debtors and within the legal structure existing as at the date of this Agreement.

11.4   <u>No Subordination</u>

(a)   Ensure that the indebtedness of the other Debtors and such Debtor to VHC under this Agreement or any other Framework Documents will not be subordinated in priority of payment to any other present or future indebtedness, without the prior written consent of VHC.

(b)   Not allow any part of the undertaking, property, assets or rights, of the Debtors or such Debtor whether present or future, to be mortgaged, charged, pledged, used as a lien or otherwise encumbered without the prior written consent of VHC, save as contemplated in this Agreement and the other Framework Documents, provided however that in the event of a financing of any of the Debtors, which is prima facie approved by VHC, VHC shall consider a reasonable inter-creditor agreement including a re-ranking of creditors or exchange of security rights, to the extent it shall not be deemed detrimental to the bona fide interests of VHC or any of the Sellers.

## 12   FURTHER ASSURANCE

Each Debtor hereby undertakes with VHC and the other Secured Parties that this Agreement, and the other Framework Documents shall both at the date of execution and delivery thereof and as long as any of the Secured Obligations (including the Contingent Consideration) is due and/or owing, remain valid and binding upon the Debtors and the Debtors will, execute, sign, perfect and do any and every such further assurance, document, act or thing as in the reasonable opinion of VHC and the other Secured Parties may be necessary or desirable for perfecting the Call Options, the Guarantees and Pledges and any other right contemplated or constituted by this Agreement and the other Framework Documents.

## 13   DEBTORS' INDEMNIFICATION - LIMITATION OF LIABILITY

57

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

13.1    The Debtors jointly and severally, shall indemnify and hold VHC and the other Secured Parties harmless from and against any Losses suffered or incurred by any of them resulting from a breach of this Agreement.

13.2    For the purposes of this Clause 13 "Loss" or "Losses" means all losses, liabilities, indemnities, damages (excluding any incidental, consequential or indirect damages or losses), costs (including, without limitation, legal costs), charges (excluding any charges by a Party for time and services of its own personnel and management), expenses, actions, fines, penalties, Proceedings, claims, remediation, clean-up and removal costs and demands, incurred by VHC due to a breach of an obligation, covenant, undertaking, representation, warranty, declaration, or any other provision of this Agreement by any Debtor.

13.4 It is specifically and expressly agreed that the total liability of each of K1 and K2 under Clause 13.1 is a LIMITED Liability, exclusively up to the value of any shares owned by K1 or K2 in any Company from time to time and does not involve any other assets owned by K1 or K2.

## 14    ASSIGNMENT

### *14.1 Assignment, Participation, Change of Beneficiary*

a)    This Agreement as a whole, including the Guarantees and Call Options established hereby, shall be binding upon and inure to the benefit of VHC and the other Secured Parties and each Debtor and their respective successors and assigns.

b)    Each Debtor may not assign any rights and/or obligations under this Agreement or any of the other Framework Documents without the prior written consent of VHC, not to be unreasonably withheld.

c)    VHC (and the other Secured Parties together with, or with the written consent of VHC, hereinafter the "Relevant Assignor") may at any time assign, transfer, or offer participations, or in any manner dispose of all or any of its rights and/or obligations arising or accruing under this Agreement or any of the other Framework Documents in whole or in part. VHC may disclose to a potential assignee, transferee or participant or to any other person who may propose entering into contractual relations with VHC

58

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

in relation to this Agreement or any other Framework Documents such information about the Debtor and Debtors as VHC shall consider appropriate.

d)   If VHC, and any one or more of the other Secured Parties together with, or with the written consent of VHC (the "Relevant Assignor") assigns, transfers or in any other manner grants participation in respect of all or any part of its rights or benefits or transfers all or any of its obligations as provided in this Clause, each Debtor undertakes, immediately on being requested to do so by VHC, to enter into such documents as may be necessary or desirable to transfer to the assignee, transferee or participant all or the relevant part of the interest of VHC in this Agreement, and the other Framework Documents and all relevant references in this Agreement to VHC shall thereafter be construed as a reference to VHC and/or assignee, transferee or participant of VHC to the extent of their respective interests and, in the case of a transfer of all or part of the obligations of VHC, the Debtor shall thereafter look only to the assignee, transferee or participant in respect of that proportion of the obligations of VHC under this Agreement assumed by such assignee, transferee or participant. References in this Clause to VHC shall be construed also as references to any Relevant Assignor(s), so that this Clause apply  *mutatis mutandis*  to the Relevant Assignor(s).

