1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7

ANIKA R. RIECKBORN, et al.,

Plaintiffs,

8

v.

9

VELTI PLC, et al.,

10

Defendants.

11

Case No. 13-cv-03889-WHO

**ORDER REGARDING MOTION FOR FINAL APPROVAL OF PARTIAL SETTLEMENT AND MOTION FOR ATTORNEY'S FEES**

Re: Dkt. Nos. 170, 171

12

## INTRODUCTION

13        These motions of plaintiffs Bobby Yadegar / Ygar Capital LLC, St. Paul Teachers'

14    Retirement Association, Newport News Employees' Retirement Fund, and Oklahoma Firefighters

15    Pension and Retirement System (collectively, "plaintiffs") for final approval of a partial class

16    action settlement and for an award of attorney's fees and costs raise important issues in addition to

17    the fairness, reasonableness, and adequacy of the monetary value of the settlement.  Should

18    individuals named as defendants but never served be released?  Is it appropriate to decide now

19    what judgment reduction methodology will apply to a future judgment against the nonsettling

20    defendants?  If so, are the nonsettling defendants entitled to a proportionate fault reduction (or,

21    more specifically, a Section 78u-4(f)(7)(B) reduction) on all Securities Act claims, as they assert

22    they are?

23        The settlement creates a fund of $9.5 million to be distributed among a class consisting of

24    all persons who purchased or otherwise acquired Velti plc ("Velti") securities between January 27,

25    2011 and August 20, 2013.  In light of Velti's bankruptcy and the limited financial resources of

26    the individual defendants, I find that the settlement is fair, reasonable, and adequate, and that

27    plaintiffs' counsel's requested award for fees and costs is appropriate.  I also answer all of the

28    questions above in the affirmative, holding that the release of the unserved defendants is

appropriate under the circumstances of this case, and that fairness dictates that I decide now that the nonsettling defendants are entitled to a Section 78u-4(f)(7)(B) reduction on all Securities Act claims pending against them.  Accordingly, I will GRANT plaintiffs' motions for final approval and for attorney's fees and enter the Proposed Judgment submitted by plaintiffs subject to the modifications addressed in Section II of the Discussion.

**BACKGROUND**

**I.  ALLEGATIONS IN THE CONSOLIDATED COMPLAINT**

According to the Consolidated Complaint, Velti is a provider of "mobile marketing and advertising technology and solutions" for businesses around the world.  Consolidated Complaint ¶ 4 (Dkt. No. 105) ("Compl.").  It entered contracts pursuant to which it provided services but did not get paid until after its work was done and the customer invoiced.  *Id.*  Between the completion of work and the receipt of payment, the amount due represented an account receivable.  *Id.*  Throughout the relevant period, it regularly reported as revenue amounts due on contracts before the receivable was actually paid, thereby creating an appearance of healthy revenue and earnings growth.  Compl. ¶ 5.

Because Velti operated heavily in Greece, it was particularly affected by the Greek economic crisis through increasing numbers of unpaid invoices.  Compl. ¶¶ 6-7.  It continued to report robust revenue growth, however.  *Id.*  It misrepresented its "day sales outstanding" ("DSO") – a measure of the number of days it takes to collect a receivable – as significantly lower than it actually was.  Compl. ¶¶ 8-9.  It violated Generally Accepted Accounting Principles ("GAAP") in doing so.  It also represented that it was diversifying its customer base beyond Greece, but in fact it was as dependent on the Greek market as ever.  Compl. ¶ 8.

On May 16, 2012, shortly before Velti's first quarter 2012 earnings call, a stock market research firm published a report stating that Velti underreported its DSO.  Compl. ¶ 10.  Velti's securities declined in value over the next several days.  *Id.*  On May 22, 2012, it confirmed the report and changed its method of calculating its reported DSO.  Compl. ¶ 11.  Its reported DSO more than doubled as a result, from an already high 116 days to an "incredible" 272 days.  *Id.*  On November 14, 2012, it announced that due to its continued inability to timely collect receivables

2

from certain of its customers in Greece, the Balkans, and various North African and Middle Eastern countries, it was transitioning its business away from those regions and into the United States and Western Europe.  Compl. ¶ 12.  It subsequently represented that only 10 percent of its revenue came from Greece or the Balkans.  Compl. ¶ 13.

On August 20, 2013, Velti announced its 2013 second quarter financial results and revealed that it had decided to write off approximately $111 million of its receivables.  Compl. ¶ 15.  It disclosed that some of its receivables had been due since before 2012 and that, despite its representation that only 10 percent of its receivables were from Greece and the Balkans, the true proportion was about 66 percent.  *Id.*  In response to the news, Velti shares declined $0.66 per share, or 66 percent, to close on August 21, 2013 at $0.34 per share.  Compl. ¶ 16.

Plaintiffs allege four different partial corrective disclosures during the class period.  These occurred on May 16, 2012, November 15-16, 2012, January 31, 2012, and August 20, 2013.  Dkt. No. 136 at 2-4; Dkt. No. 136-2 at 5 n.5.

Velti's accounting firm, defendant Baker Tilly Virchow Krause LLP ("Baker Tilly"), opined on the financial statements contained in Velti's initial public offering on January 28, 2011 and its secondary public offering on June 14, 2011.  Velti's underwriters were Jefferies LLC, RBC Capital Markets, LLC, Needham & Company, LLC, and Canaccord Genuity Inc. (the "Underwriters").  Baker Tilly and the Underwriters are accused of failing to exercise the reasonable care necessary to ensure that Velti's DSO and financials conformed with GAAP.  Compl. ¶ 18.

## II.  FILING OF THIS ACTION AND PARTIAL SETTLEMENT

Between August 22, 2013 and October 4, 2013, four securities class actions were filed in this district in connection with the collapse of Velti's stock value.  On December 30, 2013, the cases were consolidated.  On January 24, 2014, a fifth action was filed and also consolidated.

The Consolidated Complaint identifies three groups of defendants: (1) Velti and four of its officers/directors – Wilson W. Cheung, Nicholas P. Negroponte, Jeffrey G. Ross, and Winnie W. Tso (collectively with Velti, the "Settling Defendants"); (2) five other Velti officers/directors – Jerry Goldstein, David C. Hobley, Chris Kaskavelis, David W. Mann, and Alex Moukas (the

United States District Court
Northern District of California

"Overseas Defendants"); and (3) Baker Tilly and the Underwriters (collectively, the "Nonsettling Defendants"). Dkt. No. 105. It asserts five causes of action: (1) violations of Section 11 of the Securities Act of 1933 ("Securities Act") against all defendants; (2) violations of Section 12(a)(2) of the Securities Act against Velti, Goldstein, Hobley, Kaskavelis, Mann, Moukas, Negroponte, and the Underwriters; (3) violations of Section 15 of the Securities Act against all of the individual defendants; (4) violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 against Velti, Cheung, Kaskavelis, Moukas, Ross, Tso, and Baker Tilley; and (5) violations of Section 20(a) of the Exchange Act against Cheung, Kaskavelis, Moukas, Ross, and Tso. *Id.*

Plaintiffs' counsel have undertaken extensive multinational efforts to serve the Overseas Defendants but have been unable to do so. By performing a "skip trace" and other computerized research, it was determined that Goldstein lived in Greece, Hobley in either England or Ireland, and Mann in England. Dingman Decl. ¶ 2 (Dkt. No. 136-3). A process server attempted to serve Kaskavelis and Moukas at Velti's offices in San Francisco on October 22, 2013. *Id.* Velti's legal department informed the server that Kaskavelis and Moukas did not work at that location and declined to provide additional information concerning their whereabouts. *Id.* Servers twice attempted to serve Moukas at a potential address in California; they were told that Moukas had not been seen at that location for months and that he had moved back to Greece. *Id.* ¶¶ 2, 4. Another potential address for Kaskavelis and Moukas was located in New York City. *Id.* ¶ 5. Servers twice attempted to complete service there. *Id.* One doorman at the location stated that he had never heard of Kaskavelis; another doorman told the server that he could not recall the last time he had seen Moukas. *Id.* Another attempt to serve Kaskavelis at a potential address in Massachusetts also failed. *Id.* ¶ 6. In early 2014, plaintiffs' counsel retained an international agency for the purpose of serving the Overseas Defendants in Europe but were still unable to complete service. Mickow Decl. ¶¶ 1-5 (Dkt. No. 136-4).

When Velti's United States-based operations filed for Chapter 11 bankruptcy on

November 4, 2013, the parties began discussing settlement.[1]  Plaintiffs' counsel, Velti, and some of the individual defendants mediated before the Honorable Layn Phillips on March 14, 2014. The mediation failed, but the parties continued to communicate with Judge Phillips.  At some point after the Consolidated Complaint was filed on April 22, 2014, plaintiffs and the Settling Defendants (the "Settling Parties") agreed to this partial settlement.

The Settling Parties executed a Stipulation and Agreement of Partial Settlement ("Settlement Agreement") on May 23, 2014.  Dkt. No. 170-2.  The Settlement Agreement creates a settlement fund of $9,500,000 to be distributed among class members who submit a valid, timely claim form.  Settlement Agreement ¶ 3.1; Weiser Decl. ¶ 51 (Dkt. No. 170-1).  The settlement fund is financed exclusively through Velti's insurance policies.  *See, e.g.,* Weiser Decl. ¶ 42. These policies have been rapidly diminishing following Velti's bankruptcy.  *See, e.g.,* Weiser Decl. ¶¶ 5, 38.  Participating class members will recover according to the "Plan of Distribution," which makes eligible for recovery all class members who have a net loss arising out of all transactions involving Velti securities purchased pursuant to, or traceable to, either of Velti's public offerings or on the open market during the class period.  Weiser Decl. ¶ 52.

In addition to creating the settlement fund, the Settlement Agreement includes a provision requiring the Settling Defendants to aid plaintiffs in the continued prosecution of their claims against the Nonsettling Defendants.  Settlement Agreement ¶ 3.2.  The Settlement Agreement and Proposed Judgment also include a bar order – which purports to bar certain claims against the Settling Defendants and other "Released Persons" – and judgment reduction provisions – which describe the manner in which any future judgment against the Nonsettling Defendants will be reduced.

Plaintiffs filed their motion for preliminary approval on May 23, 2014.  Dkt. No. 109.  On August 19, 2014, I granted it.  Dkt. No. 147.  As instructed by the preliminary approval order, the settlement administrator mailed 43,110 class notices to potential class members, and notice of the settlement was published in the national edition of *Investor's Business Daily* and over the *Business*

---

[1] Velti's European-based operations subsequently filed for bankruptcy on August 18, 2014 in the Royal Court of Jersey.  *See* Dkt. No. 150.

