1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    ANIKA R. RIECKBORN, et al.,                Case No. 13-cv-03889-WHO

8               Plaintiffs,                      **ORDER REGARDING DEFENDANTS'**
                                                 **MOTIONS TO DISMISS**
9         v.
                                                 Re: Dkt. Nos. 160, 161, 163, 164, 182, 183
10   JEFFERIES LLC (F/K/A JEFFERIES AND
     COMPANY, INC.), et al.,
11              Defendants.

12                                  **INTRODUCTION**

13         This is a securities class action brought on behalf of a putative class of persons who

14   purchased or otherwise acquired Velti plc ("Velti") securities between January 27, 2011 and

15   August 20, 2013.  On the last day of the putative class period, Velti announced its Q2 2013

16   financial results and disclosed that it had decided to write off approximately $111 million in

17   outstanding accounts receivable.  Plaintiffs allege that Velti's reserves and revenues were

18   materially misrepresented throughout the putative class period and bring claims against Velti's

19   accounting firm – Baker, Tilly, Virchow & Krause, LLP ("Baker Tilly") – and the underwriters of

20   Velti's initial and secondary public offerings – Jefferies LLC, RBC Capital Markets, LLC,

21   Needham & Company, LLC, and Canaccord Genuity Inc. (collectively, the "Underwriters") –

22   under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934

23   (the "Exchange Act").

24         As plaintiffs announce at the start of their opposition brief, "this case is about receivables."

25   Opp. 1 (Dkt No. 183).  Most if not all of plaintiffs' claims are founded on the charge that Velti's

26   financial reporting during the putative class period failed to account for millions of dollars of

27   uncollectible receivables on Velti's books.  Accordingly, plaintiffs must plead facts indicating that

28   these uncollectible receivables existed when the alleged misrepresentations were made, and that

*United States District Court*
*Northern District of California*

1    Velti failed to account for them.  Plaintiffs have not done so.  The motions to dismiss are

2    GRANTED.

3                                    **BACKGROUND**

4    **I.      FACTUAL BACKGROUND**

5           Except where otherwise noted, the following facts are taken from plaintiffs' Amended

6    Consolidated Complaint  ("ACC") or documents incorporated therein and are presumed true for

7    the purposes of these motions.

8           **A.      Velti's Business Model**

9           Velti was founded in Athens, Greece in 2000.  ACC ¶ 8 (Dkt. No. 144).  It is a provider of

10   "mobile marketing and advertising technology and solutions" for businesses around the world.

11   ACC  ¶ 6.  As a regular part of its business, Velti entered contracts pursuant to which it provided

12   services but did not get paid until its work had been completed, the customer had been invoiced,

13   and the customer had delivered payment.  *Id.*  Between the time the work was completed on a

14   contract and the time the customer delivered payment, the amount due on a contract represented an

15   account receivable.  *Id.*

16          Velti classified its receivables in one of two ways.  ACC ¶ 11 n.4-5.  From the time a

17   receivable was booked as revenue[1] to the time the customer was invoiced, Velti classified the

18   receivable as an "accrued contract receivable."  *Id.*  From the time the receivable was invoiced to

19   the time the customer delivered payment, Velti classified the receivable as a "trade receivable."

20   *Id.*  "Day sales outstanding" ("DSO") is a metric that measures the number of days it takes to

21   collect a receivable.  ACC ¶ 11.  From the start of the putative class period until May 2012, Velti

22   calculated its reported DSO only on the basis of its trade receivables, thereby excluding from the

23   calculation the period of time between when a receivable was booked as revenue and when the

24   customer was invoiced.  *Id.*

25

26

27   ―――――――――――――――
     [1] Velti booked its receivables as revenue around the time that its work on the underlying contract
28   had been completed.  ACC ¶ 89.

                                              2

United States District Court
Northern District of California

United States District Court
Northern District of California

Plaintiffs allege that because Velti operated heavily in Greece, it was particularly impacted by the 2010 Greek economic crisis through increasing numbers of unpaid invoices. They assert that Velti hid this from the public in part by calculating its reported DSO only on the basis of its trade receivables. *See* ACC ¶ 12. They contend that this method of calculating the reported DSO "left investors unaware that [Velti] had very . . . old receivables sitting on its books for which it was not carrying an appropriate reserve for bad debts." ACC ¶ 11.

**B.      Velti's Initial and Secondary Public Offerings**

Velti's registration statement and prospectus for its initial public offering ("IPO") was declared effective by the SEC on January 27, 2011. ACC ¶ 147; Baker Tilly RJN, Ex. A (Dkt. No. 168-1). The IPO registration statement included Baker Tilly's August 3, 2010 audit report on Velti's 2008-2009 financial statements.[2] ACC ¶ 433; Baker Tilly RJN, Ex. B (Dkt. No. 168-2).

Velti's registration statement and prospectus for its secondary public offering ("SPO") was declared effective by the SEC on June 14, 2011. ACC ¶ 151; Baker Tilly, RJN Ex. C (Dkt. No. 168-3). The SPO registration statement included Baker Tilly's April 11, 2011 audit report on Velti's 2008-2010 financial statements. Baker Tilly RJN, Ex. D (Dkt. No. 168-4).

Baker Tilly's August 3, 2010 audit report included in the IPO registration statement contained the following certification regarding Velti's financial reporting:

> In our opinion, the consolidated financial statements and financial statement schedule referred to above present fairly, in all material respects, the consolidated financial position of Velti plc and its subsidiaries as of December 31, 2009 and 2008, and the results of their operations and cash flows for each of the three years ended December 31, 2009, in conformity with accounting principles generally accepted in the United States of America.

ACC ¶¶ 148, 168. Baker Tilly's April 11, 2011 audit report included in the SPO registration statement contained a substantially identical certification regarding Velti's financial reporting for "each of the three years ending December 31, 2010." ACC ¶ 202.

The IPO registration statement reported that Velti had never failed to collect on any significant receivable or incurred any bad debt expense:

---

[2] Two portions of the Baker Tilly audit report included in the IPO registration statement are dated September 3, 2010 instead of August 3, 2010. *See* ACC ¶ 433; Baker Tilly RJN, Ex. B.

> We have not historically incurred bad debt expense, none of our significant customers have historically failed to pay amounts due to us, and we do not believe that any of the customers contributing to our increased accounts receivable aging will fail to pay us in full.

ACC ¶¶ 160, 163; Baker Tilly RJN, Ex. A at 48.  The SPO registration statement similarly reported: "We have historically collected all amounts due from our customers, . . . as evidenced by our insignificant bad debt expense for 2010, 2009, and 2008."  ACC ¶ 196, Baker Tilly RJN, Ex. C at 71.

### C.    Velti's Switch to Comprehensive DSO

Although plaintiffs claim that the 2010 Greek economic crisis triggered an increase in the number of Velti's unpaid invoices, plaintiffs do not specifically identify any collectability problems until Q1 2012.  According to the ACC, Velti's DSO began to accelerate in that quarter.  *See* ACC ¶¶ 119, 128.  A confidential witness who joined Velti in June 2011 informed plaintiffs that "sometime in Q1 2012" he or she "began to hear that . . . [Velti] was having trouble collecting receivables."  ACC ¶ 119.  The confidential witness also recalled "emails sent around [Velti] discussing DSOs and how they needed to be shorter."  *Id.*

Shortly before Velti's Q1 2012 earnings call, which occurred on May 15, 2012, a stock market research firm specializing in forensic accounting issues published a report stating that Velti's reported DSO only accounted for trade receivables.[3]  ACC ¶ 12.  Plaintiffs allege that the report "revealed" Velti's "DSO machinations" which had been previously "hidden."  *Id.*  Plaintiffs state that the report was "slowly digested by the market," and that Velti's securities declined in value over the next several days.  *Id.*

On May 22, 2012, Velti confirmed that the information in the report was accurate and announced that it was changing its method of calculating its reported DSO.  ACC ¶ 13.  The new method, which calculated what Velti called "comprehensive DSO," accounted for both trade

---

[3] Plaintiffs do not identify the the title or author of the report  or the specific date on which the report was published.  *See* ACC ¶ 12.  The Underwriters assert, and plaintiffs do not dispute, that the report was published by "CFRA" on May 10, 2012.  *See* Underwriters Opp. 8; Underwriters RJN, Ex. H.

receivables and accrued contract receivables.  ACC ¶¶ 99, 277.  Velti's reported DSO more than

doubled as a result, from 116 days to 272 days.   ACC ¶ 13.  Plaintiffs assert that

> [b]ecause the trade DSO figure was less than half of the comprehensive DSO,
> until May 22, 2012, Velti was able to mislead investors into believing that it was
> taking a much shorter time to collect on outstanding receivables.  Disclosing only
> the trade DSO figure also enabled Velti to conceal that it had a large sum of
> aging, undisclosed receivables sitting in its accrued contract receivables.

ACC ¶ 280.

On November 14, 2012, Velti announced that due to its inability to timely collect

receivables from certain of its customers in Greece, the Balkans, and various North African and

Middle Eastern countries, it was transitioning its business away from those regions and into the

United States and Western Europe.  ACC ¶ 14.  Plaintiffs allege that at the time this announcement

was made, the DSO for customers in those regions had risen to 450 days.  ACC ¶ 14.  Velti

subsequently represented that only 10 percent of its receivables were attributable to customers in

Greece or the Balkans.  ACC ¶ 15.

