THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (168562)
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone:  (858) 794-1441
Facsimile:  (858) 794-1450
kah@weiserlawfirm.com

*Lead Counsel for Plaintiffs*

[*Additional Counsel on Signature Page*]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re VELTI PLC SECURITIES LITIGATION ) | Master File No. 3:13-cv-03889-WHO |
| ) | |
| ) | Consolidated with Case Nos. |
| ) | 13-cv-03954-WHO |
| ) | 13-cv-04140-WHO |
| ) | 13-cv-04606-WHO |
| _____ ) | |
| This Document Relates To: ) | **SECOND AMENDED CONSOLIDATED** |
| ) | **COMPLAINT FOR VIOLATIONS OF** |
| All Actions ) | **THE SECURITIES ACT OF 1933 AND** |
| ) | **THE SECURITIES EXCHANGE ACT OF** |
| ) | **1934** |
| ) | |
| ) | CLASS ACTION |
| _____ ) | |

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION AND FACTUAL BACKGROUND ....................................................1

II.  JURISDICTION AND VENUE .....................................................................................13

III.  INTRADISTRICT ASSIGNMENT................................................................................14

IV.  PARTIES .......................................................................................................................14

V.  THE FRAUD AT VELTI ...............................................................................................17

    A.  Velti's Accounting Misrepresented the Company's Financial Results ................17

        1.  Applicable Standards .................................................................17

        2.  Velti Violated GAAP by Failing to Record an Adequate
            Allowance for Doubtful Accounts ...............................................18

        3.  Velti's Accrued Contract Receivables .......................................22

        4.  Velti Violated Its Own Revenue Recognition Policy ................24

VI.  DEFENDANTS VIOLATED THE SECURITIES ACT.................................................24

    A.  The IPO.................................................................................................26

    B.  The SPO.................................................................................................35

VII.  BAKER TILLY VIOLATED THE EXCHANGE ACT .................................................41

    A.  Baker Tilly Made False and Misleading Statements ............................................42

    B.  Baker Tilly's Statements Were Knowingly or Recklessly False and
        Misleading.................................................................................................49

        1.  Red Flags .................................................................................50

        2.  Baker Tilly's Audits.................................................................53

            i.  Accrued Receivables.................................................54

            ii.  Concentration of Credit Risk ....................................55

            iii.  Velti's Lack of a Formula for Reserves......................55

            iv.  Internal Controls .......................................................55

            v.  Access to Documents.................................................56

        3.  Deloitte's Review.................................................57

**TABLE OF CONTENTS**

**Page**

C. Additional Allegations of Baker Tilly's Scienter ..................................59

   1. SpinCo...........................................................................................59

   2. Velti's DSO Number Prior to May 2012 ...................................61

   3. The Company's Collection Problems Were Apparent..............61

D. The Greek and Cypriot Economic Crises Cannot Excuse Baker Tilly .................65

VIII. THE CLASS PERIOD ENDING DISCLOSURES..........................................67

IX. LOSS CAUSATION............................................................................................68

X. SCIENTER ...........................................................................................................69

XI. UNDISCLOSED ADVERSE FACTS................................................................69

XII. APPLICABILITY OF PRESUMPTION OF RELIANCE WITH RESPECT TO EXCHANGE ACT CLAIMS ...........................................................................70

XIII. NO SAFE HARBOR ..........................................................................................72

XIV. CLASS ACTION ALLEGATIONS ...................................................................72

XV. CLAIMS FOR RELIEF.......................................................................................74

COUNT I ............................................................................................................74

COUNT II ..........................................................................................................76

COUNT III .........................................................................................................78

PRAYER FOR RELIEF ...........................................................................................80

1       Lead Plaintiff Bobby Yadegar/Ygar Capital LLC and additional plaintiffs Frank

2   Borreani, St. Paul Teachers' Retirement Fund Association, Newport News Employees'

3   Retirement Fund and Oklahoma Firefighters Pension and Retirement System (collectively

4   "Plaintiffs"), by and through their attorneys, allege the following upon information and belief,

5   except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.

6   Plaintiffs' information and belief is based upon, among other things, their counsel's

7   investigation, which includes without limitation, a review and analysis of: (a) regulatory filings

8   made by Velti plc ("Velti" or the "Company"), with the United States Securities and Exchange

9   Commission ("SEC"); (b) interviews with and documents produced by the Settling Defendants

10  (defined herein);[1] (c) research reports by financial analysts; (d) transcripts of investor conference

11  calls; (e) press releases and media reports issued by and disseminated by Velti; (f) other publicly

12  available information concerning Velti; and (g) documents and information obtained by Lead

13  Counsel from former Velti employees through the course of Lead Counsel's investigation.  Lead

14  Counsel's investigation into the factual allegations contained herein is continuing, and many of

15  the relevant facts are known only by Defendants (defined herein) or are exclusively within their

16  custody or control.  Plaintiffs believe that substantial additional evidentiary support will exist for

17  the allegations set forth herein after a reasonable opportunity for further investigation or

18  discovery.

19  **I.     INTRODUCTION AND FACTUAL BACKGROUND**

20      1.     This is a securities class action on behalf of: (1) persons or entities who purchased

21  or otherwise acquired the securities of Velti pursuant and/or traceable to the Company's

22  registration statement and prospectus (the "IPO Registration Statement") issued in connection

23  with the Company's January 28, 2011 initial public offering (the "IPO") and/or to the

24  Company's registration statement and prospectus (the "SPO Registration Statement") issued in

---

[1]   Counsel for Plaintiffs interviewed: 1) David W. Mann ("Mann") and David C. Hobley ("Hobley"), members of the Company's Audit Committee; 2) Wilson W. Cheung ("Cheung"); 3) Winnie W. Tso ("Tso"); 4) Jeffrey G. Ross ("Ross"); and 5) Alex Moukas ("Moukas").  Further, counsel for Plaintiffs reviewed certain documents produced by the Settling Defendants.

1   connection with the Company's June 14, 2011 secondary public offering (the "SPO"),[2] seeking

2   to pursue remedies under the Securities Act of 1933 (the "Securities Act"); and (2) persons or

3   entities who purchased or otherwise acquired Velti's securities between January 27, 2011 and

4   August 20, 2013, inclusive (the "Class Period"), seeking to pursue remedies under the Securities

5   Exchange Act of 1934 (the "Exchange Act'') (hereinafter collectively the "Class").[3]

6         2.      Plaintiffs allege liability, negligence, and non-fraud based claims under the

7   Securities Act.  These claims are brought against Baker Tilly Virchow Krause, LLP ("Baker

8   Tilly"), Velti's accounting firm, which issued audit reports certifying the Company's financial

9   statements contained in the IPO and SPO Registration Statements, and the Underwriter

10  Defendants (defined herein) who are statutorily responsible for material misstatements of facts

11  and omissions in the IPO Registration Statement and SPO Registration Statement by virtue of

12  having endorsed the Offerings.

13        3.      Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in

14  connection with these non-fraud claims, which are pleaded separately in this Complaint from

15  Plaintiffs' Exchange Act claims.  Further, any challenged statements of opinion or belief made in

16  connection with the Offerings are alleged to have been actionably materially misstated

17  statements of opinion when made by virtue of the fact that the speaker omitted to disclose facts

18  material to a reasonable investor and that the speaker lacked a basis (that a reasonable investor

19  would expect) for making such statements.

20        4.      Separately, Plaintiffs allege a claim for violation of Section 10(b) of the Exchange

21  Act against Baker Tilly.  Specifically, Plaintiffs allege that Baker Tilly knowingly, or with

22  deliberate recklessness, issued false and misleading "Report[s] of Independent Registered Public

23  Accounting Firm" during the Class Period.

24

25

26  [2]  The IPO and SPO are referred to herein collectively as the "Offerings."

27  [3]  Collectively, the IPO Registration Statement and the SPO Registration Statement are referred
    to herein as the "Registration Statements."

28

5.      Velti was a provider of mobile marketing and advertising technology and solutions for brands, advertising agencies, mobile operators, and media companies primarily in Europe (especially Greece, where the Company was founded), the Americas, Asia, and Africa. Velti claimed that its products and services allowed customers to create targeted, interactive, and measurable marketing and advertising campaigns directed to consumers via their mobile devices. Velti sold its services to customers pursuant to written contracts that set forth the payment terms.

6.      It was Velti's stated policy to recognize revenue when "all of the following conditions are satisfied: (i) there is persuasive evidence of an arrangement; (ii) the service has been rendered or delivery has occurred; (iii) the fee to be paid by the customer is fixed or determinable; and (iv) collectability of the fee is reasonably assured…."  Velti did not get paid, however, until after the work done pursuant to a given contract was completed and the customer was invoiced.  Between the time of completion of work and the ultimate receipt of payment by the Company, the amount due to Velti represented an account receivable.

7.      Velti recorded two key types of receivables: "accrued contracts receivables" (or "accrued receivables") and "trade receivables."  Velti booked revenue that had not been invoiced or reconciled with the customers as accrued contracts receivable.  Once an invoice had been issued, the receivable was then moved from being an accrued contract receivable to a trade receivable.

8.      The relationship between Velti's accounts receivable and revenue is particularly important in the context of this case, because Velti frequently represented that its criteria for recognizing revenue on a particular contract was satisfied long (usually months or even years) before the receivable was actually paid and even before the amount was reconciled with and invoiced to the customer.  Thus, Velti recorded revenue from a given contract long before the underlying customer actually paid Velti.  This meant Velti was often able to publicly portray extremely healthy revenue and earnings growth when it reported financial results, but, in reality, the underlying revenue was based on what amounted to, at most, "a promise to pay" instead of

1   cash in hand, and the tenuous relationship between promises and cash-in-hand meant that the

2   Company's growth could evaporate at any moment.

3          9.      Velti was founded in Athens in 2000, and, up to and including the Class Period,

4   maintained the most significant portion of its customer base in Greece.  Velti's contracts in

5   Greece (and the Balkan/Southeastern region of Europe) typically had much longer payment

6   terms than those in other geographic regions, particularly when compared to the U.S. and

7   Western Europe.  Velti's Greek ties would pose a challenge in April 2010 when Greek

8   government debt was downgraded, setting off a chain reaction throughout the country (which

9   eventually spread to the entire Balkan region).  Dramatically tightening credit led companies

10  within Greece to substantially delay (already slow, even before the issues in Greece's economy

11  were exposed) payments to creditors and led multinational companies to reduce their exposure to

12  the country's deteriorating economic situation.

13         10.     As the Greek economic crisis continued, Velti quickly began feeling the pinch.

14  Already saddled with slow payments (by U.S. commercial standards) due to the Company's

15  large Greek customer base (and Greece's "slow pay" business culture), Velti's invoices remained

16  unpaid.  While the Company continued to report robust revenue growth at the time of the IPO,

17  the truth was that the historical gap between the work performed by Velti and actual cash in hand

18  was growing to such a degree that it was unclear that the Company would ever be paid on many

19  accounts.

20         11.     Indeed, even as early as the end of 2009, according to the Company's former

21  Senior Manager of Global Financial Planning and Analysis (who was interviewed by Plaintiffs'

22  counsel), 19.8% of the Company's accounts receivables were more than 90 days "overdue," and

23  8.3% of the Company's accounts receivables were "overdue" by more than 365 days.

24  "Overdue," according to this employee, was a term used by Velti to designate an account that

25  had not been paid within 6 months.  Thus, an ***account that was overdue by 90 days was an***

26  ***account that had been outstanding and unpaid for 9 months, and an account overdue by 365***

27  ***days had been outstanding and unpaid for over 18 months***.

28

12.     Such problems were even more pronounced in Greece and Southeastern Europe. A February 8, 2011 report prepared by Velti just days after the IPO, and given to Baker Tilly, identifies each and every customer from the region, the amounts billed to each customer, and the dates that each customer was billed.  This report further shows that despite some €23 million (or, at the time, approximately $32 million) in overdue invoiced trade receivables (just a subset of the Company's total receivables) on the Company's books (32% of which was more than 90 days overdue) from Greece, *the Company had virtually no bad debt provision*.

13.     The Company's former Senior Manager of Global Financial Planning and Analysis states that a similar astonishing document (prepared by Velti and dated February 4, 2011) **shows that 95% of €62 million (or, at the time, approximately $82 million) worth of Velti's accounts receivables in the region were 90+ days overdue, 77% were 180+ days overdue, and 35% were 300+ days overdue**.[4]  Again, using the Company's terminology, this meant that 95% of the Company's receivables in the region were more than 270 days overdue, 77% were more than 360 days overdue, and 35% were more than 460 days overdue.  But, according to this former employee, instead of disclosing the serious problems presented by the foregoing, the Company instead stretched its definition of a "normal" payment time frame in certain countries.  This allowed the Company to characterize outstanding and otherwise overdue accounts – while long aged in terms of actual time – as not unusual or uncollectible.  But the Company's characterization did nothing to change the fact that it was highly unlikely that the Company would ever collect these monies.

14.     Further, in a May 14, 2012 presentation to Velti's Audit Committee that Baker Tilly made just a month before the SPO, Baker Tilly stated that the comprehensive DSO[5] (trade

---

[4] That the Underwriter Defendants should have, in the exercise of reasonable care, been aware of this, as well, is certain: according to this former employee, the Underwriter Defendants (in particular defendant Jefferies), created a detailed model of the Company's receivables and collections running from 2007 through 2012 that formed the pillar of the Company's modelling both pre and post IPO.

[5] Velti's operating metric of days sales outstanding ("DSO") – the length of time it took the Company to actually collect cash for work completed on a contract – was a critical metric for both the Company and investors.

1   receivables, accrued receivables (that is, accounts receivables that have not yet been invoiced)

2   and post-dated checks) for Velti SA – which is the Greek subsidiary responsible for the majority

3   of the ultimate write-off and accounted for roughly half of Velti's receivables in Q1 2012 – was

4   **649 days**.  As this information is as of the end of **Q1 2012 on average these receivables had**

5   **been outstanding since approximately June, 2010, over six months before the IPO and over a**

6   **year before the SPO**.  Given that the Company's accounts receivable were so overdue, there was

7   no reasonable basis to continue to recognize them as revenue, rendering the Company's

8   financials materially false and misleading.

9       15.    But it is more than that; instead of candidly informing the market (which would

10   have dramatically reduced the proceeds reaped in the IPO and likely spelled an early doom for

11   the SPO), Velti instead represented to the market that its accounts receivable collections were

12   actually **improving**.   Moreover, the Company **continued to** deceive investors by failing to

13   increase its reserves in a material way to protect against the significantly increasing risks of non-

14   payment by customers, particularly those in Greece.

15       16.    Independent auditors and underwriters of public offerings owe special duties to

16   the investing public; they are, at core, the gatekeepers to the securities markets, and are

17   recognized by courts and the law as having a special role to protect the markets from

18   misstatements by the corporations with whom they contract.  Despite these duties, Baker Tilly

19   and the Underwriter Defendants did nothing to uncover, stop or disclose Velti's conduct.  Instead

20   they endorsed the Company's Offerings.

21       17.    Had they performed their duties, they would have easily discovered and been able

22   to stop Velti's conduct as evidenced by the fact that an independent accounting firm that was

23   asked to review the Company's receivables at the end of the Class Period by the new Chief

24   Financial Officer ("CFO") who started to get very concerned about the Company's receivables,

25   was able to identify the fatal condition of the Company's financials with minimal effort.  In or

26   about June 2013, the Company retained Deloitte LLP ("Deloitte"), to perform an independent

27   review of the collectability of the receivables from Velti's Greek and Cypriot businesses that

28

1   Baker Tilly had certified as correct, and that the Company had reported in its financial

2   statements.

3       18.     According to Ross, then the Company's new CFO, just two Deloitte employees

4   were dispatched by Deloitte to perform the review.  It took these two employees  (both of whom

5   had no prior knowledge of the Company) just two weeks to conclude that $111 million worth of

6   the Company's reported $286 million worth of receivables were uncollectible and would need to

7   be written-off almost immediately.

8       19.     The preliminary results of the Deloitte review were presented to Velti's Board of

9   Directors on July 11, 2013, and almost immediately passed on to Baker Tilly.  Baker Tilly's

10  response to Deloitte's findings, which disagreed with virtually everything Baker Tilly had been

11  telling Velti about the collectability of the Company's receivables, was, according to the Settling

12  Defendants, to agree with Deloitte!  Baker Tilly did not even object or argue with Deloitte's

13  conclusions.  It simply accepted the fact that Deloitte had concluded that the Company would

14  need to write-off $111 million worth of receivables (a decision that would almost certainly doom

15  the Company) and carried on as usual.

16      20.     After this report, the Company never filed any further financial statements.  While

17  it apparently struggled for survival for a short period, the Company's U.S. entities filed for

18  Bankruptcy protection on November 4, 2013 and its European operations followed a month later.

19      21.     This is especially supportive of Plaintiffs' claims: according to witnesses

20  interviewed by Plaintiffs, just weeks (or at the most, months) earlier than the Deloitte report,

21  Baker Tilly had purportedly reviewed nearly *all* of the Company's outstanding receivables (and

22  had billed the Company accordingly), and now Deloitte was recommending that 43% of them be

23  written-off after a two week review by two professionals who had not previously done any work

24  for Velti.  In fact, Moukas stated that he believed that Deloitte's post-review focus would be on

25  improving the collectability of outstanding receivables.  In other words, he thought he was

26  "walking into one type of meeting", but it turned out to be something quite different; he was

27  going to be told that he should write down nearly half the value of the business, shortly after

28

[3:13-CV-03889-WHO] SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934      -7-

1   Baker Tilly said the exact opposite.  As revealed by the various reports discussed, above, by the

2   former Senior Manager of Global Financial Planning and Analysis the vastly aged receivables

3   was well-known to Baker Tilly, as far back as February, 2011.

4          22.    As a result of Baker Tilly's and the Underwriter Defendants' failure to fulfill their

5   responsibilities throughout the Class Period, Velti was able to (and did) continue raising and

6   borrowing cash when it had no business doing so.  For example, in August 2012, Velti entered

7   into a $50 million multi-currency senior revolving credit facility with HSBC.  The Company also

8   entered into "factoring arrangements"[6] in order to monetize its outstanding accounts receivables.

9   On November 14, 2012 the Company announced that due to its continued inability to timely

10  collect from certain of its customers in the Greek, Balkan, and select North African and Middle

11  Eastern regions, it was divesting certain assets and customers in those regions.  By the time this

12  decision was made, DSO for these customers had climbed to an astonishing *450 days*.  However,

13  Velti blunted the impact of this news by falsely and repeatedly stating that Velti had successfully

14  transitioned its new business away from those regions to the U.S. and Western Europe.  But this

15  was false; Velti did not, in actuality, materially shift business away from the Greek region.

