1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   In re VELTI PLC SECURITIES              Case No. 13-cv-03889-WHO
    LITIGATION
8                                           **ORDER ON MOTIONS TO DISMISS**
    This Document Relates To:               **SECOND AMENDED CONSOLIDATED**
9                                           **COMPLAINT**
    All Actions
10                                          Re: Dkt. Nos. 210, 212

11

12

13                            **INTRODUCTION**

14          This is a securities class action brought on behalf of a putative class of persons who

15   purchased or otherwise acquired Velti plc ("Velti") securities between January 27, 2011 and

16   August 20, 2013.  On the last day of the putative class period, Velti announced its Q2 2013

17   financial results and disclosed that it had decided to write off approximately $111 million in

18   outstanding accounts receivable.  Plaintiffs[1] allege that Velti's bad debt reserves were materially

19   understated throughout the putative class period and bring claims against Velti's accounting firm –

20   Baker, Tilly, Virchow & Krause, LLP ("Baker Tilly") – and the underwriters of Velti's initial and

21   secondary public offerings – Jefferies LLC, RBC Capital Markets, LLC, Needham & Company,

22   LLC, and Canaccord Genuity Inc. (collectively, the "Underwriters") – under Sections 11 and

23

24

25

26

27   [1] There are five named plaintiffs in this case: Bobby Yadegar, Frank Borreani, St. Paul Teachers'
     Retirement Fund Association, Newport News Employees' Retirement Fund, and Oklahoma
28   Firefighters Pension and Retirement System.  SACC ¶¶ 44-48 (Dkt. No. 209).

United States District Court
Northern District of California

1   12(a)(2) of the Securities Act of 1933 (the "Securities Act") and Section 10(b) of the Securities

2   Exchange Act of 1934 (the "Exchange Act").[2]

3          Baker Tilly and the Underwriters (collectively, "defendants") move to dismiss plaintiffs'

4   second amended consolidated complaint ("SACC").  I previously dismissed plaintiffs' amended

5   consolidated complaint ("ACC"), principally on the ground that plaintiffs had not adequately

6   alleged under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform

7   Act ("PSLRA") how or why Velti's bad debt reserves were understated at the relevant times.  Dkt.

8   No. 205 ("Prior Order").  Defendants argue that the SACC should be dismissed on the same

9   ground, and that plaintiffs' Section 11 claims are additionally flawed because no named plaintiff

10  can plausibly establish both standing and loss causation under Section 11.

11         While I find that plaintiffs' Securities Act claims against the Underwriters are now subject

12  to Federal Rule of Civil Procedure 8(a), not Rule 9(b), I agree with defendants that the Securities

13  Act claims against both Baker Tilly and the Underwriters remain deficient.  Plaintiffs do not

14  adequately allege any materially misleading misstatement or omission in either of Velti's

15  registration statements, and, moreover, the only two named plaintiffs that have sought to establish

16  standing under Section 11 have loss causation and other threshold problems.  In addition, although

17  the new allegations in the SACC advance the ball on plaintiffs' Section 10(b) claims, those claims

18  still fail to satisfy Rule 9(b) and the PSLRA's exacting pleading requirements.

19         Accordingly, the motions to dismiss are GRANTED, and the SACC is DISMISSED.

20  Given the detailed nature of my Prior Order, the unusual access plaintiffs have had to Velti's

21  documents and directors/officers, and the deficiencies I identify in the SACC, I am skeptical that

22  plaintiffs can successfully plead claims against these defendants.  However, I will allow leave to

23  amend if plaintiffs so choose.

24

25

26  [2] Plaintiffs also brought claims against Velti itself and a number of its directors/officers but
27  already entered a partial settlement with those parties.  *See* Dkt. No. 199 ("Order Regarding
    Motion for Final Approval of Partial Settlement and Motion for Attorney's Fees").  As part of the
28  partial settlement, Velti agreed to provide plaintiffs with certain document discovery and to make
    some of its directors/officers available for interviews with plaintiffs' counsel.  *See* SACC ¶ 1 n.1.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BACKGROUND**

**I.      FACTUAL BACKGROUND**

      **A.      Velti's Business Model**

      Velti was founded in Athens, Greece in 2000.  SACC ¶ 5.  It was a provider of "mobile marketing and advertising technology and solutions" for businesses around the world.  *Id.*  Specifically, Velti "claimed that its products and services allowed customers to create targeted, interactive, and measurable marketing and advertising campaigns directed to consumers via their mobile devices."  *Id.*  As a regular part of its business, Velti entered contracts pursuant to which it provided services but did not get paid until its work had been completed, the customer had been invoiced, and the customer had delivered payment.  *Id.* ¶ 6.  Between the time the work was completed on a contract and the time the customer delivered payment, the amount due on a contract was an account receivable.  *Id.*

      Velti classified its accounts receivable in two key ways.  *Id.* ¶ 7.  From the time a receivable was booked as revenue to the time the customer was invoiced, Velti classified it as an "accrued contract receivable" or "accrued receivable."  *Id.*  From the time the receivable was invoiced to the time the customer delivered payment, Velti classified it as a "trade receivable."  *Id.*  "Days sales outstanding" ("DSO") is a metric that measures the length of time it takes to collect a receivable.  *Id.* ¶ 15 n.5.  From the start of the putative class period until May 2012, Velti calculated its reported DSO figures only on the basis of its trade receivables, thereby excluding from the calculation the period of time between when a receivable was booked as revenue and when the customer was invoiced.[3]  Starting in May 2012, Velti began reporting "comprehensive" DSO figures, or DSO figures that accounted for both accrued and trade receivables.

      From its inception in Greece, Velti maintained a significant portion of its customer base in Greece and Southeastern Europe.  *Id.* ¶ 9.  Its contracts in these markets "typically had much longer payment terms than those in other geographic regions," especially as compared to the

---

[3] In the Prior Order, I held that plaintiffs' Securities Act claims were time-barred to the extent that they were based on the allegation that Velti misrepresented its DSO figures in its registration statements by "improperly exclud[ing]" accrued receivables.  Prior Order at 10-14.

United States District Court
Northern District of California

1  United States and Western Europe.  *Id.*  Plaintiffs allege that because Velti operated heavily in

2  Greece, it was particularly impacted by the Greek economic crisis beginning in April 2010

3  through substantial delays in the already slow payment cycles and increasing numbers of unpaid

4  invoices.  *Id.* ¶¶ 9-10.  They allege that "[w]hile [Velti] continued to report robust revenue

5  growth . . . , the truth was that . . . it was unclear that [Velti] would ever be paid on many [of its]

6  accounts."  *Id.* ¶ 10.

7       **B.     Initial Public Offering**

8       Velti's registration statement and prospectus for its initial public offering ("IPO") was

9  declared effective by the SEC on January 27, 2011.  SACC ¶ 87; Baker Tilly RJN Ex. A (Dkt. No.

10  211-1) ("IPO Reg. Stmt.").[4]  The IPO registration statement included Baker Tilly's August 3,

11  2010 "Report of Independent Registered Public Accounting Firm" on Velti's 2008 and 2009

12  financial statements.  IPO Reg. Stmt. at F-2.  The August 3, 2010 report included the following

13  statement regarding Velti's financial reporting:

14               We have audited the accompanying consolidated balance sheets of
                 Velti plc and subsidiaries . . . as of December 31, 2009 and 2008,
15               and the related consolidated statements of operations, changes in
                 shareholders' equity and comprehensive income (loss), and cash
16               flows for each of the three years in the period ended December 31,
                 2009 . . . In our opinion, the consolidated financial statements . . .
17               referred to above present fairly, in all material respects, the
                 consolidated financial position of Velti plc and its subsidiaries as of
18               December 31, 2009 and 2008, and the results of their operations and
                 cash flows for each of the three years ended December 31, 2009, in
19               conformity with accounting principles generally accepted in the
                 United States of America.

20

21

22

23

24

_____

25  [4] Defendants' unopposed requests for judicial notice of the IPO and SPO registration statements
    are both GRANTED.  *See* Dkt. Nos. 211, 213.  Baker Tilly's unopposed requests for judicial
26  notice of the consent statements it filed with the SEC in conjunction with the registration
    statements, of Velti's historical stock price chart, and of the transcript of Velti CFO Jeffrey Ross's
27  August 20, 2013 conference call are also GRANTED.  *See* Dkt. No. 211.  Baker Tilly's other
    requests for judicial notice concern documents that I do not rely on in resolving these motions to
28  dismiss, and they are DENIED AS MOOT.  *See id.*

SACC ¶ 117; IPO Reg. Stmt. at F-2.[5]

The accompanying consolidated balance sheets included the following information regarding Velti's balance of receivables:

| | September 30, 2010 (unaudited) | December 31, 2009 | December 31, 2008 |
|---|---|---|---|
| **Trade receivables, net of allowance for doubtful accounts (in thousands)** | $41,395 | $32,505 | $11,013 |
| **Accrued contract receivables (in thousands)** | $20,988 | $15,342 | $8,560 |

IPO Reg. Stmt. at F-3.  Following the consolidated balance sheets, Velti reported that "as of September 30, 2010 and December 31, 2009 and 2008, the allowance for doubtful accounts was $135,000 (unaudited), $135,000 and $131,000, respectively."  SACC ¶ 104; IPO Reg. Stmt. at F-14.  With respect to DSOs, Velti reported that "[d]uring 2009, [its] DSOs on trade receivables increased from 65 days to 131 days before improving to 77 days at the end of June 2010," and that its DSOs "declined in the nine months ended September 30, 2010 to 110 days."  IPO Reg. Stmt. at 78.

Elsewhere in the IPO registration statement, under the heading, "Revenue Recognition," Velti stated that it "recognize[s] revenue when all of the following conditions are satisfied: (i) there is persuasive evidence of an arrangement; (ii) the service has been rendered or delivery has occurred; (iii) the fee to be paid by the customer is fixed or determinable; and (iv) collectability of the fee is reasonably assured."  SACC ¶ 100; IPO Reg. Stmt. at 56, F-9.

Under the heading, "Use of Estimates and Judgment," Velti stated the following about its financial reporting:

---

[5] In the SACC and in their opposition brief, plaintiffs assert that Baker Tilly "certified [Velti's] financial results for the nine months ended September 30, 2010 . . . in the IPO registration statement."  SACC ¶ 92; Opp. at 9 (Dkt. No. 216).  This is incorrect.  The IPO registration statement makes clear that Velti's financial results for the nine months ending September 30, 2010 were "unaudited."  *See* IPO Reg. Stmt. at F-3, F-4, F-6.  Plaintiffs also claim in their opposition brief that Baker Tilly is subject to liability for certifying Velti's DSO figures.  *See* Opp. at 9. However, plaintiffs have not alleged that Velti's DSO figures were included in the financial statements that Baker Tilly audited.  *See* Prior Order at 25 (noting same).

> The preparation of financial statements in accordance with [GAAP] requires the use of estimates and assumptions that affect the reported amounts of assets and liabilities, the assessment of recoverability of long-lived assets, bad debt reserve, and the reported amounts of revenue and expenses during the reporting period. Our consolidated financial statements include amounts that are based on management's best estimates and judgments. Actual results could differ materially from those estimates.

IPO Reg. Stmt. at F-8.

Under the heading, "Allowance for Doubtful Accounts," Velti further described its calculation of bad debt reserves:

> We evaluate the collectability of accounts receivable based on a combination of factors; an allowance for doubtful accounts is provided based on estimates developed using standard quantitative measures, which include historical write offs and current economic conditions. We also make a specific allowance if there is strong evidence indicating that the amounts due are unlikely to be collectible. As of September 30, 2010 and December 31, 2009 and 2008, the allowance for doubtful accounts was $135,000 (unaudited), $135,000 and $131,000, respectively.

SACC ¶ 104; IPO Reg. Stmt. at F-14.

Velti also included the following disclosure regarding its receivables, its DSOs, and the slow payment terms common to the "emerging markets" where it conducted much of its business:

> Much of our business is in emerging markets where payment terms on amounts due to us may be longer than on our contracts with customers in other markets. Our days sales outstanding deteriorated during 2009 by increasing from 65 days to 131 days before improving to 77 days by the end of June 2010. Days sales outstanding has declined in the nine months ended September 30, 2010 to 110 days. The deterioration in days sales outstanding in the nine months ended September 30, 2010 is primarily due to outstanding amounts from five customers in the approximate aggregate amount of $5.9 million, the majority of which we have collected subsequent to September 30, 2010. The remaining amount due is from customers with whom we have a history of payment and expect to collect fully. We have not historically incurred bad debt expense, none of our significant customers have historically failed to pay amounts due to us, and we do not believe that any of the customers contributing to our increased accounts receivable aging will fail to pay us in full.[6] Accordingly, we have not determined that any slow-paying customers will require an allowance for bad debt against accounts receivable. In addition, our trade receivables balance increased from $24.4 million in June 30, 2010 to $38.2 million . . . in September 30, 2010 due to the timing of completing our campaigns and billing of our customers. As a result,

---

[6] Plaintiffs do not claim that these receivables or any other receivables reported in the IPO and SPO registration statements ultimately proved uncollectible.

United States District Court
Northern District of California

> our DSOs increased during the third quarter of 2010. However, we expect our DSOs to improve by the end of 2010 due to the increase in our fourth quarter collection efforts.

SACC ¶¶ 107, 110; IPO Reg. Stmt. at 48 (footnote added).

Similarly, in a section of the IPO registration statement titled, "Risk Factors," Velti included the following disclosure:

> **Our days sales outstanding, or DSOs, may fluctuate significantly from quarter to quarter. Deterioration in DSOs results in a delay in the cash flows we generate from our customers, which could have a material adverse impact on our financial condition and the results of our operations.**
>
> The mobile advertising and marketing industry has historically been subject to seasonal fluctuations in demand, with a significant amount of the activity occurring in the second half of the year. In addition, a significant amount of our business is conducted in emerging markets. Typically payment terms in these regions are longer than payment terms in our other markets. These emerging markets have under-developed legal systems for securing debt and enforcing collection of debt. While we qualify customers that we do business with, their financial positions may change adversely over the longer time period given for payment.
>
> The effect of the seasonality in our business and the longer payment terms, combined with differences in the timing of invoicing and revenue recognition, has in the past and may in the future result in an increase in our DSOs, such as the recent increase in DSOs in the quarter ended September 30, 2010. Any increase in our DSOs could have a material adverse impact on our cash flows and working capital, as well as on our financial condition and the results of our operations.

1   IPO Reg. Stmt. at 13-14 (emphasis in original).  Velti further warned that if it was "unable to

2   manage the . . . international aspects of our business, our operating results and overall business will

3   be significantly and adversely affected" by, among other things, "longer payment cycles and

4   difficulties in collecting accounts receivable." *Id.* at 16.

5          Finally, in a section titled, "Geographic Revenue Concentration," Velti disclosed how

6   much of its revenue was attributable to Greece as compared to countries/regions.  *Id.* at 54-55.  For

7   the year ended December 31, 2009, Velti reported that $8,384,000 of its $89,965,000 in total

8   revenue was attributable to Greece, while $36,441,000 of its total revenue was attributable to

9   "other European countries" (i.e., European countries other than Greece, Russia, and the United

10  Kingdom).[7]  *Id.*

11         **C.      Secondary Public Offering**

12         Velti's registration statement and prospectus for its secondary public offering ("SPO") was

13  declared effective by the SEC on June 14, 2011.  SACC ¶ 121; Baker Tilly RJN Ex. C (Dkt. No.

14  211-3) ("SPO Reg. Stmt.").  The SPO registration statement included Baker Tilly's April 11, 2011

15  "Report of Independent Registered Public Accounting Firm" on Velti's 2008 to 2010 financial

16  statements.  SPO Reg. Stmt. at F-2.  The April 11, 2011 report included a statement regarding

17  Velti's financial reporting substantially identical to the statement in the August 3, 2010 report,

18  except that it applied to "the consolidated financial position of Velti plc and its subsidiaries as of

19  December 31, 2010 and 2009, and the results of their operations and cash flows for each of the

20  three years in the period ended December 31, 2010." *Id.*

21         The accompanying consolidated balance sheets included the following information

22  regarding Velti's balance of receivables:

23

24

25

26  [7] In disclosing its "Geographic Revenue Concentration," Velti stated, "Revenue from customers
    for whom we provide services in multiple locations is allocated according to the location of the
27  respective customer's domicile.  Revenue from customers for whom we provide services in a
    single or very few related locations is allocated according to the location of the respective
28  customer's place of operations."  IPO Reg. Stmt. at 54.  Velti included an identical explanation in
    its SPO registration statement.  *See* SPO Reg. Stmt. at 48.