## 15   WAIVER, REMEDIES & AMENDMENTS

### *15.1 Waiver & Remedies*

15.1.1   No delay or omission by any Party to exercise any right, remedy or power vested in such Party under this Agreement and/or the other Framework Documents or by Applicable Law shall impair such right or power, or be construed as a waiver of, or as an acquiescence in any default by any of the other Parties nor shall any single or partial exercise by a Party of any power, right or remedy preclude any other or further exercise thereof or the exercise of any other power, right or remedy. In the event of a Party on any occasion agreeing to waive any such right, remedy or power, or consent to any departure from the strict application of the provisions of this Agreement, or of any of the other Framework Documents, such waiver shall not in any way prejudice or affect the powers conferred upon such Party under this Agreement and the other Framework Documents or the right

59

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

of such Party thereafter to act strictly in accordance with the terms of this Agreement and the other Framework Documents.

15.1.2   No modification or waiver of any provision of this Agreement and/or of any of the other Framework Documents nor any consent to any departure therefrom by any Party shall be effective unless the same shall be in writing and then shall only be effective in the specific case and for the specific purpose for which given. No notice to or demand on any such Party in any such case shall entitle such Party to any other or further notice or demand in similar or other circumstances.

*15.2 Amendments*

This Agreement may not be varied, modified, amended, supplemented or changed in any respect unless evidenced in a written instrument that is duly signed by all of the Parties. Notwithstanding the above, the obligations undertaken by the Parties under this Agreement may not be renegotiated.

## 16   CONFIDENTIALITY – NON SOLICITATION

16.1     The Parties undertake to hold in confidence the provisions of this Agreement (and the discussions between the Parties preceding the execution of this Agreement) as well as any information relating to a Party and disclosed by such Party to another Party.

16.2     Sub-Clause 16.1 shall prohibit disclosure or use of any information to the extent:

a)   the disclosure or use is required by Applicable Law, or order of any court, tribunal, regulatory body or the rules and regulations of any recognized stock exchange; or

b)   the disclosure or use is required to vest the full benefit of this Agreement in VHC and/or the other Secured Parties; or

c)   the disclosure or use is required for the purpose of any judicial Proceedings arising out of this Agreement or any other agreement entered into under or pursuant to this Agreement; or

d)   the disclosure is reasonably required to be made to a Taxation authority in connection with the Taxation affairs of the disclosing Party; or

e)   the disclosure is made to professional advisers of VHC, the other Secured Parties or the Debtors on terms that such professional advisers undertake to comply with the

60

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

provisions of Sub-Clause 16.1, in respect of such information as if they were a party to this Agreement; or

f)   the information becomes publicly available (other than by breach of this Agreement); or

g)   the other Party has given prior written approval to the disclosure or use of the information;

provided that prior to disclosure or use of any information pursuant to Sub-Clause 16.2 paragraphs (a), (b) or (c), the Party concerned shall promptly notify the other Party of such requirement with a view to providing the other Party with the opportunity to contest such disclosure or use or otherwise to agree the timing and content of such disclosure or use.

16.3   Any public announcement or similar publicity with respect to this Agreement will be issued, if at all, at such time and in such manner as the Parties agree.

16.4   VHC and the Sellers herein shall not offer employment to, enter into a contact for the services of, or attempt to entice away from any of the Debtors, any individual who is at the time of the offer or attempt, and was at the Closing Date, a director, officer or employee holding an executive or managerial position with or a position substantive for  the course of business of any of the Debtors, without the prior consent of the Purchasers, not to be unreasonably withheld.