United States District Court
Northern District of California

*Wire*.  Mot. 25; Weiser Decl. ¶¶ 50-51.  The settlement administrator set up a website, www.veltisecuritieslitigation.com, which allowed visitors to view the Settlement Agreement, class notice, and Plan of Distribution, to submit questions, and to file a claim online.  Bravata Decl. ¶ 7 (Dkt. No. 181).  By the December 2, 2014 deadline, eight potential class members had submitted objections and five had opted out.  *See* Reply 1; Bravata Decl. ¶ 10 (Dkt. No. 181).  Three of the objections were subsequently withdrawn.  Dkt. No. 196.

Plaintiffs filed their motion for final approval and motion for attorney's fees on November 6, 2014.  Dkt. Nos. 170, 171.  As at preliminary approval, the Nonsettling Defendants filed extensive objections, primarily regarding the Proposed Judgment's bar order and judgment reduction provisions.  *See* Dkt. Nos. 176, 178.  The final approval hearing was held on January 14, 2015.

## LEGAL STANDARD

## I.  CLASS ACTION SETTLEMENT APPROVAL

Rule 23(e) of the Federal Rules of Civil Procedure requires a court to determine whether a proposed settlement is fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e).  To determine whether a settlement agreement meets these standards, a district court must consider a number of factors, including: "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement."  *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (quoting same).  "This list is not exclusive and different factors may predominate in different factual contexts."  *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).  In certain cases, one factor alone may prove determinative in finding sufficient grounds for approval.  *See id.*

Settlements that occur before formal class certification require a higher standard of fairness.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000).  In reviewing such

United States District Court
Northern District of California

6

settlements, in addition to considering the above factors, the court must also ensure that "the settlement is not the product of collusion among the negotiating parties." *Bluetooth,* 654 F.3d at 946-47 (internal quotation marks and citations omitted). Signs of collusion include: (1) "when counsel receive a disproportionate distribution of the settlement;" (2) when the parties negotiate an arrangement under which defendants agree not to oppose an attorneys' fee award up to a certain amount separate from the class's actual recovery, as such arrangements carry "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class;" and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* at 947.

While considering all these interests, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). "Finally, it must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation." *Id.*

## II. ATTORNEY'S FEE AWARD

Federal Rule of Civil Procedure 23(h) provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Attorney's fees provisions included in proposed class action agreements must be "fundamentally fair, adequate and reasonable." *Staton v. Boeing Co.,* 327 F.3d 938, 964 (9th Cir. 2003). In "common fund cases," a court has discretion to award attorneys' fees either as a percentage of such common fund or by using the lodestar method. *Id.* at 967–68. "The percentage method means that the court simply awards the attorneys a percentage of the fund sufficient to provide class counsel with a reasonable fee." *Hanlon,* 150 F.3d at 1029. Even when applying the percentage method, the court should use the lodestar method as a cross-

United States District Court
Northern District of California

1  check to determine the fairness of the fee award. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043,

2  1050 (9th Cir. 2002).

3  **DISCUSSION**

4  **I.  FINAL APPROVAL OF PARTIAL CLASS ACTION SETTLEMENT**

5  **A.  Strength of Plaintiffs' Case and Risk, Expense, Complexity, and Likely Duration**
   **of Further Litigation**

6

7  In determining whether the settlement is fair, reasonable, and adequate, I must balance the

8  risks of continued litigation, including the strengths and weaknesses of plaintiffs' case, against the

9  benefits afforded to class members, including the immediacy and certainty of recovery. *See*

10  *Larsen v. Trader Joe's Co.*, No. 11-cv-05188-WHO, 2014 WL 3404531, at *4 (N.D. Cal. July 11,

11  2014); *LaGarde v. Support.com, Inc.*, No. 12-cv-00609-JSC, 2013 WL 1283325, at *4 (N.D. Cal.

12  Mar. 26, 2013).  "In most situations, unless the settlement is clearly inadequate, its acceptance and

13  approval are preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural*

14  *Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (internal

15  quotation marks omitted).

16  Plaintiffs contend that their claims have significant merit but acknowledge a number of

17  risks and uncertainties should they proceed towards summary judgment and trial.  Mot. 10-15.

18  The Settling Defendants have adamantly denied liability and have asserted from the outset that

19  they possess absolute defenses to all of plaintiffs' claims.  The Settling Defendants' basic position

20  is that Velti's collapse was due to a confluence of events beyond their control, and that Velti relied

21  on its advisors – namely Baker Tilly – in assessing whether their receivables were properly

22  managed and reported.  Plaintiffs state that while they believe they could prevail over this defense,

23  success is by no means guaranteed given the inherent unpredictability of complex securities

24  litigation.  Mot. 10-11.

25  Further, even if plaintiffs were able to establish liability against the Settling Defendants,

26  they would also have to show loss causation and damages.  Plaintiffs assert that the Supreme

27  Court's decision in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005), has made proving loss

28  causation more difficult and point to a number of cases rejecting securities claims for failure to

8

United States District Court
Northern District of California

satisfy this element.  Mot. 12.  Proving damages would also entail substantial uncertainty, as it would depend in large part on which, if any, of the four alleged partial corrective disclosures plaintiffs are ultimately able to rely.  *See* Mulholland Decl. ¶ 9 (Dkt. No. 136-2).  According to plaintiffs, damages could range from anywhere between $34 million and $287 million depending on this issue.  *See id.*  The Settling Defendants, meanwhile, maintain that damages are as low as $28 million.  *See* Dkt. No. 136 at 4 n.9.

Plaintiffs assert that the international aspects of this case create additional risks.  Discovery would likely be a significant obstacle if the litigation were to continue, as a large portion of the documents and witnesses necessary to prosecute plaintiffs' claims are located in Greece, and foreign privacy laws would hinder their ability to obtain and review the evidence necessary to prove their claims.  Service on the Settling Defendants (for the purpose of obtaining discovery or enforcing judgment) would be problematic as well, as some of them live abroad.  Finally, plaintiffs note that any judgment would likely be appealed, and that barring settlement, "there is no question that this case would be litigated for years, . . . costing millions of additional dollars, with the possibility that the end result would not be better for the class, and might even be worse."  Mot. 15.

Plaintiffs have shown through their briefing and attached declarations that further litigation is likely to be costly and time-intensive, with no guarantee of a more beneficial outcome for class members as a result.  Accordingly, it is reasonable for plaintiffs to decide that the guarantee of an immediate recovery outweighs the uncertainties of pursuing a possibly more favorable outcome by continuing to litigate.  These first two factors weigh in favor of approval.

**B. Risk of Maintaining Class Action Status Throughout the Trial**

Plaintiffs have defined the class period to run from January 27, 2011, to August 20, 2013, a period which spans four alleged corrective disclosures.  Plaintiffs acknowledge that this class period could be shortened if I were to find that certain disclosures were not in fact corrective.  *See* Dkt. No. 136 at 7-8.  For example, defendants have argued that the disclosure on May 16, 2012 sufficiently revealed Velti's accounting practices such that the class period should end on this date.  *Id.* at 8.  If this argument prevailed, the amount of damages possibly recoverable by the class

9

1    would shrink dramatically.  I agree with plaintiffs that the class period is likely to be a heavily

2    litigated matter in this action, and that the class period's end date will control to a large extent the

3    class's potentially recoverable damages.  This factor favors approval.

4        **C.  Amount Offered in Settlement**

5        Assessing the fairness, adequacy, and reasonableness of the amount offered in settlement is

6    not a matter of applying a "particular formula."  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965

7    (9th Cir. 2009).  "[U]ltimately, [it] is nothing more than an amalgam of delicate balancing, gross

8    approximations, and rough justice."  *Id.*

9        Under the circumstances, I find that the $9.5 million offered in settlement is reasonable.

10   Velti's United States-based operations filed for bankruptcy on November 4, 2013; its European

11   operations did the same less than a year after.  As plaintiffs observe, these bankruptcy filings

12   "immediately placed Velti's assets within the confines of bankruptcy proceedings . . . and

13   effectively started the clock on when plaintiffs could ensure any recovery for the settlement class."

14   Reply 4.  Plaintiffs state that the personal assets of the individual defendants who are settling have

15   also been diligently reviewed and are likewise extremely limited.  Mot. 15; Weiser Decl. ¶ 42.

16   The fact that some of these individuals live abroad adds risk and complexity to enforcing any

17   judgment against them.  Mot. 15.  The upshot is that even if plaintiffs were able to secure a

18   judgment against the Settling Defendants, it is not at all clear that plaintiffs would be able to

19   collect it.

20       In *Torrisi v. Tucson Elec. Power Co.*, the Ninth Circuit found that the defendant's

21   precarious financial condition "predominate[d] to make clear that the district court acted within its

22   discretion" in approving a securities class action settlement.  8 F.3d at 1375-76.  At the time of the

23   settlement, the defendant was negotiating with its creditors to restructure its debt, and an

24   involuntary bankruptcy petition had been filed against it.  *Id.* at 1376.  The defendant had reached

25   an agreement with certain of its creditors, and there was evidence that other creditors would likely

26   have refused to assent if the settlement had failed.  *Id.*  The Ninth Circuit observed that this could

27   have resulted in "a bankruptcy organization which would have left little if anything for class

28   members."  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1     While I do not find that the Settling Defendants' financial condition is dispositive to the

2  Rule 23(e) inquiry, I do find that it highlights the reasonableness of the settlement amount.

3  Plaintiffs here "have agreed to accept a smaller certain award rather than seek the full recovery but

4  risk getting nothing." *Omnivision,* 559 F. Supp. 2d at 1042.  Given that Velti is bankrupt,

5  available insurance funds are dwindling, and there is no evidence to indicate that the individual

6  defendants would be able to provide a more than de minimis recovery for the class, this decision

7  was reasonable.  This factor favors approval.

8     **D.  Extent of Discovery Completed and Stage of the Proceedings**

9     This factor evaluates whether "the parties have sufficient information to make an informed

10  decision about settlement."  *Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1239 (9th Cir.

11  1998).  The parties agreed to this settlement before formal discovery or any significant motion

12  practice in this case.  "However, in the context of class action settlements, formal discovery is not

13  a necessary ticket to the bargaining table."  *Mego,* 213 F.3d at 459 (internal quotation marks

14  omitted).  Even where the parties decide to settle relatively early in the course of the litigation, the

15  key inquiry remains whether they had sufficient information to make an informed decision about

16  doing so.  *Id.*

17     Plaintiffs state that the settlement was reached only after plaintiffs' counsel (i) conducted

18  an extensive investigation into the underlying facts; (b) thoroughly researched relevant law; (c)

19  prepared and filed the 130-page Consolidated Complaint; (d) prepared an in depth mediation

20  statement; and (e) consulted with economic experts regarding loss causation and damages.  Weiser

21  Decl. ¶ 6.  Plaintiffs also submit a declaration from Judge Phillips stating that in preparation for

22  the mediation, the Settling Parties provided to him and exchanged amongst themselves mediation

23  briefs discussing in detail the factual and procedural background and disputed issues in this action.