### D.     Deloitte's Audit and Collapse of Velti's Stock Value

In June 2013, Velti hired Deloitte LLP ("Deloitte") to review and evaluate Velti's

operations in Greece and Cyprus, with a specific eye to determining the collectability of

receivables in those regions.  ACC ¶ 139.  After two weeks, "with access to the same information

available to Baker Tilly," Deloitte presented its initial findings, which were ultimately confirmed

in Deloitte's final report.  ACC ¶ 140.  Among other things, Deloitte's final report concluded that

(i) a "large amount" of Velti's receivables were "very old;" (ii) 85 percent of Velti's receivables in

Greece and Cypress were attributable to only 26 customers; and (iii) the receivables attributable to

those customers were uncollectible.  *Id.*

Deloitte recommended that Velti write off more than $100 million to account for its

uncollectible receivables.  ACC ¶ 142.  Velti followed Deloitte's advice.  On August 20, 2013,

Velti announced its Q2 2013 financial results and disclosed that it had decided to write off

approximately $111 million in outstanding receivables.  ACC ¶¶ 23, 401.  It disclosed that some of

the written off receivables were "substantially old" and had been due since "before 2012."  ACC ¶

United States District Court
Northern District of California

23.  Plaintiffs describe this disclosure as "a de facto admission that the [$111 million] write off was long overdue."  ACC ¶ 23.  Velti also disclosed that, despite its earlier representation that only 10 percent of its receivables were with customers in Greece and the Balkans, the true proportion was about 66 percent.  ACC ¶ 23.  Velti shares declined $0.66 per share, or 66 percent, to close on August 21, 2013 at $0.34 per share.  *Id.*  Velti's United States-based operations filed for bankruptcy on November 4, 2013.  Dkt. No. 170-1 at ¶ 39.  Its European-based operations did the same on August 18, 2014.  Dkt. No. 150.

Except for the information stated in the preceding two paragraphs, plaintiffs do not allege the specific contents or findings of Deloitte's final report and have not provided a copy of the report to defendants.

## II.    PROCEDURAL BACKGROUND

Between August 22, 2013 and October 4, 2013, four securities class actions were filed in this district in connection with the collapse of Velti's stock value.  On December 3, 2013, the cases were consolidated.  Dkt. No. 81.  On January 24, 2014, a fifth securities class action was filed.  *See Yadegar v. Velti plc*, No. 14-cv-00372-WHO (N.D. Cal. filed Jan. 24, 2014) at Dkt. Nos. 1, 6.  Baker Tilly was first named as a defendant on January 24, 2014.  *See id.* at Dkt. No. 1.  The Underwriters were first named on October 4, 2013.  *See Manabat v. Velti plc*, No. 13-cv-04606-WHO (N.D. Cal. filed Oct. 4, 2013) at Dkt. No. 1.

Plaintiffs filed a Consolidated Complaint on April 22, 2014.  Dkt. No. 105.  The Consolidated Complaint identified three groups of defendants: (1) Velti and four of its officers/directors – Wilson Cheung, Nicholas Negroponte, Jeffrey Ross, and Winnie Tso; (2) five other Velti officers/directors – Jerry Goldstein, David Hobley, Chris Kaskavelis, David Mann, and Alex Moukas; and (3) Baker Tilly and the Underwriters.  *Id.*  It asserted five causes of action: (1) violations of Section 11 of the Securities Act against all defendants; (2) violations of Section 12(a)(2) of the Securities Act against Velti, Goldstein, Hobley, Kaskavelis, Mann, Moukas, Negroponte, and the Underwriters; (3) violations of Section 15 of the Securities Act against all of the individual defendants; (4) violations of Section 10(b) against Velti, Cheung, Kaskavelis,

1  Moukas, Ross, Tso, and Baker Tilly; and (5) violations of Section 20(a) of the Exchange Act

2  against Cheung, Kaskavelis, Moukas, Ross, and Tso.  *Id.*

3         On May 23, 2014, Velti, along with Cheung, Negroponte, Ross, and Tso, entered a

4  settlement agreement with plaintiffs.  *See* Dkt. No. 170-2.  I granted preliminary approval of the

5  settlement on August 19, 2014 and final approval on February 3, 2015.  Dkt. Nos. 147, 199.  In

6  addition to Velti, Cheung, Negroponte, Ross, and Tso, the settlement agreement and resulting

7  judgment released the other five Velti officers/directors named in this action – i.e., Goldstein,

8  Hobley, Kaskavelis, Mann, and Moukas – leaving only Baker Tilly and the Underwriters as active

9  defendants.  *See* Dkt. Nos. 199, 200.

10        Plaintiffs filed the ACC on August 12, 2014.  Dkt. No. 144.  The ACC asserts three causes

11  of action relevant here: (i) violations of Section 11 against Baker Tilly and the Underwriters; (ii)

12  violations of Section 12(a)(2) against the Underwriters; and (iii) violations of Section 10(b) against

13  Baker Tilly.  Dkt. No. 44.  Defendants filed their respective motions to dismiss on October 15,

14  2014.  Dkt. Nos. 161, 164.  I heard argument from the parties on February 18, 2015.

15 **III.    REQUESTS FOR JUDICIAL NOTICE**

16        In connection with their motions to dismiss, defendants request judicial notice of a number

17  of documents, including SEC filings, NASDAQ reports of Velti's historical daily stock prices,

18  accounting standards issued by the Financial Accounting Standards Board and the American

19  Institute of Certified Public Accountants, and the May 10, 2012 CFRA report on Velti.  *See* Dkt.

20  Nos. 162, 168, 188, 191.  Plaintiffs ask that I take judicial notice of the documents only for their

21  existence and the existence of their contents, not for the truth of the information contained in them.

22  Opp. 28 n.21.

23        Federal Rule of Evidence 201 authorizes courts to "judicially notice a fact that is not

24  subject to reasonable dispute because it: (1) is generally known within the trial court's territorial

25  jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot

26  reasonably be questioned."  Fed. R. Evid. 201(b).  "[F]acts subject to judicial notice may be

27  considered on a motion to dismiss."  *Mullis v. U.S. Bankr. Court for Dist. of Nevada*, 828 F.2d

28  1385, 1388 (9th Cir. 1987).  In addition, "[a]lthough generally the scope of review on a motion to

United States District Court
Northern District of California

7

dismiss for failure to state a claim is limited to the complaint, a court may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the . . . motion." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation marks omitted). "The court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss." *Marder v. Lopez,* 450 F.3d 445, 448 (9th Cir. 2006) (internal quotation marks omitted).

Because the documents submitted by defendants for judicial notice are either appropriate for judicial notice, incorporated into the ACC, or both, the requests for judicial notice are GRANTED. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, No. 12-cv-06039-WHO, 2013 WL 6441843, at *5 (N.D. Cal. Dec. 9, 2013) (taking judicial notice of SEC filings, NASDAQ reports of historical daily stock prices, accounting standards, and analyst reports); *see also, In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (affirming judicial notice of  SEC filings alleged in plaintiff's complaint even though plaintiff questioned their veracity).  To accommodate plaintiffs' request, and because the truth of the information contained in the documents submitted for judicial notice is not necessary to resolve this motion, I take judicial notice of the documents only for their existence and the existence of their contents, not for the truth of their contents.

## LEGAL STANDARDS

## I.      RULE 12(b)(6): MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint.  *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001).  A complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In considering whether the complaint is sufficient to state a claim, the court accepts as true all factual allegations contained in the complaint.  *Id.*  However, the court need not accept as true "allegations that

United States District Court
Northern District of California

1   contradict matters properly subject to judicial notice." *In re Gilead Scis. Sec. Litig.,* 536 F.3d

2   1049, 1055 (9th Cir. 2008) (internal quotation marks omitted).  "Nor is the court required to accept

3   as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

4   inferences." *Id.*  "[I]t is within [the court's] wheelhouse to reject, as implausible, allegations that

5   are too speculative to warrant further factual development." *Dahlia v. Rodriguez,* 735 F.3d 1060,

6   1076 (9th Cir. 2013).

7   **II.      RULE 9(b): HEIGHTENED PLEADING STANDARD FOR FRAUD OR MISTAKE**

8        Claims sounding in fraud or mistake are subject to the heightened pleading standard of

9   Federal Rule of Civil Procedure 9(b), which requires that such claims "state with particularity the

10  circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  To satisfy this standard, a

11  plaintiff must identify "the time, place, and content of [the] alleged misrepresentation[s]," as well

12  as the "circumstances indicating falseness" or "manner in which the representations at issue were

13  false and misleading." *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1547-48 (9th Cir. 1994)

14  (internal quotation marks and modifications omitted).  "In other words, the plaintiff must set forth

15  an explanation as to why the statement or omission complained of was false or misleading."