16         23.    Velti's desire to shift operations away from Greece was front and center in the

17  Company's own public statements, as it stated in August 2012 that only 10% of its revenues

18  came from Greece or the Balkans.  Given Greek customers' reputation as "slow payers,"

19  combined with the region's critical economic condition, it was welcomed news that allegedly the

20  Company was shifting to a more U.S.-focused business strategy where receivables were paid at

21  more commercially-reasonable intervals.   Yet, despite Velti's repeated representations to

22  investors that the Company was successfully migrating its business away from Greece and into

23  the U.S., it was not, as revealed by Velti's own later admissions.

24         24.    Indeed, as evidenced by information provided by the Settling Defendants, even by

25  the end of the Class Period, *at least 65% of the Company's reported accounts receivable* (which

26  were reportedly $293 million as of March 31, 2013) originated from sales from Greek and

27  _____
    [6] Generally, "factoring" is the sale of receivables to a third party at a discount.

28

1   Cyprus operations.  Because Baker Tilly had access to Velti's accounts receivables (and, in early

2   2011, reports identifying and tracking the amount and time each bill to the Company's customers

3   were outstanding) it should have known that the Company had been misleading the market and

4   that the Company's receivables were far more problematic than publicly represented (given the

5   situation in Greece and Cyprus, as well as specific additional information about the Company's

6   customers in this region), and should not have been recognized as revenue.

7         25.   Compounding the Company's problems, HSBC, the Company's primary lender,

8   would soon begin to express serious reservations concerning its dealings with Velti.  Indeed, by

9   the end of March 2013, the Company had violated a covenant with HSBC which required it to

10  maintain certain leverage ratios.   This breach granted HSBC the right to accelerate the

11  Company's obligations under its existing credit facility, rendering them immediately due and

12  payable.  In the Company's June 10, 2013 Current Report filed with the SEC on Form 6-K, the

13  Company explained that as of March 31, 2013 "*substantially all our assets including our*

14  *accounts receivable were pledged as a security against borrowings from HSBC.*"   Not

15  surprisingly, as a result, Velti was unable to find lenders willing to extend the Company any

16  additional credit.

17        26.   HSBC's decision, and Velti's inability to find other financing is unsurprising as,

18  unbeknownst to the public, Velti's financial condition and reported financial results were

19  materially misstated.  These misstatements were largely the product of the misconduct of Baker

20  Tilly, who gave the Company incorrect and inaccurate advice time and again *and* who falsely

21  attested that the Company's financial statements reported on Velti's Forms 20-F filed with the

22  SEC on April 12, 2011, April 26, 2012, and April 11, 2013, gave a true and accurate presentation

23  of the Company's financial position, in violation of Generally Accepted Auditing Standards

24  ("GAAS").

25        27.   Baker Tilly's audit reports were untrue and misleading because they failed to

26  require the Company to take reserves for doubtful accounts receivables despite the growing

27  evidence of collectability problems and misrepresented that Velti's financials complied with

28

Generally Accepted Accounting Principles ("GAAP").  Indeed, Velti's reserves for doubtful accounts receivables were inadequate as demonstrated by the fact that the Deloitte report (the "Deloitte Report") evidences that over 85% of the $192 million in Greek and Cyprus receivables were owed by just 26 customers and over 65% was owed by 10 customers.  As discussed in more detail below, Deloitte further found that these 10 customers were actually just 2 related customers.   As the Q1 2013 accounts receivables were only $293 million, this means that a significant portion of the receivables was owed by a few customers. According to Hobley and Mann, by early 2013, Baker Tilly was testing a "large" percentage of the Company's receivables, a number that reached 90% of the receivables reported by the Company by the Spring of 2013.

28.    Further, Baker Tilly accepted management's representations, particularly representations by the Greek sales force, that these accounts were collectible simply because the Company had never had any collection issues in the past.  It did so, despite the well-known financial crisis in Greece and Cyprus.  And Baker Tilly continued to rely on these representations even after the Company's present experience was different from past historical performance, in that DSOs and accounts receivable were growing at the same time.

29.    Finally, according to the Company's former Senior Manager of Global Financial Planning and Analysis, Baker Tilly received and reviewed reports (as early as the end of 2010 and February, 2011) showing that the Company's accounts receivable balances were comprised of dangerously aged and overdue balances, yet it still certified the Company's reporting of these balances as revenue (in violation of both GAAP and the Company's stated revenue recognition policies) *and* certified the Company's decision to set its reserves against uncollectible receivables at a fraction of the real uncollectible amounts.

30.    Pursuant to GAAS, Baker Tilly was obliged to exercise professional skepticism and take additional steps to verify the collectability of the accounts receivables, especially in light of the severe red flags, including, *inter alia*, that (i) receivables were owed by a small number of companies; (ii) these companies were located in the troubled countries of Greece and Cyprus; and (iii) the Company's DSOs and accounts receivable were increasing significantly and

1  materially.  Yet they clearly did not, as demonstrated by the fact that when Velti's new CFO

2  hired Deloitte, Deloitte immediately recommended a $110 million write-down of receivables.

3      31.    Any suggestion that these receivables had only recently become uncollectible is

4  belied by the limited evidence uncovered to date and detailed herein.  According to the

5  Company's former Senior Manager of Global Financial Planning and Analysis, and documents

6  in his possession, early as February 4, 2011, 95% of the €62 million (or, at the time,

7  approximately $82 million) worth of Velti's accounts receivables on the books for southeastern

8  Europe were 90+ days overdue, 77% were 180+ days overdue, and 35% were 300+ days

9  overdue.  Even if one were to focus solely on the 300+ day overdue segment of these

10  receivables, this represents €21.7 million worth of dead receivables as of February, 2011.  In

11  other words: this amount represents over 20% of the amount written-off at the direction of

12  Deloitte nearly two years later![7]

13      32.    The Class Period ends on August 20, 2013 when the Company reported its Q2

14  2013 financial results and revealed the shocking news that it was writing off approximately $111

15  million of its trade receivables and accrued contract receivables.  And, when it did so, the

16  Company simultaneously made a stunning disclosure.

17      33.    Ross revealed, on August 20, 2013, that the receivables were "substantially old"

18  and had been on Velti's books since *before 2012*; a *de facto* admission that the write-off was

19  long overdue.  A chart identifying Company's 26 top customers (by name), which owed 85% of

20  the $192 million in Greek and Cyprus receivables (*i.e.* to subsidiaries Velti SA and Velti PS), of

21  which 10 customers owed 65% is set forth herein.  This chart also details the types of accounts

22  these customers represent, as well as the exact amounts owed.

23      34.    That the Company's receivables were substantially old, had been on Velti's books

24  since prior to the IPO and should have been written-off far earlier, is confirmed by Baker Tilly's

---

[7] Thus, giving Baker Tilly and the Underwriter Defendants the greatest benefit of doubt, even if one were to consider *only* the value of the Company's receivables that were 300+ days overdue as amounts against which a reserve should be taken, the Company had €21.7 million (approximately $29 million) worth of receivables sitting on its books against a reserve of just $135,000.

presentations to Velti's Audit Committee.  For example, in Baker Tilly's May 14, 2012 presentation to the Audit Committee regarding Q1 2012, Baker Tilly stated that the comprehensive DSO (trade receivables, accrued receivables and post-dated checks) for Velti SA – which is the Greek subsidiary responsible for the majority of the ultimate write-off and accounted for roughly half of Velti's receivables in Q1 2012 – was 649 days.  *As this information is as of the end of Q1 2012, on average these receivables had been outstanding since approximately June, 2010, over six months before the IPO and over a year before the SPO*.

35.    Baker Tilly's May 14, 2012 presentation further confirms that Velti was extremely under-reserved as, according to the presentation, a large portion of Velti SA's receivables were accrued (unbilled) and ***even older*** on average than 649 days.  That is, the May 14, 2012 presentation states that trade receivables for Velti SA had a DSO of 191 days.  As the DSO of 191 days is included in Velti SA's total DSO, the age of the accrued receivable and check receivables must be older than the 649 days.  ***This means that not only were there significant receivables over 649 days, but much of these were not even invoiced or reconciled with the customers – yet Velti had no reserve for accrued receivable at this time***.

36.    On the Company's August 20, 2013 disclosures, shares of Velti's stock price declined by $0.66 per share, more than 66%, to close on August 21, 2013, at $0.34 per share, on heavy trading volume.

37.    In sum, throughout the Class Period, Velti made material misstatements and omissions about the Company's business, operations, and prospects, misstating or failing to disclose that: (i) the Company was experiencing  difficulties collecting material  receivables; (ii) a significant portion of the Company's receivables were uncollectible; (iii) as a result, the Company's revenues and receivables were overstated during the Class Period; (iv) the Company's allowance for doubtful accounts was understated; (v) the Company lacked adequate internal and financial controls over its financial reporting; (vi) Velti's financial statements hid the true length of time it took the Company to collect recognized revenue and misled investors

1   about the quality and collectability of its receivables; and (vii) as a result of the foregoing, the

2   Company's statements and reported financial results were materially false and misleading at all

3   relevant times.

4          38.    The foregoing could not have occurred but for the actions of Baker Tilly and the

5   Underwriter Defendants who endorsed the IPO and SPO and/or who certified the financials

6   included therein and, as to Baker Tilly, throughout the Class Period.  Baker Tilly and the

7   Underwriter Defendants failed to exercise the necessary reasonable care to ensure the

8   Company's DSOs and financials conformed to Generally Accepted Accounting Principles

9   ("GAAP"), and properly represented its financials, an act that infected both the IPO and SPO and

10   misled investors throughout the Class Period.

11   **II.     JURISDICTION AND VENUE**

12          39.    The claims asserted herein arise under Sections 11 and 12 of the Securities Act

13   (15 U.S.C. §§77k and 77l(a) and Section 10(b) of the Exchange Act (15 U.S.C. §§78j(b)) and

14   Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15          40.    This Court has jurisdiction over the subject matter of this action pursuant to 28

16   U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. §77v) and Section 27 of the Exchange

17   Act (15 U.S.C. §78aa).

18          41.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and

19   Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the

20   alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts

21   charged herein, including the preparation and dissemination of materially false and/or misleading

22   information, occurred in substantial part in this Judicial District.  Additionally, the Company

23   maintained corporate, sales, marketing, product development, professional services, support and

24   administrative facilities in San Francisco, California.  The Company also has maintained, at

25   various relevant times, a registered agent at One Market Street, Suite 600, San Francisco,

26   California 94105.

27

28

42.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**III.     INTRADISTRICT ASSIGNMENT**

43.     A substantial part of the events or omissions which give rise to the claims in this action occurred in the City of San Francisco, in the County of San Francisco, and as such this action is properly assigned to the San Francisco Division of this Court.

**IV.     PARTIES**

44.     Court appointed Lead Plaintiff Bobby Yadegar controls Ygar Capital LLC ("YGAR"), is its sole owner, and has full authority to act for and on its behalf.   YGAR purchased or acquired Velti common stock[8] during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.  YGAR's certification was previously filed herein on October 21, 2013.  (ECF No. 44-2.)  YGAR has also been assigned the right to prosecute claims on behalf of certain additional parties, who also suffered damages, as set forth in its previously filed certifications.

45.     Additional Plaintiff Frank Borreani ("Borreani") purchased Velti common stock both pursuant to and traceable to the Company's January 28, 2011 IPO Registration Statement. On February 4, 2011 Borreani purchased 1,400 shares traceable to the IPO and purchased additional shares throughout the Class Period.   As a consequence of his purchases of Velti common stock, Borreani has suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

46.     Additional Plaintiff St. Paul Teachers' Retirement Fund Association ("St. Paul") purchased Velti common stock pursuant to and traceable both to (a) the Company's January 28,

---

[8]     The term "common stock" is used herein to refer to any and all Velti equity securities that traded on any securities exchange in the United States.

2011 IPO Registration Statement, and (b) the Company's June 14, 2011 SPO Registration Statement.  St. Paul purchased 96 shares in the IPO directly from the Underwriter Defendants and 6,460 shares in the SPO directly from the Underwriter Defendants.  Further, St. Paul purchased or acquired additional Velti common stock during the Class Period.  As a consequence of its purchases of Velti common stock, St. Paul has suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

47.    Additional Plaintiff Newport News Employees' Retirement Fund ("NNERF") purchased or acquired Velti common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

48.    Additional Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") purchased or acquired Velti common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

49.    Non-Party Velti was a Jersey corporation with its principal executive offices located at First Floor, 28-32 Pembroke Street Upper, Dublin 2, Republic of Ireland.  Velti maintained an office in the United States offices in San Francisco, and its registered agent was located at One Market Street, Suite 600 San Francisco, California 94105.  Velti described itself as the "leading global provider" of mobile marketing and advertising technology and solutions that enables brands, advertising agencies, mobile operators, and media to implement highly targeted, interactive, and measurable campaigns by communicating with and engaging consumers via their mobile devices.  Velti sold its customers an "integrated, easy-to-use, end-to-end software platform," and generated revenue from its software-as-a-service ("SaaS") model, from licensing its software to customers and from providing managed services to customers.

50.    Non-parties Moukas, Cheung, Ross, Tso, Chris Kaskavelis ("Kaskavelis"), Mann, Hobley, Jerry Goldstein ("Goldstein") and Nicholas P. Negroponte ("Negroponte") are

1  collectively referred to herein as the "Non-Party Individual Defendants."   Velti, Moukas,

2  Cheung, Ross, Tso, Kaskavelis, Mann, Hobley, Goldstein, and Negroponte are collectively

3  herein referred to as the "Settling Defendants."

4       51.     Velti and the Non-Party Individual Defendants reached a settlement with the

5  Class for $9.5 million and have been released from the case.  As partial consideration for the

6  settlement, Non- Party Individual Defendants Tso, Ross, Cheung, Hobley, Mann, and Moukas

7  agreed to be interviewed by Plaintiffs for purposes of the continued litigation of claims by the

8  Class against Baker Tilly and the Underwriter Defendants (defined herein).  They are referred to

9  herein, collectively, as the "Released Defendants."

10       52.     Defendant Jefferies LLC (f/k/a Jefferies & Company, Inc.) ("Jefferies") served as

11  an underwriter in connection with the IPO and the SPO.

12       53.     Defendant RBC Capital Markets, LLC ("RBC") served as an underwriter in

13  connection with the IPO and the SPO.

14       54.     Defendant Needham & Company, LLC ("Needham") served as an underwriter in

15  connection with the IPO and the SPO.

16       55.     Defendant Canaccord Genuity Inc. ("Canaccord") served as an underwriter in

17  connection with the IPO and the SPO.

18       56.     Defendants Jefferies, RBC, Needham, and Canaccord are collectively referred to

19  hereinafter as the "Underwriter Defendants."

20       57.     Defendant Baker Tilly served as the Company's accounting firm and certified the

21  Company's consolidated financial statements and issued audit reports, which were included in

22  both the IPO Registration Statement and SPO Registration Statement (the "Registration

23  Statements"), and in the Company's Annual Reports filed with the SEC on Form 20-F on April

24  12, 2011, April 26, 2012 and April 11, 2013.  Baker Tilly also expressly consented to the use of

25  its name and its audit reports in the IPO and SPO Registration Statements and provided letters

26  dated August 3, 2010 and September 3, 2010 for inclusion in the Registration Statements, which

27  consented to reference to Baker Tilly and to the incorporation by reference of the Baker Tilly

28

1   Report (defined herein).   Baker Tilly is located at 225 South Sixth Street, Suite 2300,

2   Minneapolis, Minnesota 55402.

3   **V.      THE FRAUD AT VELTI**

4          **A.      Velti's Accounting Misrepresented the Company's Financial Results**

5                  **1.      Applicable Standards**

6          58.      Throughout the Class Period, the Company's accounts receivable, net income and

7   shareholder equity were materially overstated as described above and herein.   In particular,

8   Velti's receivables were overstated because it failed to record either a timely write-off or an

9   adequate allowance for doubtful accounts.  This inflated the Company's receivables, and, thus,

10  its net income and shareholder equity for GAAP and non-GAAP purposes, rendering them

11  materially false and misleading.

12         59.      GAAP rules required Velti to record a reserve for the uncertainty associated with

13  the collectability of its outstanding receivables, particularly in light of its customers' economic

14  condition and age of such receivables.  FASB Accounting Standard Codification ("ASC") 450-

15  20-25-2 *Recognition of Loss Contingencies* requires that:

16         An estimated loss from a loss contingency shall be accrued by a charge to income
           if both of the following conditions are met:

17                 a.      Information available before the financial statements are issued or
                   are available to be issued (as discussed in Section 855-10-25) indicates

18                 that it is probable that an asset had been impaired or a liability had been
                   incurred at the date of the financial statements.  Date of the financial

19                 statements means the end of the most recent accounting period for which
                   financial statements are being presented.  It is implicit in this condition

20                 that it must be probable that one or more future events will occur
                   confirming the fact of the loss.

21

22                 b.      The amount of loss can be reasonably estimated.

23         60.      When current information and events make it probable that an entity will be

24  unable to collect amounts due according to the contractual terms of a receivable, a loss

25  contingency should be accrued, ASC 310-10-35-10 *Receivables*:

26         If, based on current information and events, it is probable that the entity will be
           unable to collect all amounts due according to the contractual terms of the

27         receivable, the condition in paragraph 450-20-25-2(a) is met.  As used here, all
           amounts due according to the contractual terms means that both the contractual

28         interest payments and the contractual principal payments will be collected as

scheduled according to the receivable's contractual terms.  However, a creditor need not consider an insignificant delay or insignificant shortfall in amount of payments as meeting the condition in paragraph 450-20-25-2(a).  Whether the amount of loss can be reasonably estimated (the condition in paragraph 450-20-25-2(b)) will normally depend on, among other things, the experience of the entity, information about the ability of individual debtors to pay, and appraisal of the receivables in light of the current economic environment.  In the case of an entity that has no experience of its own, reference to the experience of other entities in the same business may be appropriate.

### 2. Velti Violated GAAP by Failing to Record an Adequate Allowance for Doubtful Accounts

61.     According to statements from Ross during his interview by Plaintiffs, prior to his arrival at Velti in January 2013, the Company's only methodology for calculating or allocating reserves against uncollectible receivables was just based on never having a bad debt before and representations by Velti employees that the customers would pay.  Because the Company's clients had always eventually paid, the presumption was that they always would.[9]  According to Ross, the Company's presumption that its customers would always eventually pay was condoned and supported by Baker Tilly, and would ultimately doom the Company.  He said they should have a mathematical formula, so he adopted a formula.

62.     Indeed, throughout the Class Period, the Company increasingly struggled to collect receivables.  This is evidenced by the Company's growing receivables balances, swelling DSO numbers, numerous financial reports prepared by the Company (detailing each individual account, its amounts, and the amount of time by which each was outstanding and overdue), and the decision, announced on November 14, 2012, to divest certain assets in Greece and the Balkans, and the necessity of reclaiming $5.1 million in factored receivables announced at the same time.  These allegations are bolstered by the Company's own financials, the Deloitte Report, reports prepared by the Company and reviewed by Plaintiffs, and by defendant Ross' admission at the end of the Class Period, a significant amount of Velti's receivables were "substantially old" and had been on Velti's books since before 2012.