United States District Court
Northern District of California

|  | March 31, 2011 (unaudited) | December 31, 2010 | December 31, 2009 |
|---|---|---|---|
| **Trade receivables net of allowance for doubtful accounts (in thousands)** | $40,762 | $39,114 | $32,505 |
| **Accrued contract receivables (in thousands)** | $34,966 | $35,588 | $15,342 |

SPO Reg. Stmt. at F-3.  Following the consolidated balance sheets, Velti reported that "[t]he allowance for doubtful accounts was $554,000, $135,000 and $135,000, as of March 31, 2011, and December 31, 2010 and 2009, respectively."  SACC ¶ 139; SPO Reg. Stmt. at F-14.  With respect to DSOs, Velti reported that its "DSOs based on trailing 12 months' revenue were 113 as of March 31, 2011 compared to 121 and 131 as of December 31, 2010 and 2009, respectively."  SPO Reg. Stmt. at 44.

The SPO registration statement included the same explanation of "Revenue Recognition" as the IPO registration statement.  *See* SACC ¶ 133; SPO Reg. Stmt. at 50, F-9.  The statement regarding "Allowance for Doubtful Accounts" was also identical except for the updated bad debt reserves figures.  *See* SACC ¶ 139; SPO Reg. Stmt. at F-14.  The disclosures in the SPO registration statement regarding Velti's accounts receivable, DSO figures, and the risks associated with its business in emerging markets were substantially similar to those in the IPO registration statement.  Specifically, with respect to its business in emerging markets, Velti stated that

> [s]ome of our business is in emerging markets where payment terms on amounts due to us may be longer than on our contracts with customers in other markets. Our days sales outstanding (DSOs) is calculated based on trade receivables, which includes only amounts invoiced as of the balance sheet date. Our DSOs have historically decreased during the first and second quarter, and increased during the third and fourth quarters, due to the seasonal nature of our business. DSOs based on trailing 12 months' revenue were 113 as of March 31, 2011 compared to 121 and 131 as of December 31, 2010 and 2009, respectively. We have historically collected all amounts due from our customers, even from those customers with balances with longer aging, as evidenced by our insignificant bad debt expense for 2010, 2009 and 2008. We do evaluate receivables on a customer specific basis and record a reserve based on relevant facts and circumstances as deemed necessary. Accordingly, during the three months ended March 31, 2011 we recorded an increase in the provision for doubtful accounts by $419,000 primarily related to one customer subject to currency control restrictions.

1    SACC ¶ 137; SPO Reg. Stmt. at 71.

2        Velti also disclosed that, for the year ended December 31, 2010, $10,847,000 of its total

3    revenue of $116,269,000 was attributable to Greece, while $33,510,000 of its total revenue was

4    attributable to "other European countries" (i.e., European countries other than Greece, Russia, and

5    the United Kingdom).  SPO Reg. Stmt. at 49.

6    .    **D.    Velti's Methodology for Calculating Bad Debt Reserves**

7        Jeffrey Ross joined Velti as CFO in January 2013.  SACC ¶ 61.  During interviews with

8    plaintiffs' counsel, he stated that before his arrival, Velti's "only methodology for calculating or

9    allocating reserves against uncollectible receivables was just based on never having a bad debt

10   before and representations by Velti employees that the customers would pay." *Id.*  "Because [the]

11   clients had always eventually paid, the presumption was that they always would." *Id.*  Ross told

12   plaintiffs' counsel that this presumption "was condoned and supported by Baker Tilly." *Id.*

13       Upon arriving at Velti and seeing its DSO figures, Ross "determined that it was

14   appropriate to apply a mathematical methodology to adequately reserve for doubtful accounts,

15   despite representations from sales departments that customers had always paid their accounts, and

16   despite the fact that [Velti] had not done so before." *Id.* ¶ 68.  Ross advocated that Velti increase

17   its bad debt reserves. *Id.*  Others at Velti resisted on the ground that Ross's calculations were "too

18   conservative." *Id.*  Nonetheless, Velti increased its reserves to $8 million in Q4 2012, and then to

19   $10 million in Q1 2013. *Id.*  In both quarters, Velti reported approximately $300 million in total

20   receivables. *Id.*

21       During Velti's March 12, 2013 earnings call, Ross described the decision to increase the

22   bad debt reserves:

23           The company has had very, very limited experience with bad
             debts. We've had very few instances where customers have
24           ultimately been unable to pay, or even bankruptcy or something
             else . . . So if you sort of come up with a reserve based on your
25           past experience, it's a rather – it's pretty dang clos[e] to
             nothing . . . I just pressure tested some of the assumptions, took
26           mathematical percentages of balances over certain ages and came
             up with an amount that I felt more comfortable with, that provided
27           us some cushion, when and if something happens. There wasn't
             much in the specific area that led me to say, oh my gosh, we have a
28           huge problem. I want a big additional reserve. But with the

United States District Court
Northern District of California

> magnitude of the reserve – with the [receivables] on the company's
> books, I just thought it was more prudent to have a little bit more
> cushion with respect to those numbers.

*Id.* ¶ 67.

When sales departments' collection forecasts fell short in Q2 2013, Ross determined that Velti needed a third party accounting firm to analyze its accounts receivable in Greece and Cyprus. *Id.* ¶ 69.

**E.      Deloitte Report and Corrective Disclosures**

In June 2013, Velti retained Deloitte LLP ("Deloitte") to review and evaluate its operations in Greece and Cyprus, with a specific eye to determining the collectability of its receivables in those regions. SACC ¶ 205. After two weeks, "with access to the same information available to Baker Tilly," Deloitte presented its initial findings, which were subsequently confirmed in its final report (the "Deloitte Report").[8] *Id.* ¶ 206. Among other things, Deloitte concluded (1) that a "large amount" of Velti's receivables were "very old;" (2) that 85 percent of Velti's $192 million in Greek and Cypriot receivables were attributable to just 26 customers, many of which were affiliated with or related to one another; and (3) that the receivables attributable to these customers were uncollectible. *Id.* At a July 11, 2013 meeting with Velti's board of directors, Deloitte stated that "many of the [26 customers] had reported troubling financial information, including evidence of bounced checks, legal orders against them, and other evidence of financial instability." *Id.* ¶¶ 195, 222.

Deloitte recommended that Velti write off approximately $111 million to account for its uncollectible receivables.[9] *Id.* ¶ 208. Velti followed Deloitte's advice. On August 20, 2013, it announced its Q2 2013 financial results and disclosed that it had decided to write off approximately $111 million in receivables. *Id.* ¶¶ 232-238. It disclosed that some of the written off receivables were "substantially old" and had been due since "before even 2012." *Id.* It also disclosed that approximately two-thirds of the written off receivables were attributable to Greece

---

[8] The Underwriters state, and plaintiffs do not dispute, that plaintiffs have not provided defendants with copies of the Deloitte Report. *See* Underwriters Mot. at 7 (Dkt. No. 212).

[9] Plaintiffs do not allege that Deloitte concluded that any of these receivables should have been written off in prior quarters. *See, e.g.,* Baker Tilly Mot. at 22 (Dkt. No. 210) (noting same).

and Cyprus.  *Id.*

During a conference call on August 20, 2013, Ross explained the write off as follows:

> [Analyst]: Okay. Could you help us understand what came to light with the Deloitte activity, and why the conclusions they reached were different, perhaps, from the previous review of receivables?

> [Ross]: Yes, sure. Scott, . . . as we moved through Q2 [2013] into Q3 [2013], we were pretty clear that we were depending on the collection of some of these old receivables. As targets kept getting pushed out and numbers kept getting missed and we were pushing on our customers and having additional conversations, it became apparent that our expectations were too high with respect to collections, and that some of these customers were in significant financial difficulty. At that point, we . . . engaged Deloitte to help us try to figure out the magnitude of the issue and if there [was] more that we could be doing, and the result of . . . their review . . . formed the basis for the reserve that we took in the quarter.

> [Analyst]: Okay. It sounds as if the conclusion that you would have difficulty collecting was a function of the economies deteriorating? Not that the review by Deloitte was different from that of your current auditor?

> [Ross]: Correct. We've gone through these results with our current auditor. It was a pretty robust process, where the customers confirmed balances, confirmed that their balances were valid, that they had the intention to pay. But then when we started looking at their financial condition, especially in light of things like the Cyprus banking crisis, where a lot of Greek companies had debt – sorry, had funds – and that started to trickle. That occurred in late Ql [2013], but really started to trickle through the Greek economy in Q2 [2013], along with just further deterioration of the Greek economy. It became pretty clear that we needed to take a larger reserve.

Baker Tilly RJN Ex. I at 6-7 (Dkt. No. 211-9).

Following these disclosures, Velti shares declined $0.66 per share, or 66 percent, to close on August 21, 2013 at $0.34 per share.  SAC ¶ 240.  Velti's United States-based operations filed for bankruptcy on November 4, 2013.  *See* Dkt. No. 170-1 at ¶ 39.  Its European-based operations did the same on August 18, 2014.  *See* Dkt. No. 150.

**F.     Summary of Velti's Reported Receivables, Reserves, and DSOs**

Plaintiffs allege, and the IPO and SPO registration statements show, that Velti's financial reporting during the class period included the following information regarding Velti's receivables, reserves, and DSOs.  I also include Velti's share price as of the close of the last day of each

quarter from Q1 2011 to Q2 2013.[10]

| | Accrued Receivables (in millions) | Total Receivables (Accrued Receivables & Trade Receivables) (in millions) | Bad Debt Reserves (in millions) | Bad Debt Reserves as Percentage of Total Receivables (in millions) | Trade DSO | Comprehensive DSO | Share Price (as of Close of Last Day of Quarter) |
|---|---|---|---|---|---|---|---|
| **Q4 2008** | $8.6 | $19.6 | $0.131 | 0.67 % | | | |
| **Q4 2009** | $15.3 | $47.8 | $0.135 | 0.28 % | 131 | | |
| **Q4 2010** | $33.6 | $72.7 | $0.135 | 0.19 % | 121 | | |
| **Q1 2011** | $34.9 | $75.7 | $0.554 | 0.73 % | 113 | | $12.59 |
| **Q2 2011** | $34.1 | $66.0 | | | 79 | | $16.91 |
| **Q3 2011** | $42.4 | $79.0 | | | 82 | | $6.61 |
| **Q4 2011** | $98.2 | $170.0 | $0.808 | 0.48 % | 86 | 261 | $6.80 |
| **Q1 2012** | $103.3 | $188.8 | | | 116 | 272 | $13.55 |
| **Q2 2012** | $75.1 | $183.2 | | | | 266 | $6.50 |
| **Q3 2012** | $72.0 | $181.5 | | | | 242 | $8.37 |
| **Q4 2012** | $134.0 | $291.0 | $8.0 | 2.75 % | | 311 | $4.50 |
| **Q1 2013** | $137.5 | $293.0 | $10.0 | 3.41 % | | 309 | $1.99 |
| **Q2 2013** | $118.6 | $271.7 | | | | | $1.40 |

      With the exception of the general theory that Velti's reserves were understated, and their

claim in the ACC that Velti improperly excluded accrued receivables from its reported DSO

---

[10] There are several unexplained discrepancies between different allegations in the SACC regarding Velti's reported financial figures.  The numbers in the table below are taken from the description of the increase in Velti's bad debt reserves following Ross's arrival at Velti at SACC ¶ 68, the table showing Velti's receivables balances and DSOs at SACC ¶ 224, and the IPO and SPO registration statements and historical stock price chart submitted by Baker Tilly for judicial notice, Baker Tilly RJN Exs. A, C, I.  No party submitted for judicial notice (in connection with this round of motions to dismiss) any of Velti's SEC filings other than the IPO and SPO registration statements, and I have relied exclusively on allegations in the SACC for periods not covered in the registration statements.  The shaded boxes in the table below represent figures that are not stated in the SACC or registration statements.

13

figures until May 2012, plaintiffs do not allege that any of these figures were inaccurate.

**G.      Additional Allegations Regarding Velti's Bad Debt Reserves**

The amendments to the SACC are largely aimed at establishing that Velti's bad debt reserves were materially understated during the class period, in particular when the IPO and SPO registration statements were issued.  New or substantially revised allegations to this effect include the following:

**1.      Former Senior Manager of Global Financial Planning and Analysis**

Plaintiffs state that according to Velti's former Senior Manager of Global Financial Planning and Analysis, "as early as the end of 2009," 19.8 percent of Velti's receivables were more than 90 days overdue, and 8.3 percent of its receivables were more than 365 days overdue. SACC ¶ 11.  The former Senior Manager told plaintiffs' counsel that Velti used the term "overdue" to describe a receivable that "had not been paid within 6 months," meaning that a receivable that was overdue by 90 days had been outstanding for 9 months, and a receivable that was overdue by 365 days had been outstanding for 18 months.  *Id.*

**2.      February 4, 2011 Report**

A February 4, 2011 report prepared by Velti shows that 95 percent of Velti's approximately $82 million in receivables from Greece and Southeastern Europe were more than 90 days overdue (or more than 225 days outstanding), 77 percent were more than 180 days overdue (or more than 295 days outstanding), and 35 percent were more than 300 days overdue (or more than 435 days outstanding).  SACC ¶ 13.  Plaintiffs do not allege that this report was given to Baker Tilly or the Underwriters but state that the Underwriters "should have, in the exercise of reasonable care, been aware of this," given that the Underwriters "created a detailed model of [Velti's] receivables and collections . . . from 2007 through 2012."  *Id.* ¶ 13 n.4.

**3.      February 8, 2011 Report**

A February 8, 2011 report prepared by Velti shortly after the IPO "identifies each and every customer from [Greece and Southeastern Europe], the amounts billed to each customer, and the dates that each customer was billed."  SACC ¶ 12.  The report shows that Velti then had approximately $32 million in overdue trade receivables from Greece, 32 percent of which were

14

1  more than 90 days overdue.  *Id.*  Plaintiffs allege that this February 8, 2011 report was given to

2  Baker Tilly shortly after the IPO.  *Id.*[11]

3                    **4.      May 14, 2012 Presentation**

4        In a May 14, 2012 presentation to Velti's Audit Committee, Baker Tilly stated that the

5  average DSO for Velti SA (a Velti subsidiary based in Greece) was 649 days as of the end of Q1

6  2012.  SACC ¶ 14.  Plaintiffs note that this figure indicates that Velti SA's receivables had been

7  outstanding on average since June 21, 2010, over six months before the IPO.  *Id.*

8                    **5.      VTRIP Entities**

9        The Deloitte Report shows that six of the Velti customers whose receivables were written

10  off in August 2013 – Virtual Trip Ltd., Epignosis Ltd., Next Generation Learning Services SA,

11  MVision SA, Infomap SA, and IT Center SA – were actually a single "affiliated customer"

12  referred to as the "VTRIP Entities."  *See, e.g.,* SACC ¶ 71 n.10.  Plaintiffs state that Deloitte

13  concluded that the size of the aggregate balance of receivables attributable to the VTRIP Entities,

14  $74.2 million, was "an issue," in particular because the average DSO for the VTRIP Entities was

15  over 700 days as of July 11, 2013.  *Id.* ¶¶ 71 n.10, 189.  Plaintiffs note that this figure indicates

16  that the VTRIP Entities' receivables had been outstanding on average since "approximately July to

17  November 2011."  *Id.* ¶ 189.

18  **II.      PROCEDURAL BACKGROUND**

19        Between August 22, 2013 and October 4, 2013, four securities class actions were filed in

20  this district in connection with the collapse of Velti's stock price.  On December 3, 2013, the cases

21  were consolidated.  Dkt. No. 81.  On January 24, 2014, a fifth securities class action was filed.

22  *See Yadegar v. Velti plc*, No. 14-cv-00372-WHO, Dkt. Nos. 1, 6 (N.D. Cal. filed Jan. 24, 2014).

23  Baker Tilly was first named as a defendant on January 24, 2014.  *See id.* at Dkt. No. 1.  The

24  Underwriters were first named on October 4, 2013.  *See Manabat v. Velti plc,* No. 13-cv-04606-

25  WHO, Dkt. No. 1 (N.D. Cal. filed Oct. 4, 2013).

26

27

28  ───────────────────
[11] The Underwriters state, and plaintiffs do not dispute, that plaintiffs have not provided copies of either of the February 2011 reports to defendants.  *See* Underwriters Mot. at 12.