## 17   DEBTORS' REPRESENTATIVE & SELLERS' REPRESENTATIVE

### 17.1   *Debtors' Representative*

18.1.1   The Debtors hereby appoint each of K1 and K2, acting severally, to be all Debtors' Representative, and their lawful agent for service and attorney to the effect that the Debtors' Representative is authorized to do the following on the Debtors' behalf:

a)   sign and enter into the Call Option Share Transfer Agreement(s), Tax return or other document in relation to the transactions contemplated hereby, subject however to any further power of attorney being required to be given in accordance with Applicable Law and the circulars and practice of the competent Taxation authorities;

61

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

b)   deliver and accept receipt of any notice, request or other communication relating to this Agreement or any other document pertaining to the transactions contemplated hereby;

c)   agree to amend this Agreement or any other document pertaining to the transactions contemplated hereby;

d)   take all actions necessary or appropriate at the Debtors' Representatives discretion, for the accomplishment of any of the foregoing and otherwise to represent each of the Debtors in any other matter under this Agreement and otherwise in relation to the transactions contemplated hereby.

17.1.2   Without prejudice to the appointment made by virtue of Clause 17.1.1 above, each of the Debtors shall also execute and deliver an irrevocable power of attorney, operating for the benefit of all the Debtors, for the appointment of K1 and K2 as the Debtors' Representative in accordance with the provisions of Clause 17.1.1 in form and substance satisfactory to VHC.


*17.2   Sellers' Representative*

17.2.1   The Sellers and VPS (jointly as defined above the "Secured Parties") hereby appoint VHC to be Sellers' and VPS' s representative (the "Sellers' Representative"), as each Secured Party's lawful agent for service and attorney. In particular the Sellers' Representative is authorized to do the following on the Secured Parties' behalf:

a)   deliver and accept receipt of any notice, request or other communication relating to this Agreement or any other document pertaining to the transactions contemplated hereby;

b)   agree to amend this Agreement or any other document pertaining to the transactions contemplated hereby;

c)   take all actions necessary or appropriate in the sole judgment of the Sellers' Representative for the accomplishment of any of the foregoing and otherwise to represent each of the Debtors in any other matter under this Agreement and otherwise in relation to the transactions contemplated hereby.


**18   NOTICES, COMMUNICATIONS**

62

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

18.1    Any notice, request, consent, waiver or any other communication that is to be made, given or delivered (or that is permitted to

be made, given or delivered) under this Agreement (each a "**Notice**" for purposes of this Clause 18 (*Notices,*

*Communications*)) shall be in writing in the English language.

18.2    Any Notice shall be considered to be validly made, given or delivered to the recipient only if delivered by hand at the address as

set out below, or sent by facsimile at the fax number as set out below, or sent by prepaid overnight courier services (by an

internationally reputable carrier in the case of international service) at the address as set out below:

**a)  in the case of VHC:**

Address: Artemidos Tower, 3 Artemidos Avenue, 7th & 8th Floors,

CY-6020 Larnaca Cyprus

Attention: Emilios Kallenos

Tel: +(30) 210 6378800
Fax +(30) 210 6378888
Mail info@velti.com

WITH A COPY TO

Mrs. Sally Rau, Chief Administrative Officer, General Counsel

Facsimile: +(44) 20 7633 5001

Tel: +353 (0) 1234 2676

Email: srau@velti.com

**b)  in the case of the Debtors, or any Debtor, to either of the Debtors Representatives as follows:**

Georgios **Karantonis**

5

2A Makrygianni Str., 19009 Pikermi, Attica, Greece

Tel: +30 210 6378 900
Fax: +30 210 6378 888
Email: gkarantonis@vci.gr

OR

Nikolaos **Karapanagou**

9 Ritsou Str.

63

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

14671 Nea Erythrea Attica Greece

Tel: +30 210 6378 900

Fax: +30 210 6378 888

Email: nkarapanagou@vci.gr

   **c)  in the case of the Sellers and VPS, to VHC acting as the Sellers Representative in the address stated hereabove**

or (in either case) to such other address or fax number as the relevant Party may have notified to the other Party in accordance with this Clause 18 (Notices, Communications).