24  Phillips Decl. ¶ 7 (Dkt. No. 136-1).  Judge Phillips adds that:

25       [i]t is apparent from the submissions and presentations made by counsel for Lead
         Plaintiff before and during the mediation session, as well as from my numerous
26       discussions with them, that they performed a thorough examination of the merits
         of the claims in this action.  It is also my opinion that counsel for Lead Plaintiff
27       performed substantial work and effort in preparing their case for mediation and in

28

presenting their claims in such a way to produce a valuable settlement for the class.

Phillips Decl. ¶ 13.

Despite reaching settlement relatively early in the life span of this case, the Settling Parties have shown that their decision to settle was made on the basis of a thorough understanding of the relevant facts and law.  This factor weighs in favor of approval.

### E.  Experience and Views of Counsel

The Ninth Circuit recognizes that "parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *Rodriguez*, 563 F.3d at 967 (internal modifications omitted).  "A district court is entitled to give consideration to the opinion of competent counsel that the settlement is fair, reasonable, and adequate." *Ching v. Siemens Indus., Inc.*, No. 11-cv-04838-MEJ, 2014 WL 2926210, at *5 (N.D. Cal. June 27, 2014) (internal quotation marks and modifications omitted).

The experience and views of plaintiffs' counsel here provide further support for approval. Plaintiffs' counsel have extensive experience in securities and other complex class action litigation.  *See* Weiser Decl. Exs. D-F (Dkt. Nos. 170-5, 170-6, 170-7, 170-8).  They recommend the settlement and attest that it is a strong result for the class given the substantial risks in continuing the action.  *See, e.g.,* Weiser Decl. ¶ 5.  Likewise, Judge Phillips states in his declaration that "[b]ased on my knowledge of the issues in dispute, my review of the substantial factual and legal materials presented before and during the mediation, the rigor of the negotiations, the relative strengths and weaknesses of the parties' positions, and the benefits achieved by the partial settlement, I believe that the terms of the $9.5 million partial settlement represent a well-reasoned and sound resolution of highly uncertain litigation and that the result is fair, adequate, reasonable and in the best interests of the class."  Phillips Decl. ¶ 12.

"The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *Omnivision*, 559 F. Supp. 2d at 1043.  The record here does not rebut this presumption.  This factor favors approval.

### F.  Reaction of Class Members

"[T]he absence of a large number of objections to a proposed class action settlement raises

12

1     a strong presumption that the terms of a proposed class settlement action are favorable to the class

2     members." *Larsen*, 2014 WL 3404531, at *5 (internal quotation marks omitted).  "A court may

3     appropriately infer that a class action settlement is fair, adequate, and reasonable when few class

4     members object to it."  *Id.* (internal quotation marks omitted).

5           Here, the settlement administrator mailed 43,110 class notices to potential class members,

6     and notice of the settlement was published in the national edition of *Investor's Business Daily* and

7     over the *Business Wire*.  Mot. 25; Weiser Decl. ¶¶ 50-51.  The settlement administrator also set up

8     a website, www.veltisecuritieslitigation.com, which allowed visitors to view the Settlement

9     Agreement, the class notice, and Plan of Distribution, to submit questions, and to file a claim

10    online.  Bravata Decl. ¶ 7.  By the December 2, 2014 deadline, only eight potential class members

11    had objected and only five had opted out.  *See* Reply 1; Bravata Decl. ¶ 10.  Three of the objectors

12    – AYM Aggressive Value Fund, Park West Investors Master Fund Limited, and Park West

13    Partners International, Limited – appeared at the final approval hearing but subsequently withdrew

14    their objections.  *See* Dkt. No. 196.  No other class members appeared at the hearing.  This lack of

15    objection from potential class members supports a finding that the settlement is favorable to the

16    class and merits approval.  *Cf. Churchill*, 361 F.3d at 577 (affirming approval of settlement with

17    45 objectors out of 90,000 notified class members).

18          Further, the five objections that were submitted (and not withdrawn) do not undermine the

19    fairness, reasonableness, or adequacy of the settlement.  Four of the objections express

20    dissatisfaction with the fact that some class members will receive a greater recovery than others

21    because of the timing of their purchases and sales of Velti securities.  I will address those

22    objections below in my discussion of the Plan of Distribution.  The fifth objection is a handwritten

23    objection with a Brayton, South Carolina address and an illegible signature filed on December 1,

24    2014.  Dkt. No. 180.  The three-sentence objection calls the settlement "mere tokenism" and

25    declares that "settlements of this nature . . . are slaps on [the] wrist."  *Id.*

26          Plaintiffs more than adequately address this objection.  *See* Reply 4-5.  Plaintiffs point to

27    the various factors that make $9.5 million settlement at this time a strong result for the class: Velti

28    is bankrupt and is currently in liquidation proceedings in both the United States and Europe.  The

United States District Court
Northern District of California

United States District Court
Northern District of California

1  personal assets of the Individual Defendants involved in the settlement are likewise extremely

2  limited and are not sufficient to support a meaningful recovery for the class.  Velti's insurance

3  policies are the only plausible method of compensating class members, and these polices are

4  rapidly diminishing as a result of Velti's bankruptcy.  On top of the risks and uncertainties that are

5  part and parcel of all complex class action litigation, discovery and service were likely to be major

6  obstacles in this case.  Finally, plaintiffs emphasize that this litigation is not over, and that the

7  class may be able to recover additional funds from the Nonsettling Defendants.  Plaintiffs contend

8  that for all these reasons, the $9.5 million partial settlement is not "mere tokenism."  Rather, it is a

9  solid recovery in the face of myriad issues "any one of which . . . could reduce shareholders'

10  recovery to nothing."  Reply 4.

     Plaintiffs observations regarding the Settling Defendants' precarious financial condition

12  and the risks of continued litigation are well-taken.  The Brayton, South Carolina objection is

13  OVERRULED.

### G.  Absence of Collusion

15  Because this settlement was reached prior to certification of the class, I must examine the

16  settlement for evidence of collusion with a higher level of scrutiny.  *Bluetooth,* 654 F.3d at 946.

17  In conducting such an examination, courts must be "particularly vigilant not only for explicit

18  collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-

19  interests and that of certain class members to infect the negotiations."  *Id.*  Signs of collusion

20  include, but are not limited to: (1) a disproportionate distribution of the settlement fund to counsel;

21  (2) negotiation of a "clear sailing provision" according to which defendants agree not to oppose an

22  attorney's fee award up to a certain amount; and (3) an arrangement for funds not awarded to

23  revert to defendants rather than to be added to the settlement fund.  *Id.* at 947.

24  The first *Bluetooth* factor weighs against a finding of collusion.  Plaintiffs' counsel move

25  for an award of $2,375,000 in fees, or 25 percent of the settlement fund.  Fees Mot. 2.  In addition,

26  plaintiffs' counsel request $219,469.67 in expenses and up to $500,000 in settlement

27

28

administration costs.[2]  Subtracting these amounts from the settlement fund, the class will be left with at least $6,405,530.33 – more than double what plaintiffs' counsel and the settlement administrator will receive.  This proportion does not indicate collusion.  The second *Bluetooth* factor also weighs against such a finding, because the Settlement Agreement does not contain a clear sailing provision.  As to the third factor, the Settlement Agreement provides that unclaimed funds will be redistributed to participating class members until the balance remaining in the fund is de minimis.  Settlement Agreement ¶ 7.6.  These remaining funds will then be donated to a cy pres beneficiary.  *Id.*  Under no circumstances does the Settlement Agreement provide for unclaimed funds to revert to Velti or the other Settling Defendants, or to Velti's insurance providers.  The *Bluetooth* factors do not indicate collusion.

### H.  Plan of Distribution

"Approval of a plan of allocation of settlement proceeds in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate.  It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits."  *Omnivision*, 2007 WL 4293467, at *7 (internal quotation marks, citations, and modifications omitted); *see also, In re Oracle Sec. Litig.*, No. 90-cv-00931-VRW, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994) ("A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable.").  "[C]ourts recognize that an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel." *Vinh Nguyen v. Radient Pharm. Corp.*, No. 11-cv-00406, 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014) (internal quotation marks and modifications omitted); *see also, Maley v. Del Global Technologies Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002) .

The Plan of Distribution proposed by plaintiffs satisfies these criteria.  The plan is structured around the four alleged partial corrective disclosures on May 16, 2012, November 15-

---

[2] At the final approval hearing, plaintiffs' counsel agreed to cap payment for settlement administration costs at $500,000.  His expectation is that costs will not reach that amount.  I will add language to the Proposed Judgment to reflect this cap.

United States District Court
Northern District of California

16, 2012, January 31, 2013, and August 20, 2013.  *See* Weiser Decl. ¶ 54.  The plan divides class

members into five groups based on when they purchased their Velti shares in relation to these

dates.  *Id.*  Within each group, class members receive different recoveries according to when they

sold their shares.  *Id.*  Generally, class members who purchased Velti shares earlier and held them

longer are entitled to a greater recovery than class members who acquired shares towards the end

of the class period.  *See id.*  Plaintiffs' counsel explained at the final approval hearing that favoring

the earlier purchasers is reasonable because each corrective disclosure successively dissipated

more and more of the inflated value of Velti securities.  Under this theory, class members who

purchased Velti shares towards the start of the class period (during the highest point of inflation)

and held them until the end of the class period (through all four partial corrective disclosures)

suffered the greatest injury.  Plaintiffs state that the Plan of Distribution was prepared in

consultation with experts and will result in a fair and equitable distribution.  Mot. 20; Weiser Decl.

¶ 53.

As noted above, four of the five objections to the settlement concern the Plan of

Distribution.  None of these objections indicates that the Plan of Distribution is unfair,

unreasonable, or inadequate.  The objections are as follows:

• Robert Hull submitted an objection on October 20, 2014.  Dkt. No. 169.  He bought
2,000 Velti shares on June 29, 2012 and sold 2,000 shares on July 17, 2012.  Hull states
that he lost $2,616.65, but under the Plan of Distribution, he will receive nothing.  Hull
writes:  "The rule that excludes my loss is arbitrary and unfair."

• Thomas Fast submitted an objection on October 21, 2014.  *Yadegar v. Velti plc*, No. 14-
00372-WHO (N.D. Cal. Oct. 27, 2014) (Dkt. No. 11).  He accuses the Plan of Distribution
of being "highly biased" towards persons who purchased Velti shares towards the
beginning of the class period.  He asks the Court to "shift a significant portion of the
settlement amount to those most affected by the fraud," i.e., persons who purchased Velti
shares towards the end, or even after, the proposed class period.

• Kevin Rowe submitted an objection on November 11, 2014.  Dkt. No. 173.  Rowe made
numerous transactions involving Velti securities during the class period.  He argues that in
place of the proposed plan of distribution, "all investors who suffered significant losses in
Velti during the class period should be compensated equally based on loss."