16  *Siegel v. Lyons,* No. 95-cv-03588-DLJ, 1996 WL 438793, at *3 (N.D. Cal. Apr. 26, 1996)

17  (internal quotation marks omitted).  The allegations of fraud "must be specific enough to give

18  defendants notice of the particular misconduct which is alleged to constitute the fraud charged so

19  that they can defend against the charge and not just deny that they have done anything wrong."

20  *Swartz v. KPMG LLP,* 476 F.3d 756, 764 (9th Cir. 2007).

21        The Ninth Circuit has held in the securities fraud context that "[a] plaintiff may . . . satisfy

22  Rule 9(b) with allegations of circumstantial evidence if the circumstantial evidence alleged

23  explains how and why the statement was misleading when made." *Fecht v. Price Co.*, 70 F.3d

24  1078, 1083 (9th Cir. 1995).

25                              **DISCUSSION**

26  **I.     SECTION 11 CLAIMS AGAINST BAKER TILLY AND THE UNDERWRITERS**

27        Section 11 creates a private right of action for any purchaser of a security where "any part

28  of the registration statement, when such part became effective, contained an untrue statement of a

United States District Court
Northern District of California

1   material fact or omitted to state a material fact required to be stated therein or necessary to make

2   the statements therein not misleading." 15 U.S.C. § 77k(a).  To prevail on a Section 11 claim, a

3   plaintiff must demonstrate (1) that the registration statement contained a misrepresentation or

4   omission; and (2) that the misrepresentation or omission was material.  *In re Daou Sys., Inc.*, 411

5   F.3d 1006, 1027 (9th Cir. 2005).  A misrepresentation or omission is material where it "would

6   have misled a reasonable investor about the nature of his or her investment."  *Id.*

7         Accountants and underwriters may be held liable under Section 11 for material

8   misrepresentations or omissions in registration statements.  *See Monroe v. Hughes*, 31 F.3d 772,

9   774 (9th Cir. 1994); *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir. 1994); 15 U.S.C. §

10  77k(a)(4)-(5).  When brought against an accountant, a Section 11 claim must be based on "those

11  portions of the [registration] statement that purport to have been prepared or certified by the

12  accountant."  *Monroe*, 31 F.3d at 774.  Section 11 liability does not require a showing of scienter,

13  and defendants will be held liable for innocent or negligent material misrepresentations or

14  omissions.  *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1404 (9th Cir. 1996); *Kaplan v. Rose*,

15  49 F.3d 1363, 1371 (9th Cir. 1994).  However, because Section 11 provides both accountants and

16  underwriters with a "due diligence" defense, *see* 15 U.S.C. § 77k(b), the statute effectively

17  "imposes a negligence standard" for their liability, *Monroe*, 31 F.3d at 774; *see also, Software*

18  *Toolworks*, 50 F.3d at 621.  In most cases, due diligence is a jury question unsuitable for

19  determination on a motion to dismiss.  *See, e.g., In re Morgan Stanley Info. Fund Sec. Litig.*, 592

20  F.3d 347, 359 n.7 (2d Cir. 2010); *Feyko v. Yuhe Int'l, Inc.*, No. 11-cv-05511, 2013 WL 3467067,

21  at *4 (C.D. Cal. July 10, 2013) ("[B]ecause due diligence should generally be reserved for a jury

22  to determine, [plaintiff] has alleged sufficient facts for a Section 11 claim.").

23      **A.**    **Statute of Limitations**

24        Defendants contend that plaintiffs' Section 11 claims are time-barred.  Baker Tilly Mot.

25  18-20; Underwriters Mot. at 20-21.  Section 11 claims must be brought "within one year after the

26  discovery of the untrue statement or the omission, or after such discovery should have been made

27  by the exercise of reasonable diligence."  15 U.S.C. § 77m.  This one year statute of limitations

28  begins to run when the plaintiff discovered or should have discovered the untrue statement or

United States District Court
Northern District of California

1   omission.  *See F.D.I.C. v. Countrywide Fin. Corp.*, No. 12-cv-04354, 2012 WL 5900973, at *3

2   (C.D. Cal. Nov. 21, 2012); *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1082

3   (N.D. Cal. 2010) (noting that "discovery . . . occurs not only once a plaintiff actually discovers the

4   facts, but also when a hypothetical reasonably diligent plaintiff would have discovered them").

5   The statute does not begin to run when the plaintiff merely "should have begun investigating."

6   *Countrywide*, 2012 WL 5900973, at *3; *see also, Merck & Co. v. Reynolds*, 559 U.S. 633, 652-53

7   (2010) (holding for the purpose of Section 10(b)'s limitations period that "the discovery of facts

8   that put a plaintiff on inquiry notice does not automatically begin the running of the limitations

9   period") (internal quotation marks omitted).  A fact is considered "discovered" when "a

10  reasonably diligent plaintiff would have sufficient information about that fact to adequately plead

11  it in a complaint . . . with sufficient detail and particularity to survive a 12(b)(6) motion to

12  dismiss."  *City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir.

13  2011); *see also, Booth v. Strategic Realty Trust, Inc.*, No. 13-cv-04921-JST, 2014 WL 3749759, at

14  *4 (N.D. Cal. July 29, 2014); *Countrywide*, 2012 WL 5900973, at *3.

15          Defendants argue that the statute of limitations on plaintiffs' Section 11 claims began to

16  run in May 2012, when CFRA issued the report stating that Velti's reported DSO accounted only

17  for trade receivables and Velti subsequently announced that it had switched to reporting

18  "comprehensive DSO."  Baker Tilly Mot. 18-20; Underwriters Mot. at 20-21.  Plaintiffs respond

19  that while the May 2012 disclosures revealed that Velti had been excluding accrued contract

20  receivables from its reported DSO, they did not reveal the extent of the problems that Velti had

21  experienced and would continue to experience in collecting its receivables, or that Velti was

22  understating reserves, overstating revenues, and lacked adequate internal controls.  Opp. 40.

23          Courts in this district have held that the determination of "discovery" for the purpose of

24  Section 11's limitations period "is fact intensive and is usually not appropriate at the pleading

25  stage."  *Booth*, 2014 WL 3749759, at *4 (internal quotation marks omitted); *see also, Rafton v.*

26  *Rydex Series Funds*, No. 10-cv-01171-LHK, 2011 WL 31114, at *9 (N.D. Cal. Jan. 5, 2011); *Bare*

27  *Escentuals*, 745 F. Supp. 2d at 1080-81; *see also, Betz v. Trainer Wortham & Co.*, 519 F.3d 863,

28  877 (9th Cir. 2008) (reversing district court's grant of summary judgment for defendants on the

ground that plaintiff's Section 10(b) claims were untimely; stating that "the defendant bears a considerable burden in demonstrating, *at the summary judgment stage*, that the plaintiff's claim is time-barred") (emphasis added).  A defendant seeking to establish, on a motion to dismiss, that a plaintiff's Section 11 claim is time-barred faces an "especially high hurdle."  *Rafton*, 2011 WL 31114, at *10.  "At the pleading stage, the question is whether it is plausible that [the] disclosures were insufficient to supply a reasonably diligent plaintiff with the information necessary to plead the Section 11 claims with sufficient detail and particularity to survive a 12(b)(6) motion."  *Booth*, 2014 WL 3749759, at *6.

In light of the high hurdle to establishing untimeliness at this juncture, the May 2012 disclosures are not enough to completely bar plaintiffs' Section 11 claims.  The CFRA report and the subsequent switch to reporting "comprehensive DSO" made plain that Velti had been excluding accrued contract receivables from it**s** reported DSO.  But neither disclosure made plain the linkages between Velti's method of calculating its reported DSO and its alleged understatement of reserves and overstatement of revenues.  Plaintiffs' Section 11 claims are based primarily on these alleged misrepresentations, not on the undisputed fact that until May 2012, Velti's reported DSO accounted only for trade receivables.

In this way, the instant case is distinguishable from those cited by defendants, in which the disclosures at issue concerned "precisely" the information the defendants had allegedly misrepresented or concealed.  *See, e.g., Freidus v. Barclays Bank PLC*, 734 F.3d 132, 138 (2d Cir. 2013) (affirming district court's dismissal of Securities Act claims as time-barred where the "corrective disclosures provided precisely the information [defendant] should have disclosed earlier such that [plaintiffs] should have discovered their alleged claims on the dates of those disclosures") (internal quotation marks and modifications omitted).  Defendants have not identified any information disclosed in May 2012 that specifically indicated that Velti's reserves or revenues were misrepresented at the time of the IPO or SPO.  The CFRA report did warn that the 4Q 2011 jump in Velti's comprehensive DSO "appear[s] to indicate the presence of lower quality revenues during 4Q 2011" and "could imply rising revenue risk."  Underwriters RJN, Ex. H at 2-3.  But it is not at all clear that these speculative warnings regarding Velti's revenues in 4Q

12

United States District Court
Northern District of California

1  2011 would have supplied a reasonably diligent plaintiff with the information necessary to plead

2  viable Section 11 claims based on alleged misrepresentations of reserves and revenues in Velti's

3  IPO and SPO registration statements, which were issued months earlier, in January and June

4  2011.  Baker Tilly's alleged Section 11 misrepresentations were made even longer before 4Q 2011

5  – i.e., in Baker Tilly's August 2010 and April 2011 audit reports.