---

[9] Moreover, that the Company never had bad debt before is likely because it refused to write off old receivables regardless of how old and uncollectible they were.

63.     Indeed, as of December 31, 2010, the Company's allowance for doubtful accounts was a mere $135,000 against a total receivable balance of over $101 million; the allowance for doubtful accounts as a percentage of total receivables was only 0.13%. *Receivables accounted for 87% of Velti's total reported revenue for fiscal year 2010*; in other words, the receivables were Velti's business.  Velti's failure to adequately reserve for the uncertainty associated with collecting these receivables allowed the Company to claim an adjusted net income for fiscal 2010 of $3 million and adjusted earnings per share of $0.07.

64.     That the Company's reserves were vastly understated by any reasonable measure is clear from the statements of the Company's Senior Manager of Global Financial Planning and Analysis, who stated that on February 4, 2011, Velti produced a report showing that 95% of €62 million (or, at the time, approximately $82 million) worth of Velti's accounts receivables in southeastern Europe were 90+ days overdue (that is, 225+ days outstanding), 77% were 180+ days overdue (that is, 295+ days outstanding), and 35% were 300+ days overdue (that is, 435+ days outstanding) as of December 31, 2010.  Again, despite the fact that 95% of the Company's receivables from Greece (worth approximately $82 million, or over 80% of the Company's *total* receivables) were overdue by even the Company's lenient six month standard, the Company had reserved just $135,000 against doubtful accounts.

65.     The following year, on December 31, 2011, Velti's allowance for doubtful accounts had crept up to $808,000, but the total receivable balance had catapulted to an astonishing $224 million; the allowance for doubtful accounts as a percentage of total receivables was 0.36%.  In other words, even well-after the Greek crisis had begun, Velti was effectively telling the market that it would be ***perfect***, that it would nearly collect every cent it was owed.  Receivables accounted for 119% of Velti's total reported revenue for fiscal year 2011.  Velti's failure to adequately reserve for the uncertainty associated with collecting these receivables allowed the Company to claim an adjusted net income for fiscal 2011 of $29 million and adjusted earnings per share of $0.50.  Again, as already noted, above, the Company's

1  reserves paled in the face of the outstanding and extremely aged accounts receivables on the

2  Company's books.

3      66.    By year-end 2012, Velti's allowance for doubtful accounts was still only $8

4  million against a total receivable balance of over $303 million; the allowance for doubtful

5  accounts as a percentage of total receivables was 2.64%.  Thus, while the allowance for doubtful

6  accounts was slowing increasing (in terms of a percentage of revenues), it really was like

7  pushing back the ocean with a broom.  Receivables accounted for 112% of Velti's total reported

8  revenue for fiscal year 2012.  Velti's failure to adequately reserve for the uncertainty associated

9  with collecting these receivables allowed the Company to claim an adjusted net income for fiscal

10  year 2012 of $22.2 million and adjusted EPS of $.34.  Given that the Company's total receivable

11  balance was now multiples of what it had been in the report prepared by Velti on February 4,

12  2011, it is even more credibly indisputable that the Company's recognition of such revenue was

13  in violation of both GAAP and the Company's revenue recognition policy.  That is, the

14  substantial growth illustrates that it was highly improbable that the Company would ever be able

15  to collect that which it had billed.

16      67.    After new CFO Ross joined the Company in January 2013, Velti's allowance for

17  doubtful accounts slowly began creeping up.   In the March 12, 2013 earnings call, Ross alluded

18  to the fact that he had concerns about relying on the Company's purported prior history to assess

19  what the receivables should so he started applying a mathematical testing to require a larger

20  reserve:

21      The company has had very, very limited experience with bad debts. We've had
        very few instances where customers have ultimately been unable to pay, or even

22      bankruptcy or something else. Often times it takes a heck of a long time, but very
        little experience. So if you sort of come up with a reserve based on your past

23      experience, It's a rather – it's pretty dang closed to nothing. I – just looking at it,
        there – you look at the DSOs of the company and sort of say, they're a little bit

24      older. *I just pressure tested some of the assumptions, took mathematical
        percentages of balances over certain ages and came up with an amount that I*

25      *felt more comfortable with*, that provided us some cushion, when and if
        something happens. There wasn't much in the specific area that led me to say, oh

26      my gosh, we have a huge problem. I want a big additional reserve. But with the
        magnitude of the reserve – with the AR on the company's books, I just thought it

27      was more prudent to have a little bit more cushion with respect to those numbers.

28

68.     During conversations with counsel, upon seeing the large DSOs, Ross explained that he determined that it was appropriate to apply a mathematical methodology to adequately reserve for doubtful accounts, despite representations from sales departments that the customers had always paid their accounts, and despite the fact that the Company had not done so before. By March 12, 2013, when the Company announced its Q4 2012 and year-end 2012 results, the figure was $8 million against a total receivable balance of over $303 million.  The next quarter, Q1 2013, the allowance was raised to $10 million against a total receivable balance of nearly $306 million; the allowance for doubtful accounts as a percentage of total receivables was 3.3%. Receivables accounted for 118% of the Company's total reported revenue for the four quarters preceding and including Q1 2013, meaning that accumulated receivables were greater than the Company's total reported revenue for the four quarters preceding Q1 2013.   According to Ross, almost immediately upon joining Velti he became concerned about the Company's accounts receivable balance and advocated that Company should take a minimal reserve.   Others in the Company resisted, suggesting his reserve calculations were too conservative.

69.     However, Ross explained to counsel, when the sales departments' collection forecasts were not being met by Q2 2013, he determined that he needed an independant third party accounting firm to analyze the accounts receivables for the Greece and Cyprus divisions for the Company.  He confirmed in discussions with counsel that he did not ask Baker Tilly to perform this analysis, but rather Velti retained Deloitte in June 2013.

70.     On August 20, 2013, Velti announced that it had (unbeknownst to the market until then) engaged Deloitte to undertake a formal review of its outstanding accounts receivable and that, as a result of Deloitte's review, the Company would write off $111 million worth of its then $286 million worth of receivables.   The Company's allowance for doubtful accounts as a percentage of total receivables *skyrocketed to 43% – thirteen times what it had been in the previous quarter*.  The Company blamed the write-off on customers with business activities in Greece and Cyprus, saying the economic uncertainty in the region was contributing to a deterioration in collections.

71.     Although this statement (and the conduct; a huge one-time write-down) was meant to suggest that Velti had been hit by a tidal wave, the truth was the waters had been, for years by this point, rising around them.   As already noted above, despite the fact that this information was only publicly disclosed at the end of the Class Period, these problems existed far earlier.[10]

### 3.     Velti's Accrued Contract Receivables

72.     Velti also misled the market with respect to the reporting of its accounts receivable.   Velti recorded two key types of receivables: accrued contracts receivable and trade receivables.   Velti booked revenue that had not been invoiced but for which it claimed all revenue recognition criteria had been met into accrued contracts receivable.   Once an invoice had been issued, the receivable was then moved from being an accrued contract receivable to a trade receivable.   Velti claimed that this two-tiered process was necessary because the amounts recorded in the accrued contracts receivable required reconciliation with the Company's customer before an invoice was sent.   Wilson Cheung explained this reconciliation process during the Company's Q2 2011 investor conference call:

> So, what a typical campaign we normally run is that after the campaign has ended, then we would begin to recognize that revenue assuming that all of the requirements have been met, so they would be recognized as revenue and accrued receivables.  Some of these campaigns, once they have ended usually it will take a couple of weeks for us to reconcile the data with our customers before we can actually invoice them. So, we would start to see what we actually repocket some of the accrued receivables through trade receivables.  A lot of this change is between the two buckets is primarily due to timing of when the campaign actually ended.

73.     If the Company followed the reconciliation process as disclosed by Cheung and described in Velti's annual report on Form 20-F, it would take only a few weeks after the end of

---

[10] As just one example in addition to those already discussed above, the Deloitte Report concluded that customers Virtual Trip Ltd., Epignosis Ltd., Next Generation Learning Services S.A., MVision S.A., Infomap S.A., and IT Center S.A. were actually one affiliated customer, referred to as the the "VTRIP Entities" and their contracts were archetypical of the uncollectible nature of the Company's contracts overall.  In presenting the Deloitte Report to the Board on July 11, 2013 Deloitte concluded that the aggregate size of the outstanding accounts receivable represented by the VTRIP Entities was an issue.  Such a high concentration of receivables from a single customer that represented so much of Velti's overall receivables was particularly problematic because the average DSO of the VTRIP Entities was over 700 days.

1  a campaign for Velti to invoice its customers.  Once the invoice was issued, the receivable

2  should move from the accrued contract receivable category to the trade receivable category.  Any

3  differences between Velti's numbers included in the accrued contract receivable and the ultimate

4  number agreed to with its customer should have been immediately been written-off.

5  74.   From January 27, 2011 to August 20, 2013, however, Velti provided little to no

6  reserve for its trade receivables, and *completely failed to record any type of reserve for its*

7  *accrued contract receivables* until the last quarter of 2012.  Even then, the Company only

8  recorded a $1 million reserve for an accrued contract receivable balance of $134 million.  This

9  represented a reserve of less than 1%.  In other words, Velti historically had left almost no

10  margin for error; if even a handful of its customers did not pay, it would have had a material

11  effect on the Company's balance sheet and reported growth rates.

12  75.   Because the accrued contract receivable balance should only be a temporary

13  account whereby the balance would be reclassified to trade receivables once the reconciliation

14  process between Velti and its customers was completed, Velti especially shocked the market

15  when it announced an increase in the allowance for doubtful accounts reserves for its accrued

16  contract receivables from $1.4 million on an accrued contract receivable balance of $137.5

17  million, or 1%, to $77.8 million on an accrued contract receivable balance of $118.6 million, or a

18  whopping 65.6%.  Simply, 70% of the $111 million write-off announced on August 20, 2013

19  was directed at the Company's accrued contract receivables.

20  76.   Again, as revealed by the Deloitte Report, a host of the Company's accrued

21  contract receivables were uncollectible and should have been reserved against far earlier.  For

22  example, the Deloitte Report concluded that the aggregate size of the outstanding accounts

23  receivable represented by the VTRIP Entities was an issue of particular concern because it both

24  represented a high concentration of receivables from a single customer, and because the average

25  DSO of the VTRIP Entities was over 700 days.  Any one of these facts was more than sufficient

26  to preclude such amounts from being recorded as revenue, under GAAP, without a substantial

27  reserve.

28

[3:13-CV-03889-WHO] SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

### 4.    Velti Violated Its Own Revenue Recognition Policy

77.     In addition to violating GAAP by failing to properly reserve for uncollectible accounts, Velti violated its own publicly stated revenue recognition policy by booking revenue when collectability was not reasonably assured.  In its Forms 20-F for fiscal years 2010, 2011 and 2012, Velti explained that it recognized revenue when the following conditions were satisfied:

> (a)    there was persuasive evidence of an arrangement;

> (b)    the service had been rendered or delivery had occurred;

> (c)    the fee to be paid by the customer was fixed or determinable; and

> (d)    collectability of the fee was reasonably assured.

78.     The assurances Velti provided that it had satisfied its revenue recognition policy were false.  Specifically, Velti did not satisfy the fourth prong of the test – *i.e*, that collectability of the fee was reasonably assured.   Accordingly, Velti's reported revenue numbers were materially inflated, and its allowance for doubtful accounts was materially understated.

79.     As already discussed, above, according to the Company's former Senior Manager of Global Financial Planning and Analysis a document reflecting the Company's accounts receivable as of December 31, 2010 (produced by Velti and dated February 4, 2011) shows that 95% of €62 million (or, at the time, approximately $82 million) worth of Velti's accounts receivables were 90+ days overdue (that is, 225+ days outstanding), 77% were 180+ days overdue (that is, 295+ days outstanding), and 35% were 300+ days overdue (that is, 435+ days outstanding) as of December 31, 2010.  Given as much, that these revenues never should have been booked in the first place necessarily follows.

## VI.    DEFENDANTS VIOLATED THE SECURITIES ACT

80.     Plaintiffs allege claims under the Securities Act against Baker Tilly and the Underwriter Defendants.

81.     Baker Tilly and the Underwriter Defendants are statutorily liable under Section 11 of the Securities Act for the materially inaccurate statements and omissions contained in the IPO Registration Statement and SPO Registration Statement.

82.     Specifically, Baker Tilly is liable for the statements it personally made in the Registration Statements, described herein because it expressly consented to the use of its name and inclusion of its audit reports in the Registration Statements and provided a letter dated August 3, 2010 and September 3, 2010 for inclusion in the Registration Statements and, which consented to the reference to Baker Tilly and to the incorporation by reference of the Baker Tilly audit reports.

83.     Its statements are both misrepresentations of material fact and omitted facts necessary to make the statements made in the Registration Statements not misleading.  To the extent that any of Baker Tilly's statements are opinions, they are actionable because (i) they were both objectively and subjectively false; and/or (ii) they implied facts regarding its inquiry or knowledge underlying such opinions, including its compliance with GAAS in performing its audit.

84.     Similarly, the Underwriter Defendants are statutorily liable because the Registrations Statements contained (i) false statements regarding Velti's financial situation or omitted facts necessary to make the statements made not misleading; and (ii) any statements of opinion regarding Velti's financials were both objectively and subjectively false and/or implied facts regarding its inquiry or knowledge underlying such opinions.  Specifically, the Underwriter Defendants are liable under §§ 11 and 12 for their role in underwriting Velti's IPO and SPO.

85.     Plaintiffs also allege claims under Section 12(a)(2) of the Securities Act against the Underwriter Defendants for their role in underwriting Velti's IPO and SPO and selling and soliciting sales of Velti shares pursuant to the misleading Registration Statements.

86.     Plaintiffs expressly disclaim any allegations of intentional fraud in these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims.

1      **A.      The IPO**

2          87.      On January 27, 2011, the Company's final Registration Statement for its IPO was

3   declared effective by the SEC.   The final Prospectus for the IPO was filed with the SEC on

4   January 28, 2011, prior to the opening of the market, and was dated January 27, 2011.   The

5   offering was for 11,092,300 ordinary shares of Velti at $12 per share plus any over-allotment.

6          88.      Velti's financial statements for the three years in the period ended December 31,

7   2009 were incorporated by reference in the IPO Registration Statement.

8          89.      The IPO Registration Statement was negligently prepared and, as a result,

9   contained untrue statements of material facts or omitted to state other facts necessary to make the

10  statements made not misleading and was not prepared in accordance with the rules and

11  regulations governing its preparation.   To the extent any statements or omissions alleged to be

12  false and misleading are included in the IPO Registration Statements are statements of opinion,

13  Plaintiffs allege herein that such statements or omissions were false and misleading by omission

14  in that the speaker omitted to disclose facts material to a reasonable investor and that the speaker

15  lacked a basis (that a reasonable investor would expect) for making such statements.

16         90.      The untrue statements of material fact and omitted material facts in the IPO

17  Registration Statement relate to: (i) the difficulty the Company was having collecting certain

18  receivables; (ii) the fact that certain of the Company's receivables were uncollectible; (iii) the

19  fact that the Company's revenues and receivables were overstated during the Class Period; (iv)

20  (iv) that the Company lacked adequate internal and financial controls; and (v) as a result of the

21  foregoing, the Company's financial results were materially false and misleading at all relevant

22  times.

23         91.      Velti's January 27, 2011 IPO Registration Statement contained a host of

24  actionably false and misleading statements.   The "'who, what, when, where and how" of each

25  false statement is set forth, below.

26         92.      Baker Tilly (who) certified the Company's financial results for the nine months

27  ended September 30, 2010, which represented revenue of $58.8 million, a net loss of $17.7

28

million, adjusted EBITDA of $4.7 million, EPS of $(0.47) and DSO of 110 days as of September 30, 2010 (what) on January 27, 2011 (when) in the IPO Registration Statement (where). These statements were false (how) because they overstated the company's accounts receivable, and, thus, revenue, income and shareholder equity in violation of GAAP and the Company failed to record a proper allowance for doubtful accounts in violation of GAAP.

93.     Baker Tilly's statements were further false and misleading by omission in that it omitted to disclose facts material to a reasonable investor and that Baker Tilly lacked a basis (that a reasonable investor would expect) for making such statements. That is, it had access to information regarding Velti's receivables, was aware of the DSO of such receivables and knew that only two related customers accounted for the majority of the Company's business. Indeed, the statements failed to disclose that a host of problematic contracts identified in the Deloitte Report confirm that the Company's financials were false because Velti customers Virtual Trip Ltd., Epignosis Ltd., Next Generation Learning Services S.A., MVision S.A., Infomap S.A., and IT Center S.A. were actually one affiliated customer, referred to as the the "VTRIP Entities." Such contracts were archetypical of the uncollectible nature of the Company's contracts overall. That is, the VTRIP Entities were affiliated and therefore represent a significant concentration of receivables from a single party concluded that the aggregate size of the outstanding accounts receivable represented by the VTRIP Entities was an issue because it both represented a high concentration of receivables from a single customer and because the average DSO of the VTRIP Entities was over 700 days. Accordingly, the Company's receivables were overstated, and its allowance for doubtful accounts was understated.

94.     The Underwriter Defendants (who) are responsible for the statements[11] (what) made on January 27, 2011 (when) in the IPO Registration Statement (where). These statements were false (how) because they overstated the company's accounts receivable, and, thus, revenue, income and shareholder equity in violation of GAAP and the Company failed to record a proper

---

[11] Pursuant to the Securities Act, underwriters of an offering are strictly liable for all statements made in offering documents.

allowance for doubtful accounts in violation of GAAP.  These statements were further false and misleading by omission in that the speaker omitted to disclose facts material to a reasonable investor and that the speaker lacked a basis (that a reasonable investor would expect) for making such statements.  That is, the statements failed to disclose that a host of problematic contracts identified in the Deloitte Report confirm that the Company's financials were false because Velti customers Virtual Trip Ltd., Epignosis Ltd., Next Generation Learning Services S.A., MVision S.A., Infomap S.A., and IT Center S.A. were actually one affiliated customer, referred to as the the "VTRIP Entities."  Such contracts were archetypical of the uncollectible nature of the Company's contracts overall.  That is, the VTRIP Entities were affiliated and therefore represent a significant concentration of receivables from a single party concluded that the aggregate size of the outstanding accounts receivable represented by the VTRIP Entities was an issue because it both represented a high concentration of receivables from a single customer and because the average DSO of the VTRIP Entities was over 700 days.   Accordingly, the Company's receivables were overstated, and its allowance for doubtful accounts was understated.

95.     Moreover, the IPO Registration Statement included Baker Tilly's audit report providing an unqualified Report of Independent Registered Public Accounting Firm with respect to the financial statements for the three years ended December 31, 2009.  It also included a statement by Baker Tilly stating that:

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements and financial statement schedule are free of material misstatement.  The Group is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control over financial reporting. Accordingly, we express no such opinion. ***An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audits provide a reasonable basis for our opinion***.