United States District Court
Northern District of California

1    Plaintiffs filed a consolidated complaint on April 22, 2014.  Dkt. No. 105.  The

2    consolidated complaint identified three groups of defendants: (1) Velti and four of its

3    directors/officers – Wilson Cheung, Nicholas Negroponte, Jeffrey Ross, and Winnie Tso; (2) five

4    other Velti directors/officers – Jerry Goldstein, David Hobley, Chris Kaskavelis, David Mann, and

5    Alex Moukas; and (3) Baker Tilly and the Underwriters.  *Id.*  It asserted five causes of action:

6    (1) violations of Section 11 of the Securities Act against all defendants; (2) violations of Section

7    12(a)(2) of the Securities Act against Velti, Goldstein, Hobley, Kaskavelis, Mann, Moukas,

8    Negroponte, and the Underwriters; (3) violations of Section 15 of the Securities Act against all of

9    the individual defendants; (4) violations of Section 10(b) of the Exchange Act against Velti,

10   Cheung, Kaskavelis, Moukas, Ross, Tso, and Baker Tilly; and (5) violations of Section 20(a) of

11   the Exchange Act against Cheung, Kaskavelis, Moukas, Ross, and Tso.  *Id.*

12   On May 23, 2014, Velti, along with Cheung, Negroponte, Ross, and Tso, entered a

13   settlement agreement with plaintiffs.  *See* Dkt. No. 170-2.  I granted preliminary approval of the

14   partial settlement on August 19, 2014 and final approval on February 3, 2015.  Dkt. Nos. 147, 199.

15   In addition to Velti, Cheung, Negroponte, Ross, and Tso, the settlement agreement and resulting

16   judgment released the other five Velti directors/officers named in this action – i.e., Goldstein,

17   Hobley, Kaskavelis, Mann, and Moukas – leaving only Baker Tilly and the Underwriters as active

18   defendants.  *See* Dkt. Nos. 199, 200.

19   Plaintiffs filed the ACC on August 12, 2014.  Dkt. No. 144.  On February 27, 2015, I

20   granted Baker Tilly and the Underwriters' motions to dismiss.  Prior Order at 33.

21   Plaintiffs filed the SACC on April 13, 2015.  The ACC asserts three causes of action:

22   (1) violations of Section 11 of the Securities Act against Baker Tilly and the Underwriters, SACC

23   ¶¶ 258-67; (2) violations of Section 12(a)(2) of the Securities Act against the Underwriters, *id.* ¶¶

24   268-77; and (3) violations of Section 10(b) of the Exchange Act against Baker Tilly, *id.* ¶¶ 278-88.

25   Defendants filed their respective motions to dismiss on May 18, 2015.  Dkt. Nos. 210, 212.  I

26   heard argument from the parties on August 5, 2015.  Dkt. No. 219.

27

28

United States District Court
Northern District of California

16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LEGAL STANDARD**

**I.      MOTION TO DISMISS UNDER RULE 12(b)(6)**

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). While "a complaint need not contain detailed factual allegations . . . it must plead enough facts to state a claim to relief that is plausible on its face." *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (internal quotation marks and citations omitted). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "[C]onclusory allegations of law and unwarranted inferences are insufficient to avoid . . . dismissal" under this standard. *Cousins*, 568 F.3d at 1067 (internal quotation marks omitted). "[I]t is within [the court's] wheelhouse to reject, as implausible, allegations that are too speculative to warrant further factual development." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076 (9th Cir. 2013).

**II.     HEIGHTENED PLEADING STANDARD UNDER RULE 9(b)**

Federal Rule of Civil Procedure 9(b) requires that claims sounding in fraud or mistake "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this standard, a plaintiff must identify "the time, place, and content of [the] alleged misrepresentation[s]," as well as the "circumstances indicating falseness" or "manner in which the representations at issue were false and misleading." *In re GlenFed Inc. Sec. Litig.*, 42 F.3d 1541, 1547-48 (9th Cir.1994) (internal quotation marks and alterations omitted). "In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading." *Siegel v. Lyons*, No. 95-cv-03588-DLJ, 1996 WL 438793, at *3 (N.D.Cal. Apr. 26, 1996) (internal quotation marks omitted). The allegations of fraud "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

The Ninth Circuit has held in the securities fraud context that "[a] plaintiff may . . . satisfy

Rule 9(b) with allegations of circumstantial evidence if the circumstantial evidence alleged explains how and why the statement was misleading when made." *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995).

## DISCUSSION

## I.  SECTION 11 CLAIMS AGAINST BAKER TILLY AND THE UNDERWRITERS

Section 11 of the Securities Act creates a private right of action for a purchaser of a security where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  The statute "thus creates two ways to hold issuers liable for the contents of a registration statement – one focusing on what the  statement says and the other on what it leaves out." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015).  To prevail on a Section 11 claim, a plaintiff must demonstrate (1) that the registration statement contained a misstatement or omission; and (2) that the misstatement or omission was material.  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005).

Accountants and underwriters may be held liable under Section 11 for material misstatements or omissions in registration statements.  *See Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir. 1994); *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir. 1994); *see also* 15 U.S.C. § 77k(a)(4)-(5).  When brought against an accountant, a Section 11 claim must be based on "those portions of the [registration] statement that purport to have been prepared or certified by the accountant." *Monroe,* 31 F.3d at 774; *see also In re Lehman Bros. Sec. & Erisa Litig.*, No. 09-md-02017, 2015 WL 5514692, at *11 (S.D.N.Y. Sept. 18, 2015) ("Accountants may be found liable under Section 11 for portions of registration statements they audited."); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 557 (N.D. Cal. 2009).  Section 11 liability does not require a showing of scienter, and defendants may be held liable for innocent or negligent material misstatements or omissions.  *See In re Stac Electronics Sec. Litig.,* 89 F.3d 1399, 1404 (9th Cir. 1996); *Kaplan v. Rose,* 49 F.3d 1363, 1371 (9th Cir. 1994).  However, because Section 11 provides both accountants and underwriters with a "due diligence" defense, *see* 15 U.S.C. §

United States District Court
Northern District of California

77k(b), the statute effectively "imposes a negligence standard" for their liability, *Monroe*, 31 F.3d at 774; *see also Software Toolworks*, 50 F.3d at 621.  In most cases, due diligence is a jury question unsuitable for determination on a motion to dismiss.  *See, e.g., In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 n.7 (2d Cir. 2010); *Software Toolworks*, 50 F.3d at 621-22; *Feyko v. Yuhe Int'l, Inc.*, No. 11-cv-05511, 2013 WL 3467067, at *4 (C.D.Cal. July 10, 2013).

Plaintiffs allege Section 11 claims against both Baker Tilly and the Underwriters.  *See* SACC ¶¶ 258-67.  Defendants raise three issues with respect to these claims: (1) whether they are governed by Federal Rule of Civil Procedure 8(a) or by the heightened pleading standard of Rule 9(b); (2) whether, under either standard, plaintiffs have adequately alleged that either of Velti's registration statements contained an actionable misstatement or omission; and (3) whether the claims must be dismissed for failure to plausibly establish standing and loss causation.

### A.      Pleading Standard

In the Prior Order, I found that plaintiffs had alleged a unified course of fraudulent conduct against both Baker Tilly and the Underwriters and analyzed their Securities Act claims under Rule 9(b).  Prior Order at 14-16.  I highlighted that the section of the ACC titled, "Securities Act Claims," incorporated a number of paragraphs which plaintiffs also used as a basis for their Section 10(b) claims, that plaintiffs repeatedly accused Baker Tilly and the Underwriters of fraudulent and deliberately reckless conduct in connection with the Securities Act claims, and that the "boilerplate disclaimers" in the ACC did not justify analysis under Rule 8(a).  *Id.*

Defendants contend that plaintiffs have failed to cure these deficiencies.  *See* Baker Tilly Mot. at 10-11; Underwriters Mot. at 9-10; Baker Tilly Reply at 11 (Dkt. No. 217); Underwriters Reply at 2-4 (Dkt. No. 218).

Baker Tilly points out that, in the introduction section of the SACC, plaintiffs allege that "the vastly aged receivables were well known to Baker Tilly as far back as February 2011," *id.* ¶ 21, and that it "received and reviewed reports . . . showing that [Velti's] accounts receivable balances were comprised of dangerously aged and overdue balances, yet still certified Velti's reporting of these balances as revenue," *id.* ¶ 29.  Baker Tilly also notes that, in the Securities Act section of the SACC, plaintiffs allege that it failed to conduct "[e]ven the most cursory of

19

examinations or audit testing," and that there was an "obvious failure to take an adequate reserve against or write off . . . uncollectible accounts." *Id.* ¶¶ 119, 148.  Plaintiffs repeatedly use this same phrasing in the Exchange Act section of the SACC, each time immediately followed by the following conclusion: "Accordingly, Baker Tilly either knew, or, at the barest minimum, was deliberately recklessness in not knowing and not disclosing that Velti's financial statements had not been prepared in accordance with GAAP." *Id.* ¶¶ 159, 169, 178, 200.

The Underwriters point out that the SACC includes a section titled, "The Fraud at Velti," *id.* ¶¶ 58-79, and that one portion of the SACC accuses "[d]efendants" of "know[ing] and/or disregard[ing] with deliberate recklessness" the "true facts" regarding Velti's bad debt reserves, *id.* ¶ 175.  They also note that, in the Securities Act section of the SACC, plaintiffs allege that "any statements of opinion" by defendants were "both objectively and subjectively false." *Id.* ¶¶ 83-84.

Plaintiffs respond that their Securities Act claims repeatedly and explicitly exclude any allegations of fraud, and that even where their Exchange Act claims are based on the same alleged misconduct as their Securities Act claims, the SACC makes clear the different states of mind applicable to each statute and plaintiffs' distinct theories of liability.  *See* Opp. at 22-24.

The Underwriters' arguments for applying Rule 9(b) are plainly without merit.  Although the SACC includes a section titled, "The Fraud at Velti," that section is separate from and not incorporated into the Securities Act section.  *See* SACC ¶¶ 58-79.  Moreover, the section describes conduct by Velti and its directors/officers, not by Baker Tilly or the Underwriters.  *See id.*

The contention that the SACC accuses "[d]efendants" of "know[ing] and/or disregard[ing] with deliberate recklessness" the "true facts" regarding Velti's bad debt reserves is also unpersuasive given that this allegation appears in a section of the SACC titled, "Baker Tilly Made False and Misleading Statements," which itself is within a section titled, "Baker Tilly Violated the Exchange Act." *See id.* ¶ 175.  No reasonable reader of SACC ¶ 175 would understand it as an accusation in support of plaintiffs' Securities Act claims against the Underwriters.

Finally, the isolated claim in the Securities Act section that "any statements of opinion" by defendants were "both objectively and subjectively false" is contradicted by several other allegations in the SACC and appears to be an inadvertent oversight.  Plaintiffs clearly allege that

their Securities Act claims are based on defendants' alleged "lack of reasonable care," not their

"fraud or intentional or reckless misconduct." *Id.* ¶¶ 259, 270.  In the third paragraph of the

SACC, plaintiffs announce that they

> expressly disclaim any allegations of fraud or intentional misconduct in connection with [their Securities Act] claims, which are pleaded separately in this complaint from plaintiffs' Exchange Act claims. Further, any challenged statements of opinion . . . made in connection with the [IPO and SPO] are alleged to have been actionably materially misstated statements of opinion when made by virtue of the fact that the speaker omitted to disclose facts material to a reasonable investor and that the speaker lacked a basis (that a reasonable investor would expect) for making such statements.

*Id.* ¶ 3.  In addition, under the Section 11 cause of action, plaintiffs state that "[n]either Baker Tilly

nor the [Underwriters] made a reasonable investigation or possessed reasonable grounds for the

belief that the statements contained in the IPO and SPO registration statements were true and

without omission of any material facts and were not misleading." SACC ¶ 263.  Plaintiffs then

emphasize that their Section 11 claims are "not based on and d[o] not sound in fraud." *Id.*

Viewed against the backdrop of these allegations, the isolated and wholly undeveloped claim that

defendants made subjectively false statements of opinion appears to be a drafting error and is not

enough to trigger Rule 9(b) with respect to the Underwriters.

The allegations highlighted by Baker Tilly present a much stronger basis for applying Rule

9(b), especially given that some of those allegations are recycled word-for-word in the Exchange

Act section of the SACC.  Further, the Section 10(b) claims against Baker Tilly are based on the

same alleged misrepresentations as the Section 11 claims against it.  The Section 10(b) claims are

also based on other alleged misrepresentations that occurred after the registration statements were

issued.  But to the extent that the Section 10(b) claims are based on Baker Tilly's audit reports on

Velti's 2008 to 2010 financial statements, they are based on the same alleged misrepresentations

and the same alleged course of conduct as the Section 11 claims.  The only difference is Baker

Tilly's alleged state of mind.  Under Ninth Circuit precedent, "[w]here . . . a complaint employs

the exact same factual allegations to allege violations of Section 11 as it uses to allege fraudulent

conduct under Section 10(b) . . . , [the court] can assume that it sounds in fraud." *Rubke v. Capitol*

*Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009); *see also In re Rigel Pharm., Inc. Sec. Litig.,*

1   697 F.3d 869, 886 (9th Cir. 2012) (applying Rule 9(b) to Section 11 claim where, although it did

2   not incorporate "all of the allegations contained in the rest of the complaint, it does not allege

3   different misrepresentations" and instead "merely relies on the same alleged

4   misrepresentations . . . that are central to [the] Section 10(b) fraud claim"); *In re Bare Escentuals,*

5   *Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067-68 (N.D. Cal. 2010) (applying Rule 9(b) to Section 11

6   claims upon finding a "remarkable similarity between the conduct forming the basis for plaintiffs'

7   Section 11 claims, and the conduct forming a basis for plaintiffs' section 10(b) claims").

8        In light of the foregoing, I find that the Section 11 claims against Baker Tilly remain

9   subject to Rule 9(b).  Although plaintiffs do not incorporate "all of the allegations" underlying

10   their Section 10(b) claims into their Section 11 claims, they "rel[y] on the same alleged

11   misrepresentations . . . that are central" to their allegations of fraud, *Rigel*, 697 F.3d at 886, and

12   "emplo[y] the exact same factual allegations" to accuse Baker Tilly of violating both Section 10(b)

13   and Section 11, *Rubke*, 551 F.3d at 1161.  In other words, plaintiffs continue to "alleg[e] a unified

14   course of fraudulent conduct" by Baker Tilly, and to "rel[y] entirely on that course of conduct as

15   the basis [for their] claim[s]."  *Rubke*, 551 F.3d at 1161.  This requires analysis under Rule 9(b),

16   despite the various disclaimers in the SACC.  *See In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260,

17   1278 (E.D. Wash. 2007) (a plaintiff "cannot escape the requirements of Rule 9(b) by virtue of a

18   general disclaimer that a [Section 11] claim is based on negligence rather than fraud"); *In re*

19   *Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1104 (D.Nev.1998) (where "overwhelming

20   majority of allegations in the [complaint] concern the fraudulent concealment or misrepresentation

21   of material information," plaintiffs "cannot avoid the more stringent requirements of Rule 9(b) by

22   merely inserting boilerplate language into their complaint stating that [their Securities Act] claims

23   are based in negligence, not fraud").

24        On the other hand, plaintiffs have sufficiently clarified and segregated their nonfraudulent

25   theories of liability against the Underwriters to justify analysis under Rule 8(a) with respect to the

26   claims against them.  The fact that plaintiffs are simultaneously bringing fraud claims against

27   Baker Tilly does not change this conclusion.  As I noted in the Prior Order, "[c]ourts regularly

28   apply Rule 8(a) to Section 11 claims brought in the same action as Section 10(b) claims, in

United States District Court
Northern District of California

particular where the Section 11 defendants are not accused of violating Section 10(b)."  Prior Order at 16 n.5; *see also Brown v. China Integrated Energy, Inc.*, No. 11-cv-02559, 2012 WL 1129909, at *4 (C.D. Cal. Apr. 2, 2012) ("[W]hile plaintiffs' allegations against other defendants may have to satisfy Rule 9(b), their allegations of negligence against [an accounting firm accused of violating Section 11] need only comply with the more lenient standards of Rule 8(a)."); *In re Surebeam Corp. Sec. Litig.*, No. 03-cv-01721, 2005 WL 5036360, at *7 (S.D. Cal. Jan. 3, 2005) (applying Rule 9(b) to Section 11 claims against certain defendants also accused of fraud but Rule 8(a) to Section 11 claims against underwriter defendants accused only of "underwrit[ing] the IPO without conducting due diligence").

While I find that plaintiffs' Section 11 claims against Baker Tilly remain subject to Rule 9(b), as discussed in the following section of this order, plaintiffs' claims against Baker Tilly based on Velti's IPO and SPO registration statements are inadequately alleged even under Rule 8(a).  Under Rule 9(b), they are particularly deficient.

## B.    Alleged Misstatements and Omissions by Baker Tilly

Plaintiffs contend that the SACC adequately alleges that Baker Tilly's August 2010 and April 2011 audit reports and the accompanying financial statements contained material misstatements and omissions because those reports and/or financial statements:

(1) understated Velti's bad debt reserves, thereby overstating certain other financial figures, and omitted material facts regarding Velti's bad debt reserves.  *See* SACC ¶¶ 90, 92-93, 105-112, 120, 124, 126, 137-141; Opp. at 9-10.