18.3    Any Notice shall conclusively be deemed to have been received by the recipient:

   d)   at the time of delivery, if delivered by hand;

   e)   on the next Business Day in the place to which it is sent, if sent by facsimile (provided the sender retains an acknowledgement or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the recipient's facsimile number); or

   f)   on the fourth Business Day following the date of posting, if sent by overnight courier.


## 19   COSTS

Each Party will each bear its own fees and expenses, including but not limited to advisors' fees and expenses, incurred in connection with the negotiations, preparation and execution of this Agreement and the transactions contemplated hereby.


## 20   GOVERNING LAW & DISPUTE RESOLUTION

*20.1 Governing Law*

This Agreement shall be governed by and construed in accordance with Applicable Law.

*20.2 Settlement of Disputes*

*20.2.1 Arbitration*

Any dispute or difference arising out of or in connection with this Agreement, including without limitation any disputes regarding its valid conclusion, existence, nullity, breach, termination or invalidity (each a " **Dispute** " for purposes of this Clause 20.2 (*Settlement of Disputes*), that cannot

64

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

be resolved by amicable negotiations 30 (thirty) calendar days from the notice served by any of the Parties relating to the potential Dispute shall be finally resolved by the ICC International Court of Arbitration under the ICC Rules of Arbitration. The Party requesting the initiation of the arbitration proceedings shall serve the other Party with a written notice that such proceedings will be initiated. The arbitral tribunal shall be composed of one (1) arbitrator in the case of claims with a pecuniary value – net of interest, below five million US Dollars ($5,000,000.00) and 3 (three) arbitrator(s) in any other case, appointed in accordance with ICC Rules. If the dispute involves more than one Debtors, those shall appoint jointly one arbitrator. The Debtors, authorize the Debtors' Representative to proceed with the appointment of the arbitrator on behalf of the Debtors. If the dispute involves VHC also the other Secured Parties or any of them, they shall appoint jointly with VHC one arbitrator, which shall be appointed at the discretion of VHC.

## *20.2.2 Seat of arbitration*

The seat of the arbitration shall be Athens Greece. The language of the arbitration shall be English.

## *20.3Award Final and Binding*

### *20.3.1Award*

Any award of the arbitral tribunal rendered in accordance with this Clause 20.2 ( *Settlement of Disputes*) shall be final and binding on the Parties.

### *20.3.2 Judgment*

Judgment upon any such award made may be entered in any jurisdiction, or application may be made to any court of competent jurisdiction for confirmation of such award, judicial acceptance of such award, or for any order of enforcement or other legal remedy, as the case may be.

### *20.3.3 Cost of Dispute*

In the event of a Dispute, the Party prevailing in such dispute shall be entitled to recover all expenses, including without limitation arbitrators' fees and expenses, reasonable attorneys' fees and expenses and arbitral and court-related costs, incurred in ascertaining such Party's rights and in preparing to enforce, and in enforcing, such Party's rights under this Agreement, as determined by the arbitration tribunal, whether or not it was necessary for such Party to institute any enforcement proceedings.

65

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

*20.3.4 Confidentiality of Proceedings.*

The Parties undertake to procure that all arbitration proceedings conducted in accordance with this Agreement shall be kept confidential. This undertaking shall cover, inter alia, all information, data and documentation disclosed during the course of such proceedings, as well as any decision or award made or declared by the arbitral tribunal. Such information may not be disclosed to a third party without the prior written consent of the other Party. Regardless of the above, a Party shall not be prevented from disclosing information in order to safeguard its rights during the course of the proceedings, to enforce an award or to disclose such information as such Party is under an obligation to disclose pursuant to Applicable Law or decision by a court of law or government agency. All such information, data and documentation shall remain the property of the party who originally produced the same (the "Producing Party").  All originals and copies thereof shall be returned to the Producing Party within ninety (90) calendar days after publication of the final award in the arbitration; provided, however, that no Producing Party shall be entitled to the return of its information, data and documentation until it has fully satisfied any obligations imposed upon it by the award.