• Patrick Drewes submitted an objection on November 25, 2014.  Dkt. No. 174.  Drewes
purchased 12,575 Velti shares in February 2013.  He critiques the proposed distribution

16

plan as structured so that "those who invested early and heavily . . . receive a majority" of the recovery.

The Hull objection fails because Hull did not hold his Velti shares through an alleged corrective disclosure. Hull states that he bought 2,000 Velti shares on June 29, 2012 and sold 2,000 shares on July 17, 2012. Dkt. No. 169. Plaintiffs do not allege that any corrective disclosures occurred during that period. This means that Hull's only potential losses would be the result of "in and out" trades – i.e., trades of Velti stock that occurred in between corrective disclosures. Given the difficulty, under *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005),[3] of proving loss based on such trades, it is not unfair or unreasonable to exclude them from the Plan of Distribution. *See Vinh Nguyen*, 2014 WL 1802293, at *5-8 (rejecting argument that distribution plan was unfair because it excluded in-and-out traders where the objector "points to almost no evidence in the record suggesting that the in-and-out traders had any reasonable chance of proving [loss]"). The Hull objection is OVERRULED.

The Fast, Rowe, and Drewes objections make two distinct arguments: first, that all class members should recover an equal percentage of their losses; and second, that the Plan of Distribution too heavily favors class members that purchased early in the class period. Neither argument is persuasive. First, governing law recognizes that shareholders are damaged differently according to when they purchased and sold their shares in relation to the corrective disclosures. *See Dura*, 544 U.S. at 342-46; *see also, Vinh Nguyen*, 2014 WL 1802293, at *5 ("A settlement in a securities class action case can be reasonable if it fairly treats class members by awarding a pro rata share to every authorized claimant, but also sensibly makes interclass distinctions based upon, inter alia, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue."). It is reasonable to design a distribution plan based on this principle. Second, while the Plan of Distribution does favor early purchasers, neither Fast nor Drewes shows that doing so is unreasonable. It is certainly possible that a fair and reasonable distribution plan could be created that would award a greater recovery to late purchasers. But

---

[3] "In *Dura*, the Supreme Court held that a person who misrepresents the financial condition of a corporation in order to sell stock is only liable to a relying purchaser for the loss the purchaser sustains when the facts 'become generally known' and 'as a result' share value depreciates." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010).

17

plaintiffs have provided an explanation of their chosen allocation that is reasonable and that corresponds to the allegations in the Consolidated Complaint.  The objectors have not demonstrated that this explanation is unsound.  The Fast, Rowe, and Drewe objections are OVERRULED.

## II. NONSETTLING DEFENDANTS' OBJECTIONS

"There is . . . a recognized exception to the general principle barring objections by nonsettling defendants to permit a nonsettling defendant to object where it can demonstrate that it will sustain some formal legal prejudice as a result of the settlement."  *Waller v. Fin. Corp. of Am.*, 828 F.2d 579, 583 (9th Cir. 1987); *see also, Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995).  "[A] nonsettling defendant has standing to object to a partial settlement which purports to strip it of a legal claim or cause of action, an action for indemnity or contribution for example."  W*aller*, 828 F.2d at 583.  The Nonsettling Defendants object to the settlement on several grounds.  I address each in turn.

### A.  Bar Order

The Nonsettling Defendants contend that the Proposed Judgment's bar order "reach[es] far beyond [that] allowed by the PSLRA."  Underwriters Opp. 13.  As part of the PSLRA, Congress enacted 15 U.S.C. § 78u-4(f)(7)(A), "which makes the entry of a bar order against future claims for contribution mandatory upon a court's approval of a settlement in a [qualifying] case."  *In re Heritage Bond Litig.*, 546 F.3d 667, 677 (9th Cir. 2008).  Section 78u-4(f)(7)(A) states:

(7) Settlement discharge

(A) In general

A covered person who settles any private action at any time before final verdict or judgment shall be discharged from all claims for contribution brought by other persons.  Upon entry of the settlement by the court, the court shall enter a bar order constituting the final discharge of all obligations to the plaintiff of the settling covered person arising out of the action.  The order shall bar all future claims for contribution arising out of the action:

(i) by any person against the settling covered person; and

(ii) by the settling covered person against any person, other than a person whose liability has been extinguished by the settlement of the settling covered person.

United States District Court
Northern District of California

15 U.S.C. § 78u-4(f)(7)(A).  A "covered person" is defined as either "(i) a defendant in any private action arising under [the Exchange Act];" or "(ii) a defendant in any private action arising under [Section 11 of the Securities Act], who is an outside director of the issuer of the securities that are the subject of the action."  15 U.S.C. § 78u-4(f)(10)(C).

The relevant bar order in the Proposed Judgment provides:

> Upon the Effective Date, all Persons, including, but not limited to, Plaintiffs, on behalf of themselves and the Settlement Class, Settlement Class Members (i.e. those who have not timely opted out of, or timely requested exclusion from, the Settlement Class), and the Nonsettling Defendants, shall be enjoined and barred from commencing or continuing any claim, cross-claim, third-party claim, claim over, or action in any forum against the Released Persons, seeking, as damages, indemnity, contribution, or otherwise, the recovery of all or part of any liability or settlement which such persons (i) paid, (ii) were obligated to pay or agreed to pay, or (iii) may become obligated to pay to the Settlement Class, as a result of such persons' liability for or participation in any acts, facts, statements or omissions that were or could have been alleged in the Action.
>
> Accordingly, to the full extent provided by [Section 78u-4(f)(7)(A)], the Court hereby bars all barred claims against the Released Persons as provided herein and in the Settlement Agreement.

Proposed Judgment ¶¶ 12-13.  The corresponding language in the Settlement Agreement is virtually identical.  *See* Settlement Agreement ¶ 5.5.[4]

---

[4] Paragraph 5.5 of the Settlement Agreement states:

> "As provided by applicable laws, all Persons, including, but not limited to, Plaintiffs, on behalf of themselves and the Settlement Class, and the Nonsettling Defendants, shall be enjoined and barred from commencing or continuing any claim, cross-claim, third-party claim, claim over, or action in any forum against the Released Persons, seeking, as damages, indemnity, contribution, or otherwise, the recovery of all or part of any liability or settlement which such persons (i) paid, (ii) were obligated to pay or agreed to pay, or (iii) may become obligated to pay to the Settlement Class, as a result of such persons' liability for or participation in any acts, facts, statements or omissions that were or could have been alleged in the Action."

Settlement Agreement ¶ 5.5.

The Nonsettling Defendants raise three specific issues with the bar order: (1) it purports to release the Overseas Defendants and other persons who are not parties to the settlement agreement; (2) it purports to release independent claims; and (3) it is not mutual.

### 1. Release of Overseas Defendants

Baker Tilly criticizes the bar order because it defines "Released Persons" to include Velti and all nine Velti directors and officers named as defendants in this case. *See* Settlement Agreement ¶¶ 1.19-1.20.[5]  Only four of those directors and officers are parties to the Settlement Agreement, however.  The other five directors and officers – i.e., the Overseas Defendants – have not been served in this action and did not sign the Settlement Agreement.  Baker Tilly points to Section 78u-4(f)(7)(A), which refers to "covered person[s] who settl[e]" and "settling covered person[s]," and argues that nonsettling persons, whether or not they qualify as covered, may not be released by a bar order.  Baker Tilly Opp. 14-15.

---

[5] The Settlement Agreement defines "Released Persons" as "each and all of the Released Defendants in their individual and corporate capacities and each and all of their Related Persons." Settlement Agreement ¶ 1.20.  The "Released Defendants" are the Settling Defendants plus the Overseas Defendants.  *Id.* ¶ 1.19.  "Related Persons" means:

> with respect to the Released Defendants, each and all of their respective present or former parents, subsidiaries, affiliates, successors and assigns and each and all of their respective present or former officers, directors, employees, employers, attorneys, accountants (except for Baker Tilly), financial advisors, commercial bank lenders, insurers (including Released Defendants' insurers and those insurers' respective businesses, affiliates, subsidiaries, parents and affiliated corporations, divisions, predecessors, shareholders partners, joint venturers, principals, insurers, reinsurers, successors and assigns, and their respective past and present employees, officers, directors, attorneys, accountants, auditors, agents and representatives), reinsurers, investment bankers, representatives, general and limited partners and partnerships, heirs, executors, administrators, successors, affiliates, agents, spouses, associates and assigns of each of them or any trust of which any Released Defendant and/or their Related Persons is the settlor or which is for the benefit of any Released Defendant and/or their Related Persons and/or member(s) of his or her family and any entity in which any such Released Defendant and/or their Related Persons has a controlling interest. The Nonsettling Defendants are specifically excluded from the definition of Related Persons.

*Id.* ¶ 1.17.

United States District Court
Northern District of California

The Underwriters similarly argue that the bar order is overly broad because it extends to the Overseas Defendants and other persons affiliated with Velti, each of whom "have contractual and indemnity obligations to the [Underwriters]."  Underwriters Opp. 14.  The Underwriters assert that "none of these [individuals] is contributing anything to the settlement," and that there is thus no justification for barring contribution or indemnification claims against them.  *Id.*  Moreover, because the settlement agreement does not "bar or otherwise affect any claim of right to indemnification between Velti and any present or former officer or director of Velti," the settlement would effectively allow Velti to preference indemnification of its directors and officers over indemnification of other entities, such as the Underwriters.  Underwriters Opp. 13-15.[6]

The Settling Defendants respond that courts routinely grant bar orders that extend to both settling defendants and other affiliated persons, including affiliated nonparties.  *See* Settling Defendants Response 5-7 ("Response").  The Settling Defendants cite several cases that support this point.  *See, e.g., Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 101-03 (D. Conn. 2010) (preliminarily approving settlement of Exchange Act claims where "Released Parties" was defined to include the defendants, and among others, the defendants' respective "past or present advisors, affiliates, agents, assigns, attorneys, . . . consultants, . . . present and former employees, [and] any entity in which any defendant has a controlling interest"); *In re PNC Fin. Servs. Grp., Inc.*, 440 F.

---

[6] The Underwriters also argue that the bar order is not broad enough, in that it does not provide them with an "unconditional release."  Underwriters Opp. 12.  They state that Velti and Negroponte are both parties to the underwriting agreements and specifically agreed therein that they would not, without the consent of the Underwriters, enter a settlement in which "any indemnified party is or could have been a party and indemnity was or could have been sought hereunder by such indemnified party, unless such settlement . . . includes an unconditional release of such indemnified party from all liability on claims that are the subject matter of such . . . suit."  *Id.*  Velti states that it would be willing to add language to the bar order clarifying that the order does not extend to "claims asserted in the Velti plc liquidation proceedings for alleged breach of the underwriting agreements."  Response 1, 8-9.  Negroponte does not make the same offer.  According to the Settling Defendants, the relevant provisions in the underwriting agreements do not apply to Negroponte in the circumstances of this case, and in any event the Underwriters have not sought indemnification from him.  *See* Response 8.  Given that the Underwriters do not cite any authority stating that they must be provided an "unconditional release" in these circumstances, or that their nonrelease warrants rejection of the settlement, I find that the exception Velti has offered to add adequately addresses this issue.  As the Settling Defendants have agreed to this modification of the bar order, I will revise the Proposed Judgment accordingly.