6      That said, to the extent plaintiffs' Section 11 claims are based on the allegation that Velti

7  "improperly excluded" accrued contract receivables from its reported DSO, *see* Opp. 27-28, the

8  claims are time-barred.  The CFRA report plainly stated that Velti "only include[d] trade

9  receivables within [its] calculation of DSO."  Underwriters RJN, Ex. H at 4.  According to the

10  ACC, the CFRA report "revealed" that Velti's reported DSO "only included trade receivables and

11  excluded accrued receivables," information that was "digested by the market" and that triggered a

12  significant decline in Velti's stock value.  ACC ¶ 12.  On May 22, 2012, Velti confirmed that the

13  CFRA report was accurate and announced that it had modified its reported DSO to include

14  accrued contract receivables.  ACC ¶¶ 13, 99, 277.  In addition, according to both the ACC and the

15  documents submitted for judicial notice by defendants, the SPO registration statement reported

16  that Velti's DSO was "calculated based on trade receivables."  ACC ¶ 196; Baker Tilly RJN, Ex.

17  C at 71.  In short, by the end of May 2012, Velti's allegedly misleading method of calculating its

18  reported DSO had been explicitly disclosed to the public on at least three different occasions.

19      While defendants face a high hurdle in establishing untimeliness on a motion to dismiss,

20  these facts are sufficient to satisfy that burden with respect to plaintiffs' allegation that Velti's

21  DSO figure was misrepresented in the registration statements.  As in *Freidus v. Barclays Bank*

22  *PLC*, the disclosures in May 2012 and in the SPO registration statement "provided precisely the

23  information" that plaintiffs claim should have been disclosed earlier.  734 F.3d at 138.  In this

24  situation, fact discovery and development of the factual record are not necessary to determine

25  when "discovery" occurred for the purpose of Section 11's limitations period.

26      There is no dispute that defendants were not sued within one year of May 2012.

27  Accordingly, to the extent plaintiffs' Section 11 claims are based on the allegation that Velti's

28  DSO figure was misrepresented in the registration statements, the claims are time-barred and must

1    be DISMISSED WITH PREJUDICE.  As pleaded, there is no indication that plaintiffs can amend

2    the complaint to overcome this defect.  To the extent plaintiffs' Section 11 claims are based on

3    other alleged misrepresentations, defendants' motions to dismiss for untimeliness are DENIED.

**B.    Pleading Standard**

5        The parties dispute whether Rule 8(a) or the heightened pleading standard of Rule 9(b)

6    governs plaintiffs' Section 11 claims.[4]  Although Section 11 does not contain a fraud element,

7    Section 11 claims may nonetheless be subject to Rule 9(b) if the complaint is "grounded in fraud"

8    or "sounds in fraud."  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 885-86 (9th Cir. 2012);

9    *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009).

10       To decide whether a complaint sounds in fraud, a court must "determine, after a close

11   examination of the language and structure of the complaint, whether the complaint alleges a

12   unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of a

13   claim."  *Rubke*, 551 F.3d at 1161.  "Where . . . a complaint employs the exact same factual

14   allegations to allege violations of Section 11 as it uses to allege fraudulent conduct under Section

15   10(b) of the Exchange Act, [the court] can assume that it sounds in fraud."  *Id.*  However, a

16   complaint that neither specifically alleges fraud "nor alleges facts that would necessarily constitute

17   fraud" does not sound in fraud and is not governed by Rule 9(b).  *Vess v. Ciba-Geigy Corp. USA*,

18   317 F.3d 1097, 1105-06 (9th Cir. 2003); *see also, In re Charles Schwab Corp. Sec. Litig.*, 257

19   F.R.D. 534, 545-46 (N.D. Cal. 2009).

20       Plaintiffs have alleged a unified course of fraudulent conduct against both Baker Tilly and

21   the Underwriters.  While plaintiffs attempt to distinguish their Section 11 claims by including a

22   separate section of factual allegations in the ACC entitled, "Securities Act Claims," that section

23   incorporates a number of paragraphs which plaintiffs also use as a basis for their Section 10(b)

24   claims.  *See* ACC ¶¶ 150, 154 (incorporating ACC ¶¶ 156-69, 193-204).  The incorporated

25   paragraphs include the allegation that the "true facts" underlying the "false and misleading"

26   statements in the IPO and SPO registration statements "were known to and/or disregarded with

27

28   ─────────────────
[4] Defendants assert that plaintiffs' Section 11 claims must be dismissed under either pleading
standard but contend that the claims are especially defective under Rule 9(b).

United States District Court
Northern District of California

deliberate recklessness by defendants but concealed from the investing public." ACC ¶¶ 166, 199. The incorporated paragraphs also assert that Baker Tilly "knew [or] was deliberately reckless in not knowing and not disclosing [in the IPO and SPO registration statements] that Velti's financial statements had not been prepared in accordance with GAAP." ACC ¶¶ 169, 204. Elsewhere in the complaint, plaintiffs allege that defendants "engaged in a fraudulent scheme to manipulate [Velti's] financial results," and that, "as a result of this fraudulent scheme, defendants violated the federal securities laws in several ways," including by issuing or causing the issuance of "false and misleading statements . . . in violation of Section 11 . . . of the Securities Act." ACC ¶¶ 62, 64.

These allegations – which intermix plaintiffs' Section 11 and Section 10(b) pleading and squarely accuse both Baker Tilly and the Underwriters of fraudulent conduct in connection with Velti's registration statements – distinguish this case from those cited by plaintiffs. *See, e.g., In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 273 (3d Cir. 2006) (declining to apply Rule 9(b) to Securities Act claims where plaintiff "carefully segregated its allegations of negligence against [certain defendants] from its allegations of fraud against those defendants," thereby creating "a clear conceptual separation in the complaint between claims sounding in negligence and those sounding in fraud"); *In Re Violin Memory Sec. Litig.*, No. 13-cv-05486-YGR, 2014 WL 5525946, at *8 (N.D. Cal. Oct. 31, 2014) (applying Rule 8(a) to Section 11 claims where complaint contained "no allegation that defendants 'knowingly' or 'intentionally' concealed information or made misrepresentations"); *Charles Schwab*, 257 F.R.D. at 545 (applying Rule 8(a) to Section 11 claims where complaint "does not specifically allege fraud," "assiduously avoids use of the word [fraud]," and generally avoids allegations "inherently suggestive of fraud such as that defendants 'knowingly' or 'intentionally' made the misrepresentations alleged").

Plaintiffs contend that despite these allegations, the Section 11 claims in the ACC should not be subject to Rule 9(b). Opp. 18-21. Plaintiffs assert that the allegations regarding the "fraudulent scheme to manipulate [Velti's] financial results" are aimed exclusively at Velti and the individual defendants; thus, "to the extent that the Securities Act claims incorporate allegations of fraud to support claims that Velti's financial statements were false," such allegations do not concern either Baker Tilly or the Underwriters. Opp. 20. This would be a significant point if it

15

1   were supported by the ACC.  However, it is not.  *See Charles Schwab*, 257 F.R.D. at 545 ("In

2   their opposition brief, plaintiffs disclaim any allegation of fraud . . . The substance of the

3   allegations themselves, however, must be examined.").  The allegations in the ACC accuse all

4   defendants of  "engag[ing] in a fraudulent scheme to manipulate [Velti's] financial results" by

5   issuing or causing the issuance of "false and misleading statements . . . in violation of Section 11."

6   ACC ¶¶ 62, 64.  The ACC likewise alleges (in paragraphs incorporated into the "Securities Act

7   Claims" section) that all defendants "kn[ew] and/or disregarded with deliberate recklessness" the

8   false and misleading statements in the registration statements.  ACC ¶¶ 166, 199.  If plaintiffs

9   mean to limit these and similar allegations to Velti and the individual defendants, plaintiffs must

10   include language to that effect in the ACC.

11         Plaintiffs also note that while the Section 11 cause of action incorporates "each and every

12   allegation above," it excludes "those alleging fraud."  ACC ¶ 428.  In light of the rest of the

13   language and structure of the ACC, this and other boilerplate disclaimers included in plaintiffs'

14   allegations do not justify analysis under Rule 8(a).  A plaintiff "cannot escape the requirements of

15   Rule 9(b) by virtue of a general disclaimer that a [Section 11] claim is based on negligence rather

16   than fraud."  *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1278 (E.D. Wash. 2007); *see also, In

17   re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1104 (D. Nev. 1998) (where "overwhelming

18   majority of allegations in the [complaint] concern the fraudulent concealment or misrepresentation

19   of material information," plaintiffs "cannot avoid the more stringent requirements of Rule 9(b) by

20   merely inserting boilerplate language into their complaint stating that [their Securities Act] claims

21   are based in negligence, not fraud"); *Rigel*, 697 F.3d at 885-86.  As currently alleged, plaintiffs'

22   Section 11 claims sound in fraud and are subject to Rule 9(b).[5]

23   _____

24   [5] This is not to say that it is impossible for plaintiffs to bring their Section 11 claims in conjunction
    with their Section 10(b) claims without subjecting the Section 11 claims to Rule 9(b).  Courts

25   regularly apply Rule 8(a) to Section 11 claims brought in the same action as Section 10(b) claims,
    in particular where the Section 11 defendants are not accused of violating Section 10(b).  *See, e.g.,*

26   *Brown v. China Integrated Energy, Inc.*, No. 11-cv-02559, 2012 WL 1129909, at *3-4 (C.D. Cal.
    Apr. 2, 2012); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1162-63 (C.D. Cal.