96.     Baker Tilly (who) is responsible for these statements (what) made on January 27, 2011 (when) in the IPO Registration Statement (where).   The statements that Baker Tilly's

1   testing of the items on the Company's financial statements was a reasonably held belief are false

2   and misleading (how) because the evidence discussed herein demonstrates that the statements of

3   "opinions" could not be reasonably held when made.

4          97.    Next, the IPO Registration Statement falsely represented that Velti's financial

5   results were prepared in accordance with GAAP:

6          Beginning with the year ended December 31, 2009, we changed the preparation of
           our financial statements from being in accordance with international financial
7          reporting standards, or IFRS, as adopted by the EU to being in accordance with
           accounting principles generally accepted in the United States, or U.S. GAAP.

8          98.    Further, Baker Tilly expressly certified that it had audited the Company's

9   financial results, and that those results were presented "in conformity with accounting principles

10  generally accepted in the United States of America."

11         99.    Baker Tilly (who) is responsible for these statements (what) made on January 27,

12  2011 (when) in the IPO Registration Statement (where). The statements that Velti's financial

13  results were prepared in accordance with GAAP were false (how) because they overstated the

14  company's accounts receivable, and, thus, revenue, income and shareholder equity in violation of

15  GAAP and the Company failed to record a proper allowance for doubtful accounts in violation of

16  GAAP.  These statements were further false and misleading by omission in that the speaker

17  omitted to disclose facts material to a reasonable investor and that the speaker lacked a basis

18  (that a reasonable investor would expect) for making such statements.  More specifically, as

19  already discussed, above, at minimum, several of the contracts identified in the Deloitte Report

20  confirm that the Company's financials were false (in violation of GAAP) because the VTRIP

21  Entities were affiliated and therefore represented a significant concentration of receivables from

22  a single customer because the average DSO of the VTRIP Entities was over 700 days.

23         100.   The Company also stated that it recognized revenue only when collectability of

24  the fee was reasonably assured, among other factors:

25  **_Revenue Recognition_**

26  We recognize revenue when all of the following conditions are satisfied: (i) there
    is persuasive evidence of an arrangement; (ii) the service has been rendered or
27  delivery has occurred; (iii) the fee to be paid by the customer is fixed or
    determinable; and (iv) collectability of the fee is reasonably assured.  …

28

1    101.   The Underwriter Defendants (who) are responsible for these statements (what)

2  made on January 27, 2011 (when) in the IPO Registration Statement (where).

3    102.   This statement was false (how) because the Company regularly recognized and

4  reported revenue despite the fact that collectability was not reasonably assured.   These

5  statements were further false and misleading by omission in that the speakers omitted to disclose

6  facts material to a reasonable investor and that the speaker lacked a basis (that a reasonable

7  investor would expect) for making such statements.

8    103.   The Underwriter Defendants are responsible for this false statement because

9  underwriters of an offering are liable for all statements made in offering documents unless they

10  establish that they exercised due diligence.

11    104.   The IPO Registration Statement further stated that the Company accrued an

12  allowance for doubtful accounts if there was "strong evidence" that the amounts due are unlikely

13  to be collectible:

14    ***Allowance for Doubtful Accounts***

15    We evaluate the collectability of accounts receivable based on a combination of
    factors; an allowance for doubtful accounts is provided based on estimates
    developed using standard quantitative measures, which include historical write
16    offs and current economic conditions. We also make a specific allowance if there
    is strong evidence indicating that the amounts due are unlikely to be collectible.
17    As of September 30, 2010 and December 31, 2009 and 2008, the allowance for
    doubtful accounts was $135,000 (unaudited), $135,000 and $131,000,
18    respectively

19    105.   Both Baker Tilly and the Underwriter Defendants (who) are responsible for these

20  statements (what) made on January 27, 2011 (when) in the IPO Registration Statement (where).

21  These statements were false (how) because the allowance for doubtful accounts – while literally

22  true – was materially false and misleading because it was understated.   Had such allowances

23  been accurately stated, they would have been much higher, rendering the other derivative

24  financial results (such as assets) reported on the Company's balance sheet materially false and

25  misleading.   These statements were further false and misleading by omission in that the speakers

26  omitted to disclose facts material to a reasonable investor and that the speaker lacked a basis

27  (that a reasonable investor would expect) for making such statements.

28

106.     Baker Tilly and the Underwriter Defendants are accountable for these statements, under the Securities Act.  Baker Tilly is responsible for its statements certifying the financials reported on the Company's balance sheet and representing that it performed its audit in compliance with GAAS.  The Underwriter Defendants are responsible because, as underwriters, they are subject to liability under Section 11 of the Securities Act for all statements in registration statements.

107.     The IPO Registration Statement assured investors that the Company always collected outstanding amounts due from its customers:

> [W]e have not determined that any slow-paying customers will require an allowance for bad debt against accounts receivable. In addition, our trade receivables balance increased from $24.4 million in June 30, 2010 to $38.2 million (excluding the impact of newly acquired Mobclix) in September 30, 2010 due to the timing of completing our campaigns and billing of our customers. As a result, our DSOs increased during the third quarter of 2010. However, we expect our DSOs to improve by the end of 2010 due to the increase in our fourth quarter collection efforts.

108.     Both Baker Tilly and the Underwriter Defendants (who) are responsible for these statements (what) made on January 27, 2011 (when) in the IPO Registration Statement (where). These statements were false (how) because the Company's trade receivables were overstated in that they were uncollectible because, among others, the VTRIP Entities were not six separate customers, but rather a single affiliated customer which comprised a significant amount of the Company's receivable.  Such a concentration of outstanding receivables with a single customer increases the risk to the Company if the customer fails to pay and the Company failed to increase reserves to protect against its exposure to the VTRIP Entities and their average 700 days DSO. These statements were further false and misleading by omission in that the speakers omitted to disclose facts material to a reasonable investor and that the speaker lacked a basis (that a reasonable investor would expect) for making such statements.

109.     Baker Tilly and the Underwriter Defendants are accountable for these statements, under the Securities Act.  Baker Tilly is responsible because the Company's trade receivables balance is a balance sheet item, and Baker Tilly certified the financials reported on the Company's balance sheet.   The Underwriter Defendants are responsible because, as

underwriters, they are subject to liability under Section 11 of the Securities Act for all statements in registration statements.

110.   The IPO Registration Statement stated the following regarding the Company's accounts receivable:

> We have not historically incurred bad debt expense, none of our significant customers have historically failed to pay amounts due to us, and we do not believe that any of the customers contributing to our increased accounts receivable aging will fail to pay us in full. ***Accordingly, we have not determined that any slow-paying customers will require an allowance for bad debt against accounts receivable.***

111.   Both Baker Tilly and the Underwriter Defendants (who) are responsible for these statements (what) made on January 27, 2011 (when) in the IPO Registration Statement (where). These statements were false (how) because Baker Tilly tested the Company's receivables and certified that no allowance for bad debt against the accounts receivable were necessary when that was not the case. These statements were further false and misleading by omission in that the speakers omitted to disclose facts material to a reasonable investor and that the speaker lacked a basis (that a reasonable investor would expect) for making such statements.

112.   Baker Tilly and the Underwriter Defendants are accountable for these statements, under the Securities Act.  Baker Tilly is responsible because accounts receivable is a balance sheet item, and Baker Tilly certified the financials reported on the Company's balance sheet. The Underwriter Defendants are responsible because, as underwriters, they are subject to liability under Section 11 of the Securities Act for all statements in registration statements.

113.   The IPO Registration Statement further stated under the heading "Liquidity and Capital Resources":

> In addition, our trade receivables balance increased from $24.4 million in June 30, 2010 to $38.2 million (excluding the impact of newly acquired Mobclix) in September 30, 2010 due to the timing of completing our campaigns and billing of our customers.  As a result, our DSOs increased during the third quarter of 2010. However, we expect our DSOs to improve by the end of 2010 due to the increase in our fourth quarter collection efforts. ***We believe that our increase in DSOs is temporary and will improve as the economic climate improves and as we expand our geographic reach into North America and Asia.***

114.   The Underwriter Defendants (who) are responsible for these statements (what) made on January 27, 2011 (when) in the IPO Registration Statement (where).

115.    These statements were false (how) because there was no reasonable basis, as explained herein, to state that the Company's DSO increase was temporary or would improve in time.   These statements were further false and misleading by omission in that the speakers omitted to disclose facts material to a reasonable investor and that the speaker lacked a basis (that a reasonable investor would expect) for making such statements.

116.    The Underwriter Defendants are accountable for these statements, under the Securities Act.   The Underwriter Defendants are responsible because, as underwriters, they are subject to liability under Section 11 of the Securities Act for all statements in registration statements.

117.    The IPO Registration Statement also included the Report of Independent Registered Public Accounting Firm Defendant Baker Tilly, that falsely informed investors that the IPO Registration Statement was prepared in accordance with GAAP:

> In our opinion, the consolidated financial statements and financial statement schedule referred to above present fairly, in all material respects, the consolidated financial position of Velti plc and its subsidiaries as of December 31, 2009 and 2008, and the results of their operations and cash flows for each of the three years ended December 31, 2009, in conformity with accounting principles generally accepted in the United States of America.

118.    Baker Tilly (who) is responsible for these statements (what) made on January 27, 2011 (when) in the IPO Registration Statement.   These statements that Velti's financial results were prepared in accordance with GAAP were false (how), as explained in more detail herein, because they overstated the company's accounts receivable, and, thus, revenue, income and shareholder equity in violation of GAAP and the Company failed to record a proper allowance for doubtful accounts in violation of GAAP.

119.    Baker Tilly's Report of Independent Registered Public Accounting Firm was further false and misleading because, in conducting its audit, Baker Tilly failed to exercise due professional care as required by GAAS AU Section 230.   By failing to approach their work with the required skepticism the auditors failed to perform the audit in accordance with GAAS AU 230.   This failure resulted in a build-up of uncollectable receivables which ultimately necessitated the $111 million write-off.   Through its report, Baker Tilly falsely assured investors

1  that Velti's financial statements were prepared in accordance with GAAP, when in fact they

2  were not.  Baker Tilly failed to examine the credit worthiness of Velti's customers in the PIIGS[12]

3  regions in the face of numerous red flags, a critical inquiry in determining whether collectability

4  would be reasonably assured under GAAP.  Even the most cursory of examinations or audit

5  testing of the reconciliation process between accrued accounts receivable and trade accounts

6  receivable would have revealed the rapidly burgeoning accrued accounts receivables balance,

7  and an obvious failure to take an adequate reserve against or write-off those uncollectable

8  accounts.  These statements were further false and misleading by omission in that the speakers

9  omitted to disclose facts material to a reasonable investor and that the speaker lacked a basis

10  (that a reasonable investor would expect) for making such statements.

11      120.    In sum, the statements contained in the Company's IPO Registration Statement

12  concerning its financial results, its factoring activities, its revenue recognition procedures, its

13  DSO, and its accounting for its allowance for doubtful accounts were false and misleading and

14  falsely assured and comforted the market that its receivables were collectible and within normal

15  operating ranges given the Company's revenue and net income for the same period.  The true

16  facts regarding these statements were as follows:

17      (a)    the Company was having difficulty collecting its receivables;

18      (b)    a significant portion of the Company's receivables were owed by customers in

19            dubious financial condition and were uncollectible;

20      (c)    as a result, the Company's revenues and receivables were materially overstated;

21            and

22      (d)    the Company's allowance for doubtful accounts was materially understated.

23

24

25

26

27  [12] PIIGS is an economists' term used to refer collectively to Portugal, Italy, Ireland, Greece and Spain.

28

### B.     The SPO

121.     On June 15, 2011, the Company issued its final Prospectus for the SPO, which was declared effective by the SEC on June 14, 2011.  The offering was for 8,000,000 ordinary shares of Velti at $15.25 per share plus any over-allotment.

122.     The SPO incorporated the consolidated balance sheets of Velti plc and subsidiaries (the "Group") as of December 31, 2010 and 2009, and the related consolidated statements of operations, shareholders' equity and comprehensive income (loss), and cash flows for each of the three years in the period ended December 31, 2010.

123.     The SPO Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.  To the extent any statements or omissions alleged to be false and misleading are included in the SPO Registration Statement are statements of opinion, Plaintiffs allege herein that such statements or omissions were false and misleading by omission in that the speaker omitted to disclose facts material to a reasonable investor and that the speaker lacked a basis (that a reasonable investor would expect) for making such statements.

124.     As discussed, below, the untrue statements of material fact and omitted material facts in the SPO Registration Statement relate to (i) the difficulty the Company was having collecting certain receivables; (ii) the fact that certain of the Company's receivables were uncollectible; (iii) the fact that the Company's revenues and receivables were overstated during the Class Period; (iv) that the Company lacked adequate internal and financial controls; and (v) as a result of the foregoing, the Company's financial results were materially false and misleading at all relevant times.

125.     On June 15, 2011, the Company issued the SPO Registration Statement, which was declared effective by the SEC on June 14, 2011.  The SPO Registration Statement contained a host of actionably false and misleading statements.  The "'who, what, when, where and how' of each false statement is set forth, below.

126.   The SPO Registration Statement included Velti's financial results.  Baker Tilly (who) certified the Company's financial results (what) on January 27, 2011 (when) in the IPO Registration Statement (where).  These statements were false (how) because they overstated the company's accounts receivable, and, thus, revenue, income and shareholder equity in violation of GAAP and the Company failed to record a proper allowance for doubtful accounts in violation of GAAP.

127.   The Underwriter Defendants are also accountable for these statements, under the Securities Act because, as underwriters, they are subject to liability under Section 11 of the Securities Act for all statements in registration statements.

128.   Moreover, the SPO Registration Statement included Baker Tilly's audit report providing an unqualified Report of Independent Registered Public Accounting Firm with respect to these financial statements.  It also included a statement by Baker Tilly stating that:

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements and financial statement schedule are free of material misstatement. The Group is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting.

> Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control over financial reporting. Accordingly, we express no such opinion. ***An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audits provide a reasonable basis for our opinion***.

129.   Baker Tilly (who) is responsible for these statements (what) made on June 15, 2011 (when) in the SPO Registration Statement (where).  The statements that Baker Tilly's testing of the items on the Company's financial statements was a reasonably held belief are false and misleading (how) because the evidence discussed herein demonstrates that the statements of "opinions" could not be reasonably held when made.

130.   In its audit report, Baker Tilly also represented that:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Velti plc and its subsidiaries as of December 31, 2010 and 2009, and the results of their

operations and cash flows for each of the three years in the period ended December 31, 2010, in conformity with accounting principles generally accepted in the United States of America. ***In addition, in our opinion, the financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related financial statements.***

131.   Baker Tilly (who) is responsible for these statements (what) made on June 15, 2011 (when) in the SPO Registration Statement (where).  The statements that Baker Tilly's testing of the items on the Company's financial statements was a reasonably held belief are false and misleading (how) because the evidence discussed herein demonstrates that the statements of "opinions" could not be reasonably held when made.

132.   Velti acknowledged in its SPO Registration Statement that there were some material weaknesses in Velti's internal control over financial reporting relating to its financial statement close process, but informed investors that it had taken steps to remediate those weaknesses including implementing additional control procedures in connection with its review of key financial estimates including accounts receivable and its allowance for doubtful accounts.

133.   The SPO Registration Statement represented that under the terms of the Company's revenue recognition policy the Company only recognized revenue when certain criteria were met, including the existence of evidence to support the recognition of revenue as of the reporting date.  The Company also stated that revenue would only be recognized as accrued contract receivable when all of the revenue recognition criteria had been met:

> **Revenue Recognition**
>
> We account for our revenue for these services and licenses in accordance with Accounting Standards Codification (ASC) Topic 605 — Revenue Recognition and ASC Topic 985-605 — Certain Revenue Arrangements that Include Software Elements. We recognize revenue when all of the following conditions are satisfied: (i) there is persuasive evidence of an arrangement; (ii) the service has been rendered or delivery has occurred; (iii) the fee to be paid by the customer is fixed or determinable; and (iv) collectability of the fee is reasonably assured.

134.   The Underwriter Defendants (who) are responsible for these statements (what) made on June 15, 2011 (when) in the IPO Registration Statement (where).

135.   This statement was false (how) because the Company regularly recognized and reported revenue despite the fact that collectability was not reasonably assured.  These statements were further false and misleading by omission in that the speakers omitted to disclose

facts material to a reasonable investor and that the speaker lacked a basis (that a reasonable investor would expect) for making such statements.

136.   The Underwriter Defendants are responsible for this false statement because underwriters of an offering are strictly liable for all statements made in offering documents.

137.   The SPO Registration Statement also reported a $419,000 increase to its allowance for doubtful accounts, but downplayed the small increase reassuring investors that the Company had always collected from its customers even from customers with old balances:

> Some of our business is in emerging markets where payment terms on amounts due to us may be longer than on our contracts with customers in other markets. …. Our DSOs have historically decreased during the first and second quarter, and increased during the third and fourth quarters, due to the seasonal nature of our business. DSOs based on trailing 12 months' revenue were 113 as of March 31, 2011 compared to 121 and 131 as of December 31, 2010 and 2009, respectively. ***We have historically collected all amounts due from our customers, even from those customers with balances with longer aging, as evidenced by our insignificant bad debt expense for 2010, 2009 and 2008.*** We do evaluate receivables on a customer specific basis and record a reserve based on relevant facts and circumstances as deemed necessary.  Accordingly, during the three months ended March 31, 2011 we recorded an increase in the provision for doubtful accounts by $419,000 primarily related to one customer subject to currency control restrictions.

138.   Both Baker Tilly and the Underwriter Defendants (who) are responsible for these statements (what) made on June 15, 2011 (when) in the SPO Registration Statement (where). These statements were false because the allowance for doubtful accounts – while literally true – was materially false and misleading because it was understated.  Had such allowances been accurately stated, they would have been much higher, rendering the other derivative financial results (such as assets) reported on the Company's balance sheet materially false and misleading.

139.   The SPO Registration Statement explained that Velti takes "historical write offs and current economic conditions" into account when setting an allowance for doubtful accounts as follows:

> ***Allowance for Doubtful Accounts***
>
> We evaluate the collectability of accounts receivable based on a combination of factors; an allowance for doubtful accounts is provided based on estimates developed using standard quantitative measures, which include historical write offs and current economic conditions. We also make a specific allowance if there is strong evidence indicating that the amounts due are unlikely to be collectible. The allowance for doubtful accounts was $554,000, $135,000 and $135,000, as of March 31, 2011, and December 31, 2010 and 2009, respectively.

140.    Both Baker Tilly and the Underwriter Defendants (who) are responsible for these statements (what) made on June 15, 2001 (when) in the IPO Registration Statement (where). These statements were false (how) because the allowance for doubtful accounts – while literally true – was materially false and misleading because it was understated.  Had such allowances been accurately stated, they would have been much higher, rendering the other derivative financial results (such as assets) reported on the Company's balance sheet materially false and misleading.  These statements were further false and misleading by omission in that the speakers omitted to disclose facts material to a reasonable investor and that the speaker lacked a basis (that a reasonable investor would expect) for making such statements.