(2) omitted that Velti was having difficulty collecting certain receivables, and that certain of Velti's receivables were uncollectible.  *See* SACC ¶¶ 90, 120, 124, 144; Opp. at 9-13.

(3) falsely represented that Velti's financials were prepared in accordance with GAAP, and omitted material facts regarding whether Velti's financials were prepared in accordance with GAAP.  *See* SACC ¶¶ 98-99, 117-118, 146-148; Opp. at 11.

(4) omitted that Velti lacked adequate internal controls.  *See, e.g.,* SACC ¶¶ 90, 124.[12]

Each of these alleged misstatements and omissions is grounded on the basic theory that Velti's bad debt reserves were materially understated in the August 2010 and April 2011 audit reports and accompanying financial statements, and that the audit reports and financial statements omitted material information regarding the reserves.[13]

In the Prior Order, I explained that while "[u]nderstatement of bad debt reserves can be a form of securities fraud, . . . a plaintiff alleging a Section 11 violation on the basis of misstated bad debt reserves must . . . plead [both objective] and subjective falsity."  Prior Order at 20 (internal quotation marks omitted).  This is because where an alleged misstatement is a statement of opinion, as opposed to a statement of fact, "it is only actionable under Section 11 where the complaint alleges that it was both objectively and subjectively false or misleading."  *Id.* (internal quotation marks and alterations omitted).  "Subjective falsity means the person who gave the opinion believed it was false or misleading at the time it was given."  *Id.*  I held that plaintiffs had not adequately alleged objective falsity.  I explained that

> the facts stated in the ACC are not sufficient under Rule 9(b) to
> show that Velti's reserves were objectively false or misleading in
> either of the registration statements.  Courts have held that claims
> based on misstated bad debt reserves are insufficiently alleged
> where they: (i) do not identify any specific accounts that were in

---

[12] In their opposition brief, plaintiffs appear to argue that Baker Tilly may also be held liable for various alleged statements that Baker Tilly did not make and that were not contained in the August 2010 and April 2011 audit reports or the accompanying financial statements.  *See* Opp. at 13-20 (discussing various alleged misstatements by Velti regarding, e.g., its revenue recognition policy, its plan to shift its business away from Greece and Southeastern Europe, and its methodology for calculating its bad debt reserves).  To reiterate, Section 11 "permits an action against an accountant based on material misstatements or omissions in a registration statement, but only as to those portions of the statement that purport to have been prepared or certified by the accountant."  *Monroe*, 31 F.3d at 774.  Plaintiffs do not explain why this principle does not bar Section 11 claims against Baker Tilly based on misstatements or omissions not contained in the audit reports or accompanying financial statements.

[13] Plaintiffs also accuse Baker Tilly of "fail[ing] to exercise due professional care as required by GAAS AU Section 230" in conducting its audits of Velti's financials.  SACC ¶¶ 119, 147.  Plaintiffs allege that under GAAS AU Section 230.07, an auditor must "exercise professional skepticism," which requires an auditor to "us[e] the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence."  *Id.* ¶ 187.  Plaintiffs offer no argument in support of the GAAS theory in their opposition brief, and I construe it as another iteration of their basic theory regarding Velti's allegedly understated bad debt reserves.

24

jeopardy when the alleged misrepresentations were made; (ii) do not identify any specific accounts in existence at the time the alleged misrepresentations were made that were ultimately rendered uncollectible; and (iii) fail to provide details about when and to what level the allowance should have been changed.

The ACC pleads none of these things. Plaintiffs do not identify a single receivable that was in jeopardy of becoming uncollectible when the IPO and SPO registration statements were issued, nor any receivable that existed then and was ultimately written off . . . Nor do plaintiffs state when and to what extent Velti's reserves should have been increased.

With the exception of the Greek economic crisis beginning in April 2010, each of the allegations highlighted by plaintiffs concerns an event that occurred months, if not years, after the registration statements were issued. There are no allegations of contemporaneous statements or conditions specific to defendants or anyone else associated with Velti that show that Velti's reserves were understated at the time the registration statements were issued. The allegations that in fall 2012 Velti (i) divested itself of certain receivables with DSOs topping 450 days and (ii) reclaimed from third parties $5.1 million in factored receivables do indicate that there were receivables which Velti acquired in 2011 and 2012 which had not yet been paid by fall 2012. But it does not necessarily follow that these receivables were so evidently uncollectible in January and June 2011 that Velti's reported reserves constituted a falsehood at that time.

Similarly, because the $111 million write down occurred more than two years after the IPO and SPO, that the write down occurred is not a sufficient indicator of how or why the reserve figures in the registration statements were misleading when made. Although plaintiffs vaguely allege that some of the written off receivables were "substantially old" and had been due since "before 2012," plaintiffs do not allege that any of the receivables had been due since January or June 2011, much less that evidence existed at that time that the receivables were uncollectible.

Meanwhile, plaintiffs' own allegations indicate that Velti's accounts receivable woes did not develop until Q4 2011, after both registration statements had been issued. The ACC states that between December 31, 2010 (a month before the IPO) and June 30, 2011 (two weeks after the SPO), Velti reduced its receivables from $72.7 million to $66 million. By September 30, 2011, Velti had increased its receivables to $79 million, but it was not until December 31, 2011 . . . that receivables jumped to $170 million. *Id.* Plaintiffs also fail to specifically allege any collectability problems earlier than Q1 2012 except to vaguely allude to the onset of the Greek economic crisis in April 2010. Plaintiffs' confidential witness joined Velti in June 2011 yet stated that it was not until "sometime in Q1 2012" that he or she "began to hear that Velti was having trouble collecting receivables."

*Id.* at 21-23 (some internal quotation marks, citations, and alterations omitted).

United States District Court
Northern District of California

1

## 1.     Statements of Opinion Under *Omnicare*

Shortly after I issued the Prior Order, the Supreme Court decided *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015), and clarified the framework for analyzing Section 11 claims based on allegedly misleading statements of opinion.

The Court began by addressing Section 11's false-statements clause, which applies where a registration statement contains an "untrue statement of . . . material fact," 15 U.S.C. § 77k(a).  The Court reconfirmed that a statement of opinion does not violate this clause merely because the opinion ultimately proves incorrect.  135 S. Ct. at 1325.  "That still leaves some room for [the clause] to apply to expressions of opinion," however.  *Id.* at 1326.  Because every statement of opinion explicitly affirms at least one fact – i.e., that the speaker "holds the stated belief" – such a statement may give rise to Section 11 liability under the false-statements clause where the speaker did not in fact "hold the belief she professed."  *Id.*  In addition, "some sentences that begin with opinion words like 'I believe' contain embedded statements of fact."  *Id.* at 1327.  Such sentences "may be read to affirm not only the speaker's state of mind, . . . but also an underlying fact."  *Id.* And if that underlying fact proves untrue, the sentence may qualify as an "untrue statement of . . . material fact," 15 U.S.C. § 77k(a), despite also containing within it an expression of opinion.  *See* 135 S. Ct. at 1327.

The Court then turned to Section 11's omissions clause, which applies, in the context of a Section 11 claim based on an allegedly misleading opinion statement, where the registration statement omits to state a fact "necessary to make the [opinion] not misleading," 15 U.S.C. § 77k(a).  The Court held that while "a statement of opinion is not misleading just because external facts show the opinion to be incorrect," 135 S. Ct. at 1328, an opinion statement may nonetheless violate the omissions clause.  The Court explained that "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion," i.e., "about the speaker's basis for holding that view."  *Id.*  When a registration statement includes an opinion statement, a reasonable investor "expects not just that the issuer believes the opinion . . . , but that it fairly aligns with the information in the issuer's possession at the time."  *Id.* at 1329.  "Thus, if a registration statement omits material facts about

26

the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then [the] omissions clause creates liability." *Id.* at 1329.  Put differently, the omissions clause applies to an opinion statement where an "excluded fact shows that [the defendant] lacked the basis for making th[e] statemen[t] that a reasonable investor would expect." *Id.* at 1333.

The Court was careful to emphasize that the omissions clause does not create a "general disclosure requirement." *Id.* at 1332.  "An opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.  Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." *Id.* at 1329.  Further, "an investor reads each statement within [a registration statement] in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information.  And the investor takes into account the customs and practices of the relevant industry.  So an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Id.* at 1330.

The Court concluded that to state a claim under Section 11's omissions clause based on a statement of opinion, a plaintiff must identify particular, material facts "going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 1332.  "That is no small task for an investor." *Id.*

### 2.    False-Statements Clause

Plaintiffs appear to seek to hold Baker Tilly liable under Section 11's false-statements clause. *See, e.g.,* Opp. at 9-13.  They cannot do so based on the allegations in the SACC.

As discussed above with respect to the applicable pleading standard, plaintiffs assert that their Securities Act claims are based on defendants' alleged "lack of reasonable care," not their "fraud or intentional or reckless misconduct."  SACC ¶¶ 259, 270.  Plaintiffs "expressly disclaim

27

any allegations of fraud or intentional misconduct in connection with [their Securities Act] claims"
and state that any allegedly misleading statements of opinion in the registration statements are
actionable because the speaker "omitted to disclose facts material to a reasonable investor [and]
lacked a basis (that a reasonable investor would expect) for making such statements." *Id.* ¶ 3.
They also emphasize that their Section 11 claims are "not based on and d[o] not sound in fraud."
*Id.* ¶ 263.

In *Omnicare*, the Supreme Court held that because the plaintiffs' complaint explicitly
"exclud[ed] and disclaim[ed] any allegation that could be construed as alleging fraud or
intentional or reckless misconduct," 135 S. Ct. at 1324 (internal quotation marks omitted), the
plaintiffs had effectively pleaded themselves out of stating a claim under Section 11's false-
statements clause. *Id.* at 1327. The Court explained: "[Plaintiffs] do not contest that [defendant's]
opinion was honestly held. Recall that their complaint explicitly 'excludes and disclaims' any
allegation sounding in fraud or deception." *Id.*

The same is true here. The SACC repeatedly disavows any allegation sounding in fraud or
deception in support of plaintiffs' Securities Act claims. To the extent that plaintiffs seek to bring
claims against Baker Tilly under Section 11's false-statements clause, their claims are deficiently
pleaded and must be dismissed.[14]

### 3.   Omissions Clause

Plaintiffs' claims against Baker Tilly also fail to the extent that they are brought under
Section 11's omissions clause.

---

[14] Plaintiffs' errant allegation that defendants' statements of opinion were "subjectively . . . false"
does not change this conclusion. *See* SACC ¶¶ 83-84. As discussed above with respect to the
applicable pleading standard, that allegation is thoroughly outweighed by others in the SACC that
squarely contradict it, to the point that it appears to be a drafting error.

I also note that there may be some inconsistency in holding, on the one hand, that plaintiffs'
disclaimers of fraudulent conduct are insufficient to avoid analysis under Rule 9(b), and on the
other hand, that those same disclaimers effectively preclude their claims under Section 11's false-
statements clause. To the extent that there is an inconsistency, it is not material here. For the
reasons stated elsewhere in this order, plaintiffs' claims against Baker Tilly under the false-
statements clause also fail because plaintiffs have not adequately alleged that Baker Tilly made
any materially misleading statement of opinion that it did not believe was true at the time. *See*
*Omnicare*, 135 S. Ct. at 1326-27.

After *Omnicare*, a plaintiff seeking to establish liability under the omissions clause based on a statement of opinion must: (1) "identify [a] particular [omitted] fac[t] going to the basis for the [defendant's] opinion – [a] fac[t] about the inquiry the [defendant] did or did not conduct or the knowledge it did or did not have;" (2) show that the fact is material, i.e., that "there is a substantial likelihood that a reasonable investor would consider it important;" and (3) show that the omission of the fact rendered the opinion statement misleading to a reasonable person reading it "fairly and in context," i.e., "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information," as well as "the customs and practices of the relevant industry." *Omnicare*, 135 S. Ct. at 1330-33; *see also In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14-cv-00950, 2015 WL 4931357, at *20 (S.D.N.Y. Aug. 19, 2015) (describing omissions clause pleading requirements for opinion statements under *Omnicare*); *Medina v. Tremor Video, Inc.*, No. 13-cv-08364, 2015 WL 3540809, at *2 (S.D.N.Y. June 5, 2015) (same).

In support of their omissions theory, plaintiffs identify only one specific fact that Baker Tilly omitted from its audit reports: that the VTRIP Entities were "affiliated" and "represented a significant concentration of receivables from a single customer because the average DSO of the VTRIP Entities was over 700 days." Opp. at 11-12. According to the SACC, however, the VTRIP Entities were not reported as having an average DSO of over 700 days until July 11, 2013. SACC ¶¶ 71 n.10, 189. As plaintiffs themselves point out, this indicates that the VTRIP Entities' receivables had been outstanding on average since "approximately July to November 2011," well after both of Velti's offerings, and even longer after Baker Tilly issued the August 2010 and April 2011 audit reports and the time periods covered by those reports. *Id.* ¶ 189. Baker Tilly cannot be held liable for failing to disclose a group of receivables that, according to the SACC, were on average nonexistent when the IPO and SPO occurred. Nor can Baker Tilly be held liable for failing to disclose the "affiliated" nature of the VTRIP Entities, where the SACC does not support a plausible inference that the VTRIP Entities represented a special credit risk at the time of either offering. *See, e.g., Omnicare*, 135 S. Ct. at 1333 (instructing lower courts to consider on remand whether the allegedly omitted attorney warning rendered defendant's legal compliance opinion statements misleading, by inquiring into "such matters as the attorney's status and expertise and

1    other legal information *available to [defendant] at the time*") (emphasis added).

2           In addition to the VTRIP Entities, plaintiffs accuse Baker Tilly of omitting generally that

3    Velti was having difficulty collecting certain receivables, and that certain of Velti's receivables

4    were uncollectible.  *See, e.g.,* SACC ¶¶ 90, 120, 124, 144.  I am not convinced that the allegations

5    in the SACC are sufficient to support this theory either.  With the exception of the information

6    regarding the VTRIP Entities discussed above, plaintiffs do not set out in any organized fashion

7    what specific facts regarding Velti's receivables were omitted from Baker Tilly's audit reports and

8    the underlying financial statements.  Plaintiffs appear to rely on the following allegations in

9    arguing that Velti's bad debt reserves were understated at or around the time of the IPO and SPO:

10          (1)    Greece was experiencing an economic crisis before and during the putative class

11   period.  SACC ¶¶ 8-9.

12          (2)    According to Velti's former Senior Manager of Global Financial Planning and

13   Analysis, "as early as the end of 2009," 19.8 percent of Velti's accounts receivable were more

14   than 90 days overdue (or unpaid for 9 months), while 8.3 percent of its accounts receivable were

15   more than 365 days overdue (or unpaid for 18 months).  *Id.* ¶ 11.

16          (3)    The February 4, 2011 report prepared by Velti shows that 95 percent of Velti's

17   approximately $82 million in accounts receivable from Greece and Southeastern Europe were then

18   more than 90 days overdue, 77 percent were more than 180 days overdue, and 35 percent were

19   more than 300 days overdue.  *Id.* ¶ 13.

20          (4)    The February 8, 2011 report given to Baker Tilly shortly after the IPO shows that

21   Velti then had approximately $32 million in overdue trade receivables from Greece, 32 percent of

22   which were more than 90 days overdue.  *Id.* ¶ 12.

23          (5)    In its May 14, 2012 presentation to Velti's "Audit Committee," Baker Tilly stated

24   that the average DSO for Velti SA was 649 days as of the end of Q1 2012, indicating that Velti

25   SA's receivables had been outstanding on average since June 21, 2010.  *Id.* ¶ 14.

26          (6)    On November 14, 2012, Velti announced that it was divesting itself of certain

27   receivables for which the DSOs were approximately 450 days, indicating that they had been

28   outstanding on average since August 22, 2011.  *Id.* ¶¶ 22, 229.

United States District Court
Northern District of California

1    (7)    Also on November 14, 2012, Velti announced that it was reclaiming from third

2    parties $5.1 million in factored receivables that remained unpaid, "indicating that Velti knew these

3    receivables were uncollectible." *Id.* ¶¶ 62, 217.

4    (8)    Velti admitted on August 20, 2013 that some of the $111 million in receivables

5    being written off were "substantially old" and had been due since "before even 2012." *Id.* ¶¶ 33,

6    232-38.

7    (9)    By August 20, 2013, at least 65 percent of Velti's receivables originated from sales

8    by its operations in Greece and Cyprus. *Id.* ¶ 24.