## LIST OF SCHEDULES

The following Schedules are attached to this Agreement and are incorporated by reference herein:

*The Transfer Agreements*

"VCI SPA"                          Schedule (A)

"VELTI E.O.O.D SPA"               Schedule (B)

"AR Transfer Agreement"           Schedule (C)

"IP Transfer Agreement"           Schedule (D)

"ADVENT SPA"                      Schedule (E)

"CY1 & CY 2 SPA"                  Schedule (F)

*VELTI S.A. Pledge Agreements*

"VELTI S.A. Pledge on STARCAPITAL Shares of K1"     Schedule (G)

"VELTI S.A. Pledge on STARCAPITAL Shares of K2"     Schedule (H)

66

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

---

"VELTI S.A. Pledge on VCI Shares"          Schedule (I)

"VELTI S.A. Pledge on VCI Business Receivables"     Schedule (J).

*The VHC Pledge Agreements*

"VHC Pledge on I-VCI Shares"          Schedule (K)

"VHC Pledge on ROSSVAYS Shares"          Schedule (L)

"VHC Fixed and Floating Charge on I-VCI Assets"       Schedule (M)

"VHC Fixed and Floating Charge on ROSSVAYS Assets"    Schedule (N)

"VHC Pledge on VELTI E.O.O.D Shares"          Schedule (O)

"VHC Floating Pledge on VELTI E.O.O.D Business Receivables"    Schedule (P)

*Other Schedules*

EBITDA                    Schedule (Q)

"DIGITAL RUM"                   Schedule (R)

"DIGITAL RUM Debt to VELTI S.A."          Schedule ($S_1$)

"DIGITAL RUM Debt to VPS"             Schedule ($S_2$)

"Exercise Notice"             Schedule (T)

"Debtors' Bank Accounts"             Schedule (U)

"Digital Rum Loan"             Schedule (V)

"Agreed Upon Procedures"             Schedule (W)

(SIGNATURE PAGE FOLLOWS)

67

Source: Velti plc, 20-F, April 11, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

*EXECUTION COPY*

---

**IN WITNESS WHEREOF**, this Agreement has been signed as follows.


**VELTI HOLDINGS CYPRUS LTD**


/s/ Emilios Kallenos

Name: Emilios Kallenos


**VELTI S.A.**


/s/ Menelaos Scouloudis

Name:   Menelaos Scouloudis


**VELTI M-TELECOM LTD**


/s/ Menelaos Scouloudis

Name: Menelaos Scouloudis


**VELTI PLATFORMS & SERVICES LTD**

/s/ Soterakis Koupepides

Name: Soterakis Koupepides


**GEORGIOS KARANTONIS (K1)**


/s/ Georgios Karantonis

68

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

Name: Georgios Karantonis

## NIKOLAOS KARAPANAGOU (K2)

Nikolaos Karapanagou

Name:    Nikolaos Karapanagou

## STARCAPITAL LIMITED

/s/ Georgios Karantonis

Name: Georgios Karantonis

## I-VCI LIMITED

/s/ Theodoros Louka

Name: Theodoros Louka

## ROSSVAYS INVESTMENTS LIMITED

/s/ Andreas Charalambous

Name: Andreas Charalambous

## VCI S.A.

69

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EXECUTION COPY*

/s/ Georgios Karantonis

Name: Georgios Karantonis

**VELTI E.O.O.D**

/s/ Emmanouil Orfanoudakis

Name: Emmanouil Orfanoudakis

70

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

EX 8.1

**LIST OF SUBSIDIARIES OF VELTI PLC**

As of December 31, 2012, we had the following significant subsidiaries:

| Subsidiary name | Proportion held | Country of operation | Nature of activities |
|---|---|---|---|
| Velti Limited | 100% | U.K. | Holding company |
| Velti DR Limited | 100% | U.K. | Mobile marketing and advertising |
| Velti, Inc. | 100% | U.S. | Mobile marketing and advertising |
| Mobclix, Inc. | 100% | U.S. | Mobile marketing and advertising |
| Velti S.A. | 100% | Greece | Mobile marketing and advertising |
| Velti Platforms and Services Limited | 100% | Cyprus | Mobile marketing and advertising |
| Velti Mobile Platforms Limited | 100% | British Virgin Islands | Mobile marketing and advertising |
| Mobile Interactive Group Limited | 100% | U.K. | Mobile marketing and advertising |
| Velti Mobile Marketing Technology LLC | 100% | Russia | Mobile marketing and advertising |
| Velti India Private Limited | 100% | India | Mobile marketing and advertising |
| Velti FZ LLC | 100% | UAE | Mobile marketing and advertising |
| Velti Istanbul Mobil Teknolojileri | 100% | Turkey | Mobile marketing and advertising |
| Velti North America Inc. | 100% | U.S | Holding Company |
| Velti Ukraine Mobile Marketing Services LLC | 100% | Ukraine | Mobile marketing and advertising |
| Velti do Brasil Marketing Eletronico Ltda | 100% | Brazil | Mobile marketing and advertising |
| Casee (Beijing) Information Technology Company Limited | 100% | China | Mobile marketing and advertising |
| Velti Netherlands B.V. | 100% | Netherlands | Holding Company |
| Mobile Interactive Group Blgm N.V. | 100% | Belgium | Mobile marketing and advertising |
| ZayPay International B.V. | 100% | Netherlands | Mobile marketing and advertising |

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

EXHIBIT 12.1

**CERTIFICATION PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Alex Moukas, certify that:

1. I have reviewed this annual report on Form 20-F of Velti plc, for the fiscal year ended December 31, 2012;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Group and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the Audit Committee of the Board of Directors (or persons performing the equivalents functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date:    April 11, 2013                                          By: /s/ Alex Moukas
                                                                 _____
                                                                 Alex Moukas
                                                                 Chief Executive Officer

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

EXHIBIT 12.2

**CERTIFICATION PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Wilson W. Cheung, certify that:

1.  I have reviewed this annual report on Form 20-F of Velti plc, for the fiscal year ended December 31, 2012;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.  The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Group and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.  The Company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the Audit Committee of the Board of Directors (or persons performing the equivalents functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date:    April 11, 2013

By: /s/ Wilson W. Cheung
Wilson W. Cheung
Principal Financial Officer

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

EXHIBIT 13.1

**CERTIFICATION PURSUANT TO
18 U.S.C. Section 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Velti plc on Form 20-F for the period ended December 31, 2012 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Alex Moukas, Chief Executive Officer, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:     April 11, 2013                                                                  By: /s/ Alex Moukas
                                                                                      _____
                                                                                      Alex Moukas
                                                                                      Chief Executive Officer

A signed original of this written statement required by 18 U.S.C. Section 1350 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**EXHIBIT 13.C**

**REF TIAIROTINP  US F8S OP T  TN**
**1e S .8.R. 8ctio5 130, D**
**O8 O9 NUTE9  US F8S OP T  TN**
**8ERTINP  6, –  NA THE 8OF BOP E8INXYE2  ORT NA C, , C**

In connection with the Annual Report of Velti plc on Form 20-F for the period ended December 31, 2012 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Wilson W. Cheung, Principal Financial Officer, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    April 11, 2013

By: /s/ Wilson W. Cheung
Wilson W. Cheung
Principal Financial Officer

A signed original of this written statement required by 18 U.S.C. Section 1350 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source: Velti plc, 20-F, April 11, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

1

**ATTESTATION**

2          I, Kathleen A. Herkenhoff, am the ECF User whose identification and password are being

3  used to file the Declaration of Christopher L. Nelson In Support of Preliminary Approval of Partial

4  Settlement.  In compliance, I hereby attest that Christopher L. Nelson has concurred in this filing.

5

6  DATED:  May 23, 2014                    THE WEISER LAW FIRM, P.C.

7

8                                          _____s/ Kathleen A. Herkenhoff_____

9                                          Kathleen A. Herkenhoff
                                           Lead Counsel for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 <u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on May 23, 2014, I authorized the electronic filing of the foregoing with

3 the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4 e-mail addresses denoted on the attached Electronic Mail Notice List.