United States District Court
Northern District of California

United States District Court
Northern District of California

Supp. 2d 421, 438, 452 (W.D. Pa. 2006) (finally approving partial settlement of Exchange Act claims where bar order extended to "various affiliates, employees and others associated with the settling entities" and nonsettling defendants would "enjoy the benefit of a corresponding judgment reduction for the elimination of its contribution claims against any released party"); *see also, Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 109 (2d Cir. 2005) ("[C]lass action settlements have in the past released claims against nonparties where, as here, the claims against the nonparty being released were based on the same underlying factual predicate as the claims asserted against the parties to the action being settled.") (citing cases).

The Settling Defendants emphasize that the settlement will be funded by the officers' and directors' liability insurance carriers on behalf of Velti and all officers and directors named in the action. Response 7. Further, the Settlement Agreement provides for mutual releases between all Released Persons and plaintiffs. Settlement Agreement ¶¶ 5.1-5.2, 5.4. The Settling Defendants assert that the payment by the insurance carriers and the mutual releases "constitute consideration" for the release of the Overseas Defendants. Response 7.

Neither the Nonsettling Defendants nor the Settling Defendants offer convincing authority regarding the breadth of the Proposed Judgment's bar order. The Nonsettling Defendants do not cite any case law in support of their position. Baker Tilly's reliance on the fact that Section 78u-4(f)(7)(A) explicitly extends to "covered person[s] who settl[e]" and "settling covered person[s]" is not compelling given that the statute does not limit bar orders to such parties or provide that the contribution bar described therein is to be the only type of bar order. *Cf. In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 859 (11th Cir. 2009) (holding that Section 78u-4(f)(7)(A) does not preclude a bar order containing an indemnification provision, as there is no "language in the statute suggesting that the contribution bar is exclusive"); *In re Rite Aid Corp. Sec. Litig.,* 146 F. Supp. 2d 706, 726 (E.D. Pa. 2001) ("[Section 78u-4(f)(7)(A)] does not include any explicit language stating that the order therein described is the *only* bar order that we may entertain.") (emphasis in original). In other words, Section 78u-4(f)(7)(A) is not the exclusive authority for issuance of a bar order – the Ninth Circuit "acknowledge[s] the authority of a district court under federal common law to issue bar orders barring future claims for contribution and indemnity as

United States District Court
Northern District of California

part of its approval of a proposed settlement in a class action securities fraud case, once it has found that the settlement satisfies the requirements of Rule 23." *Heritage Bond*, 546 F.3d at 676. As to the Settling Defendants, while they do cite cases involving the release of nonparties, none of the cases they cite involves the release of named (but not served) nonsettling defendants, which is the situation here.

In *In re Consol. Pinnacle W. Sec. Litig. / Resolution Trust Corp. Merabank Litig.*, 51 F.3d 194, 197 (9th Cir. 1995), the Ninth Circuit held that the district court did not abuse its discretion in applying a bar order to a nonparty to a partial settlement agreement where the district court had found the nonparty "to be a critical participant and contributor to the overall settlement." *Id.* at 197. Relying on *Pinnacle*, the court in *Rite Aid* held that nonparty insurers were properly included in a partial settlement's bar order where the insurers had "not only contributed to the settlement, but their contribution will go to reduce, dollar for dollar, any judgment against the [nonsettling defendants]." 146 F. Supp. 2d at 732. The insurers were thus "critical participant[s] and contributor[s] to the overall settlement" and were "properly included in the bar order despite their nonparty status." *Id.* (internal quotation marks omitted). At least two other courts have looked to the "critical participant and contributor" language from *Pinnacle* in assessing the inclusion of nonparties in bar orders. *See PNC*, 440 F. Supp. 2d at 453 (approving bar order that extended to nonparties where "each of the released parties contributed to the settlement in a manner that was essential to the partial settlement agreement and is properly designated as a released party"); *In re Lloyd's Am. Trust Fund Litig.*, No. 96-cv-01262, 2002 WL 31663577, at *11 (S.D.N.Y. Nov. 26, 2002) ("[C]ourts recognize that it is appropriate for a class action settlement to include a limited release of a nonparty . . . where that nonparty has contributed substantially to making the settlement possible.").

The inclusion of nonparties affiliated with Velti in the bar order is unremarkable. The Settling Defendants are correct that nonparties affiliated with settling defendants are routinely included in bar orders, even in cases governed by the PSLRA. *See, e.g., Menkes*, 270 F.R.D. at 101-03; *PNC*, 440 F. Supp. 2d at 452. The inclusion of the Overseas Defendants is more unique. However, Baker Tilly and the Underwriters have not produced any authority stating that a

23

nonsettling defendant cannot be included in a bar order in a partial settlement, or indicating that the Overseas Defendants are not properly considered critical participants and contributors given the circumstances of this case. It is undisputed that the settlement fund will be financed by insurance providers on behalf of Velti and all directors and officers named in the action. These insurers would have little incentive to settle if they could not get a complete release of each of their insureds – otherwise, they would face the likelihood of more litigation. Further, while the Overseas Defendants have not personally contributed to the fund, the insurers have contributed on their behalf – in precisely the same way the insurers have contributed on behalf of the Settling Defendants. The upshot is that the class will be compensated for the release of the Overseas Defendants. The Nonsettling Defendants will be compensated as well in that, as discussed in more detail below, the Overseas Defendants' proportionate fault will be factored into the reduction of any future judgment against the Nonsettling Defendants. Finally, the fact that the Overseas Defendants have not been served in this action (and there is no indication that they would be served with further time and effort) weakens any distinction between them and other released persons affiliated with Velti. The Overseas Defendants may remain "Released Persons."

### 2. Independent Claims

Baker Tilly objects that the bar order in the Proposed Judgment "might be interpreted as barring independent claims by Baker Tilly." Baker Tilly Opp. 16. "[A] bar order issued in a partial settlement of a securities fraud class action case cannot bar independent claims." *Heritage Bond*, 546 F.3d at 676. "[S]uch bar orders may only bar claims for contribution and indemnity and claims where the injury is the nonsettling defendant's liability to the plaintiff." *Id.* at 680. Baker Tilly asks that the following sentence be added to Proposed Judgment ¶ 12 to "ensure that there is no doubt" about the bar order's scope: "Nothing in this paragraph shall preclude any Nonsettling Defendant from bringing or asserting against a Released Person any claims that seek recovery for amounts other than amounts the Released Person (i) paid, (ii) was obligated to pay or agreed to pay, or (iii) may become obligated to pay to the Settlement Class." Baker Tilly Opp. 16.

United States District Court
Northern District of California

The Settling Defendants agree that the bar order may not extend to Baker Tilly's independent claims but contend that Proposed Judgment ¶ 12 unambiguously does not. Proposed Judgment ¶ 12 states:

> Upon the Effective Date, all Persons, including, but not limited to, Plaintiffs, on behalf of themselves and the Settlement Class, Settlement Class Members (i.e. those who have not timely opted out of, or timely requested exclusion from, the Settlement Class), and the Nonsettling Defendants, shall be enjoined and barred from commencing or continuing any claim, cross-claim, third-party claim, claim over, or action in any forum against the Released Persons, seeking, as damages, indemnity, contribution, or otherwise, the recovery of all or part of any liability or settlement which such persons (i) paid, (ii) were obligated to pay or agreed to pay, or (iii) may become obligated to pay to the Settlement Class, as a result of such persons' liability for or participation in any acts, facts, statements or omissions that were or could have been alleged in the Action.

Proposed Judgment ¶ 12.

This language is plainly distinguishable from the language in the overly broad bar orders at issue in *Heritage*, which precluded the nonsettling defendants from bringing against the settling defendants any future claims "arising out of or related to . . . any of the transactions or occurrences alleged." 546 F.3d at 670. Proposed Judgment ¶ 12 does not release independent claims. The additional sentence requested by Baker Tilly is not necessary.

### 3. Mutuality

The Nonsettling Defendants assert that the bar order "must be mutual," meaning that any party who is protected against claims of contribution and indemnification must also be prohibited from asserting such claims. Baker Tilly Opp. 14. The bar order in the Proposed Judgment prohibits contribution and indemnification claims "against the Released Persons." Proposed Judgment ¶¶ 12-13. The bar order does not, however, prohibit such claims by the Released Persons against others. *See id*. The Nonsettling Defendants contend that the bar order must do so. They note that Section 78u-4(f)(7)(A) plainly requires that its mandatory contribution bar be mutual. *See* 15 U.S.C. § 78u-4(f)(7)(A) ("The order shall bar all future claims for contribution arising out of the action; (i) by any person against the settling covered person; and (ii) by the settling covered person against any person."). The Settling Defendants concede that the bar order should be mutual and state that if I determine that additional language is necessary to clarify this

25

issue, they would not object to including such language.[7]  Response 3, 7.  I agree with the parties and find that additional language is necessary to clarify that the bar order prohibits claims both against and by the Released Persons.  As there is no dispute on this issue, I will edit the Proposed Judgment accordingly.

## B. Judgment Reduction Methodology

Under 15 U.S.C. § 78u-4(f)(7)(B), also enacted by the PSLRA, where a "covered person" settles before a final verdict or judgment, the subsequent verdict or judgment is reduced by the greater of: "(i) an amount that corresponds to the percentage of responsibility of that covered person; or (ii) the amount paid to the plaintiff by that covered person."  15 U.S.C. § 78u-4(f)(7)(B).  As stated above, a "covered person" is either "(i) a defendant in any private action arising under [the Exchange Act];" or "(ii) a defendant in any private action arising under [Section 11], who is an outside director of the issuer of the securities that are the subject of the action."  15 U.S.C. § 78u-4(f)(10)(C).  Section 78u-4(f)(7)(B) serves the purpose of "ensuring that a nonsettling party [is not] exposed to liability for more than its percentage of responsibility for plaintiffs' damages."  *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 204 (S.D.N.Y. 2005).

The judgment reduction provisions in the Settlement Agreement state in relevant part:

5.6.  With respect to the . . . Exchange Act claims only:  Pursuant to 15 U.S.C. § 78u-4(f)(7)(B) and pursuant to federal common law, in the event Plaintiffs or the Settlement Class shall obtain a verdict or judgment against any of the Nonsettling Defendants in the Action, the verdict or judgment shall be reduced by the greater of (i) an amount that corresponds to the percentage of responsibility of the Released Persons, or (ii) the amount paid on behalf of the Released Persons in this Partial Settlement.