27   2008); *In re Exodus Commc'ns, Inc. Sec. Litig.*, No. 01-cv-02661-MMC, 2005 WL 1869289, at
    *12 (N.D. Cal. Aug. 5, 2005) ("As a result of the amendments to the complaint, plaintiffs have

28   made sufficiently clear their intent to assert two alternative theories of liability against
    [defendants]: (1) a Section 11 claim based on negligent or innocent misrepresentations or

United States District Court
Northern District of California

**C.      Failure to Adequately Plead Falsity of Alleged Misrepresentations by the Underwriters**

Plaintiffs claim that the Underwriters are liable under Section 11 on the basis of four categories of misrepresentations in the IPO and SPO registration statements: (i) misrepresentations regarding Velti's methodology for calculating reserves and the amount of its reported reserves; (ii) misrepresentations regarding Velti's methodology for ascertaining the collectability of its receivables for the purpose of calculating revenues and the amount of its reported revenues; (iii) misrepresentations that Velti's financial statements conformed with GAAP; and (iv) misrepresentations regarding Velti's DSO figures. *See* Opp. 22.  As stated above, plaintiffs' allegation that Velti's DSO figures were misrepresented fails because it is time-barred.  Plaintiffs' three other theories of Section 11 liability are deficient because the ACC does not adequately plead the falsity of any of the alleged misrepresentations.

**1.      Methodology for Calculating Reserves and the Amount of Reported Reserves**

Plaintiffs identify the following representations in the IPO registration statement regarding Velti's reserves:

Allowance for Doubtful Accounts

We evaluate the collectability of accounts receivable based on a combination of factors; an allowance for doubtful accounts is provided based on estimates developed using standard quantitative measures, which include historical write offs and current economic conditions. We also make a specific allowance if there is strong evidence indicating that the amounts due are unlikely to be collectible. As of September 30, 2010 and December 31, 2009 and 2008, the allowance for doubtful accounts was $135,000 (unaudited), $135,000, and $131,000, respectively.

[ . . . ]

We have not historically incurred bad debt expense, none of our significant customers have historically failed to pay amounts due to us, and we do not believe that any of the customers contributing to our increased accounts receivable aging will fail to pay us in full. Accordingly, we have not determined that any slow-

---

omissions, . . . and (2) a Section 10(b) claim based on fraud.").  To avoid the heightened pleading standard, however, plaintiffs must ensure that their complaint does not sound in fraud.

United States District Court
Northern District of California

paying customers will require an allowance for bad debt against accounts receivable.

ACC ¶¶ 159-60.  The SPO registration statement included similar representations regarding Velti's reserves:

> Allowance for Doubtful Accounts
>
> We evaluate the collectability of accounts receivable based on a combination of factors; an allowance for doubtful accounts is provided based on estimates developed using standard quantitative measures, which include historical write offs and current economic conditions. We also make a specific allowance if there is strong evidence indicating that the amounts due are unlikely to be collectible. The allowance for doubtful accounts was $554,000, $135,000, and $135,000, as of March 31, 2011, and December 31, 2010 and 2009, respectively.
>
> [ . . . ]
>
> We have historically collected all amounts due from our customers, even from those customers with balances with longer aging, as evidenced by our insignificant bad debt expense for 2010, 2009 and 2008. We do evaluate receivables on a customer specific basis and record a reserve based on relevant facts and circumstances as deemed necessary. Accordingly, during the three months ended March 31, 2011 we recorded an increase in the provision for doubtful accounts by $419,000 primarily related to one customer subject to currency control restrictions.

ACC ¶¶ 196-97.

Plaintiffs offer two theories that these statements were false or misleading when made. They first contend that Velti did not actually calculate its reserves "based on estimates developed using standard quantitative measures, which include historical write offs and current economic conditions," as stated in both registration statements.  Opp. 23.  According to plaintiffs, Velti in fact "never had any methodology for calculating its reserves."  *Id.*  Plaintiffs base this claim on an alleged statement by defendant Jeffrey Ross that, before his arrival at Velti in January 2013, "[Velti] had no methodology for calculating or allocating reserves against uncollectible receivables.  Because [Velti's] clients had always eventually paid, the presumption was that they always would."  ACC ¶ 74.

Plaintiffs provide no context for this statement or any supporting factual allegations.  They do not even provide the exact language of the statement, instead paraphrasing it as quoted above.

Moreover, the other allegation that plaintiffs offer in support of their claim that Velti "never had any methodology for calculating its reserves" conflicts with that claim. Plaintiffs point to another statement by Ross – this one made during Velti's Q4 2012 conference call on March 12, 2013 – in which he explains that Velti had decided to increase its reserves because

> [Velti] has had very, very limited experience with bad debts . . . So if you sort of come up with a reserve based on your past experience, it's a rather – it's pretty dang close to nothing . . . I just pressure tested some of the assumptions, took mathematical percentages of balances over certain ages and came up with an amount that I felt more comfortable with, that provided us some cushion, when and if something happens. There wasn't much in the specific area that led me to say, oh my gosh, we have a huge problem. I want a big additional reserve . . . I just thought it was more prudent to have a little bit more cushion with respect to those numbers.

ACC ¶ 367. But this quote does not indicate that Velti had "no methodology" whatsoever for calculating its reserves. Rather, it shows that Velti had a methodology based on certain "assumptions" based on past experience that Ross found insufficient. Ross's statement is additionally deficient because, according to the ACC, Ross did not begin working for Velti until January 2013. This was approximately two years after issuance of the IPO registration statement and approximately one-and-a-half years after issuance of the SPO registration statement. Absent additional details about the content and/or context of Ross's statement, it is not enough to satisfy the pleading requirements of Rule 9(b).

Plaintiffs' second theory that the statements regarding Velti's reserves were false or misleading when made is that, even at the time of the IPO and SPO, Velti's reserves were materially understated. Opp. 23. In support of this theory, plaintiffs point to several allegations in the ACC, including that: (i) the Greek economic crisis began in April 2010, ACC ¶ 8; (ii) Velti admitted on August 20, 2013 that some of the $111 million in receivables being written off were "substantially old" and had been due since before 2012, and that approximately 66 percent of its receivables were from Greece and the Balkans, ACC ¶ 15; (iii) in fall 2012, Velti divested itself of certain receivables for which the DSOs topped 450 days, ACC ¶ 338; (iv) also in fall 2012, Velti reclaimed from third parties $5.1 million in factored receivables that remained unpaid, ACC ¶ 323; and (v) Deloitte was able to swiftly determine in summer 2013 that many of Velti's receivables

United States District Court
Northern District of California

needed to be written off.  Opp. 23-24.

"[U]nderstatement of bad debt reserves can be a form of securities fraud."  *Kane v. Madge Networks N.V.*, No. 96-cv-20652-RMW, 2000 WL 33208116, at *5 (N.D. Cal. May 26, 2000).  This is because understatement of bad debt reserves "lead[s] to overstatement of income, and ultimately inflation of stock price."  *Id.*  However, the Ninth Circuit has recognized that the calculation of such reserves is "based on flexible accounting concepts, which, when applied, do not always (or perhaps ever) yield a single correct figure."  *GlenFed*, 42 F.3d at 1549.  Accordingly, it is not enough to merely plead that bad debt reserves turned out to be inadequate.  *See, e.g., NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, No. 10-cv-00440, 2012 WL 3191860, at *10 (S.D.N.Y. Feb. 9, 2012) ("[T]he mere fact that [defendant's] predicted loan loss reserves turned out to be insufficient some time after they were made does not render those figures false at the time that they were publicly filed with the SEC."); *In re Loewen Grp. Inc.*, No. 98-cv-06740, 2004 WL 1853137, at *12 (E.D. Pa. Aug. 18, 2004) ("Neither the increase in allowance toward the end of the class period nor the eventual financial ruin of [the corporate defendant] are proof that defendants committed any acts worse than mismanagement.") (internal modifications omitted).  Instead, a plaintiff must set forth facts demonstrating that the reserves figure was "a falsehood."  *GlenFed*, 42 F.3d at 1549.  A plaintiff "may need to draw on contemporaneous statements or conditions to make this demonstration."  *Id.*

Whether pleading under Rule 8(a) or under Rule 9(b), a plaintiff alleging a Section 11 violation on the basis of misstated bad debt reserves must also plead subjective falsity.  Where an alleged misrepresentation is an opinion, as opposed to a statement of fact, it is only actionable under Section 11 where "the complaint alleges . . . that [it was] both objectively and subjectively false or misleading."  *Rubke*, 551 F.3d at 1162; *see also, City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, No. 12-cv-06039-WHO, 2013 WL 6441843, at *13 (N.D. Cal. Dec. 9, 2013).