141.    Baker Tilly and the Underwriter Defendants are accountable for these statements, under the Securities Act.  Baker Tilly is responsible because the allowance for doubtful accounts impacts derivative balance sheet items, and Baker Tilly certified the financials reported on the Company's balance sheet.   The Underwriter Defendants are responsible because, as underwriters, they are subject to liability under Section 11 of the Securities Act for all statements in registration statements.

142.    The SPO Registration Statement further stated that as of March 31, 2011 Velti had factored $6.1 million in receivables noting that its credit risk with regard to its accounts receivable "is limited as we have policies in place to ensure that sales are made to customers with a high credit standing, and we enter into factoring arrangements with local banks for a material portion of our accounts receivable."

143.    The Underwriter Defendants (who) are responsible for these statements (what) made on June 15, 2011 (when) in the IPO Registration Statement (where).  These statements were false (how) because in reality, Velti's borrowing arrangements from its factors with recourse and at high interest rates were highly unusual and confirm that the factors themselves had little confidence in the collectability of these accounts receivable as adequate security for their loans.  Given as much, it follows that Velti's accounts receivable were of dubious quality.  Further, by pledging its accounts receivable and agreeing to these terms, and not having to write

1   off its worthless accounts receivable, Velti was able to defer the day of reckoning when it could

2   no longer use this source of asset based financing.  As such, the Underwriter Defendants should

3   have caused the Company to disclose this information, and their failure to do so rendered such

4   statements further false and misleading by omission in that the speakers omitted to disclose facts

5   material to a reasonable investor and that the speaker lacked a basis (that a reasonable investor

6   would expect) for making such statements.

7       144.   The statements contained in the SPO Registration Statement concerning Velti's

8   financial results, its factoring activities, its revenue recognition procedures and its accounting for

9   its allowance for doubtful accounts deceptively assured and comforted the market that Velti's

10  receivables were within normal operating ranges given the Company's revenue and net income

11  for the same period.  But these statements were false, and the truth was:

12      (a)    that the Company was having difficulty collecting its receivables;

13      (b)    that a significant portion of the Company's receivables were owed by customers

14             in dubious financial condition and were uncollectible;

15      (c)    that, as a result, the Company's revenues and receivables were overstated;

16      (d)    that the Company's allowance for doubtful accounts was understated; and

17      (e)    that by revealing only the DSO number for its trade receivables and excluding the

18             DSO number associated with its accrued contracts receivables, Velti hid the true

19             length of time it took the company to collect recognized revenue and misled

20             investors about the quality and collectability of its receivables.

21      145.   As a result of the Company's failure to follow GAAP and its own revenue

22  recognition policy, the Company's reported financial results were materially false and

23  misleading.

24      146.   The Company's Auditors, Baker Tilly, issued a clean audit report, included in the

25  SPO Registration Statement, informing investors that the Company's financial statements were

26  prepared in accordance with GAAP:

27          In our opinion, the consolidated financial statements referred to above present
            fairly, in all material respects, the consolidated financial position of Velti plc and
28          its subsidiaries as of December 31, 2010 and 2009, and the results of their

operations and cash flows for each of the three years ended December 31, 2010, in conformity with accounting principles generally accepted in the United States of America.

147.    Defendant Baker Tilly's (who) report (what) set forth in the SPO Registration Statement (where) on June 15, 2011 (when).  Baker Tilly's report was false and misleading because Baker Tilly failed to exercise due professional care as required by GAAS AU Section 230.  By failing to approach their work with the required skepticism the auditors failed to perform the audit in accordance with GAAS.  A failure which resulted in a build-up of uncollectable receivables and which ultimately necessitated the $111 million write-down.

148.    By issuing a clean audit report, Baker Tilly assured investors that Velti's financial statements were prepared in accordance with GAAP, when in fact they were not.  Even the most cursory of examinations or audit testing of the reconciliation process between accrued accounts receivable and trade accounts receivable would have revealed the rapidly burgeoning accrued accounts receivables balance, and an obvious failure to take an adequate reserve against these uncollectable accounts.  The report was further false and misleading by omission in that the speakers omitted to disclose facts material to a reasonable investor and that the speaker lacked a basis (that a reasonable investor would expect) for making such statements.

## VII.    BAKER TILLY VIOLATED THE EXCHANGE ACT

149.    During the Class Period, Velti's financial reports filed with the SEC: (i) overstated the company's accounts receivable, and, thus, revenue, income and shareholder equity in violation of GAAP; (ii) failed to record a proper allowance for doubtful accounts in violation of GAAP; and (iii) mislead investors regarding the quality and collectability of Velti's receivables by reporting false and issued misleading figures for the days sales outstanding, which is one of Velti's primary business metrics and is an important measure of the Company's overall financial health.

150.    As a result, the Company's Class Period financial statements were materially misleading and not presented in accordance with GAAP.  GAAP consists of those principles recognized by the accounting profession as conventions, rules and procedures necessary to define accounting practices at a particular time.  The SEC has the statutory authority for the

1   promulgation of GAAP for public companies and has delegated that authority to the Financial

2   Accounting Standards Board ("FASB").   The FASB issues concept statements, which are the

3   fundamental building blocks of GAAP.   SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1))

4   provides that financial statements filed with the SEC that are not presented in accordance with

5   GAAP will be presumed to be misleading.

6       151.   Despite the foregoing, during the Class Period Baker Tilly certified that it had

7   audited the Company, pursuant to GAAS, and found that Velti's financials were fairly presented

8   in accordance with GAAP.   By so doing, Baker Tilly violated Rule 10b-5 and Section 10(b) of

9   the Exchange Act.

10      152.   Each of the false and misleading statements are set forth below, followed by a

11  detailed recitation of the bases for Plaintiffs' allegations that not only were these statements false

12  and misleading when made, but also the reasons why Baker Tilly knew or was severely reckless

13  in not knowing as much.

14      **A.   Baker Tilly Made False and Misleading Statements[13]**

15      153.   On April 12, 2011, Velti filed its Annual Report on Form 20-F with the SEC for

16  the 2010 fiscal year ("2010 Annual Report").   The Company reported fiscal year 2010 revenue of

17  $116.3, an increase of $26.3 or 29% compared to 2009, and trade and accrued contract

18  receivables of $39 million and $33.6 million respectively.

19      154.   Baker Tilly (who) is responsible for these statements (what) made in the April 12,

20  2011 (when) Annual Report on Form 20-F (where).

21      155.   These statements were false (how) because:

22      (a)   the Company was having difficulty collecting its receivables;

23      (b)   a significant portion of the Company's receivables were owed by customers in

24          dubious financial condition and were uncollectible and thus should not have been

25          recognized and recorded on the Company's balance sheet;

26

27  _____
    [13] The statements made in the Registration Statements are also actionable, against Baker Tilly,
    under the Exchange Act.   To minimize redundancy, they are not repeated here.

28

(c)     as a result, the Company's revenues and receivables were overstated; and

(d)     the Company's allowance for doubtful accounts was understated.

156.    Indeed, as the Deloitte Report noted several of the contracts identified in the Deloitte Report confirm that the Company's financials were false because the VTRIP Entities were affiliated and therefore represented a significant concentration of receivables from a single customer because the average DSO of the VTRIP Entities was over 700 days.

157.    Baker Tilly is responsible for these statements because accounts receivable is a balance sheet item, and Baker Tilly certified the financials reported on the Company's balance sheet.

158.    Velti's fiscal year 2010 Form 20-F also contained the Report of Independent Registered Public Accounting Firm from, Baker Tilly, and representations that it had "conducted [its] audits in accordance with the standards of the Public Company Accounting Oversight Board" and that "the consolidated financial statements . . . present fairly, in all material respects, the consolidated financial position of Velti."

159.    Baker Tilly's Report of Independent Registered Public Accounting Firm was false and misleading because Baker Tilly failed to exercise due professional care as required by GAAS AU Section 230.  By failing to approach their work with the required skepticism the auditors failed to perform the audit in accordance with GAAS.  This failure resulted in a build-up of uncollectable receivables – already over $20 million in southeastern Europe that were almost a year overdue by February, 2011 – and which ultimately necessitated the $111 million write-down in 2013.  By issuing the clean audit report Baker Tilly falsely assured investors that Velti's 2010 Annual Report filed with the SEC on Form 20-F was prepared in accordance with GAAP, when in fact it was not.  Even the most cursory of examinations or audit testing of the reconciliation process between accrued accounts receivable and trade accounts receivable would have revealed the rapidly burgeoning accrued accounts receivables balance, and an obvious failure to take an adequate reserve against these uncollectable accounts. Accordingly, Baker Tilly

1  either knew, or, at the barest minimum, was deliberately recklessness in not knowing and not

2  disclosing that Velti's financial statements had not been prepared in accordance with GAAP.

3       160.    On April 26, 2012, Velti filed its Annual Report on Form 20-F for the year ended

4  December 31, 2011 on Form 20-F with the SEC ("2011 Annual Report").   The Company

5  reported fiscal year 2011 revenue of $189.2 million and trade and accrued contract receivables of

6  $70.9 million and $98.2 million, respectively.   This compared with $39.1 million of trade

7  receivables and $33.6 million of accrued contract receivables as of December 31, 2010.

8       161.    Baker Tilly (who) is responsible for these statements (what) made in the April 26,

9  2012 (when) Annual Report on Form 20-F (where).

10      162.    These statements were false (how), as set forth in more detail herein, because:

11      (a)      the Company was having difficulty collecting its receivables;

12      (b)      a significant portion of the Company's receivables were owed by customers in

13              dubious financial condition and were uncollectible and thus should not have been

14              recognized and recorded on the Company's balance sheet;

15      (c)      as a result, the Company's revenues and receivables were overstated; and

16      (d)      the Company's allowance for doubtful accounts was understated.

17      163.    Despite the growing receivables figure, the 2011 Annual Report assured investors

18  that the Company had evaluated the collectability of accounts receivable and that where there is

19  "…strong evidence indicating that the amounts due are unlikely to be collectable, the Company

20  makes a specific allowance for doubtful accounts" and had concluded that "[a]s of December 31,

21  2011 and 2010, the allowance for doubtful accounts was $808,000 and $135,000, respectively."

22  **Allowance for Doubtful Accounts**

23  We evaluate the collectability of accounts receivable based on a combination of
   factors; an allowance for doubtful accounts is provided based on estimates
   developed using standard quantitative measures, which include historical write

24  offs and current economic conditions. We also make a specific allowance if there
   is strong evidence indicating that the amounts due are unlikely to be collectible.

25  As of December 31, 2011 and 2010, the allowance for doubtful accounts was
   $808,000 and $135,000, respectively.

26

27      164. Baker Tilly (who) is responsible for this statement (what) in the April 26, 2012

28  (when) Form 20-F (where).

165.  This statement was false (how) because:

(a)     the Company was having difficulty collecting its receivables;

(b)     a significant portion of the Company's receivables were owed by customers in dubious financial condition and were uncollectible and thus should not have been recognized and recorded on the Company's balance sheet;

(c)     as a result, the Company's revenues and receivables were overstated; and

(d)     the Company's allowance for doubtful accounts was understated.

166.  Velti's 2011 Form 20-F contained representations from Defendant Baker Tilly, the Company's auditors, that the audit had been conducted "in accordance with the standards of the Public Company Accounting Oversight Board."   The auditors also issued the following report on Velti's financial results and internal controls over financial reporting:

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements and the financial statement schedule are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the consolidated financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.
>
> *  *  *
>
> In our opinion, the consolidated financial statements and financial statement schedule referred to above present fairly, in all material respects, the financial position of the Velti plc as of December 31, 2011 and 2010, and the consolidated results of their operations and cash flows for each of the three years in the period ended December 31, 2011 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule, in all material respects, presents fairly the information set forth therein when read in conjunction with the related consolidated financial statements. Also in our opinion, the accompanying financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein. Also in our opinion, Velti plc maintained, in all material respects, effective internal control over financial reporting as of December 31, 2011, based on criteria established in *Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission*.

167.    Defendant Baker Tilly's (who) statements in the Report of Independent Registered Public Accounting Firm (what) in the April 26, 2012 (where) Form 20-F (where) was false and misleading (how) because: (i) in auditing Velti, Baker Tilly failed to exercise due professional care as required by GAAS AU Section 230; and (ii) the Company's internal controls were ineffective.

168.    By failing to approach their work with the required skepticism the auditors failed to perform the audit in accordance with GAAS, failing both to properly test for collectability.  By issuing a clean audit report Baker Tilly falsely assured investors that Velti's 2010 Annual Report filed with the SEC on Form 20-F was prepared in accordance with GAAP and that Velti had appropriate internal controls in place to ensure the accuracy of their financial statements.

169.    Defendant Baker Tilly's statements regarding the Company's internal controls were further false and misleading.  Indeed, even the most cursory of examinations or audit testing of the reconciliation process between accrued accounts receivable and trade accounts receivable would have revealed the rapidly burgeoning accrued accounts receivables balance, and an obvious failure to take an adequate reserve against these uncollectable accounts.  Accordingly, Baker Tilly either knew, or, at the barest minimum, was deliberately recklessness in not knowing and not disclosing that Velti's financial statements had not been prepared in accordance with GAAP.

170.    On April 11, 2013, Velti filed its Annual Report for the year ended December 31, 2012 on Form 20-F with the SEC ("2012 Annual Report").  The Company's 2012 Annual Report was signed by defendants Moukas and Cheung, and repeated the Company's financial results previously announced on March 12, 2013.

171.    The 2012 Annual Report falsely informed investors that under the terms of the Company's revenue recognition policy, the Company only recognized revenue when certain criteria were met, including the existence of evidence to support the recognition of revenue as of the reporting date.

172.    The 2012 Annual Report assured investors that the Company evaluated the collectability of accounts receivable and mad a specific allowance if there was "strong evidence indicating that the amounts due are unlikely to be collectible."

173.    As of December 31, 2012 the Company's allowance for doubtful accounts for trade receivables and accrued contract receivables was $7 million and $0.8 million respectively. The Company also explained that it maintains an allowance for doubtful accounts to reflect the expected non-collection of accounts receivable and accrued contract receivables and writes off accounts receivable when it considers them uncollectible.

174.    Baker Tilly (who) is responsible for these statements (what) made on April 11, 2013 (when) in the Form 20-F (where).  These statement were false (how), as set forth in more detail herein, because the allowance for doubtful accounts – while literally true – was materially false and misleading because it was understated.  Had such allowances been accurately stated, they would have been much higher, rendering the other derivative financial results (such as assets) reported on the Company's balance sheet materially false and misleading.

175.    The statements contained in the Company's 2012 Annual Report concerning the Company's financial results, factoring and accounting for doubtful accounts, deceptively assured and comforted the market that its receivables were within normal operating ranges given the Company's revenue and net income for the same period.  The true facts, which were known to and/or disregarded with deliberate recklessness by Defendants but concealed from the investing public, were as follows:

(a)    that the Company was having difficulty collecting its receivables;

(b)    that a significant portion of the Company's receivables were owed by customers in dubious financial condition and were  uncollectible and had been on Velti's books since 2011;

(c)    that, as a result, the Company's revenues and receivables were overstated; and

(d)    that the Company's allowance for doubtful accounts was understated.

176.   Baker Tilly (who) is responsible for these statements (what) made on April 11, 2013 (when) in the Form 20-F (where).   The statements regarding the Company's internal controls were also false and misleading because: (i) the Company did not disclose the fraudulent scheme alleged herein; and (ii) Defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP.   These statements that Velti's financial results were prepared in accordance with GAAP were false (how), as set forth in more detail herein, because they overstated the company's accounts receivable, and, thus, revenue, income and shareholder equity in violation of GAAP and the Company failed to record a proper allowance for doubtful accounts in violation of GAAP.

177.   Velti's fiscal year 2012 Form 20-F also contained representations from the Company's auditors that "we conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board" and that "the financial statements . . . present fairly, in all material respects, the consolidated financial position of Velti."

178.   Defendant Baker Tilly's (who) Report of Independent Registered Public Accounting Firm (what)  made on April 11, 2013 (when) in the Form 20-F (where) was false and misleading (how), as set forth in more detail below at herein, because Baker Tilly failed to exercise due professional care as required by AU Section 230 and GAAS.   By failing to approach their work with the required skepticism the auditors failed to perform the audit in accordance with GAAS.   A failure which resulted in a build-up of uncollectable receivables and which ultimately necessitated the $111 million write-down.   Even the most cursory of examinations or audit testing of the reconciliation process between accrued accounts receivable and trade accounts receivable would have revealed the rapidly burgeoning accrued accounts receivables balance, and an obvious failure to take an adequate reserve against these uncollectable accounts. Accordingly, Baker Tilly either knew, or, at the barest minimum, was deliberately recklessness in not knowing and not disclosing that Velti's financial statements had not been prepared in accordance with GAAP.

179.    Indeed, in the Report of Independent Registered Public Accounting Firm, Baker Tilly expressly (and finally) noted that the Company's internal controls had material weaknesses and that, "because of the effect of the material weakness described above on the achievement of the objectives of the control criteria, Velti plc has not maintained effective internal control over financial reporting as of December 31, 2012, based on the COSO criteria."

**B.     Baker Tilly's Statements Were Knowingly or Recklessly False and Misleading**

180.    As discussed above, during the Class Period, Baker Tilly issued three categories of false and misleading statements which give rise to liability under Section 10(b) of the Exchange Act.

181.    First, Baker Tilly issued audit reports on the Company's financial statements for the years ended 2009, 2010, 2011 and 2012, thereby falsely assuring investors that the Company's financial statements were prepared in accordance with GAAP and accurately presented the financial position of the Company.

182.    As discussed, above, these statements were false and misleading because Velti did not comply with GAAP and its financials did not accurately represent the Company's financial condition.  Indeed, GAAP rules required Velti to record a reserve for the uncertainty associated with the collectability of its outstanding receivables, particularly in light of its customers' economic condition and age of such receivables.  *See* ASC 450-20-25-2 *Recognition of Loss Contingencies*.  When current information and events make it probable that an entity will be unable to collect amounts due according to the contractual terms of a receivable, a loss contingency should be accrued as set forth in ASC 310-10-35-10 *Receivables*.  Velti's financial statements did not comply with GAAP as they did not provide for a mechanism to calculate reserves.  They also did not provide for adequate reserves, which in turn inflated revenues, income and earnings per share.

183.    Second, Baker Tilly also issued an opinion attesting to the efficacy of the Company's internal controls over financial reporting in the financial report for fiscal year 2011. As discussed herein Velti's internal controls were not effective.

184.     Third, Baker Tilly falsely represented that it conducted its audits in compliance with GAAS.  However, for the reasons discussed below, Baker Tilly did not properly conduct its audits in compliance with GAAS.