9    (10)    Deloitte was able to swiftly determine in summer 2013 that the "vast majority" of

10   Velti's receivables from Greece and Cyprus were held by affiliated or related entities, such as the

11   VTRIP Entities, and needed to be written off. *See, e.g, id.* ¶ 27.

12   The bulk of these allegations concern circumstances or events that either had not occurred

13   at the time of the offerings (i.e., allegations nos. 5-10) or were matters of general public

14   knowledge (i.e, allegation no. 1).  Viewed in the light most favorable to plaintiffs, they indicate

15   that around the time of the IPO and SPO – and, to a lesser extent, during the periods covered by

16   the August 2010 and April 2011 audit reports – Velti had some undefined amount of receivables

17   with relatively high DSOs.  That information cannot provide the basis for a claim under the

18   omissions clause, however, because it was not omitted from the registration statements.  Both

19   registration statements disclosed detailed information regarding Velti's balance of receivables and

20   the average DSOs for those receivables.  *See* IPO Reg. Stmt. at F-3 (disclosing exact balance of

21   accrued and trade receivables for 12/31/08, 12/31/09, and 09/30/10); *id.* at 78 ("During 2009, our

22   DSOs on trade receivables increased from 65 days to 131 days before improving to 77 days at the

23   end of June 2010.  Our DSOs declined in the nine months ended September 30, 2010 to

24   110 days."); SPO Reg. Stmt. at F-3 (disclosing exact balance of accrued and trade receivables for

25   12/31/09, 12/31/10, and 03/31/11); *id.* at 44 ("DSOs based on trailing 12 months' revenue were

26   113 as of March 31, 2011 compared to 121 and 131 as of December 31, 2010 and 2009,

27   respectively.").  Plaintiffs do not allege that the accounts receivable figures in the registration

28   statements were inaccurate, or that they failed to account for any receivables.  And while plaintiffs

United States District Court
Northern District of California

31

1  previously claimed that the DSO figures in the registration statements were misleading in that they

2  excluded accrued receivables, that theory is time-barred under the Security Act's one-year statute

3  of limitations.  *See* Prior Order at 10-14.

4         The allegations regarding the February 2011 reports (i.e., allegations nos. 3-4) and the

5  statements by Velti's former Senior Manager (i.e., allegation no. 2) provide a stronger basis for

6  inferring that Velti had significant balances of receivables with relatively high DSOs even at the

7  time of the offerings and during the periods covered by the August 2010 and April 2011 audit

8  reports.  But, again, both registration statements included detailed information regarding Velti's

9  balance of receivables and average DSOs.  And, again, plaintiffs do not allege that these figures

10  were inaccurate in any way that is not time-barred or that they failed to account for the

11  information reflected in the February 2011 reports and the statements by Velti's former Senior

12  Manager.[15]

13         It is true that the registration statements did not disclose the exact percentage of Velti's

14  outstanding receivables attributable to Greece and Southeastern Europe, or the specific DSOs for

15  this particular subset of receivables.  The February 2011 reports indicate that Baker Tilly may

16  have had this information in its possession when it prepared its audit reports.[16]  However, the

17  registration statements did disclose how much of Velti's revenue was attributable to Greece (and

18  to European countries other than Greece, Russia, and the United Kingdom) versus other

19

20  _____

21  [15] That said, it is hard to square plaintiffs' allegation that the February 4, 2011 report shows $82 million in outstanding receivables attributable to Greece and Southeastern Europe, SACC ¶ 13, with their allegation that Velti's total balance of receivables was $72.7 million in Q4 2010, $75.7 million in Q1 2011, and $66 million in Q2 2011, *id.* ¶ 224.  Plaintiffs do not explain this apparent conflict and, again, do not allege that Velti's receivables balances were understated in the registration statements.  If plaintiffs mean to allege that Velti's receivables balances were understated in the registration statements, they should make that clear in their pleadings and briefing.

25  [16] Baker Tilly disputes whether the allegations in the SACC are sufficient to infer that it possessed the information in the February 8, 2011 report at the time of the IPO, or that it ever possessed the information in the February 4, 2011 report.  The Underwriters likewise dispute whether the allegations in the SACC are sufficient to infer that it ever possessed the information in either of the February 2011 reports.  Because I find that plaintiffs' claims fail even assuming that both defendants possessed the information in both reports before both offerings, I do not address whether plaintiffs have adequately alleged that defendants possessed the relevant information at the relevant times.

United States District Court
Northern District of California

countries/regions.  *See* IPO Reg. Stmt. at 54-55; SPO Reg. Stmt. at 48-49.  The registration

statements also disclosed that "much" or "some" or "a significant amount" of Velti's business was

in "emerging markets where payment terms on amounts due to us may be longer than on our

contracts with customers in other markets."  SACC ¶¶107, 110, 137; IPO Reg. Stmt. at 13, 48;

SPO Reg. Stmt. at 12, 71.  And they repeatedly highlighted the risks associated with Velti's

business in these emerging markets.  Both registration statements warned,

> **Deterioration in DSOs results in a delay in the cash flows we generate from our customers, which could have a material adverse impact on our financial condition and the results of our operations.**
>
> [ . . . ]
>
> [A] significant amount of our business is conducted in emerging markets.  Typically payment terms in these regions are longer than payment terms in our other markets.  These emerging markets have underdeveloped legal systems for securing debt and enforcing collection of debt.  While we qualify customers that we do business with, their financial positions may change adversely over the longer time period given for payment.
>
> The effect of the seasonality in our business and the longer payment terms, combined with differences in the timing of invoicing and revenue recognition, has in the past and may in the future result in an increase in our DSOs.  Any increase in our DSOs could have a material adverse impact on our cash flows and working capital, as well as on our financial condition and the results of our operations.

IPO Reg. Stmt. at 13-14 (emphasis in original); SPO Reg. Stmt. at 12 (emphasis in original).

Similarly, both registration statements cautioned investors that if Velti was "unable to manage the

. . . international aspects of [its] business, [its] operating results and overall business [would] be

significantly and adversely affected" by, among other things, "longer payment cycles and

difficulties in collecting accounts receivable."  IPO Reg. Stmt. at 16; SPO Reg. Stmt. at 14-15.

Plaintiffs attempt to characterize the facts alleged in the SACC as clear indicators that

when Baker Tilly prepared its audit reports, it possessed information showing that Velti's

receivables were significantly less collectible than a reasonable investor would expect based on

Velti's minimal bad debt reserves.  But the only information to this effect that plaintiffs have

alleged Baker Tilly possessed was (1) that Velti had significant balances of receivables; (2) that

the DSOs for many of the receivables were relatively high; and (3) that many of the receivables

with relatively high DSOs were attributable to customers located in Greece and Southeastern Europe.  Each of these circumstances – and the risks they entailed – was disclosed in the registration statements.  Both registration statements reported Velti's balance of receivables and the average DSOs on those receivables.[17]  And while the registration statements did not specify the exact percentage of Velti's outstanding receivables attributable to Greece and Southeastern Europe, or the specific DSOs for this particular subset of receivables, the omissions clause does not create a "general disclosure requirement." *Omnicare*, 135 S. Ct. at 1332.  Nor does it create liability where an omitted fact renders an opinion statement misleading only when viewed "in a vacuum," and not when viewed "fairly and in context." *Id.* at 1330, 1332.  Given the plethora of information in Velti's registration statements regarding its balance of receivables, its average DSOs, its bad debt reserves, and its business in Greece and other "emerging markets [with] underdeveloped legal systems for securing debt and enforcing collection of debt," the omission of the exact amount and specific DSOs for its receivables in Greece and Southeastern Europe is not enough to support a viable claim under Section 11.

This is especially so given that plaintiffs do not allege facts plausibly indicating that, at the time of the offerings, the DSOs on Velti's receivables in Greece and Southeastern Europe should have alerted Baker Tilly that those receivables were in danger of becoming uncollectible.  They do not dispute that payment terms in emerging markets such as Greece and Southeastern Europe were "typically . . . longer than payment terms in . . . other markets." IPO Reg. Stmt. at 13-14; SPO Reg. Stmt. at 12.  And they allege no facts that raise any doubt as to the veracity of Velti's claims in the registration statements that, despite these longer payment terms, "none of [its] significant customers [had] historically failed to pay amounts due," IPO Reg. Stmt. at 48, and that it had "historically collected all amounts due from [its] customers, even from those customers with balances with longer aging," SPO Reg. Stmt. at 71.  As far as the SACC is concerned, these claims were completely accurate, and Velti's historical collection record at the time of the offerings was

---

[17] Again, to the extent that plaintiffs' claims are based on the theory that the registration statements failed to accurately disclose Velti's DSO figures because they did not include accrued receivables, their claims are time-barred.

as strong as the registration statements made it out to be.  Accordingly, merely alleging that Velti's Greek and Southeastern European receivables had high DSOs *relative to other regions* does not create a plausible inference that, at the time of the offerings, those receivables were so evidently uncollectible as to necessitate an increase in bad debt reserves.  Given that Velti had "historically collected all amounts due from [its] customers" despite the longer payment terms in Greece and Southeastern Europe, what matters is whether the DSOs on Velti's Greek and Southeastern European receivables were problematic *for those regions*.  Nothing in the SACC indicates that the DSOs stated in the February 2011 reports were higher than the DSOs on Greek and Southeastern European receivables that Velti had previously experienced and successfully collected.[18]

Other than the relatively high DSOs, plaintiffs allege no specific facts regarding any of Velti's Greek and Southeastern European receivables in existence at or before the time of the offerings.  Like the ACC, the SACC does not identify a single receivable in existence at that time that was demonstrably in danger of becoming uncollectible.  Nor does the SACC identify a single receivable in existence at that time that ultimately became uncollectible.  Plaintiffs' failure to articulate any specific problems with Velti's Greek and Southeastern European receivables at or before the time of the offerings – other than the relatively high DSOs – dooms their claims against Baker Tilly under Section 11's omissions clause.  Plaintiffs have not identified any particular, material, omitted fact going to the basis for Baker Tilly's opinions on Velti's bad debt reserves, the omission of which made those opinions misleading to a reasonable person reading them fairly and in context.  *See Omnicare*, 135 S. Ct. at 1332.

Further, plaintiffs' inability to identify any specific, undisclosed problems with Velti's Greek and Southeastern European receivables at or before the time of the offerings points to another, even more fundamental defect in their Section 11 claims:  Plaintiffs still have not

---

[18] In their opposition brief, plaintiffs assert that "even before the IPO . . . , a material percentage of Velti's  receivables were 'old' and problematic even by Velti's/Greece's 'slow-pay' standards."  Opp. at 15 n.15.  On the following page, plaintiffs similarly assert that "Velti was having trouble collecting its receivables even by its own standards."  *Id.* at 16 n.16.  But plaintiffs cite no allegations in the SACC and no other authority for either of these assertions.

United States District Court
Northern District of California

United States District Court
Northern District of California

adequately alleged that Velti's bad debt reserves were false in either of the registration statements. In the Prior Order, I found that plaintiffs had not adequately alleged falsity because they (1) had not identified any specific receivables that were in danger of becoming uncollectible when registration statements were issued, (2) had not identified any specific receivables in existence at that time that ultimately proved uncollectible, and (3) had not provided any details about when and to what extent the bad debt reserves should have been increased. Prior Order at 21-23.

The SACC, like the ACC, "pleads none of things." *Id.* at 21. With the exception of the February 2011 reports and the statements by Velti's former Senior Manager, the SACC, like the ACC, contains "no allegations of 'contemporaneous statements or conditions' specific to defendants or anyone else associated with Velti that show that Velti's reserves were understated at the time the registration statements were issued." *Id.* at 22 (quoting *GlenFed*, 42 F.3d at 1549). Because the February 2011 reports and the statements by the former Senior Manager indicate only that Velti's Greek and Southeastern European receivables had relatively high DSOs, they do not plausibly establish the falsity of the bad debt reserves reported in the registration statements. Again, given Velti's undisputedly strong collection record on receivables in Greece and Southeastern Europe despite the longer payment terms in those regions, plaintiffs have not shown that the DSOs on such receivables, standing alone, were indicators of uncollectability at the time of the offerings.

The falsity analysis in the Prior Order was under Rule 9(b), not Rule 8(a). Even under Rule 8(a), however, the falsity of allegedly understated bad debt reserves is not taken as a given. *See NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, No. 10-cv-00440, 2012 WL 3191860, at *10 (S.D.N.Y. Feb. 9, 2012) ("[T]he mere fact that [defendant's] predicted loss reserves turned out to be insufficient some time after they were made does not render those figures false at the time that they were publicly filed with the SEC."); *see also In re CIT Grp. Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004) ("That defendants . . . decided to revise the amount of loan loss reserves that [they] deemed adequate [just three weeks after their IPO] provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time the registration statement and prospectus became effective.").

36

United States District Court
Northern District of California

1    Here, the August 2013 write off that triggered plaintiffs' claims occurred more than two

2    years after the offerings.  Plaintiffs have not alleged that any of the receivables written off in

3    August 2013 were outstanding at or before the time of the offerings.  They have not alleged when

4    and to what extent Velti's bad debt reserves should have been increased.  And they have not

5    plausibly identified any receivables that were in danger of becoming uncollectible when the

6    registration statements were issued, or any receivables in existence at or before that time that

7    ultimately proved uncollectible.  Meanwhile, the allegations in the SACC continue to indicate that

8    Velti's balance of receivables decreased between the two offerings, and that "Velti's accounts

9    receivable woes did not develop until Q4 2011, after both registration statements had been

10   issued."  Prior Order at 23; *see also* SACC ¶ 224 (alleging that Velti's balance of receivables went

11   from $72.7 million in Q4 2010, to $75.7 million in Q1 2011, to $66.0 million in Q2 2011).  While

12   the threshold for pleading the falsity of Velti's bad debt reserves is undoubtedly lower under Rule

13   8(a) than under Rule 9(b), the allegations in the SACC still fall short.

14       Plaintiffs fail to state a Section 11 claim against Baker Tilly.

15       **C.    Alleged Misstatements and Omissions by the Underwriters**

16       Plaintiffs' Section 11 claims against the Underwriters are also defective, largely for the

17   same reasons as their Section 11 claims against Baker Tilly.

18       Plaintiffs seek to hold the Underwriters liable under Section 11 on the grounds that one or

19   both of the registration statements:

20       (1) understated Velti's bad debt reserves, thereby overstating certain other financial

21   figures, and omitted material facts regarding Velti's bad debt reserves.  SACC ¶¶ 94, 104-112,

22   127, 137-141; Opp. at 9-21.

23       (2) omitted that Velti was having difficulty collecting certain receivables, and that certain

24   of Velti's receivables were uncollectible.  SACC ¶¶ 90, 120, 124, 144; Opp. at 9-21.

25       (3) falsely represented that Velti recognized revenue only when collection of the revenue

26   was "reasonably assured," and omitted material facts regarding Velti's recognition of revenue.

27   SACC ¶¶ 100-103, 133-36; Opp. at 13-14.

28       (4) falsely stated, "We believe that our increase in DSOs is temporary and will improve as

1    the economic climate improves and as we expand our geographic reach into North America and

2    Asia," and omitted material facts regarding this statement.  SACC ¶ 113; Opp. at 19.

3          (5) falsely represented that Velti's credit risk with regard to its accounts receivable "is

4    limited as we have policies in place to ensure that sales are made to customers with a high credit

5    standing, and we enter into factoring arrangements with local banks for a material portion of our

6    accounts receivable."  SACC ¶ 142; Opp. at 20.

7          (6) falsely represented that Velti calculated its bad debt reserves based on "standard

8    quantitative measures."  SACC ¶¶ 104-106, 139-41; Opp. at 15.

9          The first four of these alleged misstatements and omissions are derivative of the basic

10   theory that Velti's bad debt reserves were materially understated in the IPO and SPO registration

11   statements, and that the registration statements omitted material information regarding those

12   reserves.  They fail for the reasons discussed above with respect to Baker Tilly's alleged

13   misstatements and omissions.

14         The fifth alleged misstatement fails because plaintiffs do not identify any facts plausibly

15   indicating that it was false or misleading when made.  *See* Opp. at 19-20.  In their opposition brief,

16   plaintiffs state that "[i]n reality, Velti's borrowing arrangements – from its factors with recourse

17   and at high interest rates – were highly unusual and confirm that the factors themselves had little

18   confidence in the collectability of [Velti's] accounts receivable as adequate security for their

19   loans."  Opp. at 20.  Plaintiffs do not provide a citation for this assertion, however, and do not

20   offer any other facts in support of their claims based on the alleged misstatement.  Plaintiffs have

21   not plausibly established that Velti either did not have "policies in place to ensure that sales [were]

22   made to customers with a high credit standing," or did not "enter into factoring arrangements with

23   local banks for a material portion of [its] accounts receivable."  SACC ¶ 142.