5      I certify under penalty of perjury under the laws of the United States of America that the

6 foregoing is true and correct.  Executed on May 23, 2014.

7                               s/ KATHLEEN A. HERKENHOFF

                               KATHLEEN A. HERKENHOFF
8
                               THE WEISER LAW FIRM, P.C.
9                                12707 High Bluff Drive, Suite 200

                               San Diego, CA 92130
10                                Telephone: 858/794-1441

                               Facsimile: 858/794-1450
11
                               Email: kah@weiserlawfirm.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:13-cv-03889-WHO Rieckborn v. Velti plc et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Peter E. Borkon**
  peterb@hbsslaw.com

- **Donald A. Broggi**
  dbroi@scott-scott.com

- **Joseph Daniel Cohen**
  jcohen@scott-scott.com

- **Hal Davis Cunningham**
  hcunningham@scott-scott.com,efile@scott-scott.com

- **Brock Dahl**
  bdahl@wsgr.com

- **Patrick Norton Downes**
  pdownes@loeb.com

- **Cynthia A. Dy**
  cdy@wsgr.com

- **Boris Feldman**
  bbahns@wsgr.com

- **Jonathan Gardner**
  jgardner@labaton.com,cvillegas@labaton.com,fmalonzo@labaton.com

- **Lionel Z. Glancy**
  info@glancylaw.com,lboyarsky@glancylaw.com,lglancy@glancylaw.com

- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com,csadler@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Joseph P. Guglielmo**
  jguglielmo@scott-scott.com

- **Christopher T. Heffelfinger**
  cheffelfinger@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Kathleen Ann Herkenhoff**
  kah@weiserlawfirm.com,jmf@weiserlawfirm.com,hl@weiserlawfirm.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,peterb@hbsslaw.com,pashad@hbsslaw.com,sf_filings@hbsslaw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Robert Alan Meyer**
  rmeyer@loeb.com

- **Donald Anthony Miller**
  dmiller@loeb.com,vmanssourian@loeb.com

- **Matthew C Moehlman**
  mmoehlman@labaton.com

- **Christopher Leigh Nelson**
  cln@weiserlawfirm.com

- **John D. Pernick**
  john.pernick@bingham.com

- **Anthony David Phillips**
  aphillips@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Joseph Mark Profy**
  jmp@weiserlawfirm.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,mmgoldberg@glancylaw.com,echang@glancylaw.com

- **Mark Punzalan**
  markp@punzalanlaw.com,office@punzalanlaw.com

- **Brian J. Robbins**
  notice@robbinsarroyo.com

- **Casey Edwards Sadler**
  csadler@glancylaw.com

- **Charlene Sachi Shimada**
  charlene.shimada@bingham.com

- **Evan Jason Smith**
  esmith@brodsky-smith.com

- **Michael Walter Stocker**
  mstocker@labaton.com,drogers@labaton.com,ElectronicCaseFiling@labaton.com,lmehringer@labaton.com

- **Jon A Tostrud**
  jtostrud@tostrudlaw.com,acarter@tostrudlaw.com

- **Diane Marie Walters**
  dwalters@wsgr.com,vshreve@wsgr.com

- **Lucy Han Wang**
  lucy.wang@bingham.com,andrew.obach@bingham.com

- **Robert Brian Weiser**
  rw@weiserlawfirm.com

- **Wendy Hope Zoberman**
  wzoberman@bermandevalerio.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)