5.7.  With respect to the Securities Act claims only:  Any person or entity so barred and enjoined pursuant to ¶ 5.5 shall be entitled to appropriate judgment reduction in accordance with applicable statutory or common law rule to the extent permitted under the Securities Act for the claims alleged herein.

Settlement Agreement ¶¶ 5.6-5.7.

The judgment reduction provision in the Proposed Judgment states:

---

[7] At the final approval hearing, counsel for the Settling Defendants reiterated that they do not object to a mutual bar order.

Any final verdict or judgment obtained by or on behalf of Plaintiffs or the Settlement Class against any Person, other than the Released Persons, relating to the Released Claims, shall be reduced in accordance with applicable law.

Proposed Judgment ¶ 14.

The parties agree that Section 78u-4(f)(7)(B) will govern the Nonsettling Defendants' judgment reduction based on claims settled by "covered persons," meaning all Exchange Act claims, plus Section 11 claims settled by outside directors. The parties disagree over what formula will govern the Nonsettling Defendants' setoff based on Securities Act claims other than Section 11 claims settled by outside directors (i.e., "uncovered" Securities Act claims).[8] The parties further dispute whether Proposed Judgment ¶ 14 as currently drafted adequately defines that formula.

Plaintiffs assert that by stating that any future judgment will be "reduced in accordance with applicable law," the provision is sufficiently definite, and that the Nonsettling Defendants are only entitled to a pro tanto reduction on uncovered Securities Act claims. The Nonsettling Defendants contend that the provision is unacceptably vague, and that they are entitled to a Section 78u-4(f)(7)(B) reduction on all Securities Act claims.[9] I find that in the circumstances of this case, the Nonsettling Defendants are right.

---

[8] As stated above, plaintiffs allege both Securities Act and Exchange Act claims against Baker Tilly and only Securities Act claims against the Underwriters. Against Baker Tilly, plaintiffs allege Section 11 claims and Section 10(b) / Rule 10b-5 claims. Against the Underwriters, plaintiffs allege Section 11 claims and Section 12(a)(2) claims. The Section 11 claims are also alleged against all other defendants, i.e., Velti and all individual defendants. The Section 12(a)(2) claims are also alleged against Velti, Goldstein, Hobley, Kaskavelis, Mann, Moukas, and Negroponte. Because the parties do not distinguish between Section 11 and Section 12(a)(2) for the purposes of the judgment reduction issue, I do not consider the distinction.

[9] The Nonsettling Defendants also contend that their judgment reduction must be coextensive with the bar order. In other words, if the bar order extends to a group of persons beyond the Settling Defendants, the judgment reduction must factor in the proportionate fault of all such persons. *See* Baker Tilly Opp. 15; Underwriters Opp. 17. There does not appear to be any dispute on this issue, as Settlement Agreement ¶ 5.6 already provides that the judgment reduction calculation will be based on either "the percentage of responsibility of the Released Persons" or the amount paid on their behalf. Settlement Agreement ¶ 5.6.

United States District Court
Northern District of California

**1.  The judgment reduction provision must state with more clarity how Securities Act claims will be reduced.**

In arguing that Proposed Judgment ¶ 14 in unacceptably vague as written, the Nonsettling Defendants rely on *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155 (4th Cir. 1991).  There, the district court approved a settlement of Exchange Act claims which provided that the nonsettling defendant's judgment reduction would be "based on controlling legal principles in effect at the time."  *Id.* at 160.  The Fourth Circuit reversed, reasoning that the failure to determine a specific judgment reduction method at the time of settlement prejudiced the nonsettling defendant.  *Id.* at 160-62.  The court observed that the setoff formula "determines to a large extent the manner in which a defense should be made at trial."  *Id.* at 161.  For example, the settling defendants' extent of fault compared to the nonsettling defendant's "is either highly relevant (under the proportionate rule), minimally important (under the pro rata rule), or not important at all (under the pro tanto rule)."  *Id.* (internal quotation marks omitted).  A nonsettling defendant "is entitled to know what the law of the case is in advance of trial, not on the eve, after discovery is concluded and witnesses have been prepared."  *Id.*  Further, the failure to designate a setoff formula "exposes [the nonsettling defendant] to the risk of receiving inadequate credit for the contribution bar imposed on it."  *Id.*  The court noted that while "there is certainly some risk involved under any of the [judgment reduction] methods the [district court] might have chosen, . . . choosing a method at least allows the parties to know what the nature of that risk is."  *Id.*

The Second Circuit has applied *Jiffy Lube* on at least two occasions in determining whether a partial settlement provided a sufficiently definite description of the judgment reduction method.  *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 274-75 (2d Cir. 2006) (vacating approval of partial settlement with judgment reduction provision which "simply provides that nonsettling parties shall be 'sufficiently' compensated, without specifying how such compensation shall be calculated"); *Gerber v. MTC Elec. Technologies Co.*, 329 F.3d 297, 304-05 (2d Cir. 2003); *see also, Fluck v. Blevins*, 969 F. Supp. 1231, 1238 (D. Or. 1997) (citing *Jiffy Lube* and stating that "ordinarily it is best to decide [the setoff formula] before approving the settlement and entering the bar order").

28

United States District Court
Northern District of California

1    Plaintiffs respond that courts have not uniformly followed *Jiffy Lube*.  Rather, a number of

2    courts have held that so long as the settlement "acknowledges that the applicable judgment

3    reduction method will apply," the court need not select a particular approach when approving the

4    settlement.  Reply 11 n.13.  Plaintiffs point to *In re Atmel Corp. Derivative Litig.*, No. 06-cv-

5    04592-JF, 2010 WL 9525643 (N.D. Cal. Mar. 31, 2010), the only case from this district cited by

6    either party which addresses whether a specific judgment reduction method must be identified at

7    the time of settlement approval.  In *Atmel*, the court declined to require a detailed description of

8    the setoff formula in a partial settlement of a shareholder derivative action.  *Id.* at *7-8.  The court

9    acknowledged *Jiffy Lube* but approved the settlement with only the following language regarding

10   judgment reduction: "The approval for this Settlement and this bar order shall not be construed as

11   precluding the Nonsettling Defendant from enforcing any judgment reduction, credit, or setoff

12   right otherwise available to him under the PSLRA or other applicable law."  *Id.* at *8.  In so

13   holding, the court relied in part on *In re Phenylpropanolamine Products Liab. Litig.*, 227 F.R.D.

14   553 (W.D. Wash. 2004), in which the court approved a partial settlement and entered a final

15   judgment stating: "[T]he approval for this Settlement and this bar order shall not be construed as

16   precluding a nonsettling defendant from enforcing any judgment reduction, credit, or setoff right

17   otherwise available . . . under applicable state law."  *Id.* at 568.

18       Plaintiffs cite two additional cases approving partial settlements without requiring more

19   specificity regarding the setoff calculation than that applicable law will apply.  *See In re IndyMac*

20   *Mortgage-Backed Securities Litigation*, No. 09-cv-04583 (S.D.N.Y. Dec. 18, 2012) (Dkt. No. 410)

21   (entering final judgment for partial settlement of Securities Act claims with judgment reduction

22   provision stating that nonsettling defendants "shall be entitled to appropriate judgment reduction

23   in accordance with applicable statutory or common law rule to the extent permitted under the

24   Securities Act for the claims alleged herein," the exact same language at issue here); *In re Enron*

25   *Corp. Sec., Derivative & ERISA Litig.*, No. 01-cv-03624, 2008 WL 2566867, at *8-9 (S.D. Tex.

26   June 24, 2008) (approving partial settlement of Exchange Act and state law claims despite

27   nonsettling defendants' objection that guarantee of "appropriate judgment reduction" was not

28   sufficiently definite).

29

1          Neither the Nonsettling Defendants nor plaintiffs present convincing authority in support

2    of their position.  The Nonsettling Defendants do not cite a single case from this circuit holding

3    that the setoff formula must be specifically defined at the time of settlement approval.  Meanwhile,

4    the cases cited by plaintiffs are distinguishable on their facts:  *Amtel* and *Enron* involved

5    Exchange Act claims, not Securities Act claims that were not plainly governed by Section 78u-

6    4(f)(7)(B).  *Phenylpropanolamine* did not involve securities fraud claims at all.  *IndyMac* did

7    involve a partial settlement of Securities Act claims beyond the plain scope of Section 78u-

8    4(f)(7)(B), but the nonsettling defendants in that case did not object to the setoff provision in the

9    final judgment.  *See* No. 09-cv-04583, Dkt. No. 400 at 2 ("[N]ot a single objection has been filed

10   to any aspect of the proposed settlement.").

11         In the absence of clear authority to the contrary, I find the Nonsettling Defendants'

12   position more persuasive.  This is not a case where the only claims at issue are Exchange Act

13   claims and it is plain what "applicable law" will apply in the event that a judgment reduction

14   becomes necessary.  Nor is this a case where the Nonsettling Defendants' only grievance is that

15   the setoff formula does not "predict the future – i.e., . . . tell [them] precisely the value of [the]

16   credit against their future liability."  *Initial Pub. Offering*, 226 F.R.D. at 203.  Rather, as discussed

17   in more detail below, there is considerable ambiguity regarding what setoff formula applies to

18   uncovered Securities Act claims.  The parties' respective arguments reflect this ambiguity: the

19   Nonsettling Defendants assert that they are entitled to a Section 78u-4(f)(7)(B) reduction on all

20   Securities Act claims, while plaintiffs contend that only a pro tanto reduction should apply.  Given

21   that the settlement releases Velti and all Velti officers/directors named in the action, and that the

22   amount offered in settlement is severely constricted by Velti's bankruptcy and the

23   officers/directors limited financial resources, the difference between a Section 78u-4(f)(7)(B)

24   reduction and a pro tanto reduction may well be significant.  In these circumstances, a judgment

25   reduction provision that merely refers to "applicable law" without additional clarification will

26   "inflict unfairness" on the Nonsettling Defendants.  *See Denney*, 443 F.3d at 274.  They are

27   entitled to know the nature of their risk now, not on the eve of trial.  *See Jiffy Lube*, 927 F.2d at

28   161.  Accordingly, I will consider what judgment reduction method is appropriate here.

United States District Court
Northern District of California

### 2.   The Nonsettling Defendants are entitled to a Section 78u-4(f)(7)(B) reduction on all Securities Act claims.

The Nonsettling Defendants argue that the Section 78u-4(f)(7)(B) formula should apply to Exchange Act claims and all Securities Act claims, including uncovered Securities Act claims. *See* Baker Tilly Opp. 6-14.  I agree.