Subjective falsity means the person who gave the opinion believed it was false or misleading at the time it was given.  *See Rubke*, 551 F.3d at 1162.  The Ninth Circuit has not considered whether a statement of bad debt reserves qualifies as an opinion for the purposes of

20

Section 11.  However, in *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011), the Second Circuit concluded that a determination of loan loss reserves is an opinion, reasoning that loan loss reserves "reflect management's opinion or judgment about what, if any, portion of amounts due on the loans ultimately might not be collectible." *Id.* at 113.  The court accordingly held that for an alleged misrepresentation "regarding the adequacy of loan loss reserves to give rise to liability under [Section 11], [a] plaintiff must allege that [the] defendant's opinions were both false and not honestly believed when they were made." *Id.*; *accord, Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 495 (S.D.N.Y. 2013); *NECA-IBEW*, 2012 WL 3191860, at *12.

Plaintiffs here have adequately alleged subjective falsity, *see, e.g.,* ACC ¶¶ 166, 199, but the facts stated in the ACC are not sufficient under Rule 9(b) to show that Velti's reserves were objectively false or misleading in either of the registration statements.  Courts have held that claims based on misstated bad debt reserves are insufficiently alleged where they: (i) do not identify any specific accounts that were in jeopardy when the alleged misrepresentations were made, *Siegel v. Lyons*, No. 95-cv-03588-DLJ, 1996 WL 438793, at *5 (N.D. Cal. Apr. 26, 1996); *see also, Stack v. Lobo*, 903 F. Supp. 1361, 1369 (N.D. Cal. 1995); (ii) do not identify any specific accounts in existence at the time the alleged misrepresentations were made that were ultimately rendered uncollectible, *Kane*, 2000 WL 33208116, at *6; and (iii) fail to provide "details about . . . when and to what level the allowance should have been changed," *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 823 (S.D. Cal. 2006); *see also, Loewen*, 2004 WL 1853137, at *11.

The ACC pleads none of these things.  Plaintiffs do not identify a single receivable that was in jeopardy of becoming uncollectible when the IPO and SPO registration statements were issued, nor any receivable that existed then and was ultimately written off, either following Deloitte's audit or at any other time.[6]

---

[6] Plaintiffs assert that they do identify specific uncollectible receivables, in that they allege that Deloitte determined that the ten customers who accounted for 65 percent of the receivables in Greece and Cyprus were primarily comprised of two entities, the VTRIP Group and the Globo

21

United States District Court
Northern District of California

1       Nor do plaintiffs state when and to what extent Velti's reserves should have been increased.

2  With the exception of the Greek economic crisis beginning in April 2010, each of the allegations

3  highlighted by plaintiffs concerns an event that occurred months, if not years, after the registration

4  statements were issued.  There are no allegations of "contemporaneous statements or conditions"

5  specific to defendants or anyone else associated with Velti that show that Velti's reserves were

6  understated at the time the registration statements were issued.[7]  *See GlenFed*, 42 F.3d at 1549.

7  The allegations that in fall 2012 Velti (i) divested itself of certain receivables with DSOs topping

8  450 days and (ii) reclaimed from third parties $5.1 million in factored receivables do indicate that

9  there were receivables which Velti acquired in 2011 and 2012 which had not yet been paid by fall

10  2012.  But it does not necessarily follow that these receivables were so evidently uncollectible in

11  January and June 2011 that Velti's reported reserves constituted "a falsehood" at that time.

12       Similarly, because the $111 million write down occurred more than two years after the IPO

13  and SPO, that the write down occurred is not a sufficient indicator of how or why the reserve

14  figures in the registration statements were misleading when made.  Although plaintiffs vaguely

15  allege that some of the written off receivables were "substantially old" and had been due since

---

Group.  Opp. 27; ACC ¶¶ 132, 132 n.13.  However, plaintiffs do not state that any of these accounts receivable existed – much less that they appeared uncollectible – at the time the registration statements were issued.

Plaintiffs' contention that defendants improperly rely on cases analyzed under both Rule 9(b) and the PSLRA is also unconvincing.  *See* Opp. 24 n.18.  Under the PSLRA, "to properly allege falsity, a securities fraud complaint must . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement . . . is made on information and belief, . . . state with particularity all facts on which that belief is formed."  *Zucco Partners*, 552 F.3d at 990-91 (internal quotation marks omitted).  Whatever differences exist between pleading falsity under Rule 9(b) and doing so under the PSLRA, plaintiffs offer no explanation as to why such differences are material here.

[7] This failure to plead contemporaneous facts distinguishes this case from the two cited by plaintiffs.  In *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314 (S.D.N.Y. 2001), plaintiffs alleged that the corporate defendant had a history of uncollectible receivables at the time the misrepresentations were made.  *Id.* at 318-20.  Similarly, in *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002), defendants were accused of failing to set adequate reserves for "contingent sales" for which defendants knew, "from the get go," that they would not recover the full sale price.  *Id.* at 75-77.

United States District Court
Northern District of California

1  "before 2012," plaintiffs do not allege that any of the receivables had been due since January or

2  June 2011, much less that evidence existed at that time that the receivables were uncollectible.

3         Meanwhile, plaintiffs' own allegations indicate that Velti's accounts receivable woes did

4  not develop until Q4 2011, after both registration statements had been issued.  The ACC states that

5  between December 31, 2010 (a month before the IPO) and June 30, 2011 (two weeks after the

6  SPO), Velti reduced its receivables from $72.7 million to $66 million.  ACC ¶ 128.  By September

7  30, 2011, Velti had increased its receivables to $79 million, but it was not until December 31,

8  2011, nearly one year after the IPO and several months after the SPO, that receivables jumped to

9  $170 million.  *Id.*   Plaintiffs also fail to specifically allege any collectability problems earlier than

10  Q1 2012 except to vaguely allude to the onset of the Greek economic crisis in April 2010.

11  Plaintiffs' confidential witness joined Velti in June 2011 yet stated that it was not until "sometime

12  in Q1 2012" that he or she "began to hear that . . . [Velti] was having trouble collecting

13  receivables."  ACC ¶ 119.

14         In sum, the allegations in the ACC fall short under Rule 9(b) of adequately pleading the

15  falsity of any representations in the registration statements regarding Velti's methodology for

16  calculating reserves and the amount of its reported reserves.[8]

17

18

19

20  _____

21  [8] Defendants also argue compellingly that plaintiffs' allegations of misstated reserves in the IPO
    and SPO registration statements fail to state a claim even under Rule 8(a).  *See, e.g., Panther*
22  *Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 670-73 (S.D.N.Y. 2008) (dismissing
    Section 11 claim arising from defendants' alleged failure to disclose product defect where "the
23  allegations have been craftily drafted to imply that what only became clear due to subsequent
    events was somehow known to [defendants] far earlier in time, well before the confirming event
24  occurred or other evidence came to light," but "[n]o plausibly pleaded fact suggests that
    [defendants] knew or should have known of the scope or magnitude of the defect problem at the
25  time of the [offering]"); *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690-91 (S.D.N.Y.
    2004) ("That defendants . . . decided to revise the amount of loan loss reserves that [they] deemed
26  adequate [just three weeks after their IPO] provides absolutely no reasonable basis for concluding
    that defendants did not think reserves were adequate at the time the registration statement and
27  prospectus became effective.").  Because I find that plaintiffs' Section 11 claims as currently
    pleaded are governed by Rule 9(b), I do not address that argument here.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2. Methodology for Ascertaining the Collectability of Receivables for the Purpose of Calculating Revenues and the Amount of Reported Revenues

Plaintiffs assert that the IPO and SPO registration statements falsely reported that Velti only recognized revenue from its receivables when their "collectability [was] reasonably assured." Opp. 14; ACC ¶¶ 158, 195. According to plaintiffs, Velti in fact recognized revenue from its receivables even when their collectability was not reasonably assured. Opp. 14. This claim is based on the same after-arising alleged facts that plaintiffs offer in support of their claim that the registration statements misrepresented Velti's methodology for calculating reserves and the amount of its reported reserves. *See, e.g.,* Opp. 26-27 ("[T]he same alleged facts about the reserves support an inference that the revenue was not collectible to begin with."). Accordingly, it fails for the same reasons.

### 3. Conformance with GAAP

Because the alleged misrepresentations in the registration statements regarding whether Velti's financial statements complied with GAAP are dependent on the failure to properly report reserves and revenues, these claims are also deficient. *See Fait*, 655 F.3d at 113 ("Plaintiff's remaining allegations related to SOX, GAAP, and GAAS are essentially derivative of his primary allegations regarding goodwill and loan loss reserves . . . [C]onsistent with our conclusion that the complaint does not adequately allege that defendants misstated or omitted material facts regarding goodwill or loan loss reserves, these allegations also fail to state a claim.").