185.     The Public Company Accounting Oversight Board ("PCAOB") was established by Congress to oversee the audits of public companies in order to protect investors and the public interest by promoting informative, accurate, and independent audit reports.  Audits in the U.S. must adhere to GAAS expressed by the PCAOB.

186.     Auditors are required to exercise due professional care in the planning of the audit and the preparation of the report, GAAS Interim Auditing Standards ("AU") Section 230.07:

> Due professional care requires the auditor to exercise *professional skepticism*. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence.

187. Meeting this standard requires the independent corroboration of financial information when certain red flags are uncovered and more than the unquestioning acceptance of a company's anecdotal representations.

188. In order to comply with GAAS, auditors must *always* test and question the adequacy of the allowance for doubtful accounts, as such reserves are recorded at the discretion of management.   Yet, Baker Tilly did not exercise due professional care and professional skepticism in auditing the collectability of the Company's accounts receivables and the adequacy of its reserves for the following reasons.

### 1.     Red Flags

189. Baker Tilly was aware of or was deliberate in ignoring numerous red flags that should have triggered a heightened scrutiny regarding Velti's accounts receivable and reserves, including:

(1)     As relayed by former CFO Ross, prior to his arrival at the Company in January, 2013, Velti lacked *did not have  mathematical formula for calculating reserves –*

1   any reserves were just based on never having had a "bad debt" before and

2   representations by Velti employees that the customers would pay.

3   (2)   As referenced above, Velti had extremely small reserves despite the fact that its

4   accounts receivable was very old – indeed, measured in months, if not years, for

5   example:

6   a.   As early as the end of 2009, according to the Company's former Senior

7   Manager of Global Financial Planning and Analysis, 19.8% of the

8   Company's accounts receivables were more than 90 days overdue

9   (meaning they had been outstanding for 9 months), and 8.3% of the

10   Company's accounts receivables were older than 365 days (meaning they

11   had been outstanding for over 18 months).

12   b.   As of December 31, 2010, according to a report produced by Velti and

13   given to Baker Tilly dated February 8, 2011 that identifies each and every

14   customer from the region, the amounts billed to each customer and the

15   dates the each customer was billed – the Company had €23 million (or, at

16   the time, approximately $32 million) in overdue invoiced trade receivables

17   (just a subset of the Company's total receivables) on the Company's books

18   (32% of which was more than 90 days overdue) from Greece – the

19   Company had virtually no bad debt provision.

20   c.   As of December 31, 2010, a similar document (prepared by Velti and

21   dated February 4, 2011) shows that 95% of €62 million (or, at the time,

22   approximately $82 million) worth of Velti's accounts receivables were 90+

23   days overdue, 77% were 180+ days overdue, and 35% were 300+ days

24   overdue.

25   d.   In Baker Tilly's May 14, 2012 presentation to the Audit Committee

26   regarding Q1 2012, Baker Tilly stated that the comprehensive DSO (trade

27   AR, accrued contracts accounts receivable and post dated checks) for Velti

28

1    SA – which is the Greek subsidiary responsible for the vast majority of the

2    ultimate write-off –   *was 649 days*.  Yet, Velti's reserve was less than $1

3    million at this time.  Moreover, as this information is as of Q1 2012, 649

4    days before March 31, 2012 would be June 21, 2010.  Thus, on average

5    these receivables had been outstanding *since approximately June 21,*

6    *2010, six months before the IPO and over a year before the SPO*.

7    Moreover, as DSO is an average, many receivables were *even older*.

8    Moreover, the May 14, 2012 presentation states that Trade AR for Velti

9    SA had a DSO of 191 days.  Since the DSO of 191 days is included in

10   Velti SA's total DSO, which was 649 days, the age of the *accrued*

11   *receivable* and check receivable must be *older than the 649 days*.  This

12   means that not only were there significant receivables *over 649 days* much

13   of these *were not even invoiced yet* – and thus utterly untested by Baker

14   Tilly.  Yet, Velti had *no* reserve for accrued/unbilled, accounts receivable

15   at this time.

16   e.    As relayed by Deloitte at the July 11, 2013 Board of Director meeting, the

17   VTRIP Group, which represented Velti's *largest combined outstanding*

18   *accounts receivable balance – which was $74.2 million – was over 700*

19   *days old*.    Therefore, on average these receivables had been outstanding

20   *since approximately July to November, 2011 and, some of which were*

21   *even older* as the 700 days is the average.

22   (3)    Velti had very small reserves for doubtful accounts as set forth above.

23   (4)    Velti's accrued (*i.e.* unbilled) receivables were very large – accounting for

24   approximately half of the outstanding receivables at any given time – and old –

25   where as these receivables should have had short DSOs and been smaller as they

26   should have been quickly reconciled and invoiced and, thus, moved to trade

27   receivables.   *Yet, Velti did not record any reserves for these large accrued*

1    *contract receivables until Q4 2012 and then, it only recorded a $1 million*

2    *reserved on a balance of $134 million.*

3    (5)    A very small number of customers made up the majority of the Company's

4    outstanding accounts receivable balance, and those few customers were affiliated

5    with each other.  Moreover, those customers were all in the Greece and Cyprus

6    area and the Greek economic crisis had commenced before April 2010.  Indeed,

7    85% of the Greek and Cyprus accounts receivable were owed by just 26

8    customers and over 65% was owned by just two customers that were interrelated,

9    all of whom were quickly determined to be uncollectable by Deloitte.

10   (6)    Despite contrary representations to the investing public, the vast majority of

11   Velti's income came from countries (Greece and Cyprus) suffering from a

12   significant financial crisis.  Indeed, as disclosed at the end of the Class Period,

13   customers in Greece and Cyprus "still held approximately two-thirds of [Velti's]

14   outstanding receivable and accrued revenues."

15   (7)    Velti had identified internal control problems and several of the Individual

16   Defendants stated in their SOX certifications that they had disclosed their

17   evaluations of the controls to Baker Tilly.  Indeed, Baker Tilly had recognized

18   that Velti had internal control problems in 2010 and 2012.

19   **2.    Baker Tilly's Audits**

20   190.   Yet, in the face of this, and even though, as reflected in the Audit Committee

21   meeting minutes and Baker Tilly's presentations to the Audit Committee, Baker Tilly repeatedly

22   identified the Company's account receivables as a *key risk*, Baker Tilly utterly failed to exercise

23   due professional care and professional skepticism in auditing the collectability of the Company's

24   accounts receivables.

25   191.   Baker Tilly's presentations to the Audit Committee that were produced by the

26   Settling Defendants, dated from March 15, 2011 to May 8, 2013, indicate that Baker Tilly tested

27   a sampling of accounts receivable through customer confirmation of debt (often with *minimal*

1  confirmation); contract review (*i.e.* looking at the contracts to see what the terms were) and cash

2  collections (*i.e.*, the percentage of invoices that is paid) to ascertain the collectability of Velti's

3  accounts receivables.  The presentations further indicate that Baker Tilly relied primarily on cash

4  collections.  Yet, cash collection on some receivables does not support the future cash collection

5  of the remaining balance.  Further, customer confirmation of debt (if any was even received) and

6  contract review not support collectability or ability of the customers to pay such debt.   Indeed,

7  Baker Tilly did not look at collectability or ability of the customers to pay such debt.

8  i.   *Accrued Receivables*

9        192.   Moreover, and significantly, a cash collection review ignored a large (and

10  increasing) portion of Velti's accounts receivables, namely the accrued accounts receivable (*i.e.*

11  receivables that have not yet been invoiced) as since these were unbilled there was extremely

12  limited cash collection history to review.  Likewise, debt confirmation is not possible as the

13  customers have not yet been billed in order to confirm the outstanding accounts receivable.

14        193.   As evidenced by Velti's 20-Fs for 2010, 2011 and 2012, the accrued accounts

15  receivables represented $33.6 million out of $101 million of total receivables for 2010, $98.6

16  million out of $224 million of total receivables for 2011, and $134 million out of $303.3 million

17  of total receivables for 2012.   Although the reported accrued contract receivables balance made

18  up a sizable portion of the Company's outstanding accounts receivable (a fact that Baker Tilly

19  could not ignore), a review Baker Tilly's presentations to the Audit Committee between March

20  15, 2011 to May 8, 2013 indicate that Baker Tilly did not perform additional audit procedures to

21  assess the collectability of the Company's accrued contract receivables.

22        194.   Ultimately, approximately *69% of the final reserves were recorded for the*

23  *Company's accrued contract receivables* as evidenced by Velti's Form 6-K filed with the SEC

24  on August 20, 2013.  Baker Tilly's failure to pursue additional investigation and utter ignorance

25  of the accrued contract receivables in the face of the foregoing represented yet another violation

26  of GAAS.

27

28

*ii.     Concentration of Credit Risk*

195.     Further, the Baker Tilly's presentations to the Audit Committee from March 15, 2011 to May 8, 2013 are devoid of any indication that Baker Tilly analyzed the financial health, including creditworthiness, of customers regarding the accounts receivable.  This is in the face of the high concentration of credit risk as the majority of the receivables were owned by a few customers and in a region of economic turmoil.  Indeed, Deliotte's conclusion that $111 million need to be written off was after it determined, as it presented to the Board, that Deloitte "*many of the companies had reported troubling financial information, including evidence of bounced checks, legal orders against them, and other evidence of financial instability.*"

*iii.     Velti's Lack of a Formula for Reserves*

196.     Even in the face of Velti's lack of a formula for setting reserves, Baker Tilly failed to perform independent audit work to assess the collectability of both the Company's accounts receivables and the adequacy of the Company's reserves and instead relied on the representation of Velti sales employees that the Company had no historical collection problems and the outstanding receivables would be collected.

197.     This blind reliance is even more inadequate in the face of the fact that the Company's accounts receivables and DSOs were accelerating during the Class Period from already very high levels as of December 31, 2010. Given the increasing DSOs, it is clear that the historical performance of other receivables at Velti was not a valid metric for determining collectability and it was prudent for Baker Tilly to perform additional audit work to assess the collectability of the Company's accounts receivables independently rather than to rely on the Company's representation as to the collectability of the Company's receivables.

*iv.     Internal Controls*

198.     Moreover, Baker Tilly certified that Velti's internal controls were effective in 2011 and that the problems previously identified had been fixed.  Yet, internal control problems identified in 2010 were the same that led to the ultimate need to write-off $111 million in receivables, including the failure to properly reserve for uncollectable accounts receivable or to

1  identify and calculate bad debts.  Baker Tilly did not expand its review or heighten its scrutiny of

2  Velti's financial reporting in 2011, even when the Company itself had acknowledged material

3  problems with its internal controls.

4  *v.   Access to Documents*

5  199.   Baker Tilly had access to all appropriate information as suggested by its

6  presentations to the Audit Committee.   Indeed, that Baker Tilly had all appropriate

7  documentation necessary to reach an informed and proper professional opinion is confirmed by

8  CW 1, a former Director of Revenue from December 2009 through September 2012, traveled to

9  Athens, Greece three times during 2010 for the express purpose of gathering Velti's customer

10  contracts for Baker Tilly, so that Baker Tilly could review the accounting for the contracts and

11  conform it to U.S. GAAP.  Baker Tilly was in the process of preparing the Company's financials

12  for the IPO.   Likewise, former CFO Ross relayed that accounts receivable aging reports were

13  provided to Baker Tilly on quarterly basis.  These reports would identify the Greek receivables,

14  by customers, and aged into brackets.

15  200.   There can be no credible argument that Baker Tilly was anything other than

16  clearly aware of the quarter-to-quarter reconciliations that the Company undertook concerning its

17  accrued receivables and its trade receivables, because the Company announced periodically in

18  public statements that it had engaged in these reconciliations. Even the most cursory of

19  examinations or audit testing of the reconciliation process – again, as evidenced by Deloitte's

20  conclusions – would have revealed the rapidly burgeoning accrued receivables balances from

21  troubled businesses in admittedly troubled regions, and an obvious failure to take an adequate

22  reserve against these uncollectable accounts.

23  201.   Moreover, according to interviews with directors on the Company's Audit

24  Committee, Baker Tilly was testing a large percentage of the Company's receivables (as high as

25  90% by the Spring of 2013).   Any suggestion that Baker Tilly did not know the origin,

26  geographic concentration, or payment history of the Company's customers defies credulity.

27

28

1    Accordingly, Baker Tilly either knew, or, at the barest minimum, was deliberately recklessness

2    in not knowing and not disclosing these material failures.

3        202.    Had Baker Tilly followed GAAS and exercised due professional care in

4    discharging their duties, they would have uncovered the Company's collectability problems and

5    insufficient reserves for trade receivables – as Deloitte was swiftly able to do with only the barest

6    modicum of effort.  By failing to approach their work with the required diligence – or even

7    minimal skepticism – Baker Tilly failed to perform the audit in accordance with GAAS, a failure

8    which resulted in a build-up of uncollectable receivables and which ultimately necessitated the

9    $111 million write-off.

10            **3.    Deloitte's Review**

11        203.    An additional indictment of Baker Tilly's recklessness was how quickly Deloitte

12   was able to complete its review and ascertain the need for Velti to write-down more than $111

13   million in receivables as uncollectible

14        204.    Specifically, by December 2012, the Company's cash flow situation had become

15   dire.  Indeed, at a December 14, 2012 Board meeting Moukas told the board that cash flow was

16   "management's first priority." The Company's cash flow problems did not improve; instead they

17   extended into 2013, when they were noticed by the Company's core lender, HSBC.    The

18   minutes of  the Audit Committee's June 3, 2013 meeting (where, almost ironically, it was agreed

19   that a resolution reappointing Baker Tilly as the Company's auditors would be proposed at the

20   Company's Annual General Meeting of Shareholders), state that a "lengthy discussion" took

21   place surrounding a financial review of the Company's books and records by HSBC.

22   Additionally, HSBC had already requested the Company retain a financial advisor.[14]

23        205.    As a result, shortly thereafter, Deloitte was hired by Velti to review and evaluate

24   the Company's Greek and Cyprus operations, with a specific eye to determining the

25

26   _____
     [14] According to Ross, Hobley and Mann, upon his arrival at Velti, Ross planned to ultimately

27   replace Baker Tilly as the Company's auditor, believing the Company needed a "Big 4" auditing
     firm to give confidence to the market.  Ross never had time – the Company was in crisis and
     battling to survive during his entire tenure.

28

1    collectability of the Company's outstanding receivables.  According to Ross, the engagement

2    stemmed from pressure by HSBC to ensure the Company complied with loan covenants, the

3    failure of the Company's internal cash collection efforts, and HSBC's desire for an independent

4    assessment of the Company's receivables.  In other words, by that point, it appeared that HSBC

5    no longer trusted Velti's reporting on accounts receivables as signed off by Baker Tilly.

6    Moreover, within just months of joining Velti, Ross noted that a large red flag in that the top ten

7    customers of Velti represented 65% of the Company's outstanding receivables – a dangerous

8    business concentration that radically heightened the Company's exposure.

9        206.    In two weeks, with access to the same information available to Baker Tilly,

10   Deloitte presented its preliminary findings, which were ultimately confirmed in the final report.

11   The Deloitte Report concluded, among other things, that: (i) a large amount of the Company's

12   receivables were very old; (ii) 85% of the outstanding receivables in Greece and Cyprus were

13   owed by twenty-six customers; (iii) these receivables were *uncollectible*; and (iv) many of these

14   customers were related.

15       207.    According to interviews with the Settling Defendants, the Board was "shocked" at

16   the findings of the Deloitte Report.  Members of the Board claimed they were never told that

17   such a large number of the outstanding receivables were held by incredibly small affiliated Greek

18   companies.  Nor had they been told – despite Baker Tilly's review of 90% of the Company's

19   receivables – that $111 million of these same receivables were uncollectible and functionally

20   worthless.[15]

21       208.    The Deloitte Report recommended the $111 million write-down.  According to

22   the Settling Defendants, Baker Tilly signed off on the write-down without a fight.

23

24

---

25   [15] Any suggestion that that the differing conclusions reached by Baker Tilly and Deloitte during
     their respective reviews was due to changes in market conditions in Greece and Cypress is
26   implausible.  First, Baker Tilly was and had been reviewing the receivables on an ongoing basis
     for years; it thus could not have been surprised by Deloitte's findings.  Second, the financial
27   collapse in Greece and Cypress occurred years before, and were, if anything, winding down by
     the time of Deloitte's review.

28

C.   **Additional Allegations of Baker Tilly's Scienter**

1.   **SpinCo**

209.   According to the interviews of Mann and Hobley, Baker Tilly expressly approved of the "SpinCo" transaction, a proposed divestment intended to move assets from Greece, the Balkans, and select North African and Middle Eastern geographies for a minimum cash consideration.   The receivables to be divested would come from customers with similar characteristics; high DSOs, rapidly deteriorating revenue and heavy capital expenditure requirements.   Baker Tilly informed the Audit Committee that it would successfully help the Company achieve two goals.   First, it would allow the Company to then focus on stable and quicker-paying high growth markets such as the U.S., the U.K., Western Europe and Asia.   Second, it would permit the Company to move the divested assets off of the Company's balance sheet.

210.   Baker Tilly's blessing of the plan to use SpinCo started a massive undertaking by the Company.   According to interviews with directors on the Audit Committee and Moukas, throughout the summer of 2012, thousands of man-hours, from all levels of the Company including senior management and directors, were dedicated to the painstaking effort of sifting through the Company's receivables to determine which would be spun off and therefore no longer weigh down the Company's financials.

211.   In furtherance of executing the SpinCo transaction, the Company created a committee consisting of Mann, Phokion Potamianos, Mari Baker and Moukas to consider and approve the divestment.   After hundreds (if not thousands) of man hours were spent on the SpinCo transaction, Velti eventually retained KPMG to opine on it.

212.   Stunningly, and in contrast to the representations and advice of Baker Tilly, according to Mann and Hobley, in late 2012, KPMG informed the Company that, while the SpinCo transaction could go forward, the divested assets could *not* be moved off the Company's financial statements.   Instead, according to KPMG, they would still need to be reported in the Company's consolidated financials, a result which obviated the very purpose underlying the

1   transaction; divestiture of unfavorable customers from Velti's books.  It is inconceivable that an

2   audit firm would be unable to advise a company regarding a sale of a subsidiary.

3   213.   The bombshell precipitated a flood of action at the Company.   The Audit

4   Committee met on September 6, 2012 to discuss the "balance sheet classification impact" of the

5   news, and the Audit Committee further discussed the "changes to the structure" of the SpinCo

6   transaction at an October 8, 2012 meeting.  Finally, even Baker Tilly admitted that the SpinCo

7   transaction could only proceed as described by KPMG.   Specifically, according to Audit

8   Committee meeting minutes from May 8, 2013, Baker Tilly acknowledged that Starcapital (the

9   name for the entity that would serve as the parent of the SpinCo assets) was required to be

10  reported as a variable interest entity ("VIE") and its results were to be consolidated with Velti's.