24         The sixth alleged misstatement, regarding Velti's use of "standard quantitative measures"

25   to calculate its bad debt reserves, presents a closer question.  Plaintiffs contend that they have

26   adequately alleged its falsity based on Ross's alleged statement that before his arrival in January

27   2013, Velti's "only methodology for calculating or allocating reserves against uncollectible

28   receivables was just based on never having a bad debt before and representations by Velti

1    employees that the customers would pay."  SACC ¶ 61; *see also* Opp. at 17.  Ross then

2    "determined that it was appropriate to apply a mathematical methodology to adequately reserve

3    for doubtful accounts, despite representations from sales departments that customers had always

4    paid their accounts, and despite the fact that [Velti] had not done so before."  *Id.* ¶ 68.

5          In the Prior Order, I dismissed this theory under Rule 9(b), reasoning that plaintiffs had

6    provided no context for Ross's alleged statement and no supporting allegations, and that other

7    allegations in the ACC indicated not that "Velti had 'no methodology' whatsoever for calculating

8    its reserves," but rather that "Velti had a methodology based on certain 'assumptions' based on

9    past experience that Ross found insufficient."  Prior Order at 18-19.  I also noted that Ross did not

10    begin working for Velti until approximately two years after the IPO and approximately one-and-a-

11    half years after the SPO.  *Id.*  I concluded that "[a]bsent additional details about the content and/or

12    context of Ross's statement," it was not enough to establish falsity under Rule 9(b).  *Id.*

13          As stated above, Rule 9(b) does not apply to plaintiffs' claims against the Underwriters.

14    But even under Rule 8(a), plaintiffs must plead facts that support a plausible inference that Velti's

15    statement that it calculated bad debt reserves based on "standard quantitative measures" was

16    misleading when made.

17          A statement is misleading where it "affirmatively create[s] an impression of a state of

18    affairs that differs in a material way from the one that actually exists."  *Brody v. Transitional*

19    *Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  "[W]hether a statement is misleading

20    depends on the perspective of a reasonable investor:  The inquiry . . . is objective."  *Omnicare*, 135

21    S. Ct. at 1327 (internal quotation marks omitted).  In other words, the court must look to "[t]he fair

22    and reasonable implication an ordinary investor would derive from [the statement]."  *Miller v.*

23    *Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).  Further, a statement

24            cannot be analyzed in complete isolation. Some statements,
        although literally accurate, can become, through their context and

25            manner of presentation, devices which mislead investors. For that
        reason, the disclosure required by the securities laws is measured

26            not by literal truth, but by the ability of the material to accurately
        inform rather than mislead prospective buyers.

27    *Id.* (internal quotation marks omitted).  Whether a statement is misleading is generally a "mixed

28

United States District Court
Northern District of California

question to be decided by the trier of fact." *Fecht*, 70 F.3d at 1081.  The issue is appropriately resolved as a matter of law only where "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ."  *Id.* (internal quotation marks and alterations omitted); *accord S.E.C. v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011).

Plaintiffs' theory of liability appears to be that because Velti did not rely on a "mathematical methodology" in calculating its bad debt reserves, it was not using "standard quantitative measures."  Thus, plaintiffs argue, Velti's claim that it was using such measures was misleading.

I am not persuaded that this theory constitutes a plausible claim for relief.  Plaintiffs do not explain how Velti's statement that it used "standard quantitative measures" to calculate bad debt reserves "create[d] an impression of a state of affairs that differs in a material way," *Brody*, 280 F.3d at 1006, from the one that plaintiffs allege actually existed, in which Velti's bad debt reserves were calculated without a "mathematical methodology."  Plaintiffs do not define "standard quantitative measure" or provide examples of what does and does not qualify as one.  Plaintiffs appear to assume that the term is synonymous with "mathematical methodology."  But plaintiffs state no basis for this assumption.

Further, Velti's statement "cannot be analyzed in complete isolation."  *Miller*, 519 F.3d at 886.  In both registration statements, it was included as part of the sentence, "We evaluate the collectability of accounts receivable based on a combination of factors; an allowance for doubtful accounts is provided based on estimates developed using standard quantitative measures, which include historical write offs and current economic conditions."  IPO Reg. Stmt. at F-14; SPO Reg. Stmt. at F-14.  The two examples of "standard quantitative measures" in this sentence are "historical write offs" and "current economic conditions."  *See id.*  Plaintiffs do not allege that Velti failed to consider historical write offs in calculating its bad debt reserves.  To the contrary, plaintiffs repeatedly accuse Velti of placing undue reliance on its historical write offs (or lack thereof) in calculating reserves.  *See, e.g.*, Opp. at 17 ("Velti . . . simply relied on the presumption that, because customers had paid in the past, they always would.").  And while plaintiffs do vaguely accuse Velti of failing to account for the Greek economic crisis beginning in April 2010,

United States District Court
Northern District of California

see, e.g., SACC ¶ 10, they fail to identify any particular effects on particular customers caused by the "current economic conditions" in Greece or elsewhere that Velti failed to consider in setting its reserves.

Other disclosures in the registration statements provided investors with further information about how Velti calculated its reserves. Both registration statements included the disclaimers that "[t]he preparation of financial statements in accordance with [GAAP] requires the use of estimates and assumptions that affect the reported amounts of . . . bad debt reserves," and that Velti's "consolidated financial statements include amounts that are based on management's best estimates and judgments." IPO Reg. Stmt. at F-8; SPO Reg. Stmt. at F-8.

The IPO registration statement also stated,

> We have not historically incurred bad debt expense, none of our significant customers have historically failed to pay amounts due to us, and we do not believe that any of the customers contributing to our increased accounts receivable aging will fail to pay us in full. Accordingly, we have not determined that any slow-paying customers will require an allowance for bad debt against accounts receivable.

SACC ¶¶ 107, 110; Baker Tilly RJN Ex. A at 48.

Similarly, the SPO registration stated,

> We have historically collected all amounts due from our customers, even from those customers with balances with longer aging, as evidenced by our insignificant bad debt expense for 2010, 2009 and 2008. We do evaluate receivables on a customer specific basis and record a reserve based on relevant facts and circumstances as deemed necessary. Accordingly, during the three months ended March 31, 2011 we recorded an increase in the provision for doubtful accounts by $419,000 primarily related to one customer subject to currency control restrictions.

SACC ¶ 137; Baker Tilly RJN Ex. C at 71.

These disclosures informed investors not that Velti calculated its reserves based on a "mathematical methodology," but that it did so based on assumptions gleaned from its historical track record and from "relevant facts and circumstances." SACC ¶ 137; Baker Tilly RJN Ex. C at 71. Whatever differences there are between the method of calculating bad debt reserves that Velti disclosed in its registration statements, and that described by Ross in his interviews with plaintiffs' counsel, they are insufficient to create liability for a material misstatement or omission.

United States District Court
Northern District of California

1    Plaintiffs fail to state a Section 11 claim against the Underwriters.

2    **D.    Standing and Loss Causation**

3    Defendants contend that plaintiffs' Section 11 claims are additionally deficient because the

4    named plaintiffs either lack standing to bring claims under Section 11 or cannot establish loss

5    causation with respect to those claims.  Baker Tilly Mot. at 20-12; Underwriters Mot. at 10 n.3;

6    Baker Tilly Reply at 12; Underwriters Reply at 6 n.4.  I agree.

7    "Section 11 . . . provides a cause of action to any person who buys a security issued under

8    a materially false or misleading registration statement."  *In re Century Aluminum Co. Sec. Litig.*,

9    729 F.3d 1104, 1106 (9th Cir. 2013).  Section 11 plaintiffs need not have purchased their shares in

10   the actual public offering made under the false or misleading registration statement, so long as

11   they can "trace their shares" back to the offering.  *Id.*  Where a plaintiff cannot demonstrate the

12   traceability of her shares, however, she cannot sue under Section 11.  *See In re STEC Inc. Sec.*

13   *Litig.*, No. 09-cv-08536, 2011 WL 2669217, at *13 (C.D. Cal. June 17, 2011) ("The burden of

14   tracing shares to a particular public offering rests with plaintiffs.") (internal quotation marks

15   omitted); *Guenther v. Cooper Life Sciences, Inc.*, 759 F. Supp. 1437, 1441 (N.D. Cal. 1990)

16   (granting summary judgment for defendant on Section 11 claims where plaintiffs "made no

17   attempt to trace their shares").

18   According to the SACC, only two of the named plaintiffs purchased their Velti shares

19   "traceable to" the IPO and/or SPO.  *See* SACC ¶¶ 44-48.  St. Paul Teachers' Retirement Fund

20   Association ("St. Paul") purchased Velti shares "pursuant to and traceable to" both the IPO

21   registration statement and the SPO registration statement.  *Id.* ¶ 46.  Specifically, St. Paul

22   "purchased 96 shares in the IPO directly from the [Underwriters] and 6,460 shares in the SPO

23   directly from the [Underwriters]."  *Id.*  Frank Borreani purchased Velti shares "pursuant to and

24   traceable to" the IPO registration statement.  *Id.* ¶ 45.  Plaintiffs do not allege that Borreani

25   purchased shares traceable to the SPO registration statement.

26   **1.    St. Paul**

27   Defendants argue that St. Paul cannot bring claims based on the IPO registration statement

28   because its sworn certification shows that it sold all of the shares it purchased in the IPO on the

42

same date it bought them (January 28, 2011) for a $3.00 per share profit. *See* Dkt. No. 29-2 at 4 ("Certification of Plaintiff St. Paul Teachers' Retirement Fund Association Pursuant to Federal Securities Law"). Defendants argue that St. Paul cannot bring claims based on the SPO registration statement either because its sworn certification shows that it had sold all of its Velti shares by March 12, 2013, more than five months before the August 20, 2013 disclosure of the $111 million write off. *See* Dkt. No. 29-2 at 4.[19] Defendants contend that these facts preclude St. Paul from establishing loss causation with respect to any misstatements or omissions in either of the registration statements.

Plaintiffs respond that damages "are not an element of [a] prima facie [Section 11] case," "are presumed for pleading purposes," and "are a fact issue unsuitable for adjudication" on a motion to dismiss. Opp. at 8 n.12. They cite two cases in support of these statements. In *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263 (S.D. Tex. 2005), the court declined to limit a Section 11 class to persons who acquired their shares before and held them through an alleged corrective disclosure. *Id.* at 282-84. The court stated that because Section 11 "imposes strict liability . . . , any decline in value is presumed to be caused by the misrepresentation." *Id.* at 283. In *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276 (N.D. Okla. 2010), the court rejected the defendants' argument that the plaintiff's complaint and sworn certification "establishes conclusively that plaintiff suffered no loss on its purchases of its purchases of securities." *Id.* at 1305. The court stated: "How much damage – if any – plaintiff suffered as a result of the purchases [is a] fact intensive issu[e], the resolution of which is not appropriate" based on the pleadings. *Id.*

I agree with defendants that the timing of St. Paul's purchases and sales precludes its claims under Section 11. While loss causation is not a prima facie element of a Section 11 claim, defendants are afforded an affirmative defense under 15 U.S.C. § 77k(e) to prove that the

---

[19] In their briefing on the preliminary and final approval of their partial settlement with Velti and its directors and officers, plaintiffs identified four partial disclosures during the class period: May 16, 2012, November 15-16, 2012, January 31, 2013, and August 20, 2013. *See* Dkt. No. 199 at 3, 15-16; Dkt. No. 136 at 2-4; Dkt. No. 136-2 at 5 n.5. The SACC alleges only the August 20, 2013 disclosure, however, and plaintiffs identify no other disclosures in their opposition brief. *See* SACC ¶¶ 239-240.

plaintiff's loss, or some portion thereof, was not caused by the alleged misstatements or omissions in the registration statement.  The statute provides in relevant part:

> [I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.

15 U.S.C. § 77k(e).  Courts generally refer to this defense as the "negative causation" defense. *See, e.g., Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 860 (9th Cir. 2013).

A defendant's burden in establishing a negative causation defense under Section 11 is "heavy," but "it is not insurmountable." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1422 (9th Cir. 1994) (internal quotation marks omitted).  "As is the case with any affirmative defense, if the facts as alleged by plaintiffs, and documents which the court may take judicial notice of, establish the . . . defense as a matter of law, then the motion to dismiss may be granted." *In re Shoretel Inc., Sec. Litig.*, No. 08-cv-00271-CRB, 2009 WL 248326, at *4-5 (N.D. Cal. Feb. 2, 2009) (dismissing Section 11 claims for lack of loss causation where "the face of the complaint demonstrate[d]" that the plaintiffs' claimed damages were not caused by the alleged misstatements and omissions); *see also Brown v. Ambow Educ. Holding Ltd.*, No. 12-cv-05062, 2014 WL 523166, at *14-16 (C.D. Cal. Feb. 6, 2014) ("[B]ecause these alleged corrective disclosures do not reasonably evidence the alleged misstatements or . . . omissions . . . , and [the complaint] points to no additional indications of loss causation, the face of [the complaint] demonstrates negative causation."); *Schuler v. NIVS Intellimedia Tech. Grp., Inc.*, No. 11-cv-02484, 2013 WL 944777, at *9-10 (S.D.N.Y. Mar. 12, 2013) (granting motion to dismiss Section 11 claims based on negative causation defense where named plaintiff sold his shares several months before alleged corrective disclosures and did not allege any alternative theory of causation); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009) (noting that courts have dismissed Section 11 claims based on negative causation defense where "the drop in stock price occurred prior to the disclosure of negative information to the public," and, "[c]onsequently, there could be no question that the drop in stock price was not . . . attributable to defendants' alleged

misconduct"); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1262 (N.D. Cal. 2000) (dismissing Section 11 claims brought by shareholders who sold their shares before the corrective disclosures alleged in the complaint; stating that "the complaint reveals that . . . defendants have an absolute negative causation defense").

It is apparent from the face of the SACC and judicially noticeable facts that defendants have an absolute negative causation defense against St. Paul with respect to both registration statements. St. Paul's sworn certification establishes that the 96 shares it bought in the IPO on January 28, 2011 were all sold on the same date for a $3.00 per share profit. *See* Dkt. No. 29-2 at 4. Under 15 U.S.C. § 77k(e), with limited exceptions not applicable here, Section 11 damages are measured by the difference between the amount paid for the security and its price at either: (1) the time the action was filed; or (2) the time the security was "disposed of in the market," if it was disposed of before the action was filed. *See* 15 U.S.C. § 77k(e); *see also In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1204 (9th Cir. 2002) ("[Section 11] damages must be measured by the difference between the amount paid for the security and its price at either the time it was sold or the date the [action] was filed.") (internal quotation marks omitted). Accordingly, "shareholders who sell their stock at a price higher than their purchase price are entitled to no relief under Section 11." *McKesson*, 126 F. Supp. 2d at 1262; *see also Broderbund*, 294 F.3d at 1203-05 (affirming dismissal of Section 11 claim for failure to show damages where named plaintiff earned approximately $17.00 per share on stock at issue). St. Paul cannot bring Section 11 claims based on the IPO registration statement.

St. Paul cannot bring Section 11 claims based on the SPO registration statement either. Its sworn certification establishes that it sold all of its Velti shares months before August 20, 2013, the date of the only corrective disclosures alleged in the SACC. *See* Dkt. No. 29-2 at 4; SACC ¶¶ 232-40. Under *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005), merely alleging that the defendant's stock was purchased at an artificially inflated price is not enough to establish loss causation. *Id.* at 342. Rather, it is only "when the facts become generally known" and "as a result" stock value drops that an investor suffers a cognizable loss caused by the defendant's misstatements or

omissions. *Id.* at 344 (internal quotation marks and alterations omitted).[20]  The SACC contains no theory of causation other than that based on the $111 million write off and other disclosures on August 20, 2013.  *See* SACC ¶¶ 232-40.  Having sold all of its Velti stock by that date, however, St. Paul cannot attribute its losses to those disclosures.  Indeed, based on plaintiffs' allegations, according to which it was not until the disclosures of August 20, 2013 that "the truth" about Velti's bad debt reserves became generally known, "any losses on sales prior to [August 20, 2013] necessarily would be attributable to something other than the alleged misstatements or omissions in the [registration statements]."  *In re Smart Technologies, Inc. S'holder Litig.*, 295 F.R.D. 50, 59-60 (S.D.N.Y. 2013) (emphasis omitted).  St. Paul's Section 11 claims based on the SPO registration statement are barred by defendants' negative causation defense.