In *Franklin v. Kaypro Corp.*, 884 F.2d 1222 (9th Cir. 1989), the Ninth Circuit held that where a partial settlement of Section 11 claims is approved and a contribution bar is entered, any subsequent judgment against a nonsettling defendant must be reduced by the settling defendants' percentage of liability. *Id.* at 1231.  The court found this to be the superior method of judgment reduction because it satisfies three goals: "the statutory goal of punishing each wrongdoer, the equitable goal of limiting liability to relative culpability, and the policy goal of encouraging settlement."  *Id.* at 1231.  In its conclusion, the court noted the tension between the principle of contribution and the goal of encouraging settlement of securities actions, and emphasized that "the most efficacious and equitable method of resolving this tension is by adopting a rule allowing only proportional liability if a contribution bar is entered as part of a pretrial partial settlement."  *Id.*; *see also, Eichenholtz v. Brennan*, 52 F.3d 478, 487 (3d Cir. 1995) (citing *Kaypro* in holding that under the "proportionate fault rule" the district court "did not abuse its discretion in imposing the bar order with the proportionate judgment reduction provision").

The Nonsettling Defendants contend that the proportionate fault rule articulated in *Kaypro* and *Eichenholtz* continues to apply despite the passage of the PSLRA.  For example, in *Neuberger v. Shapiro*, 110 F. Supp. 2d 373, 381-82 (E.D. Pa. 2000), the court approved a partial settlement of Section 11 claims upon finding that the bar order provided that, "in the event that a judgment is entered against nonsettling defendants, the amount of the award will be reduced by either the amount of settlement or by [the settling defendant's] proportionate fault, whichever is greater."  *Id.* at 382.  The court noted that the settling defendant was not a "covered person" under the PSLRA but, citing *Eichenholtz,* stated that "the rule in this Circuit allows contribution bar orders in federal securities cases where the jury in the nonsettling defendants' trial will assess the relative

culpability of both settling and nonsettling defendants, and the nonsettling defendants will pay a commensurate percentage of the judgment." *Id.* at 382.

Plaintiffs respond that under the plain language of Section 78u-4(f)(7)(B), proportional liability reductions do not apply to Securities Act claims except Section 11 claims against outside directors. Reply 9. According to plaintiffs, "by refusing to apply [Section 78u-4(f)(7)(B)] to Securities Act claims" settled by persons other than outside directors, the PSLRA clarified that judgment reductions based on such claims need not be based on proportionate fault. Reply 10. Plaintiffs rely on *In re WorldCom, Inc. Sec. Litig.*, No. 02-cv-03288, 2005 WL 591189 (S.D.N.Y. Mar. 14, 2005), in which the court rejected a nonsettling defendant's objection to the following judgment reduction provision in a partial settlement of Section 11 claims:

> The Nonsettling Entities/Individuals shall be entitled to judgment credit in an amount that is the greater of the amount allocated in the Settlement to claims for which a Nonsettling Entity/Individual may be found liable for common damages or, for each such claim, the proportionate share of the [Settling] Defendants' fault as proven at trial.

*Id.* at *3.

Although this setoff formula was essentially identical to that provided by Section 78u-4(f)(7)(B), the nonsettling defendant objected that because other defendants potentially proceeding to trial were insolvent, it could "end up paying much of the judgment for which [the insolvent defendants] are deemed responsible in addition to its own share." *Id.* at *3. The nonsettling defendant requested a modification of the formula to address this perceived unfairness. *Id.* The court declined to order one, observing that the nonsettling defendant was

> effectively arguing that traditional principles of joint and several liability are unfair. It is indisputable, however, that joint and several liability is prescribed by Section 11 for all defendants except outside directors . . . When Congress passed the [PSLRA], replacing the former scheme of joint and several liability for Exchange Act violators and outside directors facing Section 11 claims with proportionate liability in most circumstances, it could easily have done the same with respect to all Section 11 defendants. Congress chose not to do so.

*Id.* at *8 (footnotes omitted). The court went on to state that while the settling defendants were not "covered persons" under the PSLRA, "[b]ecause the determination to be made here is ultimately an equitable one, the PSLRA may be accorded persuasive weight." *Id.* at *9. Finding

United States District Court
Northern District of California

1   that the judgment reduction provision in the settlement was "virtually the same" as that provided

2   by Section 78u-4(f)(7)(B), the court concluded that it was adequate.  *Id.*

3          The Nonsettling Defendants have the better of these arguments.  *Kaypro* is extremely

4   persuasive here, if not controlling.  *Kaypro* directly addresses what setoff formula should apply to

5   Section 11 claims and squarely holds that "the most efficacious and equitable" approach is to limit

6   the nonsettling defendant's future liability to its proportionate fault.[10]  *See* 884 F.2d at 1231.

7   *Kaypro* also lays out several problems with the pro tanto approach urged by plaintiffs, including

8   that it encourages collusion and generally requires good faith hearings at the time of settlement

9   approval.  *Id.* at 1230.  Such hearings "bo[g] down the settlement process" and "negat[e] many of

10   the benefits of settlement."  *Id.* (internal quotation marks omitted).  Plaintiffs contend that *Kaypro*

11   is no longer good law, but plaintiffs do not explain why the case's reasoning is less applicable

12   after passage of the PSLRA than it was before given that the PSLRA did not modify joint and

13   several liability under Section 11 except to remove outside directors from its scope.  *See In re*

14   *WorldCom, Inc. Sec. Litig.*, No. 02-03288, 2005 WL 335201, at *11-12 (S.D.N.Y. Feb. 14, 2005);

15   *In re Cendant Corp. Sec. Litig.*, 139 F. Supp. 2d 585, 590-91 (D.N.J. 2001).  Nor did the PSLRA

16   address any of the drawbacks to the pro tanto approach identified by the Ninth Circuit in *Kaypro*.

17   Moreover, as the Nonsettling Defendants point out, several courts, including the Ninth Circuit,

18   have indicated that the PSLRA did not by implication overrule all existing federal common law

19   regarding the 1933 and 1934 Acts.  *See, e.g., Heritage*, 546 F.3d at 677-78; *HealthSouth*, 572 F.3d

20   at 859-61; *Neuberger*, 110 F. Supp. 2d at 381-82.  *Neuberger* illustrates this point: the court

21   applied the *Kaypro / Eichenholtz* proportionate fault rule – a creation of federal common law –

22   even though the case was governed by the PSLRA.  *See* 110 F. Supp. 2d at 381-82.[11]

23   _____

24   [10] Of course, the *Kaypro* proportionate fault rule is not equal to the judgment reduction method set
     out in Section 78u-4(f)(7)(B).  But when the proportionate fault approach is combined with the

25   "one satisfaction rule" – i.e, the basic principle that "a plaintiff is only entitled to one satisfaction
     for any given injury," *Kaypro*, 884 F.2d at 1231 – the result is the Section 78u-4(f)(7)(B) formula.

26   *Cf. Fluck*, 969 F. Supp. at 1237 (noting that in enacting Section 78u-4(f)(7)(B) "Congress
     attempted to redress the weaknesses of the pro tanto and proportionate liability approaches by

27   combining them").

28   [11] Plaintiffs' reliance on *DCD Programs, Ltd. v. Leighton*, 90 F.3d 1442 (9th Cir. 1996), and
     *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1389 (9th Cir. 1987), is also unconvincing

33

United States District Court
Northern District of California

1    Plaintiffs have not produced a single case holding that different setoff formulas should

2  apply to Exchange Act and Securities Act claims pending in the same action, and I am not aware

3  of any.  *WorldCom* does not support plaintiffs' position given that the settlement in that case

4  provided that the Section 78u-4(f)(7)(B) formula would apply to uncovered Securities Act claims.

5  *See* 2005 WL 591189 at *3.  The court did decline to impose a judgment reduction on Securities

6  Act claims that went beyond the method prescribed by Section 78u-4(f)(7)(B).  But that is not

7  what the Nonsettling Defendants are asking for here.  Indeed, if anything, *WorldCom* supports

8  applying the Section 78u-4(f)(7)(B) formula in this case because the court accorded the PSLRA

9  "persuasive weight" even though it found that the Act did not apply.  *Id.* at *9.  Likewise, in *Fluck*

10  *v. Bevins*, also cited by plaintiffs, the court decided to "follow [Section 78u-4(f)(7)(B)] for the

11  purposes of crediting any settlements reached in this action," even though the court determined

12  that the PSLRA did not govern the case.  969 F. Supp. at 1238; *see also, Gerber v. MTC Elec.*

13  *Technologies Co.*, 329 F.3d 297, 309 (2d Cir. 2003) ("While . . . we conclude that the PSLRA

14  does not control the outcome of this pre-PSLRA case, the congressional determination that a

15  mutual bar order was the better approach may have some bearing on the district court's resolution

16  of this issue.").  In short, the cases cited by plaintiffs do not provide grounds for limiting the

17  Nonsettling Defendants to a pro tanto reduction on uncovered Securities Act claims; the cases

18  provide further support for applying the Section 78u-4(f)(7)(B) formula.

19    This approach is also the most fair.  "In essence, the choice between pro tanto and

20  proportional rules is a choice as to which party should bear the risk of a bad settlement, settling

21  plaintiff or nonsettling defendant."  *In re Sunrise Sec. Litig.*, 698 F. Supp. 1256, 1259 (E.D. Pa.

22  1988).  Given that the settling plaintiff's level of control over the settlement outcome is, in most

23  cases, exponentially greater than the nonsettling defendant's, it is appropriate to place this risk on

24  the plaintiff, who then has a "financial incentive to make sure that each defendant pays his

25

26  given that those cases do not directly address the judgment reduction methodology issue.
"Questions which merely lurk in the record, neither brought to the attention of the court nor ruled

27  upon, are not to be considered as having been so decided as to constitute precedents."  *E. & J.
Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1046 n.14 (9th Cir. 2007) (internal modifications

28  omitted); *but see Fluck*, 969 F. Supp. at 1237 (describing *Kaypro*, *DCD*, and *Seymour* as "a trio of
inconsistent Ninth Circuit decisions, none of which even acknowledges the others).

respective share of damages." *Id.* at 1258. Further, under the Section 78u-4(7)(B) method, a nonsettling defendant is not exposed to paying more than if all parties had gone to trial.[12] *See Franklin*, 884 F.2d at 1231.