### D. Failure to Adequately Plead Falsity of Alleged Misrepresentations by Baker Tilly

As noted above, Baker Tilly may only be held liable under Section 11 for misrepresentations or omissions contained in "those portions of the [registration] statement[s] that purport to have been prepared or certified by [Baker Tilly]." *Monroe*, 31 F.3d at 774. Thus, the only portions of the registration statements relevant to Baker Tilly's liability under Section 11 are its audit reports concerning Velti's financial statements from 2008-2009 (in the IPO registration statement) and 2008-2010 (in the SPO registration statement). The audit report in the IPO registration statement is dated August 3, 2010; the audit report in the SPO registration statement is

24

dated April 11, 2011.  Plaintiffs contend that they have adequately alleged that the audit reports

contained material misrepresentations because the reports (i) misrepresented that Velti's financial

statements complied with GAAP; (ii) misrepresented that Baker Tilly had complied with GAAS;

and (iii) misrepresented Velti's financial condition "in several non-GAAP ways."  Opp. 30.

Plaintiffs' first and second theories fail for the reasons stated above regarding Velti's

reported reserves and revenues when the registration statements were issued.  *See* Opp. 30

("Velti's financial statements did not comply with GAAP [because they] did not provide for

adequate reserves, which in turn inflated revenues.").  Plaintiffs have not alleged sufficient facts

indicating that Velti's reported reserves or revenues were false or misleading at that time.

Accordingly, plaintiffs' claim that Velti's financial statements did not comply with GAAP

(because they failed to properly calculate reserves or revenues) or that Baker Tilly failed to

comply with GAAS are also deficient.  *See Fait*, 655 F.3d at 113.

Plaintiffs' "non-GAAP" theories are based on allegations that when the IPO and SPO

registration statements were issued, Velti was misrepresenting its DSO figures and lacked

adequate internal controls.  Opp. 30.  As I found earlier, plaintiffs' Section 11 claim that Velti's

DSO figures were misrepresented is time-barred.  Further, even if the statute of limitations had not

expired, plaintiffs have not alleged that Velti's DSO figures were included in the financial

statements that were the subject of Baker Tilly's audit reports.  Plaintiffs' reliance on alleged

misrepresentations regarding Velti's lack of internal controls is also without merit, as this claim is

duplicative of plaintiffs' claims that Velti's reserves, revenues, and DSO were misrepresented in

the registration statements.  *See Fait v. Regions Fin. Corp.*, 712 F. Supp. 2d 117, 125 (S.D.N.Y.

2010) (dismissing Section 11 claim based on representations regarding "the effectiveness of

[defendant's] internal controls" where claim was "duplicative of plaintiff's claims for

misstatements of goodwill and loan loss reserves," which were also deficient); *see also, In re

Seracare Life Sciences, Inc.*, No. 05-cv-02335, 2007 WL 935583, at *13 (S.D. Cal. Mar. 19,

2007).

Because plaintiffs have failed to adequately plead the falsity of any material

misrepresentation or omission in either of Velti's registration statements, plaintiffs' Section 11

1   claims against both Baker Tilly and the Underwriters are DISMISSED WITH LEAVE TO

2   AMEND.

3   **II.    SECTION 12(a)(2) CLAIMS AGAINST THE UNDERWRITERS**

4   Plaintiffs bring Section 12(a)(2) claims against the Underwriters.  Sections 11 and 12(a)(2)

5   are "Securities Act siblings" with similar elements.  *In re Morgan Stanley Info. Fund Sec. Litig.*,

6   592 F.3d 347, 359 (2d Cir. 2010).  "To plead a claim under Section 12(a)(2), the plaintiff must

7   allege that (1) the defendant is a statutory seller; (2) the sale was effected by means of a prospectus

8   or oral communication; and (3) the prospectus or oral communication contained a material

9   misstatement or omission."  *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-00302,

10  2011 WL 4389689, at *8 (C.D. Cal. May 5, 2011); *see also,* 15 U.S.C. § 77l(a)(2).

11  In addition to the arguments discussed above regarding the statute of limitations and

12  plaintiffs' failure to plead falsity under Rule 9(b) – which apply equally to plaintiffs' Section

13  12(a)(2) claims – the Underwriters argue that the Section 12(a)(2) claims must be dismissed

14  because plaintiffs have not established that they have standing to bring a claim under the statute.  I

15  disagree with that argument.

16  A plaintiff has standing to bring a Section 12(a)(2) claim only against a "statutory seller"

17  from which the plaintiff purchased the security at issue.  *In re Lehman Bros. Sec. & Erisa Litig.*,

18  799 F. Supp. 2d 258, 310 (S.D.N.Y. 2011); *see also, Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d

19  336, 344 (2d Cir. 1987) (noting that Section 12 "imposes liability on persons who offer or sell

20  securities and only grants standing to the person purchasing such securit[ies] from them") (internal

21  quotation marks omitted).  A "statutory seller" is "one who either transferred title to the purchaser

22  or successfully solicited [the purchase] for financial gain."  *Tsereteli v. Residential Asset*

23  *Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 391 (S.D.N.Y. 2010); *see also, Mallen v.*

24  *Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1131 (S.D. Cal. 2012) (noting that Section 12

25  "encompasses both direct sellers who pass title of the subject securities and indirect sellers who

26  'successfully solicit the purchase, motivated at least in part by a desire to serve their own financial

27  interests or those of the securities owner.'") (quoting *Pinter v. Dahl,* 486 U.S. 622, 644 n.21, 647

28  (1988)).

United States District Court
Northern District of California

"Purchasers in private or secondary market offerings do not have standing to bring actions under [Section 12(a)(2)]." *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 693 (S.D.N.Y. 2000). Courts have thus distinguished between allegations that a plaintiff purchased a security "pursuant or traceable to" a registration statement or similar document, and allegations that a plaintiff purchased a security "pursuant to" the document. While the latter allegation is sufficient to establish standing under Section 12(a)(2), the former is not. *See, e.g., Maine State*, 2011 WL 4389689, at *11; *Lehman*, 799 F. Supp. 2d at 311; *Tsereteli*, 692 F. Supp. 2d at 391 ("Plaintiffs likely would not have standing had they alleged only that they purchased the Certificates 'pursuant or traceable to' the Offering Documents . . . The amended complaint, however, alleges that plaintiffs purchased the Certificates 'pursuant to the Offering Documents.'"); *Ultrafem*, 91 F. Supp. 2d at 693-94.

Here, plaintiffs allege that plaintiff Frank Borreani "purchased Velti common stock pursuant to and traceable to [Velti's] January 28, 2011 IPO registration statement" and that plaintiff St. Paul Retirement Teachers' Retirement Fund Association "purchased Velti common stock pursuant to and traceable both to (i) [Velti's] January 28, 2011 IPO registration statement, and (ii) [Velti's] June 14, 2011 SPO registration statement." ACC ¶¶ 33-34. Plaintiffs additionally allege that "St. Paul, Borreani, and other members of the class purchased or otherwise acquired Velti common stock issued in the IPO and SPO pursuant to materially inaccurate registration statements." ACC ¶ 445. These allegations are sufficient to show that plaintiffs purchased their Velti securities in a public offering as opposed to on the aftermarket. *See Maine*, 2011 WL 4389689, at *11.

The parties also dispute whether plaintiffs have adequately alleged that the Underwriters qualify as statutory sellers. Plaintiffs allege that the Underwriters qualify as statutory sellers because they "(i) transferred title to St. Paul, Borreani, and/or other members of the class who purchased in the IPO and SPO; and (ii) solicited the purchase of the common stock by St. Paul, Borreani, and other members of the class and were financially benefitted thereby, including but not limited to by receiving underwriting fees, commissions, or discounts in connection with the IPO and SPO." ACC ¶ 442. This allegation is enough at the pleading stage to establish that the

United States District Court
Northern District of California

1  Underwriters are statutory sellers.

2       The plaintiffs cite several cases that support this view.  *See, e.g., In re MF Global Holdings*

3  *Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 323 (S.D.N.Y. 2013) (allegations that certain named

4  plaintiffs "purchased or otherwise acquired" relevant securities from underwriter defendants were

5  "sufficient to establish standing against the underwriters . . . for the purpose of withstanding a

6  motion to dismiss"); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 399 (S.D.N.Y. 2007)

7  (plaintiffs adequately alleged that underwriter defendants solicited sales where complaint stated

8  that they "issued or sold" the securities at issue and that "plaintiffs purchased the securities in the

9  [o]fferings").  These cases are persuasive and I decline to hold that plaintiffs must plead additional

10 facts regarding the Underwriters' participation in the sales of Velti securities in the IPO and SPO

11 to survive a motion to dismiss.  "Should it become apparent . . . during discovery that plaintiffs

12 cannot prove direct purchases from certain individual underwriters, those underwriters will have

13 the opportunity to seek judgment as a matter of law in a motion for summary judgment."  *MF*

14 *Global Holdings*, 982 F. Supp. 2d at 324.