11  214.   According to directors on the Audit Committee interviewed by Lead Counsel, no

12  less than $11 million of the eventual $111 million write-down is traceable directly to SpinCo.

13  Further, that during the contemplation of the Spinco Sale the average DSO for SpinCo was 450

14  days; by the time of the write-off approximately a year from the proposed transaction, the DSO

15  for Spinco was approximately *800 Days*.

16  215.   Other facts support a strong inference that Baker Tilly knew and/or was

17  deliberately reckless in disregarding that the Company was improperly accounting for

18  receivables.

19  216.   First, the sheer size of Velti's write-down provides additional evidence of Baker

20  Tilly's scienter.   In fact, the $111 million write-off was greater than the total revenue recognized

21  by the Company year to date.   Such problems do not merely appear overnight, and were so

22  obvious that they could not have been missed by a reasonably diligent (or any) auditor.

23  217.   Second, on November 14, 2012, Velti announced that it was taking back $5.1

24  million in factored receivables.   This indicates that senior management was aware that

25  receivables were uncollectable and served as an inescapably obvious red flag – for Baker Tilly –

26  with respect to the problems afflicting the balance of Velti's receivables.  Indeed, it is highly

1    unusual for a Company to reclaim factored receivables and it is an indication that the receivable

2    was not collectable.

3                    **2.**     **Velti's DSO Number Prior to May 2012**

4            218.    Prior to May 2012, Velti understated its DSO number by using only the time

5    between when the customer was actually invoiced and payment was made (its trade receivables).

6    Critically, Velti excluded receivables for the significant period of time (which was constantly

7    growing throughout the Class Period) between when Velti booked a sale as revenue and when

8    the customer was actually invoiced (its accrued receivables).  The Company was thereby able to

9    portray a materially shorter DSO, which misled investors to believe that Velti was converting

10   sales into cash much faster than it actually was.

11                   **3.**     **The Company's Collection Problems Were Apparent**

12           219.    As already discussed, the Deloitte Report confirms that Velti's collection

13   problems were easily identifiable and had been severe and ongoing for years.  This is not

14   inconsistent with the very reports that Baker Tilly received as early as February, 2011. Further,

15   Deloitte concluded that the VTRIP Entities were related and should be treated as a single

16   customer.  A single customer that accounted for a majority of the Company's receivables with an

17   average DSO of over 700 days required larger reserves.  This was more than sufficient to

18   illustrate to any auditor that the Company had serious collection problems that were not going to

19   improve.

20           220.    Indeed, according to the Deloitte Report, the Company's write-down was due to

21   the vast majority of receivables of Velti's top 26 customers which owed 85% of the $192 million

22   in Greek and Cyprus receivables (*i.e.* to subsidiaries Velti SA and Velti PS), of which 10

23   customers owed 65%.  Moreover, 8 of these 10 customers were actually just 2 related customers.

24   As detailed in the charts accompanying the Deloitte Report, these top 26 customers and the

25   accounts receivable attributed to them as of June 10, 2013 were:

26

27

28

[3:13-CV-03889-WHO] SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

| CUSTOMER | TOTAL ACCRUED RECEIVABLE[16] | TOTAL TRADE RECEIVABLE[17] | TOTAL ACCOUNTS RECEIVABLE |
|---|---|---|---|
| The VTRIP Group (consisting of Virtual Trip Ltd., Epignosis Ltd., Next Generation Learning Services S.A., MVision S.A., Infomap S.A., and IT Center S.A) | $45.3 million | $28.9 million | $74.2 million |
| The GLOBO Group (consisting of Globo Group and Profitel S.A.) | $15.6 million | $11.3 million | $26.9 million |
| Docusystems SA | $2.3 million | $16.6 million | $18.9 million |
| Trollectoria | $1.1 million | $4.1 million | $5.2 million |
| TS Consulting LTD | $3.3 million | $1.5 million | $4.8 million |
| Ministry of Development | | $4.4 million | $4.4 million |
| Voda Fone – Pana Fon SA | $2.8 million | $.3 million | $3.1 million |
| General Secretary of Research & Development | | $2.9 million | $2.9 million |
| Data Concept SA | $1.8 million | $.4 million | $2.2 million |
| H&S Technology | $2.3 million | $.5 million | $2.8 million |
| MD Newray Consulting Limited Cyprus | $.3 million | $1.8 million | $2.1 million |
| Toxilero Trading Ltd – Cyprus | $.3 million | $1.7 million | $2 million |
| Brfolg Holding Ltd | | $2 million | $2 million |
| Senecio Enterprises Ltd – Cyprus | $.3 million | $1.8 million | $2.1 million |
| Para Do Poulos Nikolaob | $.4 million | $1.5 million | $1.9 million |
| Kripo Tes Georgios Ltd | $.4 million | $1.1 million | $1.5 million |
| Tesseris Dimitrios Ltd | $.4 million | $1 million | $1.4 million |
| Praeus Bank | $1.4 million | $.1 million | $1.5 million |

[16] This includes accrued receivables for non-government as of May 31, 2013 and accrued receivable for government as of May 31, 2013.

[17] This includes post dated checks as of June 10, 2013 and outstanding open receivables as of June 10, 2013.

| Amplus SA | $.8 million | $1.7 million | $2.5 million |
|---|---|---|---|
| Information Society | | $1.2 million | $1.2 million |
| **TOTAL** | **$79 million** | **$84.8 million** | **$163. 8 million** |

221.    The fact that almost *half of these receivables were accrued* - thus unbilled and not yet reconciled with the customers – is significant as Baker Tilly's procedures primarily tested trade receivables, not accrued receivables.  Indeed, Baker Tilly's Audit Committee presentations indicate that Baker Tilly's review for collectability primarily consisted of cash collections - *i.e.*, the percentage of invoices that is paid – which could not be used for unbilled receivables. Therefore, even the insufficient testing of receivables Baker Tilly performed did not test accrued receivables.   Yet, Velti did not have *any* reserve for accrued receivables until Q4 2012 and thereafter, only a minimal $1 million reserve for accrued receivables.

222.    Furthermore, as stated in Velti's minutes of the July 11, 2013 Board of Directors meeting, Deloitte informed the board that "Deloitte had reviewed the data [for these top customers] by category, including post-dated checks, accrued receivables and outstanding amounts, as well as public information available about the financial health of each customer, and the status of the days sales outstanding (DSO)."   Deloitte "*confirmed that many of the companies had reported troubling financial information, including evidence of bounced checks, legal orders against them, and other evidence of financial instability*."   Yet, Baker Tilly's presentations to the Audit Committee are devoid of any indication that Baker Tilly analyzed the financial health, including creditworthiness, of customers.

223.    Furthermore, at the July 11, 2013 Board of Director meeting, Deloitte stated that "*the average DSO of the VTRIP group is over 700 days*…" (emphasis added).   Thus, the average of the *$74.2 million in receivables owed from VTRIP was over 700 days old*. Therefore, on average these receivables had been outstanding *since approximately July 2011, some of which were even older* as the 700 days is the average. Moreover $45.3 million of these old receivables was *accrued receivables*, which, as discussed above, were subject to minimal, if any, testing.

224.    Baker Tilly's conduct is even more improper in the face of the fact that the Company's accounts receivables and DSOs were accelerating during the Class Period, particularly in the first quarter of 2012.  Based on these continuous increases which were red flags that Baker Tilly ignored – it was prudent for Baker Tilly to perform additional audit work to assess the collectability of the Company's accounts receivables independently rather than to rely on the Company's representation as to the collectability of the Company's receivables.  The below chart reflects the increase in accounts receivables and DSO:

| Quarter | DSO | Comprehensive DSO | Accrued | Trade and Accrued AR in millions |
|---------|-----|-------------------|---------|-----------------------------------|
| Q4-2010 | 121 | N/A | 33.6 | 72.7 |
| Q1-2011 | 113 | N/A | 34.9 | 75.7 |
| Q2-2011 | 79 | N/A | 34.1 | 66.0 |
| Q3-2011 | 82 | N/A | 42.4 | 79.0 |
| Q4-2011 | 86 | 261 | 98.2 | 170.0 |
| Q1-2012 | 116 | 272 | 103.3 | 188.8 |
| Q2-2012 | N/A | 266 | 75.1 | 183.2 |
| Q3-2012 | N/A | 242 | 72.0 | 181.5 |
| Q4-2012 | N/A | 311 | 134.0 | 291.0 |
| Q1-2013 | N/A | 309 | 137.5 | 293.0 |
| Q2-2013 | N/A | N/A | 118.6 | 271.7 |

225.    While checking the creditworthiness of customers might not be standard or necessary in all cases, given the increasing DSOs, it becomes clear that the historical performance of other receivables at Velti was not a valid metric for determining collectability.  Indeed, when Deloitte checked the collectability of these same receivables, it determined that a huge write down was necessary.

226.    Baker Tilly also ignored the Company's growing accrued contract receivable balance.  Although the reported accrued contract receivables balance made up a sizable portion of the Company's outstanding accounts receivable in 2012 and 2013 (a fact that Baker Tilly could not ignore), it nevertheless did not perform additional audit procedures to assess the

1    collectability of the Company's accrued contract receivables.  Ultimately, approximately 69% of

2    the reserves were recorded for the Company's accrued contract receivables as evidenced,

3    according to the Velti's June 30, 2013 press release. Baker Tilly's failure to pursue additional

4    investigation in the face of the foregoing represented yet another violation of GAAS.

5        227.    Had Baker Tilly followed GAAS and exercised due professional care in

6    discharging its duties, it would have uncovered the Company's collectability problems and

7    insufficient reserves for trade receivables – as Deloitte was swiftly able to do with only the barest

8    modicum of effort.  By failing to approach its work with the required diligence – or even

9    minimal skepticism – Baker Tilly failed to perform the audit in accordance with GAAS, a failure

10   which resulted in a build-up of uncollectable receivables and which ultimately necessitated the

11   $111 million write-off.

12   **D.      The Greek and Cypriot Economic Crises Cannot Excuse Baker Tilly**

13       228.    Any suggestion that Baker Tilly did not know of the impact of the Greek and

14   Cypriot economic crises until at or after the end of the Class Period is nonsense. The Cypriot

15   banking crisis was in full force and widely reported by the start of 2013 and the Greek economic

16   crisis was in full swing by 2010, well before the IPO.  The Greek economic crisis did not

17   suddenly occur in 2013; it was well known to anyone paying even passing attention to the news

18   – and certainly inescapable to any business operating in the region, let alone one that relies on

19   the region for two thirds of its revenues.  Velti's suggestion that the sudden need for a massive

20   write-off in 2013 was due to a rapidly emergent financial crisis at that time simply belies even

21   the most generous credibility.  In truth, what really happened is that by August 2013, after

22   Deloitte properly evaluated the Company's accounts receivables (including the collectability of

23   these customers), these problems could no longer be concealed, and the Company had to disclose

24   them.   Indeed, such problems were well-known by Baker Tilly as early as February, 2011.

25       229.    On November 14, 2012, Velti announced that it had decided to divest its Greek

26   and Balkan subsidiaries attributing the move to the troubled economies of these regions, and

27

28

emphasized that the majority of Velti's revenue was now derived from customers in the U.S. and the U.K.  According to the press release:

> Velti also announced today that it has entered into an agreement to divest certain declining assets, focused on geographies and customers with worsening economic and demand characteristics, to a group led by local, non-executive management and comprising approximately 75 employees in total.   These assets are characterized by very long revenue collection cycles (***DSOs: approximately 450 days***),[18] are located in troubled economies, and have heavy capital expenditure requirements.
>
> Key aspects of the transaction:
>
>      \*   \*   \*
>
>  • Revenue from geographies characterized by high-DSOs, including the PIIGS countries, and other North African and Middle Eastern countries is expected to decline to 2 to 3 percent of total revenue for fiscal year 2013;
>
>      \*   \*   \*
>
>  • As a result of the divestiture and other operational improvements, Velti is targeting comprehensive DSOs below 180 days by Dec. 31, 2013;
>
>  • Revenue from the Americas and U.K., as a percentage of total revenue, are expected to increase to 55 to 60 percent in fiscal year 2012 and to 65 to 70 percent of total revenue in fiscal year 2013; and
>
>  • Velti's 2013 and 2014 revenue growth rates are expected to increase to the mid-30 percent range in both years (2013 versus pro forma 2012, excluding divested assets). (emphasis added).

230.   In the same press release former defendant Moukas represented that the move was intended to remove "economically challenged geographies" from the Company's books, specifically Greece and the Balkans.

231.   Given that Baker Tilly was the Company's auditor (and represented that it reviewed the collectability of the accounts of the Company's customers and received reports showing just how overdue those accounts were), it follows that it knew the location of the Company's customers and the impact that the Greek and Cypriot crises would have on Velti.  By knowing this information, yet still certifying the Company's financial results and failing to apprise the public of this lie and its impact, Baker Tilly actionably violated the Exchange Act.

---

[18] All emphasis added unless otherwise noted.

## VIII.   THE CLASS PERIOD ENDING DISCLOSURES

232.   On August 20, 2013, Velti issued a press release announcing 2Q2013 financial results.  In the release, former defendant Moukas revealed that during the quarter, Velti "began a major restructuring effort" to cut costs and reduce capital expenditures.  Moukas also delivered the stunning news that notwithstanding Velti's previously announced divestiture of its business with customers in Greece and Cyprus, those customers "continued to account for a significant portion of the Company's outstanding receivables," and "[d]ue to a deterioration in collections from these customers, and indications that future payments were at risk, *we made the decision to write-down more than $100 million in outstanding receivables*."

233.   The press release further revealed that Velti engaged an investment bank to help sell Mobclix, its supply-side U.S. advertising business, that Velti engaged Deloitte Financial Advisory Services to evaluate the collectability of receivable due from customers in Greece and Cyprus.   Moreover, the Company revealed that 2Q2013 revenues and free cash flow were substantially below prior quarters.

234.   That same day, Velti held a conference call with investors after the market close to discuss its second quarter 2013 results in which the Company made additional shocking revelations.  Specifically, former defendant Ross revealed for the first time, and contrary to prior Defendants' representations, that customers in Greece and Cyprus "*still held approximately two-thirds of our outstanding accounts receivable and accrued revenues*."

235.   On the call, a Wells Fargo Securities, LLC analyst questioned Defendant Ross about the seeming inconsistence between Moukas' prior statements, and the Company's latest revelations:

> **Q:**   **Peter Stabler** – Wells Fargo Securities, LLS – Analyst
>
> … A couple of questions for Jeff.  Can you help me reconcile a couple of things here, or at least tell me what I'm misunderstanding here?  In the past, Alex, you referred to your exposure to Greece from a revenue perspective as being in the high-single-digit percent.  Yet, with the write-down here, we're being told that it's attributable almost entirely to Greek-related revenues. . . Can you help me reconcile why this is such a large number tied to such a small economy? . . .

In response, Ross made the further shocking admissions: (i) that the $111 million in receivables being written off were "substantially old" and had been on Velti's books since "before even 2012," and (ii) that Velti, at worst blatantly lied in its SEC filings and public statements, and at best blatantly misled investors by presenting revenue and receivables based on the location or jurisdiction of the parent corporation rather than the country where the subsidiaries or business was located:

> **A:** **Jeff Ross** – Velti PLC - CFO
>
> … These receivables, in many instances, are substantially old, accounting for our significant overall DSO. *Many of the receivables we're writing off relate to time periods before even 2012, although some relate into 2012.* When we have internally and *in SEC filings consistent with guidance reported revenue, it's been based on the location, the jurisdiction of the corporation of most of the companies, especially when we did business with them in multiple geographies. The revenue exposure from a technical SEC perspective was less than probably the business exposure that was at a higher level, along with the fact that some of these are significantly old.*

236. Thus, Ross **admitted** that Velti's SEC filings and press releases misrepresented the true source of Velti's revenue, understated Velti's true exposure to its business in Greece and Cyprus, and that Velti was carrying a very large balance of uncollectable receivable from customers in Greece and Cyprus on its books for the entire Class Period.

237. Moreover, the Company revealed on the conference call, and contrary to prior public statements, that Velti was not having success growing its North American business, particularly its advertising business. Defendants attributed that failure in substantial part to Velti's "*failure to make timely payments to publishers on [its] Mobclix ad exchange business, which resulted in a substantial decline in that business*." Defendants also announced that Velti engaged an investment banker "to sell the remainder of [its] U.S. advertising business also known as Mobclix."

238. Velti is now defunct.

## IX.   LOSS CAUSATION

239. Baker Tilly's and the Underwriter Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

240.    During the Class Period, Plaintiffs and the Class purchased or acquired Ve1ti's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  Following the disclosure of the massive $111 million write-down, Velti common stock declined by more than 66% to close on August 21, 2013, at $0.34 per share, on heavy trading volume.

## X.    SCIENTER

241.    As alleged herein, and except as with respect to Plaintiffs' claims alleged under and/or pursuant to the Securities Act, which are expressly disclaimed with respect to scienter, Baker Tilly acted with scienter, as discussed herein, in that Baker Tilly knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Baker Tilly, by virtue of their receipt of information reflecting the true facts regarding Velti, and their certification of the Company's financial results, internal controls, and compliance with GAAP, participated in the fraudulent scheme alleged herein.

## XI.    UNDISCLOSED ADVERSE FACTS

242.    The market for Velti's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Velti's securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Velti's securities relying upon the integrity of the market price of the Company's securities and market information relating to Velti, and have been damaged thereby.

243.    During the Class Period, the investing public was materially misled, thereby inflating the price of Velti's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Baker Tilly's and the Underwriter Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Velti's business, operations, and prospects as alleged herein.

244.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Baker Tilly and the Underwriter Defendants made or caused to be made a series of materially false and/or misleading statements about Velti's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period results in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE WITH RESPECT TO EXCHANGE ACT CLAIMS

245.    Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 1288 (1972) because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

246.    In the alternative, Plaintiffs are entitled to a presumption of reliance on the material misrepresentations and omissions at issue in this case pursuant to the fraud on the market doctrine for the following reasons set forth below.

247.    The market for Velti's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to

1    disclose, Velti's securities traded at artificially inflated prices during the Class Period, Plaintiffs

2    and other members of the Class purchased or otherwise acquired the Company's securities

3    relying upon the integrity of the market price of Velti's securities and market information

4    relating to Velti, and have been damaged thereby.

5          248.    During the Class Period, the artificial inflation of Velti's stock was caused by the

6    material misrepresentation and omissions particularized in this Complaint caused the damages

7    sustained by Plaintiffs and other members of the Class.  As described herein, during the Class

8    Period, Baker Tilly and the Underwriter Defendants made or caused to be made a series of

9    materially false and/or misleading statements about Velti's business, prospects, and operations.

10   These material misstatements and/or omissions created an unrealistically positive assessment of

11   Velti and its business, operations, and prospects, thus causing the price of the Company's

12   securities to be artificially inflated at all relevant times, and when disclosed negatively affected

13   the value of the Company stock.  These materially false and/or misleading statements during the

14   Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's

15   securities at such artificially inflated prices, and each of them has been damaged as a result.