### 2.    Borreani

This leaves the Section 11 claims brought by Borreani based on the IPO registration statement.  Defendants argue that Borreani cannot bring these claims because the SACC makes only "conclusory allegations" regarding the traceability of his purchases.  *See, e.g.,* Baker Tilly Mot. at 21.  According to defendants, the vague allegation that Borreani purchased Velti shares "pursuant to and traceable to" the IPO registration statement is insufficient to establish traceability under *Century Aluminum*, given that, according to the IPO registration statement, Velti had

United States District Court
Northern District of California

---

[20] While *Dura* addressed loss causation with respect to claims under Section 10(b), courts have applied its reasoning in analyzing loss causation under Section 11.  *See, e.g., Brown*, 2014 WL 523166, at *15 n.1; *Schuler*, 2013 WL 944777, at *9 n.8; *In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 590 n.4 (S.D.N.Y. 2011); *Shoretel*, 2009 WL 248326, at *4.

previously issued tens of millions of shares on the Alternative Investment Market of the London

Stock Exchange.  Baker Tilly Reply at 13 (citing IPO Reg. Stmt. at 4).[21]

       Defendants also note that Borreani has not provided a certification pursuant to 15 U.S.C. §

77z-1(a)(2)(A), which provides that

> [e]ach plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint, that
>
> (i) states that the plaintiff has reviewed the complaint and authorized its filing;
>
> (ii) states that the plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this subchapter;
>
> (iii) states that the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;
>
> (iv) sets forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint;
>
> (v) identifies any other action under this subchapter, filed during the 3-year period preceding the date on which the certification is signed by the plaintiff, in which the plaintiff has sought to serve, or served, as a representative party on behalf of a class; and

---

[21] The relevant portion of the IPO registration statement states that

> [o]n May 3, 2006, Velti plc was first admitted and trading commenced in our ordinary shares on the Alternative Investment Market of the London Stock Exchange, or AIM. In connection with the initial public offering and placement of ordinary shares, 10,000,000 new ordinary shares were issued at a placing price of £1.00 per share, for gross proceeds of approximately £10.0 million. In October 2007, Velti plc issued 3,580,000 additional new ordinary shares at £2.10 per share in a public offering, for gross proceeds of approximately £7.5 million. In October 2009, Velti plc issued 1,820,000 additional ordinary shares at a price of £1.60 per share, for gross proceeds of approximately £2.9 million. On December 18, 2009, Velti plc completed a scheme of arrangement under the laws of England and Wales whereby Velti plc, a company incorporated under the laws of Jersey, the Channel Islands and tax resident in the Republic of Ireland, became our ultimate parent company. The ordinary shares of our new Jersey-incorporated parent were admitted for trading on AIM on December 18, 2009.

IPO Reg. Stmt. at 4.

> (vi) states that the plaintiff will not accept any payment for serving
> as a representative party on behalf of a class beyond the plaintiff's
> pro rata share of any recovery, except as ordered or approved by the
> court . . .

15 U.S.C.A. § 77z-1(a)(2)(A).  The section 77z-1(a)(2)(A) certification is a "critical part" of a

securities class action in federal court, and "[t]he failure of a named plaintiff to file a certification

with the complaint [is] fatal to the maintenance of the putative class action."  *In re Countrywide*

*Financial Corp. Mortgage-Backed Securities Litigation*, 934 F. Supp. 2d 1219, 1231 (C.D. Cal.

Mar. 21, 2013) (internal quotation marks omitted).  However, courts are "generally . . . lenient in

granting leave to amend the complaint to include this certification."  *Id.* at 1231 n.13; *see also In*

*re Direxion Shares ETF Trust*, No. 09-cv-08011, 2012 WL 717967, at *6-7 (S.D.N.Y. Mar. 6,

2012) ("[D]ismissal for failure to file new certifications where, as here, the operative pleading

states a facially plausible securities law violation would defeat the . . . important policy goal of the

efficiency and economy of litigation.").

   Plaintiffs respond that this is a case where, at the time of the IPO, all of Velti's shares had

been issued exclusively under the IPO registration statement.  Opp. at 7-8.  Plaintiffs point out that

under *Century Aluminum*, in a case where the relevant entity's shares were all "issued in a single

offering under the same registration statement," 729 F.3d at 1106, an investor can establish

traceability by simply pleading that her shares "are directly traceable to the offering in question,"

*id.* at 1107.  "No further factual enhancement is needed because by definition *all* of the company's

shares will be directly traceable to the offering in question."  *Id.* (emphasis in original).  Plaintiffs

do not address how Velti's shares on the London Stock Exchange impact this analysis, although

Baker Tilly did not raise the London Stock Exchange shares until its reply brief.  Plaintiffs also do

not address Borreani's failure to submit a certification, except to argue during the hearing that

section 77z-1(a)(2)(A) only requires a "lead plaintiff" to submit a certification, not "[e]ach

plaintiff seeking to serve as a representative party," 15 U.S.C.A. § 77z-1(a)(2)(A), as the language

of the statute actually says.

   I agree with defendants that, because Borreani has not yet submitted a section 77z-

1(a)(2)(A) certification, his claims must be dismissed.  *See Countrywide*, 934 F. Supp. 2d at 1231

1   (failure to file a certification with the complaint is "fatal to the maintenance of the putative class

2   action").  At oral argument, plaintiffs cited no authority in support of their position that a class

3   representative who is not a "lead plaintiff" need not submit a certification, and in the absence of

4   any, I will require a certification from Borreani.  He shall submit one when plaintiffs file their third

5   amended complaint, if any.

6          Because Borreani has not yet submitted a certification, and because plaintiffs have not had

7   an opportunity to brief how the London Stock Exchange shares impact Borreani's ability to plead

8   traceability, I will not address that issue now.  If and when defendants move to dismiss plaintiffs'

9   third amended complaint, defendants may raise the issue again.

10  **II.      SECTION 12(a)(2) CLAIMS AGAINST THE UNDERWRITERS**

11         Plaintiffs bring Section 12(a)(2) claims against the Underwriters.  SACC ¶¶ 268-77.

12  Sections 11 and 12(a)(2) are "Securities Act siblings" with similar elements.  *In re Morgan*

13  *Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).  "To plead a claim under Section

14  12(a)(2), the plaintiff must allege that (1) the defendant is a statutory seller; (2) the sale was

15  effected by means of a prospectus or oral communication; and (3) the prospectus or oral

16  communication contained a material misstatement or omission."  *Maine State Ret. Sys. v.*

17  *Countrywide Fin. Corp.*, No. 10-cv-00302, 2011 WL 4389689, at *8 (C.D. Cal. May 5, 2011); *see*

18  *also* 15 U.S.C. § 77l(a)(2).  The "misstatement or omission" requirement under Section 12(a)(2) is

19  materially identical to that under Section 11.  *See, e.g., Fait*, 655 F.3d at 110-14 (applying a single

20  misstatement or omission analysis to Section 11 and Section 12(a)(2) claims); *Fairway*, 2015 WL

21  4931357, at *19-20 (applying a single *Omnicare* analysis to Section 11, Section 12(a)(2), and

22  Section 10(b) claims).

23         Neither plaintiffs nor the Underwriters raise any arguments specific to Section 12(a)(2) or

24  attempt to distinguish the Section 12(a)(2) from the Section 11 claims.[22]  For the reasons stated

25

26  _____

    [22] The Underwriters raise the standing and loss causation arguments discussed above only with
27  respect to plaintiffs' Section 11 claims, not with respect to plaintiffs' Section 12(a)(2) claims.
    Accordingly, I do not address the arguments as applied to Section 12(a)(2).  If the Underwriters
28  have a good faith basis for extending the standing and loss causation arguments to Section
    12(a)(2), they may do so if there is further motion practice in this case.

United States District Court
Northern District of California

above with respect to plaintiffs' failure to adequately allege a materially misleading misstatement

or omission under Section 11, plaintiffs fail to do the same under Section 12(a)(2).

## III.   SECTION 10(b) CLAIMS AGAINST BAKER TILLY

Plaintiffs bring Section 10(b) claims against Baker Tilly.  These claims also must be

dismissed.

### A.   Legal Framework

#### 1.   Section 10(b)

Section 10(b) of the Exchange Act makes it unlawful "for any person . . . [t]o use or

employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive

device or contrivance in contravention of such rules and regulations as the Commission may

prescribe as necessary or appropriate in the public interest or for the protection of investors."  15

U.S.C. § 78j(b).  Rule 10b–5, promulgated under Section 10(b), makes it unlawful

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to
> state a material fact necessary in order to make the statements
> made, in the light of the circumstances under which they were
> made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any person, in
> connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.  The basic elements of a Section 10(b) claim are: (1) a material

misstatement or omission; (2) in connection with the purchase or sale of a security; (3) scienter;

(4) economic loss; and (5) loss causation, i.e., a causal connection between the material

misrepresentation or omission and the economic loss.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336,

341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *Zucco Partners, LLC v. Digimarc Corp.*, 552

F.3d 981, 990 (9th Cir. 2009).

#### 2.   Pleading Falsity and Scienter Under the PSLRA

The PSLRA requires a plaintiff bringing a Section 10(b) claim to satisfy a heightened

pleading standard for both falsity and scienter.  *Zucco*, 552 F.3d at 990.  It imposes "exacting

requirements" for pleading falsity.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d

United States District Court
Northern District of California

1049, 1070 (9th Cir. 2008).  The complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why the statements were false, does not satisfy this standard.  *Metzler*, 540 F.3d at 1070.  As under Rule 9(b),[23] a plaintiff pleading falsity under the PSRLA generally must identify "specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made."  *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (quoting *GlenFed*, 42 F.3d at 1549).

The PSLRA's requirements for pleading scienter are similar.  The plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  The required state of mind is either "intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976), or deliberate recklessness, i.e., "recklessness [that] reflects some degree of intentional or conscious misconduct," *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999).  Recklessness in this context "may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that [he or she] must have been aware of it." *Id.* at 976 (internal quotation marks omitted).  "[T]he ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1042 (9th Cir. 2010).

A court considering whether a plaintiff's allegations give rise to a strong inference of scienter "must take into account plausible opposing inferences." *Tellabs Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 323 (2007).  "A complaint adequately pleads scienter under the PSLRA

---

[23] Because plaintiffs' Section 10(b) claims are based on alleged fraudulent conduct, they are subject to Rule 9(b) in addition to the PSLRA's pleading requirements.

United States District Court
Northern District of California

only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx Initiatives Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011) (internal quotation marks omitted); *see also Zucco*, 552 F.3d at 991 ("A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference."). In making this determination, the court must review the complaint and other relevant material "holistically." *Matrixx*, 131 S. Ct. at 1324 (internal quotation marks omitted). "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original).

The Ninth Circuit has observed that "falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." *Daou*, 411 F.3d at 1015; *see also Ronconi*, 253 F.3d at 429 ("Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual pleading requirements of 15 U.S.C. § 78u-4(b)(1) and (b)(2) into a single inquiry.").

Although *Omnicare* concerned statements of opinion under Section 11, several courts to consider such statements under Section 10(b) since *Omnicare* have applied the *Omnicare* analysis. *See In re Lehman Bros. Sec. & Erisa Litig.*, No. 09-02017, 2015 WL 5514692, at *5 n.48 (S.D.N.Y. Sept. 18, 2015) ("*Omnicare* was a Section 11 case. Nonetheless, its reasoning applies with equal force to other provisions of the federal securities laws, including, as relevant to this case, Section 10(b) . . . , which uses very similar language."); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, No. 12-cv-00256, 2015 WL 5311196, at *1 n.3 (S.D.N.Y. Sept. 11, 2015) (same); *In re Amarin Corp. PLC.*, No. 13-cv-06663, 2015 WL 3954190, at *7 n.14 (D.N.J. June 29, 2015) (assuming without deciding that *Omnicare* applies in the Section 10(b) context); *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, No. 05-cv-01151, 2015 WL 2250472, at

52

1    *20 (D.N.J. May 13, 2015) (noting that *Omnicare* "illuminates this Court's Section 10(b) scienter

2    analysis" of defendant's allegedly misleading statements of opinion).

3                          **3.       Section 10(b) Claims Against Auditors**

4           The Ninth Circuit has held that "allegations that an accountant negligently failed to closely

5    review files or follow GAAP cannot raise a strong inference of scienter." *DSAM Global Value*

6    *Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002).

> The proof of scienter in fraud cases is often a matter of inference
> from circumstantial evidence. However, the mere publication of
> inaccurate accounting figures, or a failure to follow GAAP, without
> more, does not establish scienter. Rather, scienter requires more than
> a misapplication of accounting principles. The plaintiff must prove
> that the accounting practices were so deficient that the audit
> amounted to no audit at all, or an egregious refusal to see the
> obvious [or] investigate the doubtful, or that the accounting
> judgments which were made were such that no reasonable
> accountant would have made the same decisions if confronted with
> the same facts.

13   *Id.* (quoting *Software Toolworks*, 50 F.3d at 627-28).  In other words, the plaintiff must plead

14   "specific facts that shed light on the mental state" of the accountant, facts that establish that the

15   accountant "intentionally or knowingly falsified the financial statements" or "knew or must have

16   [known]" of the improper accounting, or that "the audit was such an extreme departure from

17   reasonable accounting practice that [the accountant] knew or had to have known that its

18   conclusions would mislead investors."  *Id.* (internal quotation marks omitted).[24]

19          The "red flag" doctrine guides the inquiry into whether a plaintiff has adequately alleged

20   that an auditor's failure to follow GAAP or GAAS was committed with the requisite mental state.

21   *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011).

22   While GAAP or GAAS violations that are "minor or technical in nature" are generally not enough

23   to support a finding of scienter, "allegations of recklessness have been sufficient where defendants

24   failed to review or check information that they had a duty to monitor, or ignored obvious signs of

25   fraud."  *Id.* (internal quotation marks omitted).  "[T]he more facts alleged that should cause a

26

27   ────────────────

28   [24] This is not to say that scienter allegations against auditors must satisfy a "heavier burden" than
     scienter allegations against other defendants.  *New Mexico*, 641 F.3d at 1095.  That is not the law
     in this circuit.  *See id.*

United States District Court
Northern District of California

1    reasonable auditor to investigate further before making a representation, the more cogent and

2    compelling a scienter inference becomes." *Id.*

3    **B.    Plaintiffs' Claims**

4    Plaintiffs' Section 10(b) claims are based in part on the alleged misstatements and

5    omissions underlying their Section 11 claims against Baker Tilly, discussed above, and in part on

6    alleged misstatements and omissions contained in Velti's annual reports (Form 20-F) for the years

7    2010, 2011, and 2012. Those annual reports were filed on April 12, 2011, April 26, 2012, and

8    April 11, 2013, respectively. *See* SACC ¶¶ 153, 160, 170; Opp. at 4 n.10. Each contained Baker

9    Tilly's audit opinion on Velti's financial statements for at least the preceding year.

10    Plaintiffs allege a variety of misstatements and omissions in connection with the annual

11    reports, each based on the basic theory that, at the relevant times, "a significant portion of [Velti's]

12    receivables were owed by customers in dubious financial condition and were uncollectible,"

13    causing Velti's bad debt reserves to be understated. *See, e.g.,* SACC ¶ 175. More specifically, the

14    alleged misstatements and omissions include that Baker Tilly's audit opinions in the 2010 to 2012

15    annual reports: (1) understated Velti's bad debt reserves; (2) overstated Velti's receivables and

16    revenues; (3) falsely represented that Baker Tilly's audits were conducted in accordance with

17    GAAS; (4) falsely represented that Velti's financial statements were prepared in accordance with

18    GAAP; (5) falsely represented that Velti's internal financial controls were adequate; and

19    (6) falsely represented that Velti made allowances for accounts receivable whenever there was

20    "strong evidence indicating that the amounts due [were] unlikely to be collectible." *See id.* ¶¶

21    153-179.

22    Plaintiffs identify a number of red flags that Baker Tilly allegedly knew of and/or ignored

23    with deliberate recklessness. They include the following:

24    (1) Before Ross's arrival in January 2013, Velti's "only methodology for calculating or

25    allocating reserves against uncollectible receivables was just based on never having a bad debt

26    before and representations by Velti employees that the customers would pay." SACC ¶¶ 61, 189.

27    (2) "Velti had extremely small reserves despite the fact that its accounts receivable

28    [balance] was very old." *Id.* ¶ 189. In support of this observation, plaintiffs point to: (a) the

54

statements by Velti's former Senior Manager of Global Financial Planning and Analysis regarding Velti's DSOs at the end of 2009; (b) the February 2011 reports; (c) Baker Tilly's May 14, 2012 presentation to Velti's Audit Committee, in which Baker Tilly stated that the average DSO for Velti SA was 649 days as of the end of Q1 2012; and (d) the affiliated nature of the VTRIP Entities and their average DSO of approximately 700 days in July 2013.  *Id.*

(3) Velti's accrued receivables balance was "very large [and] old," but Velti did not record any reserves against its accrued receivables until Q4 2012, at which point it recorded only $1 million in reserves against $134 million in accrued receivables.  *Id.* ¶ 189.