As Ninth Circuit precedent, the PSLRA's "persuasive weight," *WorldCom*, 2005 WL 591189 at *9, and fairness all weigh in favor applying the Section 78u-4(f)(7)(B) formula, and plaintiffs have not offered persuasive authority to the contrary, I find that this is the better approach.[13] The Settlement Agreement states that Securities Act claims will be reduced "in

---

[12] I recognize that in cases like this one, where the nonsettling defendants have deeper pockets than the settling defendants, and the settling defendants are either insolvent or on the verge of insolvency, applying a proportionate fault reduction may result in the nonsettling defendants paying *less* than if all parties had gone to trial. *See WorldCom*, 2005 WL 591189, at *6-9. But this was also true when *Kaypro* was decided. Moreover, the Supreme Court considered and rejected this "inconsistency" in *McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994), in which the Court held that where a partial settlement is entered in an admiralty case, a nonsettling defendant is entitled to a proportionate fault reduction. *See* 511 U.S. at 204. The Court stated:

> [T]here is no tension between joint and several liability and a proportionate share approach to settlements. Joint and several liability applies when there has been a judgment against multiple defendants. It can result in one defendant's paying more than its apportioned share of liability when the plaintiff's recovery from other defendants is limited by factors beyond the plaintiff's control, such as a defendant's insolvency. When the limitations on the plaintiff's recovery arise from outside forces, joint and several liability makes the other defendants, rather than an innocent plaintiff, responsible for the shortfall . . . [T]he proportionate share rule announced in this opinion applies when there has been a settlement. In such cases, the plaintiff's recovery against the settling defendant has been limited not by outside forces, but by its own agreement to settle. There is no reason to allocate any shortfall to the other defendants, who were not parties to the settlement.

511 U.S. at 220-21 (footnotes and citations omitted). *McDermott* is an admiralty case, and this language is dicta. Nevertheless, I am persuaded that the chance that the proportionate fault approach will result in a nonsettling defendant paying less than if all parties had gone to trial does not warrant rejecting the method.

[13] The Nonsettling Defendants argue in the alternative that they are entitled to a Section 78u-4(f)(7)(B) reduction because plaintiffs have alleged at least one Exchange Act claim against each Settling Defendant. Each Settling Defendant is thus a covered person under Section 78u-4(f)(10)(C), and because Section 78u-4(f)(7)(B) applies to all settlements by covered persons, the statute should apply to all Securities Act claims settled by all Settling Defendants. *See* Baker Tilly Opp. 7; Underwriter Opp. 16 n.4; *see also, In re Thornburg Mortgage, Inc. Sec. Litig.*, 912 F. Supp. 2d 1178, 1247-48 (D.N.M. 2012); *In re Sterling Foster & Co., Inc., Sec. Litig.*, 238 F. Supp. 2d 480 (E.D.N.Y. 2002); *In re Cendant Corp. Sec. Litig.*, 139 F. Supp. 2d 585, 591-93 (D.N.J. 2001). Because I conclude that the Section 78u-4(f)(7)(B) formula is the appropriate judgment

accordance with applicable statutory or common law rule to the extent permitted under the Securities Act for the claims alleged herein." Settlement Agreement ¶ 5.7. The judgment reduction provision in the Proposed Judgment similarly provides that any subsequent judgment against the Nonsettling Defendants "shall be reduced in accordance with applicable law." Proposed Judgment ¶ 14. I will revise Proposed Judgment ¶ 14 to clarify that applicable law in this case requires that all claims pending against the Nonsettling Defendants be reduced according to the judgment reduction method set out in Section 78u-4(f)(7)(B).

### C. Appealability

The Nonsettling Defendants ask that the final judgment include an express certification under Federal Rule of Civil Procedure 54(b) so that the judgment will be appealable before all claims in the action have been resolved. Underwriters Opp. 18 n.5; Baker Tilly Opp. 17. Rule 54(b) provides that

> [w]hen an action presents more than one claim for relief – whether as a claim, counterclaim, crossclaim, or third-party claim – or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).

Plaintiffs assert that the Proposed Judgment is sufficient to satisfy Rule 54(b) in that it provides for an "immediate entry of this Final Judgment by the Clerk of the Court." Proposed Judgment ¶ 23. Plaintiffs offer no authority for this assertion, and it is not clear that it is correct. *See Noel v. Hall*, 568 F.3d 743, 747 (9th Cir. 2009) (district court properly entered final judgment under Rule 54(b) where court "expressly determined that there was no just reason for delay"); *see also, Nat'l Ass'n of Home Builders v. Norton*, 325 F.3d 1165, 1167-68 (9th Cir. 2003). Moreover, given the substantial difference of opinion on this issue, "[p]rudence might dictate use of what

_____

reduction method for the reasons stated above, I do not address this argument.

some view as the talismanic words of Rule 54(b), as at least a nod to the wisdom of the adage, 'an ounce of prevention . . . .'" *Kelly v. Lee's Old Fashioned Hamburgers, Inc.*, 908 F.2d 1218, 1220 n.2 (5th Cir. 1990).  I will revise Proposed Judgment ¶ 23 to read:  "Pursuant to Rule 54(b), the Court finds that there is no just reason for delay and direct the Clerk of the Court to immediately enter this Final Judgment."

In sum, the *Churchill* factors support approval, the *Bluetooth* factors do not indicate collusion, and the Plan of Distribution is fair, reasonable, and adequate.  I find that the settlement is the product of arms-length mediation between experienced and professional counsel.  *See, e.g.,* Phillips Decl. ¶¶ 9-14.  The motion for final approval is GRANTED.  I will enter the Proposed Judgment submitted by plaintiffs in accordance with the discussion above.

## III.  ATTORNEY'S FEES AND COSTS

Plaintiffs' counsel seek an award of $2,375,000 in attorney's fees, or 25 percent of the $9,500,000 settlement fund.  Fees Mot. 2.  In addition, plaintiffs' counsel request $219,469.67 in expenses.  Fees Mot. 4.  Plaintiffs' counsel collectively spent 3,434.55 hours on this case.  Fees Mot. 18.  The resulting lodestar is $1,914,221.25, meaning that plaintiffs' counsel are asking for a multiplier of approximately 1.25.  *Id.*  Plaintiffs' counsel do not seek an incentive award for the class representatives.

### A.  Fees

In common fund cases such as this one, the benchmark fee award is 25 percent of the settlement fund.  *Vizcaino*, 290 F.3d at 1047.  This benchmark percentage is a starting point and "should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors."  *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).  The court's selection of the benchmark percentage or any other calculation must be supported by findings that take into account the particular circumstances of the case, such as (1) the result achieved, (2) the risk involved, (3) the skill required and the quality of work by counsel, (4) market rates, and (5) the contingent nature of the fee.  *Vizcaino*, 290 F.3d at 1048-50.  Even when determining the fee award based on a percentage of the common fund, the

court should use the lodestar method to crosscheck that amount.  *Covillo v. Specialtys Cafe*, No.

11-cv-05940-DMR, 2014 WL 954516, at *6 (N.D. Cal. Mar. 6, 2014).  The lodestar crosscheck

need not entail either "mathematical precision [or] bean counting . . . [Courts] may rely on

summaries submitted by the attorneys and need not review actual billing records."  *Id.*

The circumstances of this case support the 25 percent of the settlement fund requested by

plaintiffs' counsel.  As discussed above, the result achieved for the class is favorable considering

the Settling Defendants' precarious financial condition, the complications of prosecuting claims

against persons living abroad, and the vulnerable points in plaintiffs' case.  These same factors

highlight the considerable risk involved in litigating this action on a contingent fee basis, and the

skill required to perform such work.  A fee award of 25 percent of the common fund is the

benchmark identified by the Ninth Circuit and is squarely within the range of awards generally

approved by district courts in this circuit.  *See, e.g., Vasquez v. Coast Valley Roofing, Inc.*, 266

F.R.D. 482, 491 (E.D. Cal. 2010) ("The typical range of acceptable attorneys' fees in the Ninth

Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark.").

Finally, no class member objected to the proposed fee award.

A lodestar crosscheck confirms that the requested fee award is acceptable.  Plaintiffs'

counsel dedicated a combined total of 3,434.55 hours to litigating this case, for which they accrued

$1,914,221.25 in attorney's fees based on their hourly rates.  *See* Weiser Decl. Exs. D-F.  While

significant motion practice has not yet begun, plaintiffs' counsel have shown that in prosecuting

plaintiffs' claims, they conducted an extensive investigation into the underlying facts, thoroughly

researched relevant law, prepared and filed the 130-page Consolidated Complaint, analyzed the

Settling Defendants' financial condition, prepared a detailed mediation statement, consulted with

economic experts regarding loss causation and damages, participated in the mediation session with

Judge Phillips, and continued thereafter to negotiate with the Settling Defendants' to reach this

settlement.  *See, e.g.,* Fee Mot. 3; Weiser Decl. ¶ 6.  The hourly rates that plaintiffs' counsel

request are those they currently charge for both contingent and noncontingent work and are in line

with those prevailing in the community for similar services by lawyers of comparable skill,

United States District Court
Northern District of California

38

1   experience, and reputation.  *See* Fee Mot. 19; Weiser Decl. Exs. D-F; *Blum v. Stenson*, 465 U.S.

2   886, 895 n.11 (1984).

3      In sum, plaintiffs' counsel's lodestar is based on a reasonable expenditure of attorney time

4   charged at reasonable hourly rates.  Given the complexity of this case and the risks involved in

5   litigating it, as well as the skill and experience necessary to properly do so, the lodestar supports

6   awarding plaintiffs' counsel 25 percent of the settlement fund and a 1.25 multiplier.  *See Kerr v.*

7   *Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975); *Vizcaino*, 290 F.3d at 1051 (affirming

8   district court's application of a 3.65 multiplier based on complexity of case and risks involved,

9   among other factors).

10     **B.  Costs**

11      Plaintiffs' counsel may recover reasonable costs.  Fed. R. Civ. P. 23(h); *see also, Vincent*

12   *v. Reser*, No. 11-cv-03572-CRB, 2013 WL 621865, at *5 (N.D. Cal. Feb. 19, 2013) ("Attorneys

13   who create a common fund are entitled to the reimbursement of expenses they advanced for the

14   benefit of the class.").  Plaintiffs' counsel request $219,469.67 in expenses.  Mot. 20-22.  A

15   significant portion of this amount was spent on experts, consultants, and investigators who aided

16   plaintiffs' counsel in investigating and evaluating plaintiffs' claims.  Mot. 21.  Other significant

17   portions went to computerized factual and legal research and to travel expenses.  Mot. 21-22.  The

18   class notice informed potential class members that plaintiffs' counsel would seek $225,000 in

19   costs, to be deducted from the settlement fund.  Bravata Decl. Ex. A (Dkt. No. 181).  No class

20   member objected to this figure.  Because plaintiffs' counsel's costs are reasonable and do not

21   exceed the amount stated in the class notice, plaintiff's counsel are entitled to recover them.

22      The motion for attorney's fees is GRANTED.

23

24

25

26

27

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**CONCLUSION**

For the foregoing reasons, plaintiffs' motions for final approval and for attorney's fees,

Dkt. Nos. 170 and 171, are GRANTED.  I will enter the Proposed Judgment subject to the

modifications described above.

**IT IS SO ORDERED**.

Dated:   February 3, 2015



WILLIAM H. ORRICK
United States District Judge