15      That said, because the ACC does not plead the falsity of any material misrepresentation or

16 omission in either of Velti's registration statements, plaintiffs' Section 12(a)(2) claims against the

17 Underwriters are DISMISSED WITH LEAVE TO AMEND.

18 **III.     SECTION 10(b) CLAIMS AGAINST BAKER TILLY**

19      Section 10(b) of the Exchange Act makes it unlawful "for any person . . . [t]o use or

20 employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive

21 device or contrivance in contravention of such rules and regulations as the Commission may

22 prescribe as necessary or appropriate in the public interest or for the protection of investors." 15

23 U.S.C. § 78j(b).  Rule 10b-5, promulgated under the authority of Section 10(b), makes it unlawful

24      (a) To employ any device, scheme, or artifice to defraud,

25
26      (b) To make any untrue statement of a material fact or to omit to state a material
        fact necessary in order to make the statements made, in the light of the
        circumstances under which they were made, not misleading, or
27
28      (c) To engage in any act, practice, or course of business which operates or would
        operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  The basic elements of a Section 10(b) claim are: (i) a material misrepresentation or omission; (ii) a connection with the purchase or sale of a security; (iii) scienter; (iv) economic loss; and (v) loss causation, i.e., a causal connection between the material misrepresentation or omission and the economic loss.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Under the PSLRA, a plaintiff alleging a Section 10(b) claim must "plead with particularity both falsity and scienter."  *Zucco*, 552 F.3d at 990.

Plaintiffs allege a Section 10(b) class period that begins on January 27, 2011 and ends on August 20, 2013.  *See* ACC ¶ 1.  There is no dispute that throughout that time period, Velti's SEC filings included Baker Tilly's audit opinions on Velti's 2008 to 2012 financial statements.  *See* Baker Tilly Mot. 21.  Plaintiffs accuse Baker Tilly of fraudulently issuing clean audit opinions on these financial statements, thereby "falsely assur[ing] investors that [the] financial statements fairly reflected [Velti's] financial condition and were prepared in compliance with GAAP."  Opp. 43.

Baker Tilly argues that the Section 10(b) allegations in the ACC are deficient under Rule 9(b) and the PSLRA because they do not adequately plead either falsity or scienter.  Baker Tilly Mot. 20-24.  I agree.

The PSLRA imposes "exacting requirements" for pleading falsity.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).  The complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why the statements were false, does not satisfy this standard.  *Metzler*, 540 F.3d at 1070.  As under Rule 9(b), a plaintiff seeking to plead falsity under the PSLRA generally must identify "specific contemporaneous statements or conditions that demonstrate the

29

United States District Court
Northern District of California

1  intentional or the deliberately reckless false or misleading nature of the statements when made."

2  *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001).

3        To the extent plaintiffs' Section 10(b) claims are based on Baker Tilly's audit reports on

4  Velti's 2008 through 2010 financial statements – which were included in the IPO and SPO

5  registration statements – the claims fail to adequately plead the falsity of any alleged

6  misrepresentation for the reasons stated above regarding plaintiffs' Section 11 claims.  To the

7  extent plaintiffs' Section 10(b) claims are based on Baker Tilly's audit reports on Velti's 2011

8  through 2012 financial statements, the claims are deficient for the same reasons: the facts alleged

9  in the ACC are not sufficient under either Rule 9(b) or the PSLRA to show that any of the

10  misrepresentations alleged in the reports were false or misleading when made.

11        Although plaintiffs do not provide a clear explanation in either the ACC or their opposition

12  brief, their core theory regarding the reports appears to be the same as regarding the IPO and SPO

13  registration statements – i.e., that the reports were false and misleading because Velti's reserves

14  were materially understated when the reports were made.  *See, e.g.*, Opp. 7-8, 43.  Accordingly, to

15  adequately plead falsity, plaintiffs must allege specific facts demonstrating how and why Velti's

16  reserves were understated at those times.

17        Plaintiffs have not done so.  I assume that plaintiffs mean to rely on the same allegations

18  which they highlight in attempting to show the falsity of Velti's reserves in 2009 and 2010.  To

19  reiterate, those allegations include that: (i) the Greek economic crisis began in April 2010, ACC ¶

20  8; (ii) Velti admitted on August 20, 2013 that some of the $111 million in receivables being

21  written off were "substantially old" and had been due since before 2012, and that approximately

22  66 percent of its receivables were from Greece and the Balkans, ACC ¶ 15; (iii) in fall 2012, Velti

23  divested itself of certain receivables for which the DSOs topped 450 days, ACC ¶ 338; (iv) also in

24  fall 2012, Velti reclaimed from third parties $5.1 million in factored receivables that remained

25  unpaid, ACC ¶ 323; and (v) Deloitte was able to swiftly determine in summer 2013 that many of

26  Velti's receivables needed to be written off.  Opp. 23-24.

27        Given the greater proximity in time, these allegations carry more force with respect to

28  Velti's 2011 and 2012 reserves than with respect to the 2009 and 2010 reserves.  But they are still

United States District Court
Northern District of California

not enough to demonstrate falsity with the particularity required under Rule 9(b) and the PSLRA. Plaintiffs do not specifically identify which allegations in the ACC indicate the falsity of Velti's reserves in 2011 and 2012.  *See* Opp. 42-50.  That some of the receivables written off in summer 2013 were "substantially old" and had been due since "before 2012" does not translate to an explanation of how and why Velti's reserves were understated during the relevant time period. Likewise, Velti's decisions to divest certain aging receivables and to reclaim $5.1 million in factored receivables in fall 2012 indicate that Velti was experiencing collectability problems around that time, but they give little indication as to how and why Velti's reserves were understated.  As discussed above with regard to plaintiffs' Securities Act claims, missing from the ACC are any allegations regarding specific accounts that were in jeopardy when the alleged misrepresentations were made, specific accounts in existence at the time the alleged misrepresentations were made that were ultimately rendered uncollectible, and when and to what extent Velti's reserves should have been changed.  *See Alaska*, 434 F. Supp. 2d at 823; *Loewen*, 2004 WL 1853137, at *11; *see also, Daou*, 411 F.3d at 1016 (noting that "[w]hen pleading irregularities in revenue recognition, plaintiffs should allege . . . such basic details as the approximate amount by which revenues and earnings were overstated . . .").

Plaintiffs must plead more than generalized allegations about collectability problems and that Velti's reserves ultimately proved inadequate to show that reserves were misrepresented at the time that Baker Tilly issued its audit reports.  This is especially so given that, according to plaintiffs' own allegations, Velti increased its reserves substantially during the relevant time period.  Plaintiffs allege that Velti's receivables grew from $72.7 million in Q4 2010 to $291 million in Q4 2012, while its comprehensive DSO grew from 261 days in Q4 2011[9] to 311 days in Q4 2012.  ACC ¶ 128.  During that same time period, however, Velti increased its reserves from $135,000 as of December 31, 2010 to $8 million as of December 31, 2012, an increase of nearly 6,000 percent.  ACC ¶ 375.  Velti increased its reserves again in Q1 2013, this time to $10.1 million.  ACC ¶ 393.  These reserves turned out to be enormously insufficient.  But in light of

---

[9] Q4 2011 appears to be the earliest quarter for which a comprehensive DSO figure is available. *See* ACC ¶ 128.

Velti's apparent attempts to account for its increasing stock of outstanding receivables and growing collectability problems, its reserves figures in 2011 and 2012 are not "falsehood[s]" on their face. *GlenFed*, 42 F.3d at 1549. To show that they were, plaintiffs must plead additional specific facts; in particular, plaintiffs must plead "specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature" of the reserves figures when reported. *Ronconi*, 253 F.3d at 432.

"[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." *Daou*, 411 F.3d at 1015; *see also, Ronconi*, 253 F.3d at 429 ("Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual pleading requirements of 15 U.S.C. §§ 78u–4(b)(1) and (b)(2) into a single inquiry."). The above analysis is focused on falsity but applies also to scienter. As plaintiffs have not alleged sufficient facts to satisfy either requirement, the Section 10(b) cause of action is DISMISSED WITH LEAVE TO AMEND.

## IV.    ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

On October 3, 2014, I issued an order denying without prejudice the administrative motion to file under seal portions of the ACC, and giving the Settling Defendants (i.e., Velti, Cheung, Negroponte, Ross, and Tso) until October 24, 2014 to file a revised declaration establishing compelling reasons to justify sealing. Dkt. No. 159. On October 15, 2014, Baker Tilly and the Underwriters filed their respective motions to dismiss and sought to seal those portions of their motions that reference the portions of the ACC that had been filed under seal. Dkt. Nos. 160, 163. Baker Tilly and the Underwriters made clear that the only basis for sealing their motions was that the Settling Defendants still had time to submit a revised declaration justifying sealing of the ACC. *See id.*

The Settling Defendants did not file a revised declaration by October 24, 2014 or at any time since then. Accordingly, Baker Tilly and the Underwriters' sealing motions, Dkt. Nos. 160, 163, are DENIED. Plaintiffs' sealing motions, Dkt. Nos. 182, 183, are also DENIED. The Clerk shall UNSEAL the ACC, Dkt. No. 144, as well as each of the parties' sealing motions, Dkt. Nos.

160, 163, 182, 183.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are GRANTED WITH LEAVE TO AMEND except that to the extent plaintiffs' Section 11 claims are based on the allegation that Velti's DSO figure was misrepresented in the registration statements, those claims are time-barred and are DISMISSED WITH PREJUDICE.  All sealing motions filed in conjunction with defendants' motions to dismiss are DENIED.  Plaintiffs shall file an amended complaint within 30 days of the date of this order.

**IT IS SO ORDERED**.

Dated: February 27, 2015

WILLIAM H. ORRICK
United States District Judge