16         249.    At all relevant times, the market for Velti's securities was an efficient market for

17   the following reasons, among others:

18         (a)     Velti stock met the requirements for listing, and was listed and actively traded on

19   the NASDAQ, a highly efficient and automated market;

20         (b)     As a regulated issuer, Velti filed periodic public reports with the SEC and/or the

21   NASDAQ;

22         (c)     Velti regularly communicated with public investors via established market

23   communication mechanisms, including through regular dissemination of press releases on the

24   national circuits of major newswire services and through other wide-ranging public disclosures,

25   such as communications with the financial press and other similar reporting services; and/or

26         (d)     Velti was followed by securities analysts employed by brokerage firms who wrote

27   reports about the Company, and these reports were distributed to the sales force and certain

28

1  customers of their respective brokerage firms.  Each of these reports was publicly available and

2  entered the public marketplace.

3      250.   As a result of the foregoing, the market for Velti's securities promptly digested

4  current information regarding Velti from all publicly available sources and reflected such

5  information in Velti's stock price.  Under these circumstances, all purchasers of Velti's securities

6  during the Class Period suffered similar injury through their purchase of Velti's securities at

7  artificially inflated prices and a presumption of reliance applies.

8  **XIII.   NO SAFE HARBOR**

9      251.   The statutory safe harbor provided for forward-looking statements under certain

10  circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

11  The statements alleged to be false and misleading herein all relate to then-existing facts and

12  conditions.   In addition, to the extent certain of the statements alleged to be false may be

13  characterized as forward looking, they were not identified as "forward-looking statements" when

14  made and there were no meaningful cautionary statements identifying important factors that

15  could cause actual results to differ materially from those in the purportedly forward-looking

16  statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply

17  to any forward-looking statements pleaded herein, Baker Tilly is liable for those false forward-

18  looking statements because at the time each of those forward-looking statements was made, the

19  speaker had actual knowledge that the forward-looking statement was materially false or

20  misleading.   In addition, no safe harbor protection is available for oral or written statements

21  (including the IPO Registration Statements) made in connection with the IPO.

22  **XIV.   CLASS ACTION ALLEGATIONS**

23      252.   Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

24  Procedure, rules 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired

25  Velti's securities between January 27, 2011 and August 20, 2013, inclusive, the Class Period,

26  seeking to pursue remedies under the Exchange Act.  Plaintiffs also bring this action as a class

27  action pursuant to Rules 23(a) and (b)(3) on behalf of a class consisting of  all persons  who

28

purchased or otherwise acquired the securities of Velti pursuant and/or traceable to the Company's registration statements and prospectuses issued in connection with the Company's January 28, 2011 IPO, and/or pursuant and/or traceable to the Company's registration statement and prospectuses issued in connection with the Company's June 14, 2011 SPO, seeking to pursue remedies under the Securities Act, collectively the Class.  Excluded from the Class are the former Defendants, Baker Tilly and the Underwriter Defendants, as well as the officers and directors of the Company, at all relevant times, members or their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Baker Tilly and the Underwriter Defendants or former Defendants have or had a controlling interest.

253.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Velti's securities were actively traded on the NASDAQ Stock Exchange (the "NASDAQ").   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Velti shares were traded publicly during the Class Period on the NASDAQ.  As of March 31, 2013, the Company had 65,622,141 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained  by Velti or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

254.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Baker Tilly's and the Underwriter Defendants' wrongful conduct in violation of federal law that is complained of herein.

255.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

256.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      Whether Baker Tilly and the Underwriter Defendants violated the federal securities laws by their acts as alleged herein;

(b)      Whether statements made Baker Tilly and the Underwriter Defendants to the investing public during the Class Period omitted and/or contained untrue material facts; and

(c)      To what extent the members of the Class have sustained damages and the proper measure of damages.

257.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XV.    CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 11 of the Securities Act
**(Against Baker Tilly and the Underwriter Defendants)**

258.   Plaintiffs repeat and re-allege each and every allegation above except for those alleging fraud.

259.   This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against Baker Tilly and the Underwriter Defendants.  This particular cause of action is based on Baker Tilly and the Underwriter Defendants' lack of reasonable care, not fraud or intentional or reckless misconduct.

260.   The Registration Statements for the IPO and SPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

261.   Velti was the registrant for the IPO and SPO.  Baker Tilly and the Underwriter Defendants were responsible for the contents and dissemination of the IPO and SPO Registration Statements.

262.     Further, Baker Tilly audited Velti's financial statements for the three years in the period ended December 31, 2009, and provided an unqualified Report of Independent Registered Public Accounting Firm with respect to the financial statements and financial statement schedule of Velti, dated August 3, 2010 and September 3, 2010 (the "Baker Tilly Report"), which was incorporated by reference in the Registration Statements.  Baker Tilly expressly consented to the use of its name and the Baker Tilly Report in the Registration Statements and provided a letter dated August 3, 2010 and September 3, 2010 for inclusion in the Registration Statements and, which consented to the reference to Baker Tilly and to the incorporation by reference of the Baker Tilly Report.

263.     Neither Baker Tilly nor the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO and SPO Registration Statements were true and without omissions of any material facts and were not misleading.  This claim is not based on and does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Baker Tilly and the Underwriter Defendants acted with fraudulent intent, which are not elements of a Section 11 claim.

264.     By reasons of the conduct herein alleged, Baker Tilly and the Underwriter Defendants violated, and/or controlled a person who violated Section 11 of the Securities Act.

265.     Plaintiffs assert this claim on behalf of the members of the Class who purchased and/or acquired Velti shares pursuant and/or traceable to the Registration Statement for the IPO and/or the SPO.

266.     The Class has sustained damages.  The value of Velti common stock has declined substantially subsequent to and due to Defendants' violations.  On or about December 16, 2013, Velti stock was voluntarily delisted from NASDAQ.

267.     Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration

1   Statements.  Less than three years elapsed between the time that the securities at issue were bona

2   fide offered to the public and the time that the first complaint was filed asserting claims arising

3   out of the falsity of each of the Registration Statements.

**COUNT II**

**For Violations of Section 12(a)(2) of the Securities Act**
**(Against The Underwriter Defendants)**

268.    Plaintiffs repeat and re-allege each and every allegation above except for those alleging fraud.

269.    This Count is asserted against the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Velti common stock in the Offerings and were damaged thereby.

270.    This particular cause of action is based on Underwriter Defendants lack of reasonable care, not fraud or intentional or reckless misconduct.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that the Underwriter Defendants acted with scienter or fraudulent intent which are not elements of a Section 12(a)(2) claim.

271.    The Underwriter Defendants were sellers of Velti common stock within the meaning of the Securities Act because they: (i) transferred title to St. Paul, Borreani, and/or other members of the Class who purchased in the IPO and SPO; and (ii) solicited the purchase of the common stock by St. Paul, Borreani, and other members of the Class and were financially benefitted thereby, including but not limited to receiving underwriting fees, commissions or discounts in connection with the IPO and SPO.  The Registration Statements contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

272.    The Underwriter Defendants used the means and instrumentalities of interstate commerce and the U.S. mail.

273.    The Underwriter Defendants are unable to establish an affirmative defense based upon a reasonable or diligent investigation of the statements contained in the Registration

1   Statements. The Underwriter Defendants did not make a reasonable investigation or possess

2   reasonable grounds to believe that the statements contained therein and incorporated by reference

3   in the Registration Statements at the time of the IPO and SPO were true and that there were no

4   omissions of any material fact. Accordingly, each of the Underwriter Defendants are liable to St.

5   Paul, Borreani, and/or other members of the Class who purchased in the IPO and SPO in which

6   that Defendant acted as an underwriter.

7        274. St. Paul, Borreani, and other members of the Class purchased or otherwise

8   acquired Velti common stock issued in the IPO and SPO and sold by the Underwriter Defendants

9   pursuant to materially inaccurate Registration Statements and did not know, or in the exercise of

10   reasonable diligence could not have known, of the untruths and omissions contained therein.

11        275. The value of Velti common stock declined substantially subsequent to the

12   consummation of the IPO and SPO and St. Paul, Borreani, and the other members of the Class

13   have sustained damages. Further, and as noted, above, Velti stock has been delisted from

14   NASDAQ.

15        276. Less than one year elapsed between the time that Plaintiffs discovered or

16   reasonably could have discovered the facts upon which this complaint is based and the time that

17   the first complaint was filed asserting claims arising out of the falsity of each of the Registration

18   Statements. Less than three years elapsed between the time that the securities at issue were bona

19   fide offered to the public and the time that the first complaint was filed asserting claims arising

20   out of the falsity of each of the Registration Statements.

21        277. By reason of the foregoing, the Underwriter Defendants are liable under Section

22   12(a)(2) of the Securities Act to St. Paul, Borreani, and the other members of the Class who

23   purchased in the IPO and SPO. St. Paul, Borreani, and other members of the Class have the right

24   to rescind and recover the consideration paid for their securities on which they suffered damages.

25   In addition, St. Paul, Borreani and the members of the Class who have sold and suffered

26   damages on their securities that they originally purchased through the IPO and SPO are entitled

27   to rescissory damages.

28

**COUNT III**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Promulgated Thereunder**
**(Against Baker Tilly)**

278.    Plaintiffs repeat and re-allege each and every allegation above.

279.    During the Class Period, Baker Tilly carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Velti's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

280.    Baker Tilly: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material filet and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Velti's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants Velti, Baker Tilly and the Officer Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

281.    Baker Tilly directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Velti's financial well-being and prospects, as specified herein.

282.    Baker Tilly employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Velti's value and performance and continued substantial growth, which included the making of or the participation in the making of untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Velti and its business operations and

1    future prospects in light of the circumstances under which they were made, not misleading, as set

2    forth more particularly herein, and engaged in transactions, practices and a course of business

3    which operated as a fraud and deceit upon the purchasers of the Company's securities during the

4    Class Period.

5        283.    Baker Tilly had actual knowledge of the misrepresentations and/or omissions of

6    material facts set forth herein, or acted with deliberate recklessness and disregard for the truth in

7    that they failed to ascertain and to disclose such facts, even though such facts were available to

8    them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or

9    with deliberate recklessness and for the purpose and effect of concealing Velti's financial well-

10    being and prospects from the investing public and supporting the artificially inflated price of its

11    securities.   As demonstrated by Baker Tilly's overstatements and/or misstatements of the

12    Company's business, operations, financial well-being, and prospects throughout the Class

13    Period, Baker Tilly if it did not have actual knowledge of the misrepresentations and/or

14    omissions alleged, was deliberately reckless in failing to obtain such knowledge by deliberately

15    refraining from taking those steps necessary to discover whether those statements were false or

16    misleading.

17        284.    As a result of the dissemination of the materially false and/or misleading

18    information and/or failure to disclose material facts, as set forth above, the market price of

19    Velti's securities was artificially inflated during the Class Period.  In ignorance of the fact that

20    market prices of the Company's securities were artificially inflated, and relying directly or

21    indirectly on the false and misleading statements made by Baker Tilly, or upon the integrity of

22    the market in which the securities trades, and/or in the absence of material adverse information

23    that was known or with deliberate recklessness disregarded by  Baker Tilly  but not disclosed in

24    public statements by them during the Class Period, Plaintiffs and the other members of the Class

25    acquired Velti's securities during the Class Period at artificially high prices and were damaged

26    thereby.

27

28

285.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Velti was experiencing, which were not disclosed by Baker Tilly, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Velti securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

286.    By virtue of the foregoing, Baker Tilly has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

287.    As a direct and proximate result of Baker Tilly's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

288.    Less than two years elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the conduct alleged herein.  Less than five years elapsed between the time that Defendants' actionable conduct occurred and the time that the first complaint was filed asserting claims in connection therewith.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members, injunctive relief, rescission, and disgorgement of all ill-gotten gains and/or proceeds of stock sales against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs, the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

1    D.    Requiring the imposition of additional corporate governance measures at Velti to

2  prevent future recurrences of the conduct alleged herein; and

3    E.    Such other and further relief as the Court may deem just and proper.

4                          **JURY TRIAL DEMANDED**

5    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand

6  a trial by jury of all issues that may be so tried.

7  DATED:  April 13, 2015                    **THE WEISER LAW FIRM, P.C.**

8

9                          */s/ Christopher L. Nelson*
                             Christopher L. Nelson
10

11                         Christopher L. Nelson (admitted *Pro Hac Vice*)
                           Robert B. Weiser (admitted *Pro Hac Vice*)
12                         James M. Ficaro
                           22 Cassatt Avenue, First Floor
13                         Berwyn, PA 19312
                           Telephone: (610) 225-2677
14                         Facsimile:  (610) 408-8062
                           rbw@weiserlawfirm.com
15                         cln@weiserlawfirm.com
                           jmf@weiserlawfirm.com
16
17                         -- and --

18                         Kathleen A. Herkenhoff
                           12707 High Bluff Drive, Suite 200
19                         San Diego, CA 92130
                           Telephone:  (858) 794-1441
20                         Facsimile:  (858) 794-1450
                           kah@weiserlawfirm.com
21
                           *Lead Counsel for Lead Plaintiff Bobby*
22                         *Yadegar/Ygar Capital LLC and Frank Borreani*

23

24

25

26

27

28

[3:13-CV-03889-WHO] SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934          -81-

Joseph J. Tabacco, Jr.
Nicole Lavallee
**BERMAN DEVALERIO**
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382
jtabacco@bermandevalerio.com
cheffelfinger@bermandevalerio.com
nlavallee@bermandevalerio.com

-- and --

Wendy Zoberman (admitted *Pro Hac Vice*)
3507 Kyoto Gardens Drive, Suite 200
Palm Beach Gardens, FL 33410
Telephone: (561) 835-9400
Facsimile:  (561) 835-0322
wzoberman@bermandevalerio.com

*Liaison Counsel and Attorneys for Plaintiff*
*St. Paul Teachers' Retirement Fund Association*

Jonathan Gardner (admitted *Pro Hac Vice*)
Paul Scarlato
Carol Villegas
**LABATON SUCHAROW LLP**
140 Broadway, 34th Floor
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0470
jgardner@labaton.com
pscarlato@labaton.com
cvillegas@labaton.com

*Attorneys for Plaintiffs Newport News*
*Employees' Retirement Fund and Oklahoma*
*Firefighters Pension and Retirement System*

[3:13-CV-03889-WHO] SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934

-82-

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that on April 13, 2015, I authorized the electronic filing of the foregoing

3   with the Clerk of the Court using the CM/ECF system which will send notification of such filing

4   to the e-mail addresses denoted on the attached Electronic Mail Notice List.

5          I certify under penalty of perjury under the laws of the United States of America that the

6   foregoing is true and correct.  Executed on April 13, 2015.

7

8   Dated:  April 13, 2015                              By:   */s/ Christopher L. Nelson*
                                                            Christopher  L. Nelson

9
                                                   THE WEISER LAW FIRM, P.C.
10                                                 22 Cassatt Avenue, First Floor
                                                   Berwyn, PA 19312
11                                                 Telephone: (610) 225-2677
                                                   Facsimile:  (610) 408-8062
12
                                                   Email: cln@weiserlawfirm.com
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Mailing Information for a Case 3:13-cv-03889-WHO Rieckborn v. Velti plc et al**

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **AYM Aggressive Value Fund, LP**
  asteyer@steyerlaw.com

- **Peter E. Borkon**
  peterb@hbsslaw.com

- **Donald A. Broggi**
  dbroi@scott-scott.com

- **Joseph Daniel Cohen**
  jcohen@scott-scott.com

- **Hal Davis Cunningham**
  hcunningham@scott-scott.com,efile@scott-scott.com

- **Brock Dahl**
  bdahl@wsgr.com

- **Patrick Norton Downes**
  pdownes@loeb.com,ptaylor@loeb.com

- **Cynthia A. Dy**
  cdy@wsgr.com

- **Boris Feldman**
  bbahns@wsgr.com

- **Christine M. Fox**
  cfox@labaton.com,lmehringer@labaton.com,electroniccasefilings@labaton.com,fmalonzo@labaton.com

- **Jonathan Gardner**
  jgardner@labaton.com,jjohnson@labaton.com,cvillegas@labaton.com,acoquin@labaton.com,lmehringer@labaton.com,fmalonzo@labaton.com,acarpio@labaton.com,agreenbaum@labaton.com

- **Lionel Z. Glancy**
  info@glancylaw.com,lboyarsky@glancylaw.com,lglancy@glancylaw.com

- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com,csadler@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Joseph P. Guglielmo**
  jguglielmo@scott-scott.com

- **Christopher T. Heffelfinger**
  cheffelfinger@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Kathleen Ann Herkenhoff**
  kah@weiserlawfirm.com,jmf@weiserlawfirm.com,hl@weiserlawfirm.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,peterb@hbsslaw.com,pashad@hbsslaw.com,sf_filings@hbsslaw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Luke Anthony Liss**
  lliss@wsgr.com,dakivalles@wsgr.com

- **Robert Alan Meyer**
  rmeyer@loeb.com,ptaylor@loeb.com

- **Donald Anthony Miller**
  dmiller@loeb.com,vmanssourian@loeb.com

- **Matthew C Moehlman**
  mmoehlman@labaton.com

- **Christopher Leigh Nelson**
  cln@weiserlawfirm.com

- **Park West Investors Market Fund, Limited**
  asteyer@steyerlaw.com

- **Park West Investors Master Fund, Limited**
  asteyer@steyerlaw.com

- **Park West Partners International Limited**
  asteyer@steyerlaw.com

- **Anthony David Phillips**
  aphillips@archernorris.com,dtatmon@archernorris.com

- **Joseph Mark Profy**
  jmp@weiserlawfirm.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Mark Punzalan**
  markp@punzalanlaw.com,office@punzalanlaw.com,aapton@zlk.com

- **Brian J. Robbins**
  notice@robbinsarroyo.com

notice@robbinsarroyo.com

- **Casey Edwards Sadler**
  csadler@glancylaw.com

- **Charlene Sachi Shimada**
  charlene.shimada@morganlewis.com

- **Evan Jason Smith**
  esmith@brodsky-smith.com

- **Allan Steyer**
  asteyer@steyerlaw.com,lrorem@steyerlaw.com

- **Michael Walter Stocker**
  mstocker@labaton.com,drogers@labaton.com,ElectronicCaseFiling@labaton.com,lmehringer@labaton.com

- **Jon A Tostrud**
  jtostrud@tostrudlaw.com,acarter@tostrudlaw.com

- **Diane Marie Walters**
  dwalters@wsgr.com,vshreve@wsgr.com

- **Lucy Han Wang**
  lucy.wang@morganlewis.com,andrew.obach@morganlewis.com

- **Robert Brian Weiser**
  rw@weiserlawfirm.com

- **Wendy Hope Zoberman**
  wzoberman@bermandevalerio.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)