(4) According to the annual reports for 2010 to 2012, Velti's accrued receivables represented $33.6 million of $101 million in total receivables in 2010, $98.6 million of $224 million in total receivables in 2011, and $134 million of $303 million in total receivables in 2012. *Id.* ¶ 193.

(5) The Deloitte Report concluded that (a) a "large amount" of Velti's receivables were "very old;" (b) 85 percent of Velti's $192 million in Greek and Cypriot receivables were attributable to only 26 customers, many of which were affiliated or related; and (c) the receivables attributable to these customers were uncollectible.  *Id.* ¶¶ 189, 206.  In addition, at a July 11, 2013 board of directors meeting, Velti stated that it had found that many of these 26 customers "had reported troubling financial information, including evidence of bounced checks, legal orders against them, and other evidence of financial instability."  *Id.* ¶¶ 195, 222.

(6) "[T]he vast majority of Velti's income came from countries (Greece and Cyprus) suffering from a significant financial crisis."  *Id.* ¶ 189.

(7) "Velti had identified internal control problems [and] Baker Tilly had recognized that Velti had internal control problems."  *Id.*

(8) On November 14, 2012, Velti announced that it was reclaiming from third parties $5.1 million in factored receivables that remained unpaid, "indicating that Velti knew these receivables were uncollectible."  *Id.* ¶¶ 62, 217.

Plaintiffs also allege that in or around the summer of 2012, Baker Tilly gave its approval for a proposed transaction, the "SpinCo Transaction," intended to allow Velti to divest itself of

1    certain receivables from customers in Greece, Southeastern Europe, and certain regions in North

2    Africa and the Middle East.  *Id.* ¶ 209.  The receivables to be divested were to come from

3    customers with "high DSOs, rapidly deteriorating revenue, and heavy capital expenditure

4    requirements."  *Id.*  Baker Tilly informed Velti's Audit Committee that the SpinCo Transaction

5    would enable Velti to remove the divested receivables from its balance sheets and then focus on

6    more stable markets such as the United States, Western Europe, and Asia.  *Id.*

7            Plaintiffs state that "hundreds (if not thousands) of man hours were spent on the SpinCo

8    Transaction."  *Id.* ¶ 211.  However, when Velti retained KPMG to assess the transaction, KPMG

9    opined that, "while the . . . transaction could go forward, the divested assets could not be moved

10   off [Velti's] financial statements."  *Id.* ¶ 212.  "Instead, according to KPMG, they would still need

11   to be reported . . . , a result which obviated the very purpose underlying the transaction: divesture

12   of unfavorable customers from Velti's books."  *Id.*  Plaintiffs allege that Baker Tilly subsequently

13   agreed with KPMG, and that at an Audit Committee meeting on May 8, 2013, Baker Tilly

14   "acknowledged that StarCapital (the name for the entity that would serve as the parent of the

15   SpinCo assets) was required to be reported as a variable interest entity."  *Id.* ¶ 213.  Members of

16   Velti's Audit Committee told plaintiffs' counsel that "no less than $11 million" of the $111

17   million in receivables written off in August 2013 is "traceable directly" to the SpinCo Transaction.

18   *Id.* ¶ 214.

19           **C.      Analysis**

20           To the extent that plaintiffs' Section 10(b) claims are based on Baker Tilly's audit opinions

21   on Velti's 2008 to 2010 financial statements – which were included in the IPO and SPO

22   registration statements discussed above – the claims fail for the same reasons as plaintiffs' Section

23   11 claims against Baker Tilly (minus the standing and loss causation issues, which Baker Tilly

24   does not raise with respect to plaintiffs' Section 10(b) claims).[25]

25

26   [25] One other difference between plaintiffs' Section 11 claims and their Section 10(b) claims based
     on Velti's 2008 to 2010 financial statements is that the Section 10(b) claims are not time-barred to
27   the extent that they are based on Velti's alleged misrepresentation of its DSO figures in its
     registration statements.  This difference does not materially impact the outcome on the Section
28   10(b) claims, however, in particular given the PSLRA's demanding pleading requirements and
     that plaintiffs do not allege that Baker Tilly audited Velti's DSO figures.

United States District Court
Northern District of California

1    The Section 10(b) claims also fail to the extent that they are based on Baker Tilly's audit

2    opinions on Velti's 2011 and 2012 financial statements.  As I explained in the Prior Order,

3    "merely plead[ing] that bad debt reserves turned out to be inadequate" is not enough to state a

4    claim based on allegedly misstated bad debt reserves, in particular under Rule 9(b) and the

5    PSLRA.  *See* Prior Order at 20; *see also In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326,

6    361-62 (S.D.N.Y. 2011) ("[T]he fact of a 'massive increase' to loan loss reserves is not, in itself,

7    an indicator that the previous reserve levels were inadequate . . . In the absence of particularized

8    allegations that Wachovia was experiencing or internally predicting losses exceeding [its]

9    reserves, the subsequent disclosures provide no basis to conclude that defendants recklessly

10   misstated previous reserve levels.") (internal quotation marks omitted); *In re Loewen Grp. Inc.*,

11   No. 98-cv-06740, 2004 WL 1853137, at *12 (E.D. Pa. Aug. 18, 2004) ("[N]either the increase in

12   allowance toward the end of the class period nor the eventual financial ruin of [defendants] are

13   proof that defendants committed any acts worse than mismanagement."); *Kane v. Madge*

14   *Networks N.V.*, No. 96-cv-20652-RMW, 2000 WL 33208116, at *5 (N.D. Cal. May 26, 2000)

15   ("[I]t is not enough to allege that the bad debt reserves were inadequate, because even reasonable

16   predictions turn out to be wrong.").

17   Instead, a plaintiff must set forth specific facts demonstrating that the alleged misstatement

18   of bad debt reserves was "a falsehood." *GlenFed*, 42 F.3d at 1549.  A plaintiff "may need to draw

19   on contemporaneous statements or conditions to make this demonstration." *Id.*; *see also Ronconi*,

20   253 F.3d at 432 (under the PSLRA, "the complaint must contain allegations of specific

21   'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately

22   reckless false or misleading nature of the statements when made").  In the context of securities

23   fraud claims based on misstated bad debt reserves, courts have held that claims were insufficiently

24   alleged where they

>    (i) do not identify any specific accounts that were in jeopardy when
>    the alleged misrepresentations were made, *Siegel v. Lyons*, No. 95-
>    cv-03588-DLJ, 1996 WL 438793, at *5 (N.D.Cal. Apr. 26, 1996);
>    *see also Stack v. Lobo*, 903 F.Supp. 1361, 1369 (N.D. Cal.1995);
>    (ii) do not identify any specific accounts in existence at the time the
>    alleged misrepresentations were made that were ultimately rendered
>    uncollectible, *Kane*, 2000 WL 33208116, at *6; and (iii) fail to

25

26

27

28

1   provide "details about . . . when and to what level the allowance
    should have been changed," *Alaska Elec. Pension Fund v. Adecco*
2   *S.A.*, 434 F.Supp.2d 815, 823 (S.D. Cal. 2006); *see also Loewen*,
    2004 WL 1853137, at *11.

3   Prior Order at 22.

4          The allegations in the ACC in support of plaintiffs' Section 10(b) claims were not

5   sufficient under Rule 9(b) and the PSLRA. *Id.* at 30-32. The allegations in the SACC push the

6   claims closer to the line, but they still fall short, in particular with respect to scienter.

7          Plaintiffs now identify receivables that existed when Baker Tilly gave its audit opinions on

8   Velti's 2011 and 2012 financial statements that ultimately proved uncollectible – e.g., the

9   receivables attributable to the VTRIP Entities. But even assuming that plaintiffs now adequately

10  demonstrate that Velti's bad debt reserves were "falsehood[s]" at the relevant times, *see GlenFed*,

11  42 F.3d at 1549, plaintiffs still fail to allege particular facts indicating that Baker Tilly

12  intentionally or knowingly falsified Velti's financial statements, knew or must have known that

13  Velti's reserves were materially understated, or conducted an audit that "was such an extreme

14  departure from reasonable accounting practice that [it] knew or had to have known that its

15  conclusions would mislead investors," *DSAM*, 288 F.3d at 390 (internal quotation marks omitted).

16         Much like their Section 11 claims, plaintiffs' Section 10(b) claims are based principally on

17  the notion that because Velti's receivables had relatively high DSOs, they should have been

18  written off much earlier than August 2013. Given Velti's uncontroverted record of collecting

19  receivables with high DSOs, however, merely alleging that the receivables had high DSOs does

20  little to support a cogent and compelling inference of scienter. Velti's balance of receivables and

21  average DSOs had certainly increased by the end of 2012, but so had its bad debt reserves.

22  Accordingly, the increase in receivables and DSOs, standing alone, does not indicate that Baker

23  Tilly knew or should have known at any time before its final audit of Velti's financial statements

24  that Velti's reserves were insufficient. Plaintiffs also focus on the affiliated or related nature of

25  the entities whose receivables were written off in August 2013. But without allegations indicating

26  that these entities were demonstrable credit risks at the relevant times, their affiliated or related

27  nature is not the sort of red flag that supports a finding of scienter under the PSLRA.

28         The SACC does include some allegations indicating that by the end of 2012, Velti was

United States District Court
Northern District of California

58

United States District Court
Northern District of California

1    experiencing collectability problems.  By the summer of 2012, Velti had begun working on the

2    SpinCo Transaction, and in November 2012, it announced that it had reclaimed $5.1 million in

3    previously factored receivables.  Plaintiffs accurately characterize these allegations as indicators

4    that some of Velti's receivables had proved uncollectible by the end of 2012.  But, again, plaintiffs

5    also allege that Velti had increased its bad debt reserves to $8.0 million by Q4 2012, and to $10.0

6    million by Q1 2013.  *See* SACC ¶ 68.  Plaintiffs do not explain in what way this increase in

7    reserves failed to appropriately account for the collectability problems reflected in the SpinCo

8    Transaction and the reclaimed factored receivables, much less plead facts indicating that Baker

9    Tilly overlooked or ignored these events with scienter.

10   Another one of plaintiffs' possibly more promising allegations is that many of the entities

11   whose receivables were written off in August 2013 "had reported troubling financial information,

12   including evidence of bounced checks, legal orders against them, and other evidence of financial

13   instability."  SACC ¶¶ 195, 222.  This is the sort of information about "contemporaneous . . .

14   conditions," *Ronconi*, 253 F.3d at 432, that could establish scienter in this case.  But not as alleged

15   in the SACC.  Despite their months of discovery from Velti and their access to the Deloitte

16   Report, plaintiffs do not allege which entities reported the troubling financial information, what

17   exactly the information was, when the information first developed or when the entities first

18   reported it, or why the information was "troubling" (as opposed to, e.g., irrelevant or immaterial).

19   Nor do plaintiffs allege when or how Baker Tilly would have obtained the information.  *See*

20   SACC ¶¶ 195, 222.  Although plaintiffs state that by early 2013 Baker Tilly was "testing" up to 90

21   percent of Velti's receivables, plaintiffs do not explain what materials Baker Tilly reviewed in that

22   process, or what information Baker Tilly learned or should have learned from it.  *See id.* ¶¶ 27,

23   201.

24   The allegations regarding Velti's lack of a "mathematical methodology" for calculating

25   bad debt reserves before Ross's arrival adds little to the scienter analysis.  *See* SACC ¶¶ 61, 189.

26   As discussed above with respect to the Securities Act claims against the Underwriters, the

27   allegations in the SACC do not plausibly establish that this alleged state of affairs was materially

28   different from that which Velti disclosed in its registration statements.  The assertion that Baker

59

1    Tilly had "recognized that Velti had internal control problems," *id.* ¶ 189, is also unconvincing,

2    because plaintiffs do not allege any details regarding what those internal control problems were, or

3    what Baker Tilly knew about them.

4           Plaintiffs' efforts to establish scienter are further hampered by the fact that the principal

5    substance of the red flags they allege were plainly disclosed in Velti's financial statements.

6    Plaintiffs repeatedly emphasize that Velti had extremely minimal bad debt reserves in light of its

7    large balance of aging receivables, as if this were a sure sign that Velti and Baker Tilly were

8    intentionally or recklessly deceiving the investing public.  According to the SACC, however,

9    Velti's reserves and receivables were accurately disclosed in all of the financial statements audited

10   by Baker Tilly, from 2008 to 2012.  And while plaintiffs contend that Velti improperly excluded

11   accrued receivables from its DSO figures until May 2012, Velti announced its switch to

12   "comprehensive" DSO within a month of the release of Velti's annual report for the year 2011.

13   *See* Prior Order at 13.  There is no dispute that from that time forward Velti accurately reported its

14   average DSOs.  Plaintiffs also emphasize that Velti's balance of accrued receivables was "very

15   large [and] old," and that Velti did not record any reserves for its accrued receivables until Q4

16   2012, at which point it recorded only $1 million in reserves against $134 million in accrued

17   receivables.  SACC ¶ 189.  But plaintiffs specifically allege that Velti's financial statements

18   consistently and accurately disclosed its balance of accrued receivables, and there is no indication

19   in the SACC that Velti failed to disclose its lack of corresponding reserves.  *See, e.g., id.* ¶ 193.

20   The fact that these alleged red flags were plainly reported in Velti's SEC filings cuts against any

21   inference that Baker Tilly acted with scienter and highlights that, at most, plaintiffs' allegations

22   give rise to an inference of negligence.[26]

23          Whether viewed individually or holistically, the alleged red flags in the SAC do not give

24   rise to a cogent and compelling scienter inference that is "at least as compelling as any opposing

25   innocent inference."  *Zucco*, 552 F.3d at 991.

26   _____

27   [26] That Velti's financial problems were largely, if not wholly, disclosed to the investing public is reflected in Velti's stock price, which had dropped from $16.91 at the end of Q2 2011(the quarter of the SPO) to $1.00 at the end of August 20, 2013, just before the corrective disclosures allegedly

28   hit the market.  *See* SACC ¶¶ 232-40.

1         Finally, the *Omnicare* framework for analyzing allegedly misleading statements of opinion

2 further confirms that plaintiffs have not stated a claim under Section 10(b) based on the allegedly

3 understated bad debt reserves in Velti's 2011 and 2012 annual reports.  With respect to Section

4 10(b)'s false statements clause, plaintiffs do not adequately allege that Baker Tilly did not believe

5 that the bad debt reserves in the 2011 and 2012 annual reports were accurate.  *See* 135 S. Ct. at

6 1326.  Plaintiffs identify no contemporaneous statements to this effect, and as discussed above, the

7 SACC does not contain facts indicating that Baker Tilly knew or must have known that the

8 reserves were understated at the relevant times.  Similarly, with respect to the omissions clause,

9 plaintiffs fail to allege any particular omitted fact going to the basis for Baker Tilly's opinions on

10 Velti's bad debt reserves, whose omission not only rendered those opinions misleading to a

11 reasonable person reading them fairly and in context, but also was committed with the requisite

12 state of mind under the PSLRA.  *See id.* at 1332.  To the extent that plaintiffs have identified

13 particular, material, omitted facts regarding Velti's bad debt reserves that Baker Tilly knew before

14 its final audit of Velti's financial statements, the omission of those facts at most supports an

15 inference of negligence on Baker Tilly's part.  It does not support a cogent and compelling

16 inference of scienter.

17         Plaintiffs fail to state a Section 10(b) against Baker Tilly.

18 **III.**     **LEAVE TO AMEND**

19         The SACC is plaintiffs' fourth unsuccessful attempt to state a claim against defendants.  At

20 oral argument, when asked what new factual matter could be added in a third amended complaint,

21 plaintiffs' counsel was unable to identify any facts that have not already been alleged.  This makes

22 me skeptical that plaintiffs will be able to cure the deficiencies in the SACC, in particular given

23 that plaintiffs have already been afforded an usual level of access to and discovery from Velti and

24 its directors/officers.  Nonetheless, I will give plaintiffs another opportunity to amend.  If they are

25 still unable to state a claim in their next pleading, I will be inclined to find that further amendment

26 would be futile.

27                              **CONCLUSION**

28         For the foregoing reasons, the motions to dismiss are GRANTED, and the SACC is

United States District Court
Northern District of California

1    DISMISSED WITH LEAVE TO AMEND.  Plaintiffs shall file their third amended complaint, if

2    any, within 30 days of the date of this order.

3         **IT IS SO ORDERED**.

4    Dated: October 1, 2015.



_____

5         WILLIAM H. ORRICK
     United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

62